M.
Callahan

STATE OF MICHIGAN

34TH JUDICIAL DISTRICT COURT COUNTY OF WAYNE

THE STATE OF MICHIGAN

07-24733

CASE NO.   07-4683,
           07-4682

v

PAULA RENA BENNETT,
KYRON DARELL BENSON

                    Defendants.
                                      /

ORIGINAL

PRELIMINARY EXAMINATION

BEFORE THE HONORABLE BRIAN A. OAKLEY, DISTRICT JUDGE

Romulus, Michigan – Wednesday, December 12, 2007

APPEARANCES:

For the People:          Ms. Molly A. Kettler    P59877
                         Wayne County Prosecutors Office
                         1441 Saint Antoine Street
                         Detroit, Michigan 48226
                         (313) 224-6692

For Defendant Bennett:   Mr. Walter A. White    P27792
                         7215 Belleville Road
                         Belleville, Michigan 48111
                         (734) 328-3820

For Defendant Benson:    Mr. Raymond R. Burkett    P30155
                         220 Bagley Street, Suite 210
                         Detroit, Michigan 48226
                         (313) 961-0192

Recorded by/Transcribed By:   Paula K. Moore    CER 5234
                              Certified Electronic Recorder
                              (734) 941-4462

1-2-08

1

TABLE OF CONTENTS

WITNESSES:          PEOPLE                                    PAGE

JESSICA GRACE FRITZ
        Direct Examination by Ms. Kettler              8
        Cross-Examination by Mr. Burkett               67
        Cross-Examination by Ms. White                 87
        Redirect Examination by Ms. Kettler            109
        Continued Cross-Examination by Mr. Burkett     183

BREANNA NICOLE KANDLER
        Direct Examination by Ms. Kettler              114
        Cross-Examination by Mr. Burkett               156
        Cross-Examination by Mr. White                 174




WITNESSES:          DEFENDANT
NONE










EXHIBITS:                        MARKED        RECEIVED
NONE

Romulus, Michigan

Wednesday, December 12, 2007 - at 10:01 a.m.

THE COURT: People versus Paula Bennett and Kyron Benson.

MS. KETTLER: Good morning, your Honor. Molly Kettler, P59877, on behalf of the People of the State of Michigan.

THE COURT: Thank you.

MR. WHITE: Walter White appearing with and on behalf of Paula Bennett, as counsel.

THE COURT: Thank you.

MR. BURKETT: Good morning, uh, Judge Oakley. Raymond Burkett appearing on behalf of, um, Mr. Benson in this matter.

THE COURT: Good morning, all. Are we ready to proceed?

MR. WHITE: We are.

MS. KETTLER: We're ready, your Honor.

MR. BURKETT: Yes. Uh, your Honor, prior to proceeding, two quick things. Uh, number one, I--I'm going to make a motion to sequester, uh, the witnesses, out there.

MR. WHITE: I join in that motion.

MR. BURKETT: I'll make--I'll make sure our witnesses will step out.

MS. KETTLER: I, uh, would join in that, um,

3

motion, as well. But, I would ask for an exception for the officer in charge.

THE COURT: Gentlemen?

MR. BURKETT: No problem. I mean, of course.

THE COURT: Thank you.

Folks, if anyone is in the courtroom now, that could be called to testify today at some--or, at some later date, please step out into the hallway until you're called in.

I don't see anybody leaving. Anybody stay that shouldn't, gentlemen?

MR. BURKETT: I kept my folks already outside.

MR. KETTLER: Your Honor, I'd ask the officer in charge to look. Obviously, I'm not familiar with anybody-- everybody. But, I want to be sure, uh, that Kathleen McIntyre, in particular is, uh, not in the courtroom. And, I would ask the Court, also, to advise people the meaning of the sequestration order. That means even though you may be able to stay in court, not to discuss what you hear in here.

MR. BURKETT: I'd agree with that.

THE COURT: Okay.

MR. WHITE: I agree.

THE COURT: Understand, folks, that if you are in the courtroom you are not allowed to discuss what you hear in the courtroom with somebody that's waiting out in the hallway

4

to be called in to--as a witness. If you do that it could make the whole proceedings go south quick, and then none of us want that.

Uh, counsel, you don't have to jump up to talk to me.

MS. KETTLER: Oh.

THE COURT: It--it's okay if you do.

MS. KETTLER: Okay.

THE COURT: I know sometimes it's instinctive for attorneys, but you don't have to jump up for me.

MS. KETTLER: Okay.

MR. BURKETT: You see, I'm still standing.

THE COURT: You've heard that from me before, Mr. Burkett.

MR. BURKETT: Yes.

THE COURT: Now, we're ready to start?

MR. BURKETT: One other matter, your Honor.

THE COURT: Go ahead.

MR. BURKETT: Your Honor, as--as you're well aware of this is a First Degree Murder hearing, and of course there can be none any more serious. And, I'm--I don't want to rush through anything. The prosecutor has advised me that she's going to follow the statute in terms of, um, investigating subpoena testimony, which means she won't let us see the transcript until after the folks have testified. Uh, she can

do that, of course. But, that puts me in a predicament that prior to my cross-examining folks, I need to read these transcripts. And, it would be unfair for me to just to rush in to it, which is going to delay the proceedings. I've asked her to give them to me ahead of time so we don't delay the proceedings. What difference does it make, I mean, I'm going to have them. But, I mean, I--I'm just letting you know that the delay won't be on my part.

THE COURT: Okay. Anything else?

MS. KETTLER: I don't believe so. I believe we're, uh--we do have one stipulation, though, your Honor.

THE COURT: I love that, go ahead.

MS. KETTLER: Okay. Uh, it's my understanding from talking with counsel that we're going to stipulate to the testimony of the medical examiner and the identifier.

I'm sorry, I did not discuss this with you, Mr. Burkett.

MR. BURKETT: No.

MS. KETTLER: But, I did give you a, uh, copy of the examination. I discussed it with Mr. White. Are you, um, requiring the, um, calling of the medical examiner?

MR. BURKETT: I am not.

MS. KETTLER: Okay.

I believe then, your Honor, that we will stipulate to the admission of what I am going to ask Madam Court

Reporter to mark as People's preliminary examination one.

That is the entire, uh, autopsy report. And, the following

stipulation that if Doctor Sommerset--J. Scott Sommerset were

here, he would be qualified by the Court as an expert in

forensic pathology, and permitted by the Court to give his

expert opinion. And, he would testify that he performed an

autopsy on Stephanie McClure on October 7, 2007, and that,

uh, Stephanie McClure, a twenty-two-year-old, white female

died of multiple gunshot wounds, mainly five. And, that the

manner of death is homicide and, um, that Ms. McClure was--

Ms. McClure's remains were identified by her family at the

morgue.

        Is that a correct stipula--stipulation for exam

only, counsel?

        MR. BURKETT: Yes, I'm sorry. Yes, it is.

        MR. WHITE: I agree for purposes of exam only it is

so stipulated.

        THE COURT: Thank you, all.

        MS. KETTLER: And, I am providing a copy of that to

the court reporter. And, at this time, your Honor, the

People would ask, uh, the Court's permission to proceed and

to call Jessica Fritz as our first witness.

        THE COURT: John, are you going to grab her?

        OFFICER TOTH: Yes, sir.

        THE COURT: Thank you.

Ms. Fritz, watch your step on that ramp right there.  Raise your right hand for me.  Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth?

MS. FRITZ:  Yes.

THE COURT:  Have a seat.  I'm going to ask you to speak very loudly, keep your voice up.

MS. FRITZ:  Okay.

THE COURT:  Try to avoid answers like um-hmm and uh-huh.  Try to stick with yeses, noes, and I don't knows.  Head nods, we can't record.

Counsel, proceed.

JESSICA GRACE FRITZ

called by the People at 10:06 a.m. and sworn by the Court; testified:

MS. KETTLER:  Thank you.

DIRECT EXAMINATION

BY MS. KETTLER:

Q    Good morning.  Uh, would you please state your full name for the record?

A    Jessica Grace Fritz.

Q    All right.  And, Ms. Fritz, you are here pursuant to receiving a, uh, subpoena, a court order to appear, is that right?

A    Yes.

Q  And, I've discussed with you prior to, uh, you're being called here, in addition to the Judge swearing you in, I've discussed the fact with you that you're under oath and that you'd have to tell the truth in this proceeding, is that correct?

A  Yes.

Q  Okay.  Ms. Fritz, I'm going to ask you a couple of background questions first.  First of all; how old are you?

A  Seventeen.

Q  All right.  And, you need to keep your voice up nice and loud, please.

A  Okay.

Q  And, do you know, um, either of the, uh, defendants that are seated at the table to my right?

A  Yes.

Q  Okay.  Who do you see there that you know?

A  Paula.

Q  All right.  And, what's Paula's last name?

A  Bennett.

Q  And, how long have you known Paula Bennett?

A  Um, about two years.

Q  Okay.  And, what--what was the nature of your relationship with her, were the two of you friends?

A  Yeah, my best friend.

Q  Okay, best friend.  What about, uh, the young man that's

9

1      seated at the table in--

2  A   Oh, I didn't--

3  Q   --in the green?

4  A   --I didn't even see him.

5  Q   Okay.  Do you know him?

6  A   Yes.

7  Q   What's his name?

8  A   Kyron.

9  Q   Do you know his last name?

10 A   Benson.

11 Q   All right.  And, how long have you known Mr. Benson?

12 A   About a couple--five months.

13 Q   Okay.  And, how do you know Mr. Benson?

14 A   Paula's boyfriend.

15 Q   Okay.  So, you know him through her, is that correct?

16 A   Yes.

17 Q   Did you know him before the two of them became involved?

18 A   I knew of him, but I never talked to him.

19 Q   Okay, all right.  And, did you know the young lady who was

20     killed, Stephanie McClure?

21 A   Yes.

22 Q   How long have you known Stephanie?

23 A   About three months.

24 Q   All right.  And, were the two of you friends?

25 A   Um-hmm, yeah.

Q    Okay.  Did you go to school with any of these people that

I've asked you about?

A    Paula.

Q    Okay.  And, what school was that?

A    Lincoln High School.

Q    Okay.  Did you graduate from there?

A    No, not yet.

Q    Okay.  Did Paula already graduate?

A    Yes.

Q    Is that where you got to know Paula?

A    Yes.

Q    Okay.  I want to, um, first of all direct your attention back

to October 6, 2007.  Um, do you recall, uh, did, um--on that

date spending some time with your friend Paula?

A    Yes.

Q    Okay.  Do you also recall being in the presence of Mr. Benson

at some point during that day?

A    Yes.

Q    All right.  I want to ask you first of all, um, when did you

first come into contact with Paula that day?

A    Her--Paula and Breanna picked me up at my house about 8:30.

Q    In the morning?

A    No, at night.

Q    Okay.  At your house?

A    Yes.

Q   And, who is Breanna and what's Breanna's last name?

A   Kandler.

Q   Okay.   They picked you up at your home?

A   Yes.

Q   Who was, uh--was that in a vehicle?

A   Yes.

Q   Who was driving?

A   Breanna.

Q   Uh, what--whose vehicle was that?

A   Breanna's.

Q   Okay.   And, was there a particular purpose that they picked you up at your house for?

A   Yes.   We were going to Cluck's, that's where Katie works.

Q   And, who is Katie?

A   Our friend.

Q   Okay.   What's Katie's last name?

A   McIntyre.

Q   All right.   So, you, and Breanna, and Paula were gonna go to Cluck's, is that right?

A   Yes, to pick up Katie.

Q   All right.   And, did you arrive at that location?

A   Yes.

Q   Did you have any, um, conversations on the way to Cluck's with Breanna and Paula?

A   Um, about what we were gonna do that night.

12

Q    Okay.  And, what was your plan to do that night?

A    Uh, we were supposed to go bowling.

Q    Okay.  Did you have any conversations at all about Stephanie, in the car on the way to Cluck's?

A    No.

Q    Okay.  Did you have any conversations about Kyron?

A    Um, we--yeah.  Paula told me we can't go bowling--

                MR. BURKETT:  Judge, I'm going to object to what Paula told her.

                MS. KETTLER:  This is offered only against Ms., uh, Bennett.  And, it's an admission against her.

                MR. BURKETT:  If it's only offered towards Ms. Bennett, I guess I can't object to that.

                THE COURT:  That's what I was thinking.

                MR. BURKETT:  Beg your pardon?

                THE COURT:  That's what I was thinking.

                MR. BURKETT:  Oh, okay.

                THE WITNESS:  Do you want me to answer that?

                THE COURT:  So, I'll overrule your objection.

                Yes, please answer the question if you--

                THE WITNESS:  All right.

                THE COURT:  --remember the question.  If you need it to be repeated, we can do that.

BY MS. KETTLER:

Q    Did Paula say something to you about Kyron or Stephanie?

13

A    Not Stephanie.  We--she told me that we can't go bowling

because she had to give her money to Kyron.

Q    Okay.  And, that's in the car on the way to Cluck's, is that

right?

A    Yes.

Q    Uh, when you arrived at Cluck's, did, uh--you went there to

pick up your friend, is that right?

A    Yes.

Q    And, was she ready to go when you arrived there?

A    Uh, we had to wait in the car about five minutes.

Q    Okay.  And, that's--that was who again?

A    Katie McIntyre.

Q    Okay.  And, when Katie came out, uh, did she come out to the

car that you were in?

A    Yes.

Q    All right.  And, from there, did you all go somewhere?

A    Yes.  We went to Paula's.

Q    Okay.  And, Paula Bennett?

A    Bennett, yeah.

Q    And, where was Paula living at that point in time?

A    Harbor Club.

Q    Are those some apartments?

A    Yes.

Q    In Belleville.

A    Yes.

Q    On the service drive.

A    Yes.

Q    Okay.  While you were driving from Cluck's to Paula's apartment, did you have any conversations about Stephanie or, uh, Kyron?

A    Um, not about Stephanie.  Um, we had to wait at--Paula had to call Kyron because Kyron had the other set of keys to her house.

Q    Okay.  So, you heard Paula call Kyron--

A    Yeah.

Q    --is that right?

A    Yes.

Q    On the cell phone.

A    Yes.

Q    And, what did you hear Paula talking about on the cell phone to Kyron?

A    That she needed him to come to the apartment and let us in, or give her, her keys.

Q    Okay.  And, when you then arrived at, uh, the house--or, the---I'm sorry, Paula's apartment, was Kyron there with the keys, yet?

A    Nope.

Q    How long did you wait, or did Kyron appear eventually?

A    Yes, about thirty minutes later.

Q    Okay.  And, where did you wait while you were waiting for

15

1      Kyron to come with, um, Paula's house keys?

2   A   At the park acro--like, it's right by her apartment.

3   Q   Okay.  Did you wait in the vehicle?

4   A   No.

5   Q   Okay.  Where--you were outside in the park?

6   A   Yes.

7   Q   All right.  And, did you have any conversations about

8      Stephanie during that period of time?

9   A   No.

10  Q   What about anything about Kyron, except about the pho--um,

11     need for him to bring the keys?

12  A   No.

13  Q   All right.  When Kyron arrived, uh, did you see how he got

14     there?

15  A   Yes.

16  Q   Uh, was it in a vehicle?

17  A   Yes.

18  Q   Uh, what type of vehicle?

19  A   Um, it looked like a green Grand Prix.

20  Q   Okay.

21  A   An old one.

22  Q   And, was he driving the vehicle, or was someone else driving?

23  A   He was driving.

24  Q   Was he alone or with someone else?

25  A   He was alone.

Q   Okay.  And, did he come out to the park where you were, or what happened when he arrived there?

A   Um, we--we saw him pull in, so we started walking towards the door.

Q   Okay.  Towards the door for the apartment building.

A   Yes.

Q   All right.  And, at that point then, did he, uh--uh, let you into the apartment?

A   Yes.

Q   All right.  When you, uh, went into the apartment then, who all went into the apartment?

A   Me, Paula, Kyron, Breanna, and Katie.

Q   Okay.  And, when you went into the apartment, uh--what happened when you went into the apartment?

A   Um, they had this dog--

Q   Who is they?

A   Paula and Kyron.

Q   All right.  At that time did Kyron live at that apartment with Paula?

A   Um, yeah.  I'm gonna say yeah because--

Q   Well he spent a lot of time there, at the least.

A   Yeah.

Q   Is that right?

A   Yeah, yes.

Q   Okay.  He had keys to the apartment.

17

A   All of his stuff was there, yeah, he had keys.

Q   Okay.  And, you said the two of them had a dog, is that right?

A   It was just--they just got it.

Q   Okay.  What kind of dog was it?

A   It was a pitbull, it was a baby.

Q   Young puppy?

A   Yeah, baby, yeah.

Q   All right.  So, when you got to the apartment, what happened?

A   Um, as soon as--as soon as I got into the--as soon as we all walked in, I started asking--I'm like, where's--where's Moo Moo (phonetic), that's his--that was his name.  And, it wasn't nowhere to be found.

Q   All right.

A   And--

Q   Were you, uh--you and the other people in the apartment looking around the apartment--

A   Yeah.

Q   --for the dog?

A   Yes, everywhere.

Q   Okay.  What did you see Kyron do?

A   He wasn't doing--I mean, he was just standing there.

Q   Okay.

A   And--

Q   At some point, did you--

18

A    Yes.

Q    --see him do something?

A    No. And--

Q    Did you--I'm sorry.

A    I heard him make a joke and he said why don't you look in-- well, maybe you should check the freezer.

Q    All right. Well, you took it as a joke, right?

A    I mean, who would say--I took it as a joke because nobody in their right mind would say that. So, we start looking and I say--I say; Kyron, how about you go look in the freezer.

Q    And, what did Kyron do?

A    He looked in the freezer and he--I said Kyron is there--is there anything in there. And, he paused for about ten seconds and he brings out this box. And, he sets it on the counter, and I started crying, and I said, no Kyron, oh my God, no. And, he pulls--he pulls it out and it's a bag, with like a strap that you pull and it tightens at the top. And, the dog's in there, dead.

Q    Okay.

A    And, he's saying; Stephanie did it, Stephanie did it. And, I said no. And, me and Paula got in a argument about who did it. And, she said; if you think Kyron did it then you can leave. And, I walked out in the hallway--and I walked out in the hallway and called my mom.

Q    Okay. Who walked out in the hallway with you?

19

A    Just me.

Q    Okay.  And, so when you left and went out into the hallway, everybody you mentioned before; Paula, uh, Kyron, Breanna, and Katie were still in the apartment, is that right?

A    Yes.

Q    All right.  You called your mom to come over, is that right?

A    Yes.

Q    Okay.

A    No.  I--I just called her and told her--asked her what I should do.

Q    Okay.  And, after you stepped out in the hall and had that conversation, uh, what happened next?

A    Um, Paula came outside--came out in the hallway, and got me, and told me to come back inside.  And, then, you know, she saw I was upset, so--

Q    So, Paula asked you to come back into the apartment, is that right?

A    Yes.

Q    And, did you do that?

A    Yes.

Q    Okay.  When you went back in the apartment, what happened?

A    They were discussing what to do with the dog.

Q    Who is they?

A    Paula, Kyron, Breanna, and Katie.

Q    Okay.  And, uh, was anything done with the dog?

20

A    Yes.

Q    All right.  What was--what did you see done with the dog?

A    They--we all--me, Paula, Breanna, and Katie, went in Paula--
     in Breanna's car.  Paula said we couldn't--we had to drop it
     off somewhere because somebody would find it in her dumpster.

Q    Paula said that?

A    Yes.

Q    All right.

A    And, I went with 'em because I'm not gonna stay in that
     apartment by myself.  So, I went with 'em and they dropped it
     off on Button Road, in a--on an abandoned house.

Q    Okay.

A    In a laundry basket.

Q    Who carried the dog out to the car?

A    Paula.

Q    Okay.  Did Kyron go with you to drop off the dog?

A    Nope.  He left.

Q    All right.  Um, how long did Kyron stay at the apartment
     after, uh, he pulled the dog out of the freezer?

A    About fifteen minutes, fifteen, twenty minutes.

Q    Okay.  When you went back into the apartment, did Kyron say
     anything to you?

A    No.

Q    Okay, all right.  So, then you, Paula, Katie, and Breanna go
     to take this dog to this place on Button Road, right?

21

1    A    Yes.

2    Q    And, what kind of place was it?

3    A    Um, it was a house, but nobody lived in it.

4    Q    Okay.  Um, who actually got out of the car with the dog?

5    A    Paula.

6    Q    How long did you stay at that location?

7    A    Uh, about a minute-and-a-half.

8    Q    Okay.

9    A    Just long enough for her to--she didn't even--she didn't even

10        really get out of the car.  She just opened it, leaned out,

11        and put it on the ground.

12   Q    Okay.  And, where did you go from there?

13   A    Back to the apartment.

14   Q    Okay.  When you got back to the apartment, what happened?

15   A    Um--

16   Q    Well, let me stop you, sorry to interrupt you.  Did everybody

17        who was in the car when you went to dump off the dead dog, go

18        back to the apartment?

19

20   A    Yeah.

21   Q    What?

22   A    Yes.

23   Q    Okay.  And, when you got back to the apartment, uh, what

24        happened then?

25   A    We were--we sat down on the couch, turned on the T.V., and

         was talking about the dog's kill, and who really did it, um,

1      for about ten minutes.  Paula--uh, and then Breanna left

2      because, she said it--this was about, uh, 10:30, 11:00, and

3      Breanna--Breanna has curfew.  So, Breanna had to go home, so

4      she left.

5    Q  Okay.  And, then what did you do?

6    A  Uh, me, Breanna, and Paul--me, Breanna--or, me, Katie, and

7      Paula were watching--started watching Desperate Housewives.

8    Q  All right.  I'm sorry; you said Katie had gone home?

9    A  No, Breanna.

10   Q  Breanna went home, so you, Katie, and Je--and, uh, Paula were

11     watching Desperate Housewives, is that right?

12   A  Yes, yes.

13   Q  All right.  And, while you--about what time is this, at this

14     point in time?

15   A  About eleven.

16   Q  All right.  Eleven o'clock at night?

17   A  Yes.

18   Q  Is Kyron there?

19   A  No.

20   Q  All right.  Now, how long was--or, was Stephanie--do you know

21     where Stephanie was living at before she was killed?

22   A  She--I--I believe she was moving out of Paula's.

23   Q  Okay.  At some point in time before her death, were you aware

24     of Stephanie living at Paula's apartment with her?

25   A  Yes.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q   Do you know approximately how long that went on?

2   A   About two weeks.

3   Q   Okay.  And, you said previously--was that also at that time

4       Kyron was living there for the most part?

5   A   Yes.

6   Q   Okay.  At some point in time, um, did Paula complain to you

7       about something that she believed that Stephanie had done?

8   A   Yes.

9   Q   Okay.  And, what did she complain to you about Stephanie

10      doing?

11  A   She told me that Stephanie stole her laptop, and Play Station

12      Two, and her shoes.

13  Q   Okay.  And, uh, when was it that Paula complained to you

14      about this?

15  A   What--what day was October--what day was October 6th, on?

16  Q   Okay.  I can't--

17  A   You can't tell me?

18  Q   --I can't tell you.  In rela--just tell us--let's do it this

19      way--

20  A   About--about four days before--

21  Q   Okay.  Be--

22  A   --before the day that we were watching Desperate Housewives.

23  Q   Okay.  So, about four days before the night that you were

24      watching--

25  A   Yeah.

24

Q    --Desparate Housewives?

A    Yes.

Q    Paula had complained to you about Stephanie taking some things that belonged to her, is that right?

A    Yes.

Q    And, um, did she--how did she say that she felt about that?

A    She said she was mad because she let her live with her and she never thought she would do that to her.

Q    Okay, all right. And, did Kyron ever say anything to you about, uh, these items being taken from, uh, Paula?

A    No.

Q    All right. Did--other than the fact that Paula told you that these items were missing and she thought Stephanie had them, did she say anything else about, um, where she thought they might be, or what she thought Stephanie was going to do with them?

A    Um, Paula told me that Breanna called her the next--the day after that she found out that they were missing, and said that Stephanie left a voice mail on her sister's voi--on her sister's cell phone saying; I have a Play Station Two and a laptop for sale if you know anybody who wants it. And, I guess that's how she came to think that Stephanie had it.

Q    Okay. Paula--

A    Or, to know that Stephanie had it.

Q    --Paula told you that someone had told her this?

25

A    Yes.

Q    Okay. And, was that the same day that Paula told you these items were missing?

A    That was--it was the next day.

Q    Okay. By the--you--you said that it only lasted maybe, about two weeks that Stephanie was staying with Paula and Kyron, is that right?

A    Yeah. And, she didn't stay there every night.

Q    Okay.

A    It was--you know--

Q    Was there a point in time where--did you spend a lot of time at that apartment?

A    Yeah, yeah.

Q    Was there a point in time where, um, Stephanie kind of formally moved out, or did she just stop coming around?

A    Yeah. She just kind of stopped coming around.

Q    Okay. And, did you at any point ask Paula about that?

A    No verbal response.

Q    You know, what's going on with Stephanie, or anything like that?

A    No.

Q    Okay. So, you said she just kind of stopped coming around, is that right?

A    Yeah.

Q    And, by the time of the night that you were watching

1

2     Desperate Housewives, had Stephanie moved her things out of

     the apartment?

3

4  A   She never--she never really had a lot of her things there.

     She just slept there sometimes.

5

6  Q   Okay, all right.

7  A   Like, I really never saw any of her stuff there beside--you

     know--

8

9  Q   All right.  Well, by the time of the night that you were

     watching Desperate Housewives, had she stopped coming around?

10

11  A   Yes.

12  Q   Okay.  When you were, um--I want to take you back to the time

     now when you went with your friends to the apartment, Ky--

13

14     Kyron and Paula's apartment, uh, when you found this--or when

     Kyron pulled the dead dog out of the freezer and said

15

16     Stephanie did it.  Um, do you recall at this point in time

     any, um, things that Kyron said about Stephanie, or

17

18     Stephanie's relationship with Paula?

19  A   No.

20  Q   Okay.  Do you recall that you gave a statement in this case,

     a written statement to the police?

21

22  A   Yes.

23  Q   Okay.  And, do you also recall that you gave an investigative

     subpoena at the office of the Wayne County Prosecutor?

24

25  A   Yes.

  Q   Okay.  And, at that point in time that you gave that

27

investigative subpoena, were you--uh, was it me or another prosecutor who did that with you?

A    It was another prosecutor.

Q    Okay. And, that was Mr. Moran?

A    No verbal response.

Q    Oh, I'm sorry, Ms. Kowal?

A    Yeah.

Q    Did Ms.--at that point in time, Ms. Kowal advised you that you were under oath just as if you were in court?

A    Yeah.

Q    Did she advise you that your testimony there, uh, was subject to penalty of perjury if you lied or misled in your answers?

A    Yes.

Q    Did she advise you that you had a right to have an attorney at that proceeding?

A    Yes.

Q    Did she advise you that you had a right not to answer anything that you would incriminate you?

A    Yes.

Q    Okay. And, do you recall talking, uh, with an--do you recall that at that time there was a court reporter taking that all down?

A    Yes.

Q    Okay. And, do you recall at that point in time, uh, telling Ms. Kowal something that Kyron said about Paula and

28

Stephanie's relationship?

A   No.   Not--

Q   Okay.   I--I think I asked you earlier.   Did you say--did Kyron say--I think you answered this, but I just want to be sure it's on the record.   Did Kyron say who he thought killed the dog?

A   Stephanie.

Q   Okay.   And, do you recall, uh, telling police and prosecutors that Kyron said Paula lets people walk all over her?

A   Yes, I do.

Q   Okay.   Does that refresh your memory?

A   Yes, it does.

Q   Do you remember anything else he said in that apartment?

A   She--he--he always tells her--told her that she's too nice to people.   She does--you know--

Q   Okay, all right.   Do you remember at that point in time--is that the point in time that you stepped outside to make a phone call?

A   No verbal response.

Q   After he said those things in the apartment, did you go out on a balcony or something to make a phone call?

A   Yes.

Q   Okay.   And, after you made that phone call, uh, did you have some conversation with Paula on the balcony?

A   Yes, I did.

1

Q    Okay.  And, what did Paula say--did Paula come out to the

2    balcony?

3

A    Yes.

4

Q    And, what did Paula say to you?

5

A    Um, she said her and Kyron were going to Paula's (sic)

6    apartment to get her house keys.

7

Q    Okay.  Going to whose apartment?

8

A    Or, Stephanie's aunt's house.

9

Q    Okay.  So, they--she said they--that she and Kyron were gonna

10    go to Stephanie's and wait for Stephanie, is that right?

11

A    Yes.

12

Q    What were they gonna get besides her keys to her apartment?

13

A    Um, her--try to get her shoes, and her laptop, and Play

14    Station Two back.

15

Q    Okay.  So, by this time Stephanie had stopped coming around,

16    you've--we've covered that, already.  Um, did you,

17    personally, know at that point in time who--where Stephanie

18    was living?

19

A    No.

20

Q    Okay.  So, this information about Stephanie's aunt's house--

21

A    That's just from--

22

Q    Came from Paula?

23

A    Yes.

24

Q    Okay.  And, when Paula told you that, um, did the two of them

25    leave?

A    Yes.

Q    Did they leave together?

A    Yes.

Q    Okay.  Is this later on in the evening, or right after the dog is found?

A    This was about 1:30.

Q    Okay, all right.  Let me go back, I'm sorry.

A    Okay.

Q    Let me go back to the time you're watching Desperate Housewives.  Do you watch that whole show before something else happens?

A    Yes.

Q    Okay.  What--and after you're done watching that, what happens?

A    We--we watch--we have the--she--Paula has the whole series, so we were watching 'em.

Q    Oh, you're watching them on DVD?

A    Right, yeah.

Q    Okay.  At some point, did someone come over to the house while you were watching these shows--or, they apartment?

A    Well, before that Katie went into Paula's bedroom and went to bed.

Q    Okay.

A    And, me and Paula were still watching it.

Q    So, now it's just you and Paula--

31

```
 1   A    Yes.

 2   Q    --on the couch, watching Desperate Housewives?

 3   A    Yes.

 4   Q    And, what happens then?

 5   A    Kyron gets there about 1:30.

 6   Q    Okay.  Did you hear, before Kyron got there at about 1:30,

 7        did you hear Paula having any conversations with him on the

 8        phone?

 9   A    No.

10   Q    Okay.  He just shows up.

11   A    Yes.

12   Q    And, at that point in time, how does he get in?

13   A    No verbal response.

14   Q    Do you have to buzz him in, or does he have his key?

15   A    No.  We--Paula buzzed him in.

16   Q    All right.  And, when he gets there, what happens?

17   A    Um, they were--I was on the balcony.  That's when--

18   Q    Okay.  That's when you're--

19   A    Right.

20   Q    --on the balcony to make a phone call?

21   A    Right.

22   Q    And, at that point you're calling who?

23   A    My boyfriend, Ricky.

24   Q    Okay.  Earlier on, you had called your Mother?

25   A    Yes.
```

32

Q   And, then Kyron leaves and comes back, and then you're on the balcony call--talking to Rick--calling Ricky, is that right?

A   Right.

Q   And, what's Ricky's last name?

A   Wren.

Q   Okay.  Is this when Paula comes out on the balcony?

A   Yes.

Q   And, is this when Paula tells you what you testified previously to, that they're gonna go wait for Stephanie at Stephanie's aunt's house?

A   Yes.

Q   Okay.  And, is this the time when you see Paula and, um, Kyron leave together?

A   Yes.

Q   All right.  And, do you just see them leave the apartment, or are you still out on the balcony, or do you go back inside?

A   No.  I go back inside when they leave.

Q   Okay.  The two of them leave together, is that right?

A   No verbal response.

Q   Did you--

        THE COURT:  Is that a yes?

        THE WITNESS:  Yes.

        THE COURT:  Thank you.

BY MS. KETTLER:

Q   Uh, did you--did they say anything--either one of them say

33

anything else before they left?

A   Well, when I was talking to Paula on the balcony and she was telling me, uh, Kyron sticks his head out the window and says let's go shoot this move.  But that's, uh--

Q   Let's--let's go shoot this move.

A   It means let's hurry up, let's go.

Q   Okay.  So, that's what Kyron sticks his head out and says to you, as Paula's on the balcony telling you; we're gonna go wait for Stephanie, is that right?

A   Yes.

Q   All right.  And, is that the point in time when they left?

A   Yes.

Q   All right.  And, so at that point in time, it's just you, Paula, and Kyron awake in the apartment?

A   Um-hmm.

Q   All right, all right.  Try to remember to say yes or no.  I know I--I even do it myself.  And, so that's when Kyron and Paula leave, correct?

A   Yes.

Q   Where--how did they leave?

A   No verbal response.

Q   Do you actually see a vehicle that they leave in?

A   Well, I saw--

Q   Or, do you see them leave the apartment?

A   I just saw 'em leave the apartment.

34

1

Q    Okay.  And, does--does, um, Paula have a car?

2

A    No.

3

Q    Okay.  And so, uh, when they left, um, did either of them say

4

      anything about how they were gonna get where they were going?

5

A    No.

6

Q    Anybody have car keys in their hand?

7

A    Kyron did.

8

Q    Okay.  And, you had previously seen Kyron driving and getting

9

      out of a, uh, green--what you thought was a green Grand Prix,

10

      is that right?

11

A    Yes.

12

Q    So, roughly, what time is this when you see--when you hear

13

      Kyron say, let's go shoot this move, and you see Kyron and

14

      Paula leave?

15

A    About 1:30.

16

Q    1:30 in the morning?

17

A    Yes.

18

Q    Okay.  And so, they leave, is that right?

19

A    Yes.

20

Q    Did you have any information about whose car that was that

21

22

      Kyron was driving?

23

A    It was his Grandpa's.

24

Q    Okay.  Who--who indicated that?

25

A    Paula.

Q    Okay.  When Kyron came back to the apartment about 1:30, uh,

1    did he come by himself or with someone else?

2    A  He went--he came into the apartment by himself.

3    Q  Okay.  Did you see the two of them, meaning Stephanie--I'm

4    sorry, meaning Paula and Kyron talking to each other

5    privately before Paula came out and talked to you?

6    A  They were on the couch.

7    Q  Okay.  And, describe for the Judge what you saw, um, and

8    could you hear what they saying?

9    A  No.  I was--

10    Q  I meant--

11    A  --I was on the phone.

12    Q  Okay.  And, what were they--after you got off the phone, or

13    while they were doing that, what--was there anything else

14    that kept you from being able to hear what they were saying?

15    A  No.

16    Q  Were they talking quietly, or normally?

17    A  I mean, the screen door--the--the sliding glass door was shut

18    so I really--I didn't hear.

19    Q  Okay. At some point you observed them talking when you

20    weren't on the balcony, correct?

21    A  Yeah.  I knew they--I knew they were on the couch.

22    Q  Okay.  And, describe for the Judge how they were talking.

23    A  They were on the couch, sitting closely to each other.  Kyron

24    was in his--in Paula's face, as usual.

25    Q  All right.  Loud or sof--uh, regular tone of voice, yelling,

whispering?

A   I could just--I--regular voice I guess, because I couldn't

hear 'em outside.

Q   Okay.

A   I could just see.

Q   Did you remember telling the prosecutors when you gave your

investigative subpoena, they were talking quietly to each

other about what they were gonna do with, uh--regarding

Stephanie?

A   No.

MR. WHITE:  Objection, it calls for a conclusion on

the witness as far as what they were going to do regarding

Stephanie.  I don't think she can testify to that.  She said

she didn't hear the conversation.

MS. KETTLER:  I think she can, if she at some point

heard some part of the conversation, or what the topic of the

conversation was.

THE COURT:  Wasn't the current--

MS. KETTLER:  If she did.

THE COURT:  --wasn't the current question whether

or not she--she remembers telling the prosecutor that?

MS. KETTLER:  Yes.  That's correct.

THE COURT:  Then let's establish whether or not she

remembers and then we'll talk about the reason for the

objection.

37

MS. KETTLER: Thank you.

MR. WHITE: Okay. Thank you.

BY MS. KETTLER:

Q  Do you remember the prosecutors asking you; "...fair enough. Can you give us a sense of the tone of the conversation between Kyron and Paula as they were talking or before they left..." Do you remember being asked that question?

A  No.

Q  Okay. Well do you remember be--telling the prosecutors; "...they were talking to each other, you know, very quietly about they were going to go find Stephanie to go get her keys back and her shoes..." Do you remember telling the prosecutors that?

A  Yes.

Q  And, is that the truth?

A  I didn't--I didn't say that they were talking quietly, did I?

Q  Well--

A  Well I--

Q  --if that's--do you dispute it or you just don't remember?

A  I dispute it because I was--the sliding door was closed and I was outside. I can't tell if they're talking quietly or--

Q  Okay.

MS. KETTLER: May I approach the witness, your Honor?

THE COURT: Please, do.

38

MR. BURKETT:  Well, Judge, before she does that,

can she finish the sentence that she was saying because she,

uh--the prosecutor cut her off?

THE COURT:  Any objection to that?

MS. KETTLER:  No.

THE COURT:  Okay.

THE WITNESS:  I'm saying; the sliding glass door

was closed, I was on the balcony.  I--I couldn't tell if they

were talking quietly.  All I saw was them on the couch

together.

BY MS. KETTLER:

Q    Okay.  You were not on the balcony the entire time Kyron was

in the apartment, correct?

A    He was--the second time at 1:30?

Q    Yes.

A    He was only--he was only there for about ten minutes.

Q    Okay.  But, you were in the apartment with him at some point

in time, that second time, correct?

A    Not until they left.  Yeah, when they left.

Q    Okay.  As they're leaving, okay.

MS. KETTLER:  May I approach the witness?

THE COURT:  Please.

BY MS. KETTLER:

Q    I'm going to show you a transcript of your investigative

subpoena, page fourteen.  I want to ask you first of all to

39

read to yourself the question that starts on line nineteen,
and your answer that starts on line twenty-two. Have you had
a chance to read that over?

A    Yeah.

Q    Okay. Did that refresh your memory about, uh--uh, the answer
you gave at the investigative subpoena--

            MR BURKETT: Judge--

BY MS. KETTLER:

Q    --where the court reporter, uh, transcribed it?

            MR. BURKETT: --Judge, I have an objection to that.
Number one; she never said she didn't remember it, she said
she didn't say it. So, reading something that's, uh, typed
out doesn't refresh anyone's memory if their testimony is I
never said it in the first place.

            MS. KETTLER: It--anything can be used to refresh
memory, and the wit--it's up to the witness to decide whether
it refreshes her memory or not.

            MR. BURKETT: But she said, I didn't say it. She
didn't say I don't remember saying it. She clearly said, I
didn't say it. So to show her something that's typed out
saying okay, not that you didn't say it, we got it down here
and--and typed out, does that refresh your memory that you
did say it.

            MS. KETTLER: I--first of all, I object to this
speaking objections rather than legal ob--objections because

                              40

they seem designed to attempt to try and reproach or influence the witness' answer.  And, I don't think it's an improper question.

THE COURT:  Nor do I.  I'll allow it.

BY MS. KETTLER:

Q    Does that refresh your memory, uh, regarding the ques--the answer you gave when you were asked the question; "...fair enough.  Can you give us a sense of the tone of the conversation between Kyron and Paula as they were talking or before they left..."?

A    No verbal response.

Q    Did you give the answer; "...they were talking to each other, you know very quietly about they were going to go find Stephanie to get her keys back and her shoes...", did you give that answer?

A    No--I--I--I must have been thinking that Paula was telling me quietly that they're going to get--

Q    Okay.

A    --that they're going--

Q    All right.

A    --because she was.

Q    All right.

A    Because, Kyron didn't know that I knew that they were going.

Q    All right.  So, you don't dispute that it says this on this page, correct?

41

A    No.

Q    All right. Your recollection of it at this point is that you saw them on the couch talking to one another, correct?

A    Yes.

Q    And, that they were sitting close to one another, correct?

A    Yes.

Q    That Kyron was up in Paula's face, correct?

A    Yes.

Q    But you can't remember, at this point in time--or you don't think, at this point in time you--you meant to say that they were talking quiet?

A    Right.

Q    Is that right?

A    Yes.

Q    Okay, all right. So, you said that you saw the two of them, Paula and Kyron leave, is that right?

A    Yes.

Q    At that point that the two of them left, Kyron with the keys in his hands, uh, you're the only one apart--awake in the apartment at that point, to the best of your knowledge, right?

A    Yes.

Q    All right. And, it's about 1:30, is that right?

A    Yes.

Q    What did you do after Paula and Kyron left?

A    Fell asleep on the couch.

Q    And, okay.  What is the next thing you remember happening after you fell asleep on the couch?

A    The door being slammed open.

Q    Okay.  So, you hear a noise at the door, is that right?

A    Yes.

Q    What do you do then?

A    I jump up.  I'm still on the couch but I was startled.

Q    All right.  And, is the couch in the same room that the door is in?

A    Yes.

Q    All right.  And, then do you look in the direction of the door?

A    Yes.

Q    And, who do you see?

A    Paula.

Q    What did you see Paula do?

A    Her eyes were big and her hands were shaking like this.

Q    Okay.  And, how did she come in the door?

A    Slammed it open.

Q    Okay.  Did she walk in or run in?

A    Run in.

Q    All right.  And, do you--you said her eyes were real big and her hands were shaking, is that right?

A    Yeah.

43

Q    To the best of your recollection, about what time was it when Paula came running in the door?

A    About 3:10, 3:05.

Q    Okay.  And, was she alone?

A    Yes.

Q    And, so she--her eyes are big, her hands shaking, she comes running in, and what does she say?

A    She said; he did it, he did it.

        MR. BURKETT:  Judge, that's what I'm objecting to, and that statement does not go to her state of mind.  That goes directly to what she's saying my client is saying.  And, it's purely hearsay.

        MS. KETTLER:  It's an admission against Paula. And, I would submit to the Court it is an excited utterance in addition to that.  It is only offered against Paula. Despite the fact that she's talking about what Kyron did, it's important in light of her actions in the further testimony.

        MR. BURKETT:  Your Honor, unless I can cross-examine Paula on that statement, it is still purely hearsay.

        MS. KETTLER:  I just said it was only offered against Paula.

        MR. BURKETT:  But Paula hasn't done anything wrong here.  I was saying that even if it's offered against Paula, according to what I just heard, Paula's done nothing wrong,

44

so it can't be against her. She's trying to get in the back

door what she knows legally she can't get in the front door.

MS. KETTLER: Judge, anything the prosecution seeks

to use against a person charged with a crime is an admission.

Whether Mr. Burkett agrees that it is, uh--

THE COURT: Meaningful.

MS. KETTLER: --incriminating doesn't matter.

THE COURT: I agree.

MS. KETTLER: It's only offered against Paula.

THE COURT: I agree. I'll allow it.

BY MS. KETTLER:

Q    What else did she say--

MR. BURKETT: I'm sorry, Judge, but you're only

holding this against Paula, I mean, not against my client?

THE COURT: Correct, correct. It's only being

offered for that, that's the only way I'm hearing it.

MR. BURKETT: Sure.

BY MS. KETTLER:

Q    What, uh--

MS. KETTLER: Oh, I'm sorry. I didn't mean to cut

you off.

THE COURT: That's all right.

BY MS. KETTLER:

Q    What else did you--did you hear Paula say, at that time?

A    She said; he did it, he did it. I said; he did what, Paula?

1      She said; he shot her, he shot Stephanie.

2   Q   All right.  Did she say whether--how she knew this?

3   A   No verbal response.

4   Q   All right.  If you need a minute that's fine.  Just take a

5      minute and get your self together, and you let me know when

6      you're ready to go on then, all right?

7   A   No verbal response.

8   Q   Take a deep breath.

9   A   She said--

10              MR. BURKETT:  Judge, while she's getting this

11      minute together, so I don't stand up and continue to object--

12              MS. KETTLER:  That's all right.

13              MR. BURKETT:  --can I have a standing objection

14      against what she's saying that Paula said against Kyron?

15              MS. KETTLER:  I don't--I'm only offering the

16      statements against Paula, so, you know--

17              THE COURT:  If that changes you'll let us know?

18              MS. KETTLER:  Absolutely, Judge.

19              THE COURT:  Fair enough?

20              MR. BURKETT:  Yes, sir.

21              THE WITNESS:  Can I go?

22  BY MS. KETTLER:

23

24  Q   Sure.

25  A   She--as she said, he did it, he did it, I said he did what.

       She said he shot her, he shot Stephanie.  I said; no, he

                                   46

1    didn't, how do you know?  She said I heard it, I heard the

2    gunshots.  I heard click, click, click, like five times.

3  Q  All right.  And, did she say something else, um, to sort of

4    convince you that she was telling the truth?

5  A  She told me that she swore on her mother's grave.

6  Q  Okay.  And, what did you do at that point?

7  A  Um, I called Ricky, my boyfriend.

8  Q  Sure, your boyfriend.  And, um, did you have a conversation

9    with him?

10  A  Um, I just told him he needs to get here.

11  Q  Okay.

12  A  Like, hurry up.

13  Q  All right.  So, you were on the phone with him long enough to

14    say that, is that right?

15  A  No verbal response.

16  Q  And, when you han--you need to answer out loud.

17  A  Yes.

18  Q  Okay.  And, when you got off the phone then, do you have

19    some--any additional conversation with Paula?

20  A  She--not--not really.  She--I just kept denying--I just kept

21    telling her, no, he didn't, he just--maybe he was just

22    scaring you, maybe he was just scaring her, you know.  And,

23    she said; no, Jessica, he--he did it.

24  Q  Okay.  And, then did you see her do something with the phone?

25  A  Not--no.

47

Q    Okay.  At some point, did she say that she was gonna try and
call someone?

A    Yes.

Q    All right.  And, who did you see her, um--or who did she say
she was gonna call?

A    She called--she called Kyron, but that was after my boyfriend
got there.

Q    Okay.  So, your boyfriend gets there in like, roughly how
much time?

A    About ten minutes.

Q    All right.  And, after Mr. Wren gets there, um, is this when
Paula starts trying to call Kyron?

A    Well, when Pa--when Ricky got there, Paula was waiting at the
door still shaking.  And, I didn't say anything to him when
he walked in the door.  I said--Paula looked at him and said;
he--he did it, Ricky, he killed Stephanie.  And, he looks at
her, and he back--and, he takes a couple steps back, and he
said, no--no she--no, he didn't, no, he didn't.

Q    Okay.  After that exchange between Ricky and Paula, uh, what
happens next?

A    Paula tried to call Kyron.

Q    Okay.

A    About five, six times.

Q    All right.  He ever--

A    He's not answering.

48

Q    All right.  Did you ever hear her succeed in getting him on

the phone and begin to talk to him?

A    Yes.

Q    All right.  Did you hear her say anything to him?

A    She said; where are you.

Q    All right.  Is that all?

A    Yes.

Q    What was her demeanor like at that point in time?

A    Um, like, in shock, like--

Q    All right.

A    --she was--her eyes were still big.  I mean, she wasn't

crying but--I mean, I think we all--I mean, me personally, I

didn't--I still didn't believe it.  I mean, who--

Q    All right.  You--you were surprised, shocked, stunned?

A    Right.

Q    Okay.

A    Yes.

Q    Is--Richard Wren, your boyfriend, does he stay there at the

apartment?

A    No.

Q    Okay.

A    Oh, does he stay there once he gets there?

Q    Yes.

A    Yes.

Q    All right.  And, after he gets there, uh--or, after Paula

49

1   tries to talk, um--talk with Kyron on the phone, does she

2   tell you additional information about what she witnessed with

3   regard to Stephanie's death?

4   A   Yes.

5   Q   What did she tell you?

6   A   She told me that she was driving and she dropped Kyron off

7   by--by Stephanie--they saw Stephanie's car--

8   Q   Did she say where they went to do this?

9   A   Holliday--they said they went to Holliday West.

10  Q   What's Holliday West?

11  A   A trailer park.

12  Q   Okay.  So they go to the trailer park, she's driving, and

13  then what happened?

14  A   Kyron gets out the car.

15  Q   Where?

16  A   At Holliday West.

17  Q   By what, what part of it?

18  A   I don't know.

19  Q   Earlier you said something and--

20  A   I mean I--

21  Q   --and I initially--

22  A   At her aunt's house.

23  Q   Okay.

24  A   I don't--I mean--

25  Q   Did you say something about a car?

A    Yeah. They saw--that's how they knew Stephanie was there because they saw her car.

Q    Okay. So, she, um--Kyron gets dropped off near her car, is that correct?

A    Yes.

Q    Where in relation to Stephanie's car?

A    No verbal response.

Q    Did she say like, in front of it, by it, behind it?

A    No.

Q    Okay.

A    All she said was Stephanie was getting--Stephanie was getting out the car and he was walking towards her.

Q    Did she say who else, if anybody, was in the car with them?

A    Yes.

Q    Who did she say?

A    Um, a guy named Big Mike.

Q    Okay. Does--is that someone you know?

A    Um, never, no.

Q    Okay. So, she said that she--Kyron got out of the car near Stephanie's, uh, car, is that right?

A    Yes.

Q    And, what does she say she saw and heard then?

A    She was driving a little bit and she saw--she told me she saw Kyron and Stephanie face to face. And then, she drove a little bit further and that's when she hears the click,

click, click, click. And then, all of a sudden, she sees Kyron running.

Q   Okay. When you said she drove a little further--

A   Like, I think she was just, maybe--I don't--she didn't tell me where she was--

Q   Tell us what she said, the best you can.

A   Uh--

Q   She said she drove a little further.

A   Yes. That's what she said.

Q   Okay. She heard the noises.

A   Yes. And, then she drove--she drove and then she saw Kyron running.

Q   Okay.

A   That's how, um, she said it.

Q   Did she say where Kyron--Kyron was in relation to her and the car when she saw him running?

A   No.

Q   Okay. And what--after she saw Kyron running, what did she say she did then?

A   She said that, fin--Kyron caught up to the car, and Kyron got in the driver's seat, and she got in the backseat.

Q   Okay. Did she say where they went from the trailer park?

A   She said they went to her house--her apartment.

Q   What about this third person who was in the vehicle, Big Mike, or Mike, did she say what they did with him or if he

52

1    came back with them?

2  A   No.  Yeah, she--or, no, no, she didn't.

3  Q   Okay.  So, you don't know what--

4  A   I imagine--she said they went straight from there to the

5    apartment, so I imagine he's still with them.

6  Q   Okay.  But she didn't say, specifically.

7  A   No.

8  Q   All right.  Did she say if Mike was still in the car when

9    they left the shooting?

10

11  A   No.

12  Q   Okay.  Did she say who drove away from the scene?

13  A   Yes.

14  Q   All right.  And did you talk about this with the prosecutors,

15    as well?

16  A   No.

17  Q   Okay.

18  A   No.

19  Q   All right.  Do you remember, uh--well, who did she say drove

20    away from the scene?

21  A   Kyron.

22  Q   Okay.  Do you remember telling the prosecutor that she drove

23    away from the scene?

24  A   No.

25  Q   Okay.  But you--she told you that--that she drove to the

    location, is that right?

1  A    Yes.   She drove to it.

2  Q    Okay.   And, that Kyron got back in the car after she saw him

3       run, is that right?

4  A    Yes.

5  Q    And, then they left the trailer park?

6  A    Yes.

7  Q    Did she say anything about what she saw before she heard the

8       clicking like any kind of interaction, if any, between

9       Stephanie and Kyron?

10 A    Well, this is what she told me the next day after--the--the

11      day after this; she--she told me that--I guess Kyron told

12      her--this is what she told me; Kyron told her that her--

13      Stephanie and Kyron were actually arguing before.

14 Q    Okay.   At the trailer park.

15 A    Yes.

16 Q    And, did she tell you what she saw happening with Kyron as

17      Stephanie was arguing with him?

18 A    No.

19 Q    All right.   Did she indicate to you that Kyron was getting

20      mad?

21 A    No.

22 Q    Okay.   Do you remember telling the prosecutors that?

23 A    No verbal response.

24 Q    Stephanie was getting--

25 A    That's just--that's what Paula told me.

54

Q   Right.

A   She didn't say she saw it, that's just what she told me.

Q   All right.  That's what she told you though?

A   Yes.

Q   That Kyron was getting mad and he had an attitude, is that right--or, Stephanie had an attitude that made Kyron mad?

A   That's what Paula told me.

Q   Okay, all right.  So, I'll take you back to the apartment, now.  After, uh, Paula has told you these things, what happens at that point in time?

A   Um, me and Ricky go in the bedroom, in one--in one of her other bedrooms, and we're sittin' on the bed talking about this whole thing.  About how she---he didn't kill her, you know, he couldn't have.

Q   Okay.

A   We never--you know, we never thought he'd do--you know, we never thought he'd do something like that, he couldn't do that.

Q   All right.  And, did you go to bed--did you sleep at Paula's apartment that night?

A   Yes.

Q   And, when you went in that apartment--I mean--I'm sorry.  When you went in that bedroom to go to sleep eventually, was Paula the only person--other person awake in the apartment?

A   Yes.

55

Q    Was Katie still there sleeping at the apartment?

A    Yes.

Q    All right.  At any point did Katie wake up and come out?

A    Paula woke--Paula shook her and woke her up.  She didn't--but she didn't wake up.  She shook her and she said--she says-- she said Katie, wake up, wake up.  And, Katie went, what, you know.

Q    Okay.

A    And, Paula said he killed Stephanie, Kyron killed Stephanie. And, she said no--she just said no, you know and went back to sleep.

Q    Okay.  So, Katie didn't really, like, get up out the bed, or anything?

A    No verbal response.

Q    Okay.  And, so--

          THE COURT:  Is that a yes?

          THE WITNESS:  Oh, no.

BY MS. KETTLER:

Q    --when you go to bed, just Paula is the only person awake in the apartment, right?

A    Yes.

Q    And, when you go in that bedroom to go to sleep, where is Paula in the apartment?

A    In the livingroom.

Q    What's she doing when you went in there to go to sleep?

56

A    Talking on the phone.

Q    Do you know who she was--did she say who she was talking to?

A    No.

Q    All right.  So, can you tell me, by the time you guys go to sleep it's pretty late?

A    Yeah, yes.

Q    And, um, when you wake up the next day, um, roughly what time was it when you woke up the next day?

A    Well, I woke up--

Q    Or, the same day, later in that morning.

A    Right.  We woke up to a phone call from Breanna about--

Q    All right.  You heard the phone ring, correct?

A    Well, Paula answered it.

Q    But did--

A    It was her cell phone.

Q    --you hear it ring?

A    No.

Q    Okay.  There was a phone call, you observed Paula on the phone?

A    Yes.

Q    Okay.  Um, and, did you observe her talking on the phone?

A    Yes.

Q    All right.  Did you talk to the person on the phone?

A    No.

Q    All right.  Tell the Judge while you saw Paula talking on the

phone--this is her cell phone, right?

A   Yes.

Q   Describe how she's behaving while she's having this conversation.

A   She was crying but you could tell that--you can tell when someone's fake crying and they know what happened.  You know, it was a fake cry, that's what it was.

Q   All right.  Do you remember the word you used to describe it actually when you talked to the prosecutors?

A   No.

Q   Did you tell the prosecutor she was acting hysterical, but as soon as she got off the phone it was okay and she was fine?

A   I said--I don't know if I said hysterical but she was like throwing--she was trying to make herself throw up in the toilet and crying.

Q   Okay.  So, while she's on the phone she's crying and carrying on, correct?

A   Yeah, yes.

Q   Okay.  And then, after the phone call describe what her behavior was like.

A   Uh, back to normal.

Q   Okay.  How long did the phone call last?

A   About five minutes.

Q   All right.  And, after she got off the phone, did Paula tell you something about what would happen if you told?

1  A    Yeah.  She said, you know--she said, you know that if Kyron

2      finds out that any of you told, that he will kill you and

3      your families.

4  Q    Okay.

5          MS. KETTLER:  And, just for the record; that's only

6      offered against Paula.

7          THE COURT:  Thank you.

8  BY MS. KETTLER:

9  Q    What did you say to, um, Paula when she said that?

10 A    I told her I wouldn't.

11 Q    Okay.  And, did she say something else to you, uh, about--did

12     she ask you specifically about whether you were going to

13     tell?

14 A    Yeah.  But, this was later that day at my house when--

15 Q    Okay.

16 A    --she popped up at my house.

17 Q    All right.  How much later in the day?

18 A    Um, about six--five, six o'clock.

19 Q    Okay.  So, after Paula said, if you tell Kyron will kill you

20     and your family, how much longer did you stay at her

21     apartment before you left?

22 A    About, uh, thirty minutes.

23 Q    Okay.  And then, you--when you left, did Richard--Ricky go

24     with you?

25 A    Yes.  His dad picked us up.

59

Q    Okay.  And, where did you go from there?

A    I went to--they dropped me off at my house.

Q    Okay.  Your house with your--you--you live with your parents?

A    Yes.

Q    Okay.  And, um, was Katie still there when you left at Paula's apartment?

A    Yes.

Q    Okay.  Was Katie present when Paula said; if you tell Kyron will kill you and your family?

A    No.

Q    Okay.  And, so you said that, uh, you had another conversation with Paula later in the day at your house, is that right?

A    Yes.  Her and--

Q    And, you said this--I'm sorry.

A    --her and Katie were there.

Q    Okay.  She and Katie came to your house.

A    No verbal response.

Q    Uh, roughly what time?

A    About six o'clock.

Q    Okay.  And, uh, did they--how--how did they get there?

A    I'm not too sure.  They just--they were just knocking at my door and I let 'em in.

Q    Okay.  Uh, they both come in, Katie and Paula.

A    Yes.

60

Q   Uh, what, um--does Paula say or do at that point in time?

A   We go in my room and they're, you know, doing their makeup, doing their hair. And, I'm laying on my bed and I'm just thinking. And, I start crying and Paula's like--Paula looked at me and she said, what's wrong? You're not gonna--you're not gonna tell on me are you? And, I looked at her, and I said; Paula, I said; you're acting--you're--you're walking around like nothing's wrong. And, she says; I don't--she says, well she's dead, I can't bring her back. And, then I cry and she--she just--she--she just doesn't have any remorse. And, even though that's my best friend, it's just--it's a true fact.

Q   Okay. So, after she said that, she's dead, I can't bring her back, did she say anything again to you about what would happen if you told?

A   No. She was just making--she just asked me a couple times; you're not gonna--you're gonna tell nobody, are you?

Q   Okay. Did, um--to your knowledge, did, um, Kyron know where your family lived?

A   Yes.

Q   Okay. Did she ever point that fact out to you?

A   No verbal response.

Q   Did she say, you know, Kyron knows where your family lives?

A   She told me that that's what Kyron said.

Q   Okay. And, that's at--when she's at your apartment later in

1    the day?

2  A    Yes.

3  Q    When you gave your investigative subpoena at the prosecutors'

4     office, um, you also had the opportunity to look at the

5     written statement that you did at the police department, is

6     that right?

7  A    Yes.

8  Q    And, Ms. Kowal gave you a chance to read through that, right?

9  A    Yes.

10 Q    And, um, Ms. Kowal asked you if the contents of that

11    statement were true, is that correct?

12 A    Yes.

13 Q    And, what was your answer?

14 A    Yes.

15 Q    And, so everything that's in your statement to the police is

16    true, is that right?

17

18 A    Yes.

19 Q    And, also at that investigative subpoena after you answered

20    the prosecutors' questions, um, she--she asked you to look at

21    the whole statement and you said it was true, right?

22 A    Yes.

23 Q    And, then she read--read certain portions of it to you and

24    you said yes, that's true, correct?

25 A    Yes.

   Q    Okay.  So, at the end of this when you're--when she's done

1    asking you questions, she gave you a chance to change

2    anything, is that right?

3    A   Yes.

4    Q   Did she say--did she remind you, you were under penalty of

5    oath?

6    A   Yes.

7    Q   I mean, um, penalty of perjury?

8    A   Yes.

9    Q   And, did she at that point in time say to you, um, Jessica is

10   there anything in your--that you told me today that you need

11   to change?

12

13   A   Yes.

14   Q   All right.  And, um, did you take the opportunity to change

15   anything?

16   A   No.

17   Q   All right.  You said that everything you told was the truth,

18   right?

19   A   Yeah.

20   Q   Where, uh, did you--did Paula tell you anything about what

21   had been done, or what would be done with the gun that was

22   used to kill Stephanie?

23   A   She said they probably tossed it in a lake.

24   Q   Okay.  And, at that point in time when you gave the

25   investigative subpoena, uh, you identified a photograph of

Kyron Benson, is that correct?

A    Yes.

Q    And, the Kyron that you've been talking about in your testimony today, is the Kyron--the same Kyron that you've identified, uh, previously at the table next to his counsel, is that correct?

A    Yes.

          MS. KETTLER:  If I could have just one moment?

          THE COURT:  Sure.

          MS. KETTLER:  Nothing further.  Thank you, your Honor.

          THE COURT:  Mr. White?

          MR. WHITE:  Thank you.

          MS. KETTLER:  Okay.  At this time if counsel will make a request on the record I will provide copies of the investigative report.

          MR. WHITE:  I do so request.

          MR. BURKETT:  Yes, your Honor.

          THE COURT:  Thank you.

          MS. KETTLER:  I'm providing a copy, uh, to each counsel.  I would ask though, your Honor, that there is some--I would ask that counsel not share any addresses or--of wit--um, witnesses, or people involved in this case with anybody not involved in this case, out of concern for witnesses in this case.

          THE COURT:  Gentlemen?

                              64

MR. WHITE:  I have no objection to limiting

disclosure.  These people know each other anyway, but it--but

even with that I will not add to their knowledge.

THE COURT:  Okay.

MR. BURKETT:  I--and, I wouldn't have done that

anyway.

THE COURT:  Thank you, thank you.

Cross-examine, Mr. White?

MR. WHITE:  Oh, okay.

THE COURT:  Do you need a minute?

MR. WHITE:  Judge, I haven't seen the document.  It

appears to be--

MR. BURKETT:  It's quite thick.  What I would like

to do, with your permission, is allow me to cross-examine her

now.  And, then I'd like to take--I mean, this thing is what,

thirty or forty pages, to read this, and resume my cross-

examination.

THE COURT:  Any objection?

MS. KETTLER:  I don't have objection to that as

long as we finish up today.

THE COURT:  Oh, we're going to finish today.

MS. KETTLER:  Thank you, your Honor.

THE COURT:  We'll do our best.

MR. BURKETT:  Is that all right?

THE COURT:  It's all right with me.

1    MR. WHITE:   Your Honor, I'm just pointing out, if I

2  could, that if the People were willing to give us the

3  remainder over our lunch break, we would be--this would move

4  much quicker.

5       THE COURT:   You're assuming we're going to have a

6  lunch break.

7       MR. WHITE:   That's all right, your Honor.   I know I

8  don't need lunch.

9       MR. BURKETT:   Judge, look at me.   Do I look like--

10  you know.

11       THE COURT:   All right.   I'm--I'm assuming--I'm

12  assuming that Ms. Kettler is not prepared to give those

13  statements out at this point.   I'm assuming there are other

14  statements we're talking about, not the one you gentlemen

15  have in your hands.

16       MS. KETTLER:   That's right.   And, that's only

17  because the statute provides this.   It's really my duty.

18

19       THE COURT:   That's--no, I--the statute lets you do

20  it.   We'll--we'll work around it.

21       Mr. White, are you prepared to cross-examine now,

22  or do you want to read?

23       MR. WHITE:   No.   Perhaps counsel could cross-

24  examine now, while I familiarize myself with this.

25       THE COURT:   That's all right, that's fine.

    MR. WHITE:   Then I could cross-examine and he could

66

1    have recross.

2              THE COURT:  That's fine.

3              Are you all right, Ms. Fritz?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.

6              Go ahead, counsel.

7              MR. BURKETT:  Thank you, your Honor, uh,

8    momentarily.

9              THE COURT:  That's all right.

10             MR. BURKETT:  You don't mind if I come up, do you?

11             THE COURT:  No.

12             MR. BURKETT:  Thank you.

13                        CROSS-EXAMINATION

14   BY MR. BURKETT:

15   Q    Good morning, Ms. Fritz.

16

17   A    Good morning.

18   Q    Uh, Ms. Fritz, I--I just have a few questions that I--I want

19       to go over with you.  So, if I ask you something that you

20       don't understand, if you will, uh, let me know I'll repeat it

21       in such a fashion that you do understand, okay?

22   A    Yes.

23   Q    Okay.  Um, first of all, let me make some inquiries about

24       you.  Um, other than the prosecutors, when you went down to

25       the prosecutors' office--

     A    Yes.

                              67

Q   Was that downtown Detroit?

A   Yes.

Q   Other than that, uh, how many times, uh, did you talk to the police about this case?

A   Once.

Q   And, how many statements did you write?

A   One.

Q   One statement--

A   Two--two, one at, um, one--just--no, just one.  Because the statement at Frank Murphy goes--is the same one that I wrote at the, um, police station.

Q   Okay.  Did you write a statement at Frank Murphy?

A   No.  I wrote it at the police station.

Q   Okay.  And, what date was that statement written?

A   I don't remember.

Q   Okay.  But, the statement was written prior to your going to Frank Murphy?

A   It was--it was the day before.

Q   Okay.

A   Not even a day.

Q   Now, when you wrote the statement, was the officer--in-- charge here, this officer here, was he the one who you wrote the statement to?

A   Yes.

Q   Okay.  And, prior to your writing the statement, you were

1    instructed to put down everything you knew that transpired in

2    this case, is that correct?

3  A  Yes.

4  Q  And, after you wrote your statement, the prosecutor asked

5    you, uh--when you gave your testimony down at Frank Murphy,

6    they allowed you to read it to make sure it was correct.

7  A  Yes.

8  Q  Did this officer do the same thing to you, while--after you

9    wrote--did--your written statement, did he allow you a chance

10    to go over it, and then if it was correct ask you to sign it?

11

12  A  No.

13  Q  He didn't?

14  A  No.

15  Q  Did you sign this statement?

16  A  Yes, I did.

17  Q  And, by signing it, you've already told us that everything in

18    it was true.

19  A  Yes.

20  Q  Okay.  And, how long were you at the police station giving

21    this statement?

22  A  From three o'clock in the morning until five o'clock the next

23    day, in the afternoon.

24  Q  Oh, they kept you overnight?

25  A  Yeah, yes.

   Q  Okay.  And, were you under the impression that you were a

                                    69

Q   Okay.

A   So, I'm not gonna put down something that's--it's--it's a maybe.

Q   Okay.  But, you did say it here today, that you thought that--that that's what Stephanie (sic) told you.

A   I didn't say I thought, I said that's what they told me.

Q   Who told you that?

A   Paula.

Q   Paula told you that they threw the gun in a creek, or a river, or something.

A   Yes.

Q   Then, why didn't you put that in your statement?

A   'Cause it wasn't something that I knew.  I was--I was puttin' on the statement what I know, not what they told me.

Q   Okay.  You didn't know that Kyron shot anyone, did you?

A   No.

Q   But, you put that in your statement, correct?

A   Yes.

Q   You never told--or, you never put in your statement that Kyron and Stephanie was outside arguing, did you?

A   Yes, I did.

Q   You put that in your statement.

A   It is in my statement that they told--that--yes, it is.

Q   That--

A   Maybe you should re--uh, yes, I did.

71

Q  Okay.  That you told--that you wrote that in your statement.

A  Yes.  That Paula--yes.

Q  Okay.  Did you tell in your statement who was driving the car to the scene, and who drove it back?

A  No verbal response.

Q  Did you put that in your statement?

A  Yes.

Q  You told the police that Stephanie (sic) drove the car to the--

A  Kyron.

Q  --trailer park.

A  Kyron did.

Q  I mean--I'm sorry.  You told--that Kyron dro--Kyron drove the car, correct?

A  Yes.

Q  Okay.  You didn't know that though, did you?

A  No.  Paula told me.

Q  Paula told you that.

A  Yeah.

Q  And, did Paula tell you who drove the car back?

A  Yes.

Q  Uh, who drove the car back?

A  Kyron.

Q  Okay.  So, at no time did you tell anyone that Paula was driving that car, is that correct?

72

A    Yes, I did.

             MS. KETTLER:  Objection, that's a

mischaracterization of her testimony.

             MR. BURKETT:  Well, this is cross-examination.

             THE WITNESS:  I put in my--I put in my statement--

             MR. BURKETT:  Wait a minute, hold on here.

             THE COURT:  Hold on, hold on.

             I'm going to allow the question because I---there's

been some confusion on the record.  I know what she said

during direct testimony regarding who drove to and from.

But, I think there's been some muddying of the waters, so

I'll allow the question to try to clarify.

             MR. BURKETT:  Okay.

BY MR. BURKETT:

Q    Let's clarify this--this up.

A    Um-hmm.

Q    Did you put in your statement anywhere, that Paula told you

that Kyron drove the car to the trailer park?

A    No.

Q    Did you tell--did you put in your statement at any point,

that Paula told you that Kyron drove the car from the trailer

park back to her apartment?

A    No.

Q    Okay.  When is the first time you told someone that Paula

told you that?

A    When is the first time?

Q    Yes.

A    Um, well she didn't tell me that night.  She told me the day

after that.

Q    She did?

A    Yeah.

Q    Okay.  Exactly what did she tell you?

A    You want me to re--you want me to say the whole thing?

Q    Please.

A    What did she tell me?

Q    What did--uh, what did she tell you as it relates to who--

A    I mean, I might as well just say--

Q    --drove the car?

A    --the whole story over, again.

Q    No.  You listen to my question.

          THE COURT:  Ms. Fritz, first of all; don't play

games.  Second of all; you wait for him for finish the

question before you attempt an answer.  Is that clear?

          THE WITNESS:  Yeah.

BY MR. BURKETT:

Q    As it relates--

          MR. BURKETT:  I'm sorry.  Were you finished?

          THE COURT:  Go ahead.

BY MR. BURKETT:

Q    As it relates to who drove the car back from the shooting,

74

Q   who did Paula tell you drove the car?

A   From the shooting?

Q   Yes.

A   Kyron.

Q   She told you that?

A   Yes, she did.

Q   Okay.  That night of the shooting, from--at 1:30, when Kyron picked her up and brought her back, she never told you that she was driving the car, did she?

A   Yes, she did.  She told me she was driving the car while--she told me she was driving the car while he shot her.

Q   Okay.  She was driving the car while he shot--so, she took the car, if I understand you, and went somewhere while Kyron shot her, is that what you're saying?

A   She was in the car watching it.

Q   But, was she driving the car?

A   Yes.  She was--I told you--okay.  Her--Kyron and Paula--Kyron and Stephanie were face to face.  I told you that Paula said she drove a little bit further and that's when she heard the gunshots.  So, she drove a little bit further and that's when she saw Kyron running.

Q   Okay.  And, during this time did she tell--did Paula tell you where this person, Big Mike was?

A   No.  She just told me that he was--he was with 'em.

Q   Okay.  And, did she tell you what Big Mike's role was?

75

A   No.

Q   She did not?

A   No.

Q   Now, you have, uh--you told us something that, uh, I didn't quite understand.  You said that when they were at the apartment and Kyron was talking with Paula, I think your exact words were that he was in her face as usual.  What do you mean by that?

A   He's always in her face.

Q   I know, but what does that mean?

A   What does it mean?

Q   I mean, like they were kissing, or--

A   No.

Q   --what?

A   Like, let me try to think of, um, a better word to use.  I mean he was always yelling at her when he talked.  He couldn't talk to her like a normal person.

Q   Okay.  Was he yelling at her this time?

A   I didn't hear it, no.  But, he was in her face.

Q   He was in her face.

A   Yes.

Q   Okay.  When, um, you wrote your statement, you did not put in your statement, did you, that Kyron says something to the effect of, look in the freezer for the dog?

A   I put--didn't put anything in my statement about the dog.

Q    You didn't?

A    No, I didn't.

Q    Why not?

A    I didn't think it had anything to do with this murder and who got killed.

Q    Okay.  Didn't you tell us that this officer told you to put down as much as you can remember of what transpired that night?

A    Yes.

Q    Okay.  And, you said Kyron was upset in terms of--I mean, I'm sorry.  You said that Kyron appeared to be upset about the killing of the dog, correct?

A    No, he didn't.

Q    Then, he--did you testify earlier that he said that Stephanie probably killed the dog?

A    Yes.  But, he didn't say it upsetly.  He just said, you know Stephanie probably killed it.

Q    Okay.  So, he wa--so, as far as you're concerned, then he wasn't upset about that?

A    Not at all.

Q    Okay.  Now, you told us that, uh, when Stephanie (sic) came back around 1:30 or so--

A    It's Paula.

Q    I mean, about two o'clock--now Stephanie--I keep saying Stephanie, I'm sorry.  When Paula came back, that, uh, she

77

1    was crying and upset.

2  A   Yes.

3  Q   You never put in your statement that, um, Stephanie (sic) was

4      not upset.  You never put in your statement, did you, that

5      she had this fake crying, did you?

6  A   When she first came in the door?

7  Q   At any point.  At any point when you gave the police your

8      statement, you never put in that statement that Stephanie

9      (sic) was faking crying did you?

10  A   Yes, I did.  When she--when it says where she was on the

11      phone with Breanna, and I said she was hysterically mak--

12              MR. BURKETT:  Can I approach the witness?

13              THE COURT:  Please.

14  BY MR. BURKETT:

15  Q   I want to show you your copy of your statement.  And, I could

16      have just missed it.  This is the statement that you gave the

17      police.

18  A   Yes.

19  Q   Okay.  In that statement, did you say anywhere that she was

20      fake--doing some fake crying?

21  A   Hold on.  You're right.

22  Q   I'm right that you never told anybody that, correct?

23  A   Nope.

24  Q   Okay.  As a matter of fact, what you told the police was, you

25      didn't even believe Paula, correct?

A     I didn't--no, I didn't believe her.

Q     You didn't believe anybody was killed that night?

A     No.

Q     And, as a matter of fact, when your boyfriend came over, you all had a--you talked for a few minutes, then you and your boyfriend went to bed, correct?

A     Yes.

Q     Correct?

A     Yes.

Q     'Cause if you thought somebody was killed you would have been too upset to sleep, correct?

A     Right.

             MS. KETTLER:   Your Honor, I'm going to object to that, that it calls for speculation.

             THE COURT:   Uh, I think the way it was worded, it calls for speculation, but she answered it.

             Continue.

             MR. BURKETT:   Thank you.

BY MR. BURKETT:

Q     Now, at some point, ma'am, you tell--you told us--all right, I'm sorry.   At some point, you told the police, uh, that you saw Kyron with a gun.   Did you?

A     No.   I did not say that.

Q     You never seen him with a gun.

A     Never.

79

Q    Okay. You never told the police that when they left the house that night, at 1:30, uh--that morning at 1:30, that Kyron was angry?

A    He didn't look angry to me. I mean, I didn't even talk to him.

Q    Okay. But, you--

A    I was--

Q    --you saw him.

A    Yes.

Q    Okay. Would this be--well, let me ask you this; I take it by your testimony here, you don't like Tyrone (sic) very much, do you?

A    I mean, I liked him until now.

Q    Until now.

A    Yeah.

Q    All right. So, when Ky--when Kyron got to the house, what-- they had this conversation and then they left, is that correct?

A    Yes.

Q    And, then at some point, Paula comes back to the house, is that right?

A    Yes.

Q    This person about--named Mike, did you--have you ever seen this person before?

A    No.

1    Q   So, you wouldn't--you don't know who he is or--

2    A   No.

3    Q   --anything about him.

4    A   I just know that his name is--they call him Big Mike, or

5        whatever, yeah.

6    Q   Okay.  And, we've established, I think, that you never put

7        that in any statement that you told the po--written statement

8        that you gave the police that morning, correct?

9    A   No.

10   Q   No, you didn't tell the police about Big Mike being in the

11       car?

12   A   No.

13   Q   Okay.  You--you don't know what--what role Big Mike played in

14       this, if any?

15   A   No.

16   Q   Okay.  Now, you spoke--you talked--you said that you called

17       your boyfriend Ricky.

18

19   A   Um-hmm.

20   Q   Is that yes?

21               THE COURT:  Is that a yes?

22               THE WITNESS:  Yes.

23   BY MR. BURKETT:

24   Q   Okay.  Um, and you called him twice that morning--that day--

25       that morning.

     A   Once.

82

Q   Once, okay.  I--you called him once and told him to come
over.

A   Yes.

Q   But, prior to that you called him be--earlier that evening,
correct?

A   No.

Q   Oh, I thought you--I thought you testified that you did call
him.

A   No.

Q   Okay.  So, you--you only made one call to Ricky that night.

A   Yes.

Q   And, that was to come over.

A   Yes.

Q   And, that was because of things that Paula had said to you.

A   Yes.

Q   Okay.  Uh, how long has, uh, Ricky been your boyfriend?

A   Uh, a year.

Q   So, what time was it that Ricky came to the place?

A   About 3:25.

Q   Okay.

A   3:30.

Q   You were aware, were you not, of any dispute that your
boyfriend and Stephanie had, correct?

A   Re--can you say that question again?

Q   You know that your boyfriend Ricky and Stephanie had a

dispute going on didn't you?

A    No.  They didn't, no.

MS. KETTLER:  I'm going to object as to first; lack of knowledge, second; relevance.  I move to strike the question and the partial answer.

MR. BURKETT:  Well, may I respond?

THE COURT:  Please.

MR. BURKETT:  First of all; I'm trying to show this Court that other people had a motive to kill Stephanie, that's number one.  Number two; it's not a lack of knowledge if she knows about it.

MS. KETTLER:  If she has first hand knowledge, it's not lack of knowledge, but he didn't lay the proper foundation for that.  And, the fact that other people may have motive, are not relevant at this point.  Maybe at trial, but I would submit they're not--they're not--that's not relevant for probable cause determination.

MR. BURKETT:  Well, let me--let me put it this way--

THE COURT:  Let's talk about the relevance.

MR. BURKETT:  Okay.

THE COURT:  Because I agree you didn't lay a proper foundation.  But, let's talk about whether or not it's relevant.

MR. BURKETT:  Okay.

84

BY MR. BURKETT:

Q    You are aware, are you not, that your boyfriend and Stephanie had a credit card scheme going on, didn't you?

MS. KETTLER:  Your Honor, again, I thought the Court asked him to speak to the relevance issue.  And, I renew my motion for this to be stricken from the record.  It is not relevant and there is no foundation that she has any kind of knowledge for it.

MR. BURKETT:  Let me--

THE COURT:  Let's talk about the relevance of all of this.

MR. BURKETT:  Well, I--I'm showing--I think I can show this Court that her testimony, we believe, is geared to protect her boyfriend, who we believe, committed this crime. And, that she has changed her sta--her written statement, uh, in order to protect her boyfriend.  And, her boyfriend had a motive for her to do this.  The reason being; since we're off the record--I mean since--Stephanie was scheduled to testify in court, uh, about her boyfriend, uh, Richard, and he did not want her to testify.  Further we can show that because Richard knew the police were after him, he was packing up, trying to get out of town.  And, we think that Richard is-- had a lot to do with this and that she's trying to cover for him.

MS. KETTLER:  Judge, unless we're--we can disclaim-

85

--we can disprove all of what counsel asserts on the record. But, I don't think it's a good, um, use of the Court's resource at a probable cause hearing to fully litigate that whole collateral issue.  Because we can, but it's not relevant for probable cause hearing purposes and it's not a good use of the Court's resources.

THE COURT:  That's my concern.  That it's--this is a probable hearing and the fact that there are others that may have had a motive, certainly is a question for the trier of fact.

MR. BURKETT:  I'm sorry, sir.  It's a question of what?

THE COURT:  Certainly a question for the trier of fact.

MR. BURKETT:  Okay.

THE COURT:  But, I'm not so sure it's relevant for today's proceedings.

MR. BURKETT:  I'll move on.

THE COURT:  Thank you.

MR. BURKETT:  Sure.

BY MR. BURKETT:

Q    Um, Ms. Fritz, you--did you hear Paula say--say--ever say at that night that Stephanie got exactly what she deserved?

A    No.

Q    You didn't.

A    No.

Q    Did you ever tell that to the police?

A    No.

Q    I think I asked you this, um, you did not put in your statement, did you, that Stephanie and Kyron were arguing, did you?

A    No.  Because I didn't find that out until after I was already out of the police station.

Q    Okay.  Did--when you left the police station, were you instructed that if you had any more additional information, you could come back to them and give them a supplemental report?

A    No.

Q    Okay.

            THE COURT:  I'm sorry, what was the answer, Ms Fritz?

            THE WITNESS:  No.

            THE COURT:  Thank you.

            MR. BURKETT:  Judge, that's all I have until I can read this other stuff.

            THE COURT:  Understood, understood.

            Mr. White?

            MR. WHITE:  Yes, your Honor.  I'm prepared to cross-examine at this time.

                        CROSS-EXAMINATION

BY MR. WHITE:

Q    Now, Ms. Fritz, you say you knew Ms. Bennett for several

years.

A    Yes.

Q    And, during that period of time, how long--

          THE COURT RECORDER:   I need for you to speak up.

          MR. WHITE:   All right.

BY MR. WHITE:

Q    How long was she dating or otherwise involved with, uh, Mr.

Benson?

A    Ever since I've known her.

Q    All right.   And, did you ever spend any time overnight at

their house, or spend time with them--

A    Yes.

Q    --when they were together as a couple?

A    Yes.

Q    And, how would you characterize their relationship?

A    Um, unhealthy, um, not--not good at all.

Q    What do you mean by that, specifically?

A    No verbal response.

Q    Do you have any specific examples you can point to?

A    I've watched beat--I've watched him beat her up several

times.

          MS. KETTLER:   Your Honor, I actually, object to the

relevance of this, too.   I don't--I don't think this is

88

1  relevant for these purposes.

2          MR. WHITE:  Your Honor, I believe, the relevance

3  comes later when we've looked at some of the statements that

4  my client was alleged to have made.  That they--that there

5  may be a basis for her being fearful of the co-defendant.

6  That might lead her to, uh, say things that would be more

7  harmful to herself and protective of the co-defendant.  And,

8  I think it is relevant based on that.  I think that--I'm

9  trying to build a foundation for--for that right now, and I

10  would ask you to reserve a ruling or simply to rule in my

11  favor.

12          MS. KETTLER:  Judge, I think that, again, this is a

13  collateral issue.  And, this may all be true, I--I can't, you

14  know, speak to that.  But if we get into litigating that at

15  this point, we'll be here for a week.  And, what's relevant

16  for probable cause purposes is that she made the statements,

17  not maybe why she made them.  That may very well be relevant

18  for a trier of fact.  But my position would be it's not--it

19  shouldn't be litigated now.

20  

21          MR. WHITE:  And, my response, your Honor is that in

22  order to find probable cause, your Honor has to make your

23  decision based on truthful statements, not merely statements.

24  And, I think that's why you should view these things in a

25  certain context.

          MS. KETTLER:  Your Honor's role, respectfully, as

the evaluator is not to determine whether the statements are truth--or, truthful or not.  If we establish probable cause, it's to go to the jury.  Your can't--your Honor, can't possible determine what her motivations are by someone saying, you know this person knocked her around a couple times.  It just creates a bunch of collateral issues.

THE COURT:  And, my understanding of my role is that unless I find the testimony that I've heard to be totally incredible, I can base my probable cause on that.  And, I think what you're telling me, Mr. White, is if I allow you to go down this line of, uh, questioning with Ms. Fritz, you may be able to lay a better ground work that all of the statements, or at least some of the statements that Ms., uh, Bennett may have made, were out of fear.

And, let's assume that's true.  That's not enough for me to decide that all of the testimony that I have heard is without any weight.  So, I would still find probable cause, still send it to the trier of fact, the trier of fact would have to go through all of this testimony.  So, I am going to sustain the objection.  I don't think it's relevant for today's proceedings.  Please move on.

MR. WHITE:  I will, your Honor.  Thank you.

THE COURT:  You're welcome.

BY MR. WHITE:

Q    Now, um, on the evening--first off, when did you find out

90

1    that, uh, Stephanie had, uh, su--supposedly taken things from

2    Paula and, uh, Kyron's apartment?

3    A  No verbal response.

4    Q  When did you first know that there had been some alleged

5    theft?

6    A  Paula told me about five--four or five days before the, um--

7    the killing, the murder.

8    Q  And, what was her attitude at that point?

9    A  No verbal response.

10   Q  What was her affect, or her attitude?

11   A  At that point she didn't really--she didn't know if--she

12   didn't have no proof if Stephanie did it.  That's just what

13   Kyron was telling her.

14   Q  Okay.

15   A  Because--yeah.

16   Q  Now, did you ever see her get really angry when that subject

17   came up?

18   A  Who, Paula?

19   Q  Paula.

20   A  No.

21   Q  Okay.

22          MS. KETTLER:  Your Honor, I'm going to object to

23   asking to characterize someone else's state of mind, unless

24   it's based on what she actually saw, not making any

25   conclusion about it.

1              MR. WHITE:  Your Honor, I think that, uh, observed

2 emotions are something we do every day and that anyone of us

3 is qualified to do that.  I'm not asking for expert testimony

4 in psychology.  I'm simply asking for normal human

5 observation.

6              THE COURT:  Couch your questions in that

7 terminology and I think we'll be all right.

8              MR. WHITE:  All right, thank you.

9 BY MR. WHITE:

10 Q   Did you ever hear Paula say anything threatening?

11 A   No.

12 Q   Um, did you say--hear her say anything about wanting

13 Stephanie to be injured?

14 A   No.

15 Q   Uh, did you---were you aware that she reported the crime to

16 the police?

17 A   Yes.

18 Q   All right.  Were you present when she did that, or not?

19 A   No.

20 Q   All right.  Now, going to the evening of October 6th, uh, who-

21 -you were picked up at about 8:30.

22 A   Yes.

23 Q   Who was driving at that point?

24 A   Breanna.

25 Q   Okay.  And, she was driving her--her car.

A   Yes.

Q   Now, Paula didn't have a working car at that point, did she?

A   No.

Q   And, neither did Kyron, correct?

A   No.

Q   All right.  Now, you went to Chick's (sic) to wait for your friend, uh, Katie.

A   Yes.

Q   And, how long did you wait for her?

A   About five minutes.

Q   Okay.  Now, were you ever at the gas station when there was any incident involving Kyron, or a party store, or anything like that?

A   No verbal response.

Q   That night?

A   Yes.

Q   When was that?

A   On our way--on our way back from dropping the dog off.  His car was there, so we stopped there.

Q   Okay.  So, let's try to get this in order then, all right?

A   Um-hmm.

Q   Now, you, uh, said that you--the first time you testified, that you went and got Katie.  And, then you talked about bowling but, uh, didn't discuss Stephanie or Kyron.  And, Paula said there was no money for bowling because she had to

93

1   give the money to Kyron, right?

2   A   Yes.

3   Q   All right.  And, so, uh, you then went to Paula's house.

4   A   Yes.

5   Q   And, you waited for Kyron to let you in.

6   A   Yes.

7   Q   And, he let you in, right?

8   A   Yes.

9   Q   And, he stayed for about thirty minutes.

10  A   About twenty.

11  Q   Twenty minutes.  Okay.  Is that when you found the dog?

12  A   Yes.

13  Q   All right.  And, he was the one that suggested that it might

14  be in the fridge.

15

16  A   Yes.

17          THE COURT:  Mr. White, I'm going to ask you to

18  phrase your questions, so that it's not just your inflection

19  that makes it a question.

20          MR. WHITE:  It's not just what?

21          THE COURT:  Your inflection.  Because you're

22  testifying with a question mark in your voice rather--

23          MR. WHITE:  All right.

24          THE COURT:  --than saying; isn't it true that, or

25  isn't it correct.

        MR. WHITE:  Well, this is--this is cross-

                        94

examination, your Honor.

THE COURT:  I understand that, I understand.  But, I--I maintain the record, so I would prefer you not to make (inaudible) statements with the raised inflection at the end that makes it a question.  I'll let you get away with some of it but try and be aware of it.

MR. WHITE:  All right.  I'll--all right.

BY MR. WHITE:

Q    So, Kyron did discover the dog in the fridge.

A    Yes.

Q    After approximately how long?

A    About five minutes.

Q    Was that the first place he looked?

A    Yes.

Q    And, then he said he thought Stephanie had killed the dog.

A    Yes.

Q    Okay.  Now, um, at that point, did Kyron stay at the apartment, or did he leave?

A    He left the same time we did.

Q    And, this was in the, uh, green car.

A    Yes.

Q    That you believed belonged to his grandfather.

A    Yes.

Q    All right.  Now, uh, approximately how far from the apartment did you drop the dog off?

95

1   A   Well the apartment is on, um--in Belleville, and I--it was on

2       my street.  I live on Button Road, that's in Willis, and it

3       was on Button Road.  So, about fifteen minutes.

4   Q   Did anyone actually look at the dog?

5   A   Paula--Paula, Breanna, and Katie did the next day.  That's

6       what they told me.

7   Q   All right.  But, not that day?

8   A   No.

9   Q   All right.  And, after you dropped the dog off, uh, you, uh,

10      said you returned to the apartment, correct?

11

12  A   Yes.

13  Q   Did you return directly to the apartment?

14  A   I mis--I missed the gas station part.

15  Q   All right.  Now, what happened at the gas station?

16  A   We saw Kyron--we were driving, it was at Dairy Mart.  We saw

17      Kyron, pulled in there and Pa--Kyron actually--Kyron was

18      backing up and this guy hit him.

19  Q   And, what did you see take place next?

20  A   Uh, we got in the car, in Breanna's car, and we left.

21  Q   All right.  So, you didn't see any confrontation between

22      these people.

23  A   No.

24  Q   All right.  You didn't see any firearms.

25  A   No.

    Q   All right.  Now, you didn't mention that in the written

statement.

A   Right.

Q   All right.   And, as near as I can tell, you didn't mention that in the statement that was given under oath, to the prosecutors' office.

A   Yes.

Q   You--

A   No.

Q   --you didn't think that was relevant.

A   Um, I mean, I had a lot of things on my mind, so the gas station--you--you're right, I should have, but--

Q   All right.   So, how long were you at the gas station?

A   Like, three minutes.

Q   Now, during that time that you were at the gas station, did Kyron talk at all to Paula?

A   Yes.

Q   Was it in your--were you--was she in your car?

A   No.   We were--I was in Breanna's car.

Q   All right.   Where was Paula?

A   That--she was out of the car talking to Kyron.

Q   Okay.   She was out of the car talking to Kyron.   You couldn't overhear any of that conversation.

A   No.

Q   And, afterwards, uh, she didn't comment on anything that was said, did she?

1  A    No.

2  Q    All right.  Now, she left with you.

3  A    No verbal response.

4  Q    She didn't leave with Kyron.

5  A    No.  She didn't leave--

6            THE COURT:  Is that correct?

7            THE WITNESS:  Yes.

8  BY MR. WHITE:

9  Q    Is that correct?

10 A    Yes.

11 Q    All right.  So, um, you then returned, uh, to Paula's

12    apartment.  Uh, and you say you left--that Breanna left about

13    11:30, is that correct?

14 A    Yes.

15 Q    All right.  Now, as far as you observed, uh, Paula and

16    Stephanie got along very well.

17

18 A    Yeah, yes.

19 Q    And, when Paula found out that Stephanie might have stolen

20    things from her, she didn't--she was disappointed, correct?

21 A    Yes.

22 Q    She was hurt.

23 A    Yes.

24 Q    And, she didn't say that Stephanie needed to be killed, or

25    injured, or anything else, did she?

A    No.

98

Q   Did you ever hear Kyron say anything about her?

A   No.  Not until the dog thing happened and then he was trying to blame--like I thought--I thought Kyron liked Stephanie until the dog thing.  And, then he said Stephanie did it, you know.

Q   All right.  He didn't have any evidence of that, at least as far as you knew.

A   No.

Q   Now, whose dog was it, uh, Paula's or, uh, Kyron's dog?

A   Paula bought it, but I think it was more to be Kyron's.

Q   All right.  And, how old was this puppy?

A   Couple weeks.

Q   All right.  Now, you said that the property taken; the laptop and everything else were things that Paula had paid for.

A   Yes.

Q   Now, were they her things or were these things she bought for Kyron?

A   Um, the--

Q   If you know.

A   Yeah.  The Play Station Two was bought for Kyron.  And, the laptop was bought for her and Kyron.

Q   Okay.  I assume the women's shoes were bought for Paula.

A   Yes.

Q   All right.  Now, you--so, you were in the house, and you watched Desperate Housewives, and, uh, things like that.  Uh,

1   until Kyron came by--did he call before he came by?

2  A   Not to my knowledge.

3  Q   Okay.   When he came by, you said he was having a conversation

4   with Paula.

5   THE COURT:   Is that correct?

6  BY MR. WHITE:

7  Q   Is that correct?

8  A   When he came the second time?

9  Q   Yes.

10  A   Yes.

11  Q   And, you were outside on the balcony.

12  A   Yes.

13   THE COURT:   Right?

14  BY MR. WHITE:

15  Q   Right?

16  A   Yes.

17   MR. WHITE:   I'm sorry, your Honor.

18   THE COURT:   That's all right.   I know it's a habit.

19  BY MR. WHITE:

20  Q   And, when you were outside on the balcony, is it correct that

21   you could not hear anything they were saying?

22  A   Yes.

23  Q   Because the doorwall was closed.

24  A   Yes.

25  Q   Now, how far apart were they sitting, if you can remember?

100

A     Their legs were touching.

Q     All right.  And, was Kyron angry, happy, pleasant, what was the look on his face?

            MS. KETTLER:  You know, again, I move to--I move to object to this because I--I don't think a person can say what someone's state of mind is just by looking at him.  People express themselves differently.  So, I object to asking her to speculate about that.

            MR. WHITE:  I think, again, we have common experience--

            THE COURT:  I sustain the objection.  You can ask her how he appeared.

BY MR. WHITE:

Q     How did he appear to be?

A     Well, I couldn't see his face because he was turned into her--into her bod--like, her face was right here and he was turned into her face.

Q     All right.  So, then--then it would indicate that you--you couldn't tell.  All right.  How soon after that did you leave the house?

A     You mean, did they leave?

Q     Or rather, did they leave the house?

A     About five min--about five minutes.

Q     All right.  And, when was the first time you heard any mention of Mike?

101

A    That--I mean Paula's told me that Kyron--I'll be like,

where's Kyron, and she'll say, oh with Big Mike.

Q    Let me be more specific.  That evening, did you hear about

him before Paula and Kyron left, or only after Paula

returned?

A    Only after.

Q    Okay.  Now, at the time that you wrote your statement out for

the police, you didn't put anything in there about, uh, Paula

was driving or not, right?

A    Right.

Q    Okay.  And that was on the 6th.

A    Yes.

Q    All right.  And, uh, you didn't put anything in there about

Paula actually seeing, uh, Kyron confront Stephanie, did you?

A    No verbal response.

Q    In what you wrote on, on the 6th.

A    I'm pretty sure that I didn't write it down, but when the,

um--when we went to Frank Murphy, I'm almost positive, I said

that on recording.

Q    All right.  So, when you were being questioned, who

questioned you, a prosecutor, the police, or who?

A    Over--in the recording?

Q    In the recording.

A    A prosecutor.

Q    Okay.  So, when you were being questioned by the prosecutor,

102

1    you talked about things that you said Paula had said, or

2    seen, or was driving.

3  A  Yes.

4  Q  But, you didn't put any of that in your statement?

5  A  No.

6  Q  And, you tell us your statement is true?

7  A  Yes.

8  Q  Correct?

9  A  Yes.

10  Q  All right.  Now, you knew Paula and you knew Kyron.  Had you

11    ever seen Kyron let Paula drive his car?

12  A  No.

13  Q  Um, the--when Paula returned that night, she didn't say

14    anything about anybody driv--or, about her driving the car,

15    did she?

16  A  No, it was the day after.

17  Q  Okay.  So, that night she didn't say anything about driving

18    the car.  What she told you was that, uh--what she told you

19    is there was a--she told you that Mike was in the car that

20    night, right?

21

22  A  No verbal response.

23  Q  After she came back.

24  A  Yeah.

25  Q  And, she told you she had heard shots, correct?

   A  Yes.

                        103

Q    She--did she tell you how far away she was from, uh, where Kyron had gone?

A    No.

Q    Okay.  She didn't say she was a block away.

A    No.

Q    And, she didn't tell you she was in the backseat of the car.

A    No.

Q    All right.  She didn't tell you anything about details of any of the stuff, correct?

A    Correct.

Q    Now, she just told you that night when she was really upset, that she'd heard five shots, five clicks.

A    Click, click, click, click, click, yes.

Q    Now, did you know where Stephanie lived at that point?

A    I just knew what trailer park.  I didn't know which--

Q    But, you didn't know where it was.

A    No.

Q    Okay.  Now, you called your boyfriend Ricky to come over, right?

A    Yes.

Q    And, he got there in about ten minutes.

A    Yes.

Q    Now, when Paula repeated her story, did she change any of the details from what she told you?

A    No.

104

Q   Now, you didn't believe this, did you?

A   No verbal response.

Q   You didn't believe that it happened.

A   No.

Q   All right.

A   I still don't.

Q   All right. Uh, and, at that point she tried to call, uh, Kyron several times on her phone.

A   Yes.

Q   Now, you said she came back at three o'clock in the morning. What time did she make her first attempt to call Tyrone-- Kyron?

A   Probably about 3:45.

Q   Okay. And, do you know when she finally reached him?

A   No.

Q   It's--

A   I know when--I know that it took her--I know she kept ending the call, and doing it again, and ending it, doing it again.

Q   All right. Were you still up when she finally got a hold of him?

A   I was in the other room.

Q   Awake?

A   Awake, yes.

Q   What time did you finally go to sleep?

A   Probably five.

Q   What time did you get up the following morning?

A   I'm pretty sure that phone call was about 9:30, 10:00.

Q   Okay.  Um, and, you said Paula acted like she was in shock, she was shaking, and her eyes were big, and everything when she came in.

A   Yes.

Q   Okay.  Now, did Paula--Paula told you that she was afraid that if anybody talked about it, Kyron would injure their family.

A   Yes.

Q   Uh, did she refer to herself and her own family, too?

A   She said--I mean, she said; if anybody--she said; you know, if anybody tells any--anybody about this, they'll kill you and your families.  I mean, I can't--I don't know.

Q   Did you feel she--

          MR. BURKETT:  I'm sorry, for one second.

          Your Honor, I did not make an objection to counsel's cross-examine.  I mean, I made it to the prosecutor, but I still have a standing objection about anything that Kyron--that she said Kyron said.

          THE COURT:  I agree, you still have a standing objection.

          MR. BURKETT:  Thank you, your Honor.  And, I won't interrupt again.

          MR. WHITE:  That's actually the direction I was

                              106

going in.

        THE COURT:   Okay.

        MR. WHITE:   I think I can tie this up.

        THE COURT:   Go ahead.

BY MR. WHITE:

Q   Did you feel like she was--like Paula was making a threat to you, or did you feel like she was warning you of something that somebody else might do?

A   She--like, she was warning me.

Q   Well--

        MS. KETTLER:   I--I object to this.   This is entirely asking somebody to speculate what's going on in someone else's mind.

        MR. WHITE:   But she is--

        THE COURT:   No, no.   The question was; what did the witness think.   I think that's proper.

        Mr. Burkett, were you going to object?

        MR. BURKETT:   I was, but it--I'm sorry.   I was going to object, but if it's going to be that--that what she thought, I think it's irrelevant, what she thought.

        THE COURT:   Okay.   You were going to object but you're not now?

        MR. BURKETT:   Well--

        THE COURT:   Or--

        MR. BURKETT:   I'm sorry, I was going to object.   I

107

thought that she was going to say something about my client.
But, I object on the basis of relevancy, now.

THE COURT:   Okay.   Ask another question, Mr. White.

MR. WHITE:   Thank you.

BY MR. WHITE:

Q    Now, when--when again did you say you had the discussion
     Paula told you she was driving?

A    It was the day--it was when she came over to my house, the
     day after.

Q    All right.   And, she'd never mentioned it before then.

A    Not that she was driving.

Q    All right.   Now, did she tell you she had seen--directly seen
     a confrontation between Mr. Benson and Ms. McClure, or did
     she just tell you she'd heard shots?

A    She--she told me that Kyron told her that they were arguing--
     they were arguing before he shot her.

Q    Okay.   But, on--

A    But, yes.   All she--all she heard was shots.

Q    Okay.   That's what I'm asking you.

A    Yes.

Q    She--she didn't tell you she observed the inci--or, the
     shooting, did she?

A    No.

Q    All right.

MR. WHITE:   One moment, your Honor.

108

THE COURT: Sure.

MR. WHITE: I don't have anything more at this time, your Honor.

THE COURT: Mr. Burkett, are you prepared?

MR. WHITE: Perhaps, after counsel.

THE COURT: Are you prepared to cross-examine any further?

MR. BURKETT: Uh, I--

THE COURT: Or do you feel the need to cross-examine any further, I should ask?

MR. BURKETT: --I do need. But, I haven't--I've been trying to go through this thing but it's almost impossible when they're asking questions.

THE COURT: No. That's--I'm just--

MR. BURKETT: But I do have a few questions I could ask and I won't have to be repetitive.

THE COURT: This is--

MR. BURKETT: But, I'll wait--I'll wait, then.

THE COURT: All right. Redirect?

MS. KETTLER: Before he finishes his cross?

THE COURT: It--it's very disjointed.

MS. KETTLER: Okay. I only actually have very, uh, limited questions, but I'll go ahead.

THE COURT: Go ahead.

REDIRECT EXAMINATION

109

BY MS. KETTLER:

Q    Um, when Mr. Burkett talked to you about, um, the time you spent with the police giving your statements, you said it was like, until three o'clock in the morning, until five p.m. the next day, is that right?

A    Yes.

Q    Um, you weren't at the police station that whole time, is that right?

A    No.

Q    Okay. That's including--

A    But I was with the police the whole time.

Q    Okay. That's including the time that the police took you to Frank Murphy.

A    Yes.

Q    Okay. And, um, you weren't locked up in a cell or anything.

A    No.

Q    Okay. Uh, and, when you referred to the next day, um, are, uh, referring to later that day?

A    No verbal response.

Q    I mean, that--

A    Yes. Later that--I forgot that was so late in the--early in the morning.

Q    Okay. And, your statement that you gave to the police, you wrote out yourself, is that correct?

A    Yes.

Q    It's not in question and answer form, is that.

A    No.

Q    Is that right?

A    Yes.

Q    Um, have you had any police training to know what all you should, uh, include in the statement?

A    No.

Q    Um, have you ever known--have you ever been a witness in a homicide before?

A    No.

Q    Okay.

A    And, I never want to be in another one of these again.

          MS. KETTLER:   Nothing further.

          THE COURT:   Gentlemen, any further questions at this time, for this witness?

          MR. WHITE:   Not at this time.

          MR. BURKETT:   No, your Honor.

          THE COURT:   Ms. Fritz, you can step down.   Don't go too far.

          Um, let's take a break on this proceeding so I can take care of other matters and give everybody a chance to stretch your legs.

          (At 11:51 a.m., witness excused)

          (At 11:52 a.m. until 12:05 p.m., other matters heard)

111

THE COURT: Back on the record with Benson and Bennett.

Madam Prosecutor, I think, um--well, let me think.

Mr. Burkett, or--

MR. BURKETT: Yes, Judge.

THE COURT: --Mr. White, after you've had a chance to further digest those statements, do we need to get Ms. Fritz back on the stand?

MR. BURKETT: Uh, your Honor--

THE COURT: At this point?

MR. BURKETT: No. Uh, I liked what you suggested at the sidebar.

THE COURT: Okay, okay. You're not ready to sign off on her, but you're not ready to question her, either.

MR. BURKETT: Correct.

THE COURT: That's okay.

Then, I think we're probably ready for another witness.

MS. KETTLER: Yes, your Honor.

MR. WHITE: Yes.

THE COURT: What's your name?

MS. KANDLER: Breanna Kandler.

THE COURT: Ms. Kandler, I want you to raise your right hand for me.

Are we on the record?

THE COURT RECORDER: I am on, sir.

THE COURT: Do you swear or affirm that you will tell the truth, the whole truth, and nothing but the truth?

MS. KANDLER: Yes.

THE COURT: All right. I want you to speak up--you can put your hand down. I want you to speak up and I want you to state your full name, and spell your name for the record, please.

BREANNA NICOLE KANDLER

called by the People at 12:06 p.m. and sworn by the Court; testified:

THE WITNESS: Breanna Nicole Kandler, B--

THE COURT: You're going to have to be much louder than that. Do you have brothers or sisters?

THE WITNESS: No verbal response.

THE COURT: Yes?

THE WITNESS: Yes.

THE COURT: Use the voice you use with them when you're mad at them, loud.

THE WITNESS: Breanna Nicole Kandler, B-R-E-A-N-N-A, K--or, N-I-C-O-L-E, K-A-N-D-L-E-R.

THE COURT: Thank you, Ms. Kandler. I'm going to caution you, try to avoid head nods to answer a question. And, uh, also try to avoid saying um-hmm, or hm-mmm. Try to stick with yeses, noes, and I don't knows, please.

113

1       THE WITNESS:  Okay.

2       THE COURT:  Counsel, proceed.

3       MS. KETTLER:  Thank you, your Honor.

4                    DIRECT EXAMINATION

5    BY MS. KETTLER:

6    Q    Good morning, ma'am.  Uh, I need you to keep your voice up

7         nice and loud.  And, I know you're kind of soft spoken, but

8         will you try really hard to do that for me, please?

9    A    Yes.

10   Q    Please state you full name for the record.

11   A    Breanna Nicole Kandler.

12   Q    Okay.  And, old are you?

13   A    Eighteen.

14   Q    Do you know, uh, Paula Bennett?

15   A    Yes.

16   Q    And, how long have you known Paula?

17   A    Since eighth grade.

18   Q    Okay.  Uh, how would you describe your relationship with her

19        before all this happened?

20   A    Really good friends.

21   Q    Okay.  What about, uh, Mr. Benson, Kyron Benson, do you know

22        him?

23   A    Yes.

24   Q    How long have you known him?

25   A    Uh, two years.

                              114

1   Q    Okay.   And, how do you know him?

2   A    Through Paula.

3   Q    Okay.   Um, did you go to school with Paula?

4   A    Yes.

5   Q    All right.   And, she already graduated.

6   A    Yes.

7   Q    Have you graduated, as well?

8   A    Yes.

9   Q    And, what school was that?

10  A    Lincoln.

11  Q    Okay.   Uh, I want to ask you, um--first of all; you're here

12       pursuant to a subpoena, is that correct?

13  A    Yes.

14  Q    Court order, you're not here voluntarily, is that right?

15  A    Yes.

16  Q    Okay.   But, I have--in addition to the Judge swearing you in,

17       I have advised you, uh, that you have to tell the truth, or

18       you could be prosecuted for perjury, is that correct?

19  

20  A    Yes.

21  Q    All right, thank you.   Ma'am, I want to direct your attention

22       back to, uh, December 6, of 2007.   Did you spend some time--

23       in, um, December--

24                  MS. KETTLER:   I'm sorry, did I say December?

25                  THE COURT:   You did.

    BY MS. KETTLER:

                              115

1  Q   --October 5th, that night into October 6th.  Uh, did you spend

2      some time with your friend Paula Bennett?

3  A   That day, yes.

4  Q   Okay.  When, um--the day before, um, Stephanie was killed,

5      when was the first contact that you had with Paula?

6  A   Can you repeat that?

7  Q   Yes.  Did that day--that day that you had contact with Paula,

8      what--about what time was it that you had your first, um,

9      contact regarding her?

10 A   Um, the day after.

11 Q   The day before Stephanie was killed, I'm sorry.

12 A   Probably eleven o'clock in the afternoon.

13 Q   Okay.

14 A   Around there.

15 Q   And, how did you have contact with her?

16 A   No verbal response.

17 Q   Um, was it on the phone, or in person?

18 A   In person.

19             MR. WHITE:  Your Honor, I can't hear her answers.

20             THE COURT:  Ms. Kandler, please try to be louder.

21             THE WITNESS:  In person.

22             THE COURT:  As a matter of fact, let's take a break

23      while we serve that.

24             MS. KETTLER:  Yeah.  I'm sorry, it's kind of

25      distracting.

1    THE COURT:  I--and, I apologize.

2    MS. KETTLER:  That's okay.

3    THE COURT:  But, I was just informed that, uh,

4    neither Mr. Benson or Ms. Bennett were given any food before

5    the jail brought them out here today.  So, uh, my court

6    officers went out and got them some fast food.  Uh, we've all

7    agreed that we'll let them eat so they don't, uh, faint from

8    hunger.

9    MR. BURKETT:  That's--all right.  Yes, your Honor,

10   that's fine.

11   THE COURT:  It's okay with me.

12   MS. KETTLER:  Can I have my drink on the table?

13   THE COURT:  Yes, you can.

14   MS. KETTLER:  Thank you.

15   THE COURT:  I'm not going to send out for Burger

16   King for you, but you can have your Diet Coke.

17   MS. KETTLER:  That's okay, as long as I have

18   caffeine I'm all set.

19   THE COURT:  Proceed, please.

20   MS. KETTLER:  All right, thanks.

21   BY MS. KETTLER:

22

23   Q    I know it's hard, but you've got to keep your voice up nice

24   and loud, okay?

25   A    Yes.

     Q    You said it was about eleven o'clock, uh, that you had

                                  117

1       contact with Paula, is that right?

2   A   Yes.

3   Q   All right. And, was that on the phone, or in person?

4   A   In person.

5   Q   All right. Where was that?

6   A   At her job.

7   Q   All right. Did you go there--you went up to her job?

8   A   Yeah.

9   Q   And where was that?

10  A   At Cluck's.

11  Q   Okay. I need you to say yes or no, not yeah, okay?

12  A   No verbal response.

13  Q   All right, all right. And, that's Cluck's, where is that

14      located?

15  A   On Michigan Ave.

16  Q   Okay. And, in what town?

17  A   Ypsilanti.

18  Q   Okay. And, what was--did you drive there?

19  A   Yes.

20  Q   What was your purpose in driving there?

21  A   To see her.

22  Q   Okay. And, did you see her there?

23  A   Yes.

24  Q   And, did you leave from there with her?

25  A   Yes.

Q   Was she done working at that point in time?

A   No.

Q   Okay.

A   I waited for her.

Q   And, this is at eleven o'clock in the morning, correct?

A   Yes.

Q   All right.  How long did you wait for her, roughly?

A   Probably, an hour or two.

Q   Okay.  Were you talking to her during that period of time?

A   Yes.

Q   All right.  And, what were you talking about?

A   Um, that her stuff got stolen from her apartment.

Q   All right.  Was there some particular stuff that she indicated had been stolen?

A   Yes.

Q   And, did Paula tell you what--uh, what were the items that Paula told you had been stolen from her?

A   A laptop, a Play Station Two, some shoes, some clothes.

Q   Whose clothes?

A   Hers and Kyron--well, Kyron's.  And, um, some games for the Play Station Two.

Q   Okay.  And, this day when you went to her job, um, was this the first time she had told you about this--that--that these items had been stolen from her?

A   Yes.

119

Q   Okay.  And, did Paula tell you, um, who she thought had stolen the items from her?

A   Yes.

Q   And, who did she say thought--she thought stole the items from her?

A   Stephanie.

Q   Okay.  And, did she tell you--Stephanie--did, uh, you know Stephanie before she was killed?

A   Yes.

Q   What's Stephanie's last name?

A   McClure.

Q   How long had you known Stephanie before she was killed?

A   A long time.

Q   Okay.  You gotta keep your voice up.

A   A long time.

Q   Okay.  And, was she a friend of your?

A   Yes.

Q   All right.  Did Paula tell you this about her things being stolen as soon as you got there to her job?

A   Yes.

Q   All right.  And, while you were there, um, talking with her at her job, did the two of you come up with some type of plan about what you would do about those items being stolen?

A   Yes.

Q   And, what was your plan?

120

1   A   To go make a police report.

2   Q   Okay.  Did Paula tell you any details about why she thought

3       it was Stephanie that had stolen these things from her?

4

5   A   No.

6   Q   Okay.  Um, and so, after she was done working then, did you

7       two follow through on that plan to go to the police station?

8   A   Yes.

9   Q   And, what police station did you go to?

10  A   Van Buren.

11  Q   Okay.  And, did you make, uh--did you go with her, uh, while

12      she made that police report?

13  A   Yes.

14  Q   And, did you also write out a statement regarding your

15      knowledge of the matter?

16  A   Yes.

17  Q   Okay.  And, um, can you tell the Judge about what time of day

18      it would have been that you made the police report at Sum--at

19      Van Buren?

20  A   Well like, one, or two in the afternoon.

21  Q   Okay.  And, you drove Paula there in your car, is that

22      correct?

23  A   Yes.

24  Q   All right.  And, was it just the two of you?

25          THE COURT:  Counsel, give me just a second, please.

    Thank you.

121

MS. KETTLER: Yes.

BY MR. KETTLER:

Q  Um, I'm sorry. I hate to--did I ask you, um, was it just the two of you in the car there?

A  Yes.

Q  Okay. And, did you go anywhere before you went to Van Buren to make the police report?

A  No.

Q  All right. And, after you were done at the Van Buren Police Department, did you and Paula go somewhere else?

A  Yes.

Q  And, where was that?

A  Uh, to Applebee's parking lot.

Q  Okay. And, are you still driving?

A  Yes.

Q  All right. And, so just the two of you, you and Paula go to the Applebee's parking lot.

A  Yes.

Q  And, why do you go there?

A  To pick up Kyron.

Q  Okay. And, do you see Kyron in the courtroom?

A  Yes.

Q  Where he sitting and what is is he wearing?

A  Uh, a green jumpsuit, I guess.

Q  Okay.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2           MS. KETTLER:  I'd ask the record reflect the

3    identification of the defendant.

4           THE COURT:  So noted.

5    BY MS. KETTLER:

6    Q    And, um, did you--is--why were you going to Applebee's to

7    meet Kyron there?

8    A    'Cause he wanted us to pick him up.

9    Q    At that location.

10   A    Yeah.

11   Q    Okay.  Did he work there?

12   A    No.

13   Q    He was just going to meet you there.

14   A    Yes.

15   Q    All right.  And, when you got there, was Kyron there?

16   A    Yes.

17   Q    All right.  And, uh, did you have any conversation with Kyron

18   at Applebee's?

19   A    No.

20   Q    All right.  Did he, um--did you stay in the car?

21   A    Yes.

22   Q    Did he--was he on foot or in a car?

23   A    In a car.

24   Q    All right.  Did Paula get out of the car that you were in?

25   A    No.

     Q    All right.  So, what do you do, um--you're meeting him there

                                  123

1        at Applebee's, correct?

2  A   Yes.

3  Q   And, from there what happens?

4  A   Um, we were driving and he wanted, um, me to take him to go

5        get the key.

6  Q   Okay.  First of all; who is he?

7  A   Kyron.

8  Q   And, how did you know that Kyron wanted you to take him to

9        get the key?

10  A   Pau--Paula wanted me to take her to get the key.

11  Q   Okay.  The key to what?

12  A   To her apartment.

13  Q   Okay.  And, she wanted you to take her to get it from who?

14  A   Stephanie.

15  Q   Okay.  An, extra key.

16  A   Yes.

17  Q   All right.  It--was, uh, Paula without a key of her own at

18        that point?

19  A   I think so.

20  Q   Who had the other key of hers, besides Stephanie?

21  A   Kyron.

22  Q   Okay.  So, what was the purpose of going to meet Kyron if--if

23        it was, um, you who was supposed to drive Paula to go get the

24        extra key?

25  A   I don't know why we picked up Kyron.

124

Q    Okay.  So, he gets in the car with you, is that right?

A    Yes.

Q    And, from there, where do you go?

A    We were driving down Belleville Road.

Q    And, where did you go to?

A    We went to his friend Bruce's.

Q    Okay.  And where is that located?

A    On Textile.

Q    Textile Road?

A    Yes.

          MR. WHITE:  Uh, she's gonna--I didn't hear the last words she said as to where he went to.

          THE COURT RECORDER:  Mr. White, I can't hear you.

          MR. WHITE:  Oh, all right.  I'll be louder.

          If I could have her repeat where she went to, your Honor, it would be--

          THE COURT:  Textile Road was the answer, correct?

          THE WITNESS:  Yes.

          THE COURT:  Thank you.

BY MS. KETTLER:

Q    All right.  And, um, when you went--is that somewhere you had gone before?

A    No.

Q    All right.  Did you get out of the car at Bruce's on Textile Road?

125

A   Yes.

Q   Did Kyron get out of the car?

A   Yes.

Q   Did Paula get out of the car?

A   Yes.

Q   All right.   How long were the two of them out of the car?

A   Probably twenty minutes, tops.

Q   Okay.   Did they go in a house there?

A   Yes.

Q   And, you just waited in the car?

A   No.

Q   Okay.   What did you do?

A   I went inside.

Q   Oh, you did go inside.

A   Yes.

Q   All right.   Did you have any conversations with them inside
    the house?

A   Yes.

Q   Okay.   Did you have any--what was the nature of your
    conversations inside the house?

A   Just about her stuff being stolen.

Q   Okay.   What, if anything, did Kyron say at Bruce's house
    about Paula's things being stolen?

A   That he was mad, and that he--she shouldn't of nev--she
    should of never gave him a key--gave her a key.

126

1   Q   To the apartment.

2   A   Yes.

3   Q   Okay.  And, what did Paula say about, uh, the things being

4        stolen, while you were at Kyron's house--I mean, I'm sorry,

5        Bruce's house?

6   A   That she just wanted her stuff back.

·7             MS. KETTLER:  May I have just one moment?

8             THE COURT:  Sure.

9  BY MS. KETTLER:

10  Q   Before you got to Bruce's house, what conversations--while

11       you're driving over to Bruce's house, what conversations do

12       you have with Kyron and Paula about the fact that, um,

13       Paula's things are missing?

14  A   Um, Kyron was threatening to kill Stephanie.

15  Q   Okay.  What did he say, the best you can remember?

16  A   I'm gonna kill her.

17  Q   Okay.  And, did he say why?

18  A   No, not really.

19  Q   Okay.  Was this in the context of this conversation about the

20       things being stolen?

21  A   Yes.

22  Q   All right.  Um, can you recall, roughly, where you were when

23       Kyron said he was gonna kill Stephanie?

24  A   Belleville Road.

25  Q   Okay.  Belleville, about where, do you remember?

A     Almost uptown Belleville.

Q     Okay.  Do you remember any of the other, um, things that Kyron said while you were riding in the car, about Stephanie?

A     No.

Q     All right.  Did you give a statement to the police, uh, soon after this happened?

A     Yes.

Q     And, do you think your memory was better the day after it happened, then it is now?

A     Yes.

Q     Okay.  And, when you gave your statement to the police, did you tell the truth?

A     Yes.

Q     All right.  In addition to giving the statement to the police, did you give an investigative subpoena at the prosecutors' office?

A     Yes.

Q     All right.  And, when you did that, were you placed under oath, just like you were in court here today?

A     Yes.

Q     And, were you advised, uh, by myself that, uh, you have a right not to answer questions that would incriminate you?

A     Yes.

Q     Were you advised that you had a right to an attorney?

A     Yes.

128

Q   And, were you advised, uh, that you could be prosecuted for perjury if you lied or misled in your answers?

A   Yes.

Q   And, you were aware that when you were giving those statements that it was a court reporter, just like the lady here today, taking everything down, is that correct?

A   Yes.

Q   And, did you tell the truth at your investigative subpoena?

A   Yes.

Q   All right.   First of all I want to ask you a couple of questions about this statement that you gave to, uh, the police.   Was that at the Sumpter Township Police Department?

A   Yes.

Q   All right.   And, um, before you gave that statement to the police, were you advised of your rights?

A   Yes.

Q   All right.   And--all right.   Do you think that if you were to look at the statement that you gave the police, it would refresh you recollection about what else Kyron said that day, about killing, uh--uh, Stephanie?

A   Yes.

Q   All right.

            MS. KETTLER:   May I approach the witness?

            THE COURT:   You may.

BY MS. KETTLER:

Q   I'm gonna show you your statement, uh, page four, first of
    all.  Is that, uh, the statement that--is that page four of
    the statement that you gave at the Sumpter Township Police
    Department?

A   Yes.

Q   And, is that in question and answer form?

A   Yes.

Q   All right.  And, I want you to review that whole page to
    yourself, first of all, if you would please.  All right.
    Does that refresh your memory?

A   Yes.

Q   All right.  Is everything on that page the truth?

A   Yes.

Q   All right.  And, what else did Kyron say besides that he was
    going to kill Stephanie, while you were in the car?

A   That Stephanie was--or that Paula was stupid for giving her a
    key.

Q   Okay.  And, did he say anything else about Stephanie?

A   He kept saying that she was done, and if he didn't do it
    somebody--it would be done.

Q   Okay.  And, um, did you say anything to him in response to
    his saying that?

A   That's he's crazy, and that's--that he's insane, and that
    he's crazy for even thinking of doing something like that.

Q   Why?

130

A   Because it's not--she didn't--that's not--she didn't deserve to do--that did not deserve to happen.

Q   Okay.  What did you tell him that she deserved if she did steal the things?

A   That if she--she needed to sit in jail and think about what she did.

Q   Okay.  And, after that did he give you some response to your comments about that?

A   Not that I can remember.

Q   Do you remember the next page of your statement?

A   No verbal response.

Q   Did--did you, uh--were you asked the question what did Benson say back?

A   Yes.

Q   And, did you give the answer that he didn't care and if I said anything I would be next.

A   Yeah.

Q   Is that the truth?

A   Yes.

Q   Now, that statement that I just read to you and the things that you refreshed your recollection on in your statement, you were asked about all of those in your investigative subpoena, is that correct?

A   Yes.

Q   So, did you tell the truth when you wrote this statement to

1   the police?

2  A   Yes.

3  Q   And, then when you were asked about this statement in your

4     investigative subpoena, you again said that that was the

5     truth, is that correct?

6  A   Yes.

7  Q   All right. After Mr. Benson said that to you, um, about that

8     he didn't care and if you said anything you would be next,

9     what impact did that have on you?

10  A   I was scared for my life, and the people around me, and my

11     friends, and family.

12  Q   And, how do you feel about that now?

13  A   I'm still scared.

14  Q   Okay. So, this conversation is going on in the car, in-

15     between Applebee's and Bruce's house, is that right?

16  A   Yes.

17  Q   Okay. And, then while you were at Bruce's house, um, you

18     said that you, and Kyron, and Paula were in there for about

19     twenty minutes, is that right?

20  A   Yes.

21  Q   Okay. And, was there any conversation that you heard by

22     either Paula or Kyron at Bruce's house, about Stephanie?

23  A   No.

24  Q   About the things being gone, or what they were going to do

25     about it?

132

A   No.

Q   Okay.  And, when you left Bruce's house, who--um, did both Kyron and Paula come with you?

A   No.

Q   Okay.  You--did you leave by yourself?

A   No.

Q   Okay.  Who left?

A   Me and Paula.

Q   Okay.  And, Kyron stayed at Bruce's house?

A   Yes.

Q   Do you--do you know Bruce's last name?

A   No.

Q   Okay.  And, when you and Paula left Bruce's house, where did you go from there?

A   We went to Rite-Aid.

Q   All right.  And, why did you go to Rite-Aid?

A   To talk to Rita.

Q   Okay.  Who is Rita?

A   Uh, Paula's cousin.

Q   Okay.  And, let me back up just for a minute.  When Kyron is saying these things about--about killing Stephanie, roughly, what time is it?

A   I'm thinking around three.

Q   Okay.  Three o'clock in the afternoon?

A   No verbal response.

133

Q    The afternoon, um, before Stephanie got killed?

A    Yes.

Q    Okay.  So, you go to Rite-Aid with Paula, is that correct?

A    Yes.

Q    And, um, you go to see Rita, who is who to Paula, to your knowledge?

A    Her cousin.

Q    All right.  Did you, um, succeed in seeing Rita there?

A    Yes.

Q    Let me back up just one second, I'm sorry to bounce around on you.  When you left Bruce's house, um, and Kyron stayed there but Paula went with you, what happened to the plan for you to take them to go get the key to the house?

A    I told him no.

Q    Okay.  And, why is that?

A    Because I didn't know what he was gonna do.

Q    Okay.  So, you told him no, you would not do that, is that right?

A    Yes.

Q    And, that's the point in time when you went to Rite-Aid, uh, and saw Rita, is that correct?

A    After we left.

Q    After you left Bruce's?

A    Yes.

Q    Okay.  And, is Rita somebody that you knew before?

134

A    Yes.

Q    Okay.  And, was she--you said she was there at the store.
     What did Paula say to Rita?

A    That Kyron was mad and that he was saying that he was gonna
     kill Stephanie.

Q    Okay.  And, so, Paula told that to Rita, is that right?

A    Yes.

Q    And, did she talk, uh, specifically at that point about this,
     in terms of her things being to stolen being the reason?

A    Yes.

Q    About how long did you stay at Rite-Aid?

A    Um, not very long.  Like, maybe twenty minutes to a half-an-
     hour.

Q    Okay.  And, is this basically, this whole time you talking
     with Rita about the things being stolen, and Kyron saying he
     was gonna kill Stephanie?

A    Yes.

Q    All right.  Did you buy anything?

A    No.

Q    Did Paula buy anything?

A    Yes.

Q    Okay.  So, you spent about twenty minutes at Rite-Aid, is
     that correct?

A    Yes.

Q    And, where do you go from there?

135

A    Uh, to Jessica's.

Q    Okay.   Who is Jessica?

A    Uh, a friend.

Q    What's Jessica's last name?

A    Fritz.

Q    Okay.   And, you and Paula go then to her house?

A    Yes.

Q    Is that--and did--you're still driving the car, correct?

A    Yes.

Q    You picked Jessica up.

A    Yes.

Q    And, where do you go from there?

A    To--back--back to Cluck's.

Q    Okay.   And, what's the purpose of going to Cluck's at that point in time?

A    To, uh, wait for Katie to get off of work, to pick her up.

Q    Okay.   And, when you are in the vehicle with Jessica, did you talk at all about the conversation that you heard between, uh, Paula and Kyron earlier that day?

A    Yes.

Q    And, did--what was the conversation that you had in the car with Jessica there?

A    That Kyron was threatening to kill Stephanie.

Q    Okay.   And, was there some expression of, um, oh, you know I don't think he'll really do that?

136

A    Yes.

Q    Who said that?

A    Jessica.

Q    Okay.  And, what did Paula say in response to that?

A    She didn't think he would do it, either.

Q    Well, didn't Paula say he looked pretty serious?

A    Yeah.

Q    All right.  And, you told the police that the day after this happened, correct?

A    No verbal response.

Q    Did you put that in your, um, witness statement that Paula said--Paula said that he looked pretty serious about killing Stephanie, is that correct?

A    Yes.

Q    Pardon me.  And, was that the truth?

A    Yes.

Q    All right.  Um, so at least--you know, obviously, you don't know what Paula thought, correct?

A    Right.

Q    But, you know what she said, is that right?

A    Yes.

Q    And, Paula said he looked pretty serious, is that correct?

A    Yes.

Q    And, in addition to putting that in your statement to the police, you also talked about that in--in your investigative

137

1    subpoena and said that was the truth, is that correct?

2  A   Yes.

3  Q   All right.  At this point in time, what's your state of mind

4      about, you know, how dangerous this situation is?

5  A   Well, I'm scared.

6  Q   Okay.  And, did Katie get off work?

7  A   Yes.

8  Q   And, um, when you went to Cluck's, did you all wait in the

9      vehicle for Katie to get off, or did you go inside?

10 A   We went inside.

11 Q   Okay.  And, were you talking with Katie before she got off

12     work, or not--or, I mean, were you able to talk to her?

13 A   Yes.

14 Q   Was she already done working when you got there?

15 A   Yes.

16 Q   Okay.  And, did you have a conversation with, um, Katie while

17     you were still at Cluck's, or did you leave right away?

18 A   Uh, we pretty much left right away.

19 Q   Okay.  And, what--once--once Katie was with you, what did

20     Paula say to Katie?

21 A   That Kyron was gonna kill Stephanie.

22 Q   Okay.

23         MR. BURKETT:  Your Honor, I still have the standing

24     objection.

25         MR. WHITE:  And--and I didn't hear what she said,

138

so I--

THE COURT:  Ms. Kandler, could you repeat your answer, please.

THE WITNESS:  That Steph--that Kyron was gonna kill Stephanie.

THE COURT:  Thank you.

BY MS. KETTLER:

Q    Okay.  So, at this point in time, you, Paula, and Jessica are all in the car, uh, and Katie, talking about the fact that Kyron threatened to kill Stephanie, is that right?

A    Yes.

Q    Okay.  Where did you go when you left Cluck's?

A    To Paula's apartment.

Q    All right.  And, what are you doing, uh, at that point?

A    Waiting for Kyron to get there with the key.

Q    Okay.  So, Stephanie didn't even have--I'm sorry.  Paula didn't even have a key to her own apartment, is that--at this point, is that right?

A    Yes.

Q    Kyron's got a key, and maybe Stephanie has a key, is that right?

A    Yes.

Q    And, how long did you have to wait for Kyron to get there?

A    Probably a half-an-hour.

Q    Okay.  And, when he arrived there, uh, did you see how he

139

1    arrived?

2   A   No verbal response.

3   Q   Was it on foot, or in a vehicle?

4   A   It was in a car.

5   Q   Okay.  What kind of car.

6   A   Um, I--

7   Q   If you know.

8   A   --I don't know.

9   Q   Do you remember what color it was?

10   A   It was a darker color.

11   Q   Okay.  Was he driving or riding in the car?

12   A   Uh, driving.

13   Q   Okay.  Was anyone else in the car with him?

14   A   No.

15   Q   Okay.  And, so, did all of you go into Paula's apartment?

16   A   Yes.

17   Q   And, when you got into the apartment, what happened?

18   A   We were sitting there looking for, uh, her puppy.

19   Q   All right.  What was the puppy's name if you remember?

20   A   Moo Moo.

21   Q   Okay.  And, um, was the dog there?

22   A   Yes.

23   Q   Okay.  Where was the dog?

24   A   In the freezer.

25   Q   And, how did you see the dog--how did you happen to see that

the dog was in the freezer?

A     Kyron opened the freezer door.

Q     Okay.  Did he take it out?

A     Yes.

Q     Did he go right to the freezer and take it out?

A     No verbal response.

Q     I mean, did he look around the apartment or go right to the freezer?

A     He went right to the freezer.

Q     Okay.  Did he say anything that you recall when he got the dog out of the freezer?

A     No.

Q     Okay.  Did you look at the puppy?

A     No verbal response.

Q     I'm sorry if I might have asked you this already.

A     No.

Q     Okay.  But, the--the puppy was dead, is that correct?

A     Yes.

Q     Okay.  Now, you at some point went to a place called the Dairy Mart, is that right?

A     Yes.

Q     Is that before you, uh, came back to the apartment and found the puppy dead?

A     No.

Q     It was after.

141

A    Yes.

Q    After you find the--the puppy dead, what, um, happens at that point?

A    Me, Paula--me, Paula, Katie, and Jessica went to an abandoned barn on Button Road.

Q    Okay.

A    And, dropped it off.

Q    The puppy?

A    Yes.

Q    All right.  After Kyron took the dead puppy out of the freezer, what did he do?

A    He was threatening to kill Stephanie, and he said that if I said anything, or anything about it, that I'd be next.  And, if it wasn't him that did it, it would be somebody, and everybody would know where I was, and who I was.

Q    Did he say how everybody would know who--where you were and who you were?

A    He--that he would let everybody know.

Q    Okay.  Are you aware of Kyron being involved in a gang?

A    No verbal response.

Q    Is that something that he talked about with you?

A    No.

Q    Okay.  Uh, you--but you--are you--have you been in contact with friends of his before?

A    Some.

142

Q   Okay.  But, he said that he would let them know where and who you were, is that right?

A   Yes.

Q   All right.  So, you, um, went to--so, when you all went to drop off the puppy, um, did Kyron leave the apartment, also?

A   Not that I seen, not when we did.

Q   All right.  So, when you all left, he was still in the apartment, is that right?

A   Yes.

Q   Um, did, uh--did he give Paula the key for her apartment, or did he still keep it?

A   I think he still had it.

Q   After you drop the puppy off, where do you go from there?

A   We went to Dairy Mart.

Q   Okay.  And, um, what was the purpose in going to Dairy Mart?

A   To drop Paula off with him.

Q   Okay.  Did she ask you to take her there to drop her off?

A   Yes.

Q   All right.  Did she say why?

A   She needed to talk to him.

Q   To who?

A   Kyron.

Q   Did she--did you observe Paula having any, uh, phone contact with Kyron, uh, at any point, um, before going to Dairy Mart?

A   Yes.

Q  Okay. And, after she was on the phone, is that when she asked to be taken to Dairy Mart?

A  Yes.

Q  Okay. The Dairy Mart is located where?

A  On Textile.

Q  All right. And, um, when you went there--by the time you got there, about what time was it, if you know?

A  Eleven o'clock at night.

Q  Okay. And, when you got there, was Kyron already there?

A  Yes.

Q  All right. You were driving your car, and who was with you?

A  No verbal response.

Q  Paula, uh, Katie, and Jessica?

A  Yes.

Q  And, yourself?

A  Yes.

Q  And, Kyron is there in what type of a vehicle?

A  Uh, the same one that he--

Q  Okay.

A  --was in before.

Q  All right. And, if--if you know, was there anyone in his vehicle with him, or was he alone?

A  He was alone.

Q  Okay. And, when you got there, did something out of the ordinary happen?

A    Uh, he was backing in and this guy, Chris, was coming out, and they kind of hit each other.

Q    Okay.  When you say he, you mean Kyron?

A    Yes.

Q    All right.  So, their, uh--uh, vehicles, uh, this Chris was driving and the vehicle Kyron was driving, uh, bumped into each other, is that right?

A    Yes.

Q    And, that was in the--attempts to get in a parking spot, is that correct?

A    Yes.

Q    And, what happened at that point?

A    Kyron got out and started yelling at Chris, and then they got into an argument.

Q    Were all of you, uh, young women in the car at this point, or did any of you get out?

A    Jessica and Paula got out.

Q    Jessica and Paula got out, all right.  And, you stayed in the vehicle, is that right?

A    Yes.

Q    All right.  So, um, you see Kyron arguing with this other young man, Chris Lei (phonetic), is that right?

A    Yes.

Q    What do you see him do?

A    Um, he went back to his car and pulled out a gun, he put it

1    in his pocket or his pants.

2    Q    Okay.  And, you saw him do this?

3    A    Yes.

4    Q    And, did you tell the police this, um, the--the day that you

5    gave your first statement to the police?

6    A    Yes.

7    Q    And, is that the truth?

8    A    Yes.

9    Q    And, did you also testify to that in your investigative

10   subpoena?

11   A    Yes.

12   Q    All right.  After you saw Kyron put this gun either in his

13   pants, or his waistband, where did he go from there?

14   A    He went back over to Chris.

15   Q    Okay.  And, could you tell, was this argument continuing at

16   that point?

17   A    Yes.  And, Chris kind of just dropped it and it was over.

18   Q    Okay.  At that point in time when Kyron was out in the

19   parking lot, and was arguing with Chris, and has the gun on

20   him, at that point in time, does he say anything more about

21   Stephanie?

22   A    No.

23   Q    Okay.  So, um, after this argument with Chris kind of ends,

24   what do you see Paula do?

25   A    Um, Paula got in the car with Kyron.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Q    Okay.

          THE COURT:  I'm sorry, she did what?

          THE WITNESS:  Got in the car with Kyron.

          THE COURT:  Thank you.

BY MS. KETTLER:

Q    Did you hear Paula say anything to Kyron, or Kyron say

     anything to Paula before she got in the car with him?

A    He needed to calm down, it wasn't that big of a deal.

Q    All right.  And, um, did you ever see him take the gun back

     out of his waistband, or pocket?

A    No.

Q    And, what did you, and Katie, and Jessica do at that point?

A    Um, they--Paula--or, Kyron gave Jessica or Katie the key, and

     I took them back to Paula's apartment and dropped them off,

     and then I went home.

Q    Okay.  And, by the time you got home what did--did you go

     straight home?

A    Yes.

Q    And, by the time you got home, it was what time?

A    Around 11:45.

Q    So, it's around eleven o'clock at night, when you first go to

     the Dairy Mart.

A    Yes.

Q    And, see Kyron with the gun, is that right?

A    Yes.

147

Q    You--so, you dropped them off without going back into Paula's apartment, is that correct?

A    Yes.

Q    And, how did you learn that Stephanie had been killed?

A    Uh, when I woke up the next morning.

Q    Okay.  How--who--who informed you?

A    My mom.

Q    Okay.  And, what did you do after you learned that?

A    I freaked out, and I called Paula, and I told her.

Q    And, what did Paula say, if you remember?

A    She was freaked out.

Q    Okay.  Did she act like she was surprised?

A    Yes.

Q    Okay.  How many of the details did you know--in other words, when your mom told you that Stephanie had been killed, did you know how, or where?

A    That she was shot.

Q    Okay.  And, did you know where this had happened?

A    Yes.

Q    Okay.  And, did Paula ask you about the details of it when you talked on the phone?

A    Yes.

Q    Okay.  Paula ever, uh, say--did Paula say anything else to you in that phone conversation?

A    No.

1   Q   Paula ever express any sadness or remorse that Stephanie was

2       dead?

3   A   Yes.

4   Q   And, when?

5   A   On the phone.

6   Q   Okay.

7               MS. KETTLER:   If I could have just a moment, your

8       Honor.

9               THE COURT:   Sure.

10  BY MS. KETTLER:

11  Q   What--at what point in time did you become aware that Kyron

12      had a gun in his car, that he later took out and put in his,

13      um, waistband, or pants?

14  A   When he was--when he was in my car.

15  Q   Okay.   Did he tell you or show you?

16  A   He didn't tell me or show me.

17  Q   Okay.   How did you find out?

18  A   Paula was freakin' out about it and she told me.

19  Q   Okay.   While the three of you were in your car?

20  A   Yes.

21  Q   Kyron had a gun then?

22  A   Yes.

23  Q   Okay.   But, you didn't actually see it.

24  A   No.

25  Q   But, that's when you first became aware that he was in

149

1        possession of a gun.

2    A   Yes.

3    Q   Okay.

4             MS. KETTLER:  Okay.  Nothing further, thank you.

5             And, for the record, if they make the request, I'll

6        give them the copies.

7             MR. WHITE:  I so request.

8             MR. BURKETT:  Yes, your Honor.

9             MS. KETTLER:  I'm giving both counsel a copy of the

10       investigative subpoena of Breanna Kandler.

11            THE COURT:  Thank you.  Ms. Kettler, do you

12       anticipate any other witnesses?

13            MS. KETTLER:  I don't think so.  No, your Honor.

14            THE COURT:  I wonder if it wouldn't be more

15       efficient if we took a break now so that, uh, both defense

16       counsels can look at this statement thoroughly, as well as

17       Ms. Fritz's, and then, uh, reconvene.

18            MR. BURKETT:  Yes, your Honor.

19            THE COURT:  Any objections?

20            MR. BURKETT:  Yes, your Honor.

21            THE COURT:  All right.  Gentlemen, give me an idea

22       how much time you'd want to do that?

23            MR. BURKETT:  Well, let's see, you're talking about

24       a hundred pages.  Thirty, forty--

25            MS. KETTLER:  It's not a hundred pages.

                                150

MR. BURKETT: Well, this is fifty pages, itself.

MS. KETTLER: The--what's attached are the subpoena--the investigative subpoena exhibits, which were provided to counsel--

THE COURT: Okay, okay.

MS. KETTLER: --in discovery.

THE COURT: So, what do you think?

MR. BURKETT: I would think a half-an-hour, to forty-five minutes.

MR. WHITE: I agree.

THE COURT: How about we reconvene at 1:30, it's what, 12:46 now?

MS. KETTLER: Yes, your Honor.

THE COURT: That all right?

MR. WHITE: That seems reasonable.

MS. KETTLER: Yes.

THE COURT: All right. I'll let you manage your own witnesses.

MS. KETTLER: Okay.

THE COURT: We'll be back on the record with these matters at 1:30.

(At 12:45 p.m., until 1:32 p.m., proceedings in recess)

THE COURT: All right. We're back on the record with Benson and Bennett.

151

Uh, can we put Ms. Kandler back on the stand; I think that's where we were at.

MS. KETTLER:  Uh, either one.  We could finish, uh, the first one.

MR. BURKETT:  I'd like the People to bring the last one, first.

MS. KETTLER:  Okay.

THE COURT:  Finish up with Ms. Kandler before we bring, uh, Ms. Fritz back on?

MR. BURKETT:  That was the last one, right?

THE COURT:  Ms. Kettler, that's okay with you?

MS. KETTLER:  No verbal response.

THE COURT:  That's all right?

MS. KETTLER:  Yes, your Honor.  There's probably something we could do in the mean time is--

THE COURT:  Try it.

MS. KETTLER:  --and that is, uh, I would move for the admission of People's exhibit two.  I've had it marked. This as a certified, uh--certified copy, uh, Mr. Benson's conviction in Washtenaw County, which is submitted in support of the Felon In Possession Of A Firearm charge.  Uh, the People would--that because, uh, previously convicted of Breaking and Entering A Vehicle With Damage, uh, he is ineligible, uh, to carry a firearm lawfully at this time. And, I would move for the admission of People's exhibit two.

152

THE COURT:  No objections?

MR. BURKETT:  No.

THE COURT:  Thank you.  That'll come in as exhibit-
-plaintiff's exhibit two.

MS. KETTLER:  Oh, your Honor--

THE COURT:  Go ahead.

MS. KETTLER:  --I apologize, your Honor.

THE COURT:  That's all right.

MS. KETTLER:  There is one other thing, and I think
that the witness maybe should step out for a moment.

THE COURT:  Okay.

MS. KETTLER:  If we could for a second?

THE COURT:  If you don't mind.

Thank you, sergeant.

MS. KETTLER:  Your Honor, this is a very serious
case, obviously, with high emotions on both sides.  And,
maybe I should have brought this up earlier, but frankly; I
didn't think it would be necessary.  I want to ask the Court
to admonish every single person in this courtroom, that they
should not have contact with witnesses or anybody involved in
this case.  Uh, while we were taking a break there was an
incident in which, uh--uh, family members of the victim were
approached and a comment was made to them of a threatening
nature.

That is intolerable and, um, I know the Court

153

doesn't appreciate it.  And, I can also assure everybody in this courtroom that if anybody tampers with any of our witnesses, we will pursue it with every bit of gusto we can, because we can't have that.  This is not the wild, wild, west.

THE COURT:  All right.

MR. BURKETT:  Well--

THE COURT:  Go ahead.

MR. BURKETT:  I'm in agreement.

THE COURT:  I'm sure you are.

MR. BURKETT:  Uh, and if she'll tell me if it was any of my folks, which I don't think it was, I'll speak to them personally.  If--I mean, you know who I represent.  If it's members of this family, which I'm sure it wasn't, uh, I'll speak to them personally about it.

THE COURT:  Okay.

MR. BURKETT:  And, I'll assure you that won't happen again.

MR. WHITE:  And, I will, of course, make the same offer.  Perhaps we could discuss this later.  And, if it's-- I--and when we find out what the basis of it is, we could deal with resolving it.  Uh, the only thing I would say is I know the People would, of course, protect any witnesses we have, too, throughout the proceedings.  And, that our witnesses should be aware of that.

154

THE COURT:   Thank you.

MS. KETTLER:   I just ask the Court to instruct them on that because--

THE COURT:   I'm going to.

MS. KETTLER:   --they're going to end up with a case themselves--

THE COURT:   I'm going to.

MS. KETTLER:   --if they tamper with witnesses.

THE COURT:   I will be as clear as I know how.

MS. KETTLER:   Thank you, Judge.

THE COURT:   Folks, if there any more shenanigans like I just heard about, if it happens anywhere where I see it, or I hear it, or I can put a witness on the stand today, I will hold you in contempt, and I will jail you.   And, in addition, I am sure the prosecutors' office will proceed with charges against you.   And, if it doesn't happen in such a manner that I can jail you today, then I am sure that I will have a chance to jail you in the future because the prosecutors' office is not going to take this lightly.

Furthermore, I must add that I can't imagine in any situation where in any--any way, anything like that is going to help anybody's cause.   Victim's family, defendants, it's not going to help a thing, it's just going to muck things up and slow down the process.   And, we all want to put this terrible tragedy behind us as fast as we can.   So, with that,

155

1    let's get the witness back on the stand and proceed.

2              MS. KETTLER:   Thank you, Judge.

3              THE COURT:   You're welcome.

4              Ms. Kandler, right here.   Just have a seat, you're

5    still under oath.

6              Mr. Grubbs.

7              I'm sorry, gentlemen.   I just want to get Mr.

8    Grubbs out of here before he gets stuck for an hour.

9              (At 1:37 p.m. until 1:38 p.m., other matters heard)

10             THE COURT:   Now, gentlemen, I turn Ms. Kandler over

11   to you for, uh, cross.

12             MR. WHITE:   Thank you.

13                         CROSS-EXAMINATION

14   BY MR. BURKETT:

15   Q    Good afternoon, ma'am.

16   A    Hi.

17   Q    All right.   I want to be as quick as I can.   I just have a

18   few questions to go over with you.   Um, referring to the, uh-

19   -to the day that this tragic thing took place, um, at some

20   point you went down to the Sumpter Police Department, is that

21   correct, ma'am.

22   A    Yes.

23   Q    And, how long after the shooting did that take place?

24   A    Um, a couple days.

25   Q    A couple days.

                              156

A    Yes.

Q    Okay.  And, you gave your written statement.

A    Yes.

Q    And, in that written statement that you gave to the police, you, uh--they asked you questions and you gave answers, is that correct?

A    Yes.

Q    And, they asked you to tell them everything you knew concerning the shooting, and who might be involved, is that correct, ma'am?

A    Yes.

Q    And, at a later--and, you did that.

A    Yes.

Q    And, at a later point, you went down to Frank Murphy Hall of Justice in Detroit.

A    Yes.

Q    And, you were--you were, um, placed in a room with a prosecutor.

A    Yes.

Q    And, you were given your rights, is that correct, ma'am?

A    Yes.

Q    Did they ever tell you, you were a suspect in this case?

A    No.

Q    Did you ever ask them why are you telling me my constitutional rights?

157

1

2   A   No.

3           MS. KETTLER:   Object to the relevance of that.

4   It's required by law.

5           MR. BURKETT:   Even if it's required by law I can

6   still asked.

7           THE COURT:   And, it's been answered, move on.

8           MR. BURKETT:   Thank you, Judge.

9   BY MR. BURKETT:

10  Q   Now, um, you were--and what date did--the prosecutor went

11  over that statement that you gave them at the, uh--when you

12  went downtown, is that correct?

13  A   Yes.

14  Q   Okay.  They also told you, ma'am, that if you told anything

15  on that statement that wasn't true, or anythi--any of the

16  questions that weren't true, uh, you could sp--spend the rest

17  of your life in prison, didn't they?

18  A   Yes.

19  Q   Okay.  Now, you spoke to the prosecutor about, um, Kyron.

20  Uh, would this be a true statement; you don't like Kyron and

21  you never have liked Kyron, is that correct, ma'am?

22  A   Yes.

23  Q   That's a true statement.

24  A   Yes.

25  Q   Okay.  And, what about Stephanie, were you friends with her?

    A   Somewhat, yeah.

Q   Okay.  And, did you tell Paula that Stephanie was selling her merchandise?

A   Yes.

Q   Okay.  And, when did you tell that to Paula?

A   After I found out.

Q   I know, but when?

A   Uh, the--

Q   Was it before the incident or after the incident?

A   Before we went to the police and made a police report.

Q   Okay.  And, how did you know that she was selling the things?

A   Because I--somebody had told me that there was a message on the phone saying that she was selling all the stuff that she had stole from Paula.

Q   Okay.  Now, um, you said that at some point, um, you were in a car with Kyron, is that correct?

A   Yes.

Q   And, who else was in that car with you?

A   Paula.

Q   And, anybody else?

A   No.

Q   Jessica wasn't with you?

A   Not when Kyron was in the car, no.

Q   Okay.  Um, at that point, um, did you see Kyron with a gun?

A   No.

Q   Did, uh--when he was in the car with you at any time, did he

159

1

2     ever tell you he had a gun?

3  A   No.

4  Q   He never did.

5  A   No.

6  Q   Okay.  Did Jessica tell you that he had a gun?

7  A   No.

8  Q   Okay.  Do you recall testifying under oath that Kyron told
       you when you were at the prosecutors' office that he had a
9      gun on him, but you didn't see it?

10

11 A   No verbal response.

12 Q   Do you recall that testimony?

13 A   No.

14 Q   At some point, um--at some point, ma'am, you told this
       honorable Court that Kyron told you--this was before the
15     shooting, that he was going to kill Stephanie, is that
16     correct?

17

18 A   Yes.

19 Q   And, is it also true, ma'am, that he also told you that if
       you tell anyone he would kill you, or his friends would kill
20     you, your family, and you friends, correct?
21

22 A   Yes.

23 Q   And, of course you were petrified by this--

24 A   Yes.

25 Q   --true, beg your pardon?

   A   Yes.

Q  So, soon after he told you this and before the shooting, you had went to the police and told them that you had been threatened, didn't you?

A  No.

Q  Why not?

A  Because I was scared.

Q  You were scared to go to the police?

A  Yes.

Q  Ma'am, when you wrote your statement out at the Sumpter Police station, didn't you write that you never believed that Kyron would do that thing, correct?

A  Yes.

Q  Okay. Well, if you were so afraid that he was gonna harm you and your friends, why would you tell the police who was there to protect you, that you didn't think he meant this?

A  Because he threatened me.

Q  But you were in police custody at this time, correct?

A  No. He threatened me after I already went to the police and we made a police report.

Q  Okay. Let's back up for a minute. After the killing, that's when you went to the police department, correct?

A  Yes.

Q  Before the shooting, ma'am, he had threatened you.

A  Yes.

Q  Correct?

161

1    A    Yes.

2    Q    While you were at the police department making this report,

3         ma'am, you told the police you never thought for one minute

4         that Kyron meant that, didn't you?

5    A    Well, that's not what I meant.

6    Q    But, that's what you wrote and that's what you signed, true?

7    A    What--

8              MS. KETTLER:   Your Honor, I'm going to object.

9         This is--

10             THE WITNESS:   --I said was--

11             MS. KETTLER:   Wait.

12             --this is a total mischaracterization both of her

13        testimony and the contents of her statement.

14             MR. BURKETT:   Well, I don't begin to understand

15        how.  I mean, let me rephrase it.  Let me ask the question

16        again.

17             THE COURT:   Try because I have no idea what's in

18        the statement so I can't even respond to that objection.

19   BY MR. BURKETT:

20

21   Q    Ma'am,--

22             MR. BURKETT:   Pardon me for one second.

23             THE COURT:   Sure.

24             MR. BURKETT:   May I approach the witness, your

25        Honor?

              THE COURT:   Please.

                                162

BY MR. BURKETT:

Q    Ma'am, is this the statement that you wrote?

A    Yes.

Q    Is that the signature that--that you have there?

A    Yes.

Q    The part that I have marked in yellow, would you read it out loud, please?

          MS. KETTLER:  Is there a page number, counsel, please?

          THE WITNESS:  "...I didn't really think he was gonna do it..."

          MS. KETTLER:  Page number, please?

          MR. BURKETT:  What?

          THE COURT:  Page number.

          MR. BURKETT:  Oh.

          THE WITNESS:  Eight.

          THE COURT:  Thank you.

BY MR. BURKETT:

Q    I'm sorry, will--

A    "...I didn't really think he was gonna do it..."

Q    You didn't think who was gonna do it?

A    Kyron.

Q    He--you didn't think Kyron was gonna do what?

A    Kill Stephanie.

Q    Okay.  And, did you tell the police at that time, ma'am,

1

2    that, uh, you were so afraid that he was gonna kill you?

3    A   I was scared. They--

4    Q   So you didn't.

5    A   --for my life.

6    Q   So, you didn't tell the police.

7            MS. KETTLER: I would ask the witness be allowed to

8    finish her answer before she's cut off--

9            THE COURT: That's fair.

10           MR. KETTLER: --by counsel.

11           MR. BURKETT: Yes, I apologize.

12 BY MR. BURKETT:

13    Q   You didn't tell the police did you, ma'am?

14    A   Will you repeat the question?

15    Q   Sure. You did not tell the police, when you went to the

16    Sumpter Police Department, that he--you were so afraid that

17    he was gonna kill you.

18    A   I did tell them that I was threatened.

19    Q   Okay. And, you--okay. Now, when he talked about killing

20    Stephanie, where did this take place at?

21    A   Um, in my car, and at the apartment.

22    Q   Okay. And, did you interpret Kyron to be angry at that time?

23    A   Yes.

24    Q   Okay. And, did you have any reason why he was angry?

25    A   Because all--because the things were stolen.

    Q   Okay. And, you concluded that he was just blowing off steam,

1    didn't you?

2  A  Yes.

3  Q  Okay.  Now, when you went to the apartment, uh, at some point

4    it was you, Jessica, Paula, and Kyron.  Was anyone else

5    there?

6  A  Katie.

7  Q  Katie, okay.  And, the puppy was missing, correct?

8  A  He wasn't missing but it was in the freezer.

9  Q  Well, you couldn't--they couldn't find the puppy at first,

10    correct?

11  A  Yes.

12  Q  Did you hear Kyron say anything?

13

14  A  No.

15  Q  Okay.  He--didn't--you didn't hear Kyron say the puppy must

16    be in the freezer?

17  A  No.

18  Q  Okay.  'Cause if you would have heard that, you would have

19    put that in your statement, wouldn't you?

20         MS. KETTLER:  Objection, calls for speculation.

21         MR. BURKETT:  It's not important.

22         THE COURT:  Okay, thank you.

23  BY MR. BURKETT:

24  Q  Um, so when they went to the place--when you went to the

25    apartment to look for the puppy, you looked--everyone was

    looking for the puppy, is that correct?

                        165

A   Yes.

Q   You were calling the puppy's name, correct?

A   Yes.

Q   Okay.  Kyron was looking for the puppy.

A   Kyron went straight to the freezer.

Q   Okay.  Uh, well, do know who--did--whether Kyron was looking for the puppy, or not?

A   No, I don't.

Q   Did Kyron make any statements about who did this to the puppy?

A   No.

Q   He never did.

A   He said something about Stephanie doing it.

Q   Well, what did he say about Stephanie?

A   That she must have put the dog in the freezer.

Q   Okay.  Now, you--you testified earlier that at a, uh, gas station that, uh, Kyron, uh, got involved in some type of accident.

A   Yes.

Q   And, that--what time was this accident?

A   Around, uh, eleven o'clock.

Q   P.m.?

A   Yes.  At night, yes.

Q   Oh, okay.  And, that he got out of the car and he was talking with the person.

166

A    Yes.

Q    Who was the person?

A    Chris Lei.

Q    I'm sorry?

A    Chris Lei.

Q    Lei, okay.  Uh, and you gave that information to the police, correct?

A    Yes.

Q    Okay.  And, you saw Kyron--you said after the accident, he went back to his car.

A    Yes.

Q    And, you sa--how--now, how far were you from Kyron when he went back to the car?

A    Not far at all.

Q    Okay.  But, how far is that?

A    Like, car distance.

Q    Okay.

A    Side by side.

Q    Okay.  And, who else was present at that time?

A    Me, and Katie, Jessica, and Paula.

Q    Okay.  And, you saw Kyron take something out of the car.

A    I saw Kyron take a gun out of the car.

Q    Okay.  Did you mention that to Jessica, or Katie, or anyone else?

A    I mentioned it to Paula.

167

1   Q  Okay.  Did you mention it to Jessica?

2   A  Um, not that I can remember.

3   Q  But, she was present.

4   A  She wasn't in the car with me, but she--she was there.

5   Q  Okay.  Now, would you describe the gun that he took out?

6   A  Okay.  It was a handgun.  I didn't--

7   Q  What color was it?

8   A  I'm not sure.

9   Q  Okay.  You don't know whether it was silver or dark?

10  A  I--no.

11  Q  Okay.  And, when he took the gun out of the car, what did he

12     do with it?

13  A  Put it in his pants or his pocket.

14  Q  And, then he went back to this Christopher person, and

15     continued to argue with him, correct?

16  A  Yes.

17  Q  Did he pull the gun out--

18  A  Not--

19  Q  --while talking to Christopher?

20  A  --not that I seen.

21  Q  Okay.  Could you hear the argument that was taking place with

22     he and Christopher?

23  A  No.  I wasn't paying any attention.

24  Q  So, I just want to make sure I got the sequence right.  There

25     was an accident, he gets out, and there's a big argument.  He

1      goes back to his car, he gets a gun out, puts it in his

2      pocket, and goes back to finish talking to Christopher.

3 A    Yes.

4 Q    He never takes the gun out again.

5 A    Not that I seen.

6 Q    Okay. And, you cannot describe the gun.

7 A    No.

8 Q    You don't know whether it was a real gun or not, correct?

9 A    Correct.

10 Q    Uh, it could have been a cell phone, correct?

11 A    No.

12           MS. KETTLER: Objection, calls for speculation.

13      It's also asked and answered.

14           THE COURT: Overruled, already answered.

15 BY MR. BURKETT:

16

17 Q    Ma'am, the truth of the matter is, you don't know what that

18      was that he pulled out of his pocket--I mean, he took out of

19      that car, did you?

20 A    Yeah. I--I know it was a gun.

21 Q    Okay. That must have scared you to death, correct?

22 A    Yeah.

23 Q    Okay. Is there any reason why you didn't tell the police or

24      anything about that, at that time?

25 A    I was scared.

   Q    Okay. You're not scared now, are you?

1    A    Yeah.

2    Q    Okay.  The next day after Stephanie was killed, uh, you

3    called Paula.

4    A    Yes.

5    Q    Is that true?

6    A    No verbal response.

7    Q    And, uh, you are the person that told Paula that Stephanie

8    had been killed--

9    A    Yes.

10    Q    --correct?

11    A    Yes.

12    Q    With this conversation you had with Paula, Paula told you she

13    didn't believe you, correct?

14

15    A    She was shocked.  She didn't say she didn't believe me.  She-

16    -she was shocked.

17    Q    Well, did you tell the police in your statement that Paula

18    said she didn't believe you?

19    A    I might have, I--

20    Q    Okay.  You're memory is really not too good on what happened

21    during that period of time, is that correct?

22    A    Can I see the statement?

23    Q    Sure.

24               MR. BURKETT:  May I?

25               THE COURT:  Please.

BY MR. BURKETT:

1   Q   I'm showing you, I guess, the bottom of page eleven and the

2       top of page twelve, would you read the parts that I--out

3       loud, that I have marked in Yellow?

4   A   "Have you talked to Bennett about what has happened?  Yes, I

5       called her and told her and she didn't believe me..."

6   Q   Okay.  Does that somewhat refresh your memory?

7   A   Yes.

8   Q   Okay.  So when you did--um, Bennett, Paula Bennett, correct?

9   A   Yes.

10  Q   Okay.  So, when you did call her, uh, she indicated to you

11      that she doesn't believe you.

12  A   Yes.

13  Q   Okay.  At any point, did Paula tell you that Kyron had

14      anything to do with this?

15  A   No.

16          MR. BURKETT:  Just one second, your Honor.  I'm

17      sorry, could I approach the witness, again?

18          THE COURT:  Go ahead.

19  BY MR. BURKETT:

20  Q   I just want you to read this to your--

21          MS. KETTLER:  Page number, please, counsel.

22          MR. BURKETT:  Page thirty-three.

23  BY MR. BURKETT:

24  Q   Read the part that I have marked in yellow and I want to ask

25      you some questions about it.

                        171

A   "...did you..." "...did you..."

Q   No.  Read it to yourself, I'm sorry.

A   All right.

Q   Did you get a chance to read it?

A   Yes.

Q   Okay.  A few minutes ago I asked did you ever tell the
prosecutors that Kyron told you he had a gun.  Does that
refresh your memory as to what happened?

A   He didn't tell me.

Q   He didn't.

A   Paula told me.

Q   Okay.  Kyron never told you that.

A   No.

Q   Did--okay.  Do you remember being asked these questions and
you giving these answers?

A   Yes.

Q       Uh, "...did you..." "...did you..." or, "...did you have
        any knowledge that he may have a gun, prior to you
        meeting...", uh "...prior to you seeing the gun?"
        Answer; "Yes."  Question; "What was the knowledge that
        you had about that.." "...about that before that?"
        Answer; "He was talking about it, that he had it on
        him." "Okay."  Answer; "After he had already put it in
        my car."

    Does that--

172

1          MS. KETTLER:  Objection, that's not what it says.

2          MR. BURKETT:  Okay.

3          MR. KETTLER:  "...already..." "...after he already

4    got in my car..."

5          MR. BURKETT:  I'm sorry, he had already got in the

6    car.  I don't have my glasses, I'm operating with a handicap

7    here.

8  BY MR. BURKETT:

9   Q  You remem--you recall those questions being asked of you and

10  you giving those answers?

11  A  Yes.

12  Q  So, he told you that he had a gun, correct?

13  A  Yes.

14  Q  Okay.  Did you forget that when I asked you that earlier?

15  A  They both--I guess, they both told me that he had a gun.

16  Q  Okay.  They both told you that he had a gun.  But when you

17  went to the Sumpter Police, uh--a couple days later, you

18  never told that to the Sumpter Police, that he got in your

19  car and told you that he had a gun, did you?

20  A  No.

21  Q  Okay.  You never told the Sumpter Police that--excuse me,

22  that Paula told you he had a gun, correct?

23  A  I'm not sure.

24  Q  Okay.

25          MR. BURKETT:  Judge, uh, that's it.

173

THE COURT:   Thank you.

Mr. White?

MR. WHITE:   Thank you, your Honor.

CROSS-EXAMINATION

BY MR. WHITE:

Q    Now, I noticed that, uh, the statement you made to the Sumpter police is basically questions and answers.

A    Yes.

Q    And, the statement you made when you were under subpoena is also questions and answers.

A    Yes.

Q    Did you ever make a statement where you just wrote out what happened according to your memory?

A    I think so.

Q    Was that before you were asked these questions and answers?

A    I'm not sure.  I don't remember.

Q    Okay.  But you think that you did write out a statement.

A    I think so.

Q    Be--because these questions and answers, of course, what you were doing was answering questions, right?

A    No verbal response.

THE COURT:   Correct?

THE WITNESS:   Yes.

BY MR. WHITE:

Q    And, if something--you had seen or heard something and you

174

1    weren't asked a question about it, you wouldn't have answered

2    it, correct?

3  A  Incorrect.

4  Q  You would have answered it?

5  A  I--I told them everything that I knew.

6  Q  All right.  But it was in a question and answer form, it

7     wasn't something you just wrote out from fresher memory.

8  A  Yeah.

9  Q  Okay.  Now, when you told Paula that Stephanie was the one

10    who'd, uh, taken her property, your response and her response

11    was to go and make a police report, right?

12 A  Yes.

13 Q  All right.  Did she seem when she first found out angry or

14    furious?

15 A  She was mad.

16 Q  Can you describe what--what she acted like?

17 A  She was just mad.  She--

18 Q  All right.  Did she make any threats?

19 A  No.

20 Q  And so, you went to the police station and you filled out the

21    report, correct--or she filled out the report?

22 A  We both filled out our own.

23 Q  Okay.  And, then from there, uh, you, uh, drove to

24    Applebee's.

25 A  Yes.

1  Q   All right.  And, you, uh, picked up Kyron, correct?

2  A   Yes.

3  Q   And, that was because he want--he wanted a ride, not because

4      he had business there at Applebee's, is that right?

5  A   Right.

6  Q   Okay.  Now, at that point you guys didn't discuss anything

7      about Stephanie stealing from you, when you picked up Kyron

8      at first, did you?

9  A   No.  Not that I can remember.

10  Q   Okay.  And, what was Kyron acting like at that point?

11  A   An idiot.

12  Q   An idiot.

13  A   Yeah.

14  Q   Is there any particular thing that he did, or is it--

15  A   Just, I guess, being himself.

16  Q   What did he say or do?

17  A   Um, that he was threatening to kill Stephanie.

18  Q   Oh, so he would--was killing--threatening to kill Stephanie.

19  A   Yes.

20  Q   Was this before or after you were--he was told that Stephanie

21      might have been connected to stealing the property.

22  A   After.

23  Q   All right.  Before that, he wasn't acting that way, was he?

24  A   No.

25  Q   Okay.  Now, Paula asked you to go get her key--take them to

1  go get the key from Stephanie, right?

2  A  Yes.

3  Q  And, at that point neither she or Kyron had a car, right?

4  A  No verbal response.

5  Q  You were driving them around.

6  A  Yes.

7  Q  Okay.  And, you were driving over towards Bruce's house.

8  A  When?

9  Q  After they--after Paula asked you to get the key, were you

10  driving to somebody named Bruce's house?

11  A  Yes.

12  Q  All right.  Now, when you were in the car, did you become

13  aware of the fact that there might be a gun in the car?

14

15  A  No verbal response.

16  Q  That Kyron or som--might have a gun with him.

17  A  Yes.

18  Q  Okay.  Now, at that point did Kyron start talking about

19  harming Stephanie?

20  A  Yes.

21  Q  Okay.  Now, you got to Bruce's house, you said Kyron was

22  still angry.

23  A  Yes.

24  Q  Was he angry at Stephanie, or was he angry at Paula for

25  giving Stephanie a key?

MS. KETTLER:  Your Honor, again I object.  This is

177

1  why I object to asking witnesses to testify about other

2  people's state of mind.  She can't possibly know that without

3  speculating.

4        MR. WHITE:  Well, the reason--if I can respond,

5  briefly.  I believe her previous testimony was that Kyron

6  said, you were stupid for giving her the key.

7        THE COURT:  Then you can ask a question that refers

8  to that.

9        MR. WHITE:  That--and that's what I'm saying.

10       THE COURT:  Did you hear him say anything, did he

11  give you an indication that.

12       MR. WHITE:  All right.

13       THE COURT:  But don't ask her what was in his head.

14       MR. WHITE:  All right.

15 BY MR. WHITE:

17 Q   Did you hear Kyron say anything to Paula at that point, when

18     you were over at Bruce's.

19 A   Not when we were over at Bruce's.

20 Q   Not when you were over at Bruce's.  What did you hear and

21     when did you hear it?

22 A   When we were in the car he was saying that she was stupid for

23     giving her the key and that he was gonna kill her.

24 Q   All right.  Now, was this after Paula asked you to take her

25     over and get her key back that he started saying things like

       that?

                              178

A    No.   It was before.

Q    All right.   And so, what did you say to him when he made
those kind of statements?

A    No verbal response.

Q    What did you say to him?

A    That he's insane and crazy, that he shouldn't even think
about doing anything like that.

Q    All right.   And, his response was?

A    He don't care.

Q    All right.   Now, what happened--you told them--you told them
that you were not going to take them over to Stephanie house
at that point, correct?

A    Yes.

Q    And, you dropped him off.

A    Yes.

Q    And, you left with Paula, correct?

A    Yes.

Q    All right.   Now, when you were talking to Paula, what did she
say when Mr. Benson was talking about violent threats, what
were he words?

A    That she--she just wanted her things back.

Q    All right.   Now, I'm going to show you part of your original
statement to refresh your recollection.   I'm talking about
page seven, lines three through four--well, let's see, two,
three, four.   Can you read that to yourself quietly?

179

1    A    Okay.

2    Q    Okay.  Does that refresh your recollection of what was said

3         to you?

4    A    Yes.

5    Q    And, was what she said to you that, uh, Mr. Benson was crazy

6         and she didn't want anything bad to happen to Paula--or, to,

7         uh, Stephanie?

8    A    Yes.

9    Q    That, uh, she just wanted her things back.

10   A    Yes.

11   Q    Now, you never called the police that evening, correct?

12   A    Correct.

13   Q    Because you didn't think he was gonna do it.

14   A    Because I was scared.

15   Q    Did you think--actually think that Mr. Benson was going to

16        kill somebody that evening?

17   A    No.

18   Q    Now, did--now, you discussed the conversation after going to

19        Shop Rite, with, uh, Katie, uh, Jessica, uh, Paula, and

20        yourself, right?

21   A    What?

22   Q    Okay.  After you left Shop Rite--

23   A    What's that?

24        THE COURT:  Rite-Aid.

25   BY MR. WHITE:

180

Q    Rite-aid, I'm sorry.   After you left--

            MR. WHITE:   May I approach, Judge?

BY MR. WHITE:

Q    After you left Rite-Aid, was there a discussion in the car

about, uh, whether or not Kyron was serious?

A    Yes.

Q    All right.   And, uh, did Paula indicate that she didn't think

he was gonna do it?

A    No verbal response.

Q    That she didn't believe he was gonna do it, also?

A    I don't remember what she said exactly.

            MR. WHITE:   If I could have just a moment, your

Honor.

            THE COURT:   Sure.

BY MR. WHITE:

Q    All right.   Um, I'm gonna ask--I'm gonna just move to another

area, if I could.   Uh, as far as Paula being in the car with

you at the--when you first went to Applebee's, had she asked

you to help her pick up the key before you picked up Kyron,

or not?

A    I'm not sure.

Q    You don't know whether it was before or after you picked up

Kyron?

A    Well, I know she wanted me to after, but I don't remember if

she asked me before.

181

Q Okay.  Now, after the incident at the, uh, Rite-Aid, um, did--you said Paula left with Kyron in the--the dark colored car?

A Yes.

Q And, she came back to the apartment approximately how soon after that?

A I have no idea.

Q All right.

A I was not there.

Q Oh, all right.  So, you just dropped the other two girls off and went home.

A Yes.

Q Okay.

MR. WHITE:  I have nothing more for this witness at this time.

MS. KETTLER:  I have no--nothing further.

THE COURT:  Ms. Kandler, you can step down and watch your step.

Are we ready to get Ms. Fritz back on the stand?

(At 2:10 p.m., witness excused)

MS. KETTLER:  Yes, your Honor.

(At 2:10 p.m., until 2:13 p.m., other matters heard)

THE COURT:  Ms. Fritz, right back up here.  You're still under oath.

Go ahead, Mr. Burk--Burkett.

182

JESSICA GRACE FRITZ

recalled to testify at 2:13 p.m. and sworn prior by the

Court; testified:

        MR. BURKETT:  I've said this before, but this time

I'll be very quick, your Honor.

        THE COURT:  We'll see.

        MR. BURKETT:  Problems with our lawyers, huh.

        CONTINUED CROSS-EXAMINATION

BY MR. BURKETT:

Q    Couple things.  When you were up here before, I had asked you

did you remember there, uh, being an accident.  The, uh, and-

-you told us you did not, correct?

A    Correct.

Q    And, you still don't remember.

A    No.  I remember now.

Q    I'm sorry, the Judge was saying something.

        THE COURT:  No.  I'm just saying bless you to the

sneezer.  It's a reaction of mine, I'm sorry.

        MR. BURKETT:  Oh, okay.  I'm sorry.

BY MR. BURKETT:

Q    Okay.  You still don't.

A    Yeah--no.  Yes, I do.  I remember.

Q    You remember it now.

A    Yeah.  But it--

Q    Well, wait a minute.  What happened that caused you to

1   remember it?

2   A   Um, they said that--they said what--I thought you went to the

3   gas station.

4   Q   I know.  My question to you is; what made you remember it

5   after you got off the witness stand?

6       MS. KETTLER:  Your Honor, objection.  That is

7   completely a mischaracterization.  She remembered it before

8   she got off the witness stand.  For counsel to try and make

9   it seem otherwise, is very disingenuous.

10      MR. BURKETT:  Well, how do you know what she

11  remembered?

12      MS. KETTLER:  Because she said she did on the

13  record.

14      MR. BURKETT:  I didn't hear that.

15  BY MR. BURKETT:

16  Q   So, you do remember the accident?

17  A   Yes.  I told him that.

18  Q   You told who that?

19  A   When he was talking to me.

20  Q   Okay, I'm sorry.

21      THE COURT:  I'm assuming he refers to Mr. White.

22      THE WITNESS:  Yes.

23  BY MR. BURKETT:

24  Q   Okay.  You forgot when I was asking you questions, is that

25  correct?

184

1    A    Yes.

2    Q    Okay.  You saw no guns by Kyron--

3    A    No.

4    Q    --at the time of the accident.  Nobody told you at the time

5         of the accident that he had a gun, did they?

6    A    No.

7    Q    Okay.  The day--the only thing I'm talking about is the day

8         that Stephanie was killed, is the only day I'm talking about.

9    A    Okay.

10   Q    On that day, were you or any of your friends drinking any

11        alcoholic beverages, or smoking any marijuana, or drugs?

12   A    From that day?

13   Q    No.  On that day.

14   A    On that day, no.

15   Q    Is that true and correct?

16   A    Yes.

17   Q    And, your friends, I'm talking about the--your boyfriend

18        Ricky.

19   A    Yes.

20   Q    Okay.  He had not been drinking, that you are aware of.

21   A    No.

22   Q    Okay.  Uh, after you gave your statement to the police, um,

23        the written statement, when is the next time that you spoke

24        with Ricky, your boyfriend?

25   A    He was--he was at the police station with me.

185

Q   Okay.   But, he wasn't in the room with you when you gave your statement, was he?

A   When I gave my written statement?

Q   Yes.

A   No.

Q   Okay.   But, you did discuss what you had told the police with Ricky, didn't you?

A   No.

Q   You never discussed it?

A   No.

Q   He never asked you what did you tell the police?

A   No.

Q   Okay.   You never told the police, in your written statement that, uh, once, um, Paula came home, she continuously tried to call, uh, Kyron, did you?

A   No.

Q   Any reason why you didn't tell that to the police?

A   No.

Q   Okay.   Uh, once you got off the witness stand this morning, did anybody talk to you about your testimony?

A   No.

Q   Okay.   Now, I might have this incorrect, so if I do you can just correct me.   Did you tell us that you did not know where Stephanie lived?

A   Correct.

186

Q    Okay.  Did you ever tell the police, uh, that you knew where she lived?

A    Not in her trailer park.  She used to live across the street from my boyfriend, with her aunt.

Q    Okay.  And, where is that?

A    Um, in something manor, it's an apartment.

Q    Okay.  Did you ever give the address of 372 to the police?

A    No.

Q    372 Utica.

          MR. BURKETT:  May I approach the witness?

          THE COURT:  Sure.

BY MR. BURKETT:

Q    See the part I have marked in yellow?

          THE COURT:  Just for the record, what page are you on Mr. Burkett?

          MR. BURKETT:  Judge, it doesn't have a page number.

          THE COURT:  Never mind.

          MS. KETTLER:  What document is it?

          THE WITNESS:  I don't even know what that is.

          MR. BURKETT:  Your Honor, may I approach the prosecutor?

          THE COURT:  Please.

          MS. KETTLER:  Okay.  Thank you.  It's the police report, it's not anything she wrote.

          MR. BURKETT:  Okay.  The infor--okay.

187

BY MR. BURKETT:

Q    Uh, you did not write this, correct?

A    Correct.

Q    And, if the police say that you gave them this--this information, as far as you're concerned that would be incorrect about this address or what have you?

A    No.  I did not give them that address.

Q    Okay.

A    Whose address is that supposed to be?

Q    Well, I was gonna ask you but, uh--

A    I don't know.

Q    Okay.  So, you don't know anybody that lives at that address, do you?

A    No.

Q    Do you know where her--or Stephanie's aunt lives at?

A    I know she lived at, um--which one are you talking about?

Q    Which aunt were you talking to the police about?

A    I never--I never talked to the police about where Stephanie lived.

Q    Okay.  Thank you, very much.

           MR. BURKETT:  I don't have anything further.

           THE COURT:  Mr. White?

           MR. WHITE:  I have nothing for this witness.

           THE COURT:  Ms. Kettler?

           MS. KETTLER:  Nothing further.

                              188

THE COURT: Ms. Fritz you can stand down. Watch your step on the way out.

Anything else from the People?

(At 2:18 p.m., witness excused)

MS. KETTLER: Judge, I have no further witnesses and the People move to bind over as charged. Uh, if it's acceptable to the Court, we would reserve argument, if any, for rebuttal.

THE COURT: That's okay with me.

Gentlemen?

MR. BURKETT: I don't have any witnesses.

MR. WHITE: And, neither do I, your Honor.

THE COURT: Thank you.

MR. BURKETT: Uh, in terms of Mr. Benson, your Honor. You've heard the testimony so I'm not going to go over it with you. The first witness, uh, that testified, Jessica, um, absolutely nothing as evidence that she gave--no admissible evidence that she gave against Kyron. So, the only thing we're dealing with is the second witness. Uh, because the Court has already ruled that's it not going to consider those hearsay statements.

The second witness, the only thing she talked about was that he made threats, uh, the day of the shooting, and that's it. That's not enough to bind him over on Premeditated First Degree Murder. It doesn't require a whole

189

lot of argument. They just haven't produced anything to show

that. And, I'd ask that you not bind him over on those

charges.

MS. KETTLER: Do you--oh, I'm sorry. I was waiting

for the other one. Judge, this isn't--

THE COURT: I'm not smart enough to argue both

defendants at the same time.

MS. KETTLER: I'm not either, so I'm glad to do it

this way. Uh, Judge, I understand, obviously, um, Mr.

Burkett's argument. And, there--it is true that there are no,

uh, admissions to which Jessica Fritz testified coming from

Kyron Benson. However, uh, this is a probable cause and what

we do have is, uh, not just an isolated, off the cuff

comment, oh--of oh, I'm gonna kill her. We have testimony of

this, uh, defendant all day long basically, uh--uh, making

threats that he's gonna kill this woman, uh, I'm gonna kill

her, she's done. And, when he's challenged on that, uh, by,

uh, Ms. Kandler, he says I don't care, and if you tell on me

you're next.

We have, um--and not only that, that's very close

in time to the time this woman was ultimately killed. But we

also have him as late as eleven o'clock that evening carrying

a gun. So, not only is he threatening to kill this woman,

carrying a gun, but then we also have the testimony of him

leaving the apartment at approximately 1:30 a.m. after the--

190

and, uh, making the statement; let's go shoot this move. It's very close in time to the time which the young woman was shot. And, then very shortly they after--there after, we have, uh--uh, Ms. Bennett coming back to the apartment upset and whatnot.

It is--without a doubt it is a circumstantial case. But, for these probable cause, uh--uh, purposes, I think that I would submit to the Court that this should be, uh, enough to--submitted to a trier of fact in order for them to make that ultimate determination of when you have a person repeatedly, not just once, repeatedly threatening not only to kill somebody, and carrying a gun less than, you know, eight hours before she gets killed. Having the motive, threatening to do it, having the means to do it, and then threatening people about what's gonna happen to them if they tell on him.

In addition to that, that clearly meets, uh, probable cause standard in this case. We also have, uh, a Felony Possession charge in this case and we have submitted to the Court a, uh, certified copy of conviction that the defendant was previously convicted of Breaking And Entering A Vehicle With Damage, which is a felony punishable by up to four or more years. And, he has not regained his, uh, right to lawfully, uh, carry a firearm.

MR. BURKETT: Can I respond to that?

THE COURT: You may.

191

MR. BURKETT: Your Honor, in all candor, I think the prosecutor has given new meaning to the word circumstantial evidence. Number one; what she's failed to realize is that her own witness did not believe that he would do this, Kyron. These were threats that he made when his puppy was killed, and his house was burglarized, and his items were stolen. That does--that does not meet the standard of, uh, that he must have done it. I mean, how many times have, uh, people broke into your home or done something to you, and you'd say that whole day, I'm gonna kill that person if I ever catch him.

People say these off the cuff things, but they need to be coupled with something. There's no evidence, like for example, we know that according to the, uh, police report he (sic) was shot with a gun, with some--with some type of weapon. They've put in no evidence of what kind of weapon it was. Uh, we know that, uh--that they never found a weapon. Uh, and out of these things, there's nothing to tie him to going over to that--that trailer park and killing Stephanie. All except he was angry with her for killing his puppy, and for stealing the clothes. And, he made some off the cuff statements. It's not enough to tell him to stand trial, uh, for these acts. And, I'd ask that you don't bind him over on this.

MS. KETTLER: I would--can I just respond briefly,

again?

THE COURT:  Sure.

MS. KETTLER:  Uh, I would also submit that, uh, I neglected to mention this before, the only person that killed that puppy is the defendant.  That is why it's not a valid--

MR. BURKETT:  Oh, well I'm going to object. There's no evidence to that.

MS. KETTLER:  --argument, your Honor.

THE COURT:  Hold on.  I don't care who killed the puppy.

MS. KETTLER:  And if the defendant--

THE COURT:  And I love dogs.  I don't care who killed the puppy.

MS. KETTLER:  --and the defendant walked right to that freezer and took it right out, because he knew he was gonna kill that woman.  And, he knew that he needed to make sure that all these people who had heard him talking about killing her all day long knew that he was a bad guy.  And, that if they told that he'd have something for 'em.  That's what I would submit to you.  And, this isn't a matter of somebody just saying, oh, I'm gonna kill her.  That's very different from all day long to repeat to people, again and again, and again; I'm gonna kill her, she's done, if I--if I don't do it, I'll get someone else to do it.  And, oh, by the way, I got a gun so I can do it.  And, oh, by the way, let's

193

shoot this move, Stephanie (sic), and go over and wait for
her.  Clearly, there is sufficient evidence for a bind over
on that.

THE COURT:  Mr. White, any argument to the--as to
the bind over for--

MR. WHITE:  Yes, your Honor.

THE COURT:  --Ms. Bennett?

MR. WHITE:  Your Honor, we would object to a bind
over.  In this particular case, uh, the circumstances as
described by the prosecution's two witnesses are that my
client, uh, was a victim of a burglary.  She did what she
should have done, which was report it to the police.  Uh,
she, uh, had a boyfriend, who, uh, she told about that
because some of the property was his too.  He became angry.
Uh, when he became angry and expressed his anger, uh, as the
second witness, Ms. Clay--Ms.--Ms. Kandler clearly testified,
uh, my client's testimony was that he was crazy, that he was
talking crazy.

Uh, later on Ms. Kandler indicated, uh, that my
client didn't believe that he was gonna do it, that she
disbelieved, uh, that he was gonna do it.  Uh, my client is
by no way tied to this crime.  I mean, supposedly she drove
over, or was a passenger in the car depending on what you
believe, either coming or going.  But, the fact of the matter
is, uh, that doesn't make her a principle, or I think even an

aider and abettor in a First Degree Murder, under these circumstances. There is no allegation, no evidence of course, that my client who has no record of injuring anybody. Uh, there's no allegation that my client had the kind of extreme anger, or hot blood, uh, that would cause her to be interested in doing anything except getting her property back. And, um, I think that there's nothing to tie her to anything, uh, more substantial.

Uh, obviously what ever happened, whether Mr. Benson fired the shots, or some other party fired the shots, when she found out that--that Stephanie had been shot she was both shocked and appalled. And, that is, uh--and that is not the response you would expect from somebody who is a parti-- who would act as an active participant and or a planner in this kind of event. I don't think that they have enough evidence for a bind over, and I would ask, uh, your Honor to decline.

MS. KETTLER: I would indicate, your Honor, that in some ways, the evidence against, uh, Paula Bennett is even stronger than the evidence that we have presented against Kyron Bennett, in some--uh, Benson, in some ways. And, the reason for that is, obviously this is an aiding and abetting case. Obviously we're not saying that Paula, uh--uh, Bennett goes over there and shoots this woman. What we are saying is that she's an aider and abettor. And, frankly, uh, Judge,

here is a person who has been again, riding around all day, listening to her co-defendant talk about the fact that he is going to kill this woman, brandishing a gun, telling other people he's going to kill her.  Then she--then she goes around and reports to all kinds of people, Kyron says he's going to kill her.  And, then despite all that--and--and incidentally, it doesn't really matter if people believed that he was going to kill this young woman or not.

Who would in their right mind, think somebody would kill somebody over material things.  But, we know that happens, and we know that's what's happened here.  The fact is, she goes around telling everybody that she knows he's gonna do--that he's saying that he's gonna do this.  And, despite that, uh, certainly Breanna Kandler is concerned about it, uh---concerned enough about it that she says, forget it, I'm not driving you guys over there to get the key from her, and confront her.  So, you know, the fact that people may act like they're surprised, or act like they are shocked and appalled, doesn't make it so.  And, that's why I repeatedly objected to asking witnesses to testify to what other people are thinking.

The fact that Ms. Kandler, uh--or, I'm sorry.  The fact that, uh, Paula Bennett acts as though she is shocked and appalled--appalled and surprised when she gets the call about this young woman being dead, doesn't mean that she's

196

shocked and appalled. It may very well be a consciousness of a quilt and concern of detection, and being concerned about what's gonna happen at that point. Any degree of participation and supporting or encouraging someone else in the commission of a crime, makes you, uh, guilty as an aider and abettor. Now, whether we agree with that or not, given this is--given this is a very serious offense, I realize that. But, the nature of the offense does not effect the analysis of what is an aider and abettor. You're an aider and abettor or you're not.

What the crime is, is something all together different. And, the fact is, if no other reason, and there are--and there is other evidence, but I'm gonna, uh, point to this in particular because I'm trying to make this as succinct as possible. We have the testimony of the fact that, um--the fact that after she's heard this all day, she leaves, tells people--with Kyron, tells people they're going over there to wait for Stephanie. She leaves that apartment with him to wait for her and confront her even though she knows he's been saying all day he's gonna kill her.

And, we have the testimony from Jessica Fritz, under oath, uh, and both at the investigative subpoena and here again today, that she was in the car and that she--she was a little further away from Kyron. When Kyron got out, she observes the shooting, and then she waits for him to get

197

back in the car, and drives him away.   Now, simply driving

him away would make her an accessory after the fact, not, uh,

an aider an abettor.   But, what she's doing is, since he

can't drive, and confront and shoot this woman at the same

time, she's driving the car.   She has to, uh--goes and drives

forward a little bit further, that's the clear testimony from

Jessica Fritz.   And, then after the shooting stops, she

allows him to get back in the car, which she has been driving

a little bit away from the scene so he can accomplish what he

has gone there to do.

I think on these facts, clearly a trier of fact can

infer judging by his conduct all day long, and that her

knowing of that conduct, of her knowing that he has a gun,

and he's angry, and going over there to wait and confront

her, that she is encouraging and supporting him in this, and

that she should be held, uh, over for trial for that.

MR. WHITE:   Brief response, your Honor.

THE COURT:   Sure.

MR. WHITE:   Your Honor, I would just merely remind

the Court that the evidence I heard, at least indicates that

she had spent all day trying to, um, basically diffuse this

situation.   She kept repeatedly saying all she wanted was her

property back, and that she didn't want anybody to be injured

or killed.   And, secondly; the fact that, uh apparently--

THE COURT:   Mr. White, Paula's having trouble

recording you.

MR. WHITE: Oh. And, also from statements, first that, uh, she had indicated that she was trying to calm things--that the testimony indicated that she was trying to calm things down, and, no matter how aggravated, uh, Mr. Benson may have been. Secondly, uh, that she disbelieved that he was gonna act. I think that these two things are inconsistent with being an aider and abettor.

MS. KETTLER: After all this has happened, surely she's gonna say she doesn't think he was gonna do that. But the fact of matter is, Judge, in order to avoid being held responsible for her part in it, the fact of the matter is it's just a simple as this; her admissions. I drove the car, I heard the shooting, bam, bam, Kyron caught up and got in, and we left. She took him--she goes over there with him, someone who has been threatening to kill her all day. She's driving the car so he can do whatever he's going to do.

If they just went over there to get the things she would just park the car while he's out there talking. But, she drives up a little bit and has--and has to, um--he has to catch up to get in. Clearly a trier of fact can find she's an aider and abettor.

THE COURT: Thank you, all.

As to Ms. Bennett, I am going to bind over on the complaint and warrant.

199

Mr. White, I agree with the prosecutor's argument. The fact that she was privy to his threats that were being made for a, roughly, eight hour period, if my test--my notes are correct, prior to the shooting, um, and still got in the car behind the wheel, and drove him to confront the victim, is that--that alone is enough probable cause for me to send it to the trier of fact. Arraignment on information date on this will be--

--the second, Paula. Is that right?

THE COURT RECORDER: The 27th.

THE COURT: Oh, the 27th. Okay. December 27th, is the AOI date.

MR. WHITE: What time, your Honor?

THE COURT: Um, 9:00 a.m. The bond will be continued.

As to Mr. Benson, I also bind over on the, uh, counts one, two, and three, as listed in complaints. Mr. Burkett, there is also a misdemeanor file that's scheduled for today and we've got to do something with that. It's not part of the same, uh--

MR. BURKETT: I wasn't even aware that there was a misdemeanor, Judge.

THE COURT: Well, then I'll give you a minute to get up to speed so we can talk about that one.

MS. KETTLER: Judge, can I--oh, I apologize.

200

THE COURT:  That's all right.  Go ahead.

MS. KETTLER:  May I address bond.  I--I wasn't here for the arraignment on the warrant.  It's my understanding Mr., uh--uh, Bennett (sic), is on remand, is that correct?

THE COURT:  Uh, let's see, no bond.

MS. KETTLER:  Ms. Bennett--Ms. Benson, I'm sorry, should--I'm sorry, this is difficult.  Kyron Benson is on remand.  Ms. Bennett, Paula Bennett, um, if she has a bond at this point in time, I would set--um, ask the Court to place her on remand status.  Um, it's my position she should have been all along.  But, now that the Court has heard testimony and bound her over for First Degree Premeditated Murder, I would suggest that's it's only fair--it's only fair to the other that they be treated similarly, but also as, uh--to protect the community, and there is a risk of flight as well. I'd ask that she be placed on remand.

THE COURT:  Just for the record; the, uh, bond on Ms. Bennett is currently one million, ten percent, so a hundred-thousand dollars.

MS. KETTLER:  Oh.

MR. WHITE:  If I may respond--oh.

THE COURT:  Now, you can respond.  I just wanted the record to reflect what the current bond is.

MR. WHITE:  Uh, your Honor, obviously, she has not posted the bond yet.  She doesn't have the resources.  The

201

fact of the matter is, though, having heard, uh, the preliminary examination, your order--your Honor, can take, uh, some notice of the strengths and weaknesses of the People's case.  I don't believe, at this time it would be appropriate to change the bond.  I will be making a motion in Circuit Court about it.

THE COURT:  Okay.  Anything else as to bond?

MS. KETTLER:  Nothing further, your Honor.

THE COURT:  All right.

MR. BURKETT:  Your--your Honor, in--in terms of my case, uh, I'm going to be arguing a bond reduction in this case.  But, what I'd ask you to do, is to refer it, uh, to the bond folks downtown.  So, when we go there--when we go there, they'll have all the information available to them.

THE COURT:  Right.  I'm going to leave both bonds the way they are, but I'll make a note in--in, uh, each of the files that, uh--what are we calling it now, pretrial services?

MR. BURKETT:  Yes.

MR. WHITE:  Yes.

THE COURT:  For a pretrial service downtown.  Anything else from the People?

MS. KETTLER:  No, thank you, your Honor.

MR. WHITE:  No.  Nothing today, your Honor.

MR. BURKETT:  Nothing.

202

1          THE COURT:  Mr. Benson, Ms. Bennett, good luck

2   downtown.

3          Thank you, folks.

4          MS. KETTLER:  Thank you, Judge.

5          (At 2:37 p.m., proceedings concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

STATE OF MICHIGAN )

)

COUNTY OF WAYNE )

    I certify that this transcript, consisting of 204 pages, is a complete, true, and correct transcript of the proceedings and testimony taken in this case on December 12, 2007.

December 20, 2007

            Paula K. Moore   CER 5234
            Certified Electronic Recorder
            11131 S. Wayne Road
            Romulus, Mi 48174
            (734) 941-4462

204

# Pages 70 & 80

# missing