STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF
MICHIGAN,

          Plaintiff,

-v-                  Case No. 07-024733-01
                           07-024733-02

KYRON DARELL BENSON AND
PAULA RENAI BENNETT,

          Defendant.

_____/

JURY TRIAL
VOLUME III

          Proceedings had before the Honorable MICHAEL J. CALLAHAN, Judge of the Third Judicial Circuit of Michigan, 703 Frank Murphy Hall of Justice, Detroit, Michigan 48226, on May 8, 2008.

APPEARANCES:

                    MS. MOLLY KETTLER
                    Prosecuting Attorney

                      On behalf of the Plaintiff

                    MR. RAYMOND BURKETT
                    Attorney at Law

                      On behalf of Defendant Benson

                    MR. WALTER A. WHITE
                    Attorney at Law

                      On behalf of Defendant Bennett

                    Jeffrey B. Goldsmith
                    Official Court Reporter
                    CSMR-0037
                    <u>INDEX</u>

| WITNESS | PAGE |
|---|---|

**FREDERICK WATSON**

| | |
|---|---|
| Direct Examination by Ms. Kettler | 33 |
| Cross Examination by Mr. Burkett | 35 |

**BREANNA KANDLER**

| | |
|---|---|
| Direct Examination by Ms. Kettler | 35 |
| Cross Examination by Mr. Burkett | 70 |
| Cross Examination by Mr. White | 87 |
| Redirect Examination by Ms. Kettler | 99 |
| Recross Examination by Mr. Burkett | 102 |
| Recross Examination by Mr. White | 105 |

| EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| Plaintiff's #1 | Prev. | 34 |

May 8, 2008

Detroit, Michigan

3

# PROCEEDINGS

\*      \*      \*

MR. BURKETT: I would make a motion, with the exception of the one officer in charge, that all witnesses be sequestered and I will keep our folks out.

MS. KETTLER: I would join in that request, however, I do not expect to call Officer Czinski as a witness.   He's on the witness list, but he's endorsed in the alternative.   I don't expect to call him, so I'd ask that he be allowed to remain in your courtroom along with the officer in charge, Detective Toth.

MR. BURKETT: Your Honor, as an officer of the Court, I see a need that I will probably-

THE COURT: Well, I'll allow it over objection. If he's been present during testimony, you can certainly cross examine him on that topic.

MR. BURKETT: Oh.   Does that go for our witnesses too?

THE COURT: Sure.

MR. BURKETT: Okay.

THE COURT: This blanket sequestration of witnesses that has been going on in this building since 1967 is, in my mind, extraordinary.   The relief of sequestering witnesses is an extraordinary relief.   I don't care if they're in or out to be perfectly honest with you.

MS. KETTLER: Judge, counsel mentioned our witnesses.   I did not receive a witness list from Mr. Burkett.   Has he filed one?

THE COURT: Well, that's something we can take up.   My question was, are you ready for the jury?   And then Mr. Burkett went into this business about how many people are in or out.   Are you ready for the jury?

4

MS. KETTLER: Yes, your Honor.

THE COURT: Are you ready for the jury?

MR. BURKETT: Yes, Sir.

THE COURT: Bring the juries.

(whereupon the juries enter the courtroom)

THE COURT: Ladies and gentlemen, thank you.   You can understand now and as your routine makes it's way through this trial, you will understand the importance for timeliness.   Let me call the cases separately.   This is the case of People vs. Kyron Darell Benson.   Will the jury please stand and raise your right hand.

(whereupon the jury for Benson was sworn)

THE COURT: This is the case of the People of the State of Michigan vs. Paula Bennett.   Will the jury please rise and raise your right hands.

(whereupon the jury for Bennett was sworn)

THE COURT: The trial now proceeds to opening statement by the People.

MS. KETTLER: Thank you, your Honor.   Good morning, ladies and gentlemen of Mr. Benson's jury and good morning ladies and gentlemen of Ms. Bennett's jury.   I want to start out by telling you that it was not Paula Bennett's intention or idea to kill Stephanie McClure.   I say that from the very beginning.   It wasn't her idea.

However, the fact of the matter is, that despite the fact that she didn't pull the trigger, she knew that Kyron Benson, her boyfriend, was going to kill Stephanie McClure.   And she helped him to do it.   And, in fact, it would not have been possible for him to do it except for the fact that she helped him.   Stephanie

5

McClure is, was, a friend of Paula Bennett's.   Paula Bennett had an apartment in Belleville which, at times, Mr. Benson lived with her there.   At times he would leave, but continuing until the day of the murder he had access to that apartment and a key to it.

There came a point in time when Stephanie McClure asked to stay there with them and she was allowed to do that by Ms. Bennett for a period of time.   At a certain point of time, very closely before the murder, Stephanie McClure stole a number of items from that apartment that belonged to Ms. Bennett and Mr. Benson.   It may surprise you to hear me say that the victim did something that's wrong, she stole, but that's the fact.   She stole some items from these people.   And this set a terrible chain of events in motion that went on from that point forward. Why do I say that it would not have been possible for Kyron Benson to kill Stephanie McClure if it was not for the help of Paula Bennett?   Let me tell you.   And why do I say that she knew he was going to kill Stephanie?   Let me tell you.

The evidence is going to show that all day long, and this is the tragedy of this, Mr. Benson was going around telling any number of people that he was going to kill Stephanie and to some of those people, he even displayed a weapon.   That's what Stephanie McClure's life came down to at this point: a Play Station 2, a laptop computer, some games, some clothes and some shoes.   But it's not just about that, the evidence is going to show that Mr. Benson was enraged that someone would dare to disrespect him and that people knew that she had taken these things.   And the evidence will show that he thought and threatened and premeditated and planned to kill her because of that all day long.   The evidence is going to show that this is a classic case of premeditated murder and that Ms. Bennett knew that.   Any number of people, as I said, heard Mr. Benson saying that he was

6

going to kill this young girl and the tragedy, as I said, of it is that any number of people might have been able to stop it, but they didn't.

You're going to hear from witnesses who heard him talking about doing it and did nothing.   And probably because the evidence will show, like most people, nobody could believe that someone could take someone's life over material things or this perceived loss of respect, whatever that means.   It doesn't certainly measure up to taking a human life.   But what you're going to hear is that Paula Bennett started out trying to do the right thing that people should do.   If someone steals from you, you should go to the police and allow them to handle it. And you're going to hear that she did that.

She, along with a friend of her's, Breanna Kandler, who's a witness in this case, went to the police department at about 5:30 the evening before Stephanie was murdered by Mr. Benson and made a report about these items being stolen.   And at that point, you're going to hear that Breanna Kandler was asked by Ms. Benson, Bennett, and I apologize in advance.   It gets a little tricky with two B names.   But Breanna Kandler will testify that Paula, at this point, doesn't even have a key to her own apartment.   Mr. Benson, who in many ways the evidence will show, is kind of running the show and running her around, but she chose to participate in that, had the key.   And he was, you will hear, enraged by the fact that these things had been stolen from him.   But not just that.   He wasn't just angry with Ms. McClure.   He turned himself on Ms. Bennett.   And she knew that.   And she knew the kind of rage he was capable of, but nonetheless, she allowed him to do this and she assisted him.

Let's back up a minute.   We have Breanna Kandler being asked by Paula, take me, drive me and Kyron to go get my key from Stephanie.   Ms.

Kandler, as the same person who has gone to the Van Buren Police Department to help her make that police report or when she made that police report, and they go to an Applebee's Restaurant and they meet up with Kyron.   And it's at that point in time that Breanna Kandler first hears Mr. Benson begin to threaten to kill Stephanie.   And also while he is in the car with them, she sees that he is in possession of a gun.

Now, you're going to see throughout the course of this case that there are any number of very different ways that people reacted to what was happening.   And I say that not because it's your job to judge them, was what they did right or wrong, because it may play into how you evaluate their credibility as witnesses.   What you're going to hear is that Breanna Kandler, at that point, for whatever reason, a little lightbulb went off in her head that this is wrong and I don't want to participate in this.   This is dangerous.   And she, at that point after hearing these threats, refused to take them to get the key from Stephanie.   She drops Mr. Benson off at a friend's, of his, house and goes on her way.   Refused to participate in that further.   Unfortunately, it apparently didn't set off a lightbulb for Ms. Bennett that now is the time to nip this in the bud and it continues on.

You're going to hear from another witness who is also a friend of Ms. Bennett.   Her name is Jessica Fritz and she's going to talk to you about the fact that she spent time also with the two of them and she heard again and again and again these threats that Kyron was going to kill Stephanie over these stolen items. And one thing that's particularly interesting about that is that her testimony will show you even further that, in fact, Paula Bennett knew that Mr. Benson was serious about killing Stephanie because they go then to talk to a cousin of Ms. Bennett's, Ms. Rita Merry, and Jessica says, I don't think he'd do anything like that.   What does Paula say?   I don't know.   He sounded pretty serious.   But, nonetheless, she continues to

8

let this chain of events unfold.

As I said, I'm not going to go through each and every incident that lead up to this, but there are a number of occasions and you'll hear about those, upon which he threatened to kill Stephanie that day and nobody did anything.   Later that evening, you're going to hear testimony that there came a time where Kyron and Paula and Jessica Fritz are at Paula's apartment, as well as, a young lady named Kathleen McIntyre, also known as Kate, who's also a friend of Ms. Bennett's.   Now, Katie's reaction to this situation is interesting to and telling as to her credibility.   But, I'll come back to that.   But, what you're going to hear is, after riding around all day brandishing a gun.

By the way, during the course of this time, he gets into an incident over a parking spot, a minor parking collision, and draws a gun on somebody else that day.   Ms. Bennett's also aware of that and she still apparently doesn't know what was going to happen, but we'll talk about that further.   They get back to this apartment and they're continuing to talk about the fact that Stephanie McClure took their things and what they're going to do about it.   And Ms. Bennett and Mr. Benson are discussing what they're going to do and you're going to hear that at a point Mr. Benson says, alright, let's go shoot this move.   Whatever that may mean.

We're going to go confront Stephanie and get our things back. This is very important at this case, at this point.   What happens at this point, unfolded further as the case went along because Katie McIntyre, as I said, she's a friend of Ms. Bennett's.   Despite the fact that she knew of these threats and she knew what was going to happen and she knew what did happen, she refused to talk to the police at all.   And I say that because I think it's important when you hear her

9

testify for you to evaluate her credibility.   I think the evidence will show that both she and her mother are hostile to this prosecution, that they think Ms. Bennett should not be prosecuted and that Mr. Benson should take all the weight for it.

So, I tell you that the evidence will show that so that you will keep that in mind as you listen to her testimony and going forward.   What happens then after Mr. Benson says, let's go shoot this move, after he's been threatening and displaying his weapon?   The evidence is going to show that Mr. Benson and Ms. Bennett get in a vehicle and here's what kind of blew the case open, as they say on T.V.   And this occurred much later in the case.   This case had already, the evidence will show, been bound over for trial without the testimony of a young man named Mark Larvaidan, Mike Larvaidan, sorry.   But eventually, and again I think it's telling how people react to this type of a situation, eventually he came forward and told what happened that night.   The police were successful in pursuing leads and identifying who this person was, who they had previously only known as "Big Mike".

Well, Mr. Benson drove and met up with Mr. Larvaidan, who he had been talking to all day about his rage, that this little hoe, as he called her, had disrespected him by taking his things.   Mike is a person who's a little bit older than Mr. Benson, who's probably a kind of a person Mr. Benson looked up to, looks up to.   In fact, he called him Uncle Mike.   He's sort of a different kind of a personality or place in life than Mr. Benson.   Evidence is going to show he's a steady guy, he's got a good job and that he tried to calm Mr. Benson down because he thought he could have some influence on him.   He thought he could stop him.

They go and meet up with Mike Larvaidan at a Kroger store. Mr. Benson is still continuing to talk about, how he's gonna, I'm about to kill this hoe.   Now, keep in mind this is almost probably after one o'clock in the morning by this

10

point.   And this business started out at five thirty that evening.   I'm about to kill this hoe.   Mr. Larvaidan gets in the car with him, tries to talk him into exercising some restraint; it's not worth it, they're material things.   Mr. Larvaidan knows that Mr. Benson has this gun.   What happens at this point?   This is very important because remember Stephanie had been staying with these two in Belleville at the Harbor Club Apartments on the service drive.   Where is she now?   Mr. Benson doesn't know. Ms. Bennett does though and she tells him where to go and how to get there.

And that is the thing that allows him to get out of that car there and confront her and shoot her once and then again and again and again and again. And after he gets out of the car, but before he shoots those five bullets into her, Ms. Bennett moves the vehicle so it will be in a position where it will be nice and handy for him to get to and get out of there fast after he does this shooting.   Mr. Larvaidan failed to stop him.   Didn't want anything to do with this.   Most people wouldn't want to testify against a friend.   I think you'll see that in Katie McIntyre, but you'll also see that in him.   Mr. Larvaidan, this evidence will show, was never a suspect in this case.   He was a witness.   And the evidence is going to corroborate that even before he came forward, it was clear that Mr. Benson along with Ms. Bennett were the murderers of Stephanie McClure.

Why do I say it was clear?   Because you're going to hear that the police department here, unfortunately again, you're going to have to hear that, a number of the young people who are involved in this, what's swirling around, are involved in some unsavory things.   And because of that, they had to do a very thorough investigation and that's what they did.   You're going to hear that in addition to the fact that Stephanie had stolen these items, that Stephanie and another young man, who's involved with the case, had been engaged in a scheme to steal credit

11

card numbers from a pizza place that they lived at, or not lived at.   Sometimes it

feels that you live at work, but they worked at.   And she had had some unpleasant

dealings with a former boyfriend, as well.

So, what they did is they set out, did they say, oh, I know who it

must be?   I'm going to charge him, pursue him and close my eyes to everything

else?   No, the evidence is going to show that they did a very thorough investigation

and they pursued any number of avenues and possible potential suspects, but the

facts is the evidence just keep on pointing back and coming back to Mr. Benson

along with Ms. Bennett murdering this young lady.   So, Ms. Bennett moves the

vehicle to a place where Mr. Benson can quickly get away after the shooting, comes

back, gets in that vehicle and drives away.   So, let's be clear.   The evidence is not

going to be that she just drove away, cause she didn't.   She helped him get there

and she put the car in a position where he could quickly get away.   Because where

they first pulled in initially was a dead end.   And you're going to hear that Mike

Larvaidan said when Mr. Benson got back in the car and I apologize, you're going to

hear some bad words in here.   I know that's not going to shock anybody, but he

said, you better hope that bitch is dead cause you're going to jail if she isn't.

He knew without a doubt at that point that Mr. Benson had

done it.   Just like the other witnesses who are at that apartment which he came

back knew because when she came back in she was in a state, call it an excited

utterance in the law; "Oh, my God.   He did it.   He did it."

MR. BURKETT: Your Honor, I'm going to object to that.   I have

an objection to that.   Whatever she said, I can't cross examine, your Honor.   So,

she shouldn't be allowed to say what she said, when she's not going to be able to

prove it.

12

THE COURT: Can you identify which jury you're making the statement to?

MS. KETTLER: As an excited utterance, your Honor, I believe it's admissible to both juries.

THE COURT: Well, finish up your opening statement.   I'll decide that out of the presence of both juries.   But let me say to both juries, what the lawyers say is not evidence.   The only evidence you will ever hear is from the witness stand.

MS. KETTLER: Even if you put that aside, the fact is that you will also hear evidence that Mr. Benson, in addition to threatening to kill Stephanie, in advance, in addition to telling people he was going to do that, he said, you better not tell.   And you better not tell because you'll be next.   I'm going to get you.   And I'm going to do it or it's going to be done.   And before I do it, my people are going to know who you are and where you live.   That's what the evidence will show in this case.

I want to thank you.   Oh, there's one other thing I wanted to talk about.   And this is also important because it's important, I would say, that you know that this evidence will come in because it may impact on the way that you evaluate the credibility of witnesses and that is this; another example of people and their reactions to this and how they try to influence the outcome of this case outside of the courtroom.   You're also going to hear evidence that the grandmother of Mr. Benson contacted one of the witnesses on the telephone and tried to threaten him, oh, you better get a lawyer.   Don't tell them anything.   Don't tell the police.   Don't talk to the police.   I say that because you need to take into account what's going on with people trying to influence this prosecution because it's important when you

13

evaluate witness credibility. The evidence is what's in this courtroom and nobody

has a right to try to influence or obstruct it. I thank you very much for your attention.

THE COURT: Opening statement for Mr. Benson.

MR. BURKETT: Thank you. First of all, good morning

everyone. I suspect this time next week when you'll be in that jury room, you're

going to make, what I believe, will be one of the most important decisions that will

ever be made in this young man's life. And that is whether or not he should be

convicted of this murder. I suspect that the evidence that the government here is

going to bring in is going to be as lopsided as what you just heard a few minutes ago.

Now, this is what I promise you the evidence will show you.

First of all, the whole theory is that my client here had a motive to kill Stephanie

McClure and I certainly won't deny that. He definitely had a motive, but there were

other people that had motives to kill her as powerful as the one they said that he

had. And I will get into those other people who had a motive to kill her. When

Stephanie left their home there was no fight. There was no argument. She just

left. Now, I won't deny the fact that Kyron, my client here Mr. Benson, was

extremely angry. I'm going to talk about his motive. The Prosecution had told you

that he threatened to kill Stephanie McClure. I know, twice. Once of the witnesses,

Breanna, the Prosecution told you about, he told her this twice, "I'm going to kill

Stephanie."

The first time he told her this was when this woman that they

had let come and live with them, feed her, cause she didn't have a place to stay,

gave her shelter, gave her a key to the apartment. When he realized that Stephanie

had ripped him off for no reason, and the evidence will show you, not only did she rip

14

him off, that she put the stuff up for sale within one day.   He was furious and he told her friends that, I'm going to kill her for this.

The next time when he said it was when they went back into their apartment that they lived in.   And my client was given a puppy and you will hear evidence about how crazy he was about the puppy.   They couldn't find him. And he went to the freezer, I think, to get some ice to mix a drink.   Low and behold, the puppy was in the freezer, dead.   And his exact words was, Stephanie did this and I'm going to kill that bitch for this.   There was no reason for her to kill my puppy and put him in the freezer.   Yes, he was furious.   But then, who wouldn't be furious?   And this is their motive.   This is the government's motive for him killing her.

Now, I told you Stephanie McClure is dead and I'm not going to stand up here and try to kill her again, but Stephanie was not a nice person.   There was no reason for Stephanie to kill that puppy and especially put him in the freezer where someone would open it and see something that they love, killed and stuck in the freezer.   Yeah, he was furious, but who wouldn't have said those things?   The next thing.   Oh, they just forgot to tell you about that.   Stephanie McClure said, I'm sorry.   Other people that have motives and equal to that.   And before I even tell you what these other people were, she talked about what a wonderful job the Sumpter Police did.   I will show you from this witness chair, and the evidence, everything that I'm telling you, I will show you evidence.   These people did one of the lousiest jobs of investigating the case that one could ever expect.

I will show you that good police officers follow the evidence. These guys, the government here, they said, we will make the evidence fit into our theory.   Next person, you will hear about a person named Ricky Wren.   The

15

evidence will show that Stephanie came to Ricky Wren and said, I got a scheme for you and I, can make a lot of money.   I can rip off some people, credit cards.   I want you and your brother to help me.   It worked out pretty well.   I mean, she was ripping them off left and right.   The evidence will then show that Ricky Wren got busted by the police and what happens when you get busted by the police?   Stephanie goes to the police and says, let's cut a deal.   I'll testify against Ricky.   Let me go.   And that worked out fine.   Ricky Wren was supposed to go to trial the week that she got killed.   Is that a motive?   You'll have to decide that.

The Sumpter Police put out a, they call it a, be on the look out for Ricky Wren because, I mean, this guy had a heck of a load.   So, they put out this move to pick up Ricky Wren.   Ricky Wren says, they bring him to the police station and the evidence will show you, members of the jury, that he goes to the police station and the evidence will show you by the witnesses that the government is bringing in, they will show you that Ricky Wren says, I could not have done it.   I cannot have killed Stephanie because I was at a party with one of my girlfriends.   And that's going to be important.   So, the Sumpter Police, the Detective Bureau, says give us the name of this girl you were at the party with.   And how many people were at the party?   Thirty five, forty, fifty people.   Give us the name.   They interview this girl.

The evidence will show you that their witness, his girlfriend at the time says, Ricky Wren is a very bad person.   He would do a lot of things criminally.   But the one thing he won't do is kill somebody.   And if you say that he killed somebody, I'm happy to come in that courtroom and testify he didn't do it and he was with me.   Now, these good detectives, that's all they talked to is that one girl.   They say, okay.   Well, if you didn't do it, hey, if you're going to say that, no.   You're

clear.   You're free to go.   And at the same time Ricky Wren and his brother, they have evidence, was getting ready to leave town when they finally arrested him. They were up in Monroe someplace getting ready to leave town.   Good point.   The next thing that you're going to hear, there was another person.   And that other person's name was Timothy Walker.

Now, Timothy Walker, you will hear from the witness stand, was Stephanie McClure, oh, I'm sorry.   I forgot to tell you something very, very important. In Ricky Wren, you will hear testimony that right after Stephanie McClure was killed, Ricky Wren started getting e-mails from Stephanie's family.   And the e-mail says, you did it.   We know you did it and we can prove it.   Sumpter Police never went to the family about how do they know this and how can they prove it.   Why?   Because this is the person that they want.   I was talking to you about Timothy Walker. Timothy Walker was Stephanie McClure's ex-boyfriend.   Just before this incident happened, he goes to her home and in front of her home, grabs her by the throat and beats her unmercifully.   Beats her to the extent that the neighbors had to pull Timothy Walker off of her.

Once this had happened, the next thing, Stephanie goes to court and get a court order to keep him from beating her and Sumpter Police helped her do it.   Timothy Walker was scheduled to go to trial also within the next week or so after this incident.   The Sumpter Police, with their good police work, then put out a be on the look out for Mr. Will (Walker).   And they knew he drove a Nissan.   So, immediately they got on the radio and said, be on the lookout for this Nissan.   They get a message from the Canton Police Department, the Nissan that you're looking for just passed us.   So, it's in the driveway of Timothy's home.

So, they give this to these good detectives here.   And what do

17

these detectives do?   Nothing.   They didn't ask the guy, go feel the hood of the car, see if it's hot.   See if he's home.   They do nothing until the next day.   The next day they go to Timothy's home and they take all the evidence.   They take his shoes, I mean, they take his pants, his clothes.   They get a search warrant, by the way to do all this, and take it to the police station.   I believe, because we're going to send it to our laboratory to show certain things.   And some of the things that they were going to show was that Stephanie had, she had a carpet, we're going to match the fabrics of her carpet on his shoes.   Just like they did on CSI and it wasn't for entertainment purposes, as you will tell.

They take all this stuff and they put it in a garbage bag and give it to Timothy Walker.   Of course Timothy Walker's brother says, oh, he wouldn't kill her.   I mean, he might beat her to death, but he wouldn't just shoot her.   These good detectives, they believed him.   The next day, after this incident occurred, what happens?   Timothy Walker walks into the Sumpter Police Department and he says, you had a search warrant and you took everything from my house.   The officer in charge of the case said, okay.   He said, and I want it back.   He said, well, the detectives that I had on this case aren't here.   But if this stuff is yours, take it.   And gave all this stuff back.

None of this stuff was sent to the Michigan State Police to analyze to see, hey, was this the person who had beat her before?   Because the evidence will show you that there were footprints there and they tried to match it. Now, they put things from Kyron Benson's house, just like they did on CSI, they said, well, let's look.   The victim here has a certain kind of carpet that when you step on it, it leaves traces in it.   They took shoes from his home and they tried to match the shoes that he had with carpet.   The State Police said, well yeah, he had shoes and

18

it had fabric in it and we had Ms. McClure's, but it don't match.

        You will hear evidence that when you shoot a gun, powder comes back on you and powder gets on your clothes.   They had all of his clothes. None of this stuff matched.   They took fingerprints.   None of it matched.   They took casting of his shoes.   None of it matched.   None of it, but he fit their pattern.   And you will hear evidence, what the Prosecutor just told you, that Mr. Benson said, we have to go shoot the move.   But what she didn't tell you, like I said so many things, these detectives says, what does-

        MS. KETTLER: Your Honor, I'm going to object that this is argumentative and not a statement of what the evidence will show.

        MR. BURKETT: I said the evidence will show that.

        MS. KETTLER: What she didn't tell you?

        MR. BURKETT: Oh, I'm sorry.   I'm sorry.   What she forgot to tell you.

        MS. KETTLER: I object that this is argumentative, your Honor.

        MR. BURKETT: Okay.   I'll move on.

        THE COURT: Sustained.

        MR. BURKETT: The police says, we don't understand what this terminology means.   Shoot the move.   Explain it to us.   She says, well, for us young people shoot the move means, he's going over there to get his stuff.   It don't mean he's going over there and shooting somebody.   That's what she wrote down in her statement that she gave these good detectives.   So, what happened that night? I've told you and if I didn't, let me make it real clear.   When he saw was this woman, Stephanie, had killed his dog his exact words was, I'm going to kill that bitch.   Those are his exact words.

19

So, then what happened?   The evidence will show you that that night he and Paula, they went over to Stephanie's place.   They went there for one reason and one reason only and that was to get his stuff back.   Now, he knew the kind of folks that Stephanie hung around with.   He already knew that.   So, he goes to the house.   He parked the car and he gets out to go and get his stuff back from Stephanie.   Was he angry?   Yes.   When he approaches the house, Stephanie is outside the house.   Outside the house.   The evidence will show you that she had a knife in her hand and that she was having an argument or a fight with a tall white man.   Now, this is not him saying it, but their own witness will say that.   She says when she heard these shots, she looked out of the window and what did she see?   She said, as the best I could tell from the way the person moved, the person was tall and the person was white.

Now, he ain't tall and he damn sure ain't white.   But, that didn't fit into their pattern.   So, they gonna keep going.   They gonna keep going.   As he approached, this guy fired five shots into Stephanie, I think, and got into that Nissan and drove off.   A good investigation would have shown that.   So, what do they do?   He jumps in the car and they go back.   No witness will get on this witness stand and say that he shot Stephanie.   Nobody will say that.   They want you to reach the conclusion based on what they did that he's the person that shot her.   Now, she was talking about things that the grandmother will say.   First of all, there was a reason during the voir dire process picking you, that they talked about CSI for entertainment purposes and why was that reason?

MS. KETTLER: I'm going to object to this.   It's argumentative.

THE COURT: Sustained.

MR. BURKETT: Okay.   CSI-

20

THE COURT: Sustained.

MR. BURKETT: Haven't said anything.   Okay.

THE COURT: Wait a second.   First of all, it's a real bad idea to argue with me.

MR. BURKETT: Okay.

THE COURT: Secondly, she objected to the comment about CSI and then, whether you intended to or not, you started back in with CSI and that was the objection that I sustained.   Now, go on.

MR. BURKETT: I apologize.

THE COURT: Apology excepted.   Just go on.   Finish up.

MR. BURKETT: Sure.   They sent ten to twelve things to laboratories to match up to show he did it.   All of them come back, fingerprints, DNA, all that stuff came back showing they can't link him to this offense.   The next thing that happened that I want you to be aware of that I think is very, very important is this.   I've been involved in this case, the evidence will show you, since October. We've been before this Judge since January-

THE COURT: Counsel, this sounds like argument.   I don't understand why the jury's informed about what's happened before today.

MR. BURKETT: You will with my next statement.

THE COURT: Next statement.

MR. BURKETT: Okay.   The government goes to the county jail and they tape all of his phone calls, especially the one's that he had with me.   No court gave them permission to do that.   They just tape it.   He's supposed to have attorney-client privilege.   The government didn't get a search warrant to do this. They just tape his phone calls.

MS. KETTLER: I'm going to object to the comment about the necessity for a search warrant.

THE COURT: Sustained.

MR. BURKETT: Anyway, they tape all of his phone calls that he had with me.   Of course, they gonna say, well, he didn't say anything.   That's fine.  Now, this happened in the latter part of April.   I didn't find out about it until about two weeks ago.   The next thing that you will see that also in the latter part of April the detective here goes to the county jail and they have a district judge sign an order that they can take his DNA for a second time.   We're not told about this.   These detectives go to the county jail-

MS. KETTLER: Objection.   There is no requirement to advise Counsel of a search warrant and that's argumentative and it's not proper.   It's not a proper argument at that.

THE COURT: Well, what is the purpose?   Indeed, it's not evidence.   It sounds argumentative, but is even the purpose of it?   I'll take that.

MR. BURKETT: Okay.   My next statement will show you the purpose.

THE COURT: Well, tell me right now.

MR. BURKETT: Because when they went and got the search warrant and went to the county jail, one of the first things they asked him as they was taking his blood is, don't you want to tell us what happened?   I'm his attorney.   I should have been there.   They don't have a right to question my client without me being there, but they did it.

MS. KETTLER: I object to that.

THE COURT: Sustained.

22

MR. BURKETT: The only thing that this Defense Attorney for Mr. Benson is going to ask you to do is this. Follow the law that is given to you by this Judge. Apply it to the fact of this case. If you listen to their witnesses and you honestly believe those witnesses and you come back and say, well, Mr. Burkett, we think this man is guilty, the only thing I can say is, I probably did a bad job. Only thing I'm asking you to do is listen to the testimony and just be fair. Treat us like you want to be treated. If their witnesses, and you will hear that 95% of them are her friends and that they have told the police, we don't want this guy. And you can take that into consideration. I don't know any of their witnesses and neither does she.

MS. KETTLER: I object to the relevance of this, whether he knows them.

THE COURT: Sustained.

MR. BURKETT: Your job will be to judge their credibility. That's all that you can do. Judge their credibility. And I submit to you that when you look at that credibility, you're going to find that their credibility is not believable. And I'm going to ask you when this case is over to allow this man to walk out that front door the same way he walked in. Thank you.

THE COURT: Mr. White.

MR. WHITE: Thank you, your Honor. This is my first chance to talk to you folks about this case at any kind of length and it's been described already by the Prosecuting Attorney and also by Mr. Burkett, my client, Paula Bennett here, is charged with aiding and abetting a murder committed by Kyron Benson. The first thing you got to do in order to find that she aided and abetted the murder is to find, and I know you're not the jury that determines his guilt or innocence, that there was a murder committed by Kyron Benson. Because they're not telling you anybody else

23

committed the murder that she aided and abetted-

THE COURT: Can you speak louder, please? The jurors are having difficulty hearing you.

MR. WHITE: Alright. Thank you. The first requirement they have to do is show you that Kyron Benson committed the murder cause he's the only one she's charged with aiding. In addition to that, you're going to hear evidence about what happened during this case and the Prosecutor's covering some of it. Mr. Burkett's covered others. My client was friends with Stephanie McClure, let her stay in her apartment, gave Stephanie her key, which is why, you'll find out, she was dependant on Kyron for a key. Stephanie left.

A few days later, my client found out that her possessions and Kyron's possessions were being sold by Stephanie McClure. My client then did exactly the right thing. She went to the Van Buren Township Police Department and she filed a complaint for the theft of her goods. She didn't try to take matters into her own hands. She filed a complaint. She then went, and later in the day, met up with her boyfriend, Kyron Benson. He found out about the theft from her and was mad at her for letting Stephanie have a key. He was also mad at Stephanie, of course.

During the course of the day, people went different places and I'm not going to go through it step by step for you. But, two things were said by Kyron Benson and at various times. One, I'm going to get my stuff back. And two, I'm going to kill her. You're going to find out that on one of the occasions when he said, I'm going to kill her, that one of the prosecution witnesses said, why don't you kill her sister too? I hate that bitch. Because nobody took him seriously. Every time he would make some off the wall comment like that, my client would say, don't

24

do that.   I want her to go to jail.   She doesn't deserve to die.

Ultimately, my client ends up with her friends over at her apartment.   Kyron picks up his friend, Mike.   They come over to the apartment.   There's some discussion of going over and getting the stuff.   The witnesses are going to tell you that at that apartment, at about two o'clock in the morning, nobody was talking about blowing anybody away.   Now at that point, Mike Larvaidan and Kyron and Paula get into Mr. Benson's car.   Mr. Benson's grandfather owns the car.   Mr. Benson drives the car.   Mr. Benson is the one who is the owner of the car. And what's he say to Mike?   Well, before we go into that, let's take a look at Mike. This murder takes place and three people are in the car; Mike and Paula and Kyron. And you're going to hear testimony that the car was parked out of sight of where the shots came from.   And the two people in the car were Mike, who had previously been in the front right seat, and Paula who'd been in the back seat.

Now, Mike didn't just come forward as a public-spirited citizen. The police came to him, gave him a Miranda warning and I can't speak to his belief, but I believe the circumstances will show you, he had fairly good reason since he was sitting in the car and didn't get out and Paula was sitting in the car and didn't get out to believe he might be charged with first degree murder.   And I would tell you that that gives him a motivation to tell you a story that the police want him to tell. The story he tells is that when Kyron drove over there, my client pointed out either the street or the house and then pulled the car around the corner.   Kyron gets out of the car, goes, they hear shots immediately and Kyron comes right back.

Now, on the way over Kyron had said he was going to get his stuff back.   He also said something about, I'm going to kill that bitch.   Talk is cheap.  All during that he had been saying that why didn't anybody do anything about it?

Cause nobody believed him.   The fact of the matter is that in order to be guilty of aiding and abetting not only does Kyron have to be guilty, but my client has to be aware of what she's in for.   If she thinks that Kyron's just going to go over there and grab the stuff, she's not guilty of aiding and abetting for pointing out an address. And the Judge will instruct-

          MS. KETTLER: Objection.   Argumentative.   It's also a misstatement of the law.

          MR. WHITE: As I said, the Judge will give you the law.

          THE COURT: Hang on a second.   Could you just step out of the view of the jury so I can speak to them?

          MR. WHITE: Oh, sure.

          THE COURT: Ladies and gentlemen, the only law that you will ever hear in this case that you must apply is what I tell you is the law.   If a lawyer says something different about the law from what I say, you must follow what I say. Go ahead.

          MR. WHITE: Thank you, your Honor.   And as I indicated, the Judge is going to instruct you on what the law is whether I state it accurately or mis-speak, you got to take the Judge's word just as he indicated to you.   The fact of the matter is then, they go and drop Paula off at home.   Paula makes statements to her friends; Kyron shot somebody, I can't believe he did it, things like that.   Now, Paula didn't see anything.   She jumped to a conclusion and it's the same conclusion the Prosecuting Attorney wants you to jump to.   I'm going to ask you, quite simply, to listen to the evidence, evaluate it, evaluate the believability of different people.   If you do that, I believe at the conclusion of this case you'll be sending my client home where she belongs.   Thank you.

THE COURT: Ladies and gentlemen of both juries, we'll take a twenty minute break.   It is very important, I don't care if you stay together, but it is very important that you are back in your jury rooms at 10:45, fifteen minutes before eleven.   Take a break.

-     -     -

(whereupon the juries enter the courtroom)

THE COURT: Ms. Kettler, you can call your first witness.

MS. KETTLER: Thank you, your Honor.

FREDERICK WATSON

having been duly sworn on his oath at 10:47 a.m. by the Court was examined and testified as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q     Good morning, Sir.   Would you please state your full name for the record?

A     Frederick Wayne Watson.

Q     And, Sir, what is your relationship to the victim in this case, Stephanie McClure?

A     She is my cousin.

Q     Okay.   And how old was Stephanie when she was killed?

A     Twenty two.

Q     Okay.   Did there come a time when you were asked by someone in the family to go to the morgue and identify her body?

A     Not the morgue.

Q     Okay.   Where did you identify her?

A     At the place where she was murdered.

27

Q    Okay.   You identified her at the scene then?

A    At the scene.   Yes.

Q    Okay.   How did you happen to get there so quickly?

A    I just live not even a quarter mile away.

Q    Okay.   And how was it that you were alerted that you should go there?

A    A mutual friend that had already been on the scene.

Q    Okay.   And was that in person or by telephone?

A    In person.

Q    Okay.   And who was that?

A    Her name is Sheree(ph) Monture(ph).

Q    Okay.   I'm going to show you what's been shown to both counsel and marked as People's exhibit #1.   I'm going to ask you, is that a photograph of your cousin, Stephanie McClure?

A    Yes, it is.

                MS. KETTLER: Move for the admission of People's exhibit #1.

                MR. WHITE: No objection.

                THE COURT: Any objection?

                MR. BURKETT: No, I'm sorry.   No objection.

                THE COURT: It's admitted.

                MS. KETTLER: Nothing further.   Thank you, Sir.

                THE COURT: Cross exam.

                      CROSS EXAMINATION

BY MR. BURKETT:

Q    Sir, I take it that you and your cousin was pretty close?

A    Yes.

Q     For whatever it's worth, you certainly have my sympathies.   Did you know

      Ricky Wren?

A     Say again?

Q     Did you know a person by the name of Ricky Wren?

A     No.

Q     Okay.   Did you send any emails to anyone?

A     No, I have not.

                    MR. BURKETT: Thank you very much.

                    MR. WHITE: I have no questions.

                    THE COURT: Thank you.   You can step down.   You're free to

go.

                    (whereupon the witness was excused at 10:49 a.m)

                    THE COURT: Call your next witness.

                    BREANNA KANDLER

having been duly sworn on her oath at 10:50 a.m. by the Court was examined and

testified as follows:

                    DIRECT EXAMINATION

BY MS. KETTLER:

Q     Good morning, Ma'am.   Could you please state your full name for the record?

A     Breanna Nicole Kandler.

Q     Okay.   And Ma'am, how old are you?

A     Eighteen.

Q     And what is your relationship to Paula Bennett?

A     Nothing.

Q     Okay.   What was your relationship to Paula Bennett?

                    29

A    Best friends.

Q    Okay.   I want to ask you a few background questions.   First of all, how long have you known Paula?

A    Like four or five years.

Q    Okay.   And is she roughly the same age as you are?

A    Yes.

Q    How did you first become acquainted with her?

A    The trailer park.

Q    Okay.   What trailer park is that?

A    Lakeview.

Q    Okay.   Is that where you lived?

A    Yes.

Q    Did she, at one time, live there as well?

A    Yes.

Q    Alright.   Did there come a time when she moved out of that trailer park?

A    Yes.

Q    And where did she move when she moved out?

A    With her dad.

Q    Okay.   And where, you don't have to tell me exactly, but do you know what street or road her dad lives on?

A    High(ph) Street.

                THE COURT: I'm sorry.   Can you speak louder?

A    High Street.

Q    Okay.   Is that in Belleville?

A    In Ypsilanti.

Q    Ypsilanti.   Okay.   And about how long did Paula live with her father in Ypsilanti after she left the trailer park?

A    I want to say like a year or two, if that.

Q    Okay.   I need you to keep your voice up nice and loud.   Thank you.   Cause all these people have to hear you and this man here is taking down everything you say.   Alright?

A    Yes.

Q    Thank you.   Louder.

A    Yes.

Q    Thank you.   What, if anything, caused her to move out of the trailer park?

A    Because of her mom's death.

Q    Okay.   And so at that point, she moved with her dad.   Is that correct?

A    Yes.

Q    Alright.   And after that period of time that she lived with her dad, did she move somewhere else during the time you knew her?

A    Yes.

Q    Okay.   And where did she move to?

A    Her apartment.

Q    Okay.   And where was that located?

A    Harbor(ph) Club.

Q    And that's in what town?

A    Belleville.

Q    Do you know from the time that you found out that Stephanie McClure had been killed, from that time, how long before that had Paula lived in that apartment, roughly?

31

A   Like a month, month and a half.

Q   Okay.   And when she first moved to that apartment, did she move in with
    someone else or by herself?

A   Kyron was supposedly moving in with her.

Q   Okay.   Now, when you say supposedly, was he living there always or on and
    off?

A   On and off.   When he felt like it.

Q   Okay.   Let's just cover this right off the bat.   You don't especially like Kyron,
    do you?

A   No.

Q   Okay.   Is that because he's black?

A   No.

Q   Alright.   Do you have other reasons you don't like him?

A   Yes.

Q   Alright.   And did you make Paula aware of the fact that you didn't like Kyron?

A   Yes.

Q   Alright.   Regardless of the fact that you don't like Kyron, would you lie about
    him doing something?

A   No.

Q   Alright.   And did you remain friends with Paula even though she continued to
    be with Kyron?

A   Yes.

Q   I want to direct you attention back now to the day of October 5th, the day before
    Stephanie was killed.   I realize this is difficult for you.   At some point if you
    need to stop and take a moment, just let me know.   Okay?

A    Alright.

Q    I'm going to take you back to October 5th, well, let me ask you some background questions before we get to that.   Did you know Stephanie McClure?

A    Yes.

Q    And what was your relationship to her?

A    We knew each other.

Q    Okay.   Would you say you were friends?

A    Somewhat, yes.

Q    Okay.   But you're closer with Paula than Stephanie.   Is that accurate?

A    Yes, at the time.

Q    Alright.   And how long had you known Stephanie longer or shorter period of time than Paula?

A    Longer.

Q    And where did you know Stephanie from?

A    Family.

Q    And what was Stephanie's relationship to Paula before she was murdered?

A    Friends.

Q    Okay.   And at some point, though, did their relationship change before she was killed?

A    I'm not sure.

Q    Okay.   Well, that's fair enough.   You can't say what's in somebody else's mind.   Is that right?

A    Yes.

Q    Alright.   Now, I want to ask you about October 5th of 2007.   Was there a time

33

that you were contact with your best friend Paula?

A    Yes.

Q    And that day, did you first come into contact by phone or in person?

A    By phone.

Q    Okay.   And did you make an arrangement to meet up with her?

A    Yes.

Q    Okay.   And where did you meet up with Paula?

A    Cluck's.

Q    Okay.   And what is Cluck's?

A    A food place.

Q    Okay.   And where is it located?

A    On Michigan Ave.

Q    In Ypsilanti?

A    Yes.

Q    And what is your relationship to that place?   I mean, why was that a place you would chose to meet up at?

A    Because that's where she was working.

Q    Okay.   Paula was?

         THE COURT: I'm sorry.   I didn't hear you.

A    Because that's where Paula was working.

Q    Okay.   And when you met up with her there, was she working at that time?

A    Yes.

Q    Alright.   And about what time of day was it that you met up with Paula at Cluck's?

A    I want to say, like two.

34

Q    In the afternoon?

A    Yes.

Q    Okay.   And when you met there with her, was anyone else you know working

there at that time that you went there?

A    No.

Q    Alright.   And when you met with Paula, what was the purpose that you were

meeting up with her for?

A    Because we knew that the stuff had been stolen.

Q    Okay.   And how did you become aware of this?

A    Because somebody had told her about it being stolen and then we found out

who did it.

Q    Okay.   You had some conversations or received some information from

someone else about where the stolen items were.   Is that correct?

A    Yes.

Q    And who was that person?

A    My sister's mother.

Q    Okay.   So, the information that you got about the whereabouts of those items,

did you share that with Paula?

A    Yes.

Q    Okay.   And so then, at this point, both of you are aware that these items had

been stolen.   Is that correct?

A    Yes.

Q    And what were the items?

A    A laptop, Play Station 2, the games for the Play Station 2, some clothes, some

shoes, little things.

35

Q    Okay.   Shortly before this day, had someone been staying at Paula's apartment that Kyron also sometimes stayed at?

A    Can you repeat the question?

Q    Who else stayed at the apartment, the Harbor Club Apartment, during the time Paula had it?

A    Kyron and Stephanie occasionally.

Q    Okay.   Let me ask you about Stephanie in particular.   When did she first start to stay there, if you know?   About how long before she was killed did she start staying there?

A    I'm not exactly sure.

Q    Okay.   Do you know if it was days or weeks?

A    No.

Q    Okay.   As of October 5th, was Stephanie staying there with Paula at that point?

A    No.

Q    So, you meet there with her knowing these items had been stolen.   Stephanie is moved out at this point, is that right?

A    Yes.

Q    Okay.   And what is your specific purpose to do when you meet up there together?

A    To go to the police station.

Q    Okay.   And who's idea was it to go to the police station, if you remember?

A    I think all of our's.

Q    Okay.   When you say, all of your's, you mean Paula and yourself?

A    Yes.

36

Q    And what are you going to the police station to do?

A    To file a police report about the stolen things.

Q    Alright.   And what police station is that?

A    Van Buren.

Q    Alright.   And did you do that?

A    Yes.

Q    Just the two of you?

A    Yes.

Q    Who drove there?

A    Me.

Q    Okay.   And can you tell the juries roughly what time of day that was that you
     made that police report?

A    Around 3:00 or 4:00 p.m.

Q    Okay.   And that's on October 5th?

A    Yes.

Q    Alright.   Did you have any conversation with Paula on the way to the police
     station from Cluck's?

A    Yes.

Q    Okay.   And what did she have to say?

A    I'm not exactly sure word for word.

Q    Okay.   Were you discussing the stolen items?

A    Yes.

Q    Alright.   During that period of time that you're driving from Cluck's to the police
     station, do you have any conversations about Kyron?

A    Yes.

37

Q   Okay.   And so you're talking with Paula about Kyron?

A   Yes.

Q   Okay.   Were you aware at that point whether or not Paula had already told Kyron that she believed these items had been stolen?

A   Yes.

Q   Okay.   Were you present when she told him that?

A   No.

Q   Okay.   But she told you that she had told him already?

A   Yes.

Q   So, you get to the police station.   You file the police reports.   About how long were you there?

A   I want to say like half an hour, forty five minutes.

Q   Alright.   And after you get finished with that, what do you do then?

A   Go to Applebee's.

Q   Okay.   Who initiated the plan to go to Applebee's?

A   Paula and Kyron.

Q   Okay.   Was Kyron with you at that point or just Paula when you decide to go to Applebee's?

A   Just Paula.

Q   Okay.   Did Paula ask you to go there?

A   Yes.

Q   And for what purpose?

A   To pick up Kyron.

Q   Okay.   And what were you going to do when you picked up Kyron?

A   I didn't know until he got in the car.

38

Q    Okay.   So, she simply asked you to take her to Applebee's to meet Kyron.   Is
     that right?

A    Yes.

Q    Alright.   And then once you got to Applebees, did you see Kyron?

A    Yes.

Q    And what was he there for?   Was he working or he was just there?

A    He was just there.

Q    And is that the Applebees in what town?

A    Belleville.

Q    When you see him, does he come to the car that you're at or do you get out?

A    He came in my car.

Q    Okay.   You're in the driver's seat?

A    Yes.

Q    Paula's where?

A    Passenger seat.

Q    Okay.   And where does Kyron get in the car?

A    Behind Paula.

Q    When Kyron gets into the car, what does he say?

A    I'm not exactly sure word for word.

Q    Okay.   Once you met up with Kyron, was there a decision made to do
     something else besides meet with him?

A    They wanted me to take them to get the key from Stephanie.

Q    Okay.   Who made that request of you?

A    Paula and Kyron.

Q    Okay.   And when Kyron gets in the car, can you tell the juries what was he

                                        39

like?   What was his mood like?   How was he speaking?   How was he

behaving?

A   He was being really mean.

Q   When you say mean, what do you mean my that?   How was his voice?

A   Hateful.   Like he had, hateful.

Q   Alright.   And what did he say?   What was he talking about?

A   Can I see my, what I wrote?

Q   Okay.   I want you to try to remember what he was talking about first.   You

don't have to tell me word for word.   What's the discussion?

A   He just says that Paula was dumb for giving her a key and that she was done

and-

Q   Who was done?

A   Stephanie.

Q   Okay.   And why did he say she was done?

A   Because he stole her stuff or she stole his stuff.

Q   And what did he say he was going to do about that?

A   He was going to kill her.

Q   Now, when you hear Kyron talking like this, what's your reaction to that?

A   That he's crazy.

Q   Okay.   And what did you say to him?

A   I said, you're crazy.   You're insane.   Why would you even think of something

like that?   How?

Q   Why did you say that was crazy or insane?

A   Because anybody that says something like that is crazy and insane.

Q   Okay.   What did you tell him about whether or not Stephanie deserved to die

40

for stealing?

A   I said, she didn't deserve to die.   That she deserved to sit in jail and think about what she did.   But she did not deserve to die.

Q   Okay.   And after you said that to Kyron, what did he say to you?

A   Somewhere along the lines of, he don't care.

Q   And did he say he was going to do it?

A   He was threatening, yes.

Q   Okay.   And did he discuss with you anything about the fact that he had said to you, what you needed to do or not do?

A   He said that if I say anything, I will be next.

Q   Okay.   Did you take that seriously?

A   To an extent, yes.

Q   Okay.   And did you take what he was saying about killing Stephanie seriously?

A   To an extent, yes.

Q   Have you ever said in your life when somebody made you mad, I'm going to kill her?

A   Yes.

Q   Did you mean it?

A   No.

Q   Was that the manner that he said, I'm going to kill her in?   Like a joking manner?

A   It wasn't that he was joking, but it wasn't, I could tell that he was mad.

Q   And based on what you observed about his demeanor and what he said, did you make a decision about what you were willing or not willing to do at that point?

41

A   Yes.

Q   And what did you decide?

A   They wanted me to take them to get the key from Stephanie and I told them no.

Q   And why did you decide not to do that?

A   Because it could have happened then and there.

Q   Okay.   You were concerned enough that he was serious that you didn't want to take him to Stephanie.   Is that right?

A   Yes.

Q   Alright.   And did you tell them that you weren't willing to take them there to confront Stephanie?

A   Yes.

Q   Okay.   Roughly, what time is this by then?   Is this right after you left the police station?

A   Yeah.

Q   Okay.   And is this conversation going on in your car while you're still at Applebees or had you left and driven somewhere?

A   We had left and we were driving down Main Street in Belleville.

Q   Okay.   Is Paula saying anything at this point?

A   No, she's just freaking out.

Q   When you say freaking out, what do you mean by that?

A   Crying and scared.

Q   Okay.   She appeared to you to be scared?

A   Yes.

Q   And she was crying?

A   Yes.

42

Q    So, you're driving around.   After you tell Kyron and Paula that you're not willing
     to take them over to Stephanie, do you have anymore conversation or does
     Kyron say anything further from that point on about what he's going to do to
     Stephanie or was pretty much the end of it?

A    No, he was just threatening her life and mine.

Q    Do you remember something, well, let me ask you this first of all.   Did you give
     a statement to the police shortly after Stephanie was killed?

A    Yes.

Q    And did you tell the truth to the police?

A    Yes.

Q    Okay.   Did you have any reason to lie to them?

A    No.

Q    And do you think that, was that just a matter of days after Stephanie was
     murdered?

A    Yes.

Q    And do you think that your memory about what Kyron said that day was better
     then or better now?

A    Probably better then.

Q    Okay.   And do you think that if you looked at your statement it would refresh
     your recollection about whether Kyron said anything else while he was in the
     car with you?

A    Yes.

Q    Okay.   In addition to giving a statement to the police, well, let me ask you this.
     When you gave your first statement to the police, did they read you your
     Miranda warnings?

43

A   Yes.

Q   Okay.   And then you agreed to give a statement.   Is that correct?

A   Yes.

Q   And in addition to giving a statement to the police, did you also come down to the Prosecutor's office pursuant to a court order and give a statement under oath?

A   Yes.

Q   Did you take an oath, just like you did here in court, to tell the truth?

A   Yes.

Q   And were you advised at that point in time that you have to tell the truth and that lying in that proceeding is just like lying in court?

A   Yes.

Q   And when you gave that investigative subpoena, did you tell the truth then?

A   Yes.

Q   Okay.   By the way, have you had the opportunity today to read over your statement and your investigative subpoena transcript to refresh your memory?

A   Yes.

Q   Okay.   And did you do that?

A   Yes.

Q   After you told Kyron that you weren't willing to take him to confront Stephanie, where, if anywhere, did you leave him?   In other words, he's still in your car, right?

A   Yes.

Q   And did you take him somewhere?

A   Yes.

44

Q    And where was that?

A    His friend's house on Textile(ph).

Q    Okay.

THE COURT: I'm sorry?

A    His friend's house on Textile.

Q    Is that a road?

A    Textile Road, yes.

Q    And where is that located?    Belleville, Van Buren?

A    Ypsilanti.

Q    In that area, correct?

A    Yes.

Q    And is that a place you had been before?

A    No.

Q    Okay.   And did you know that person?

A    Not really.

Q    Okay.   So, did he direct you to a place to drop him off?

A    Yes.

Q    Okay.   I want to show you something and I'm showing the Counsel this, it's
      page 10 of the witness's statement.   I'm going to ask you to read to yourself,
      first of all, I'm going to show you this later.   So, you dropped Kyron off at this
      house on Textile Road.   Is that right?

A    Yes.

Q    And then, what about Paula?   Does she stay there or does she stay with you?

A    She stayed with me.

Q    And where do you go from there?

45

A    I think we went to Rite-Aid.

Q    Okay.   And why would you go, is there a special reason to go to Rite-Aid?

A    Because Paula's cousin works there.

Q    Okay.   And who's Paula's cousin?

A    Rita.

Q    Alright.   What's Rita's last name?

A    I have no idea.

Q    Okay.   But you know that, did you know that person before that day is Paula's cousin?

A    Yes.

Q    And she works there.

A    Yes.

Q    Alright.   When you go there, does Paula have conversations with her cousin Rita?

A    Yes.

Q    And what does she say to her?

A    She was telling her that Kyron was threatening to kill Stephanie.

            MR. BURKETT: Judge, I'm going to object.   Everything that Paula has told somebody else.   I can't cross examine her on what she's telling these other people.

            THE COURT: Overruled.

Q    Did Paula, do you recall Rita talking with Paula about the conversation that you all had had in the car?

A    Yes.

Q    And did Paula say whether or not she believed Kyron was serious about killing

Stephanie?

MR. BURKETT: Judge, so this record's protected, I'm objecting to all of this.

THE COURT: I'll sustain that objection.

MS. KETTLER: Okay.

A   Yes.

Q   Okay.   When the Judge says sustained, you don't answer.

A   Alright.

THE COURT: Hang on.   The last answer of the witness is stricken.

MS. KETTLER: Okay.

Q   How long did you stay there talking with Rita?

A   Not very long.

Q   Okay.   And when you left from Rita's place of employment, did Paula go with you?

A   Yes.

Q   And where did you go from there?

A   Jessica's.

Q   Okay.   And who's Jessica?

A   A friend.

Q   What's Jessica's last name?

A   Fritz.

Q   And what is her relationship to you?   She's a friend of your's and Paula's?

A   Yes.

Q   Alright.   And how long have you known her?

47

A     A couple years.

Q     And who is, well, let me rephrase that.   At that time, who was Jessica's boyfriend?

A     Ricky Wren.

Q     Okay.   And when you went to meet up with Jessica, where did you do that?

A     Her house.

Q     Okay.   And where was that located?

A     On Button(ph) Road.

Q     Okay.   Did you go pick her up somewhere first and then go to her house?

A     I would have to look at my statement.   I don't know.

Q     Okay.   You don't remember.   Is that right?

A     Right.

Q     But you remember that you did go to her house.   Is that correct?

A     Yes.

Q     Okay.   And did you have discussions at that point in time with Jessica about the conversations that went on in the car?

A     Yes.

Q     How long did you stay there with Jessica and Paula?

A     At Jessica's house?

Q     Yes.

A     I'm not exactly sure.

Q     Okay.   Hours, minutes?

A     I'm guessing minutes.

Q     And did the three of you go somewhere from there?

A     We went to Cluck's.

48

Q    Okay.   And does Jessica work there also?

A    No.

Q    Okay.   Does someone else who's a friend of your's work there?

A    Yes.

Q    And who is that?

A    Katie.

Q    So, all three of you went to Cluck's.   Is that right?

A    Yes.

Q    Was the purpose to meet up with Katie or did she just happen to be there?

A    We were meeting up with Katie.

Q    And did you have conversations at that point in time with Katie?

A    Yes.

Q    The three of you.   And where were those conversations?   Were they in a vehicle or in the restaurant?

A    Both.

Q    Okay.   Can you tell the juries about how long you stayed there at Cluck's with Katie and Jessica and Paula?

A    Probably like an hour, if that.

Q    Alright.   Was Katie working at that time, if you know?

A    Yes.

Q    Alright.   And was there a point in time where some of you left Cluck's?

A    Just some of us?

Q    Did some of you leave or did all of you leave together?

A    We all ended up leaving together.

Q    Okay.   So, that's all four of you, correct?

49

A    Correct.

Q    And where or how did you leave there?

A    My car.

Q    Okay.   And where did you go?

A    We went to Paula's apartment.

Q    Alright.   In Harbor Club, in Belleville?

A    Yes.

Q    And was it just the four of you then in that car going to that apartment?

A    Yes.

Q    Alright.   When you got there, were you able to go right into the apartment?

A    No.

Q    And why is that?

A    Because Kyron had the key.

Q    So, when you arrived there what do you do?

A    We waited for Kyron to get there so that we could get in.

Q    Okay.   So, Paula doesn't have a key to her own apartment.   Is that right?

A    Correct.

Q    And did Kyron arrive there with the key?

A    Yes.

Q    About how long after the four of you arrived did Kyron arrive?

A    Probably around an hour.

Q    Okay.   And when he arrives is he driving a vehicle?

A    Yes.

Q    Is there anyone with him?

A    No.

50

Q    Okay.   Did he go in the apartment with the four of you?

A    Yes.

Q    Alright.   Now, when you go into the apartment, tell the jury what happens.   Tell the juries, sorry.

A    We're looking for the pitbull puppy which was Kyron's.

Q    And Kyron's alone or Kyron's and Paula's?

A    Paula bought it, but it was for Kyron.

Q    Okay.   And is that the first pet that they had had in that apartment?

A    No.

Q    Okay.   Was there another pet?

A    Not at the time.

Q    I mean previously the other pet.   What was it?

A    A dog.

Q    And what happened to it?

A    The other dog?

Q    Yes.

A    Kyron took it from Paula and let it loose.

Q    What was that dog's name?

A    Baby Girl.

Q    And who's dog was that originally?

A    Paula's mom's.

Q    Did you ever hear Kyron talk about whether or not he wanted animals to be in the apartment?

A    He didn't.

Q    Why is that?

51

A   Because he just didn't.   I think it's because it was Paula's and he knew how much she loved the dog.

Q   Okay.   So, Baby Girl just disappeared?

A   Yes.

Q   Alright.   So, you go into the apartment and you're looking for the puppy.   This puppy is a pitbull.   Is that right?

A   Correct.

Q   What was this puppy's name, if you know?

A   Moo Moo.

Q   Okay.   And what happened when you start looking for the puppy?

A   We can't find her.

Q   Okay.   Are all of you looking for her?

A   Yes.

Q   And was she eventually found?

A   Yes.

Q   And who found her?

A   Kyron.

Q   And where did he find her?

A   In the freezer.

Q   Did he just go to the freezer and open it up?

A   Yep.

Q   And there she was?

A   In a box, in a bag.

Q   And what did he say then?

A   I can't exactly remember.

52

Q      Did he accuse someone else of putting the dog in the freezer?

A      Yes.

Q      Okay.   What do you girls do at that point with regard to the puppy that Kyron

       has taken out of the freezer?

A      We didn't know what to do, but we-

Q      Do you need a minute?

A      We took it to an abandoned barn on Button Road.

Q      Okay.   And how was the puppy?   In other words, was it in some kind of a

       container?

A      It was in a box, like a cardboard box inside a Nike bag.

Q      Okay.   And did Kyron lovingly take his puppy and bury it?

A      No.

Q      What did you do with the puppy?

A      Dropped it off.

Q      And did all four of you girls go to do that?

A      Yes.

Q      And who actually put it, got out of the car and took the puppy out?

A      Katie.

Q      Okay.   Do you remember before you left the house to take the puppy away, do

       you remember anything else Kyron said at that point in time?

A      That me and Katie were sitting on the couch and Paula and Jessica were in the

       hallway of the apartment complex and he looked at me and Katie and he said,

       if you guys say anything about, along the lines of, me killing Stephanie then you

       guys will be next.   We know where you live, where you sleep and my friends

       will too.

                                        53

Q   Okay.   Did he say how his friends were going to know where you all lived?

A   Because he was going to tell them.

Q   And he said that to you?

A   Yes.

Q   Did you take this seriously at this point in time?

A   I was scared, yes.

Q   Okay.   And this is you and Katie he's saying this to, right?

A   Yes.

Q   Kyron stayed at the apartment while you girls took the puppy away?   Let me rephrase that.   When you left, was he still there at the apartment?

A   I'm pretty sure, yes.

Q   Okay.   After you go and take the puppy there, what do you girls do after that?

A   Paula talked to Kyron on the phone and Paula wanted me to take her to Dairy Mart to drop her off with Kyron.

Q   Where's Dairy Mart?

A   On Textile.

Q   Okay.   And so do you agree to take Paula there to meet up with Kyron?

A   Yes.

Q   And when you get to the Dairy Mart is he there?

A   Yes.

Q   Okay.   Is he in a vehicle?

A   Yes.

Q   Now, at this point is it just you and Paula or is some of the other girls there?

A   Me, Paula, Jessica and Katie.

Q   Alright.   And what does Paula do when you arrive there?

54

A     She gets out of my car.

Q     And where does she go?

A     Over to Kyron.

Q     Alright.   And do you hear Kyron say anything at that point?

A     He was mad because Chris, while he was backing in, Chris was pulling out and
      they kind of hit each other.

Q     Now, who's Chris?

A     Chris is the guy that was in his truck at that Dairy Mart at the time.

Q     Is that somebody you knew before this day?

A     Yes.

Q     Alright.   So, did you actually see the cars hit each other?

A     Barely, yes.

Q     Okay.   Was there any damage?

A     No.

Q     After the cars hit, how does Kyron react to that?

A     He goes over to his, he was pulled in, backed in and me and Katie, Katie was
      sitting behind me.   I was in the driver's seat.   He opens his driver's side door
      and he pulls out a gun and he puts it in his pants.

Q     Okay.   And where was Paula at that point in time?

A     She was outside on the other side of his car.

Q     So she was closer to him than you were.   Is that right?

A     No.

Q     No, you're closer?

A     Yes.

Q     Okay.   So, after he puts this gun in his pocket, does he have some further

                                        55

conversations with Chris?

A    He was just yelling at him.

Q    Is that the first time that day that you saw Kyron with a gun?

A    Yes.

Q    So, how long does this go on that Kyron is talking with Chris Lay at the Dairy Mart?

A    Probably five, maybe ten minutes.

Q    Okay.   And during that period of time, has Paula gotten back in your car or is she still outside of the car?

A    She's still outside of the car.

Q    At some point you leave the Dairy Mart.   Is that right?

A    Yes.

Q    And why is that?

A    Because Katie and Jessica wanted me to take them back to Paula's apartment.

Q    And does Paula say, wait for me or go ahead and go or what?

A    She was with Kyron.   She got in the car with Kyron.   Jessica and Katie got in the car with me.

Q    Okay.   And based on the conversations that you had with Paula at the Dairy Mart, do you expect her to return to the apartment?

A    Yes.

Q    Shortly?

A    Yes.

Q    So, you're going back there to meet up with her?

A    No.

Q    Okay.   Did you have a key at that point?

A     No, Kyron gave Katie and Jessica the key to the apartment.

Q     Okay.   So when you go back then to the apartment, what do you do?

A     I drop Katie and Jessica off at the apartment.   I don't get out of my car and I go straight home.

Q     Okay.   Why do you leave at that point in time?

A     Because I felt it was time for me to go home.

Q     When did you learn that Stephanie had been murdered?

A     The next morning when I woke up.

Q     And who did you learn it from?

A     My mom.

Q     Okay.   And when you learned that, did you contact Paula?

A     Yes.

Q     And did you tell her that?

A     Yes.

Q     Did you discuss that with her, that Stephanie was dead?

A     Yes.

Q     Did she ask you how she was killed?

A     I can't exactly remember.

Q     After that day then you said you had a conversation with Paula about it.   Is that correct?

A     Yes.

Q     Did you ever have any further contact with Kyron after that day?

A     No.

Q     After that day, did you have any further contact with Paula?

A     Yes.

Q   And did Paula discuss Stephanie's murder with you after that day and that
phone call?

A   What do you mean?

Q   I mean, did you discuss what happened that night?

A   No.

Q   And why is that?

A   Because she acted like nothing happened.

Q   Okay.   So, you didn't pursue the issue with her?

A   Right.

Q   You said that you told the police the truth.   Is that right?

A   Yes.

Q   And you said that you told the truth in this investigative subpoena.   Is that
right?

A   Yes.

Q   Did you also testify a preliminary examination in Romulus?

A   Yes.

Q   And when you gave that testimony were you aware that Paula was charged
with first degree murder?

A   No.

Q   Okay.   Well, you knew she was charged with something to do with the death of
Stephanie.   Is that right?

A   Yes.

Q   You knew she was locked up, right?

A   Yes.

Q   And you knew that Mr. Benson was also there, locked up, for the murder of

58

Stephanie.   Is that right?

A     Yes.

Q     But now, as of today, you know that she's charged with first degree murder.   Is that right?

A     Now I do.

        MS. KETTLER: At this time that's all I have for both juries, your Honor.   However, I have something for Ms. Bennett's jury only.

        THE COURT: Ladies and gentlemen, would you step into the jury room, please?

        (whereupon the Benson jury left the courtroom)

        THE COURT: The Benson jury has left the courtroom.   You may proceed.

Q     I want to direct your attention now back to the time that you were at Rite Aid with Paula's cousin Rita and talking with her.   Remember that point in time?

A     Yes.

Q     I'm going to ask you some additional questions about that first of all.   What did Paula tell her cousin about what Kyron had said?

A     That he was threatening to kill Stephanie.

Q     Okay.   And did she tell her cousin that more than one time?

A     I'm pretty sure.

Q     Okay.   And okay, I also want to ask you another question about the point in time that you picked up Jessica at her house.   Remember that?   Before you went to Cluck's?

A     Yeah.

Q     Okay.   Were you present when Jessica and Paula had a conversation about

59

whether or not Kyron was serious about killing Stephanie?

A    I don't exactly remember.

Q    Okay.   But if you testified about this previously or given a police statement previously about it, you told the truth at that time.   Is that right?

A    Yes.

Q    And you think that would refresh your memory?

A    Yes.

Q    I'm going to show you page 9 of your statement that you gave to the police. Counsel have copies of this statement.   And I'm going to ask you to read to yourself first starting with the second question on the page.   And then the answer after that.   I'm going to point it out to you.   The second question on the page and the answer.   Okay.   Have you had a chance to read it to yourself?

A    Yes.

Q    Okay.   And does that refresh your memory about a conversation Paula had with Jessica about whether or not Kyron was serious?

A    Yes.

Q    Alright.   And were Jessica, Paula and you discussing whether or not he was serious about killing Stephanie?

A    Yes.

Q    And what did Paula say about that?

A    That he looked pretty serious about killing Stephanie.

Q    Did you come in voluntarily to give your police statement?

A    Yes.

MS. KETTLER: Nothing further.   Thank you.

THE COURT: Well, you can return the other jury.

60

(whereupon the Benson jury enters the courtroom)

THE COURT: You can be seated.   Both juries are present and properly seated.   Cross exam for Mr. Benson by Mr. Burkett.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Do you pronounce your name Kandler?

A    Kandler.

Q    Kandler, okay.   Ms. Kandler, you and I have met before.   Is that correct?

A    Yes.

Q    Okay.   And I think you told us that prior to your coming here to testify that you had read certain things?

A    Can you talk into the mic, please?

Q    Sure.   Before you came in here to testify you had read certain things?

A    Yes.

Q    And what was it that you read?

A    My whole statement.

Q    Okay.   Anything else?

A    No.

Q    Okay.   Did you read, for example, of your testimony at the prosecutor's office?

A    I looked over it.   Yes, I did.

Q    Okay.   Did you also read your testimony of when you testified in court out in Romulus?

A    That's what I read over, yes.

Q    Okay.   Now, if I understand you correctly, when Kyron stated that he was going to kill Stephanie, you told the police you didn't take that seriously, did you?

61

A    I did to an extent.

Q    Okay.   My question was, you told the police you didn't take that seriously.

    MS. KETTLER: You know, I'm going to object as to the relevance of whether she took it seriously or not.

    THE COURT: Well, that's not the question.   The question was did she tell that to the police.

A    Did I tell them that he threatened to kill me or kill Stephanie?

Q    Yes.

A    Yes, I did.

    THE COURT: Hang on.   That's still not the question, at least not the question Mr. Burkett first asked.   The question that he asked was, did you tell the police that you took it seriously or not?

A    No.

Q    No, you didn't?

A    To an extent I did.

Q    Okay.

A    But not completely.

Q    Alright.   You did tell the police as it relates to threatening you that you didn't believe Kyron would kill you, correct?

    MS. KETTLER: I'm going to object again.   That's an impeachment that she should be confronted with this supposed inconsistent statement.

    MR. BURKETT: May I respond?

    THE COURT: I thought the objection to that was going to be whether it was relevant.   How is it even relevant?

62

              MS. KETTLER: Well, I continued to say it wasn't relevant, but I thought the Court was deferring on that.

              THE COURT: No, that was a different question.   I only take them one at a time.   I'm the umpire.   I never call the pitch until it's left the pitcher's hand.

              MS. KETTLER: Alright.   I object to the relevance-

              THE COURT: It is irrelevant.   Go ahead.

Q     Is there any particular reason that you do not go to the police when Kyron, as you stated, told you that he was going to kill Stephanie prior to her being killed?

              MS. KETTLER: I object as to the relevance of that.

              THE COURT: How is it relevant?

              MR. BURKETT: I want to know what her actions were.   Why didn't she go to the police?

              THE COURT: Why didn't she go to the police about what?

              MR. BURKETT: About what Kyron, she claims Kyron had said.

              THE COURT: Well, I'll allow that.   But I didn't understand that to be the question.   Did you go to the police about what Kyron said?

A     After he was in jail.

Q     You did not go before?

A     No.

Q     Okay.   Now, if I might, you have testified that you heard Kyron say on two occasions that he was going to kill Stephanie, true?

A     True.

Q     Okay.   The first time he said that was when things was stolen from his house.

Is that correct?

A    Yes.

Q    And the second time he says that was when he opened the freezer and saw the dead puppy?

A    Yes.

Q    That's true?

A    Yes.

Q    And his exact words were something to the effect, Stephanie did this, correct?

A    Yeah.

Q    Okay.   He also said, I ought to kill that bitch, correct?

A    Yeah, pretty much.

Q    Okay.   Ma'am, all these threats that you said that you heard Kyron say about killing you, about killing Stephanie, you have testified that you were under the impression that Kyron was just blowing off steam.

        MS. KETTLER: I'm going to object as to the relevance of what she thought he was doing.

        THE COURT: We've been over that.   How is it relevant, what she thought he was saying?

        MR. BURKETT: Well, I thought it was relevant, but if you vote it's not I'll move on.

        THE COURT: It's not.   Go on.

Q    I want to talk to you about the time you took Kyron to this Dairy Mart or whatever it was.   Would this be true, that you never saw Kyron in your car with a gun?

A    That is true.

Q    Okay.   In your car, Ma'am, Kyron never told you he had a gun?

A    No, he told Paula.

Q    No, I said, did he tell you he had a gun?

A    No.

Q    Now, you talked about this dog that Paula had before.   A dog called Baby Girl?

A    Yes.

Q    Okay.   You don't know what happened to that dog, do you?

A    Yes, I do.

Q    Okay.   Is it true, that that dog is with Paula's father now?

A    Yes, now.

Q    Oh.   I thought you said that he just took and got rid of the dog or abandoned the dog?

A    He did.

Q    Okay.   That's fine.   Now, you have told the police and you have told the prosecutor not so much that you didn't like Kyron, but you literally despise him. Is that correct, Ma'am?

A    Yeah.   I never did like him.

Q    Okay.   I used the term despise.

A    Meaning, don't like him?

Q    Okay.   That's fine.   Now, you stated, Ma'am, that when you got to the Dairy Mart, Kyron took a gun out of your car.   Is that true?

A    No.   No.   No.

Q    You didn't?

A    No.   That's not what I said, no.

Q    Well, what did you say?

65

A    He was backing in-

Q    Who was backing in?

A    Kyron was backing in to a parking spot.   I pulled up next to him.   He pulled a gun out of his car, not mine.

Q    Okay.   And how far away from Kyron were you?

A    My car was right here.   His car was right here.   He was on this side of the car.   I was in my car on this side.   Not very far.

Q    Okay.   Would this be true?   Did he ever threaten anyone with this gun?

A    Like pull it out and threaten somebody?

Q    Yes.

A    No.

Q    Okay.   When he pulled the gun out, what did he do with it?

A    He put it in his pants or his pocket.

Q    Okay.   But you supposed that he was angry with the person that backed into his car, correct?

A    Yes.

Q    Did you ever see him threaten this person?

A    He was running his mouth to him.

Q    Okay.   My question to you is straight.   Did you ever see him threaten this person?

A    No.

Q    Okay.   Did you ever hear him tell this person, I have a gun?   I will shoot you?

A    No.

Q    Okay.   He was just angry, as far as you're concerned, that somebody backed into his car.

66

A    He backed into his car, but yes.

Q    Okay.   Now, when this gun that he pulled out, let's do it this way, do you know whether or not it was a real gun?

A    Yeah.

Q    It was a real gun?

A    Yes.

Q    What kind was it?

A    A handgun.   I don't know.

Q    What color was it?

A    Either black or silver.

Q    Okay.   Is it true that I've told you that it had to be either black or silver and you said you didn't know?

A    It was a gun.

Q    Okay.   It was gun.   It was either black or white.

A    No, it was either black or silver.

Q    Black or silver.   Okay.   When you saw him get this gun, Ma'am, is it true, did you mention it to anyone else at the time?

A    No, actually it was mentioned to me.

Q    Okay.   When you saw him get this gun Jessica was with you?

A    No.   Jessica went outside of the car.   No, she was not inside my car.

Q    Okay.   Where was Jessica in relationship to you?

A    What?

Q    Where was Jessica standing in relationship to where you were?

A    She was outside of my car over by Chris's truck.

Q    Ma'am, isn't this a true statement?   You never saw Kyron with a gun?

A     No.

Q     Okay.  Is this a true statement, that you never told the Sumpter Police you saw Kyron with a gun that day?

A     Can I read what I wrote or something cause that doesn't make any sense?

Q     No.  It really doesn't, but did you tell the Sumpter Police-

            MS. KETTLER: I'm going to object.

            THE COURT: Hang on a second.   The witness doesn't need to say whether the lawyer's questions make sense and the lawyer doesn't need to say it to the witness that the question make sense.   The question as I understand it, Mr. Burkett, is did you tell the Sumpter Police that you saw Kyron with a gun?   Isn't that the question?

            MR. BURKETT: Yes, Sir.

            THE COURT: Ma'am, answer the question.

A     Yes.

Q     When did you tell them that, Ma'am?

A     When I went to the police and made my police report or statement.

Q     Okay.  You've made three statements.   Was it when you first went there, after Stephanie was killed?

A     Yes.

Q     Okay.  And it's no question that you told them at that time.   Is that correct?

A     Yes.

Q     Okay.  Just one second.   How long have you known Kyron?

A     A couple years.

Q     How many times have you been to their home?

A     A lot.

68

Q   A lot.   The only time you've only seen Kyron, as you say, with a gun was that
    time over at the Dairy Mart.   Isn't that true, Ma'am?

A   Yes.

Q   Okay.   You never heard Kyron even talk about a gun before that.   Isn't that
    true?

A   No.

Q   Now, you stated that Stephanie was a friend of yours?   Or was she a friend of
    yours?

A   She was an acquaintance.   Yes, I've known her my whole life.

Q   Okay.   And Paula is a friend of yours?

A   She was, yes.

Q   She's no longer a friend?

A   No.

Q   Okay.   And Kyron, Kyron I'm sorry, has never been a friend?

A   No.

Q   Okay.   Now, the prosecutor asked you, did you dislike their relationship based
    on racial grounds?   And you said no.

A   Correct.

Q   Okay.   So race had nothing to do with it?

A   No.

Q   Alright.   Now, let's get back to these threats that were made.   In terms of
    Kyron, Mr. Benson, killing Stephanie, you only heard it twice, correct?

A   He said it over and over again.

Q   Okay.   Let me put it to you this way.   You told the police that you only heard it
    twice.   Is that true?

69

MS. KETTLER: I'm going to object.    That's a

mischaracterization of her testimony and if he seeks to impeach her, I think he

should show something.

THE COURT: Well, the problem is it's two questions.    It's a

question about what she told the police and it's a question about the number of times

he said what.    So, which is the question?

Q    The question is, you only told the police you heard Kyron threaten to kill

Stephanie twice.

A    I'd have to see the papers to answer my question.

Q    You don't have an independent recollection?

A    Not exactly.

Q    Okay.    Let me put it to you this way, Ma'am.    The first time that you can recall

that you're sitting here was when he found out his property was stolen?

A    Yes.

Q    And the second time was when he found out that dog had been killed, correct?

A    Yes.

Q    Now, you told us that, a few minutes ago, that when the dog was killed, you told

this jury that Kyron didn't show any emotion.    Is that true?

A    That's true.

Q    He didn't cry or anything?

A    No.

Q    The only thing he did, according to you, was to get angry and say, well, the only

thing he did was to get angry, true?

MS. KETTLER: I'm going to object to asking her to testify about

someone else's state of mind.

70

THE COURT: Overruled.   That's within a person's common experience.

A   Can you repeat the question?

Q   Certainly.   The only, you've already told us he showed no emotion.   The only thing you saw Kyron do was to get very angry, true?

A   True.

Q   In terms of showing emotions then after his anger the only thing that you saw Kyron do was to cuss and say something to the effect, she killed my dog.   I'm gonna kill the bitch.   True or false?

A   True.

Q   But because he didn't cry, you're telling this jury he showed no emotion, correct?

A   He showed no emotions because he's the one that did it.

Q   Oh my God.   He did?

A   Yes.   He's the one that killed the dog.

Q   He's the one that killed the dog?   Ma'am, in your lifetime did you ever tell the police, a prosecutor or anyone in the world that Kyron killed the dog?

A   I've told people that.   I'm pretty sure, yes.

Q   No, I said the police and the prosecutor.   Did you tell any of these people that?

A   Not exactly.   But-

Q   Then exactly what did you-

MS. KETTLER: I'm going to ask that the witness be allowed to finish her answer before she's cut off.

THE COURT: Well, she said not exactly.   He went on to

71

something else.

        MS. KETTLER: She said, but and she was cut off.

        THE COURT: Oh, I'm sorry.

        MR. BURKETT: I didn't hear that but, but go ahead.

A    Not exactly, but whether or not everybody believes that Kyron did it.

Q    Who in the world is everybody?

        THE COURT: That's, counsel-

        MR. BURKETT: Alright.   I'll move on.

        THE COURT: Thank you.

Q    Ma'am, are you just making this stuff up as we go?

A    No.

Q    Allow me to finish.   Are you (inaudible).

A    What?

Q    Nothing.   Ma'am,-

        MS. KETTLER: I didn't hear that last question.

        MR. BURKETT: I asked, she is screaming up there.   Was she

angry with me.

Q    Ma'am, you come into this courtroom and for the first time saying Kyron killed

    his puppy, correct?

A    Correct.

Q    And it was his puppy?

A    Yes.

Q    Okay.   Now, do you know any reason why he would have killed his own

    puppy?

        MS. KETTLER: Objection.   That's for speculation.

MR. BURKETT: I'm going to move on, Judge.    That's okay, Judge.

MS. KETTLER: And I'd ask that the Judge instruct the jury to disregard that.    It's a statement.    It's not a question.

THE COURT: He said he'd move on.    You can disregard the questions about the puppy.

MR. BURKETT: Your Honor, I'm sorry.    So I don't violate your order, she could disregard that statement.

THE COURT: Believe me, if you do, you'll know it.

MR. BURKETT: There's no question in my mind.    Okay.

Q    Now, let me ask you this then.    If Kyron would have started crying, then you would have thought he had emotion.

MS. KETTLER: Objection.

THE COURT: Sustained.    Calls for speculation.

MR. BURKETT: Okay.

Q    Ma'am, when the puppy, after the puppy was killed, what did you do with the puppy?

A    We took it to an abandoned barn on Button Road.

Q    Okay.    Who took it?

A    Me, Katie, Jessica and Paula.

Q    Okay.    What's Katie's last name?

A    McIntyre.

Q    And what's Jessica's last name?

A    Fritz.

Q    Okay.    All three of you, I guess.

73

A    Four.

Q    Four of you.    Are you positive that's what you did with it?

A    Yes.

Q    Okay.    Are you positive, Ma'am, that you didn't take the puppy and throw the puppy into a dumpster?

A    I'm positive.

Q    Okay.    And if anybody said different, you'd disagree right?

THE COURT: Counsel.

Q    Okay.    I'm just about finished, Judge.    Just give me a second.    Could you tell me, Chris, what is his last name?

A    Lay.

Q    Okay.    Did you ever discuss, and this is a yes or no question, did you ever discuss with Chris the accident?

A    No.

Q    Did you ever tell Chris that you saw Kyron put a gun in his pocket and that you were worried about it?

A    No.

Q    What you did say though was that even though you saw Kyron put a gun in his pocket, you weren't paying any attention to it?    Do you recall saying that?

A    Paying any attention to who?

Q    To the argument they were having.

A    No, I wasn't.

Q    No, you wasn't paying attention?

A    In a way.    Yes, I was.

Q    Okay.    My question was, didn't you testify that when you saw Kyron put the

74

gun in his pocket and have an argument that you weren't paying any attention?

A    I can't exactly remember.

Q    Okay.   Well, you know, if you see somebody put a gun in their pocket in an

argument, Ma'am, were you of the opinion that Kyron would do something?

MS. KETTLER: Objection.   It's calling for her to speculate about

what's in somebody else's mind.   It's also not relevant.

MR. BURKETT: What's in her mind, your Honor.

THE COURT: I'll allow it.

A    Repeat the question.

Q    Sure.   You see somebody take a gun, so you claim, but you don't know

whether the gun was black or white,-

THE COURT: Counsel, that wasn't the question.   Just ask the

question again.

Q    Okay.   Sure.   And you see him take this gun and stick it in his pocket and then

go have an argument with someone and you're not the least bit concerned as

whether or not he's going to use the gun?

A    I don't know how to answer that question.

THE COURT: Go on to something else.

MR. BURKETT: Give me one second.   That's all I have.

THE COURT: Mr. White.

CROSS EXAMINATION

BY MR. WHITE:

Q    You made it fairly clear that you didn't like Kyron.   Did you know him at all or

talk to him or do things with him at all?

A    No.   I've talked to him, but I never have liked him.

75

Q     Okay.   And you only knew him in context of a friend of Paula's?

A     Yes.

Q     Alright.   Now, you said you had a relationship with Stephanie McClure.
      What's your relationship to Stephanie McClure?

A     We were acquaintances and I've known her my whole life.

Q     Alright.   I thought I heard you say something about family connection.   Is there
      some relationship there?

A     No, not blood.

Q     So, it's just long term acquaintances?

A     Yes.

Q     Now, when you first met with Paula, was it at Cluck's did you say?

A     Yes.

Q     And at that time, she told you about the stolen property and Stephanie, correct?

A     She told me about the stolen property, yes.

Q     And what she wanted you to do and what you ended up doing was going to the
      police and making a police report, right?

A     Correct.

Q     Now, did Paula lose her temper or make any threats or act in any kind of angry
      way about this?

A     No, she was just mad that her stuff was gone.

Q     Right.   Did she indicate to you that she was disappointed in Stephanie?

A     Yeah, she was just mad.   She wasn't like, she wasn't acting like Kyron was.

Q     When you say mad, did she raise her voice?

A     No.

Q     Did she do anything other than say, I want to go report it to the police?

76

A   Not really.   She was just mad.

Q   Okay.   So, you went to the police station.   Paula drove or you drove?

A   I did.

Q   Now, did Paula have a car at that point?

A   No.

Q   Okay.   And you were at the police station.   You got there about three or four in the afternoon?

A   Yeah.

Q   Alright.   And you think you were there maybe forty five minutes or an hour.

A   Yes.

Q   Alright.   Now, at that point you went to Applebee's to meet Kyron, correct?

A   After that, yes.

Q   Alright.   And when you met Kyron, were you there when Paula told Kyron what happened?

A   Yes.

Q   And did you overhear the conversation?

A   In my car, yes.

Q   It took place in your car?

A   Yeah, he had known about it.   But yes, it did take place in my car.

Q   Well, did he know that Stephanie had done it or did he just know that the stuff was missing?

A   He knew that Stephanie had done it.

Q   Alright.   Now, did Kyron get mad at that point?

A   Yes.

Q   Did he get mad at Paula for letting Stephanie have the key?

77

A    Yes.

Q    And for letting Stephanie stay there?

A    Yes.

Q    Alright.   At that point, did he indicate anything at that point other than he wanted to get the stuff back?

A    Yes.

Q    What did he say at that point?

A    He wanted to kill her.   He was going to kill her.

Q    Alright.   Now, did you make a joke with him to the effect that, why don't you kill her sister too?   She's a bitch.   Did you say that to Kyron?

A    No.

Q    You never said anything like that to Kyron?

A    No.

Q    Now, at that point you said Paul freaked out.   Did Paula say anything about him not doing anything more than letting justice take it's course?

A    She was crying.   She was scared.   And she didn't want him to do it.   She wanted-

        MS. KETTLER: Well, I'm going to object to asking her to testify about what's in someone else's mind.

        THE COURT: Well, I thought what we were going to get around to what his client said.

        MR. WHITE: And that's what I'm actually trying to listen at this point.

        THE COURT: Well, let's not make it eventual.   Let's make it now.

Q      Alright.   What exactly did Paula say, as well as you can remember?

A      To me?

Q      To Kyron.   Did she say, he was crazy?

A      Yeah.

               THE COURT: Well, hang on a second.   Let's not suggest the

answer.   Ma'am, his question is, what did you hear Ms. Bennett say to Mr. Benson?

That's his question.

A      Along the lines of, he's crazy and that she didn't want anything to happen to

        Stephanie.

Q      Alright.   Now, did she indicate that she wanted the court system to handle it?

A      Yes.

Q      Did Paula ever agree, in your presence, to use violence against Stephanie?

A      No.

Q      Alright.   Now, you said Paula and Kyron asked you to take them to where

        Stephanie was to get their key back.

A      Yes.

Q      Was it Kyron who asked you or Paula who asked you?

A      They both did.

Q      Alright.   And you said no to them, correct?

A      Correct.

Q      And did Kyron, at that point, blow up at you, threaten you?

A      He was threatening to kill Stephanie and he said if you say anything you will be

        next.

Q      Alright.   But he didn't do anything to harm you, did he?

A      No.

79

Q    And you didn't feel so threatened that you took him to Stephanie's house, did
     you?

A    No.

Q    Instead, you let him out at another place, right?

A    Yes.

Q    And he got out of the car, right?

A    Yes.

Q    And did Paula get out of the car then too?

A    Yes.

Q    Okay.   So, they both got out of the car?

A    Yeah.

Q    Alright.   Go ahead.   I don't want to-

A    We all got out for a minute.   Then me and Paula got back in my car and left
     from there.

Q    Okay.   And there was his friend's house, correct?

A    Yes.

Q    Okay.   Now, what time was that?

A    I want to say around like 7:00 or 7:30 p.m..

Q    Okay.   Now, did Paula say anything to you about hurting Stephanie or being in
     favor of it or did she make any comments at all about that at that point when
     Kyron's out of the car?

A    No, she just said that he was pretty serious about actually killing her.

Q    Alright.   But neither you nor she took any action towards calling the police,
     correct?

A    Correct.

                                          80

Q     Okay.   Now, you went at that point to Paula's place?   Where did you go next?

A     To Rite Aid.

Q     To Rite Aid.   And that's where Paula talked to her cousin Rita, correct?

A     Yes.

Q     Now, after that where was the next place you went?

A     To Jessica's.

Q     And what happened at Jessica's?

A     We picked her up.

Q     Alright.   And then where did you go?

A     We went to Cluck's.

Q     Alright.   And you picked up Ms. McIntyre, right?

A     Yes.

Q     Alright.   And then where did you go?

A     We went back to Paula's apartment to wait for Kyron to come give us the key to get in.

Q     Okay.   Now, you couldn't get into the apartment because you didn't have a key, right?

A     Right.

Q     So, you waited in like a little park area across the parking lot in front of the apartment?

A     Yes.

Q     Now when you were waiting there, did you drink anything?   Did you have beer or anything like that to drink?

A     No.

Q     Did you smoke marijuana?

81

A    Yeah.

Q    Alright.   And did you smoke marijuana for the whole time you were waiting for

       Kyron to show up?

A    Not the whole time.   No.

Q    Okay.   When Kyron showed up that's when you went into the apartment,

       correct?

A    Yeah.

Q    And at some point the dog was discovered.

A    Yes.

Q    Now, you're talking about Kyron's response and everything, were you still pretty

       high from the marijuana you'd been smoking?

A    No.

Q    Alright.   So, you're telling us that that had completely worn off by then?

A    Pretty much, yeah.

Q    And you said that Kyron made another threat in regards to Stephanie based on

       the fact that he said she killed his dog, right?

A    Yeah.

Q    Okay.   What was Paula's response to him saying that?   Did she say anything

       at that point?

A    I can't recall.

Q    So it's possible she could've told him not to do anything stupid.

A    Well, yeah.   Yeah.   Yeah.

Q    Now at that point you dropped the dog off, but Kyron didn't go with you,

       correct?

A    Correct.

82

Q    And you just took it and put the box down at an abandoned farm and drove
     away, right?

A    Yeah.

Q    Now, when you were smoking the marijuana, did Jessica smoke any marijuana
     with you?

A    Yes.

Q    And did Paula?

A    I'm not exactly sure.

Q    Did anybody else?

A    Me, Katie and Jessica.

Q    Okay.   Thank you.   Now, after the dog was dropped off you drove your friends
     over to the Dairy Mart, correct?

A    Correct.

Q    And that's where this parking lot incident took place?

A    Yes.

Q    Now, you say you saw a firearm.   Was it a pistol or a rifle or shotgun?

A    It was a handgun.   I know that much.

Q    Can you hold your hands up and show us how long it was?   I would say her
     fingers are approximately six inches apart.   Would you agree, Ms. Kettler?

               MS. KETTLER: Yes.

Q    Alright.

A    It wasn't a big gun.

Q    Okay.   Now, do you know if it was a revolver or an automatic pistol?

A    I don't think it was a revolver.

Q    Alright.

                                83

A    I think it was automatic.

Q    Do you know the difference?

A    Yeah.

Q    Alright.    So, you think it was an automatic pistol.    Now, where was Paula standing when Kyron pulled that gun out of the car and put it in his pocket?

A    On the other side of his car.

Q    So would it be your observation that she would have difficulty seeing-

        THE COURT: Counsel.

        MS. KETTLER: Objection.

        THE COURT: Sustained.    Noone could tell what somebody else saw.

Q    She was standing on the other side of the car.    Was she facing towards Kyron or away from Kyron?

A    I'm not exactly sure.    I couldn't say about that exact moment.

Q    Okay.    What kind of car did Kyron have?

A    I forget what kind it's called.

Q    Was it a big car or little car?

A    It was kind of a long car.    I don't know.

Q    Was it a Station Wagon?

A    No.

Q    Okay.    It was a car and not a truck, correct?

A    Correct.

Q    Okay.    Now, do you know of your own knowledge whether the vehicle belonged to Kyron or not?

A    I'm sure it didn't.    He didn't have a car.

Q    Alright.   Now, he was driving it though?

A    Yeah.

Q    Now, did he ever let Paula drive his vehicles?

A    I'm not-

Q    Did you ever see Paula driving one of Kyron's cars?

A    No.   I've never seen her drive his car.

Q    Alright.   Now, you said you and the other girls went back to Kyron's apartment

      and, rather Paula's apartment, Kyron gave you the key, correct?

A    I dropped Katie and Jessica off at the apartment, yes.   And then I went home.

Q    Alright.   You went home at that point.   Now, you heard about the homicide the

      next morning?

A    Yes.

Q    Alright.   And you called Paula, but you can't remember what she said to you at

      that point?

A    She didn't believe me.

                    MR. WHITE: I don't have anything more.   Thank you.

                    THE COURT: Anything?

                    MS. KETTLER: Yes, briefly.

                    THE COURT: Ten minutes for each side on redirect.

                    MS. KETTLER: Thank you.

                    REDIRECT EXAMINATION

BY MS. KETTLER:

Q    You said that Paula didn't believe you when you told her that Stephanie had

      been murdered.   You're not inside Paula's head, right?

A    Right.

                                    85

Q    Is it possible, in your experience, for someone to act like they don't believe?

A    Yes.

Q    And you don't know if she really didn't believe or she was acting like she didn't believe.   Is that right?

A    Correct.

Q    And similarly Mr. Burkett asked you whether or not Kyron was angry when he went to the freezer and took the puppy out.   Do you know if he was angry or pretending to be angry?

A    He was pretending to be angry.

Q    Well, in your opinion.

A    Right.

Q    But you don't know because you're not inside his head, right?

A    Correct.

Q    And when you said to the jury, he killed the puppy.   You didn't actually see him kill the puppy.   Is that right?

A    Correct.

Q    But that's your belief.   Is that correct?

A    Correct.

Q    Okay.   When Kyron was having this conversation with Chris Lay at the Dairy Mart, could you hear conversation?

A    Not really.

Q    Okay.   You couldn't hear the content of it.   Could you hear the, do you know what I mean by when I say, tenor of it?   Was it a normal talking conversation or was it yelling?

A    Kyron was mad.   He was yelling.

86

Q    Okay.   And you said that it was brought to your attention that Kyron pulled a
     gun out at the Dairy Mart.   Is that right?

A    Correct.

Q    Who brought that to your attention?

A    Katie.

Q    You also indicated that you heard Kyron tell Paula, you said that Kyron told
     Paula he had a gun.   Is that right?

A    Yes.

Q    And you were present and you heard that as well.   Is that right?

A    Yes.

Q    Okay.   And was that in your car?

A    Yes.

Q    Was that at Applebees or at some other location?

A    That was on my way to drop him off at his friend's house.

Q    Him being Kyron Benson?

A    Yes, but I didn't physically see it that time.

Q    You said that you smoked some marijuana while you were waiting for Kyron to
     bring the key to the apartment.   Is that correct?

A    Yes.

Q    Alright.   Was that the first time you smoked marijuana?

A    No.

Q    Okay.   Is that a frequent thing that you do?

A    Yes.

Q    Okay.   And were you so high that, first of all, how many joints did you all have
     while you were waiting there?   How many did you smoke?   I'm sorry.   That's

87

my age.    Blunts.    Do you call it blunts?    Okay.    How many blunts did you

have while you were there?

A    I smoked half of one.

Q    Okay.    How many all together did the three of you share?

A    One.

Q    Okay.    So there was only one blunt smoked?

A    Correct.

Q    And there were three, possibly four, people smoking it, correct?

A    Correct.    Yes.

Q    And given that you smoke marijuana frequently, did that make you so high that

you didn't know what was going on around you?

A    No.

Q    Did it effect your ability to remember and tell the police and the Court what

happened?

A    No.

        MS. KETTLER: Nothing further.    Thank you.

        THE COURT: Ten minutes.

        MR. BURKETT: Thank you.

RECROSS EXAMINATION

BY MR. BURKETT:

Q    Where'd the marijuana come from?

        MS. KETTLER: Objection.    Relevance.

Q    Okay.    Did you have the marijuana?

        MS. KETTLER: Objection.    Relevance.

        THE COURT: I'll allow that.

88

A     Did I have it?

Q     Yes.

A     We all did.

          THE COURT: Okay.   He meant which of the three of you produced the blunt?

A     Katie.

Q     Okay.   And how often did you, back then, were you smoking it?

A     Often.

Q     Okay.   What is often?   How many time a day?

A     At least once, or, at least once.

Q     Once a day?

A     Yeah.

Q     Okay.   And what you're saying is that even though you smoked it on a regular basis, once a day, it doesn't effect your ability to remember things, right?

A     No.

Q     I beg your pardon?

A     No.

Q     Like, for example, you remember that both Kyron and Paula asked you to take them to get the keys.   Is that correct, Ma'am?

A     Yes.

Q     In your witness statement, Ma'am, you told the police that it was only Paula that asked you that, correct?

A     Well, Kyron's sitting in the car.

Q     No,-

A     Correct.   Alright.   Correct.

Q     I'm sorry.   What?

A     Correct.

Q     Okay.   And it was Paula who was asking you to do these things.   It wasn't
      Kyron, was it?

A     Not necessarily.

Q     Okay.   And what you're trying to do is every chance you get the opportunity
      you want to bring Kyron into this.   Is that correct, Ma'am?

A     No.

Q     Okay.   Now, you told us about the gun at the Dairy Mart.   You actually saw
      that, correct?

A     Yes.

Q     Where was Katie?

A     Behind me.

Q     Okay.   When you say behind me on the other side of the car?

A     In my car, right behind the driver's seat.   In the backseat of my car.

Q     Okay.   And Jessica?

A     She was outside of the car.

Q     Okay.   Now, you told us something and I've forgotten to ask you, you said that,
      I take it that you had discussed this case among all of your friends prior to
      coming here.   Is that correct?

A     What do you mean?

Q     You talked about this case prior to your coming here with your friends.   Is that
      correct?

A     Yes.

Q     Okay.   And you talked about what you were going to testify to.   Is that correct,

90

Ma'am?

A    No.   That does not change my statement.

Q    I didn't say you changed your statement.   I asked, did you talk about what you were gonna, to your friends, what you were going to testify to?

A    No.

Q    A few minutes ago, you told me that, things that everybody knows, as it relates to Kyron and that pitbull.   Who is everybody that you talked to about that?

            MS. KETTLER: Your Honor, I object.   Your Honor has already ruled on this question.

            MR. BURKETT: I don't think you-

            THE COURT: Mr. Burkett must have forgot.

            MR. BURKETT: Oh, did you?

            THE COURT: Oh, yes.

            MR. BURKETT: Alright.   Thank you, Judge.   I don't have anything further.

            THE COURT: Ten minutes.

            RECROSS EXAMINATION

BY MR. WHITE:

Q    Now, since you didn't provide the marijuana you smoked that day, you don't know what was in it, do you?

A    Yes, I do.

Q    And how is that?

A    Because I watched it being rolled.

Q    Alright.   And so you don't think there is any possibility that there could be any adulterant in that?

A    No.

Q    You consider yourself an expert on marijuana?

A    No.

Q    Alright.   Now, have you taken any psychoactive drugs today or yesterday?

A    No.

Q    You didn't smoke any marijuana today or take anything else?

A    No.

Q    Have you taken any prescription drugs that might alter your ability to perceive things?   In other words, mental health type drugs today?

A    No.

              MR. WHITE: Alright.   Thank you.   I have nothing further.

              THE COURT: Thank you.   You can step down and you're free to go.

        (whereupon the witness was excused at 12:20 p.m.)

              THE COURT: Ladies and gentlemen, that will conclude our session for today.   Please do not discuss the case.   Be back in the jury rooms that have been assigned or where the officers ask you to be at 9:00 Monday morning.   It is very important that you make every effort to be timely because there is, as you can obviously tell, the tactics of getting everyone together become complicated if someone is late.   So, 9:00 Monday morning.   Don't discuss the case.   What? 9:00.   Thank you.

              (whereupon the juries leave the courtroom)

              THE COURT: Ms. Kettler, go ahead.

              MS. KETTLER: Judge, I have a number of civilian witnesses here.   Kathleen McIntyre, the mother, Jessica Frtiz, Mr. Lay-

92

THE COURT: Hang on.   Hang on.   I need to know.   Okay.
Go ahead.

MS. KETTLER: Okay.   Jessica Fritz, Chris Lay, Jessica
Bennett, Jon Paul Steffes, Christina Simon and Mike Larvaidan are here and I'm
asking the Court to instruct them that we're done for the day and they need to return
on Monday morning.

THE COURT: And so, they're under subpoena?   Hang on.   Ms.
Kettler, they're under subpoena?

MS. KETTLER: Yes, they are.

THE COURT: Ms. McIntyre, do you understand you must be
here Monday morning at 9;00?

MS. MCINTYRE: Yes, your Honor.   Are you talking to me or my
mother?

THE COURT: Well, I'm going to talk to both of you.   And
Ma'am, you are?

MS. MCINTYRE: Diana McIntyre.

THE COURT: You understand 9:00?   Ma'am, you are?

MS. FRITZ: Jessica Fritz.

THE COURT: I'm sorry?

MS. FRITZ: Jessica Fritz.

THE COURT: 9:00 Monday morning.

MS. FRITZ: Yes.

THE COURT: You are?

MR. LAY: Chris Lay.

THE COURT: I'm sorry?

93

MR. LAY: Chris Lay.

THE COURT: And 9:00 Monday morning?

MR. LAY: Yes, your Honor.

MS. BENNETT: Jessica Bennett.   Yes, I will be here at 9:00.

MR. STEFFES: I'm Paul Steffes.   Yes, I'll be here.

THE COURT: At 9:00 Monday morning?

MR. STEFFES: 9:00 in the morning.

THE COURT: Ma'am?

MS. SIMON: Christina Simon and I'll be here at 9:00 Monday

morning.

MR. LARVAIDAN: Michael Larvaidan.   9:00 Monday morning.


THE COURT: Okay.   I'll see you.   If anybody is not here then

the Prosecutor will inform me and you can be subject to the contempt powers of this

Court.   Thank you.

(whereupon the civilian witnesses leave the court room)

MS. KETTLER: Judge, when we brought the witnesses in to

ensure that they would return, and I would note as a preface to this, this is the same

witness who Defendant Benson's grandmother called.   And I would also note that at

the exam Mr. Burkett assured the Judge he would advised the family members there

was to be no contact.   When Mr. Larvaidan came in here today Mr. Benson

immediately began to very aggressively, as we call it, grid him in the vernacular.   He

moved to be in a position, he had to move to do this to try to stare down this witness

and began stroking his chin and staring him down.   This is the other witness who

was in the vehicle with the two Defendants.   And I just ask the Court to admonish

94

the Defendant, this isn't the Wild Wild West where we try to scare and intimidate people.

THE COURT: Well, but has anybody asked Mr. Larvaidan if he felt intimidated?

MS. KETTLER: He brought it to my attention that the Defendant was doing it.

THE COURT: Where is he now?

MS. KETTLER: He's out in the hall.

THE COURT: Bring him in.

MS. KETTLER: Oh, apparently he asked for-

MR. LAY: No, I asked for him to go to a secure location and the Deputy said that he's actually going to escort him-

MS. KETTLER: I think he already left with the Deputy to be escorted to his vehicle.

THE COURT: Well, if you want to take this up with me tomorrow I'll have the prisoner brought back.   Otherwise, we'll have to deal with it once somebody has a chance to ask Mr. Larvaidan and for him to inform me whether or not he felt threatened.

MS. KETTLER: Okay.   Thank you, Judge.

THE COURT: I can assure you if it happens in this courtroom there will be serious consequences.   Yes, Mr. Burkett?

MR. BURKETT: As always-

THE COURT: As always.   You know, I think that many times, certainly not these lawyers, think that I just stumbled in from the potato patch and decided that I would be a Judge.   I've done this for eighteen years.   I've had serious

cases with and including the Mayor of the city of Detroit.   I have never been able to abide any intimidation by anybody.   So, take your chances.

MR. BURKETT: What I wanted to tell you, Judge, before you leave the bench is that I have, as I told you before, I will talk to the folks.   I had no idea this was going on.   Tomorrow-

THE COURT: Nor did I.   If I thought it was going on, if I had seen it-

MR. BURKETT: Your Honor, could you do that Monday morning?   Based on what you ruled-

THE COURT: Monday morning is fine.

MR. BURKETT: Thank you, Judge.   I didn't tell you.   Have a good weekend.

THE COURT: I sure will.

(matter concluded)

STATE OF MICHIGAN )

COUNTY OF WAYNE )


    I, Jeffrey B. Goldsmith, Official Court Reporter for the Third Judicial Circuit of Michigan, do hereby certify that I reported the foregoing proceedings before the Honorable

MICHAEL J. CALLAHAN, Circuit Judge on May 8, 2008; that the foregoing 112 pages constitute a true and correct transcript of the proceedings so held.


_____
Official Court Reporter
CSMR-0037


97

98