STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF
MICHIGAN,

Plaintiff,

-v-                          Case No. 07-024733-01
07-024733-02
KYRON DARELL BENSON and
PAULA RENAI BENNETT,

Defendants.

_____/

JURY TRIAL
VOLUME V

Proceedings had before the

Honorable MICHAEL J. CALLAHAN, Judge of the Third Judicial

Circuit of Michigan, 703 Frank Murphy Hall of Justice,

Detroit, Michigan 48226, on May 13, 2008.

APPEARANCES:

MS. MOLLY KETTLER                    Assistant Prosecuting
Attorney

On behalf of the Plaintiff

MR. RAYMOND BURKETT
Attorney at Law

On behalf of Def. Benson

MR. WALTER A. WHITE
Attorney at Law

On behalf of Def. Bennett

Jeffrey B. Goldsmith
Official Court Reporter
CSMR-0037
INDEX

WITNESS                                    PAGE

JESSICA FRITZ

Cont. of Direct Examination by Ms. Kettler        3
Cross Examination by Mr. Burkett                 20
Cross Examination by Mr. White                   46

HEAVEN KINDALL

Direct Examination by Ms. Kettler                59
Cross Examination by Mr. Burkett                 69
Cross Examination by Mr. White                   75

RYAN HAYNES

Direct Examination by Ms. Kettler                78
Cross Examination by Mr. Burkett                 82

JENNIFER DOHRING

Direct Examination by Ms. Kettler                83

| EXHIBITS | MARKED | ADMITTED |
|----------|--------|----------|
| Plaintiff's #5 | Prev. | 16 |
| Plaintiff's #4 | Prev. | 18 |
| Plaintiff's #23 & 24 | Prev. | 81 |
| Plaintiff's #25 & 26 | Prev. | 82 |
| Plaintiff's #3 | Prev. | 88 |
| Plaintiff's #6-22 | Prev. | 88 |
| Plaintiff's #37 | Prev. | 90 |
| Plaintiff's #34-36 | Prev. | 91 |
| Plaintiff's #27-29 | Prev. | 93 |
| Plaintiff's #49-55 | Prev. | 99 |
| Plaintiff's #31 | Prev. | 103 |
| Plaintiff's #32 & 33 | Prev. | 103 |
| Plaintiff's #30 | Prev. | 104 |

May 13, 2008

Detroit, Michigan

P R O C E E D I N G S

3

*     *     *

THE COURT: Each juror is present and properly seated and you may proceed.

MS. KETTLER: Thank you your Honor.

JESSICA FRITZ

CONTINUATION OF DIRECT EXAMINATION

Q    Good morning again, Ms. Fritz, I want to ask you a couple of more questions.   I want to take you back, first of all, to the time when Paula came back to the apartment.   We talked about that briefly, after she had left with Kyron.   Are you with me?

A    Yes.

Q    Do you know where the Holiday West Trailer Park is?

A    Yes.

Q    And roughly how far is that from Paula's apartment in Harbor Club?

A    About ten minutes.

Q    Okay, driving ten minutes?

A    Yes.

Q    Alright, and when Paula came into the apartment, first of all, what drew your attention that she was there?

A    The door slammed open.

Q    Okay, loud?

A    Yes.

Q    Okay, and when you first saw Paula, describe for the juries how she appeared. What did she look like?

MR. BURKETT: Your Honor, these questions were asked and

4

answered yesterday.

        MS. KETTLER: I don't think they were in the depth that's necessary for this particular purpose your Honor.

        THE COURT: Overruled.

Q    Describe for the juries what she looked like.

A    Her eyes were big.   Her hands were shaking like this and she was crying.

Q    Okay, and what is the first thing she said when she came into the door?

        MR. BURKETT: Judge, I'm going to object to that.   This is hearsay that I won't get a chance to cross examine on.

        MS. KETTLER: It's an excited utterance your Honor.

        THE COURT: Overruled.

Q    What is the first thing she said when she came through the door?

A    He shot her.

        MR. BURKETT: Judge, I'm objecting again.   I mean, Judge, I strenuously object to this.

        MS. KETTLER: May I proceed your Honor.

        THE COURT: Overruled.

        MS. KETTLER: Okay.

Q    After that, did she immediately after that say anything else?

A    Yes.

Q    Okay, what else did she say?

A    She said he shot her.   He killed her.

Q    Okay.

        MR. BURKETT: Judge, Judge, I'm sorry to be jumping up but I need to make a motion outside the presence of the jury.

THE COURT: We will when there's a break.

MR. BURKETT: Okay, so the record is clear, I'm objecting to all this.

THE COURT: And the record is clear, I'm overruling it.

Q    Is there anything else she said at that point in time that you recall?

A    I said who are you talking about and she said he shot her.   He shot Stephanie.

Q    Okay.   And did you, after that did you two continue to talk about this or what happened after that?

A    I just kept saying you're lying, no he didn't.

Q    Okay, and what did she say in response to that?

A    She said Jessica, yes, he did.   I heard the gunshots.   I swear on my mother's grave.

Q    Okay, and is this conversation going on continuously from when she first comes in or is there a break in it?

A    There's not a break.

Q    Okay.   And so when she said that she swears on her mother's grave, did you believe it at that time?

A    Yes.

Q    And did she continue talking and tell you what specifically she did?

A    Yes.

Q    What did she say she did?

A    She said Kyron -

MR. BURKETT: Judge, I'm going to object once again to all this and I have to keep objecting so this record's real clear.   Anything that she says, especially if I can't cross examine her on it.

6

MS. KETTLER: Judge, I think the Court has ruled, and I really object to him -

THE COURT: Well we're at a different stage now.

MS. KETTLER: Right.

THE COURT: Why is this proper for the Benson jury?

MS. KETTLER: Because this is a continuation of her excited utterance.   She indicated that they continued to talk about it without a break. Nothing's happened in the interim to remove the circumstances that make it an excited utterance.

MR. BURKETT: Your Honor, before you overrule my objection, even an excited utterance, I'm entitled to question the person who made that excited utterance.

MS. KETTLER: Judge, counsel keeps making these mis-statements of the law to the jury.   It's not right.

THE COURT: I know that the lawyers think that I just stumbled in from the potato patch.   I know what the Rules of Evidence are.   The objection's overruled.   Proceed.

MS. KETTLER: Thank you.

Q    I'm sorry, I don't think you answered that.   Did she say what she did?

A    Yes.

Q    What did she say she did?

A    She drove the car while he was talking to Stephanie.

Q    Okay.   And did she say where, is this continuing nonstop, this talking?

A    Yes.

Q    Alright, and did she say where he, he being the Defendant, being Mr. Benson?

7

A     Yes.

Q     Did she say where he was talking to Stephanie at?

A     She said that she was getting, Stephanie was getting out of her car when Kyron

     went to see her and they were outside by her car.

Q     Okay, did she say anything else at that point immediately following that?

A     No.

Q     Did she say who, if anyone, was with them?

A     Yes.

Q     And was this in the same continuous conversation?

A     Yes.

Q     And who did she say was with them?

A     Big Mike.

Q     Okay, did she say if she heard anything at the crime scene?

A     Yes.

Q     And what did she say she heard?

A     She said she heard about five gunshots.

Q     Okay.

        MR. BURKETT: Judge, once again, I'm objecting.   I understand your ruling but in order to protect the record, I have to object to it.

        MR. WHITE: And I am also making an objection that these are leading questions on direct examination.   Leading's allowed at cross but not on direct, your Honor.

        THE COURT: Both objections are overruled.

        MR. WHITE: Thank you your Honor.

Q     Did she say what happened after she heard the shots?

A    Yes.

Q    Okay, and is this continuing all in the same conversation before there's any break?

A    Yes.

Q    And what did she say she saw or heard after she heard the shots?

A    She said she saw Kyron come running back to the car.

Q    And what did she say that she did with regard to the car as Kyron was running towards them?

A    She said she jumped in the passenger seat and he got in the driver's seat.

Q    She, okay, and did she say if she had to move the car to get to the place where he was?

A    She said that she was driving like around the street.   But she said she could still see him as she was driving talking to Stephanie.

Q    Okay, and did, but after the shots, did she say whether or not she had to drive the car to a place to get where he was?

A    No.

Q    Okay, she didn't say one way or the other.   Alright, is there anything else that you need to tell us that was in this first initial conversation as she, right after she comes through the door?

A    No.

Q    Okay, that's all I have for both juries, your Honor.

          THE COURT: Which jury needs to be excused?

          MS. KETTLER: Mr. Benson's.

          THE COURT: Mr. Benson's jury, step into the jury room.

       (Whereupon the Benson jury left the Courtroom)

MS. KETTLER: May I proceed your Honor.

THE COURT: Yes.

Q   Did there come a time when this initial conversation after Paula first burst through the door ended and there was some kind of break in it?

A   Yes.

Q   Okay, about how long did that first initial conversation go on?

A   About ten minutes.

Q   And what did you do at that point in time?

A   What did I do after we stopped talking?

Q   After that first approximately ten minutes of talking, yes?

A   Paula went to talk to Katie and I went to call Ricky.

Q   Okay, and Katie is where at this point in time?

A   In Paula's bedroom sleeping.

Q   Okay, and were you in the bedroom when Katie went in, I'm sorry, when Paula went into the bedroom where Katie was?

A   Not when she went in.

Q   Okay, did you go in later?

A   Yes.

Q   Did you see whether Katie woke up or not or whether Paula woke Katie up or not?

A   Yes.

Q   Okay, did she?

A   Yes.

Q   Alright, and was Katie awake or, describe what happened after Paula woke Katie up?

10

A     Paula woke Katie up.   She told her, you know, Kyron shot Stephanie.   Katie

woke up for a second and she said no, he didn't.   And she kind of just fell back

asleep.

Q     Okay, and you said that kind of at the same time that Paula's going into the

bedroom where Katie is, you made a phone call, is that right?

A     Yes.

Q     And who did you call?

A     My ex-boyfriend, Ricky.

Q     Who was at that time your current boyfriend, correct?

A     Yes.

Q     And what was your purpose in calling him?

A     Because I told him to come over.   It was an emergency.

Q     Okay, and after you told him it was an emergency, hurry up and come over,

how much longer after that did it take him to get there approximately?

A     About ten minutes.

Q     Okay, by this time that he gets there, approximately what time was it, best of

your ability?

A     About 3:45.

Q     Okay, now are you looking at a clock after Paula's told you about a murder?

A     No.

Q     Okay, so how, are you sure that's the exact time or is that your best estimate?

A     That's my best estimate.

Q     Okay.   Did Ricky arrive?

A     Yes.

Q     And did Paula tell Ricky anything after he arrived?

11

A    Yes.

Q    And were you present when that happened?

A    Yes.

Q    And what did she say?

A    She told Ricky that Kyron shot Stephanie.

Q    Okay, I don't want you to tell me what Ricky said but what did Ricky do after that?

A    He was kind of in shock.   You don't want me to tell you what he said?

Q    No, I want you to just tell, describe for me how he acted?

A    In shock, denial.

Q    Did he talk back to Paula?

A    Yes.

Q    Okay, so they talked back and forth and then what happens at that point after there's conversation between Paula and Ricky?

A    Me and Ricky go into Paula's spare bedroom and was talking about it and Paula was in the livingroom trying to call Kyron.

Q    Okay, how did you know she was trying to call Kyron?

A    Because she, before I went into the bedroom she was sitting on the couch dialing the phone and I said who are you calling?   And she said Kyron.

Q    Okay, do you know how many times she tried to call Kyron?   Was it more than once?

A    Yes.

Q    And did you ever hear her get a hold of him and have a conversation with him?

A    No.

Q    Now I want to ask you some questions about that following morning.   Did

12

Paula receive a phone call while you were still there?

A    Yes.

Q    And did she tell you who that phone call was from?

A    Yes.

Q    And who was the phone call from?

A    Breanna.

Q    And while, were you sitting there observing her while she was on the phone with Breanna.

A    When Breanna first called, Paula came into the spare bedroom and woke me up and said Stephanie's dead.

Q    Okay, during the time that this phone call was going on with Breanna, that Paula's on the phone with Breanna, how is she acting, Paula?

A    Hysterical.

Q    Okay, when you say hysterical, can you describe specifically what you mean by that?

A    She was acting like she didn't already know.   She was making herself throw up in the bathroom.

Q    Okay, while she's still on the phone?

A    Yes.

Q    Is this a phone you can walk around with?

A    Yes.

Q    Is it a cell phone or a mobile phone or a cordless phone?

A    Cell phone.

Q    And was she crying?

A    Yes.

14

Q    Okay.   And did she tell you that Breanna said that Stephanie had been killed?

A    Yes.

Q    Okay, and how long did that phone call go on?

A    About five minutes.

Q    Okay, and after that phone call ended, describe how Paula behaved?

A    She was kind of, she was basically back to herself.

Q    Okay, did the crying and carrying on continue after she hung up the phone with Breanna?

A    No.

Q    Did she continue to be in the bathroom like she was going to throw up?

A    No.

Q    Okay, so you made a conclusion based on your observation, is that correct?

A    Yes.

Q    About whether she was acting or really upset and hysterical?

A    Yes.

Q    Okay.   Now I think we talked briefly earlier about the fact that after you testified and told the truth about what Paula had told you in Romulus, right?

A    Yes.

Q    Okay, and did you, you said that there was a point in time where you were concerned about how Paula, whether Paula was going to be mad at you or not over that, is that right?

A    Yes.

Q    And as a result of your concerns, I think you indicated that you sent a letter to Paula, is that right?

A    Yes.

15

Q Alright, I'm going to show you what's been provided in discovery and showing it to counsel at this point.   I'm going to show you People's exhibit number 5. Can you tell the jury what that is?

A I don't really, what do you mean?

Q Do you recognize that?

A Oh, yeah.

Q What is it, who wrote it and what is it and where was it sent?

A I wrote it to Paula and I sent it to her in June.

Q Okay.   And this is, is this, you don't need to read the whole thing but is this expressing your concern about whether she was mad at you?

A Yes.

Q Move for the admission of People's exhibit 5.

    MR. WHITE: No objection.

    THE COURT: It's admitted.

Q And did you shortly thereafter receive a reply from Paula?

A Yes.

Q And I'm going to show you People's exhibit 4.   Do you recognize that?

A Yes.

Q And what is that?

A A letter Paula wrote back to me.

Q Okay, and in that does she indicate whether she's mad at you or not for telling the truth in Court?

A Yes.

    MR. WHITE: Your Honor, I'm going to object.   I think we're a little premature without laying a foundation that the letter actually was from Paula.

16

THE COURT: Do you want to voir dire?

MR. WHITE: Yes, I'd like to very briefly.

THE COURT: Go ahead.

BY MR. WHITE:

Q     You received a letter, is there anything about the letter that indicated it was from Paula Bennett?

A     Yes.

Q     What was that?

A     It says, love always, Paula.

Q     Other than the signature, is there anything else about it that would make you believe that that was from Paula?

A     Yes.

Q     Okay, and what would that be?

A     She's the only person who calls me Noonoo (ph).

Q     Calls you what?

A     Noonoo.   She's the only person who calls me PIC.   It's answering the questions I asked her in the letter and that's basically it.

Q     You don't recognize the handwriting?

A     Well yeah, her handwriting.

Q     Thank you, I have no further objection to the admission of the exhibit.

THE COURT: It's admitted.

MS. KETTLER: Thank you.

BY MS. KETTLER:

Q     Does that indicate whether or not she's mad about you telling the truth?

A     Yes.

17

Q      What does she say?

        MR. WHITE: Objection, I think that's a mis-characterization.

The evidence, what it indicates, I believe, from my reading the letter that she's not

mad at Jessica Fritz, her lifelong friend.   The implication that she's mad at Jessica

for telling the truth -

        THE COURT: Overruled.

        MR. WHITE: Is something that the jury should conclude.

        MS. KETTLER: Can I ask the Court's permission to allow the

witness to read the letter out loud?

        THE COURT: Any objection?

        MR. WHITE: None at all.

        THE COURT: You can read it.

Q      Go ahead.   Read everything that's on the page.


A      Okay, Monday, December 24, 2007, PIC's forever.   Hey Booface (ph), how are

     you doing PIC?   I miss you and love you so much.   I don't think that you were,

     I didn't think that you were going to write me back.   I got your letter today on

     Christmas Eve.   When I saw that I had a letter from you I instantly started

     crying.   I'm not mad at you at all.   When I saw you at Court I couldn't help but

     to cry because I miss my Fritzypoo (ph) so much.   But in a way, I was really

     happy to see you.   A little off subject, I love your pink coat LOL.   Don't worry,

     the only person I think about is me and my family.   I'm not worried about

     Kyron.   I know that right now all he's thinking about is himself.   If you seriously

     think that I would ever talk to him again, you're crazy.   I couldn't go through life

     without my PIC.   And just to let you know, I'm still loving you to death, too.   I

honestly did not think you were going to write me back.   I've been sad all day because today is my mom's two years.   And hearing from you made me smile.   Okay, onto another subject.   Bree is what?   I can't believe that.   I didn't even know that she was still seeing him.   Are you guys talking again?   How far along is she?   If you do talk to her, let her know that I love her and that I hope the best for her.   If you are allowed to see me, then I would love to see you. I'm actually going to try and call you as soon as I get done writing you.   Oh, I love your picture.   You are absolutely gorgeous.   I hope that you do send me more.   I have a camera that has pictures of you and me on it but it's packed up somewhere.   I miss Bree, too, but I know that she probably doesn't want anything to do with me.   Tell LeeAnn I said hi and that I love her, too.   God Jessica, I miss you so much.   I go for a bond reduction on the 27th and I'm praying that I get it.   Today has been so hard for me.   I miss my mom so much and instead of being with the people that I can actually talk to, I'm here.   I want to come home so bad.   Well, my sister and I are very close now and also my dad comes to see me every week.   Me and him have gotten close.   I love him so much.   I'm starting to have a lot of issue about the abuse thing.   I think about it 24/7 and I even have nightmares about it.   I need you back too, Boo, but I love you so, so much Fritzypoo and I can't wait to hear from you again. Don't ever think I don't love you or that I hate you.   All the lines from Hills Have Eyes made me cry.   Thanks, Boo.   Love you and love always, Paula.

Q      Thank you, nothing further.

          THE COURT: You can bring the jury.

(Whereupon the Bennett jury entered the Courtroom)

          THE COURT: Cross exam.

19

CROSS EXAMINATION

BY MR. BURKETT:

Q    Ms. Fritz -

A    Yes.

Q    You and I have talked before, is that correct?

A    Yes.

Q    Okay, Ms. Fritz, you wrote Paula about how many times?

A    Once.

Q    Just once?

A    Yes.

Q    Did you talk to her on the telephone?

A    Yes.

Q    How many times?

A    About twice.

Q    Okay.   But you were told that you were not supposed to have any contact with
     Paula, is that correct?

A    Not at that time.

Q    Okay, you were told out in Romulus, in Romulus, is that correct?

A    At the pretrial?

Q    At the preliminary exam?

A    Yeah, yes.

Q    Okay, these letters that you wrote came after that, correct?

A    Yes.

Q    Okay, at the preliminary exam the judge told you, not to have any contact,
     correct?

20

A    I don't remember that.   I don't remember that he told me that.

Q    You were in the courtroom, though, correct?

A    Yes.

Q    Alright.   Did the police or the prosecutor ever tell you not to have any contact with Paula?

A    No.

Q    They didn't?

A    No.

Q    Even when you gave them their letters that Paula wrote you, nobody said hey, don't have any more contact with Paula, don't write her or anything?

A    No.

Q    Okay.   From the time of the preliminary examination up until today, you and your friends have discussed this case, is that correct?

A    No, not really.

Q    What does not really mean?

A    We don't discuss it like that.

Q    Okay, you've never discussed anything at all about the case, is that what you're telling me?

A    Yes.

Q    Okay, fair enough.   You never wrote Mr. Bennett, Kyron Benson anything, did you?

A    No.

Q    And is it fair to say that he's a person that you just don't like?

A    Now?   Yeah, now I don't like him.

Q    Okay.   Now you understand that you're under oath here, correct?

21

A Right.

Q Alright, and you would never say anything under oath that wasn't true, would you?

A No.

Q Okay, because the prosecutor, because you know that it would be perjury, correct?

A Yes.

Q Okay, now I want to go back on that day and I'm only talking about the early part of October, okay?

A Yes.

Q In particular, the day before or the day that Stephanie was killed, okay?

A Okay.

Q Was Stephanie a friend of yours?

A Yes.

Q Okay, and Paula was a friend of yours?

A Yes.

Q But Kyron was not?

A He was at the time.

Q Oh, okay.   Now, do you recall going to the Dairy Mart that day?

A Yes.

Q Okay, did you see anything unusual happen?

A A guy backed into Kryon's car.

Q Okay, is it fair to say that you didn't see any type of confrontation?

A No.

Q You never saw Kyron with a gun that day?

22

A    No.

Q    Okay, prior to your taking the stand today, ma'am, did anybody give you anything to read or look over?

A    Yes.

Q    Okay, what were you given?

A    Papers that I, my statements and stuff.

Q    Okay, and you read all those things?

A    Yes.

Q    And when did you get those things?

A    The first day we were here, what Tuesday, last Tuesday.

Q    Okay, and you were told to read them?

A    Yes.

Q    Okay.   It was your interpretation of looking at Kyron and Stephanie that you thought Kyron liked Stephanie, is that correct?

A    Yes.

Q    Okay, Kyron at no time ever said anything to you in terms of Stephanie stealing from them, did he?

A    Yes, he talked about Stephanie stealing from him.

Q    When did he do that, ma'am?

A    Like when they found the dog in the freezer.

Q    Okay, did he say Stephanie stole his clothes?

A    Yes.

Q    When did he tell you that?

A    Like when they found the dog in the freezer.

Q    What exactly did he say?

23

A   He said that Stephanie even, Stephanie stole his stuff and put the dog in the freezer.

Q   Give me one second.   Do you recall back in December of last year testifying under oath, correct?

A   Yes.

Q   At that time, ma'am, did you ever say that Kyron never told you anything as it relates to stealing clothes?

MS. KETTLER: Can I have a page number for a transcript reference?

MR. BURKETT: When I get ready to impeach her with it, I will. No, what you'll do is you'll tell us the page, the line, the question, the answer.

MR. BURKETT: Sure.   I'm referring to page twenty five and I'm referring to line ten.   Ma'am, do you recall this question being asked of you and your giving this answer.

Q Okay, alright, and did Kyron ever say anything to you
   about these things being taken from Paula?

A No.

Q   Do you recall that question being asked of you and your giving that answer?

A   No.

Q   Okay, well if you gave that answer, that wouldn't be a true answer, would it, if he did say something, correct?

A   Correct.

Q   Okay.   You never heard Kyron ever say he was going to kill Stephanie, correct?

A   No.

24

Q    Okay.   Now when, I want to talk about finding that dog in the freezer.   When
     they found the dog in the freezer, what was Paula's demeanor?

A    What's demeaning mean?

Q    How was she acting?

A    She was looking for the dog, too.

Q    I know but was she crying?

A    Yes, she was crying.

Q    Hysterical?

A    Yes.

Q    Okay, she was trying to find out who did it, correct?

A    Yes.

Q    Okay, and then you told us yesterday, and correct me if I'm wrong, that you and
     the other lady got together and took the dog someplace and put it under the
     porch someplace, is that correct, ma'am?

A    Yes.

Q    Okay.   Now there came a time, did it not, that you went down, you came down
     to this building on the 12th floor shortly after this young lady was killed, do you
     recall that?

A    Yes.

Q    And you went to the prosecutor's office, is that true?

A    Yes.

Q    And now no defense lawyer was there, there was just you, the prosecutor and
     these police officers, is that correct?

A    Yes.

Q    And they asked you a bunch of questions?

25

A    Yes.

Q    Correct.   One of the things they asked you, though, correct me if I'm wrong, they told you that this was different than making a statement to the police. This was under oath, correct?

A    Yes.

Q    And that if you lied, you could be prosecuted for perjury, correct?

A    Yes.

Q    And they even told you that the penalty could even be as much as it was if as though you killed somebody, correct?

A    Yes.

Q    And so knowing that, the last thing you wanted to do would be to lie, correct?

A    Yes.

Q    And so when you gave those statements under oath to this prosecutor here or whatever prosecutor it was, the one thing you did not do was lie about anything, is that correct, ma'am?

A    Yes.

Q    Okay, now there is no question in your mind that Breanna took you and the other three young ladies somewhere to bury the dog, is that correct?

A    Yes.

Q    Okay.   I'm going to direct your attention, Ms. Prosecutor, one second, I've got the wrong thing, I'm sorry.   I'm going to direct you to page thirteen and ask you, ma'am, if you recall telling the prosecutor under oath that these questions being asked of you and the answers that you gave them, okay?

A    Uh-huh.

Q    I'm going to read them to you.   I'm going to start, Ms. Prosecutor, at line three,

26

kind of give a background.

Q Whose?

A Paula's dog.

Q In the -

A In the freezer in a box.   It was dead.   It was a puppy.

Q How did it get there?

A They don't -- they really wasn't about it.   They didn't

 – -, they just looked at it and took it outside and threw

 it in the dumpster.   And they were - -, they never really       talked about it,

who did it.   Breanna left when she - -,

 when they – -, when the dog came out of the freezer, I'm

 sorry when the dog came up because it was making her          sick.

Q So that leaves who now at the house?

A Me, Paula, Katie and Kyron.

Q     Ma'am, do you remember those questions being asked of you and you giving

those answers?

A     No.

Q     You don't, okay.   So you say that you don't remember telling a prosecutor

under oath that dog was thrown in a dumpster?

A     I remember -

Q     No, no, no.   Do you remember that?

            MS. KETTLER: I'm going to ask that the witness's answer not be

cut off, that she be allowed to answer.

            MR. BURKETT: And I have every right to ask her yes and no

answers.   Did she say that?

27

THE COURT: You can answer that.

A    Did I say that?

Q    Did you tell under oath that they threw the dog in a dumpster in back of the house?

A    No.

Q    Okay, did they say, did you tell the prosecutor under oath what I just read that Paula was not hysterical.   They didn't really care about that.   Did you tell the prosecutor that?

A    I didn't say Paula didn't care.

Q    Okay, you said they didn't care.   Who were you talking about when you said they didn't care?

A    Whoever else was in the room.

Q    And that being?

A    Kyron, Breanna.

Q    Okay, you also told the prosecutor under oath that Breanna left the house and the four of you stayed in the house.

A    I didn't say we stayed in the house.

MS. KETTLER: I'd object.   That's a mis-characterization of what he just read.

THE COURT: Well the jury will decide that.   I may even allow the jury to have the statement but ask the question.

Q    Ma'am, you told, under oath while you were sworn to tell the truth -

THE COURT: We're not going over the same thing.   Ask her the question, please.

MR. BURKETT: But it's important, okay, whatever you say,

28

Judge.

Q    You told the prosecutor that Breanna left, correct?

A    Yes.

Q    And that, that left the other people in the house, is that correct, yes or no?

A    No, no.

Q    You didn't tell them that.

A    No, I didn't say we stayed in the house.

Q    Okay.   Question, page fourteen, line twelve.

Q When they left, when the dog came out because it was      making her sick, so that leaves who now at the house?

A Me, Paula, Katie and Kyron.

Q    You didn't say that?

A    Yeah, but that doesn't mean we stayed at the house.   We were at the house.

Q    Okay.

MS. KETTLER: Excuse me counselor, may I have that line number again because what you just read is -

MR. BURKETT: Well wait a minute, you can ask for the line number, fine.   It was line twelve, starting at line twelve.

MS. KETTLER: But that's not what you just read.   I object.

THE COURT: Sustained.

MS. KETTLER: You said page fourteen, line twelve.

MR. BURKETT: No, I said line thirteen.

MS. KETTLER: Page, not line, what page?

MR. BURKETT: Page thirteen, line twelve.

MS. KETTLER: Okay, thank you.

29

MR. BURKETT: You're not going to sustain that now, right?

THE COURT: No, it's all straightened out. The only possible objection when someone is reading from a transcript is that the reading wasn't proper. She withdrew the objection so I don't have to do anything except wait.

Q Ma'am, would this be a true statement that, one second, Kyron never said anything negative about Stephanie or anyone until he saw that dog come out of the freezer? Is that a true statement?

A Yes.

Q Okay. Ma'am, I want to move up to 1:30 in the morning when they were at the house. When they left the house that day, isn't it true that Kyron said he was going over to Stephanie's to get Paula's things back?

A No.

Q He didn't say that?

A No.

Q Okay. What exactly did he say?

A He didn't say anything to me about where he was going. Paula came out on the balcony and told -

Q No, I'm just asking about what he said.

A He didn't say anything to me.

Q Okay. Ma'am, do I need to ask you to approach the witness?

THE COURT: I don't know what you're going to do.

MR. BURKETT: I'm going to show her her statement that she gave.

THE COURT: You don't have to ask me, go ahead.

MS. KETTLER: Which one please, counsel.

30

MR. BURKETT: Does that have a date?   What's the date?

MS. KETTLER: The date's on the, I'm just asking you which one.   I always show you -

MR. BURKETT: Thank you.

Q   Ma'am, by any chance, did you write that?

A   Yes, but -

Q   No, no, the question was did you write it?

A   Yes.

Q   Okay, thank you, let me have it back.   Ma'am, when you wrote this statement, would this be true, that you went to the police station, correct?

A   Yes.

Q   And the police told you to put down everything in that statement that you thought was important, correct?

A   Yes.

Q   And try not to omit anything if possible, correct?

A   Yes.

Q   Okay, did you write in your handwriting, Kyron said that they were about to leave to go wait at Paula's to get, I mean to go wait at Stephanie's to get Paula's shoes and her keys and her other set of keys to her apartment.   Did you write that down?

A   It's my handwriting, yes.

Q   Okay.   But he never said anything to you, did he, that he was going over to get Paula's stuff back?

A   No -

Q   No, he never said anything to you, did he?

31

A    No.

Q    Beg your pardon?

A    Can I answer the question?

Q    You can answer that question.

                MS. KETTLER: Judge, again, I'd ask that the witness not be cut

off in mid answer.

                THE COURT: Well I don't know if she was cut off in mid answer.

  She said no.

Q    Now when Kyron left the house, Kyron left the house that

     night, he used the phrase, I am going to shoot the move, something like that,

     correct?

A    Yes.

Q    You interpreted that phrase as what it means is that meant he was in a hurry to

     go there, correct?

A    Yes.

Q    Did you ever tell the police and this prosecutor that what that phrase meant was

     he was going over there to shoot Stephanie?

A    No.

Q    You never told this prosecutor that?

A    No.

Q    Okay.   Ma'am, you never told the police, did you, that when Kyron left the

     house that day, that morning, he was angry?   You never told them that, did

     you?

A    No.

Q    And as far as you know when he left the house that morning to get Stephanie's

                                        32

things back, he was not angry, correct?

A     No, not really.

Q     I didn't hear you.

A     No, he didn't seem angry.

Q     Okay.   When Kyron left the house that night, you did not see Kyron with a weapon, isn't that true?

A     Yes.

Q     Now you testified yesterday to something, that you had seen Kyron with a weapon, correct?

A     Not, no.

Q     You never seen Kyron with a weapon?

A     No.

Q     Okay, you say that, you told the police, ma'am, did you not, that you saw Kyron with a weapon?

A     No, I didn't.

Q     You never told them that?

A     No.

Q     Okay, and the reason you didn't tell them that, ma'am, is because you never seen him with one, is that right?

A     Correct.

Q     Okay.   Now, you told us yesterday that Kyron bought a weapon from someone, from your boyfriend, Ricky?

A     Yes.

Q     Correct?

A     Um-hm.

33

Q    You never saw that, did you?   Yes or no?

A    Yes, I saw it.

Q    You saw him buy a weapon?

A    It was in a case, I didn't see the weapon but I saw the case it was in.

Q    You described the weapon yesterday?

A    It's because it was my boyfriend's.

Q    Let me finish.   You described the weapon yesterday.   You said it was a silver gun.   Do you remember saying that?

A    I didn't say it was silver.

Q    Okay, you said it was a revolver because it had a round cylinder in it.

A    I just said it spinned.

Q    It spinned.   So in order to say it spinned, you must have seen the weapon, correct?

A    It was my boyfriend's, yeah, I saw it.

Q    I didn't ask you whose it was, I'm saying you must have seen the weapon, correct?

A    Yes, that's correct.

Q    Isn't it true that you told the police, you told this prosecutor you never saw a weapon?

A    Never saw the weapon?

Q    That's correct.

A    I never said I never saw the weapon before.

Q    You never said that?

A    No.

Q    You did see the weapon?

34

A    Are you talking about a weapon or the weapon because I don't know what you're talking about?

Q    The weapon that he bought from your boyfriend?

A    It was in the case.

Q    Did you see it, ma'am?

A    Outside the case?

Q    Yes.

A    When Kyron had it, no.

Q    Okay, did you, okay.   Did you ever see that weapon?

A    Yes.

Q    And who had that weapon when you saw it?

A    My boyfriend.

Q    Okay, now you have never heard Kyron even talk about guns before, had you?

A    No.

Q    And you testified that as long as you've known him, you've never even seen him with a weapon, isn't that true, ma'am, with a gun?

A    Yes.

Q    Now you have lied to the police, is that correct, ma'am?

A    No.

Q    In terms of a gun?

A    No.

Q    You have never lied to the police?

A    No.

Q    Did the police ask you, ma'am, on the 13th why didn't you tell us that Kyron had a gun?   Did the police ask you that?

A     Yes.

Q     Okay, and what did you tell them?

A     Because he bought the gun in July and this was October and it was at 3:00 o'clock in the morning and it slipped my mind.

Q     It just slipped your mind?

A     Yes.

Q     When you were under oath at the prosecutor's office, you told the prosecutor, these prosecutors that you had never seen Kyron with a gun, is that true, ma'am?

A     Yes.

Q     And all that just slipped your mind?

A     Yes, and I haven't seen him with a gun.

Q     Okay, okay.   And you were also asked had he ever talked to you about a gun?

A     Yeah.

Q     And you said no?

A     Right.

Q     Okay, now you said that you told the police that you didn't want to say anything in terms of the gun because you didn't want to get your boyfriend in any more trouble.   Did you tell that to these officers?

A     Yes, that was part of the reason.

Q     Because you didn't want, so you were willing to lie to the police to keep your boyfriend from getting into trouble, correct?

A     I guess you can say that.

Q     Well no, I'd rather you say it.   You were willing to lie to the police officers investigating this case because you didn't want your boyfriend to get in trouble.

36

Is that true, ma'am?

A     Yes.

Q     Now I think your exact words, I did not want him to get in any more trouble.

A     Right, any more trouble.

Q     Okay, what kind of trouble, I mean what do you mean by any more trouble?

A     He's in jail right now.

Q     Okay.

A     I know what you mean.

Q     Well then answer it.

A     Any more trouble, he already had like seven felonies at the time.

Q     Okay, he had seven felonies at the time?

A     Yeah.

Q     Now something happened to make you want to testify, you're saying, you're telling us now about all this, you don't mind getting him in trouble now, is that what I understand you to be saying?

A     Can you repeat that, please, I didn't hear you.

Q     Sure, you don't mind, the fact that he has seven felonies, you don't mind him getting in trouble now, do you?

A     Well he's already in trouble, might as well -

Q     I beg your pardon?

A     He's already in trouble.

Q     Do you have any motive whatsoever to lie on your boyfriend?

A     No.

Q     Okay, did you tell the police that one of the reasons you're so angry with him is because he broke into you and your mother's home and stole things from you?

37

A    He didn't break into my home, but no.

Q    Did you tell the police that he stole things from you and your mother?

A    No.

Q    You never told them that?

A    He's never stole anything from me.

Q    From your mother then?

A    No, he's never stole anything from my mom either.

Q    The question is did you tell that to the police?

A    No.

Q    Did you ever tell the police that you were working with the officials in Washtenaw County to put him in jail?

A    No.

Q    You never told them that?

A    No.

Q    Ma'am, do you recall what officer it was that you wrote that statement out to?

A    I don't even remember writing a statement about what you're talking about.

Q    No, on the 13th of January, do you recall what officer it was?

A    Probably Officer Toth.

Q    And did you talk to any other police officers?

A    No.

Q    Okay, and you're saying today that you never told Officer Toth that Ricky stole things from either you or your mother?

A    No, this has nothing to do with him.

Q    Right, but that wasn't the question.

A    No, no.

Q     You never told him that?

A     No.

Q     And you never told Officer Toth at any time that you were working with the police?

A     No.

Q     Did you ever tell Officer Toth or any police officer or the prosecutor that Ricky, your boyfriend at the time, ma'am, was known to carry a gun?

A     Yes.

Q     Okay.   You don't know the night Stephanie was killed whether or not Ricky had a gun that night, do you?

          MS. KETTLER: I'm going to object as to first, it calls for speculation and second as to the relevance.

          MR. BURKETT: And before you move on it, it is not, it's not speculation if she knows because she saw it.   And the relevance is -

          THE COURT: Well I guess that depends on the answer.

          MR. BURKETT: Right.

          THE COURT: And the relevance is?

          MR. BURKETT: The relevance is that we've always said from the beginning that there were other people, we believe, committed this crime.   And if Ricky, and we think with one of the persons that did it, then it's very relevant.

          THE COURT: Well so your question to this witness is, did you see Ricky with a gun on the night of the crime?

          MR. BURKETT: Yes ma'am.

          MS. KETTLER: I withdraw my objection.

          THE COURT: I'll allow it.   Did you?

39

A    No.

Q    Okay, prior to this crime, though, you had seen Ricky with a gun, is that correct?

           MS. KETTLER: Now that I object to.

           THE COURT: Now the objection is sustained.   Thank you, I really do try to pay attention as best I can.

Q    I want you to read the part that I have marked in yellow.   Oh I'm sorry, let me have this back for a second.   Ma'am, let me ask you, did you read that, what I just gave you?

A    Yes.

Q    Did you tell this officer that your boyfriend, Ricky Wren, was in jail because he stole things from you and your mother?   Did you tell him that?

A    No.

Q    You didn't tell him that?

A    He wasn't, he's not in jail for stealing things from me and my mother.   I don't understand why you just -

Q    Okay, the question, were you finished?

A    Yeah, I'm finished.

Q    I didn't ask you that.   The question to you was real straight.   Did you tell that to this police officer?

A    No.

Q    And the date being April 14th of this past year, okay?

A    Um-hm.

           THE COURT: Well counsel, now it sounds totally collateral to the trial that's going on in front of me.   So what are we doing?

MR. BURKETT: I am impeaching.

THE COURT: No, no, you can't impeach on a collateral matter. First day of evidence, you can't impeach   on a collateral matter.

MR. BURKETT: Alright, whatever you say.

THE COURT: It is what I say.

MR. BURKETT: Will you allow me at the end of the day to make a record on that?

THE COURT: You can make a record all day Saturday if you want, I'm telling you you can't impeach on a collateral matter.   Sure, make a record.

MR. BURKETT: Well I can do it outside the presence of the jury.

THE COURT: Oh good.

MR. BURKETT: Oh, you want me to do it in front of the jury?

THE COURT: I don't care where you do it.

MR. BURKETT: Your Honor, the position I'm showing that when a witness goes to the police and gives the police these statements about seeing my client with a gun and now she withdraws the statement, she never saw him with a gun.   And then, then she gives the police -

THE COURT: It doesn't sound like an objection, it sounds like a closing argument.   First of all, the jury will decide if what you say is the evidence is the evidence.   I'm telling you, I don't care what kind of a record you make, in Callahan's court, you cannot impeach on a collateral matter.   Now go on to something else.   You might argue all day.   I don't care if you agree with my ruling. It's not necessary.

MR. BURKETT: Oh, it wasn't that your Honor.   I'm not arguing with you.

41

THE COURT: Good.

MR. BURKETT:   I'll just, I thought you said make a record of it.

THE COURT: Go on to something else.

MR. BURKETT: Sure.

Q     One second.   That's it.

THE COURT: Cross exam.

## CROSS EXAMINATION

BY MR. WHITE:

Q     At the time that this homicide occurred, how long had you been going with Ricky Wren?

A     About a year and a half.

Q     Okay, and you were quite close, I assume, at the time?

A     Yes.

Q     Alright, and just as a preliminary matter, this discussion of a sale possibly of a firearm, did you actually see the firearm outside the case that day?

A     Not that day, no.

Q     Were you present at the sale of the computer and the case?

A     Yes.

Q     Alright, but you didn't see anybody open the case or take anything out of it?

A     No.

Q     So you're not sure what was in the case that day?

A     No.

Q     You don't know of your own knowledge.   Now when you found out Stephanie had been killed, you went into the police on the 7th, is that correct?

A     Yes.

42

Q     Now at that time Ricky Wren was considered a suspect, were you aware of

      that?

A     Yes.

Q     And -

                    MS. KETTLER: Well I'm going to object, that assumes a fact not

in evidence.

                    MR. WHITE: I'm asking regarding her knowledge, and this goes

to her motivation, your Honor.

                    THE COURT: Her motivation to?

                    MR. WHITE: Be truthful or lie.

                    THE COURT: I'll allow it.

Q     Alright.   Now when you originally went into the police to make a statement, was

      your primary goal to clear Ricky Wren?

A     Yes.

Q     And the first statement you made on the 7th was a handwritten statement, right?

A     Yes.

Q     And in the handwritten statement basically what you said was that Paula came

      in and said, he did it.   He did it.   I heard five or six shots, correct?

A     Yes.

Q     Now in that statement, she didn't say anything about driving the car to the

      scene of the crime, did she?

A     No, not the night, not at that time, no.

Q     Okay, so when you wrote out the statement on the 7th, the next day, the reason

      you didn't put anything in about Paula driving -

A     It was the next day after I got back from the police station that she told me that.

                                        43

Q    Alright, so that's why this isn't in the statement?

A    Yes.

Q    Okay, so she told you that the next day.   But what she told you initially was that she'd heard shots, right?

A    Yes.

Q    And she came to the conclusion, she didn't say that but she'd heard shots and she told you that Kyron had killed Stephanie, right?

A    Yes.

Q    She didn't say then that she'd seen them talking or that she'd driven or anything else, right?

A    No.

Q    Okay, now that same day you went down and made a statement in downtown Detroit that was under oath, correct?

A    Yes.

Q    Alright, now at that time, you told the police that Paula had earlier expressed disappointment that her friend, Stephanie, would take things from her, right?

A    Yes.

Q    And that she had never asked to have anything happen except the police handle it, correct?

A    Yes.

Q    And at some point after the dog situation was taken care of, you were there and Paula was there and I guess, was it Katie was sleeping in the back room, just the three of you?

A    And Breanna.

Q    I thought Breanna had already left at that point?

44

A    Are you talking about when the dog was found?

Q    No, after the dog was found, late at night, about 1:00 o'clock.

A    Yeah, it was just me and Katie.

Q    Okay, and Paula also, right?

A    Yes.

Q    And at that point Kyron came in, right?

A    Yes.

Q    And there was a discussion between Kyron and Paula, right?

A    Yes.

Q    And in the course of the discussion as you remember it and indicated in your statement to the prosecutor's office, Kyron was talking about people walking all over Paula, correct?

A    Yes.

Q    And Paula was talking about letting the police handle the situation?

A    Yes.

Q    Now when the time came when they went out the door to, you used the term, shoot the move, which meant get going fast, right?

A    Yes.

Q    The talk at that point was not about killing anybody, it was about getting the stuff back, right?

A    Yes.

Q    Now, when Paula came back in later, you said that she was all shaky, her eyes were wide, she was crying, she was upset?

A    Yes.

Q    Did she at that point, when she blurted out the statement about shots being

45

fired, did she seem like she was excited?

A    No.

Q    She didn't?

A    Like excited like happy?

Q    No, I mean excited like upset, like hysterical?

A    Yeah.

Q    Alright, and what she said to you then was that she'd heard shots, that she'd let Kyron off and that she'd heard shots, right?

A    Yes.

Q    And did she say that, did she seem to be surprised that he'd done that?

A    Yes.

          MS. KETTLER: Well I'm going to object to asking her to speculate about somebody else's mind.

          THE COURT: Overruled.

Q    Alright now, so that first night, when you wrote your written statement out, you didn't refer to things but when you talked to the police later on the 7th, you indicated to them that she heard the gunshots.   She concluded Stephanie had been killed, right?

A    Yes.

Q    Now, your Honor, I have an issue at this point because I believe part of the cross examination I'm going to do is something that would have been covered in original testimony when Mr. Benson's jury was out of the courtroom.   And so I'm wondering if Mr., perhaps we could approach the bench, it would be appropriate for Mr. Benson's jury to step out for part of my cross examination.

          THE COURT: Step into the jury room.

(Whereupon the Benson jury left the Courtroom)

Q    Alright now, after your boyfriend, Ricky, came over and at that point Paula's talking again, alright, now you said at some point she went into the bathroom and she was crying and you weren't sure whether it was, she was being honest or not, you know, that she was faking throwing up or she was -

A    Are you talking about in the morning?

Q    Oh, that was the following morning, right, okay.   Now the night before, after Ricky got there, okay, she, you characterized her as saying, did she say something to the effect of Stephanie had her whole life to live?   Do you remember saying that?

A    No.

Q    If I could approach the witness to refresh her recollection?

         THE COURT: Oh sure.

         MR. WHITE: Thank you.

         MS. KETTLER: May I have the page and line, please?

         MR. WHITE: Oh sure, starting at seventeen, on page sixteen.

Q    Would you just start reading here to yourself.

         MS. KETTLER: Mr. White, is this the Investigative Subpoena or the exam?

         MR. WHITE: This is the Investigator's Subpoena, I'm sorry, and also pages, or lines one through four.

Q    Alright, now was that your statement or was that Paula's statement?

A    That's my statement.

Q    Alright, and what was Paula's response to it?

A    I don't really remember.

47

Q    Was Paula still very upset about what she'd seen or heard?

A    Yes.

Q    Alright.    Now did Paula indicate she'd actually seen the shooting at any point?

A    No.

Q    Okay, what Paula indicated was that they'd gone over, did she tell you they, you knew they'd gone over there to get the stuff, right?

A    Yes.

Q    And then she came back and said there were shots fired.    Did she ever say that she couldn't believe what happened or anything like that or did she just seem to be surprised?

A    She just seemed to be surprised.

Q    Alright, now she was upset that night, right?

A    Yes.

Q    Right, now the following morning, the following morning when they got the call, that was a call from Breanna and that confirmed that Stephanie had actually died, right?

A    Yes.

Q    Alright, so based on not having seen, actually, I can't go there.    So based on what you'd heard, it didn't appear that Paula had known for sure whether Stephanie was dead until the following morning, correct?

A    Correct.

Q    And by that point, had she been up all night?

A    I don't really remember.    I was sleeping.

Q    Okay, so for all you know, she'd been up all night or had slept like a baby?

A    She could be, yeah.

48

Q     And did she wake you up or did she wake Katie up?

A     Well her and Katie were up when she woke me up.

Q     Okay, and what exactly did she tell you?

A     She said Breanna's on the phone and Stephanie's dead.

Q     Alright, and at that point how did she act?

A     She was crying.   She was throwing up in the toilet.   That's basically it.

Q     Have you ever seen anybody before in your life experience who's been in a

       situation where one of their close friends had been killed?

               MS. KETTLER: I'm going to object -

               THE COURT: Sustained.

               MR. WHITE: Your Honor, I'll move on, of course, but your

Honor, the argument has been by the People that my client's behavior is

inappropriate and I want to know whether or not the witness has any context for

judging -

               THE COURT: Well if that was their argument, I didn't hear it but

there should have been an objection.   Go on to something else.

Q     Alright.   I don't have anything more for this witness at this time in front of just

       the one jury.

               THE COURT: The jury can take a twenty minute break.

           (whereupon the Bennett jury left the Courtroom)

           (On the record without the juries)

               MR. BURKETT: Sure, your Honor, a couple things.   Number

one, I think that, and this is only for the Court of Appeals, that I think that based on

your rulings, you are certainly denying us a fair trial here.

               THE COURT: Well what do you want me to do?

                                    49

MR. BURKETT: Well, the one thing you could do is declare a mistrial. We have been so handicapped here to let all that stuff before my jury of what Paula had said. And I can't cross examine her on any of it.

THE COURT: Well I don't think all that stuff makes it, what exactly are you asking?

MR. BURKETT: For a mistrial.

THE COURT: No, what stuff?

MR. BURKETT: Everything that Paula told that Kyron said he did it. Kyron did it. All of this. And I can't cross examine her on any of these things.

THE COURT: Well this is about the eighth time you've said that. Ms. Kettler.

MR. BURKETT: The other thing is that I don't feel that you're being at all fair to us. You tell me this is a collateral issue.

THE COURT: It is.

MR. BURKETT: It might be, Judge, but bias and prejudice are never collateral.

THE COURT: They are always collateral if the matter that you seek to impeach is not the matter for this trial.

MR. BURKETT: But what I was trying to show, this witness has a motive for lying. And if a motive for lying is collateral, then I don't understand the Rules of Evidence. And that's what I was trying to show and you tell me I can't do that.

THE COURT: I can't comment on whether or not you understand the Rules of Evidence. My ruling was clear it was collateral and I didn't allow it. Now what else?

50

MR. BURKETT: Okay, well yeah, I understand.   I wasn't here to argue.   I'm trying to preserve the record for the Court of Appeals.

MS. KETTLER: And just, in that vein, two things.   With regard to the impeachment issue, the record should be clear that what counsel said he was trying to do, he's not exactly telling the whole story.   He was seeking one, to impeach her, not with her own statement but with a police report purporting to quote her but also what the police report said was a different question altogether than what he asked her.

THE COURT: Well that may all be true but it was collateral.

MS. KETTLER: Okay.

THE COURT: The issue of Mr. Wren's criminal involvement that doesn't pertain to this case is collateral.

MS. KETTLER: Okay.

THE COURT: You can't impeach on a collateral matter.

MR. BURKETT: Okay.

MS. KETTLER: And with regard to the other issue, with regard to the mistrial, I hear Mr. Burkett saying again and again I can't cross examine that but an excited utterance is an exception to the hearsay rule and the fact that he can't cross examine on it doesn't change its nature.   I laid forth a foundation for excited utterance and the Court found that it was.   And I don't think it's in any way any kind of violation of Mr. Benson's rights.   It certainly doesn't call for a mistrial by any stretch of the imagination.

MR. BURKETT: But based on Mr. White's cross examination, a lot of the things that were said that I was standing up objecting to was not an excited utterance, that it happened even the next day.   Of course you can have an excited

51

utterance continuing as the prosecution wants to say but it certainly wasn't excited utterance to the things that she wanted to say.   But you made your ruling.

> THE COURT: I do find that Ms. Bennett's statements when she returned to the apartment Harbor Club qualifies an excited utterance.   It was occasioned by a starting event.   The resulting statement was made while under the excitement caused by the event and the statement must relate to the circumstances of the startling event.   All of those criteria were satisfied.   You can bring the juries.

> (Whereupon the juries entered the Courtroom)

Q   Hello again, Ms. Fritz.

A   Hi.

Q   I just have one thing I just want to be clear on, it has to do with timing.   What time did you go in on the 7th to the police station to make your initial statement?

A   3:00 o'clock in the morning.

Q   3:00 o'clock in the morning on the 7th?

A   Yes.

Q   Okay, and what time did you go down to Detroit to make the statement at the prosecutor's office.

A   I think it was like about 9:00 o'clock in the morning.

Q   9:00 o'clock in the morning.   Now there was additional information in the statement that you made to the prosecutors that wasn't in your written statement and you said you talked to Ms. Bennett the next day.   When did you talk to Ms. Bennett?

A   Like 5:00 o'clock the next day.

Q   In the afternoon?

A   Yes.

Q     After you made your statement to the police?

A     Yeah.

Q     And after you made the statement downtown?

A     Yes.

Q     Alright, thank you, nothing more.

          THE COURT: Anything else?

          MS. KETTLER: No, thank you your Honor.

          THE COURT: Thank you.   You can step down and you're free to

go.   Call your next witness.

      (Whereupon the witness was excused at 11:04 a.m.)

          HEAVEN KINDALL

having been duly sworn on her oath at 11:05 a.m. was examined and testified as

follows:

        DIRECT EXAMINATION

BY MS. KETTLER:

Q     Good afternoon ma'am, would you please state your full name for the record?

A     Heaven Kindall.

Q     Okay, and Ms. Kindall, where do you live?

A     403 Nevada.

Q     Okay, and where is that located?

A     Belleville, Michigan.

Q     I mean in particular, is there a housing development there?

A     It's Holiday West Mobile Home Park.

Q     Okay.   You said what on Nevada, what address?

A     403.

Q    Okay.   I'm going to ask you, if you would please, first of all, how long have you

        lived there?

A    Fifteen years.

Q    Okay, did you know the victim in this case, Stephanie McClure?

A    A little bit.   My daughters and her daughters, she lived in our mobile home park

        maybe five years before, so briefly.

Q    Okay, and I want to ask you, I'm going to have you step down and I'm going to

        give you this red pen and ask you if you can please to circle the lot, your

        address on that diagram.   Okay, thanks, you can go ahead back.   Now if you

        were standing on your porch, or do you have a porch?

A    Steps.

Q    Like little steps, you can stand at the top.   Do you have a direct view of the

        house that Stephanie McClure was staying at?

A    No.

Q    Okay, and do you have a direct view of the area outside of her, of the place in

        the street where you would park right outside the trailer at her house?

A    No.

Q    Okay, I'm going to direct your attention back to October 6th in the very early

        morning hours.   First of all, say around between the hours of maybe like 1:30

        and 3:00, were you awake?

A    Yes, I was.

Q    And what were you doing?

A    My laptop, I work midnights so I was keeping myself busy to stay up all night.

Q    Okay, and did there come a time when you observed either heard or saw

        something that caught your attention?

54

A    I heard gunshots.

Q    Okay, and can you tell the jury roughly what time it was that that happened?

A    2:30, I actually thought it was later but I think it was 2:30.

Q    Okay.   And hearing those gunshots, where were you positioned when you heard the gunshots?

A    I was just sitting on my bedroom floor kind of with my back towards my window.

Q    Okay, and when you heard them, what did you do?

A    I kind of, I don't know if I'd say crouch, but I did give it a second, I wasn't sure, you know, and then I did jump and look out my window cause I heard the direction it came from.

Q    Now this place that you have circled on this diagram, 403 on Nevada, and your bedroom window, where would that face in the park?

A    South, I guess.

Q    When you said, I think you said I think that you went to the window, did you go to the window in the bedroom?

A    Yes.

Q    Okay, and what did you see?

A    When I looked back towards that way, there was a porch light and you could see that there was movement and then I seen kind of movement in the yard.

Q    Okay, and let me ask you this.   From where, you say the porch light area, are you talking about in front of the trailer where Stephanie was staying?

A    Yes.

Q    And how far to the best of your ability to estimate that in distance would that be from the place you were looking?

A    I'm so bad at even guesstimating, maybe -

55

Q     Are you familiar with a football field?

A     Yeah, and it was, I'd say it's less than a football field, a high school football field.

Q     Is it more than a half of a football field or less than a half of a football field?

A     Okay, than a half a football field.

Q     And what is the lighting conditions like there at 1:30, 2:00 or 2:30 in the morning, you said that morning?

A     Well right now, it's really empty there.   There's not very many trailers left.   So you get a lot of lights off other streets.

Q     Okay.

A     And the porch light was on so, it's not that good but yet you have that back lighting.

Q     Okay, so when you saw those figures, could you hear anything as far as conversation?

A     No, I mean maybe a little.   I can't really remember.

Q     Okay, could you hear any content?

A     No.

Q     But you could hear people talking?

A     A little, like maybe, a little.   I would say -

Q     Could you tell if it was one person or more than one person when you could hear a little?

A     I thought there was more than one person, yes.

Q     You thought, you weren't sure?

A     Yeah.

Q     Okay.

56

A     Because I actually thought like it was domestic, you know -

Q     And so, but that's, is there any basis for that or is that just came to your mind?

A     There had to be basis for it to me for me to think it so I mean it had to be something whether it was -

Q     What did you hear?   What did you hear or see that caused you to think it was a domestic situation?

A     I had to have heard something.   I mean it's -

Q     I'm asking you not to guess.   I'm asking you do you remember hearing or seeing anything that caused you to reach that conclusion?

A     Rustling, it was more not hearing, it was more seeing in the light.

Q     Could you clearly see the people that were in the light?

A     No.

Q     Could you see that, could you see whether it was one or two figures or more?

A     I assume there was two because there was somebody up by the porch and then there was somebody out in yard.   And I actually thought that somebody went back into the trailer originally.

Q     Okay, did you see somebody go back into the trailer?

A     No, because there's a tree.   So all I could see was light and then the figures in the light.

Q     Was the tree partly blocking your view?

A     Of the door, yes.

Q     Okay.   And did you give a statement to the police about your observations that night?

A     Yes, I did.

Q     Okay, let me go back to when you made these observations.   What do you do

57

at that point?

A    I called 911.

Q    Okay, did you make -

A    Well I should say, just so you know, when I first looked out the window, my light was on.   So I immediately looked out the window, seen something.   Then I turned around, shut my light off and then went back to the window hoping to get a better look.

Q    Why did you shut your light off?

A    Cause I couldn't see, it was hard for me to see what was going on.

Q    And when you went back to the window the second time, were you able to see anything additional?

A    Pretty much, I seen a figure walking away.

Q    Okay, and when you say a figure, why do you use that particular term?   I mean could you identify that person?

A    No, no.   I could really just see the shadows.   Like I said, there was back lighting so as they walked, I could see between their legs kind of.

Q    So when you went back that second time, is it accurate to say that at that time you could only see one figure, not two that you had seen previously?

A    Correct.

Q    And where was that figure walking, in what direction?

A    North.

Q    Okay, and north would be closer to your trailer or further from your trailer from Stephanie's trailer?

A    They're going, my trailer's here.   They're kind of going that away.   So they were going out of my view.

Q    Out of your view, okay.   Now when you called the police, what did you report to the police?

A    That I heard gunshots.

Q    Okay, and when you made that call, did you give any indication of who you had seen or what you had observed?

A    I don't think so, no.   I remember telling them that it seemed like it was quiet now.   I actually thought somebody was back in the house or something.

Q    Okay, how long did it take for the police to arrive after your 911 call, roughly?

A    Maybe five, ten minutes.   Between five and ten minutes, I think.

Q    Okay.

A    It seemed like forever.

Q    Did you hear, after those shots or as those shots were being fired, did you hear anything?

A    Initially, after, right after, when I went back to the window the second time and the figure walked away, I did hear something.   I mean, it was, I thought it was a female and it just seemed like it was a cry or a help or, I don't know, just some noise.

Q    Okay, and then did you stay in the house until the police arrived?

A    Yes, I did.

Q    Alright, now based on your assumption, and you've used that word today, correct?

A    Yes.

Q    Did you make an assumption about who that person walking away was?   In other wards, if they were white or black, male or female, tall or short, what did you assume based on that?

A    I thought it was a white male but that was based on the stride and the straight-legged jeans being tight to the leg.

Q    Well how does a white -

A    I mean that -

Q    I'm sorry?

A    I know it sounds crazy but like when I went to high school the guys, you know, had straight long legs and where guys nowadays wear the baggy, saggy pants and you don't see the stride as someone's walking because the pants, you know -

Q    Okay.   So you assumed it was a white male because of the way his pants were?

A    Correct.   As crazy as that sounds, it's just -

Q    Alright, but anything else that led you to that conclusion?

A    No.

Q    What did you assume about the height of that person?

A    That's really hard because of the way the back lighting is, I'm not sure if I was seeing shadows or -

Q    What did you assume when you talked to the police?

A    Tall.   I assumed they were taller.

Q    Okay, what did you describe to the police what you saw initially walking?

A    Tall white male, I believe.

Q    No, what did you use, the term a person or something else?   Well, I'm going to show her her statement.   Okay, I'm going to show you your statement and I'm going to direct you to the ninth line down in your statement.   It starts out with, I seen the -

60

A    I seen the figure.

Q    Okay, and I want you to take a minute to look over your statement as well.   Do you use that term figure repeatedly?

A    No, it looks like I go from that to, you know, a male due to the stride and -

Q    Let me show you, direct your attention to the fifth line.   Do you use the term figure there?

A    Yes I do.

Q    And I'm going to direct your attention to -

A    Oh yep, I see it again down at the bottom.

Q    Okay, so you repeatedly use the word figure, is that right?

A    Yes, cause I could not determine -

Q    And how many times did you use the word assumed in your statement to the police?

A    Once, twice, three times.

Q    Alright, so is it your testimony that you didn't get a look at this person walking away sufficient that you could identify them?

A    No.

Q    Alright, nothing further.   Thank you ma'am.

THE COURT: Cross exam.

MR. BURKETT: Thank you.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning ma'am.

A    Good morning.

Q    Ma'am, since this, since the night this incident occurred, have you talked with

61

the police or the prosecutor since then?

A     No, just about coming here.

Q     Okay, and with whom did you speak?

A     I spoke with Officer Toth and Molly, I think, one time.

Q     You and the prosecutor now, you are not on a first name basis, are you?

A     No, I just don't know her last name.   Molly stuck in my head.

Q     Okay, when did you speak with, as you say, the prosecutor?

A     It was just a couple of weeks ago, maybe a week, right around the time we were getting the subpoenas.

Q     Okay, and did she call you or did you call her?

A     I called her and then I think she called me back.

Q     Okay, now the night of the shooting, you're the person that called 911, is that correct?

A     Correct.

Q     And when the police come, were their lights and stuff going?

A     No.

Q     They weren't, okay.   Now, there were lights on, I mean at the location where you were outside?

A     Street lights.

Q     Yes.

A     Yes.

Q     Okay, based on what you saw that night, ma'am, is this a true statement, that you saw what you thought were three people, is that correct?

A     No, I would say there was a definite two but I don't know about three.

Q     Okay, I thought I heard you a few minutes ago say somebody came out of the

62

house.

A     There was somebody in the house, somebody was on the porch in that light and there was another figure in the yard in that light.

Q     Okay, let me talk to you a minute about the person that you saw on the porch in the light, okay.   I take it that you got a better look at that person than you did the other person?

A     Yes.

Q     Is that correct?

A     Yes.

Q     Okay, the person that you saw on the porch under the light, could you tell what his race was?

A     No.

Q     Okay, well did he have on any clothes that would suggest to you what his race was?

A     No, I couldn't tell.

Q     Beg your pardon?

A     I couldn't tell, no.

Q     And you didn't assume anything about the other person on the porch?

A     Right, no.

Q     But now the person that you saw go away, you assumed that person was white?

A     Correct.

Q     And you assumed that person was tall?

A     Correct.

Q     And I think you said you made that assumption because of the way that a

63

person dressed?

A   No, when he walked, and you see, like if someone takes a step, I could see the light between the legs?

Q   And you saw something white?

A   No, I could just see the legs and the way the pants fit.   And that's just what, whoever it was was wearing tight pants which generally, you know -

Q   Blacks don't wear, is that what you're saying?

A   No, just any, it seems like young guys around me nowadays, they just have, you know, have baggy pants.   And even my husband doesn't no longer wear the tight pants to his legs.

Q   Okay, but this person that you saw definitely had on tight pants.

A   And it seemed like he had like straight lines like, you know -

Q   The person that you saw, how tall was he?

A   I'm sorry, I just couldn't tell cause I was looking at a light.   I mean I just thought they were tall just based on the legs and the stance.   I mean a lot of it based on that what I seen with the legs.

Q   Did I allow you time to finish?   I didn't mean to cut you off.   Tell me about, as much as you can about the person that was standing in the door.

A   I really, I mean I just seen a shadow.   It was just, it was really more, I didn't see them, I seen the movement from the light.

Q   Okay.   As soon as you heard the gunshots, you went to the window, you went -

A   No, there was a delay.   There was definitely a delay.   I mean I was thinking, you know, if I should duck.   I might have ducked.

Q   Okay, would this be a true statement, ma'am.   At no time did you ever tell the police or the prosecutor that the person that was outside, you saw them run?

64

They walked, correct?

A    Yes.

Q    And that's what you put in your statement, the person walked?

A    It was a long stride, you know, walk but it was a walk.   I didn't see them run.

Q    And after the police came, how long was it before you gave your statement to the police?

A    Maybe about an hour.   And maybe even longer, maybe an hour and a half.

Q    But you gave it to them that night?

A    Yes.

Q    And at some point after that, did you go to the police department and give them another statement?

A    No.

Q    So this is the only statement that you gave them, is that correct?

A    Correct.

Q    Ma'am, I'm sure that it is, I just want to make sure, this is the statement that you gave the police, is that correct?

A    Correct.

Q    And it's a one page statement?

A    Um-hm.

Q    You, and you gave it to which police officer?

A    I don't know his name.

Q    Okay, but it wasn't any of these gentlemen?

A    No, it was not.

Q    Okay, after you gave the statement to the police, ma'am, could you tell us when, I'm sorry, when you gave this statement to the police, were you

instructed to put down everything that you saw?

A     I'm, yeah, I mean more or less, he's like write down like you seen it.

Q     Okay, and in reality, you were just trying to be helpful as best you could, is that true?

A     True.

Q     You had no interest in this whatsoever?

A     No.

Q     You had no reason to say to anyone that I thought the person was white except that that's what you thought?

A     Correct.

Q     Okay.   You had no interest in saying that I saw the person walk away because that's what you thought, correct?

A     Correct.

Q     After you gave the statement to the police, when is the very next time you talked to any police officer or prosecutor about the case?

A     When the pre, the one thing went to Romulus, not up until that point.   I got subpoenaed to go to that.

Q     Okay, you did not testify in Romulus, though, did you?

A     No.

Q     Last question, I think.   The person on the porch, did you see them come out of the house or you assume they came out of the house?

A     I don't, I want to say just because that's about the time, you know, the time I went to turn around to turn off the light.   But if they went in the house, they didn't spend very long in the house.   I mean I'm going to assume like they got to the door and I don't know whether they went in but it was rather quick.   Like

66

it was they went to the porch and walked away.   I mean I don't know for sure if they went in the house.

Q     Thank you very much, ma'am.

A     You're welcome.

THE COURT: Mr. White.

CROSS EXAMINATION

BY MR. WHITE:

Q     Now, you knew Stephanie McClure at least to know her face?

A     Yes.

Q     And did you know which place she was staying in?

A     No, I didn't know she was back in the park.

Q     Oh, you didn't know which place it was?

A     No, I didn't know she lived there.

Q     Now was the place where you saw these people 372 or was it another place?

A     It was the house, I don't even know the address.   I mean it was just kiddycorner from my window.

Q     Okay, do you know how many lots down it was?

A     No, but it's there all by itself cause there's no other -

Q     Okay, so it was the only one on that side of the street by itself?

A     Correct.

Q     Okay.   Now, until you heard the shots you were sitting on the floor with your back to the window working on your laptop, correct?

A     Correct.

Q     So at that point you stand up and look out, well, first you ducked?

A     Yeah, I kind of, yeah.

67

Q     As anyone with any sense would do.   And then you stood up and looked out
      the window, correct?

A     Yeah, kind of just leaned back and pulled the blind.

Q     And you saw two people, correct?

A     Correct, yes.

Q     And one of them was on the back porch of that house, correct?

A     Yeah, the front porch, yeah.

Q     The front porch, excuse me.   And the other one was where?

A     In the yard, like just in the yard doing something.

Q     They were both standing up, though?

A     Yes, correct.

Q     And did you hear any more shots after that?

A     No.

Q     You didn't see any flame from a gun being shot or anything like that?

A     No.

Q     Okay, so those two people were both there after all five shots had been fired,
      correct?

A     Correct.

Q     And you saw one of them leave going north on Utah, correct?

A     Correct, kind of through the yard.

Q     And so they'd be getting parallel to your house but getting closer to it, right?

A     Right, correct.

Q     And is that the one you described as someone that based on what you'd seen,
      you felt was a tall white male?

A     The one up at the porch was the one I assumed just cause I figured the first

                                      68

one kind of went out of the picture before -

Q  Okay, so it was the one up on the porch you assumed was the tall white male?

A  Correct.

Q  Okay, now did you see that person walk away?

A  Yes, that's the one I seen the legs of, I guess.

Q  Okay, now did you ever see what happened to the other person?

A  No, I just assumed they had moved that a way already.

Q  Okay, did you hear any cars revving up or anything like that?

A  No.

Q  So it's your testimony that after the shots there were two people in the yard and one of them you had the impression, based on your observation, was a tall white male, correct?

A  Correct.

Q  Nothing further.

THE COURT: Anything else?

MS. KETTLER: No, nothing further.

THE COURT: Thank you ma'am, you can step down and you're free to go.   Call your next witness.

(Whereupon the witness was excused at 11:30 a.m.)

RYAN HAYNES

having been duly sworn on his oath at 11:30 a.m. was examined and testified as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q  Good morning sir, can you pull that microphone a little closer to you, please?

69

Keep your voice up nice and loud for us, alright?

A   Okay.

Q   Mr. Haynes, where are you employed and in what capacity?

A   I'm employed with Huron Valley Ambulance as a senior paramedic.

Q   Okay, and how long have you been a paramedic?

A   I've been a paramedic for seven years.

Q   Okay.   And I want to ask you whether in the very early morning hours of October 6, 2007 you were called to a location in the Holiday West Trailer Park?

A   That is correct.

Q   Okay, and can you tell me the specific location the call was to?

A   We were dispatched to an address of 372 Utah Street.

Q   Okay, and tell the juries if you would please roughly what time you got the call?

A   We were dispatched at 2:46.

Q   Okay, and how long after you got the call would it have taken you to arrive?

A   We arrived at 3:02.

Q   Okay.   And I want to ask you when you arrived there at that location, were the police there yet?

A   Yes they were.

Q   Okay, and when you arrived, what's your immediate observation?

A   There were a couple of police cars, approached up to one of the officers and had checked in with them and they directed us up to the scene.

Q   Okay, and when you get to the scene, where is that in relation to the trailer at 372 Utah?

A   I believe it wasn't quite in front but off in fairly close proximity.

Q   Okay, what do you see with regard to the person that you're there to treat?

70

A I saw a young female. She was laying on her back supine laying next to a car beside a sidewalk.

Q Okay, I want to show you a couple of photographs which have already been shown to counsel. First I want to show you People's exhibit 23 and People's exhibit 24. I want to ask you to look at those to yourself first of all. Do those accurately depict the position in which the victim was in when you arrived at the scene?

A Yes.

Q Okay, and did you later ascertain the identity of the victim?

A The police identified her as a Stephanie McClure.

Q I'm going to move for the admission of People's 23 and 24.

   MR. BURKETT: I'm sorry, I know you let me see them once before but may I see them -

   MS. KETTLER: Sure.

   MR. WHITE: I have no objection.

   THE COURT: Any objection?

   MR. BURKETT: None.

   THE COURT: They're admitted.

Q What was Ms. McClure's condition then when you arrived?

A She was pulseless, apneic. In other wards, there was no pulse and no breathing.

Q Okay, in laymen's terms was she dead?

A Yes she was.

Q Okay, and was she declared dead at the scene?

A Yes.

Q      Did you observe some items nearby her where you arrived or did you pay
       attention to the surroundings or just the person?

A      Initially just the person but I did note it on my chart approximately about four
       feet from her head we did find a knife on the scene.

Q      Okay, and where was that positioned?

A      Like I said, as far as we charted it, it was about approximately about four feet
       away from her.

Q      On the ground?

A      On the ground.

Q      Okay, let me show you People's 26 and 25 previously shown to counsel.   Do
       those accurately depict the knife that you saw on the scene that day?

A      Yes ma'am.

Q      Okay, move for the admission of People's 25 and 26.

              MR. BURKETT: I have no objection.

Q      Would your -

              MR. WHITE: No objection.

              THE COURT: They're admitted.

Q      Once you declared the young lady dead, was your work there done after you
       declared her dead and do your documentation?

A      That's correct.

Q      Okay, can you tell me roughly how long you stayed on the scene?

A      I think we were approximately on the scene approximately about twenty
       minutes to thirty minutes.

Q      Okay, nothing further, thank you sir.

              THE COURT: Cross exam.

                                     72

CROSS EXAMINATION

BY MR. BURKETT:

Q    Sir, I'm sorry, I missed the time that you told us that you received the radio run
     to that address.

A    Sure, we were dispatched at 2:46.

Q    Okay, 2:46.   And I know it was, but it was a.m.?

A    Yes it was.

Q    Okay, 2:46, okay.   And you got there at what time?

A    We got there at 3:02.

Q    Okay, now you're not a crime scene investigator or anything like that?

A    No.

Q    Okay, and you said that you were there for over an hour?

A    No, I said approximately about twenty to thirty minutes.

Q    Oh, okay.   It was too late for you to offer any type of first aid?

A    That's correct.

Q    Alright, that's it.

                    MR. WHITE: I have no questions.

                    THE COURT: Thank you, you are free to go.   Call your next

witness.

                (Whereupon the witness was excused at 11:37 a.m.)

                          JENNIFER DOHRING

having been duly sworn on her oath at 12:29 p.m. by the Court was examined and

testified as follows:

                          DIRECT EXAMINATION

BY MS. KETTLER:

73

Q    Good afternoon, Ma'am.   Could you please state your full name for the record?

A    Yes.   My name is Jennifer Dohring.

Q    And where are you employed?

A    I work for the Michigan State Police.

Q    And in what capacity?

A    I work at the crime lab.   I'm a forensic scientist and I work in the Biology DNA Unit.

Q    Okay.   And in addition to doing work in the lab, you also go to crime scenes and assist smaller police departments in processing them.

A    Yes, I do.

Q    Okay.   Tell the jury, if you would please, what your training is; academic and otherwise, to be a forensic scientist.

A    I have a Bachelor of Science Degree in Forensic Science and I got that from John Jay College of Justice which is in New York City.   And then I've taken additional course work in the area of Molecular Biology from Wayne State University.   And then, of course, at the lab I've had my Biology training and DNA training.   I've successfully completed both of those training.

Q    Okay.   And in addition to your academic background and the continuing training, do you continue to monitor professional journals and publications for advances in science and what not?

A    Yes, I do.

Q    Okay.   Have you previously been qualified as an expert in DNA analysis or forensic science in the past?

A    Yes, I have.

Q    Can you tell the juries approximately how many times you've been qualified as

84

an expert and allowed to give your expert opinion in that field?

A    Approximately ten times.

Q    Okay.   And in addition to training, education and observing the literature in your field, do you work with and under the supervision of other forensic scientists at the State Police Lab?

A    Yes, I do.

Q    Okay.   First, I'd like to ask you some questions about the crime scene and then we'll go on to the DNA work later.   Did you have the occasion to go to a crime scene in Sumpter Township on October 6, 2007?

A    Yes, I did.

Q    How were you notified that you needed to go there?

A    I received a phone call early that morning from Metro Dispatch.   Michigan State Police has a dispatch unit and if an agency needs our assistance they'll call that number.   So, I received that phone call at home.

Q    Okay.   Can you tell me roughly what time you were asked to respond to that scene?

A    I received that phone call at approximately 3:30 in the morning.

Q    Okay.   And what time, roughly, was it when you arrived at the location?

A    It was approximately 5:45 in the morning.

Q    Alright.   And what, specifically, was the location that you went to?

A    372 Utah Court.

Q    Okay.   When you arrived at that scene, were there police from Sumpter Township there already?

A    Yes.   They had secured a perimeter for us.

Q    Okay.   First of all, I want to ask you about that.   I want to ask you to explain for

85

the juries, we have two juries here, what you mean by securing a perimeter and how that was done in this case?

A   Typically, when an agency decides that they would like to request the assistance of the Michigan State Police Crime Laboratory Personnel, they will not do any further investigation to the scene and they will simply secure the scene so that noone else can enter the area until we arrive.   So, when we arrived there was crime scene tape around the area and they were standing outside making sure that the area was secured.

Q   Okay.   And when you provide your assistance, well, in this particular case, did you work alone or with a partner?

A   I was with another forensic scientist from the lab.   His name is Guy Nutter.

Q   Okay.   And did you all create a report of your observations at the crime scene?

A   Yes, we did.

Q   Did you also create a sketch?

A   Yes.

Q   And did you take photographs at the crime scene?

A   Yes.

Q   Okay.   First of all, I'm going to ask you to look at, first of all let me show Counsel.   I'm going to show you what's previously been marked as People's exhibit #3 and ask you, does that reflect the sketch that you and Officer Nutter, oh, first of all I need to ask you that.   Are you a civilian or a trooper?

A   I'm a civilian.

Q   And what about Mr. Nutter?   Is he a trooper or civilian?

A   Also a civilian.

Q   Okay.   Did you and Mr. Nutter prepare this sketch as a result of your work at

86

the crime scene?

A    Yes.  It was actually drawn by Corporal Luke.  He's from the Sumpter

Township P.D.  He did that at the request of us.

Q    You asked Corporal Luke to prepare this sketch, correct?

A    Yes.

Q    And to the best of your knowledge, does this accurately reflect the crime scene

as you encountered it when you arrived there?

A    Yes.

              MS. KETTLER: Move for the admission of People's exhibit #3.

              MR. BURKETT: No objection.

              MR. WHITE: No objection.

              THE COURT: Admitted.

              MS. KETTLER: Thank you.

Q    I'm going to show you now photographs which have been marked People's

exhibits #6 through #22.  I'm going to ask you to look at the whole group of

them first.  Okay.  Does that group of photographs accurately depict the area

around the trailer that was taped off when you arrived?

A    Yes, it does.

Q    And is that roughly the lighting conditions that were existent when you arrived?

A    Yes.

              MS. KETTLER: Move for the admission of People's #6 through

#22.

              MR. BURKETT: I have no objection.

              THE COURT: Any objection from Bennett?

              MR. WHITE: No.  No objection, your Honor.

THE COURT: They're admitted.

Q    In addition to sort of taking pictures of the area surrounding the trailer, did you also document the condition inside the trailer?

A    Yes.

Q    Okay.   And let me ask you this, when you first arrived there was the victim still at the scene?

A    Yes, she was.

Q    And how was she positioned?

A    She was lying on her back.   When Mr. Nutter and I first arrived, she was covered with an emergency blanket.   So, we weren't able to see her, but once we removed that blanket she was lying on her back.   Both arms were over her head.   Her hands were at about head height.   And one leg was slightly bent.

Q    Okay.   And did you, in the course of documenting the crime scene, also after you documented that cause her to be flipped over so you could photograph her backside as well?

A    Yes.   When personnel from the medical examiner's office arrived, that's when she was turned over.

Q    Okay.   Now, are you finished with those?

MR. WHITE: Yes, I am.

Q    I'm going to show you, first of all, describe for the jury, if you would, the conditions inside the trailer.

A    The trailer did not appear in any way to have been ransacked.   None of the windows were broken out.   Everything was intact.   When I first entered, there was a television set that was on.   There was a bowl of food.   I don't remember what exactly was in it, but sitting on the coffee table that someone had been

88

eating.   There was a purse on the table.   Everything else just looked, you know,   like a typical home that you might walk into.   Nothing struck me as being odd or in a strange place.

Q      Okay.   Do you recall whether the T.V. was just plain T.V. or whether there was a movie in?

A      I believe there was a movie in.

Q      Okay.   Did you observe once the medical examiners, I'm going to go back for a second, when the medical examiners flipped her over to photograph the back, did you observe that?

A      I was present for that, yes.

Q      I'm going to show you People's #37.   Does that accurately depict when the medical examiner flipped the victim over to photograph her?

A      Yes.

                    MS. KETTLER: Move for the admission of People's #37.

                    MR. BURKETT: No objection.

                    THE COURT: It's admitted.

Q      Okay.   Sorry I digressed a little bit, but I want to go back inside the trailer now. You indicated that nothing appeared to be out of place or ransacked.   Is that right?

A      Correct.

Q      I'm going to show you People exhibit #34, #35 and #36.   Are these some of the photographs that you and your colleagues took inside the trailer?

A      Yes.

Q      And is that the condition you found things in within the trailer?

A      Yes.

89

MS. KETTLER: Move for the admission now of #34 through #36.

MR. BURKETT: No objections.

THE COURT: They're admitted.

MS. KETTLER: Thank you.

Q    Now we're going to go back outside.   You've taken photographs all the way around the trailer and the photographs are taken of the position the body's in, correct?

A    Correct.

Q    Now, once you go beyond taking photographs of the overview, do you seek to mark and document other particular items in the crime scene?

A    Yes, one of the first things you do at a scene is document what that scene looked like upon your arrival.   So, that's what we did first.   After that you start to look for items of evidence or items that you feel might be significant and then you will put a marker number next to that item.   So, the first item would start with a #1, a LS number.   LS stands for Laboratory Scene and so, we would say LS #1 and we would take a picture of it.   We would take a far away picture and then maybe a closer up picture.   Some forms of evidence actually get letters instead of numbers.

Q    What determines whether they get letters or numbers?

A    Generally, the members of the Trace Unit will use letters for any footwear impressions that they might see.

Q    Okay.   You've talked about markers.   Can you describe for the jury what those markers look like?

A    They're just a yellow tent.   They're plastic and they'll have a large number and

90

then a ruler on them.

Q    Okay.   So, and I'm sorry I was rustling around with my papers, you said numbers are placed for trace evidence or numbers?

A    Generally, for footwear evidence.

Q    Footwear.   Okay.   Letters or numbers for footwear?

A    Letters.

Q    Okay.   And what are numbers usually for?

A    If we retain an item of evidence to take back to the lab then it will receive an LS number.

Q    Okay.   So, the numbers are items that are actually confiscated and placed on evidence, correct?

A    Correct.

Q    Alright.   I want to show you, first of all, People's #27 and #28 and #29.   Do those photographs depict the places that you put your evidence markers for the letter evidence?

A    Yes.

Q    Okay.   And do those accurately depict the scene after you marked the pieces of evidence?

A    Yes, they do.

Q    Okay.   Thank you.

        MS. KETTLER: And so I would move for the admission of People's #27 through #29.

        MR. BURKETT: No objection.

        MR. WHITE: No objection.

        THE COURT: Admitted.

Q      I'm going to ask you, to the best you can with this chart or sketch.   Alright.   If

you could step down here for a moment.   I'm going to remind you to keep your

voice up nice and loud if you would, please.   Can you just with using this, you

don't have to write, just point our for the juries, there's a vehicle depicted in the

photograph near the body.   Is that correct?

A      Yes.

Q      And is that depicted on the sketch?

A      Yes, the vehicle is right in this location.

Q      Okay.   And if you could describe and kind of point to it, the position of

Stephanie McClure's body in connection with or in relation to the vehicle.

                    MR. BURKETT: I'm sorry.   I'd like to go down here so I can see

it.

                    THE COURT: Be my guest.

                    MR. WHITE: Also, I'm wondering if you could move that over a

little so my jury can also see it.

                    MS. KETTLER: Well, I'm doing the best I can so that both juries

can see it.   It's kind of a difficult position.

                    MR. BURKETT: I'm going to take that seat if you don't mind.

                    MS. KETTLER: No, that's fine.   Can everybody see kind of?

Okay.   No?   Alright.   How's that?

                    MR. BURKETT: I'm blocking views?   I'm sorry.

Q      Okay.   Now, if you could kind of point out the best you can, keep your back this

way.

A      Sure.

Q      Point out where the body was and describe where it was in relation to the

92

vehicle.

A    Her body was positioned just next to the vehicle in between the curb and the

vehicle.   Her body was towards the back of the vehicle, so towards the

backseat portion of the car.   This would be the driver's side.   And then, you

just asked me about the body, right.

Q    Yes.   Go ahead.   What else did you see there that was noteworthy to you or

possibly noteworthy as potential pieces of evidence?

A    A set of keys were found.   This direction is north.   This direction would be

south.   So, just south of the victim's head there was a set of keys and also a

steak knife.

Q    Alright.   Would you go ahead and put the directions, you know, like they are on

a map; north, south, east, west.   In their proper positions.

A    Sure.

Q    Okay.   Thank you.   So keys and a steak knife, correct?

A    Yes.

Q    Those are items that you marked in your photographs with evidence markers?

A    The knife got in evidence.

Q    Okay.   And what other items potentially of evidence were in that immediate

vicinity of the vehicle?

A    Several footwear impressions were marked.   That's not my area of specialty.

Guy Nutter was there to process the footwear evidence, but those were located

in this area.   So, north of the victim and then also immediately south.

Q    Okay.   Were there any other items of evidence that you took from that scene

that you did further work with; that were in your area of expertise?

A    There were some latent prints that were dusted from the driver's side of that

93

vehicle that were collected as well.

Q    Okay.   Thanks.   You can resume the witness stand.   Thank you.   I'm going to show you, first of all, are you familiar with the process for lifting latent fingerprints?

A    It's not my area of specialty.   It's not what I typically perform at a crime scene, but I have had crime scene evidence technician training where I have been trained to lift latent prints.

Q    Okay.   And just for the jury's edification or so they understand, what's the difference between a latent print and a usable print?

A    Well, that would be a little bit more not so much collecting prints and a little bit more interpretation of what a fingerprint looks like and that's not what I do.

Q    Okay.   But you are familiar with the process of actually lifting them, correct?

A    Yes.

Q    And how is that done?

A    If you see a fingerprint that you are interested in collecting, you can take a piece of clear tape and you put the tape right over the top of that print and then you pull it up and then you would take a clear backing and you would place that tape right on to that clear backing.   And then when we got back to the lab, all of that evidence was turned over to our Latent Print Unit.

Q    Okay.   Let me ask you, those photographs in your lap, did I ask you about those specifically already?   Let me see. #27 through #29, yes, we discussed those.   Okay.   Now, I want to ask you about the latent prints.   I'm going to show you what's been marked as People's #49 through #55 after counsel get the opportunity to look at them.   I want to ask you a couple questions before we look at the actual pictures of them though.   Does someone always leave a

94

fingerprint when they touch something?

A   That would be something that I would ask an expert.

Q   Okay.   Do you always find fingerprints that you can lift from a crime scene?

        MR. BURKETT: Judge, I think that would be, an expert would have to tell whether or not they can always find fingerprints.

        MS. KETTLER: That's what I said.

        MR. WHITE: I'm going to join on this.   The witness has repeatedly stated that it's beyond her area of expertise; that she doesn't collect the prints.

        THE COURT: Overruled.   She can tell us that.

Q   Okay.   As far as collecting them on the scene is what I'm asking you right now. Have you always been able to collect a latent fingerprint at every crime scene you've processed?

A   No.

Q   Okay.   And do people always leave physical evidence at a crime scene?

A   Oftentimes, evidence can be deposited at a scene, but might not be recovered due to environmental conditions or simply not discovered.   So, I would expect physical evidence could be left, but things could happen afterward that would possibly degrade or destroy different types of evidence.

Q   Is it also possible that no physical evidence would be left at a crime scene from the perpetrator?

A   You might not find physical evidence.

Q   Okay.   And so it's not the case that at every scene you've gone to you've found some physical evidence.   Is that right?

A   Correct.

Q     Okay.   So, in this particular case you and your colleagues are seeking to lift latent fingerprints so that the print people at the lab can see if they can identify them.   Is that correct?

A     Absolutely.

Q     Okay.   I'm going to show you those photographs now which have been marked as People's #49 through #55.   Are these photographs of the areas from which possible latent prints were lifted with clear tape as you discussed?

A     Yes, they are.

Q     Okay.   And what are those surfaces?   In some photographs it's not possible to tell what those surfaces are.   Could you tell me, with regard to the numbers on the back, what kind of surface is depicted in these photographs?

A     I'm sorry.   I didn't quite understand what the numbers on the back.

Q     The exhibit stickers, just for the record, for example.   I'm sorry.   There's no sticker on this.   It's just written #55.

A     Okay.

Q     For example, what is #55?   What does that depict?

A     This is the driver's side of the car.

Q     Okay.   And, by the way, what kind of car was it?

A     I believe it was a Pontiac Sunfire.

Q     Okay.   And where was, is this the vehicle that the body was positioned near?

A     Yes.

Q     Okay.   And go ahead to the next one, please.

A     For the purposes of being a little bit simpler, all of them were collected from the driver's side of the car.   So, in some of them were from the window.   Would you like me to differentiate which ones?

96

Q    No, that's fine.   There all from the car that's near the body.   Is that right?

A    Yes, all of them are from the car that was near the body and they were all from the driver's side.

                MS. KETTLER: Move for the admission of People's #49 through #55.

                MR. BURKETT: I have no objection.

                MR. WHITE: I have no objection.

                THE COURT: Admitted.

Q    So, you lift those prints and turn them over to the lab for examination.   Is that correct?

A    Yes.

Q    Okay.   Is that the only area of the crime scene from which latent fingerprints were lifted?

A    Yes.

Q    Or potential latent fingerprints.   Does the fact that you can observe with your naked eye some portion or portions of a fingerprint on an item, necessarily mean it's enough to make an identification?

A    No, sometimes you can have a latent print that's smeared and so for the purposes of identification that latent print examiner might not be able to make an identification.

Q    Okay.   In addition to the fingerprints, we talked about the fingerprints, the keys, the steak knife.   We'll talk about the footwear impressions more, were there some other physical items of evidence that were taken from the outdoor area of the scene?

A    There were several cigarette butts that were collected from the front porch area

97

of the trailer.   They were actually collected from an officer from Sumpter

Township and then brought to the laboratory at a later date.

Q     Okay.   But were they documented in place where they were seized?

A     Yes.

Q     Okay.   I'm going to show you, I think you've seen these already, but People's

#30 through #33.

               MR. BURKETT: Thank you.

               MR. WHITE: Thank you.

Q     First of all, I'm going to show you what's been shown to Counsel, People's

exhibit #31.   By the way, when you first arrive at this scene, is it still dark?

A     Yes, it was.

Q     Okay.   And as you were processing the scene, roughly how long do you stay

there?

A     I was present at the scene for about seven hours.

Q     Okay.   So, obviously it's light by the time you're finished.   Is that right?

A     Yes.

Q     Is there a particular order that you try to move in as far as processing the

scene?

A     Well, each scene is different so it depends on the circumstances, but typically

we'll process the scene in order of the most fragile evidence that should be

collected towards evidence that we know will stay there a bit longer.

Q     Okay.   In this particular case, what did you document first?

A     In this particular case because it was outside and there's always a potential of

environmental conditions affecting. Sort of the whole scene was immediately

important, but we started away from the body from where we were parked and

98

walked up towards the body looking for footwear.   And then we processed the immediate scene from where the body was located and then the surrounding outside area.   And then we processed inside area last.

Q   Okay.   Let me show you at this point what's been shown to Counsel and has been marked People's exhibit #31.   Do you recognize that?

A   Yes.

Q   Alright.   And what does that photograph depict?

A   This is a closeup photograph of the concrete area after Stephanie McClure's body was removed.   So, this would be the area that was immediately underneath her.

Q   And why are you taking pictures of that particular area?

A   Because there were plausible gunshot wounds while we were at the scene, after they moved the body, we wanted to look for possible metal fragment or portions of the bullet.   So, this is a picture of that.

Q   Of which?

A   Of possible metal fragments.

Q   Okay.   Was that item collected and taken to the lab for further analysis?

A   Yes, it was.

Q   Okay.   And can you give us a sense on, first of all, let me see here.

MS. KETTLER: Move for the admission of People's exhibit #31.

MR. BURKETT: No objections.

MR. WHITE: No objection.

THE COURT: Admitted.

MS. KETTLER: Thank you.

Q   And can you describe for the juries where, oh okay, you said that's right

99

beneath her body.   Is that correct?

A     Yes.

Q     Okay.   I'm going to show you People's #33 now and #32.   Those are obviously taken in the daylight and what do those depict?

A     These are pictures that were taken by Guy Nutter.   As I said before, he was the footwear analyst at the scene and the trace expert, and these are plausible footwear impressions.

    MS. KETTLER: Move for the admission of People's #32 and

#33.

    MR. BURKETT: No objections.

    MR. WHITE: No objection.

    THE COURT: Admitted.

Q     I'm going to show you People's #30, ask you, what does that depict?

A     This is a picture that's even closer than the one I described earlier of those possible metal fragments.

Q     Okay.   And when you seize evidence at a scene-

    MS. KETTLER: Move for the admission of People's #30.

    MR. BURKETT: No objection.

    MR. WHITE: Same.

Q     When you seize evidence at a scene like that, let's talk about it in terms of this case-

    THE COURT: Any objection?

    MS. KETTLER: Oh, I apologize, your Honor.

    MR. BURKETT: No.

    THE COURT: Admitted.

100

Q      In this particular case, you seized more than one item of evidence.   Is that

right?

A      Yes.

Q      And how is it that you when you're placing these items on evidence at a scene,

how do you keep track of them so you know what's what and where it was

found?

A      As I stated earlier with those number tents, we'll find a LS number, so a

Laboratory Scene Number, we'll start with one and we'll go through to as many

numbers as we need to.   And then we'll always document both in the notes

and also with a photograph what that evidence looked like.   And then we'll

place that evidence into a bag.   We'll package it up and we'll also identify on

the outside of that packaging where it was located or what the evidence was,

that LS number and also the laboratory number which is our case number.

Q      Okay.   And so when you prepare a written report about your work you

reference those numbers in your reports.   Is that right?

A      Yes.

Q      Was there another type of evidence or possible evidence, I think we touched on

this earlier, that were retrieved by Sumpter Township that was brought to you to

do some work?

A      The cigarette butts?

Q      Yes.   Did you see those in place at the scene or only back at the lab?

A      No, those were observed by myself at the scene and I took some notes on

them.   I made reference to where they were located and what the brand or

possible brand might be.   And then they were collected by the agency and

then brought into me at a later date.

Q     Okay.   And what brand were they?   Were you able to tell what brand they
      were?

A     Newport's.

Q     Okay.   And did you see any evidence of any Newport cigarettes inside the
      trailer?

A     Yes, there was a box of Newport's inside.

Q     And was that pictured in one of the photographs that you saw already?

A     Yes, it was.

Q     Okay.   And so those items, I want to talk now about what kind of work you did
      on those items.   We talked about your qualifications briefly.   I'm going to ask
      the Court, if I haven't already done so, to qualify her as an expert in DNA
      analysis at this point in time.

                    MR. BURKETT: No objection.

                    MR. WHITE: No objection.

                    THE COURT: She's so qualified.

Q     Okay.   Thank you.   Those items, first of all, can you give a laments
      explanation of what DNA is?   There may be different levels of knowledge for
      people, but give a lay explanation to the juries please.

A     Sure.   DNA is often referred to as the 'blue print for life'.   It's in all of us and
      it's inherited from our moms and our dads.   You get half of your DNA from your
      mom and half from your dad.   And it's what's inside all of our bodies and it tells
      our bodies how to function.   So, it's what first of all gives you two eyes and two
      arms and two legs, but it also tells your body how to digest food and things like
      that.   It tells your body how to perform.   It's present, the same DNA is present
      throughout your entire body.   So the DNA that it present in my hand is the

                                        102

same DNA that is present in my foot.   And everybody's DNA is different.   It's very individualizing with the exception of an identical twin.

Q   And in this particular case, the items that you had to analyze, explain to the jury how you actually physically work with those items to try to get a sample to work with.

A   Sure.   With the cigarette butt in particular or just in general?

Q   The cigarette butts in this case.   That's all you did in this case for DNA is cigarette butts, correct?

A   I also did fingernail clippings.

Q   Okay.   Let's talk about the cigarette butts first.

A   Okay.   When I analyze a cigarette butt where I'm going to find DNA, if there's DNA present on a cigarette butt, would be from the saliva.   Skin cells from your mouth will come off and be present in your saliva.   So, as someone smokes a cigarette they might be depositing skin cells on the mouth end of that cigarette butt.   So when I prepare a sample for DNA, I'll take a small cutting from the mouth end and I'll place it in a really small tube and then I preform my DNA analysis which I can go through if you'd like.

Q   Okay.   Well, let's stop there for a minute.

A   Okay.

Q   And you use that for, you're trying to get the saliva.   What if you only had, let's say, a portion that might have had fingers on it but not saliva?

A   You can deposit skin cells from simply touching an item. However, there's a lot more DNA present in saliva than there would be from simply skin cells falling off of your fingers from touching, but it does happen.

Q   Okay.   Once you take that sample then, what process do you use to examine

103

the DNA on, what did you use to examine the samples from the cigarette butts?

A   I simply apply some chemicals that will open up the cells.   DNA's present inside all of our cells, but there's a lot of other things present as well.   So I open up the cells and I take only the DNA out.   And then I will take the DNA and I only look at thirteen areas within that DNA.   And I make lots and lots of copies of those thirteen areas so that I can make sure that I have a large amount of DNA to look at.

Q   And what does that look like, the copies?   Describe that for the jury.

A   Well, I don't actually see the copies of DNA until I run the sample through an instrument and then the instrument will present a graph.   And they look like peaks.   And for each area of DNA that I'm looking at, you'll have one peak or you'll have two peak.   And they'll have different numbers and things associated with them, but it's just a peak on the graph.

Q   Okay.   In this case then, once you run that process and come up with these peaks, what are you comparing that to in this case?

A   I always will run a known sample, so a known DNA sample, from an individual. And normally those are either a blood sample or a buckle sample which is a cheek, inside cheek sample.   So, it's skin cells from your cheek.   I'll get a DNA profile from that sample and then I'll have my evidence samples and I can compare.   And at that point you simply have one graph and another graph and you compare.   Do they look similar or do they look different?

Q   Okay.   And in this case, what were the results of your comparing another sample to the work you did on the cigarette butts?

A   The DNA types from all three cigarette butts that I examined matched Stephanie McClure.

104

Q    Okay.   And what is the likelihood, do you make a statistical analysis of the likelihood that that's not Stephanie McClure?   Is that the right way to put it?

A    Yes, the end part of my examination, the final step is a mathematical calculation where I determine how rare that profile is.   So, if I have a number that's larger than the world population, which is approximately 6.5 billion, then I know that that's a pretty rare profile.   But if I have a number that says 1 in 5 people could match that profile, that's not very statistically significant to me. So, I did that in this case.

Q    Okay.   And were the calculations statistically significant to you such to allow you to say that they matched Stephanie McClure?

A    Yes, I felt that they were.

Q    Okay.   Can you give us those item numbers for each of those and the statistical calculation that you came up with on those?   The cigarette butts to start.

A    I'm going to give you three numbers for each sample and one is for a Caucasian population, one is for an African-American population and one is for Hispanic population.   And they might sound, the numbers might sound different to you, but they're simply there to show that they really aren't that different and so I don't expect someone from one population to be very different from another population.   But I will give you those three numbers.   So, Newport brand cigarette butt #1, which I can give you that item number, item #8; for the Caucasian population: 1 in 2.3 billion; African-American population: 1 in 1.1 billion; Hispanic population: 1 in 3.4 billion.

Q    Okay.

A    Cigarette butt #2, which is item #9; for the Caucasian population: 1 in 237

105

billion; African-American population: 1 in 308.3 billion; Hispanic population: 1 in 995.8 billion. And cigarette butt #3, which would be item #10; for the Caucasian population: 1 in 212.2 thousand; African-American: 1 in 51.6 thousand; and Hispanic: 1 in 188.2 thousand.

Q   Okay. In addition to the cigarette butt, you also did some work on some fingernail clippings. Is that right?

A   Yes, I did.

Q   And where did those come from?

A   Those were collected at the autopsy.

Q   Okay.

A   From Stephanie McClure.

Q   Okay. And what are you examining those for?

A   I'm examining fingernail clippings for the possible presence of any skin cells or blood, any DNA that could be present from a perpetrator. So, if a person is attacked they might try and defend themselves. They might get skin cells or possible blood underneath their fingernails. So in that situation, I'm just going to swab the underside of the fingernail in hopes of collecting any possible DNA. I know I'll probably get DNA from the individual from whom the nails were collected as well because it's their nails and it's close to their skin and I'll probably get skin cells from them as well. But I'm looking for possible perpetrator DNA.

Q   Okay. And once you collected those, did you collect fingernails from both hands?

A   Yes, I did.

Q   And once you collected those samples, were you able to match them to anyone

106

or any people?

A   The DNA profile that was detected on both samples matched Stephanie McClure.

Q   Okay.   Now, in a sample such as the fingernails for example, is it in some cases, are there matches to both the person who's body it came from and someone else?

A   Yes, that's possible.

Q   Okay.   So, there can be two different people's DNA present under fingernails?

A   Yes, sometimes I'll perform a DNA analysis and I'll see a mixture of different people.

Q   Okay.

A   In this case it was a single source sample.

Q   Okay.   So, by analyzing that sample you could make a determination that these are Stephanie McClure's, but also you could determine that noone else's, the sample wasn't mixed.   In other words, noone else was contributing to it.   Is that correct?

A   If someone else was contributing, it wasn't in a substantial amount. Sometimes DNA can be left and it's not enough DNA for me to detect.   So, there are levels of threshold that it must meet.   And so in this case I did not see any evidence of additional DNA present in the sample.

Q   Okay.   And is that, the same also true with regard to the cigarette butts?   Can there be a mixed sample?

A   Yes, that's true for any sample that I look at.

Q   And what could you determine with regard to the cigarette butts about the possibility of any additional contributors to the sample?

A      It appeared to be a full, or not a full profile, but a single source profile on those

       cigarette butts.   The cigarette butts, when I was at the scene I noticed and also

       when I examined them in the lab, they weren't smoked down all the way.   So,

       when I say a cigarette butt some of you might be imagining, you know, a

       smashed up cigarette butt that you'd collect from an ashtray.   But these were

       quite long.   They were perhaps smoked only a quarter of the way down.

       Maybe a half of the way down on one of the cigarette butts.   So, I didn't obtain

       a full profile.   It was what I would call a partial profile.   So, in the areas where I

       did, of those thirteen areas, in other words, I couldn't see all thirteen of those

       areas that I look at.   Out of the areas that I did see, it appeared to be single

       source sample.

Q      Okay.   And do you make this statistical calculation, with regard to the cigarette

       butts, as well?

A      Yes, those are the numbers I gave you.

Q      I'm sorry.

A      The fingernail clippings?

Q      Yes.

A      The fingernail clippings, if I may, I didn't list them in my report, but I have them

       with me.   So for both the right and the left hand nail clippings, the numbers are

       going to be the same because it was the exact same profile and all thirteen

       areas were included because I could see all thirteen of those areas.   So, for

       the Caucasian population, the number is 1 in 2.4 quintillion.   African-American

       population was 1 in 5.1 quintillion.   And the Hispanic population is 1 in 38

       quintillion.   Those numbers are much larger than the world population.

Q      Okay.   So, did you also receive some buckle swabs to compare or possibly

108

compare to the items taken on evidence?

A   Yes, I did.

Q   Okay.   And who were those buckle swabs taken from?

A   I received a buckle swab that was labeled as coming from Kyron Benson and also labeled as coming from Paula Bennett.

Q   Okay.   Did you compare those buckle swabs to either the fingernail clippings or the cigarette butts?

A   No, I did not process those samples for DNA.

Q   And explain to the jury why that is.

A   I normally would run all of my samples at the same time, however, the buckle swabs from these two individuals were brought to me at a later date.   So, I had already started the analysis.   And that's okay because if I wanted to run those samples at a later date I always could.   However, since I already had the results from the evidence that I processed and I had done my comparison and I had made the determination that all of the samples that I had matched Stephanie McClure, there wasn't really a need to show that they didn't match these suspects because I wouldn't expect them to match at all.   They might match at one or two or three, out of those thirteen areas, but I was very confident in my results that the samples I had collected matched Stephanie McClure and didn't come from anyone else.

Q   When you say one or two or three points, what is that?   Can you just explain that more?

A   Sure.   Sure.   If I can give an analogy, if I said that I saw a man rob a bank and he was tall and he was wearing a blue shirt that wouldn't be very, very descriptive.   But if I said he was tall, he was wearing a blue shirt, he had a

black hat on, he had a tattoo on his right arm and a scar on his cheek and I went on and on and I got very much more individualizing about that person, that would give you much more information.   Same thing holds true for DNA profiles.   Because we're all very similar, but we're individual, we share some of our DNA.   So, some of our DNA might be the same at some of those locations.   We might match at one or two.   We might match at five locations, but we're not going to match at all thirteen locations unless we're identical twins.

Q    And is there, pardon me if this isn't the right way to ask, but is there a certain number of points at which there has to be a match for you to make a conclusion about it?

A    Well, that's why I offer the numbers that I gave you.   It gives weight to the evidence.   I'm very confident once I give numbers that are quite large that there's not going to be anyone else.   If I'm over the world's population I'm very confident that I'm not going to see that.   Some of the numbers that I did give were below the world population.   One of them was perhaps 3.5 billion or somewhere around that.   I would then expect perhaps one other person to have that number of DNA types-

Q    In the world one other person.

A    Right.

Q    Okay.

A    Right.   But, however, in all of these samples that I looked at, if I couldn't see or if I couldn't use all thirteen of those areas I still didn't see anything that would strike me as, make me think that I saw more than one person in that sample. They appeared to be single source.

Q    Okay.   And by the way, is your work reviewed by a superior or peer reviewed?

110

A     Yes, every report that I author is going to be peer reviewed.   It's technically

reviewed by a scientist.   That scientist has to be trained with the same

qualifications that I have.   And then also someone will administratively review

that report as well.

Q     Okay.   We've talked about the fingernail clippings, the blood sample, the

cigarette butts.   I want to talk to you now about some footwear.   Did you

receive some items of footwear that were taken or did you see some and take

some back to the lab for additional work?

A     Guy Nutter collected all of the footwear.

Q     Okay.   Is that reflected in one of your reports?

A     Yes.

Q     Okay.   I can ask him about that.

A     Okay.

Q     Let me ask you about some clothing.   Did you do any work with regard to the

clothing?

A     Yes, I received two pairs of sweat pants and three pairs of shoes.

Q     Okay.   And what work did you do with regard to the shoes?

A     I was looking for the presence of blood on the shoes and for each pair of those

shoes I would look for anything that might appear to have a, what I would think

would be, characteristic of a bloodstain.   So, a bloodstain to me generally has

a reddish brown stain in appearance.   If I saw an area that looked reddish

brown in color then I would then apply some chemicals and do a test.   And

what this test is called, it's a presumptive test, for blood.   Presumptive just

means that it indicates the presence of blood, but there are other things that

could also make my test positive.   So, it doesn't necessarily mean that it is

111

blood, but it indicates the presence of blood.   It's a screening method.   If that test is negative, I'm very confident that it's not blood.   If it's positive then I'll do additional tests to prove or show that there might be DNA present.   In the case of the shoes, I did some of that testing and I had negative results.

Q   And the three pair of shoes, where did they come from?   Where were they collected from?

A   They were identified as being collected from a residence outside of the scene that I processed.   I don't know specifically where from.

Q   And with regard to your work on the shoes, did you find the presence of blood on any of those items of shoes?

A   No, I did not.

Q   Okay.   And with regard to the two pairs of, I'm sorry.

A   The sweat pants?

Q   The sweat pants.   And, yes, the sweat pants.   Did you find the presence of blood on those?

A   No, I did not.

Q   Okay.   Is that the totality of the work you did on those?

A   Yes.

          MS. KETTLER: Okay.   Thank you, Ms. Dohring.   Nothing further.

          THE COURT: Ladies and gentlemen, you're excused till 9:00 tomorrow morning.   Don't discuss the case.

          (whereupon the juries were dismissed)

          (On the record without the juries)

          THE COURT: Do you have any questions for the chemist for

112

tomorrow?   Do you have any questions for this witness tomorrow?

        MR. BURKETT: Yes, I do.

        THE COURT: Okay.   Well, thank you.   You have to be back tomorrow morning at 9:00.   Let me take up another matter.   The juries are out. You can be seated.   The writ of habeas corpus is issued for Richard Wren for Thursday morning at 9:00 a.m. when he will be testifying.   In order to obviate the matter of his possible Fifth Amendment Right's, or infringement of his Fifth Amendment Right's, if there are questions whether or not he furnished a weapon to Kyron Benson, I will not allow the lawyers to ask whether he sold it to them.   They can ask whether he supplied it.   They can ask whether or not Mr. Benson received the weapon from him, but nothing about purchase.   Clear for the People?

        MS. KETTLER: Yes, your Honor.

        THE COURT: For Mr. Benson?

        MR. BURKETT: I understand.

        MR. WHITE: Your Honor, I understand.   I'm just curious as to the reasoning behind your ruling.

        THE COURT: I gave the reasoning behind my ruling.   Typically, I answer questions from the Court of Appeals.   What are you asking me?

        MR. WHITE: Nothing, your Honor.

        THE COURT: Thank you.

        (matter concluded)

STATE OF MICHIGAN )

COUNTY OF WAYNE )


    I, Jeffrey B. Goldsmith, Official Court Reporter for the Third Judicial Circuit of

Michigan, do hereby certify that I reported the foregoing proceedings before the

Honorable

MICHAEL J. CALLAHAN, Circuit Judge on May 13, 2008; that the foregoing 121

114

pages constitute a true and correct transcript of the proceedings so held.

_____

Official Court Reporter
CSMR-0037

115

116