STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF
MICHIGAN,

                Plaintiff,

-v-                      Case No. 07-024733-01
                               07-024733-02

KYRON DARELL BENSON,
PAULA RENAI BENNETT,

                Defendant.

_____/

JURY TRIAL

VOLUME VI

Proceedings had before the Honorable MICHAEL J.

CALLAHAN, Judge of the Third Judicial Circuit of Michigan, 703 Frank Murphy Hall

of Justice, Detroit, Michigan 48226, on May 14, 2008.

APPEARANCES:

                MS. MOLLY KETTLER
                Attorney at Law

                  On behalf of the Plaintiff

                MR. RAYMOND BURKETT
                Attorney at Law

                  On behalf of Defendant Benson

                MR. WALTER WHITE
                Attorney at Law

                  On behalf of Defendant Bennett

                Jeffrey B. Goldsmith
                Official Court Reporter
                CSMR-0037

INDEX

WITNESS                                                    PAGE

   JENNIFER DOHRING

     Cross Examination by Mr. Burkett              3
     Cross Examination by Mr. White               16
     Redirect Examination by Ms. Kettler          26
     Recross Examination by Mr. Burkett           28


   CHARLES MORDEN

     Direct Examination by Ms. Kettler            31
     Cross Examination by Mr. Burkett             50
     Cross Examination by Mr. White               57
     Redirect Examination by Ms. Kettler          60
     Recross Examination by Mr. White             61


   JOHN PAUL STEFFES

     Direct Examination by Ms. Kettler            62
     Cross Examination by Mr. Burkett             71
     Cross Examination by Mr. White               74
     Redirect Examination by Mr. Kettler          77
     Recross Examination by Mr. Burkett           78


   ROBERT RAYER

     Direct Examination by Ms. Kettler            78
     Cross Examination by Mr. Burkett             93
     Cross Examination by Mr. White               99


   GUY NUTTER

     Direct Examination by Ms. Kettler            106

| EXHIBITS | MARKED | ADMITTED |
| --- | --- | --- |
| Plaintiff's #57 | Prev. | 70 |
| Plaintiff's #58 | Prev. | 70 |
| Plaintiff's 60-62 | Prev. | 82 |
| Plaintiff's #59 | Prev. | 90 |
| Plaintiff's A-L | Prev. | 110 |

Detroit, Michigan

P R O C E E D I N G S

3

\*     \*     \*

THE COURT: Cross examination of Ms. Dohring.   Go ahead.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning, Ma'am.

A    Good morning.

Q    I'm going to have just a few questions for you.   I want to make sure I have

certain things correct.   You arrived at the scene, what time?

A    At approximately 5:45 in the morning.

Q    Okay.   And if I understood you correctly, you got the call to go to the scene

somewhere around what time?

A    3:30 in the morning.

Q    Okay.   Now, according to your testimony yesterday, you collected ten fiber

samples of carpet.   That would have been LS 10 through LS 12.   I'm sorry, LS

4 through LS 10 and LS 12 through LS 14.

A    LS 4 through 10 and 12 through 14.   That's correct.

Q    Okay.   You're the person that collected it?

A    Yes, I did.

Q    Just so I understand, what was the purpose of your collecting it?

A    I did it under the assistance, I was assisting Guy Nutter in that circumstance.

He's the trace evidence at the scene.   I was collecting known samples from

him.   So, any carpet sources that were inside the trailer, I collected known

fibers, so that if he needed to do comparisons at a later date, he could.

Q    Okay.   Would it be fair to say that every room in the home that had carpet you

collected samples from?

4

A     Yes, I believe so.   And any rugs that I saw I also collected samples.

Q     From the rugs as well as the carpet?

A     Yes.

Q     Okay.   And you were doing this under the direction of Guy Nutter?

A     Yes, I was.

Q     Okay.   At some point you were sent three pairs of tennis shoes.

A     Yes, I was.

Q     Okay.   Now, and what did you do with those shoes?

A     I examined each pair of shoes for the presence of blood and I did not find any.

Q     No blood?

A     No.

Q     Okay.   On the shoes, okay.   Do you know that you examined the shoes?

A     If I look at my notes.

Q     Feel free to anytime.

A     Thank you.   I examined one pair of shoes on January 24, 2008.   Another pair on January 28, 2008.   And the third pair also on January 28th.   So two pairs of shoes on the 28th and one on the 24th of January.

Q     Okay.   It is true, is it not, that DNA can certainly be found in blood?

A     Yes, it can.

Q     Okay.   On January the 31st of this year, '08, you requested from the Sumpter Police Department DNA of suspect.   Is that correct?

A     Yes, when I authored my serology report, serology would be the identification of body fluid.   So, when I looked for those items that might contain DNA I authored a report and stated anything that was sent for DNA analysis.   And at that time I requested any samples from any possible suspects.

5

Q     Okay.   On February the 27th, you received DNA samples.   Is that correct?

A     Yes, I did.

Q     And the DNA samples that you received, who were they from?

A     I received a buckle sample, so that's a known DNA sample from the inside of
      the mouth, from Kyron Benson and Paula Bennett.

Q     Okay.   And I know you explained this yesterday, but when you say a buckle,
      could you tell us once more what that is?

A     Sure.   When you collect a known sample, you take what's called a buckle
      swab and it's almost like a cotton-tip swab, but it's got serrated edges so it kind
      of looks like a toothbrush.   And to collect the sample, rub the swabs from the
      inside cheek lining and that collects skin cells.   So, because it's collected
      directly from your body, we'll consider that a known DNA sample.

Q     Okay.   And I think that you received this on February 27th.   Would that be
      correct?

A     Yes.

Q     Okay.   Now until that date, February the 27th, did you run any DNA samples as
      it would relate to the suspects?   Up until February the 27th?

A     I was in the process of running the evidence samples and I didn't know what
      the results were at the time, but I didn't have any known samples at that time,
      no.

Q     Okay.   On April 28th, did you have communications with Detective Toth in this
      case?

A     I don't recall specific dates communication wise, but I can check my notes if
      you want me to.

Q     No, you don't have to.   The latter part of April, did you discontinue trying to

6

match the DNA with the suspects?

A    Is that the date that I authored my report?

Q    Would you just check for April 28th?

A    Please forgive me.   I have a phone log, but I can't seem to find it.   On April 28th I had a phone conversation and I faxed all of the reports over.

Q    No, that wasn't my question.   I want to show you something maybe.

A    Okay.

              MS. KETTLER: Which one is that, please?

A    This report.   Thank you.   I do have a copy of this report.

Q    Okay.   What date is that, Ma'am?

A    That was April 28th.

Q    Okay.   Now, you had a telephone conversation?

A    Yes, I did.

Q    With whom?

A    With Officer Toth.

Q    Okay.   And tell us what happened then.

A    At that time I explained what the DNA results were from the first round of testing and explained that there was no need to run the samples, the known samples I had from Kyron Benson and Paula Bennett.   I could run those samples and give some conclusions, but it wasn't necessary.

Q    Okay.   Now, just a second.   I thought the letters said that Officer Toth told you not to run, to not to continue running the tests.

A    It was at my direction.   I said there wasn't really a need to and he agreed at that time that noone else's of those samples were necessary.

Q    Okay.   So, did I misread the letter?   Your report.   The report clearly states

7

that Officer Toth told you-

A      My report is essentially that I had permission from the agency not to run those

samples.

Q      Okay.   Now, you say that your first round of testing.

A      Yes.

Q      What's the first round of testing?

A      I received evidence in this case and I had a known sample from Stephanie

McClure.   Because I didn't have any additional known samples to run from any

possible perpetrators, I went ahead and ran the evidence to see if any of the

samples I had matched Stephanie McClure.   And if it didn't match Stephanie

McClure then I would need something to do a comparison to.   Since the

samples I had matched Stephanie, there wasn't a need to look at additional

samples.

Q      Okay.   I think I asked you this.   I hope I'm not being repetitive, but you ran no

DNA testing on the shoes itself, did you?

A      No.

Q      And the only DNA that you got from any suspects were the Defendant sitting

here?

A      Correct.

Q      Okay.   Ma'am, you collected metal fragments which, I assume, were the

bullets?   Is that correct?   I'm sorry.   I was going to tell you the numbers of

them.

A      Okay.

Q      I think it would be LS11.

A      Yes, that's correct.

8

Q   Okay.   Now, the metal fragments that you had, Ma'am, I think we said, I think I said, those were the bullets, correct, that you found?

A   Well, they were metal fragments that we thought could possibly be bullet fragments.   They were collected at the scene and handed over to the Firearm's Unit.   So, we didn't make a determination.

Q   Okay.   If those would have been handled by anyone, is it possible that there would be DNA on those?

A   It's very unlikely that I would expect to obtain a DNA profile from a fired bullet or cartridge casings.   It is possible to touch a bullet, set it down and leave some DNA.

Q   Okay.

A   It's not enough, generally, to obtain a DNA profile from.   So, there's a difference between leaving DNA and leaving enough DNA for a profile.   Once that bullet's fired, because of the high heat, we generally never see a profile.

Q   But as you sit here today, you don't know whether or not those bullets had DNA samples on them, do you?

A   No, I don't.

Q   And because sometimes you don't find DNA on bullets, Ma'am, you didn't bother about testing them for DNA.   Is that correct?

A   Yes.   Because we don't expect a profile, we don't perform that type of testing.

Q   Okay.   You testified, and forgive me I don't have the number, you testified yesterday that when you looked at Ms. McClure's body there was a broken necklace that she had.

A   I don't remember testifying to that, but that's true.   There was a broken necklace.

9

Q     Okay.   Now, when you say the necklace was broken, was it still on her or
      what?

A     It was resting.   It was away from her neck.   It was resting onto her right
      shoulder and onto the ground.

Q     Okay.   So, it wasn't fastened on her?

A     Correct.   It was broken so it wasn't that it was unhooked.   It was actually
      broken.

Q     Okay.   If that necklace would have been pulled off of her by anyone, Ma'am,
      there's a possibility there would have been DNA on that.   Is that correct,
      Ma'am?

            MS. KETTLER: I'm going to object to that.   Calls for
speculation.

            MR. BURKETT: She's an expert, Judge.

            MS. KETTLER: But the question itself calls for speculation.   It
has like a chain of three ifs in it which are based on facts not in evidence.

            THE COURT: Overruled.

Q     Did you understand my question, Ma'am?

A     Yes, I did.   That would be the same scenario as what I explained earlier with
      the bullet.   It would be possible to leave some DNA, but I wouldn't expect it to
      ever be enough DNA to produce a profile.

Q     As you sit here today, Ma'am, you can't tell this jury whether or not that
      necklace had DNA on it?

A     No, I cannot.   I did not test that necklace.

Q     Okay.   Were you the person that did the footwear impressions?

A     No, I was not.

Q     You were present when they were done?

A     Yes.

Q     Okay.   I take it that it was Mr. Guy Nutter.   Am I pronouncing his name
      correctly?

A     Yes, you are.

Q     Okay.   It was Guy Nutter who ordered the footprints impression done?

A     Yes, he collected them himself.

Q     Oh, he collected them?

A     Yes.

Q     Okay.   Ma'am, you've testified yesterday that there were blood splatters.   No,
      I'm sorry.   You didn't testify.   You testified that there was a large amount of
      blood on the victim, Ms. McClure.   Do you recall that, Ma'am?

A     I don't recall testifying to that yesterday, but there was a large presence of
      blood on her face.

Q     Okay.   Forgive me because your report has a large amount of blood, correct?

A     Yes, my report does state that, yes.

Q     Okay.   Did you find blood anywhere else?

A     At the scene?

Q     Yes, Ma'am.

A     There was some blood like on the curb.   She was lying next to a curb.   There
      was a small amount of blood.   A pair of flip-flops was lying next to her upside
      down.   There was a small amount of blood on the flip-flops.   There was small
      amounts of blood on her clothing.   And then when the medical examiners
      investigator rolled the body over and she was removed, there was a large
      amount of blood underneath her as well.

                                            11

Q      Okay.   Now, you have told us, I think you told us yesterday, that you are not a
       fingerprint expert.   Is that correct?

A      That's correct.

Q      Okay.   There were keys found at the scene.

A      Yes.

Q      Did you collect those?

A      No.   They were handed over, I believe, to the agency when we left.

Q      The agency being the Sumpter Police Department?

A      That's correct.

Q      When you arrived at the scene, Ma'am, the front door of Ms. McClure's house,
       was it open, if you recall?

A      I don't recall specifically.   I apologize.

Q      You don't have to.

A      I don't recall.

Q      Okay.   Do you recall, Ma'am, what the front porch looked like?

A      Yes.

Q      Okay.   Did you check the front porch for any types of footprints?

A      I did not.   No.

Q      Okay.   Did you see anyone doing it?

A      Guy Nutter may have.   I wasn't always working directly with him.

Q      I got you.   Ma'am, you can count if you like, but I, going through your report,
       would this be a true statement; that you collected approximately sixty pieces of
       evidence?   And I don't know if you call it evidence, but samples or whatever
       from all the different things that you collected.   Does that sound about right?

A      Myself?   That I collected or the laboratory as a whole?   I don't know how

                                        12

many samples the laboratory collected.   At the scene we collected fourteen LS numbers and then a variety of latent lifts and casts.   But that number wouldn't total sixty.   If you're asking additional items that were brought in, that would certainly increase the number, but.

Q     Okay.   Did you find, considering the DNA tests and whatever you ran, did you find anything to link any suspect to the evidence that you collected?

A     No.   All of the DNA results that I have matched Stephanie McClure.

Q     Okay.   And is it true then that DNA was the only thing that you did?

A     Well, I processed the scene and collected different forms of evidence for different units.   But then I performed serology so I examined certain items for the presence of blood and then anything that I thought might be a sample that would contain DNA was forwarded and then I performed DNA analysis.

Q     Okay.   You said you collected different items for different units.   Tell me the items you collected for those units.

A     Sure.   The known fibers that were collected, those were for the Trace Unit.

Q     Just so we understand, what is the Trace Unit?

A     The Trace Unit is sometimes called the Micro Chemistry Unit.   They, at scenes, generally specialize in footwear impressions and trace evidence which is small amounts of evidence.   So, fiber types of analysis.   Things like that. Guy Nutter will testify more directly to what his specialties are.

Q     Now, just so I'm clear, you and Guy Nutter are both employed by the Michigan State Police.

A     Yes, we are.

Q     Okay.   Go ahead.

A     The metal fragments were collected and they were sent to the Firearms Unit.

13

Q    Do you know who examined those, if you know?

A    I believe Rob Rayer from the Michigan State Police.

Q    Okay.

A    And then the fingerprint lifts from the driver's side of the vehicle, they were collected and sent to the Latent Print Unit.

Q    And who did that?

A    They were sent to our Latent Print Unit to Charlie Morden, but I believe after that they were sent to our Sterling Heights Laboratory and they actually performed the analysis.

Q    Okay.   Whoever performed the analysis, as far as you know, it was the Michigan State Police.

A    Yes.

Q    And you were working in conjunction with the police department here.   Is that correct?

A    Yes, we provide services to police departments all across the state.

                    MR. BURKETT: Alright.   Thank you very much for your
assistance.

                    THE COURT: Mr. White.

                    MR. WHITE: Thank you very much.

                    CROSS EXAMINATION

BY MR. WHITE:

Q    Good morning.

A    Good morning.

Q    Now, when you got the call it was 3:30 in the morning.   Is that correct?

A    That's correct.

                    14

Q    More or less.   And did you tell the local police to secure a certain size
     perimeter or did they just tell you that they had that under control or was there
     any conversation of that?

A    I was informed at the time that a perimeter had been set up.   I did not question
     specifically how large the perimeter was.   They had a lot more facts and first
     hand information than I had, so I left it up to them to decide how large that
     perimeter should be.

Q    Okay.   Now, you arrived at 5:45 in the morning, correct?

A    Correct.

Q    And were the other people from the state police crime lab there before you?

A    No, Guy Nutter and I were the first to arrive.   We were the   only to arrive.

Q    Alright.   Now, when you arrived did you observe any police officers inside your
     perimeter, their perimeter actually?

A    The perimeter was set up and they were directly outside of the perimeter.

Q    Alright.   Now, did you recover any samples that were outside that perimeter?

A    After we had collected some evidence from their direct vicinity of the body, we
     did step outside, you know, in case a perpetrator had run in any certain
     direction, we checked that area as well.

Q    And did you recover any samples from the area outside the perimeter?

A    I believe that certain footwear impressions were photographed, but no evidence
     was collected.

Q    You didn't collect that.

A    No, I didn't.

Q    Alright.   Now, among the other things collected was a knife.   Is that correct?

A    Correct.

                                    15

Q     Did you collect that?

A     I collected it.

Q     And did it have blood on it?

A     I observed it at the scene and I did not see the presence of blood.

Q     Alright.   Did you process that knife for either fingerprints or for blood?

A     Once I got back to the lab I didn't do any additional testing because I had noted at the scene that I didn't see any physical blood on it and then the knife was sent to the Latent Print Unit.

Q     Alright.   So, you didn't do anything to preserve latent prints on the knife?

A     Well, I collected it at the scene and preserved it for latent print.   So, I certainly used gloves when handling it, placed it in the box and then I didn't open it again.   I sent it directly to the Latent Print Unit.

Q     Alright.   I understand, but my question was whether you'd lifted anything. You're saying you did preserve it.

A     Correct.

Q     So, I think the jury understands.

A     I preserved it by not touching it with my bare fingers.

Q     Alright.   Now, when you arrived at the scene it hadn't been raining out, had it?

A     I don't believe it had been.   I can check my notes.   Would you like me to?

Q     If you could.

A     Sure.   No, we did not note that it was raining.   I know it wasn't raining while we were there.

Q     Now, did you ever so any DNA testing on the knife or did you just never touch the knife again at all after you?

16

A   I did not examine the knife again.

Q   Thank you.   Now, you said you went into the inside of the trailer.

A   Correct.

Q   And you said there was a movie on the television?

A   Yes.

Q   And you said you searched the trailer after you'd searched the exterior scene because it's less likely to be affected by, for instance, weather, correct?

A   Correct.

Q   Alright.   And this movie was, about what time did you look at the trailer?

A   Let me check.   At approximately 8:20 in the morning we entered the trailer.

Q   Alright.   Now, do you know if that movie was a VHS tape or a DVD or whether it was just something on the television?

A   I didn't check specifically, but it was on the menu screen like a DVD player would have.

Q   Alright.   And it was, in fact, playing?

A   No.

Q   It was not playing?

A   Well, it was the menu screen.   So, the movie wasn't playing, but it was the opening, if you put a DVD player into the T.V. and it asks, do you want to watch the movie?   Do you want to watch the special scenes?   Things like that.

Q   Alright.   Now, when you went in the trailer you said there was a bowl of food there?

A   Yes.

Q   What kind of food?

A   I testified that I did not recall specifically.   My memory, it serves correctly, it

17

perhaps was cereal or perhaps milk in the bowl, but I don't remember and I didn't document that.

Q   Alright.   Was there any sign that anyone lived there other than Ms. McClure?

A   There was another bedroom, but it appeared very neat and orderly.   So, if someone was staying there they were certainly very meticulous.   It was my first impression that she was living alone, but perhaps that was the main bedroom. So, perhaps the owner used that bedroom.   Then there was another bedroom that appeared very lived in.

Q   Now, did you check, for instance, the spoon in the cereal for DNA?

A   No, I did not.

Q   Did you check any of the counters or anywhere else inside for DNA evidence, for potential samples of DNA?

A   No, I did not.

Q   You did collect fiber samples, correct?

A   Yes, the known samples.

Q   And none of those matched any, well, you didn't do the matching?

A   I didn't perform the analysis.

Q   Now, you collected fingerprints from the side of an automobile.   Is that correct?

A   Correct.

Q   And did you do any kind of comparison on those or did somebody else do it?

A   No, I did not.   I simply collected them and forwarded them on.

Q   Alright.   Now, you found several cigarette butts outside the trailer?

A   Correct.

Q   And you did a DNA analysis on them?

A   Correct.

18

Q     And established with an incredibly high degree of certainty that Stephanie McClure had smoked those cigarettes.

A     Some of those numbers were higher than others.   If you recall from yesterday, I said that one of those numbers was somewhere in the thousands.   So, that one wasn't as high, but they all matched and I agree that they most likely were definitely smoked by Stephanie.

Q     Okay.   Now, you talked a little bit about how you have thirteen things you test for DNA.   And a person might have five similar or three similar or whatever.

A     Sure.

QQ   Now, isn't it true that if even one thing is different that excludes that person?

A     That's correct.   You have to match at all thirteen areas in order for there to be a match.   Brothers and sisters might be very similar because they came from the same mother and father, but because I bet they're different at one or two or three of those spots, you can immediately exclude that person.

Q     I have a different perspective.   I'm the father of identical twins, so.

A     In that situation the DNA is identical.

Q     But at any event, it's not like fingerprints where you have, you identify somebody by five or eight or ten points of similarity in the print, right?

A     Correct.

Q     You've got to have one hundred percent similarity in the DNA identification, correct?

A     Correct.

Q     Unless you're talking about my two sons.

A     The last step of the analysis that I spoke of yesterday, the mathematical calculation, that comes into play when you only have say five or six of those

19

thirteen areas.   I can say they match at these areas, but my numbers won't be

as high.   So, yesterday when I said if I had numbers that were one and five, I

would expect lots of people to fall into that category.   But once I start saying

one in thirty billion, things like that, those are high numbers and I don't expect,

you know, in that situation to see anybody else with that profile.

Q     Alright.   Now, you checked fingernail clippings.

A     Yes, I did.

Q     The reason you checked those for DNA is because there's a possibility that a

victim would scratch their attacker and they have samples of the attackers DNA

under their fingernails, correct?

A     Yes.

Q     Alright.   Now, there was blood, or rather there was the necklace that was

broken, correct?

A     Yes.

Q     And you indicated that it was unlikely there would be DNA on that, correct?

A     But that's not analogist to a fired bullet.   A fired bullet is subject to immense

pressure and heat and would have also   gone through, possibly gone through

the victim's body, right?

A     Right.

Q     A necklace would be more akin to the example you gave earlier of I've got a

cartridge and I pick up the cartridge and put it down.   So, there is some

possibility there would be DNA on a necklace.

A     Sure, but just like what I said with that bullet, I wouldn't expect to obtain a DNA

profile from the small amount of DNA that you would leave on a bullet by

touching it or the small amount of DNA that you would leave on a necklace by

20

touching it.   And the difference with that bullet is that the bullet is further

subjected to heat.   So now I really don't expect a profile from it.

Q    Right.   It's almost impossible.

A    I've never seen results.

Q    Right.   On the other hand, you've probably gotten DNA off of a cartridge case

or a full cartridge, correct?

A    In my experience I have not.   It's a very small amount of DNA.

Q    Okay.   But you didn't even test for it.

A    No, because our laboratory has never had success we chose not to run those

types of samples.

Q    Alright.   Now, did you sample the blood in the vicinity of Stephanie McClure's

face or body to see if there was blood from anyone other than Ms. McClure?

A    No, in that type of situation because there was so much blood from the

incident, if there was a small amount of blood mixed in with the blood that was

most likely from the victim, I would relate that to dropping a little blue drop of

dye into a swimming pool.   There might be DNA there, but you're not going to

be able to see it because the swimming pool's going to mix in with that blue dye

and you immediately won't be able to see it.   There would be so much DNA

from Stephanie McClure present that if there was DNA from anyone else, I

would not be able to see it.

Q    So the only items you tested for DNA were the fingernail clippings and the

cigarettes?

A    And the known sample from Stephanie.

Q    And the known sample from Stephanie McClure.   No other samples that might

have been attained were tested for, correct?

A    Correct.

Q    So the conclusion we can draw from your testimony is that Stephanie McClure
     and only Stephanie McClure handled those three cigarettes, correct?

A    Because we didn't see full profiles I wouldn't jump that far, but I'm confident to
     a reasonably high degree that she's the person that smoked them.   I didn't see
     evidence of an additional donor.

Q    You were satisfied to the extent that you didn't want to even compare-

A    That's correct.

Q    Tyrone's and Paula's DNA to it.

A    That's correct.

Q    And the only other thing that you can say conclusively is that you didn't find any
     DNA, except Stephanie's, under her fingernails.

A    That's correct.

              MR. WHITE: Thanks.   I don't have anything more.   Thank you.

              THE COURT: Anything else?

              MS. KETTLER: Yes, just briefly.

              THE COURT: Five minutes.

                         REDIRECT EXAMINATION

BY MS. KETTLER:

Q    You indicated that you tested the shoes for the possible presence of blood in
     January.   Is that correct?

A    Yes.

Q    How were those preserved in the meantime from the time they were collected
     until they were tested?

A    I received them in October and they were stored in brown paper bags and they

                                    22

were retained in our evidence locker room.

Q   Okay.   And in your scientific experience, is that the best way to preserve, if there had been blood on them would that have preserved it?

A   Yes.

Q   Okay.   And Mr. Burkett asked you some questions about the fact that you did not compare the buccal swabs from Mr. Benson and Ms. Bennett to the cigarette butts or the fingernails.   Do you remember those?

A   Yes.

Q   And he used the term discontinued.   Is it accurate to say that you discontinued comparing the buccal swabs to the cigarette butts and the fingernail samples?

A   I never performed a comparison.

Q   And also he asked you in that, he said, well did I misread this letter of your report?   Do you have that in front of you, your report, page twelve?

A   I do.   Yes.

Q   And you talked about the fact that it references a phone conversation.

A   Yes.

Q   And is this your report that you prepared?

A   Yes, it is.

Q   Does that report say that detective told you to stop running the samples?

A   No, it doesn't.

Q   Mr. White asked you also some questions about whether you collected fingerprints at the scene.   I just want to be very specific about the terminology that we're using.   You explained how you used tape to lift the impression, is that the correct word for it, impression from the item that you take?

A   Correct.

23

Q    Okay.   And by looking at those, that's the only work you did is collecting them, correct?

A    Correct.

Q    And looking at those at the scene, can you tell whether or not there's sufficient ridge structure there for identification?

A    No, I cannot.

Q    Or even for an examination.

A    No.

Q    Okay.

              MS. KETTLER: Nothing further.   Thank you.

              THE COURT: Anything else?

              MR. BURKETT: Sure.

                      RECROSS EXAMINATION

BY MR. BURKETT:

Q    Ma'am, the report that I showed you earlier.

A    Yes.

Q    In terms of, would you read exactly what it.

A    Sure.   Per phone conversation on 4-28-08 with Officer John Toth at the Sumpter Township Police Department.   No analysis is needed at this time.

Q    No analysis is needed.

A    Correct.

Q    Okay.   Now, I want to ask you, is this the chart that you made?

A    It wasn't drawn by myself, as I stated yesterday, but I directed Officer-

Q    What is this?

A    There were two shoes.   Two flip flops.

Q    And right here?

A    It's an arrow to where the flip flops were located.

Q    May I use your big chart now?

A    Certainly.

Q    Can everyone see?   Okay.   Ma'am, if I could get you to come down here.

A    Sure.

Q    And show us.

A    A flip flop was located here and also here.   So, this is a flip flop at the back portion of the vehicle and then directly east of where the body was located.

Q    Okay.   Is this the street here or what is that?

A    That is the sidewalk.

Q    Okay.   So, a flip flop is located on the other side of the sidewalk.   Is that correct?

A    The body was located between the curb and the vehicle and the flip flop was on the curb and the sidewalk.   So, it's not on the other side of the sidewalk.   The word shoe is written sort of far away from where they're actually located.

Q    How far was the flip flop here?

A    There is no flip flop there.

Q    There was none?

A    No, this just says shoe and it's an arrow to where the shoes were located.

Q    Alright.   Thank you.   Was any blood on that flip flop?

A    Yes, on the flip flop that was to the east of Stephanie McClure's body was upside down and there was some very small circular staining on the underside of the shoe.

Q    Was there DNA testing done on that blood?

25

A    It wasn't tested because it was felt that it was consistent with the injuries that

she had sustained.

MR. BURKETT: Alright.   I don't have anything further.

THE COURT: Mr. White.

MR. WHITE: Nothing.   Thank you.

THE COURT: Thank you.   You can step down and you are free

to go.

MS. DOHRING: Thank you.

(whereupon the witness was excused at 9:56 a.m.)

THE COURT: Call your next witness.

CHARLES MORDEN, LT.

having been duly sworn on his oath at 9:56 a.m. by the Court was examined and

testified as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q    Good morning.   How are you?

A    Fine.   Thank you.

Q    Would you please state your full name for the record?

A    Charles Morden.   M-O-R-D-E-N.

Q    Thank you.   Okay.   And where are you employed and in what capacity?

A    I am employed with the Michigan State Police at the Northville Forensic

Laboratory.   I am the Latent Print Supervisor there.

Q    Okay.   And are you a trooper or a civilian?

A    I am an enlisted person.   I am a detective lieutenant.

Q    Okay.   Do you have a specific area of expertise within the laboratory?

26

A      Latent prints.

Q      Okay.   Can you, first of all, explain for the juries what a latent print is and what

you do with samples that are brought to you.

A      A latent print is a chance impression.   It requires some type physical,

instrumental or chemical process to develop it so we can see it with the naked

eye.

Q      Okay.   I need to back up and ask you this too.   What specialized training have

you had in education to qualify you to be an expert in latent print examination?

A      I have a Bachelor's in Chemistry, a Master's in Forensic Science.   I've

completed two years of on the job training in the field of latent prints under the

supervision of other latent print examiners.

Q      Okay.

               MR. WHITE: Your Honor, I have an objection.   It doesn't appear

that the witness that's been called is on the list of endorsed witnesses.   First

Amendment.   I may be mistaken, but I don't think this is a listed witness.

               MS. KETTLER: He is not listed by name and if you give me a

moment you're going to understand why that is.

               MR. WHITE: Well, I certainly would indulge to that extent.

               MR. BURKETT: I would have the same objection.

               MS. KETTLER: Okay.   Do you want to hear that now, your

Honor, or do you want me to go ahead and develop it further?

               THE COURT: You can proceed.

               MS. KETTLER: Okay.

Q      How long have you been working in the field of latent fingerprint analysis?

A      Seven and a half years.

27

Q    Okay.   And have you previously been qualified as an, what is your actual job
     title?

A    Detective Lieutenant State Police Specialist.

Q    Okay.   And you work in the forensic, do they call it forensic services at the
     State Police?

A    Yes.

Q    Okay.   How many times in the past have you been qualified by courts as an
     expert in your particular area of forensic science, latent fingerprint-

                    MR. WHITE: Your Honor, I'm going to restate my objection.   I
thought the people were going to get the widest witnesses here instead of someone
who is a listed witness.   And instead all she's doing is proceeding to treat this
witness like any other and blow right ahead.   I'd like to know why you got a witness
that's not on the First Amendment Witness List here.

                    MS. KETTLER: The fingerprint examiner is not listed by name
on the witness list.   He's listed as a forensic scientist or forensic chemist.   The
officer who did the analysis of the knife father passed away.   That's why this officer
is here.   And if you would have given me the courtesy of getting to that, I would
have.   May I proceed?

                    THE COURT: Well, I don't know what the objection is.   What's
the objection?

                    MR. WHITE: The objection's lack of notice.   We have a
deadline.

                    THE COURT: What do you want me to do?

                    MR. WHITE: Not allow this witness to testify.

                    THE COURT: Overruled.

                                   28

Q    Did Trooper Nowicki prepare a written report of his work on a particular item of
     evidence with regard to the murder of Stephanie McClure?

A    Yes, he did.

Q    Okay.   Now, as I was indicating before I was interrupted, how many times have
     you been qualified by courts as an expert in latent fingerprinting examination?

A    Forty one times.

Q    Okay.   And at this point in time, your Honor, I'm going to ask the Court to
     qualify Lieutenant Morden as an expert in latent fingerprint examination and
     allow him to testify to his expert opinion.

               THE COURT: Any objection?

               MR. WHITE: No objection to him testifying about what he's

done, no.

               MR. BURKETT: My objection is that he's an expert.   I don't

have a problem with it.

               THE COURT: Your objection-

               MR. BURKETT: I don't have a problem, Judge, with him being

an expert.   I do have a problem with him testifying and he's not written a report and

if he's going to read someone else's reports.   That's my objection.

               THE COURT: I don't understand the objection.

               MR. BURKETT: Let me make it real clear.

               THE COURT: Make it real quick.

               MR. BURKETT: Sure.   Let me ask him some questions, then.

Sir, you are-

               MS. KETTLER: Your Honor, may I finish doing my voir dire

before he interrupts?   I'm not finished yet.

                                        29

THE COURT: This is getting most unusual.   Most unusual.

MS. KETTLER: Yes, can I finish?

MR. BURKETT: I thought you passed him to see if I object.

THE COURT: I thought so too.

MS. KETTLER: I'm just asking at this point for him to be qualified as an expert.

THE COURT: That's when you say, or suggest to me at least, that your voir dire is finished.

MS. KETTLER: Okay.   I apologize.   I am going to lay some further foundation about what he did with regard to this evidence.

THE COURT: Go ahead.   Oh, go ahead.

MS. KETTLER: Okay.   I apologize, your Honor.

Q     Did you, I think I already asked you whether you have seen a report authored by Trooper Nowicki about his work on a piece of evidence in this case.

A     Yes.

Q     Okay.   And do you know what that piece of evidence is?

A     The evidence that I initially received on October 11th were eight latent print lifts and a box containing a serrated knife.

Q     Okay.   And you initially received those items at the Northville State Police lab. Is that correct?

A     That is correct.

Q     Okay.   Were some or all of those items also forwarded to the Sterling Heights lab?

A     Yes, all those items were.

Q     And where does Trooper Nowicki, I hope I'm not demoting him.   Is it Sergeant

or Lieutenant Nowicki?   It's Sergeant.   Okay.   Where does he work?

A   Sergeant Nowicki is a latent print examiner at the Sterling Heights laboratory for the Michigan State Police.

Q   Thanks.   And why did you send those items to the Sterling Heights lab to Sergeant Nowicki?

A   At the time I was the only latent print examiner at the Northville laboratory. This was a case that needed to be expedited and they have four examiners there.   And due to the backlog and the time constraints, I forwarded it there for examination.

Q   Okay.   And did Detective Sergeant Nowicki do some work at your direction on those items at the Sterling Heights lab?

A   Yes, he did.

Q   And after he did that work, did you review that work?

A   Yes, I did.

Q   Okay.   And what was the extent of your reviewing that work?

A   I concluded with his findings on the examination and processing of the evidence.

Q   Okay.   And is that a standard procedure that you have at the State Police laboratories to peer review one another's work?

A   Yes, and in all homicide cases the examinations have to be, all the work has to be verified.   The examiner's work has to be verified by another latent print examiner.

Q   Okay.   And you did that in this case with regard to all the pieces of evidence that Detective Sergeant Nowicki worked on?

A   Yes.

31

Q     Okay.

MS. KETTLER: I'm asking that he not only be qualified as an expert, but also be allowed to testify about the work that he peer reviewed that Sergeant Nowicki did.

THE COURT: Any questions?

MR. WHITE: I do have a question.

MR. BURKETT: Do you want him to go first?

THE COURT: Oh, I don't know.   I've lost total control.   I've never seen the witness qualified in this manner before.   Go ahead.

MR. WHITE: I just needed clarification.   When you said you reviewed the work, did you make the same fingerprint comparisons that Sergeant Nowicki did?

MR. MORDEN: Yes, I did.

MR. WHITE: Thank you.   Then, I have no objections to this witness.

MR. BURKETT: Sir, did you write an independent report of this?

MR. MORDEN: No, I did not.

MR. BURKETT: Okay.   And, Sir, did you sign the report here?

MR. MORDEN: No, I did not.

MR. BURKETT: Okay.   You testified that you reviewed it.

MR. MORDEN: Yes.

MR. BURKETT: Who does review mean?

THE COURT: Wait a second.   That sounds like cross exam to me.   I thought you were going to voir dire this witness on the expertise credential?

MR. BURKETT: Well, I thought she also said, and correct me if

32

I'm wrong, that she wanted me to voir dire on whether or not he can use this report.

        THE COURT: I didn't ask you to voir dire on anything.   I asked you if you had any questions.

        MR. BURKETT: No.   She said that.

        THE COURT: Oh, really?   Did I get substituted for?

        MR. BURKETT: Okay.   You don't want me to cross examine him on this report?

        THE COURT: That's correct.

        MR. BURKETT: I've already heard you, but I have no problems with him being called an expert.

        THE COURT: Oh.   Do you have any further questions?

        MR. BURKETT: About his expertise, no.

        THE COURT: Go ahead.

Q    Now, just so we, there may be varying levels of understanding on the juries. So, I want you to give me, if you would please, the most kind of basic laments explanations of how you do your work of examining possible latent fingerprints to start out with; what you receive and what you do to them.

A    Well, in regards to evidence, we look at the evidence to see what type of surface it is and see if there's anything on the surface that can aid us in the development or visualization of any fingerprints that are there.   With regards to latent prints or latent print lifts that are submitted, those are prints that have been developed out in the field by an evidence technician or police officer. And typically they have been done using fingerprint powder and they've been put onto a clear backer or something to preserve that print.   We do the examination of any latent prints that are on those lifts to see if there's enough

characteristics for comparison purposes.   If there's enough characteristics then

we compare them to any known fingerprint impressions.   Those are known, it's

a temprint(ph) card of the person's, intentional recording of their fingerprints for

comparisons.   If we don't have a fingerprint card to compare it to, then we'll try

to identify it through the FBI's automated fingerprint identification system.   If we

get any, say, hits or notifications or people to compare it to we'll take those

impressions that are on file and compare it to our latents.   In regards to

evidence that needs to be processed, again, we look at the type of surface and

if there's any biological fluids on it.   We'll look at first to preserve those to see if

there's any prints or visible prints that we can see.   If we see visible prints we'll

photograph them.   If not, we'll subject them through a series of chemical and

physical methods to develop prints.

Q      Okay.   And once you have that impression that's brought to you, how do you

actually physically examine it to try to find points of comparison?


A      We look at the characteristics that are present in the fingerprint.   We look at

three levels of characteristics.   First, we look at the level one detail.   Level one

detail is the pattern of that fingerprint.   We all have ridge structure on our

fingers, on our palms and on our feet.   And this ridge structure gives us the

ability to grasp or hold things.   It's kind of like tread on a tire holding that tire to

the road.   The ridges have pores on them and the pores secrete perspiration

and coat the ridges.   When we touch something we transfer that perspiration

or we may even have some other matrix on there such as blood, paint, anything

and that is transferred to the surface.   And when it transfers to the surface an

exact replica of that pattern is left behind.   We look first at the ridge structure to

34

see what type of pattern it is.   It can fall into, what we call, one of three

categories; either a whirl pattern, an arch pattern or a loop pattern.   We look at

our latent print, determine what type of pattern it is.   If it's a loop pattern we'll

look then at our known impressions and see if that person has any loops.   If he

does not have any loops and maybe he has all whirls or an arch we can

immediately exclude him as being the person that left that fingerprint behind.

However, if we see a similar pattern we go on to what we call level two detail

where we're looking at specifically the ridge itself and how it flows through the

finger and what it does as it flows through the finger.   A ridge can, as it flows

through from one side of the finger to another, it can separate which is what we

call verification.   There might even be just a ridge dot.   It can also end which

we call ridge ending.   And it can also split and converge back together which

would create an island.   We look for those characteristics in our latent print

and then we look for those same characteristics in our known impression at the

exact same spot.   If there's any deviance or if there's any additional print, one

verses the other, or there's an absence we have to say at that point that that

person did not leave that fingerprint behind.   Then, we can go onto third level

detail where we're actually looking at the ridge shape.   We're looking at

accidental characteristics such as scars or characteristics left behind from

viruses such as warts.   If everything's in agreement we can say at that point

that that person left that fingerprint behind.   The one thing about fingerprints is

they're unique and they're permanent; meaning no two fingers or persons have

the same fingerprint pattern.   So, identification is specifically to a specific finger

from a specific person can be made.

Q      Okay.   In a moment I'm going to ask Detective Toth to give me each of the

items you examined; the knife and the lifts from the car.   But first of all I want to ask you, you talked to the two juries about comparing a known print to a print lift.   What are you actually physically looking at when you're comparing them, just that print that's brought in or is there some procedure to allow you to look at it more closely?

A   We use magnifying glasses to look at it, to magnify it so we can see the detail. In some cases, we may even have to digitally enhance it, blow it up even larger if it is a faint print.   But for the most part, the tools that we use are magnifying glasses.

Q   Okay.   And you talked about how people leave fingerprints behind.   Is every individual just as likely as another to leave a fingerprint behind or does that vary?

A   No, it varies.   A latent print is a chance impression.   We have to have the right environmental factors.   We have to have the right surface factors.   Even the right touch factors and also the person's actual physiological makeup in order for a fingerprint to be left behind for us to develop.   When I talk about environment factors, a fingerprint that is left behind on a surface, it may be a nice, clean, pristine print, however, if it's exposed to the element sunlight, cold, moisture it's going to deteriorate it and there's a less likelihood that we're going to be able to develop it.   Surface conditions are a big factor.   The smoother the surface the more likelihood there's going to be a print that's left behind for us to develop as opposed to something that's very textured.   Also, such as a fiber, clothing.   Clothing's a poor surface.   It's very textured.   It's not smooth. Then again, we also have the person's touch factors.   The longer the person has contact with the surface, the more pressure that's applied, the more

36

likelihood a fingerprint's going to be left behind as opposed to someone just briefly touching an item.   Lastly, the person's own physiological makeup. Some of the processes that we use rely on certain types of chemicals that are in our perspiration.   Some people are higher secreters than others.   And also how the person or what the person may do with their hands.   If they're a contractor, if they work a lot with their hands, if they work a lot with chemicals, they're constantly stripping that perspiration off the surface.   There's going to be less likelihood of something to be left behind to actually develop.

Q   Okay.   And we talked about this briefly.   I want to be very clear on this.   When you say that you reviewed Sergeant Nowicki's work, what did you actually do? Tell them what you actually physically did with the examination regarding these items.

A   I examined the latent print lifts and looked at the prints to see which one's were identifiable.   And then I also looked at which one's he had identified to a person and compared those to the known impressions and came up with the same conclusions.   I also examined the photographs of the evidence that he processed to see if there was anything of value for comparison purposes in regards to fingerprints.

Q   Okay.   And when you say you reviewed the lift to see, I think you used the word usable or if there was a, is that the word you used?

A   Identifiable.

Q   Identifiable.   Okay.   Explain to the juries why you might have a lift that is impossible to make any identification from.   Or what makes it, I'm sorry, what makes a fingerprint usable for you to try to identify it?

A   For a print to be identifiable it needs to have the level one and level two details

37

that I discussed.   It has to have ridge characteristics present and it has to have
some type of detail for comparison to the actual known.   If there's like only one
or two kind of minutia it's really not of value for us for comparison purposes.

Q    Okay.   So, is it accurate to say that when you're looking at a lift and you're
comparing it, well, first of all, when you're looking at a lift and comparing it to
another fingerprint you're trying to look for points of similarity.

A    Uniqueness, yes.

Q    Okay.   And how do you describe those points that you use to compare?

A    We just simply, again, we find a specific minutia or characteristic in our
questioned and we look for that same characteristic or minutia in our known.
And if it's present then we move on to the next characteristic.   And if it's
present, we'll move on to the next.   When all the characteristics come into
agreement we can make an identification.   If there's a difference between the
characteristics either in our questioned or our known, we at that point have to
exclude that person as being the one that left that print behind.

Q    Okay.   And the laboratory where you work, the Michigan State Police
Laboratory, is there a specific number of points of similarity that you have to
have to make a fingerprint identification?

A    No, that used to be the old point system which is no longer used.   We use
what we call ridgeology(ph) now which is what I described to you with the
different levels of detail.

Q    Okay.   And in this case, and that's the standard protocol for the State Police
lab throughout the state?

A    Yes.

Q    Okay.   And using that protocol in your lab, were you able to make an

38

identification of a fingerprint on any of the items that were provided to you?

A    There was two fingerprints.   There was a fingerprint on two lifts that were

      identified to a person.

Q    Okay.   And what about any physical, are lifts taken off the items that are taken

      into evidence or just from the scene?

A    Depends on where the investigators lifted them from.

Q    Okay.   In this case, did you and Sergeant Nowicki make an identification of a

      fingerprint on a specific item of physical evidence that was brought to the lab?

A    Not on anything that was brought onto the lab.   Just on lifts that were brought

      to the lab.

Q    And did you receive a lift from steak knife?

A    No.

Q    Okay.   The lifts that were brought to the lab, where do they come from, or do

      you know that?

A    They came from a vehicle.

Q    Okay.   And were those where the two known prints came from?

A    Yes.

Q    Okay.   And you're looking at the actual lifts that were brought from the scene.

      Is that correct?

A    Yes.

Q    Okay.   And the two lifts that you identified, you and Detective Sergeant

      Nowicki, identified, who'd fingerprints were they?

A    They belonged to the right index and left index of Stephanie McClure.

Q    Okay.   And where did you get her known fingerprints to compare to those lifts.

A    The known prints were on file with the Michigan Criminal Justice Information

                                                39

Network.

Q     Okay.   And the Michigan Criminal Justice Information Network, how do

fingerprints get submitted in there?

A     They're submitted from an arrest and conviction of at least a misdemeanor.

Q     Okay.   And are there other sources of those prints put into that system?

A     No, they're not.

Q     Okay.   And what is AFIS?

A     AFIS is the Automated Fingerprint Information System.   It's a database that's

used to search those print cards that are on file with the Michigan Criminal

Justice Information Network.

Q     Okay.   So, that's the machinery, for lack of a better term, to allow you to

compare your prints to known prints.   Is that correct?

A     Yes.

Q     Okay.   How many of the lifts from the scene were submitted into AFIS for a

match?   How many were sufficient that you could put them in there?

A     One was entered and it was a match.

Q     To Ms. McClure?

A     Yes.

Q     And why was only one entered?

A     The other ones, once we have identification of a person then we'll go through

the lifts or fingerprints we have with the print card we develop and we'll

compare those and once we have the ones we identified, we'll again look again

at the ones we don't have identified.   If there's additional ones for comparison,

we'll put into it.

Q     Okay.   Did you have an additional fingerprints for comparison to submit into

40

AFIS?

A     No.

Q     And are those latent fingerprints retained at one of the Michigan State Police

       labs?

A     Yes.

Q     Where are these particular latent lifts retained?

A     They were retained at the Northville Laboratory.

Q     So, is it accurate to say that of the lifts you received only one of them was in

       suitable quality to put in AFIS?

A     There was two that were suitable quality.   One, of course, produced the

       information that we needed which was also led to the identification of the

       second which was also of suitable quality.

Q     Okay.   But they were both Stephanie McClure's.   Is that correct?

A     Yes.

Q     Okay.   And was any lift taken from the steak knife that was suitable for

       comparison?

A     There was ridge structure that was developed, however, it was not sufficient for

       comparison purposes.

Q     And you talked about surfaces later, or earlier, what was the surface of the

       handle of that steak knife?

A     I believe it was plastic.   I did not exactly examine the knife.   The only thing I

       examined was the photograph of the blade of the knife.

Q     Okay.   And a lift from the knife, correct?

A     Yes.

                    MS. KETTLER: I have nothing further.   Thank you for your time

                                                  41

and thanks for coming in for the Sergeant.

        THE COURT: Any questions?

        MR. BURKETT: Yes.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning, Lieutenant.

A    Good morning.

Q    Lieutenant, you wrote no reports on this case, did you?

A    That is correct.

Q    You signed no reports on this case.   Is that correct, Sir?

A    That is correct.

Q    And if I understood your testimony correctly and feel free to correct me if I'm wrong, you didn't do the initial report because your lab is too busy.

A    We were busy, yes.

Q    Yes.   And the other lab, what lab was that now?

A    Sterling Heights.

Q    The Sterling Heights lab was not that busy so you sent it them?

A    Yes.

Q    Okay.   What, Sir, what is the difference between doing a report, I mean, doing your analysis and reviewing the report?   What's the difference?

A    Basically the only difference is that the evidence has been processed and we're just looking at the evidence over again.   The examiner's reexamining the evidence and coming up with the, seeing if they come up with the same conclusion.

Q    Okay.   I'm sorry.   Is it Sergeant Nowicki?

42

A   Yes.

Q   Okay.   Did Sergeant Nowicki have the knife in Sterling Heights?

A   He processed it at Sterling Heights, yes.

Q   So that means yes, he had the knife?

A   Yes.

Q   When you did your review, Sir, you didn't have the knife.

A   No, I did not.

Q   So, then it's true what you're really depending on is that he did his job correctly?   Isn't that true, Sir?

A   Yes, he's had the same training as I have.

Q   But that does not necessarily mean he did it correctly.

A   We have the same policies and procedures that we have to follow.

Q   But you can't sit here now and tell this jury that he followed those procedures. You don't know that.

A   I have a detailed record of the examination, the processes he used to process the item.

Q   Okay.   In another real sense, you're relying on his report.

A   I'm looking at his report and then I'm seeing if I can come up with the same conclusion as him.

Q   Okay.   Now, there is no evidence that any of these fingerprints were exposed to the element.   Is that correct, Sir?

A   I don't know the history of the fingerprints, no.

Q   Okay.   But that would be something important, wouldn't it?

A   If, like I said, a fingerprint's a chance impression.   If we're able to develop it, great.   There's conditions out there that inhibit us less likelihood.   Yes, these

43

fingerprints could have been exposed to the elements, however, like I said, I don't know if they were or not, but I know that they were developed.

Q   Would he be in a better position to know if any of the fingerprints that you got that were sent to him were exposed to the elements?

A   The knife, he doesn't know any of the history of the knife unless he speaks specifically with the officer that collected it.

Q   Okay.   Did he do that?

A   I don't know.

Q   Okay.   So, in other words, he would be in a better position?

A   Yes.

Q   Thank you, Sir.   Number two, Sir, did you ever speak to the officers that collected it?

A   Not with regards to the evidence, no.

Q   Okay.   If you didn't speak to him about the evidence, what did you speak to him about?

A   I just received the evidence from him and collected it, you know, received it from him at the time it was submitted.

Q   Okay.   Were there fingerprints, Sir, that you received that you could not make a comparison to?

A   Yes.

Q   Okay.   Tell me about those.

A   There was just not enough ridge structure there for comparison purposes.

Q   Okay.   Now, do you use the same criteria as the Federal Government does?

A   I use the criteria, I'm not sure what the Federal Government does.

Q   The point system.

44

A    No, we don't use a point system and I don't believe the FBI uses a point system anymore.

Q    Okay.  Sir, would this be a true statement?  What you have got to depend on when you're doing your fingerprint analysis is that whatever detectives were working the case gave you sufficient things to take fingerprints of?  Is that a true statement?

A    I don't understand your question.

Q    Sure.  You can only take fingerprints of things the detectives working the case give you to take fingerprints of.  Is that correct, Sir?

A    Right.

Q    Okay.  Tell me, Sir, everything that was submitted to you to take a fingerprint of.

A    It would have been the knife and the latent lifts.

Q    When you say the latent lifts.

A    They're the fingerprints that the officers develop on the items that they process in their custody.

Q    Okay.  And what were they, Sir?

A    They were of a vehicle.

Q    Okay.  And how many of those prints did you receive, sir?

A    I received eight of them.

Q    Eight.  And were you able to examine all eight of them, Sir?

A    Yes, I was.

Q    Were you able to match all eight of them, Sir?

A    No, I was not.

Q    How many, and this was Stephanie McClure's vehicle, correct?

45

A    That's correct.

Q    How many of the fingerprints that you received, Sir, that you could not make a match out of?

A    There's was probably, roughly five and some of those were fingerprints and some of them were palm prints.

Q    But you can match palm prints, can't you?

A    Right.   If I have a comparison card to make a comparison to.

Q    You had Stephanie McClure's.

A    I had her fingerprints.   I did not have her palm prints.

Q    Okay.   If you wanted her palm prints, Sir, you could have called Sumpter Police and ask for them.   Did you?

A    No, I did not.

Q    Any particular reason why you did not, Sir?

A    It would have left it up to Sergeant Nowicki to see if there were any prints on file.   There were no palm prints on file for Stephanie McClure.

Q    Okay.   Do you know whether or not the good Sergeant called and said, we got palm prints on the car, let's match them with something.   Do you know whether or not he did that, Sir?

A    No.

Q    Okay.   So, you said that you have approximately five prints that you could not match?   No, I'm sorry.   Let me repeat that.   You have five prints that you did not match.   Is that correct, Sir?

A    I did not.   With the palm prints, I couldn't compare them to anything.

Q    Unless somebody gave you the palm prints.

A    Right.

46

Q     And noone gave you the palm prints.

A     That's correct.

Q     And you never asked for them?

A     No.

Q     What else, Sir, did you receive that you were asked to run fingerprints of?

A     That is it.

Q     That's it.

       MR. BURKETT: That's all I have then.

       THE COURT: Anything else?

       MR. WHITE: A little bit.

       THE COURT: A little bit.   Go ahead.   I'm sorry?

       MR. WHITE: I was joking, your Honor, I said I'm lying.   I have a

lot.

       THE COURT: Oh.   Pardon me?

       MR. WHITE: It will be modestly long.

       THE COURT: Okay.   You can take a twenty minute break.

       (Whereupon the juries left the courtroom)

             *     *     *

       (Whereupon the juries entered the courtroom)

       THE COURT: You can proceed.

       MR. WHITE: Thank you very much, your Honor.

             CROSS EXAMINATION

BY MR. WHITE:

Q     Now, Lieutenant you were forced by circumstances to reevaluate the evidence
      that Sergeant Nowicki had prepared.   Is that correct?

47

A     I wasn't forced, no.   I agreed to do it.   It had been examined also by another
      latent print examiner, Tracy McIntosh also.

Q     Alright.   Now, did you receive the actual latent lifts on the knife?

A     Yes, I was the recipient of those.

Q     And they came from the Sterling Heights lab?

A     No, they were originally submitted to the Northville lab for examination and then
      I transport them over to Sterling Heights and gave them to Sergeant Nowicki for
      processing.

Q     Now, before you sent them to Sterling Heights did you examine them?

A     No, I did not.

Q     Now, after they went to Sterling Heights, did they come back to you?

A     They did come back to the Northville lab.   Yes, they did.

Q     And what was the process for that?

A     I went over to the Sterling Heights lab and retrieved those items personally
      myself and transported them back to the Northville lab.

Q     Alright.   And you said that there were approximately two of the lifts that were
      identifiable.

A     There were two latent prints that were identified and there were eight lifts that
      had identifiable prints on them.

Q     Alright.   Now, the two lifts that were identified, where were those taken from?

A     Those lifts were taken, one was from the driver's door near the handle on the
      outside and the other was from the driver's side, driver's door window.

Q     Alright.   Now, did you examine the prints that had not been identified?

A     Yes, I did.

Q     Did any of them have any characteristics which were inconsistent with the prints

48

of Stephanie McClure?   I'm not asking whether they were identifiable, but were there any inconsistent characteristics of those prints?

A   Yes, there were.

Q   Alright.   But they were not identifiable prints?

A   That's correct.

Q   Now, did you examine the knife blade?

A   I examined the photographs of the knife blade, yes.

Q   Alight.   And was there anything inconsistent with Stephanie McClure's fingerprints on the part of the blade that, the impression that was on blade that you examined?

A   There was ridge structure, but no characteristics for comparison so I couldn't make that conclusion.

Q   So you couldn't conclude one way or the other?

A   That's correct.

Q   Alright.   Now, you indicated that what you look for is similarity.   You also look for dissimilarity in order to show that print is not consistent, correct?

A   Correct.

Q   Alright.   And you indicated that some of the prints you saw were palm prints?

A   That's correct.

Q   But you didn't have a sample of Ms. McClure's prints to compare them to?

A   That's correct.

Q   Did you have samples of either Mr. Benson's or Ms. Bennett's prints to compare to the prints that you had?

A   No.

          MR. WHITE: I don't have anything more.   Thank you.

                              49

THE COURT: Anything else?

MS. KETTLER: No, thank you.

THE COURT: Thank you.   You can step down and you're free

to go.

MS. KETTLER: Oh, I'm sorry.   I did have something.   I knew

there was, but I couldn't remember.   If I could, Judge, just briefly.

REDIRECT EXAMINATION

BY MS. KETTLER:

Q   Lieutenant Morden, I'm going to show you this envelope for demonstrative

purposes at this point.   Can you explain for the jury what this evidence tape on

this envelope means and what's the purpose and whether the items you

examined were sealed like that.

A   This is evidence tape that's been placed on the envelope to show that there's

been no tampering.   The person collecting the evidence or examines it would

then put the tape on, date it and initial it for chain of custody purposes.

Q   Okay.   And were the items you examined sealed with evidence tape?

A   Yes, they were.

MS. KETTLER: Nothing further.

THE COURT: Anything else?

RECROSS EXAMINATION

BY MR. WHITE:

Q   When you get an item it comes from the field with that evidence tape on it,

correct?

A   Yes.

Q   After you process the item what do you do to make sure the integrity of the

50

contents of that container are in tact, for instance, when you sent them to Sterling Heights?

A   When they're opened and after they're examined they're placed back in the container and then another piece of evidence tape is put on there.   The examiner would put their initials and the date that it was sealed.

Q   And so what happens is you get, basically, layers of evidence tape with initials.

A   Not layers.   We put it in different locations.   We do break the seal, but we put the evidence tape, we try to put it in other locations so they can still show the integrity of the previous tape.

Q   Well, you say in another location, does it still seal the envelope so that there cannot be any alteration of the contents of the envelope?

A   Yes.

MR. WHITE: Thank you.   I have nothing further.

THE COURT: You can step down.   Call your next witness.

(whereupon the witness was dismissed at 11:03 a.m.)

JOHN PAUL STEFFES

having been duly sworn on his oath at 11:03 a.m. by the Court was examined and testified as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q   Good morning, Sir.   Would you pull that close to you, please, the microphone?   Would you please state your full name for the record?

A   John Paul David Steffes.

Q   Okay.   And Mr. Steffes, what is your relationship, if any, to Paula Bennett?

A   She's a good friend of mine.   I know her through her sister.

51

Q    And what's her sister's relationship to you?

A    I was in a relationship with her for a little over four years.

Q    Okay.   You were engaged previously?

A    Yes.

Q    Are you now?

A    No.

Q    When did this happen?

A    In January.

Q    Okay.   As of October of 2007, were you still in a relationship with Ms. Bennett, Paula's sister Jessica?

A    Yes, I was.

Q    Okay.   And did there come a time that you became aware that Ms. Bennett had been taken into custody?

A    Yes.

Q    Okay.   And were you aware of where she was living at that point in time?

A    Yes, I was.

Q    And where was that?

A    It was at an apartment complex in Belleville called, I'm drawing a blank on the name now.

Q    Harbor Club?

A    Yes, thank you.

Q    Is it along the I-94 service drive?

A    Yes, it is.

Q    Okay.   Did you and Jessica, did you try to do anything with regard to Ms. Bennett's apartment after she was taken into custody?

52

A     Yes.   We were named her power of attorney so we took charge of cleaning out her apartment because she was being evicted.

Q     Okay.   And she was being evicted just because she wasn't paying the rent because she was locked up?

A     Yeah.

Q     Okay.   And so did you and Jessica go there to Paula's apartment to clean it out and get her things out of there?

A     That's correct.

Q     Is that an apartment you had been to before while Paula was still living there?

A     Yes, I had been there a couple times.

Q     Okay.   And did you know Kyron Benson, the other Defendant?

A     I actually only met him once.   That was a few years ago.

Q     Were you aware of his being in a relationship with Paula?

A     Yes, I was.

Q     Okay.   But did you back then, prior to Ms. Bennett being arrested, did you and your fiancee spend much time with Paula?

A     Yeah.

Q     Okay.   But you never met Mr. Benson but once several years ago?

A     That's correct.

Q     Okay.   When you went to the apartment then can you tell us roughly how long it was after Ms. Bennett was arrested that you went there to clean it out?

A     Seems to me it was roughly a week or so after.

Q     And did you ultimately make a statement to the police regarding what happened when you got there?

A     Yes.

53

Q   Okay.   And did you cooperate with the police?

A   Yes, I did.

Q   And if you looked at your statement that you gave to the police do you think it would refresh your recollection about the day that you went there?

A   Yeah, I'm sure it would.

Q   I'm handing you what seems to be your statement.   Is that your statement that you gave to the police?

A   Yes, it is.

Q   And does that refresh your memory about what day it was that you went to clean out Paula's apartment?

A   Yes, it does.

Q   What date was that?

A   That was 10-18.

Q   Okay.   Had you been contacted by the apartment people to come and do that or did you just go and do it?

A   No, we just took care of it.

Q   Okay.   And when you went there what was the condition that the apartment was in when you first went in there?

A   It was a mess.   There had been, I understand the search team had gone through.

Q   Okay.   And did you then, however, start to pack things up?

A   Yeah.

Q   During the course of your packing and cleaning things up, did you notice something unusual?

A   Yes.

54

Q   Okay.   What first caught your attention?   What did you very first see that
caught your attention?

A   While we were cleaning up garbage at one point and I happened to look up in
an area where some ceiling panels had been removed.

Q   Okay.   And what part of the apartment was that in?

A   There's a short hallway between the master bedroom and the master bathroom
and it's in the ceiling right there.

Q   Okay.   Is that short hallway also a closet area?

A   Yes.   Yes, it is.

Q   Okay.   And you noticed that some ceiling tiles had been removed?

A   Correct.

Q   Did that cause you to take any additional steps to see why that was?

A   No, I figured they were probably looking for something.

Q   Okay.   Well, did you look up there?

A   Yes, I did happen to glance up there.

Q   Okay.   And what did you see up there besides the ceiling tiles out of place.

A   There was a waded up piece of paper towel sitting on the edge of one of the
remaining ceiling panels.

Q   Okay.   When you say remaining ceiling panels, you mean it was still partially in
place?

A   It was in place.

Q   Okay.   And you saw the edge of a paper towel.   Is that right?

A   Correct.   Yes.

Q   I'm going to show you what's been marked as, and show to counsel, what's
been marked as People's exhibit #57.   So, if you could look at that.   Does that

55

appear to be the item that you saw there?

A     Yes, it does.

Q     And did you further examine that piece of paper towel or the contents of it, if
      any?

A     Yeah, well I couldn't quite reach it.   I actually at first just thought it was
      garbage, so I knocked it down on the floor.

Q     How did you knock it down?

A     With a hanger.

Q     Okay.   And when you knocked it down, did you knock the ceiling tile down too?

A     No, I did not.

Q     Okay.   When you knocked the paper towel down what, if anything, did you
      observe?

A     It fell to the ground a lot faster than I expected it to, so it occurred to me that
      there might be something in it.

Q     Okay.   And what did you do at that point?

A     I used the edge of the hanger to then open the wadded up end of it.

Q     Okay.   And what did you see within the paper towel?

A     About five or six, what looked like five or six bullets.

Q     Okay.   Upon seeing that, what action did you take?

A     Well,-

Q     I'll take that back.   If you want to refer to it just let me know.

A     We started to make some phone calls to see what the appropriate thing to do
      with them.   I left them on the floor where they laid.

Q     Exactly where they fell?

A     Exactly where they fell.

Q   Did you touch them at all?

A   No.

Q   Okay.   And you said you started making some phone calls.   Who did you call?

A   We first tried to get a hold of Paula's lawyer.   That didn't work.   So, then we
    contacted our friend Tracy Marzelli(ph) who is an officer with the Pittsfield
    Police Department.

Q   Okay.   Why would you try to call Paula's lawyer before you called the police?

A   He's the first legal expert type of person that popped into my head.

Q   Okay.   After you had a chance to think about it, did it seem appropriate to call
    the police?

A   Well, yes.

Q   Or your friend that was with a police department.

A   Yeah, I figured she could tell me, you know, the real debate was whether or not
    we were supposed to leave them or whether or not we were supposed to bring
    them somewhere.

Q   Alright.   And after conversations with your mutual friend who is a police officer,
    what did you do from there?

A   She said we should obviously call the police.   She was unclear as to whether
    we should call Sumpter Police who were handling the investigation or Belleville
    Police where the apartment was.

Q   Okay.

A   So, she recommended calling the Belleville Police.

Q   Alright.   Did you call Belleville?

A   Yes, I did.

Q   And did they come to the scene?

A    No, they did not.

Q    Did someone else come to the scene?

A    Yes.

Q    Who was that?

A    Someone from the Belleville Police informed me to call Sumpter Police and Sumpter Police sent an officer.

Q    Okay.   They told you to call Sumpter.

A    Yes.

Q    Didn't come out, just said, hey, call Sumpter.

A    Yeah.

Q    Okay.   That's interesting.   I'm going to show you what's been marked as People's exhibit #58.

A    Sure.

Q    Ask you, are those the bullets that were wrapped up in the paper towel that you knocked out of the ceiling tiles with the hanger?

A    They appear to be, yes.

Q    Okay.   And you didn't touch them, correct?

A    No, I did not.

            MS. KETTLER: Okay.   Move for the admission of People's #58.

            MR. BURKETT: No objections.

            MR. WHITE: No objections.

            THE COURT: It's admitted.

            MS. KETTLER: I believe I did. #57 was admitted as well.   Is that correct?

            MR. BURKETT: I don't think so.

MS. KETTLER: Okay.   Move for the admission of #57.

MR. WHITE: No objections.

THE COURT: Any objection from Benson?

MR. BURKETT: No.

THE COURT: It's admitted.

MS. KETTLER: Nothing further.   Thank you, Sir.

THE COURT: Cross exam.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning, Sir.

A    Good morning.

Q    You were engaged or dating the secretary or the sister of Stephanie?

A    No, the sister of Paula.

Q    Oh, sister of Paula.   I got ya.   And you went to clean up Stephanie's apartment.   Is that correct?

A    Paula's apartment.

Q    Paula's apartment.   Okay.   Sorry.   I had that wrong.   And what date did you do that on, Sir?

A    It was October 18th.

Q    And did I hear you say that you had a power of attorney?

A    Yeah.

Q    Did you have it or did Paula's sister have it.

A    Her sister had it.   We were both named on it.

Q    Oh, you were both named on it?

A    Yes.

59

Q     Okay.   And do you know what date it was that you went there?

A     It was 10-18.

Q     10-18.   And what all did you do once you got there?

A     Well, we did a lot of things.   We were cleaning up, packing up some of her

      stuff.   Trying to figure out what was garbage and what wasn't.   Surveying what

      was appropriate to take, we didn't take everything.   We left some furniture.

      We just wanted to get all her clothes and things like that.

Q     Okay.   And these bullets were up in the rafters, I mean, up in the ceiling?

A     Yeah, they were on the edge of a ceiling panel.

Q     Okay.   Now, you stated that the place had been ransacked.

A     Correct.

Q     Okay.   Could you elaborate on what you mean by that?

A     Well, drawers were all pulled open, sort of dumped out.   There was a ceiling

      vent that had been dropped.   A number of ceiling panels, as I mentioned, had

      been removed in the hallway closet area leading to the bathroom.   Things of

      that nature.

Q     Okay.   Where did you find these bullets?

A     They were wrapped in a piece paper towel sitting on the edge of one of the

      ceiling panels.

Q     Okay.   Did that panel appear that it had been moved?

A     That one did not, no.

Q     What about the ones around that panel?

A     Yes, they had been removed.

Q     They had been removed.

A     Yeah.

60

Q    Okay.   Now, when you say the ones around it, could you just kind of like

describe the ceiling panels?   I mean, were they like twelve by twelve blocks?

A    They were rectangular shaped.

Q    About how long?

A    How long?   Like maybe a foot and a half.

Q    Okay.   And what room was this in?

A    It was in the hallway area leading from the master bedroom to the master

bathroom.

Q    Okay.   As best as you can, Sir, the ones that were around it looked like they

had been moved.

A    Yeah, some of them had been completely removed and others had just been

moved.   There were only a hand full altogether.   There weren't that many.

Q    Okay.   There was only that many what?

A    There weren't that many ceiling panels.

Q    Okay.   That had been left or that had been removed or altogether?

A    In total.

Q    Okay.   After the ones had been removed, Sir, how many panels did you see up

there?

A    I think only two.

Q    Two panels.

A    Yeah.

Q    And one of the two panels had the bullets in it?

A    Yeah, sitting on the edge.

MR. BURKETT: I don't have anything further.

CROSS EXAMINATION

61

BY MR. WHITE:

Q   Now, you said that Paula was a friend of yours?

A   Correct.

Q   And she was the sister of your fiancee?

A   That's correct.

Q   And you said you'd only met Kyron once?

A   That's correct.

Q   And how long ago was that?

A   It would have to be well over two years, probably about three years by now.

Q   Okay.   Did you know he and Paula shared an apartment?

A   Yeah.

Q   Alright.   Now, when you saw Kyron the one time, three years ago, he didn't have a firearm on him, did he?

A   No.

Q   Have you ever seen Paula with a firearm?

A   No, never.

Q   Now, the apartment when you went to clean it out had already been searched by the police?

A   That is correct.

Q   And it sounds like they'd emptied all the drawers and moved ceiling tiles and everything that it appeared that they did a fairly thorough job?

A   Yeah.

Q   Alright.   Now, when you spotted this thing of the paper towels, was it in plain site?

A   Yes.

Q     Alright.   And it was just sitting on a ceiling tile.   Now, was this a hung drop
      ceiling?

A     Yeah.

Q     Okay.   So these are panels in a drop ceiling.

A     Yeah.

Q     Okay.   And so was it sitting right on the edge?

A     Yeah.

Q     Okay.   And assuming it was garbage you knocked it on the floor.

A     That's correct.

Q     And then seeing its contents, you said first you tried to call me and then you
      called a friend who is a police officer, correct?

A     That's correct.

Q     And then you called the, indirectly you got a hold of somebody to come over
      and look at the evidence, correct?

A     Yes.

Q     Now, I'm going to show you these cartridges and I'm going to ask you, do those
      look like the cartridges that you saw?

A     They look like them, yeah.

Q     Alright.   Now, you don't see any significant difference in the number or
      appearance of these cartridges?

A     No, I mean, I didn't take a lot of time examining them once I realized what it
      was.

Q     Do you know anything about guns?

A     No.

Q     Alright.   Can you read the head stamp on that cartridge through that piece of

                                    63

plastic?

A    It's got some numbers on it.   It looks like 32A076 or 0.

Q    Could it be 765?

A    No, it doesn't look like it to me.

Q    032A, you said?

A    It says 32AU, oh, 32AUTO is what it says, sorry.

Q    Alright.   32AUTO.   My eyes aren't good enough to see that kind of thing.

Now, the bullets, the part that shoots out, the cartridge is the whole unit there.

A    Okay.

Q    With the primer and the bullet and everything else.   The tip of the cartridge, the

bullet part, is copper colored, right?

A    Yeah.

Q    Alright.   Now, when you got into Paula's apartment, where did you get a key

from?

A    Where did I get a key from?

Q    Yeah.

A    I believe we got it from the apartment office.

Q    Okay.   And so having seen these bullets, you'd never seen any bullets there

before, right?

A    No.

Q    And they were up on top of the ceiling tiles.

A    Correct.

Q    Now, how long had Paula lived in the apartment?

A    I think only about a month or two.

Q    She'd only been there a month.

A     Yeah.   It wasn't very long.   Maybe only a month or two.

          MR. WHITE: Okay.   Thank you.   I don't have anything more for you.

REDIRECT EXAMINATION

BY MS. KETTLER:

Q     Just briefly, was the apartment locked when you got there?

A     No, the door had been busted open.

Q     Okay.   Was it secured however?

A     Yeah.

Q     Okay.   And was the ceiling tiles, were they disturbed or were they missing altogether?

A     One or two of them had been taken down altogether.   A third looked like it had just been slid out of the way.

          MS. KETTLER: Okay.   Thank you.   Nothing further.

RECROSS EXAMINATION

BY MR. BURKETT:

Q     How was the apartment secured?

A     The door was, it was shut, but it wasn't locked very well because it had been busted open.

Q     Okay.   So, you could just push it and it would open?

A     No, I mean, it took some force to get it open and you did have to have a key, but the lock wouldn't turn all the way.   It looked as though they had put a new lock on it, but it didn't line up.   I don't think it lined up well because they didn't fix the door.

          MR. BURKETT: Okay.   Thank you.

65

THE COURT: Mr. White, anything?

MR. WHITE: Nothing more.

THE COURT: Thank you.   You can step down.   Call your next witness.

(whereupon the witness was dismissed at 11:23 a.m.)

ROBERT RAYER

having been duly sworn on his oath at 11:24 a.m. by the Court was examined and testified as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q    Good morning.   Can you please state your full name for the        record?

A    Robert Rayer.   R-A-Y-E-R.

Q    And where are you employed?

A    I'm employed at the Northville Forensic Laboratory   Firearms Identification Unit in the Department of State Police Forensic Science Division.

Q    Okay.   Are you a civilian or a police officer?

A    I am enlisted.   I am a sworn police officer, Detective Sergeant.

Q    Okay.   You said you work in the Firearms Identification Unit.   Is that correct?

A    That is correct.

Q    What special training and education do you have to qualify you to do that work?

A    I've been in Law Enforcement for twenty two years in various SWAT and police activities, as well as, administrative duties.   In 1999 due to my SWAT background and military background, I was chosen to enter the Firearms Identification and Tool Mark Unit and the Bomb Squad.   During that period I was elected to attend the National Bureau of Alcohol and Tobacco and

66

Firearms National Firearms Examiner's Academy.   This academy is the only

academy in existence in the world.   It is an academy dedicated to training

people such as myself to do firearms and tool mark identification work from

forensic laboratories.   This was an in house training academy for

approximately five months with an additional month of training after that.   In

addition to that I had an approximately two year training session with my

department in State Police.   During this time period we attended various

manufacturing facilities that manufacture ammunition and firearms.   In addition

to that I've had extensive training by my professional organization, the Firearms

and Tool Mark Examiner's Association, as well as, other training sessions put

on by the Michigan State Police, Federal Bureau of Investigation, Alcohol,

Tobacco and Firearms.

Q     Okay.   And have you previously been qualified as an expert in Firearms

      Identification and Tool Mark Identification by courts in this state?

A     Several years ago after sixty times in court, I stopped counting.

Q     Okay.   So, the answer is yes, many times.

                    MS. KETTLER: I would ask the Court to qualify Detective

Sergeant Rayer as an expert in firearms and tool mark identification and allow him to

testify to his expert opinion.

                    MR. BURKETT: No objections.

                    MR. WHITE: No objections.

                    THE COURT: He's so qualified.

                    MS. KETTLER: Thank you.

Q     Now, Detective Sergeant I want to ask you first of all before we talk about this

      case, I want to ask you to give the juries a brief overview first of how you can

                                        67

identify fired, well, let me back up.   Explain to the jury various parts of a bullet

and the process through which it's fired, first of all, please.

A     Okay.   We don't have an visual displays here, do we?

Q     I complete bullet?

A     No, an overhead.   I got some demonstratives here.

Q     Oh, no I don't, but we can show that to the jury if you want.

A     Okay.

        MR. BURKETT: Could I take a look at them first?

A     Sure.

        MR. BURKETT: Thank you.

Q     Alright.   These are items that you've brought to help use as demonstrative

evidence.   Is that correct?

A     That's correct.

Q     Alright.   I'm going to, does counsel have any objection to the use of these in

his testimony?

        MR. BURKETT: I have, on behalf of my client, I have none.

        MR. WHITE: I would simply ask that they be marked before they

be published to the jury.

        MS. KETTLER: Alright.   I can do that.

Q     So, these have been used before in another case.   Is that right?

A     Yes, they have.

Q     Okay.   At least one of them.   So, I've marked these with an exhibit sticker with

the date on it 5-14-08 as People's exhibit #60, #61 and #62 and I move for their

admission.

        MR. WHITE: No objection.

MR. BURKETT: No objection.

THE COURT: They're admitted.

Q    And I'm going to give those to you for use in explaining that to the juries if you would please.

A    Alright.  Firearms Identification and Tool Mark Identification is a scientific discipline of Forensic Science.   The main jest of our forensic discipline is try to determine the question is whether a specific bullet or fired cartridge case, can I tilt these things to see a little bit better?

MS. KETTLER: Is it alright if he steps down and shows closer to the jury, your Honor?

THE COURT: Yes.

MS. KETTLER: Keep your voice up nice and loud while you do that.

A    Sure I can do that.

Q    Give these a number when you're referring to them, please.

A    Okay.   This is exhibit #61.

Q    Louder please.

A    Exhibit #61.

Q    Thank you.

A    Okay.  Firearms Identification is the main question is always asked, was it a fired bullet or a fired cartridge case or other ammunition component from a tool or a firearm, is they want to know whether or not it can be identifiable to a particular gun.   That's the jest of firearms identification.   Then, the next thing you have to determine is what is it we're looking for?   In this particular case we're going to show you the ammunition components of what exactly is a

69

cartridge case.   A cartridge case consists of both the carrier or the cartridge case itself, the primer, the powder and also some kind of projectile.   In this particular case it's a hollow point bullet.   Oftentimes at scenes involving firearms, various sections of these are left at scene.   There may or may not be a fired cartridge case left at scene.   There may be a bullet left at the scene. So, then the next question they ask us is what can we do with this evidence that's submitted to us?   As you can see, we have them in a flow chart here. And what we do is, we take these fired bullets or fired cartridge case and then what we do is we classify it or try to determine what it is based on its dimensions, its weights, its characteristics.   If they're sufficient in these qualities of quantity on this evidence then we can try to do a microscopic comparison as to whether or not we can identify it to another firearm, can't identify it to another firearm or there's not enough there for us to do much of anything or insufficient for identification.

Q    Okay.   Thank you.   And in this particular case involving the homicide of Stephanie McClure, did you receive some items that you were asked to examine, items of evidence?

A    Yes, I did.   May I refer to my report?

Q    If that will refresh your recollection.

A    Yes, I did.

Q    Okay.   Tell me what the first items you received were.

A    I received item #11 and #11A which was in envelope marked LS-11 were two soft metallic fragments.

Q    Okay.   Before we talk about those, what were the other items you received to analyze at a later date?

70

A    Okay.  That would be item #F1 and #F2 which were two portions of fired led bullets.

Q    Okay.  I'm going to show you what I've marked as People's exhibit #59 at this point and ask you, is this item actually sealed at this point?

A    Yes, it is.

Q    And do you recognize that as an item that you've had in your custody and examined?

A    I do.  My initials are on the label and also on the seal.

Q    Okay.  I'm going to ask you, if you would please, to go ahead and open that up and take the items inside it out.  Okay.  And those items within that larger sealed bag, did those contain all of the items you examined in connection with this case at the lab?

A    I believe so.  I can see two of the items and the other items are still sealed in this envelope here.

Q    Okay.  Which of those contains the item #11, the first items you got, #11 and #11A?

A    That would be this envelope, the two very small metallic fragments.

Q    Okay.  Would you go ahead and open that up too please and show the jury the content?  Okay.  Now, having opened that, do you recognize that as the items that you examined that were #11 and #11A?

A    Yes, I do.

Q    Okay.  Are those in clear packages or no?

A    It's a very flimsy package. I wouldn't handle it very much. You can see the very small fragments.

Q    Okay.  Yeah, if you could just show both juries the best you can the item there.

71

A    Very small fragments weighing approximately one grain and less than a grain.

Q    Less than a grain?

A    Yes, that's the measurement used in the firearms identification community.

Q    Okay.

A    There's four hundred and fifty grains per ounce.

Q    Okay.   So, it's one four hundred and fiftieth of an ounce, the item you examined.   Is that right?

A    Yes.

Q    Okay.   And there were two items such as that?

A    That's correct.

Q    Okay.   And the other one, that first one that you showed us, is that #11 or #11A?

A    The larger one is #11 and it weighed one grain.

Q    Okay.

A    And #11A, which is the smaller one, weighed point two grains.

Q    So, even less than one four hundred fiftieth of an ounce?

A    Yes.

Q    Okay.   Alright.   So, receiving these, you received these from the crime scene, correct?

A    They came from the crime scene, yes.

Q    Well, they were brought to the lab from the crime scene, correct?

A    That's correct.

Q    Were you at the Northville or Sterling Heights lab?

A    Northville.

Q    Okay.   Tell the jury what efforts, if any, you made to identify, well, this may be

72

obvious and I want you to explain, if you were able to identify what caliber those

are.

A   No, I was not.

Q   Okay.   And why is that?

A   They're too small and there's no really sufficient markings suitable for forensic

purposes on these two small fragments.

Q   Okay.   And when you talk about markings suitable for forensic purposes, what

are those?

A   I could not see any discernable rifling marks or any other tool marks besides

impact or damage marks.

Q   Okay.   But are you even able to tell for certain that they are part of a bullet?

A   No, I cannot.

Q   So, is it accurate to say that the most specific description you can give is that

they are led fragments?

A   Suspected led fragments.

Q   Suspected led fragments.   Alright.   Thank you.   Now, I want to ask you about

the other items you examined, #F1 and #F2.   Were those received by lab from

the crime scene or from somewhere else?

A   I believe these were submitted by Detective Toth from the Sumpter Township

Police Department.

Q   Okay.   And did you make an examination of those items?

A   Yes, I did.

Q   And how is the first, first of all, what is it composed of?   What's it in when you

received it?

A   They were both in sealed envelopes, DPD bullet envelopes.

Q    Okay.   But you didn't receive them from DPD, but they're in DPD bullet envelopes.   Is that right?

A    That's correct.

Q    Alright.   And the first item which you labeled #F1 in your report, how was that specifically marked?

A    That was a tape sealed envelope marked 'head' containing one portion of fired led bullet.

Q    Okay.   And item #F2?

A    One taped sealed envelope marked 'autopsy tray' containing one portion of fired led bullet.

Q    Okay.   Now, did you make an evaluation of the weight of these items?

A    Yes, I did.

Q    Okay.   How big was item #F1?

A    Item #F1 weighed one hundred and nine point two grains.   Item #F2 weighed one hundred and fifty four point eight grains.

Q    So it's still less than an ounce?

A    That is correct.

Q    Okay.   And these items are identified by you as what?   How did you identify them as you have in your report?

A    My report reads as follows: The weight and construction of items #F1 and #F2 suggests they may be thirty eight or three fifty seven caliber fired led bullets. Mutilation prevented further classification other than they display a right twist.

Q    Okay.   And did you give a further opinion about what, continuing on, if they are thirty eights or three fifty seven calibers?

A    Yes, I did.

74

Q   And what was that?

A   If they are thirty eight or three fifty seven caliber fired bullets, they display the same class characteristics as fired arms marketed by Smith and Wesson. However, no suspect firearm should be overlooked.   Due to mutilation they are not suitable for entry into the Intergratablistics(ph) Identification System or Open Shooting File.

Q   Okay.   And did you ask for those items to be resubmitted if some event were to take place?

A   Yes, if a suspect firearm becomes available they should be resubmitted.

Q   Okay.   And so was a weapon ever recovered and submitted to you in this case?

A   No, there was not.

Q   Okay.   And so based on the language of your report, is it accurate to say that you cannot give an expert opinion of the exact caliber of where those bullet fragments came from?

A   No, I cannot nail it down to a specific caliber.

Q   Okay.   You gave two possibilities.   Possibly a thirty eight or a three fifty seven, correct?

A   Yes.   That's based on weight.

Q   Okay.   And is that the only scientific characteristic you're basing that conclusion on, the weight?

A   The weight and also if you take one of the measurements that's on item #F1, the measurements from the rifling, they're unsuitable for microscopic comparison, however, I was able to make a few measurements and I did put them through several calibers and the measurements came out to that suspect

75

list of firearms, a Smith & Wesson.

Q    Okay, so is it accurate to say that if some day the weapon that was used to shoot Stephanie McClure is recovered somehow, you could compare it to these items?

A    I could.

Q    And you may or may not be able to determine whether they were fired from that weapon?

A    That's correct.

Q    Okay.   Now, thank you, you can go ahead and put those back in that envelope if you would, please.   Okay, I'd move for the admission of the entire exhibit 59.

        MR. BURKETT: I have no problem with that.

        MR. WHITE: No objection.

        THE COURT: It's admitted.

        MS. KETTLER: Thank you.

Q    Now I'm going to take that back from you so we don't get confused here.   I'm going to hand you what's previously been admitted as People's exhibit 58.   Were those items submitted to you at the lab for examination?

A    No, they were not.

Q    Okay, and looking at those items, can you see them in the bag or do you want to take one out?

A    They appear to be marked .32 automatic.

Q    Okay, oh, that's another thing I need to ask you.   What is the difference between an automatic and a revolver with regard to ejected casings?

A   A semi-automatic weapon is a firearm that's usually magazine fed.   The magazine goes up into the magazine well.   You rack the slide back.   A cartridge is chambered.   Every time you pull the trigger, a cartridge, a fire cartridge is ejected out.   Another round is placed into the chamber.   Until you stop pulling the trigger or run out of ammunition, it will stop firing.   It often leaves fired cartridge cases at the scene.   Compared to a revolver, which rotates around a cylinder, if you think about the Old Wild West type firearms, a rotating cylinder like John Wayne or Clint Eastwood used in the movies, they often don't leave evidence at the scene unless the person reloads right there on the scene because the cases are contained in that cylinder.

Q   Okay, and so those items there are marked .32 caliber automatic ammunition, is that correct?

A   That's correct.

Q   Now based on what you were, the little you were able to tell about the fragments that you examined at the lab, are those bullets consistent with the fragments that you reviewed at the lab?

A   These particular ones right here appear to be full metal jacket.   The ones that I looked at were all lead construction.   This is a smaller diameter bullet than the ones that were submitted.   Without actually having to pull the cartridge case apart, that would be just my visual observation only, not a scientific basis.

Q   Okay, so are they, looking at them, are they consistent with the fragments that

77

you've looked at already?

A    The outward appearance, no.

Q    Okay, and what about the weight?   Does the weight tell you anything about whether those unfired bullets are consistent with the fragments you evaluated at the lab?

A    Without pulling one of these bullets and knowing the specific weight of this bullet, typically .32 caliber bullets are less weight than the ones that were submitted as item F1 and F2.

Q    Okay.   Okay, thank you, nothing further.

THE COURT: Cross exam.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning Sergeant.

A    Good morning, sir.

Q    Is it fair to say that you and I have met before?

A    Yes, we have.

Q    Many times?

A    Many times.

Q    Sir, just a few questions in terms of how you did your particular work.   The L11 and the L, I'm sorry, what's marked L11 and LSA, I'm sorry, L, I can't read my writing here.   The metal, metallic fragments, that's what I'm referring to.

A    11 and 11A?

Q    Okay, I left my glasses at home today for some reason.   Okay, I want to ask you about those first.

A    Alright.

78

Q   Explain to me one more time exactly what that is.

A   All I can tell you what they are is they're suspected lead fragments.   That's the only thing I can tell you.

Q   That were fired from a gun?

A   Cannot tell.

Q   You cannot tell that?

A   No sir.

Q   Okay.   The F1 and F2 -

A   Yes sir.

Q   Tell me about those.

A   The only thing that I can tell you is an approximate caliber based on the weight.  They do display very little to no rifling marks suitable for comparison for microscopically comparing them to another firearm or inter-comparing them to each other.   They were extremely damaged.

Q   Is there any doubt that at one point they were bullets?

A   They display markings consistent with, at least F2, well, correction, no, F1 and F2, they both exhibited at least one or two of these rifling marks from a barrel. So they are consistent with projectiles being fired from a rifle barrel.

Q   Okay, now exactly when did you receive F1 and F2?

A   It was received at the front desk counter on October 11th at 1:04 p.m.

Q   Okay, when you say, that's at the state police headquarters in Northville?

A   That's correct.

Q   Okay, and you got it shortly thereafter?

A   Yes sir.

Q   Okay, after you did your examination, how long did it take you?

79

A    That I can't tell you, sir.

Q    Approximately?

A    Probably about a day.

Q    Okay, so then I'm going to conclude it was a thorough examination?

A    Yes sir.

Q    Okay, after you did that examination, you made some determinations based on your expert opinion, is that correct, sir?

A    Yes sir.

Q    And the determination that you made based on your expertise was this came from either a .38 or a .357?

A    It suggests.

Q    Yes.   Based on your expert opinion?

A    Yes sir.

Q    And that opinion has not changed, correct?

A    No sir.

Q    I'm sorry, that opinion has not changed, correct?

A    That's correct.

Q    Okay, now, may I see the exhibits that you have on -

        MS. KETTLER: Yes.

Q    I'm going to ask you a little bit about this, sir.   The cartridges, that's what I want to talk to you about, the bullets.

A    The bullets, okay.

Q    Now, you, those are the ones that you examined, correct?

A    That's correct, sir.

Q    Now, those are from, you concluded, was a .32?   No, I'm sorry, those were the

80

ones we talked about?

A    That's correct.

Q    The other bullets that you looked at a few minutes ago -

A    Yes sir.

Q    You said those are from a .32?

A    .32 automatic caliber, yes sir.

Q    Now you state that when a .32 automatic fires bullets, it ejects something out of it?

A    If it's a semi-automatic, that's correct.

Q    Okay, were you given anything to examine, any empty cartridges that a .32 would have ejected at the scene?   Were you given anything like that?

A    No sir, I was not.

Q    Those shells that you examined earlier, sir, were you ever given those shells before?   The bullets?   The .32's?

A    These right here?

Q    Yes.

A    I don't recall if I actually just looked at them briefly at the desk or if I talked with the OIC about them.

Q    Okay, what is the very first time that you saw them?

A    Like I said, because I didn't author a report, I may have briefly looked at them within the month, I believe it was, or I either talked.   I didn't author a report because it was just a question asked of me.   It wasn't a report authored or anything.

Q    Okay, do you recall when that question was asked of you, sir?

A    No, I do not.

81

Q   Okay, no one asked you to examine those bullets, did they?

A   No.

Q   Okay.   Based on your expertise, is there any way a .38 or a .357 could fire those bullets?

A   If you have a sub-caliber adapter on it and you have a single shot, you could, yes sir.

Q   Okay.   Now, is it true, sir, that when you fire a bullet from a .38, .357 or any kind of gun that it generally leaves a spray, I mean the powder comes out of it, the gun powder?

A   Gunshot residue?

Q   Okay, yes.

A   Yes sir.

Q   Okay, and generally based on things that you've testified on your expertise, when it leaves that powder, where does it go?

A   It goes into the air.

Q   Okay, would you expect to find it on someone's clothes?

A   It depends.

Q   Okay, you've testified in Court many times, though, haven't you, that the powder generally goes on someone's clothes?

A   No sir, it goes in the air.   Whether it deposits on that person's clothes depends on the atomospheric conditions, the way that the gun deposits these debris.

Q   Okay, what about a person's hands?   Would it go on their hands, the person that fired the gun assuming they didn't have on gloves and things?

A   It may or may not.

Q   Okay, you have testified in Court before, though, haven't you, sir, that gunshot,

82

the person that fired a gunshot, their hands were subjected and you could see whether they had recently fired a gun, correct?

A   It is possible.   It don't, Michigan State Police doesn't do that test so I couldn't have testified to that fact.   I could say that guns do deposit gunshot residues which may be left on your hand.

Q   Okay, what kind of testing would you call that?

A   What -

Q   Where you're checking the person's hands.

A   You're talking about gunshot residue test?

Q   Yes.

A   Yes sir, we do not do that at the Michigan State Police.

Q   Is that called paraffin test?

A   It could be.

Q   Okay, do you know if other police departments in the area do that?

A   Some do.

Q   Okay, sir, were you ever given any clothes to examine to see whether or not there was any gunshot residue on anyone's clothes?

A   No sir, I was not.

Q   Are you sure about that, sir?

A   Yes sir.

Q   Okay.   That's all I have.

                    THE COURT: Mr. White.

                    MR. WHITE: Thank you.

                    CROSS EXAMINATION

BY MR. WHITE:

83

Q    Now the only exhibits you received and were able to test were four fragments, correct?

A    Two suspected fragments and two suspected fired lead bullets.

Q    The first two fragments, you cannot even tell us were fired, were bullets, were fired by a gun or even that they're made of lead, correct?

A    That's correct, sir.

Q    Okay, so what we're really talking about is F1 and F2, the two identifiable bullets, correct?

A    I'm not exactly sure what you mean by identifiable.

Q    Well alright, things that you identified as being fired bullets?

A    Yes sir.

Q    Alright.   Now F1 weighed 109.2 grams, correct?

A    Yes sir.

Q    And F2 weighed 154.8 grams?

A    That's correct.

Q    Now, the weight of those, these are lead bullets, they're not copper-jacketed bullets?

A    That's correct.

Q    And did you find some partial rifling on the side of both of those bullets?

A    Yes sir, I did.

Q    Alright, now if there had been a copper jacket on either of those bullets, the rifling would have been on the copper jacket and not on the lead core, correct?

A    Typically, yes.

Q    Now the way you ascertained that these are .38, .357 range bullets, you said, is by weight?

84

A    Yes sir.

Q    Were you able to determine the diameter of the bullet by any other measurement?

A    Yes sir, I was.

Q    And what was the conclusion you came to as far as the diameter?   Did you have part of the base of the bullet?

A    Yes sir, I did.

Q    And what was your conclusion from that?

A    F1 was .32 inches.   F2 was .376 inches.   The length on F1 was .779 inches. The length on F2 was .731 inches.

Q    So you're saying that, you assumed that the diameter of F1 was .38 inches?

A    Yes sir.

Q    Now isn't it true that a .357 or a .38 is actually somewhere between .355 and .357 inches?

A    3,.357, yes sir.

Q    Okay, so you determined the diameter of these, at least one of these bullets to be somewhat larger than the diameter of a .38 caliber bullet, correct?

A    Yes sir.

Q    And the rifling you were able to identify was right hand twist rifling, correct?

A    That's correct.

Q    Now as far as I know, wouldn't, isn't the only firearm that uses a left hand twist a Colt?

A    No sir.

Q    Are the vast majority of left hand twist firearms Colts?

A    Very many of them are, yes sir.

85

Q    Now you've indicated you thought this might be from a Smith & Wesson revolver?

A    Yes sir.

Q    Now a Smith & Wesson revolver has a five lan in groove right hand twist, correct?

A    Some do, some do not.

Q    Can you give us an example of a Smith & Wesson revolver that does not have a five right twist?

A    I don't have a database with me, just off my hand, off the top of my head -

Q    The vast majority of Smith & Wesson revolvers are five right, isn't that correct?

A    I can't go that far as to say that.   I can say that there are Smith & Wessons with a right hand twist.

Q    Have you ever examined a Smith & Wesson with anything other than a five right twist in your own experience?

A    I don't recall off the top of my head, no sir.

Q    Alright, now were you able to ascertain that these bullets had a five right twist?

A    No sir.

Q    So what you could really say is that they are .38 caliber bullets with a right hand twist, correct?

A    That is correct, sir.

Q    There's no way to tie them to a Smith & Wesson or any other revolver with a right hand twist, correct?

A    That is correct, sir.

Q    Alright, now the .32 automatic bullets that were presented to you -

A    Yes sir.

86

Q   Today, those are full metal case bullets, right?

A   They appear to be.

Q   Alright, and the standard weight of a .32 caliber bullet is 71 grains, is that not correct?

A   In .32 auto, they vary from 55 grains to 73 grains.

Q   Alright, so a bullet that weighed 109 grains or 154 grains is too large to have come from a .32 auto, correct?

A   Yes sir, unless in a special occasion where they hand loaded them.

Q   Alright, now you also indicated when asked by Mr. Burkett if you could fire a .32 automatic bullet from a revolver that was a .38 caliber revolver, and you indicated that you could basically line the chamber so that it would be centered in the chambers so the firing pin could strike, correct?

A   Theoretically it is possible, yes sir.

Q   Now if you fired a bullet under those circumstances, it would not engage the rifling in the barrel, would it?

A   Not fully, no sir.

Q   Alright, so there would be no indication of lans or grooves on the bullet, correct?

A   There may or may not be.

Q   And the reason you say there may not be is because it would be so undersized that it would have a tendency to yaw within the barrel of the firearm, correct?

A   Exactly, it would wobble down the barrel.

Q   And so it might hit here or there but it wouldn't grasp the lans and grooves and achieve rotation from them, correct?

A   It probably would not achieve full rotation or full lan engagement, yes sir.

87

Q      Now, in this particular case, you were not presented with a cartridge, a fire

       cartridge cases, correct?

A      No sir.

Q      And you were not presented with any bullets that were identifiable as bullets

       under 73 grains, correct?

A      That's correct.

Q      And you were not presented with any full metal jacket bullets, correct?

A      Not for examination purposes, no sir.

Q      Well I'm saying for examination from the scene?

A      From the scene?

Q      From the crime scene from the autopsy?

A      Not that I'm aware of.   I don't always know where all the evidence comes from.

Q      Now the bullets, the .32 caliber bullets, cartridges that you examined, do you

       have the .32 ammunition up there?

A      Yes sir, I do.

Q      Now those cases are not new cases, are they?   They've got a bit of wear and

       tarnish on them?

A      I can't make that determination without examining them, sir.

Q      Right, have you ever examined them?

A      Not in a laboratory setting, no sir.

Q      Do you know if those were ever processed for fingerprints?

A      No sir, I do not.

Q      Now a brass cartridge case, if you put your finger on it will sometimes,

       depending on whether you excrete or not, or your salt, will sometimes leave a

       fingerprint on a brass cartridge case, correct?

                                        88

A    You would have to ask a fingerprint examiner.    That's not my area of expertise, sir.

Q    Have you ever seen a cartridge case with a fingerprint on it?

A    Yes sir, I have.

Q    Alright, but these were not processed for fingerprints?

A    I have no knowledge of that, sir.

Q    Alright, so to your knowledge you don't have -

A    That's correct, sir.

Q    Thank you, I don't have anything more.

        MS. KETTLER: Nothing further.

        THE COURT: Thank you, you can step down.    Call your next witness.

        (Whereupon the witness was excused at 12:03 p.m.)

A    Am I excused as a witness?

        THE COURT: You're free to go.

## GUY NUTTER

having been duly sworn on his oath at 12:04 p.m. was examined and testified as follows:

### DIRECT EXAMINATION

BY MS. KETTLER:

Q    Good afternoon.

A    Good afternoon.

Q    Would you please state your full name for the record?

A    Guy Nutter.

Q    Okay, and where are you employed?

A    The Michigan State Police.

Q    And in what capacity?

A    I'm a trace evidence examiner in the Trace Evidence Unit.

Q    Okay, are you a civilian or a police officer?

A    Civilian.

Q    Okay, tell the juries, please, the two juries here what your educational
     qualifications are that qualify you to do the work that you do and give an expert
     opinion on trace evidence?

A    I have a bachelor's degree in chemistry from Central Michigan University.   I
     also did an internship with the Michigan State Police in the Trace Evidence Unit
     while I was at Central.   After graduation, I was hired in by the state police and
     received two years, roughly two years of training under a senior examiner
     analyzing trace evidence and being trained in it.   And I've also traveled all over
     the country and have been trained in several different areas within trace
     evidence by experts from around the country.

Q    Okay, and have you previously been qualified by various courts as an expert in
     trace evidence?

A    Yes, I have.

Q    I'd ask the Court to qualify him as such.

                    MR. BURKETT: I have no problem.

                    MR. WHITE: No problem.

                    THE COURT: He's qualified.

                    MS. KETTLER: Thank you.

Q    I want to ask you some questions, first of all, did you work with Ms. Doring (ph)
     at the crime scene in assisting and processing the crime?

                                      90

A      Yes.

Q      Okay, and were there specific aspects of that that you handled in particular

       yourself because of your area of expertise?

A      Yes.

Q      Okay, and what areas were those?

A      Footwear and tire impressions and other trace evidence.

Q      Okay.   During the course of processing the scene, did you attempt to collect

       samples that would allow you to compare against various kinds of footwear?

A      Yes.

Q      Okay, and how do you collect the samples for that purpose?

A      Question footwear impressions at crime scenes, I first photograph them and

       then if they're three dimensional impressions, like in dirt, snow or mud, I'll take

       dental stone casts of those impressions as well.

Q      And dental stone casts, is that kind of the stuff they put in your mouth when

       they're making a form for a fake tooth to fit in?

A      Yes.

Q      That type of, okay.   In this particular case, did you take both photographs and

       dental stone casts?

A      Yes.

Q      Okay.   How many, tell the jury if you would please, how many suspected

       footwear impressions you collected samples of?

A      May I refer to my notes?

Q      If they'll refresh your recollection.

A      Twelve.

Q      Okay, and let's just talk about this right off the bat and we'll go deeper later.

91

Were you able to match any of those to any footwear provided to you as a known sample?

A   No, I was not.

Q   Okay.   And did you also collect samples of suspected tire tracks?

A   No, there were not tire tracks that I collected at the scene.

Q   Okay.   I'm going to hand you some photographs, first of all, did you take a photograph of each and every suspected footwear impression individually with an evidence marker?

A   Yes.

Q   Did you take multiple pictures of each marked possible footwear tread?

A   Yes.

Q   Okay, I'm not going to put all of these in but I want to show you some of these photographs.   First of all, I'm going to show you, one moment please, I'm going to show you, and the footwear are using letters rather than numbers, is that right?

A   Yes.

Q   Alright, I'm going to hand you three first, that I'm going to get a sticker for later but I've written an exhibit number on the back, 63, 64 and 65.   I'm going to ask you, do you recognize those as photographs you took at the scene of suspected footwear impressions?

A   Yes.

Q   Okay, and now I'm going to hand you, these were marked at different times so the numbers are different, 46, 48, 43, 45, 42 and 44 and ask you if you recognize those as photographs of footwear impressions or suspected footwear impressions you took at the scene?

92

A    Yes.

Q    Okay.   And lastly, I'm going to give you 66-69, are those also photographs of

each individual, I'm sorry, I did the wrong thing.   Here we go, 66-69, are these

also photographs of the individual footwear impressions you took at the scene?

A    Yes, they are.

Q    Okay, and do those photographs by looking at the letters on those evidence

markers, do those indicate to you that those exhibits I've just given to you

include a photograph of each of the individual photographs you took, each

evidence marker?

A    Yes.

Q    Okay, and they start with what letter and end with what letter?

A    A through L.

Q    Okay, thank you.   I would move for the admission of the photographs I've just

had the witness identify.

              MR. BURKETT: No problem.

              MR. WHITE: No objection.

              THE COURT: Admitted.

Q    Now can you tell the jury, first of all, a little bit about the science of how you go

about attempting to compare a footwear sample impression to an actual

example of footwear?

A    Yes, I take the photographs that I took at the scene and enlarge them to one to

one or life size so they're an actual representation like the size they would be if

I had them in real life.   If I have casts, I'll use the casts as well.   I'll take any

known shoes that are submitted to me which would be shoes that are going to

be then compared to those questioned impressions, make known impressions

93

from those shoes, make clear overlays from those known impressions and use the shoes, the known overlay, or the clear overlay and the known impression to then compare to that questioned impression or those questioned impressions. I'll compare first just the overall tread design which is just the makeup of the bottom of the shoe, what that tread design looks like.   If that is similar between the questioned impression known, then I will look at the size to make sure that the size is the same.   And if those are all the same, then I'll go on to look for accidental or unique characteristics to try and positively identify that shoe to that impression.   And those would be things like cuts and scratches and stones that get stuck in the bottom of the shoe from wearing them on a daily basis.

Q   Okay, and did you receive from the, well, you work in the Northville Lab?

A   Yes.

Q   Did you receive or did the lab receive from the Sumpter Township Police Department, no, it would be from Ms. Doring, actual, let me start over.   Let me rephrase that.   Did you receive some actual pieces of footwear to compare to these photographs?

A   Yes, I did.

Q   Okay, tell the juries what each of those individual pieces of footwear were and how you labeled them as far as item numbers?

A   Item one was a pair of all white, U.S. size 10, Nikki Airforce One hightop shoes. Item two was one pair of white, black and red, size U.S. 9.5 or 9 1/2 Nikki Allstar 2006 Up Tempo hightop athletic shoes.   Item three, one pair of black and white, size U.S.A. 9 1/2 Reebok Classic low top athletic shoes.

Q   Okay, and those items of footwear, is it accurate to say that you don't know where they come from, you're just the scientist?

94

A    Sometimes the bags will have markings on where they're from but I just receive them and do a comparison.

Q    Okay.   And so you indicated you were unable to make any matches of the footwear you were provided with the impressions from the scene, correct?

A    Correct.

Q    And the impressions, did you make any determination of the impressions that you got from the scene, how many of those were from the same shoes?

A    I did not but it could be done.

Q    Okay, would it take some time?

A    Yes.

Q    Okay, did you, what about the dental stone cast, did that cause you any, did they give you any additional assistance in identifying any shoes?

A    No.

Q    Okay, but you did try to compare those to the shoes you received as well?

A    Yes.

Q    Okay, and the impressions that you took from the scene, where did you gather those from?   Were they within the perimeter or both within or without the perimeter of the crime scene?

A    They were both within and without.

Q    Okay, how far away from the crime scene did you go, can you estimate what the furthest away impression was that you took?

A    At the scene, yeah, it was approximately, I would say maybe seventy five feet.

Q    Okay, and this is a trailer park that these are taken from, correct?

A    Yes.

Q    How many other trailers are, what would you say the closest trailer to the one

95

where, the Utah Court address, how far away roughly?

A    I -

Q    If you recall.   If you don't, that's fine.

A    Yeah, I don't recall exactly how far.   I know there was a vacant lot on one side of the trailer.   I'm not sure if there was a trailer on the other side or not.

Q    Okay.   But you do recall that you went as far as about seventy five feet out to take an impression, is that correct?

A    I found some impressions about seventy five but I went further than that looking.

Q    Okay, so how far out did you go looking?

A    To the next street over from Utah.

Q    Okay.   But the furthest out that you found were seventy five feet, correct?

A    Roughly.

Q    Did you examine any fibers from the scene?

A    Yes, I did.

Q    Okay, are these known fibers taken from the crime scene inside the trailer?

A    Yes.

Q    Okay, and did you, what did you compare those items to, if anything?

A    I compared them to any question fibers that I found on those civilian shoes.

Q    Okay, and when we're talking about the fibers you had from the trailer, can you give the juries just like an estimated understanding of how big the known samples are that you used?

A    The known samples are just a small cutting from the carpet so I have a representative sample of fibers from the carpet that was at the crime scene.

Q    Okay, were you able to retrieve any fibers suitable for comparison from the

96

footwear that was submitted to you?

A   Yes.

Q   Okay, and how many fibers did you take from the various pieces of footwear? If you could go through and describe with regard to each piece of footwear, how many fibers you got from each.

A   May I refer to my notes?

Q   If that will refresh your recollection.

A   Thank you.   I found one question pink fiber from the Reebok shoes, a question black fiber from the Reebok shoes and a beige fiber from the Nike Air Force One's.

Q   Okay, so when you call them question fibers, does that mean they're fibers you want to compare to the known samples?

A   Yes, they're fibers that I don't know where they came from so I refer to them as question fibers and then I compare those to the known.

Q   Okay and were you able to make any matches of the question fibers to the known?

A   No, I was not.

Q   Okay.   And in your experience, these shoes, obviously because you found some, they sometimes contain fibers, is that right?

A   Yes.

Q   And the fibers that you found on the footwear submitted, were they on the tread or other parts of the shoes?

A   I remove it usually from the bottom of the shoe.

Q   And in your experience, is it possible to say with any specificity how long fibers would stay in the treads of a shoe?

97

A    No, there's not.

Q    Okay, what various factors would affect how long it might stay?

A    It would have to do with time frame, how long between the time the person was in that area getting those carpet fibers on their shoes to the time those shoes were collected.   It would have to do with environmental factors, whether they were walking through water, whether they were walking on pavement and things like that.   Also sometimes the fibers get stuck in the actual tread, in the cuts in the bottom of the tread, sometimes they get stuck to gum or other adhesive type materials that may be on the bottom of the shoe.   So all those factors are going to play into how long they're going to persist on there.

Q    Okay, so you found no fibers on any of those shoes matching the inside of the trailer, is that right?

A    Yes.

Q    All the fiber, and this may be obvious but I just want the record to be clear, all the known fiber samples that you collected are from inside?

A    Yes.

Q    So none, you can't say that none of the shoes walked outside?   Well you can't say whether they walked inside or outside really, can you?

A    Correct.

Q    You can just say there's not a fiber from inside the trailer on the shoes?

A    Yes.

Q    Is it accurate to say that you didn't take any known samples of anything like dirt or grass or whatever outside the trailer to compare to the shoes?

A    Correct.

Q    Okay, is that, would that be scientifically possible?

A   Sometimes it is if, you could do a soil comparison if it was deemed necessary.

Q   Okay, would you deem that necessary or likely to produce meaningful scientific evidence in this case?

A   I can say that I don't normally collect any soil samples.   The casts that I take at the crime scene will usually have soil stuck to them and that can be used as a sample for comparison.

Q   Okay.   I want to, one second.   I'm going to ask you some questions about gunshot residue tests.   Are you familiar with that technique that used to be used?

A   I'm familiar with the technique but I'm not an expert in the field.

Q   Okay, but as a trace evidence, you work in Trace Evidence, correct?

A   Yes.

Q   And is gunshot residue considered trace evidence?

A   It is.

Q   Okay, and are you familiar as a scientist with various tests that are done to seek to capture gunshot residue that's left after a weapon is fired?

A   Yes.

Q   And is there such a thing as a paraffin test?

A   I'm -

Q   Are you -

A   I'm not familiar with a paraffin test.

Q   Okay.   Are you familiar with, what other types of tests for gunshot residue are you familiar with?

A   There's two.   Atomic absorption is an older technique that was used and then also scanning electron microscopes are used as well to look for that.

Q    And that's actually taking a sample that's lifted off a person's hands or clothes, is that right?

A    Yes.

Q    Does the Michigan State Police, first of all do you, in Trace Evidence, do you have a standard protocol throughout the Michigan State Police Laboratory system?

A    Yes.

Q    And do you, trace scientist, trace evidence scientists in the Michigan State Lab system use gunshot residue tests any more?

A    No, we do not.

Q    Why is that?

A    Well we don't have the instrumentation or equipment to do it and it's just not cost beneficial.

Q    More importantly, is there an aspect of the science on that that affects your decision of, or this lab's decision of whether or not to use it?

MR. WHITE: I'm going to object at this point.   He said that he is not an expert.   He can testify as to what their police is but as to the scientific basis for it, he's clearly said he's not an expert.

THE COURT: Overruled.

Q    What is it in the science that you're aware of that has caused it to fall from favor from being used?

A    From my training and experience, it's that if two people are within a similar area and a gunshot or a gun is fired, the person firing the gun will have gunshot residue on them but also the person that's near them or in the same area will also have gunshot residue on them.

100

Q     What about squad cars, would you expect them to have -

        THE COURT: Well counsel, that's a little far afield.

Q     Okay, does that cause contamination where there's a potential to get gunshot residue from a different place than the gun?

A     Yes.

Q     Do you know of any police agencies that still use gunshot residue testing?

A     Yes.

Q     And are there very many?

A     I wouldn't want to try and quantify.   You know the only lab in Michigan that does it I'm aware of and then I know some private labs that also do it.

Q     And what's the only police lab in Michigan that still does it?

A     Detroit.

Q     And that's the lab that you're doing a lot of their work now because a portion of that lab was closed?

        MR. BURKETT: Your Honor, I'm objecting to that.

        THE COURT: Sustained.

        MS. KETTLER: Withdrawn.   I have nothing further.

        THE COURT: Thank you.   Ladies and gentlemen, I'll excuse you.   We'll continue with the trial tomorrow morning.   Be here at nine o'clock.   Do not discuss the case.

        (Whereupon the juries were excused)

        (On the record without the jury)

        THE COURT: Verdict forms, we'll need verdict forms as to Mr. Benson and Ms. Bennett.   And then any lists of special instructions that either, any lawyer is requesting.   I just need the list unless the instruction itself is not in the

standard instructions.

        MS. KETTLER: Thank you your Honor.

        THE COURT: Nine o'clock.

        MS. KETTLER: Can I just inquire, will the Court permit me, just for planning purposes, to do two entirely separate closings?

        THE COURT: Absolutely.   It is required.

        MS. KETTLER: Okay, thank you.

        (Matter concluded)

STATE OF MICHIGAN )

COUNTY OF WAYNE    )

    I, Jeffrey B. Goldsmith, Official Court Reporter for the Third Judicial Circuit of Michigan, do hereby certify that I reported the foregoing proceedings before the Honorable

MICHAEL J. CALLAHAN, Circuit Judge on May 14, 2008; that the foregoing 122 pages constitute a true and correct transcript of the proceedings so held.

_____
Official Court Reporter
CSMR-0037