STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF
MICHIGAN,

    Plaintiff,

-v-        Case No. 07-024733-01 &
            07-024733-02

KYRON DARELL BENSON and
PAULA RENAI BENNETT,

    Defendants.
           /

JURY TRIAL
VOLUME VII

    Proceedings had before the

Honorable MICHAEL J. CALLAHAN, Judge of the Third Judicial

Circuit of Michigan, 703 Frank Murphy Hall of Justice,

Detroit, Michigan 48226, on May 15, 2008.

APPEARANCES:

       MS. MOLLY KETTLER
       Assistant Prosecuting Attorney

        On behalf of the Plaintiff

       MR. RAYMOND BURKETT
       Attorney at Law

        On behalf of Def. Benson

       MR. WALTER A. WHITE
       Attorney at Law

        On behalf of Def. Bennett

       Jeffrey B. Goldsmith
       Official Court Reporter
       CSMR-0037

<u>INDEX</u>

<u>WITNESS</u>                                                          <u>PAGE</u>

   GUY NUTTER
     Cross Examination by Mr. Burkett                        3
     Cross Examination by White                             21

   PHILIP JABLONSKI
     Direct Examination by Ms. Kettler                     30
     Cross Examination by Mr. Burkett                      42
     Cross Examination by Mr. White                        52
     Redirect Examination by Ms. Kettler                   55
     Recross Examination by Mr. Burkett                    59

   ERIC LUKE
     Direct Examination by Ms. Kettler                     62
     Cross Examination by Mr. Burkett                      69
     Cross Examination by Mr. White                        78

   CHRISTOPHER MCGLYNN
     Direct Examination by Ms. Kettler                     83
     Cross Examination by Mr. Burkett                      92
     Cross Examination by Mr. White                       103

   RITA MERRY
     Direct Examination by Ms. Kettler                    108
     Cross Examination by Mr. White                       116

   SUSAN DUFRESNE
     Direct Examination by Ms. Kettler                    119
     Cross Examination by Mr. Burkett                     127

| <u>EXHIBITS</u> | <u>MARKED</u> | <u>ADMITTED</u> |
| --- | --- | --- |
| Plaintiff's #38 | Prev. | 32 |
| Plaintiff's #56 | Prev. | 33 |
| Plaintiff's #39 | Prev. | 68 |
| Plaintiff's #41 | Prev. | 89 |

2

May 15, 2008

Detroit,                Michigan

P R O C E E D I N G S

\*        \*        \*

THE COURT:   The People of the State of Michigan versus Kyron Benson and Paul Bennett.   The jurors are present and properly seated and cross examination of Mr. Nutter.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning Mr. Nutter.

A    Good morning.

Q    Mr. Nutter, I don't think you and I have ever met.   My name is Raymond Burkett and I represent the Defendant here.

A    Okay.

Q    Mr. Nutter, I'm going to ask you some questions about the testimony that you gave yesterday.   Now it's my understanding that your job title is called what?

A    I'm a forensic scientist in the Trace Evidence Unit.

Q    Okay, and you went to the scene along with the other scientists, is that correct?

A    Yes.

Q    And do you recall, sir, what time it was you got there?

A    I'd have to refer to my report to figure that out.

Q    Okay, but it was somewhere around five or six o'clock in the morning, that's close enough?

3

A    Roughly, yes.

Q    Okay, now once you got to the scene, sir, you understand that you were investigating a murder case, is that correct sir?

A    Yes.

Q    And one of your purposes was, if at all possible, to help the Sumpter Police Department, sir, try to find the identity of the person who did the murder, is that correct sir?

A    That's one of our jobs, yes.

Q    Okay.   I think everyone knows, I just want to make sure, yesterday you mentioned several times about trace evidence.  Do you recall that sir?

A    Yes.

Q    Would you just explain to us what trace evidence is?

A    Yeah, trace evidence, it encompasses a lot of different types of evidence.  I look at fire debris from arson cases, glass analysis, paint analysis, fiber analysis, explosive residues, footwear and tire impressions, physical or fracture matches, lab examinations from vehicles and also any miscellaneous unknowns that we may have to do, or I may have to do a chemical analysis or some type of comparative analysis on.

Q    Thank you sir.   Sir, yesterday you testified that you collected twelve impressions.   Do you recall that sir?

A    Yes.

Q    What are impressions?

A    They're footwear impressions in this particular case.   And

4

footwear impressions are just impressions left by a shoe stepping into a substance. In this case, it was kind of a gravely dirt, most of it along a curb. There was also a couple of impressions that were off a little ways away in some mud or dirt. But footwear impressions can also be two dimensional on hard surfaces, floors and things like that as well.

Q   Okay, and you collected twelve of these?

A   Yes.

Q   Okay. And you took the ones that you collected, you took them back to the Northville State Police Post, is that correct sir?

A   Yes.

Q   And the Northville is where you work out of, is that true, sir?

A   Yes.

Q   Now when you get to the scene, sir, were you the lead, for lack of a better term, CSI investigator or –

A   Yes, I was.

Q   Okay, you decided what to collect?

A   Yes.

Q   Okay, and no detective or anyone told you what to collect, correct?

A   No.

Q   After you reviewed the same, you decided the important things that you thought would help find the person who committed this crime, is that true, sir?

A    Yes.

Q    Okay, now prior to your getting to the scene, sir, the scene
     was preserved, is that correct, sir?

A    As far as I know it was, yes.

Q    Okay.  And by preserved, we mean it was taped off?

A    The subject house, the police department is in charge of making
     sure that's secure, yes.

Q    Yeah, but was the area taped off?

A    I believe it was, yes.

Q    You don't recall?

A    I would assume that it was and if I looked at my pictures,
     I might be able to see that it was.

Q    Okay, and when you started your investigation, since it's not
     in your report, I assume you assume that the area had not been
     contaminated?

A    Yes.

Q    Yes, it was not contaminated?

A    To my knowledge, it wasn't.   Sometimes with the initial
     officers that respond, they may leave footwear impressions
     behind and things like that.   But as far as contamination,
     it was protected by the police department, yes.

Q    Sir, yesterday you told us that you authorized the collection
     of carpet samples?

A    I didn't testify to that yesterday.

Q    Oh I'm sorry, let me put it this way.   Did you authorize the

6

collection of carpet samples?

A    Yes.

Q    Okay, and the purpose that you wanted these carpet samples was for what?

A    I collect, when I go to any crime scene, I collect known carpet fibers because if a perpetrator is to walk into that scene and there is carpet, there's a potential for those carpet fibers, some of them to get stuck on the bottom of their shoes and then I could use that, if I find them on the shoes and put that suspect at the crime scene.

Q    Okay, the prosecutor said, asked you yesterday and you agreed with her that you don't always find samples on the bottom of shoes, is that correct?

A    Correct.

Q    But a lot of times you do?

A    I wouldn't say a lot of the time.

Q    But you do find them?

A    But I have found them before, yes.

Q    Okay, and you were able to match someone to those, is that correct sir?

A    Yes.

Q    Alright, now if I understand your report correctly, sir, you had ten carpet samples?

A    Can I refer to make sure?

Q    At any time, sir.

8

A   Yes, there were ten.

Q   And you had three pairs of tennis shoes?

A   Yes.

Q   And now you also, sir, I think yesterday said that you did find certain fibers in these tennis shoes?

A   I did find some potential carpet fibers on the bottom of the shoes.

Q   Okay, now before I get to this, sir, is it true according to your report that the, well, all this is considered trace evidence, correct?

A   Yes.

Q   Okay, all the trace evidence according to your report belong to Kyron Benson and Paula Bennett, is that correct, sir?

A   As far as I know the shoes belong to them.

Q   Okay, well you have the suspects, and the only suspects that you have on your report is Kyron Benson and Paula Bennett?

A   Yes.

Q   Okay.  Now sir, when you made an attempt to match the fibers, tell us what you did?

A   I collected those question fibers off the bottom of the shoes and then did a microscopic comparison to the known carpet fibers from the crime scene.

Q   Okay, and as far as you are concerned, sir, carpet samples were taken from every room in the house?

A   Yes.

9

Q    Including a rug that was near or on the front porch, is that correct, sir?

A    I'd have to refer –

Q    Please do.

A    I don't believe there's anything, did you say outside the trailer?

Q    No, I said a rug that was either near the front door or on the front porch, yes.

A    Yes.

Q    Okay, now, and you took those samples?

A    Actually forensic scientist Doreen (ph) took those samples.

Q    Okay, you did not try to match any fabrics to the shoes?

A    I, what fabrics are you referring to?

Q    From the carpet samples to the three pair of tennis shoes that you found.

A    Every known carpet sample that I, was collected was looked at and compared to any of those question fibers from the shoes.

Q    Okay, I assume then the carpet samples were taken from the rug?

A    Yes.

Q    And it was compared to the shoes?

A    Yes.

Q    Nothing that you had tied these Defendants, as it relates to the samples you took, to that crime, is that correct, sir?

A    None of the carpet fibers in question, carpet fibers from

10

the shoes were similar to any of the carpets at the crime scene.

Q   Thank you, sir.  Mr. Nutter, I'd like to talk to you for a minute, sir, about the foot impressions that you took. Yesterday, sir, you told us that you took twelve samples, is that correct, sir?

A   Yes.

Q   Okay, twelve samples of what?

A   Of question footwear impressions.

Q   Okay, could you tell us just a little bit more of what footwear impressions are, sir?

A   They're impressions that are left at a scene by somebody either stepping in dirt, snow or something that's going to leave an impression behind or else potentially just residue from the bottom of their shoe can be left behind and then be footwear impressions as well.

Q   Well those foot impressions matched with the tennis shoes that you had?

A   No, none of the submitted known shoes were similar to any of the question impressions at the scene.

Q   Well I guess, I probably didn't state that artfully enough. You did, correct me if I'm wrong, try to match those shoes with those impressions?

A   I compared the known shoes that were submitted to me to those question impressions.

Q   Okay sir.  Yesterday you said that you collected eight stone

11

impressions.  Do you recall that, sir?

A    Yes, dental stone, yes.

Q    Okay, would you be kind enough to tell us what eight stone impressions are?

A    They're just dental stone casts so if I have a three dimensional question impression that's in dirt or anything or there's depth to it, not only will I usually photograph those but I will cast them with dental stone which is mixed up and it's a liquid and then pour it into the impression and then after about thirty minutes, it sets up and becomes almost like a stone, very hard and rigid.  Then I can remove that and use that and it's kind of like being able to take that question impression with me back to the laboratory back for comparison and it represents, it's a true and accurate representation of that impression that was at the scene.

Q    Sir, did you take any foot impressions of any kind from the front porch?

A    No, I did not.

Q    Okay, sir, you did not collect any soil samples, did you?

A    No, I did not.

Q    Okay, is soil samples something that you would generally collect?

A    No.

Q    Why not?

A    I personally don't do soil analysis.   And it's just not

12

something that we commonly do.  When I do take a dental stone cast, soil is stuck to that cast which I can, if need be, I can then take that soil from the cast and do a comparison to any soil that would be in the suspect's shoe.

Q   Okay, was there any soil in the cast that you made?

A   Yes.

Q   Okay, was there any soil in the Defendant's shoes?

A   I honestly don't, I do not remember.

Q   Okay, be that as it may, you didn't try to match the soil, though, with the shoes, correct?

A   Because there's no, the tread design of the shoes is completely different than the question impressions, there's no reason for me to do any type of soil comparison.

Q   Okay, so the answer to my question is no, you did not do that?

A   No.

Q   Okay.  And the decision not to do soil testing as you said, that was a decision that you personally made?

A   Yes.

Q   Okay.  Now during this time, sir, that you're examining these things, you were in, were you in constant contact with the Sumpter Police?

A   No.

Q   Okay, did you ever contact them while you were looking through the evidence that you had?

A   I may have.

13

Q    Okay, but as you sit here now, you don't recall that?

A    I believe I did call in at least at one point to talk about some shoes, some footwear.

Q    Okay, what did you want to know about the shoes?

A    I was just making sure that they were, there weren't any other shoes that they wanted to submit for comparison.

Q    Okay, would it be fair to say, and the reason you wanted to know this, because the shoes that you had, there was no comparisons?

A    There was a comparison done but they were dissimilar to the question impressions.

Q    Okay, yesterday, sir, some of your terminology is why I'm asking because I don't quite understand, yesterday, sir, you talked about three debris lifts.  Am I pronouncing that correctly?

A    Yes.

Q    Okay.  First of all, can you tell us what debris lift is?

A    I'm not, I'm not quite sure what you're talking about.  Is it in the report?

Q    It's in your report, sir.

A    Can you point out where it is in the report?

Q    Okay, and while she's looking for it, do you know what

              MS. KETTLER: Which report is that, please?

              MR. BURKETT: Oh, I'm sorry.

Q    Okay, let me repeat my question.  According to your report, sir, you took debris and tape lifts, correct?

14

A   Yes, from the shoes.

Q   Okay, now could you just tell us what that is?

A   Yeah, when I'm examining the shoes, I will examine them over paper so that anything that falls off of those shoes then falls onto the paper and I can collect that debris off of there. So that would be the debris that I'm referring to, anything that falls off the shoe.  I also kind of brush the shoe off and allow debris to fall off of it onto that paper.  And then after I'm done with that, I'll actually take tape lifts.  Tape lifts are just some clear tape.  I make a tape loop around my hand and just tape the bottom of the shoe and around the outside edges of the shoe to collect any other trace debris that may not have fallen off onto that tape and then I can do a comparison with anything I find on the tape lifts and also the debris.

Q   Thank you, I appreciate you explaining that to me.  Sir, you also took six tape lifts from the victim and two post-it notes. What is that?

A   The tape lifts, I take the tape lifts from any of the victims that I encounter at crime scenes because if there's any contact between the suspect and the victim, I'm hoping to find a fiber transferred between them.  And I also will take post-it note lifts from their hands to try and collect any trace evidence that may be on their hands as well.

Q   That post-it thing, what was that one more time?

15

A    It's just, like a common yellow post-it note.  I just peel
     it off and use the adhesive portion of it to actually, you
     know, pull stuff off of their hands.

Q    Sir, you took the clothes that the deceased were wearing,
     correct?

A    I did receive them, yes.

Q    Okay, when I say you took them, I'm using took and receive
     interchangeably.

A    Okay.

Q    You received them?

A    Yes.

Q    Sir, was there any powder burns or anything like that on the
     clothes?

A    Not to my recollection.

Q    Okay, but that was something that you would sure want to check,
     correct?

A    I wasn't necessarily looking for that, no.

Q    You don't want to see if the person, would that have told you
     how close the person may have been when they fired the shots?

A    That's not something that I do in trace evidence.

Q    Okay, so would it be fair to say then although you received
     the clothes, you did nothing with them?

A    I, with these particular clothes, I did not do anything other
     than just the, give them a quick lookover.

Q    Okay, and when you were giving them a quick lookover, sir,

16

why were you looking them over?

A   I was just looking to see if there was anything, trace evidence-wise or anything of interest that I may want to collect.

Q   Okay.  Sir, the footprints that you took, especially the ones that were cast, were these footprints, were they in mud or what?

A   The ones that were on the body were in kind of a gravely sand almost that was along the curb of Utah Court Road, between that and the sidewalk.  And then there were two additional that I took from kind of a muddy, dirty area in the vacant lot next to the trailer.

Q   Okay, let me, I want to discuss this briefly.  The ones that you took that were in the muddy lot next to, near the trailer, sir, you took those casts?

A   I don't believe I cast those impressions.  I think I just photographed them.

Q   Okay, you didn't bring any of those casts that you took to Court, did you?

A   The prosecutor may have some here.

Q   Okay, but according to your report, you said you were going to leave them at the post in Northville.

A   Is that a question?

Q   Yeah, you did not leave them at the post?

A   No, when I'm finished with my analysis, they're stored in an

17

evidence vault and the submitting agency comes and picks those up and then they're in charge, or they're in custody in those particular items.

Q   Do you know if they were ever picked up?

A   I would assume they were.

Q   So you really don't know?

A   No, I don't.

Q   Okay, now sir, would the ones that you took that were obtained in the mud area, sir, could that in any way help you to determine the weight of the individual?

A   No.

Q   Okay, it wouldn't be that if it was in mud, if it were down so far, you could say this person weighed two hundred pounds or three hundred?  It wouldn't help you at all?

A   No.

Q   Okay.  Sir, the other thing that I want to talk to you about, sir, is the gun powder residue that you testified to yesterday.  You gave us, yesterday, certain opinions that you had as it relates to gun powder residue.  Do you recall that, sir?

A   Yes, I do.

Q   And I think one of the examples that you gave us, sir, was that if, I think the prosecutor asked you, and if I got it backwards, that one of the reasons you don't like to do it because if a person fired a weapon at another person, it's possible that gun powder residue would be on two people,

18

correct?

A   Correct.

Q   And because of that, sir, that's one of the reasons that you don't like to use it?

A   Yes.

Q   Okay, if there were two people and one of them were shot, then that means the other one would have, could have had a residue on it.  Was that what you meant?

A   I, in that scenario, if they were close enough, I would expect both of them to possibly have, or it's possible for neither of them to have any gunshot residue.

Q   Right, I understand that.  Okay.  Did you also yesterday to one of the prosecutor's question is that another reason that you don't do it because, I think I quoted it, it was not cost beneficial?

A   Well that's one of the factors that we take into account when I'm advising an agency, because we don't do it, we usually give them some private laboratories that do it and it can be an expensive thing to do.  And so if I were to tell them about my opinion about, you know, if they were both in the same room, there's a potential for both of them to have it on them or neither of them.  And if it doesn't warrant them making that expense, then they may not want to go that route.

Q   Okay, when you talked, did you talk to the agencies in this case about this, if you recall?

19

A    I honestly do not recall if I did or not.

Q    Okay sir, you know that the city of Detroit does this, correct?

A    Yes.

Q    Do you know, sir, whether you told them whether or not they should go and ask the city of Detroit to make this determination?

A    I don't recall.

Q    Okay.  Sir, you said that the state police at one point did do these types of tests, is that correct, sir?

A    They may have before I worked there but I honestly do not know if they did before I started working there but in the time that I've been working there, they have never done it.

Q    Okay.  And how long have you been working there, sir?

A    A little over nine years.

Q    Sir, forget about the gunpowder test that we were talking about before, the state police, though, they do have some mechanism, do they not, to tell whether or not a person had fired a weapon, don't they?

A    I couldn't answer that.  You'd have to ask a firearm's examiner that.

Q    Okay, but for a person who collects trace evidence, you've never had the opportunity to look at a person or test a person whether or not they fired a weapon in the nine years you've been a trace evidence expert?

A    I personally have not.

20

Q   Sir, in the past, have you ever, first of all, in the past, have you ever referred your lab work out to another department like Detroit?

A   Yes, I have.

Q   And when you generally do that, is it because you're too busy or what?

A   No, this was, I thought you were speaking of gunshot residue.

Q   Yes, okay, the gunshot residue?

A   I recall probably two or three times referring an agency to contact Detroit Police Department to see if they would possibly do it for them.

Q   Okay.  Would this be a true statement, sir, with the examples that you've taken, the carpet examples, footwear, everything that you've taken thus far, sir, you did nothing, you found nothing that could connect these two people to that scene, is that true, sir?

A   That's true.

Q   Thank you very much.

              THE COURT: Mr. White.

              MR. WHITE: Thank you.

                CROSS EXAMINATION

BY MR. WHITE:

Q   Now Mr. Nutter, when you came to the scene, it was to investigate a -

              MS. KETTLER: I can't hear counsel.

21

MR. WHITE: I'm sorry your Honor, it takes me a little while to warm up in the morning.

Q   Mr. Nutter, when you –

THE COURT: And I'm sure, pardon me?  I'm sorry, did you say something additionally?

MR. WHITE: No, I just started in on the question with a proper tone of voice.

THE COURT: Go ahead.

MR. WHITE: Thank you.

Q   Excuse me Mr. Nutter.  When you came to the scene, you knew it was a homicide investigation, right?

A   Yes.

Q   In fact, there was still a body of someone lying there by the side of the road, correct?

A   Yes.

Q   And this was out at the curb between, or the curb and an automobile?

THE COURT: Counsel, we're going over stuff that's just been gone over and over.

MR. WHITE: Your Honor, I would ask for broad latitude in cross examination.  I am going to tie it in very quickly, though, and I –

THE COURT: Very quickly.

MR. WHITE: Thank you.

Q   Now you did, you obtained fibers from inside the house, correct?

A    Yes.

Q    And none of those matched anything, correct?

A    None of them matched any of the question fibers from the suspect's shoes.

Q    Now did it appear to you that the homicide may have taken place outside?

A    If I were to make an educated guess, I would expect that it occurred outside.

Q    Alright, and Mr. Burkett asked you about gathering up stone samples, earth samples, did you gather up any grass samples?

A    No.

Q    These are things, though, that can become lodged in shoes, correct?

A    Grass could become lodged in shoes, yes.

Q    Or perhaps stains even could end up on the bottom of a shoe, correct?

A    Yes.

Q    Now when you examined the scene, you took, what was it eight or nine casts, dental casts?

A    I believe it was eight.

Q    Alright, eight dental casts. Now the purpose of taking those, you didn't have samples to compare them to right there at the scene, did you?

A    I actually did have some photographs of some shoes of potential suspects that I did have at the scene.

23

Q   So when you went to that scene at five o'clock in the morning, you already had shoes from potential suspects to compare them to?

A   I didn't have them immediately but I did have them at some point during the crime, during the processing of the crime scene.

Q   Before you left the crime scene?

A   Yes.

Q   Alright, and did you make your determination that there was no match at that point?

A   Yes.

Q   Alright, yet you still preserved the samples, the dental casts, correct?

A   Yes.

Q   And would it be correct to state that the reason you did that was so that even if the samples you'd been shown that had been brought to the scene didn't match up, you could still compare future shoes from a potential perpetrator, correct?

A   Correct.

Q   Alright, so did you examine the castings you took later on at the laboratory at some other point?

A   Yes.

Q   Alright, did you ascertain what types of shoes they were from?

A   No, I did not.

Q   Did you ascertain what size shoes they were from?

24

A    No.

Q    Well assuming that the shoes that you had been provided with did not match, didn't you feel that it might be of value to the police officers to know that the shoes that were at the scene that they should be looking for might be, for instance, a Reebok in size eleven?

A    If the agency submitting the evidence requests that, then I will do search for them, yes.

Q    Alright, so you never received a request from the agency to know what any of the other footprints that you recovered and did casts from the scene?

A    No.

Q    Alright, and on your own you would not have evaluated who, what size shoes they were or where they were made or anything like that?

A    You can't determine a size by just looking at a question impression so I don't do that in any case but there are cases where I will do a search of the overall tread design to see if I can determine the make and manufacture of the shoe.

Q    Alright, but not in this case?

A    No.

Q    And because the agency did not request it?

A    Correct.

Q    Now if the agency had requested it, would you be able to ascertain the manufacture of some of the shoes?

A    Maybe.

Q    Alright, did you eliminate the boots of the police officers on the scene as a possible source of those impressions?

A    I don't believe I did in this particular case.

Q    You don't remember whether you did or not?

A    No, I do not.

Q    Alright, now -

A    Sir, I made a mistake with that last statement, if I could -

Q    Oh, by all means.

A    I did have photographs of the bottom of the shoes of a few of the detectives and officers that were at the scene but not everyone so I did use some of those for elimination purposes.

Q    Alright, now operate, this area you went into was taped off, correct?

A    I believe it was.

Q    And so you're operating under the assumption that the police have properly contained it and prevented contamination, correct?

A    Yes.

Q    Did you do a comparison between the shoes or flip flops, whatever they were, of the victim to any of the impressions on the ground?

A    I would do that at the crime scene.

Q    Did you do so?

A     Yes.

Q     And did they match any of the impressions?

A     No.

Q     Alright.   Now, you said you received the clothing of the deceased?

A     Yes.

Q     And did you do an examination of the clothing of the deceased?

A     I believe I looked at them under light.

Q     Were there bullet holes in any of the clothing?

A     I honestly do not recall.

Q     So you don't recall whether there were even bullet holes in the clothing you looked at?

A     Correct.

Q     And you said you weren't looking for powder residue, did you notice any discoloration on the clothing?

A     The powder residue wouldn't cause any discoloration so that wasn't something that I was looking for.

Q     Alright, and now that's not something that you would evaluate anyway, whether or not there were components of gun powder or primers or anything on the clothing, right, that's not your –

A     Correct.

Q     Job to evaluate.   So when you were done examining the clothing, I gather you just did a basic examination of it?

A     Yes.

27

Q   And when you were done with that, who did you then send the clothing to for further testing?

A   I believe I just stored them in our vault to be returned to the agency.

Q   So no one else as far as you know did any further testing on it?

A   No, I believe, I have to refer to my notes.

Q   Feel free.

A   I believe I got the clothing for a forensic scientist from our laboratory who had already previously examined them but I don't have my chain of custody with this so I can't say that for sure.

Q   Do you remember the name of that scientist?

A   Forensic scientist Dorry (ph).

Q   Dorry?   And you then put the clothes when you were done examining them in the evidence locker?

A   Yes.

Q   Alright, now Mr. Burkett asked you whether you can tell someone's weight by the depth of an impression, is that correct?

A   Yes, he did.

Q   And you told him you could not.   Could you tell, for instance, from the impressions you saw whether someone was walking or running, for instance, whether the impression was on the ball of their foot or the heal?

A   I suppose it's possible to at least make a guess of that but

28

that's not something that I would ever do.

Q   Is it outside your area of expertise?

A   No, it's just not important whether they were running or walking to me.

Q   Alright, so that's information that we don't have here today, whether somebody was walking or running?

A   No.

Q   Okay, and I mean you could have made an estimation but you chose not to, you didn't think it was relevant?

A   I don't believe I even thought about it when I was looking at the impressions.

Q   Alright, now did you have an opportunity to measure length of stride in any of these footprints?

A   No, there weren't any impressions that were like a continuation, somebody walking or running so I did not do anything like that.

Q   Alright, so now I'm going to show you something with numbers on them.   What?

THE COURT: Excuse me, I hate to interrupt anybody's need for a discussion.   What's going on?

MR. WHITE: Alright, Mr. Burkett has given me three folders, perhaps he can deal with them on recross if he'd like to do that.   I'm –

Q   So you, just to recapitulate –

THE COURT: No sir, we're not going to recapitulate

here.  If you have specific questions, ask him.  We've been over
and over this.  Now go on.

Q   You did not make any positive identification of fiber
    materials, correct?

A   Correct.

Q   You do not recall whether there were any bullet holes in the
    clothing, correct?

A   Correct.

Q   You did not identify any of the shoe prints at the scene of
    the crime, correct?

A   Correct.

Q   You did not tie any fiber or footprint evidence to either one
    of the Defendants, correct?

A   Correct.

Q   You did not ascertain whether the one footprint in the yard
    was someone who was running or walking, correct?

A   Correct.

Q   And you were aware that this was a murder case, correct?

A   Correct.

Q   Nothing further.

              THE COURT: Anything else?

              MS. KETTLER: No, I have nothing further.

              THE COURT: Thank you, you can step down.  Call your
next witness.  You're free to go.

              (Whereupon the witness was excused at 9:56 a.m.)

                              30

PHILIP JABLONSKI

having been duly sworn on his oath at 9:57 a.m. was examined and testified as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

MS. KETTLER: I'm going to show him those exhibits. Would you like to look at them?

Q    Good morning Officer, would you please state your full name for the record?

A    Philip Jablonski.

Q    And where are you employed?

A    Sumpter Township Police Department.

Q    And how long have you been employed there?

A    About two and a half years.

Q    Okay, how long have you been a policeman total?

A    About thirty three.

Q    Before you were employed at Sumpter, where were you employed prior to that?

A    I was a sergeant for the Wayne County Sheriffs Department.

Q    Okay, and how long did you work there?

A    For twenty eight years.

Q    Okay, Officer Jablonski, I want to ask you first of all about whether or not you went to the scene of the homicide of Stephanie McClure on October 6, 2007 on Utah Court?

A    Yes, I did.

31

Q   Okay, can you tell me when you arrived at that scene roughly what time it was?

A   It was around 2:30.

Q   Okay, in the morning?

A   In the morning.

Q   And when you arrived, were you the first officer there or were there other officers there already?

A   I was the first one on the scene.

Q   Okay, and did you arrive there with another officer or alone?

A   At the time I was by myself.   Officer Toth was also responding.

Q   Okay.   And so when you arrived there, did you have the opportunity when you worked with the Sheriffs Department to be dispatched to homicide scenes?

A   A few times, yes.

Q   Okay, and so when you arrived at this scene, was it obvious to you whether or not Stephanie was dead?

A   Yes.

Q   Okay, it was obvious that she was?

A   Yes.

Q   So you immediately knew it was a homicide scene, is that correct?

A   Yes.

Q   Alright, tell me, first of all, I'm going to show you a photograph that's been marked as People's 38 and it's been shown to both counsel.   Is that the position Stephanie McClure

32

was in when you immediately arrived?

A    Yes.

Q    Move for the admission of People's 38.

       MR. WHITE: No objection.

       THE COURT: It's admitted.

Q    And those items that are depicted in there, a flip flop and

    some keys and a steak knife in the far left corner, were those

    items all in those particular locations when you arrived?

A    Yes.

Q    Okay, thank you.  And I'm going to show you what's been marked

    as People's 56.  I'm going to ask you to go ahead and open

    that up.  Well first of all, did you, you personally observed

    the steak knife and that it was collected at the scene?

A    Yeah, I imagine it was collected at the scene by the –

Q    Okay, I'd ask you to open that up.  Okay, is that the knife

    that was at the scene that you observed?

A    It appears to be.  It's the same type.

Q    Move for the admission of People's 56.

       MR. WHITE: May I voir dire briefly on the exhibit,

your Honor?

       THE COURT: Oh sure.

       MR. WHITE: Thank you your Honor.

BY MR. WHITE:

Q    Now, you've identified the knife.  Is there some way –

A    I'm saying it appears to be the same one.  I did not collect

it or mark it myself.

Q    Alright, so at this point you simply can tell us that it's similar to the knife that you'd seen?

A    Yes.

MR. WHITE: Your Honor, I'm not going to have an objection at this point.  I believe it goes to the weight of the evidence.

THE COURT: It's admitted.

MS. KETTLER: Thank you.

Q    Is there a Sumpter Police Department evidence tag on this or sticker?

A    It says submission from the Sumpter Police Department, yes.

Q    Actually it's a state police sticker that says a submission from Sumpter, is that correct?

A    Right, yes it is.

Q    Is there also evidence tape sealing it prior to your opening it?

A    From the Michigan State Police Lab, yes.

Q    Okay, thank you.  What is it once you insure that the young lady is in fact deceased, what's the first thing you want to do there at that scene?

A    Well at that time, I just, we did not know if the perpetrator or shooter was still there.  The house, the lights that were on in the trailer, the tv playing, the door open.

Q    Could you hear the tv playing without going in?

34

A   Yes.

Q   And that's because the door was open?

A   Yes.

Q   Okay, so what do you do making those observations?

A   Well we took up defense positions and when Officer Luke (ph), Corporal Luke arrived he and I entered the residence to secure and look for any other victims.

Q   Okay and when you went into that trailer, did you observe any blood anywhere in the trailer?

A   No.

Q   Were there any additional victims?

A   No.

Q   Was there any living person in the trailer?

A   No.

Q   Did it seem to be ransacked in any way?

A   No.

Q   Okay, so once you determine that immediate area is secure, what do you do then at that point?

A   Protect the scene.

Q   Okay, and what do you do to protect or preserve the scene?

A   Keep everybody out.

Q   Okay, and is there something you use to cordon off the area?

A   Police tape.

Q   Okay, and did you and other officers do that at the scene?

A   Yes, we did.

35

Q   Okay, so at this point you're, is it correct that you're there, you have a deceased young lady at the very beginnings of a homicide investigation?

A   Yes.

Q   What's the first step you took to try to get some kind of lead to pursue in this case?

A   When I notified dispatch of what I had found, ran the plate on the vehicle that was, that Stephanie was laying next to.

Q   Okay.

A   And it came back to her.  It also showed there was a PPO with her former boyfriend.

Q   And what was that person's name, if you recall?

A   I don't recall, no.

Q   Would referring to your report refresh your recollection?

A   Yes.

Q   I'm showing him his report.

A   Timothy Allen Walker.

Q   Okay, and then do you, after you get that information, do you take steps with regard to that to try to locate him?

A   Yes, I had dispatch put out a BOL for him and his vehicle.

Q   And what's BOL for the jury.

A   Be on the lookout.

Q   Okay.  And after that's accomplished, do you remain at the scene?

A   Yes, for a little while.

36

Q   And do you and Corporal Luke, do you keep it under your observation until Corporal Luke arrives?

A   Yes.

Q   Okay, and he assisted you with looking into the residence, is that correct?

A   Yes.

Q   Okay, from the scene then were you dispatched to another location?

A   Yes.

Q   And do you recall that address without referring to your report?

A   No.

Q   What was that, would your report refresh your recollection?

A   Right, 10800 Buchanan, Van Buren Township.

Q   And what was your reason for going there?

A   Van Buren Township had taken Mr. Walker and his half brother –

Q   Into custody?

A   Into custody, yes.

Q   Okay, was there a, can you tell me about how long you stayed at this homicide scene before you went to the Van Buren Township Buchanan Street location?

A   A couple of hours.

Q   Okay, and did you have information about whether or not he was under surveillance there where he was before you got there?

A   Yes.

37

Q    Okay, from the time he was located, was he kept under surveillance by the other agency?  You've got to keep your voice up.

A    Yes.

Q    Okay.  And then when you went to his location, the Buchanan Street, did you take someone into custody there?

A    Mr. Wren.

Q    Mr. Wren or Mr. Walker?

A    I took Mr. Wren.

Q    Okay, whose residence is Buchanan?

A    Mr. Walker's.

Q    I'm talking about the first location you went to, you took Walker into custody?

A    No, Walker was, I think in Officer Lang's car.

Q    Okay, but you and the other officer who was with you took him into custody.

A    Right, right.

Q    Alright, and who else was there with you to take Walker into custody?

A    Officer Lang.

Q    Anyone else?

A    Van Buren officers.

Q    I'm directing your attention to the bottom paragraph of your report.  Let me be more clear about exactly what I'm asking you.  You initially go there and take a person into custody,

38

is that right?

A    Yes.

Q    And about what time is it that you take Walker into custody?

A    Around 4:40.

Q    Okay, and then you are also at that location for another purpose, to take something there, is that right?

A    Oh, at 6:30, I took the search warrant back over there.

Q    Okay, and you received that search warrant from who?

A    Officer Toth.

Q    And that's for Mr. Walker's residence?

A    Yes.

Q    And did you assist in the execution of this search warrant at that residence?

A    Yes.

Q    And can you tell the Court, I mean the juries, what was confiscated pursuant to that search warrant there?

A    It was clothes, shoes and gloves.

Q    Okay, and who are those turned over to after they're taken on evidence?

A    I believe Officer Lang took them.

Q    Okay, your police agency took custody?

A    Right, Sumpter Township.

Q    Okay, and did you also impound any vehicles at that location?

A    Yes.

Q    Okay, how many?

A Two.

Q Okay.  Now I want to direct your attention to October 6th at 22:35 hours, reference your report 17.  Did you assist Sumpter officer and Monroe officers in some other police action at that point in time?

A Yes.

Q And by the way, for people not familiar with military time, what is 21:30?

A 9:30.

Q Okay, in the evening?

A Yes.

Q And where did you go at that point in time?

A To Monroe, a Tuttle Hill address.

Q Specifically what address in Tuttle Hill?

A 10225.

Q Okay, and what was the purpose in going there?

A To take into custody a Nicholas Wren.

Q Okay, and did you accomplish that?

A Yes.

Q While you were there, did you or other officers talk to Nicholas Wren about why you were there and what was going on?

A I didn't, no.

Q Okay, was Nicholas Wren's mother there at that time?

A I did not enter the residence.

Q Okay, but Nicholas Wren was taken into custody at that point

40

and transported for interrogation, is that right?

A   Yes.

Q   Alright, now I want to refer your attention to 2235.   Were you dispatched to another location to pick up another individual for questioning?

A   Yes, I was sent to the Michigan State Police post in Ypsilanti.

Q   And who did you pick up there?

A   Richard Paul Wren.

Q   Okay, and who directed you to go there?

A   Dispatch.

Q   Okay, and when you took him into custody, was there any problems, any incidents?

A   No.

Q   Okay.   And you took him where at that point?

A   Back to our station.

Q   Okay, and you turned him over for questioning at that point?

A   Yes.

Q   Okay.   When you arrived, I want to take you back to when you went to the Buchanan address and picked up Mr. Walker.   Was that location secured by Van Buren at that point in time?

A   Yes.

Q   Do you have, did you have any information about how long it had been secured and that Mr. Walker had been there?

            MR. WHITE: Objection, hearsay.

            MS. KETTLER: I asked him not the content but whether

41

he had information.

    THE COURT: He can answer.

Q You personally had that information?

A You mean from –

Q Van Buren, how long they'd been –

A Yeah, they had –

Q Don't tell me what, just did you have that information?

A Yes.

Q Okay, so was there any kind of a rush for you to get there?

A No.

Q Okay, nothing further.

    THE COURT: Cross exam.

    CROSS EXAMINATION

BY MR. BURKETT:

Q Good morning, sir.

A Good morning.

Q I'm sorry, is it Sergeant?

A No, it's Officer.

Q Okay.  Back then, sir, were you a detective?

A No.

Q Are you a detective now?

A No.

Q Okay, it's my understanding that when you got to the scene, you were one of the first officers to get to the scene?  Is that true, sir?

A   Yes.

Q   That date, do you have a pretty good memory of what transpired?

A   Yes.

Q   One of the things that you did, sir, was you ran a license plate check on a vehicle, correct?

A   Yes.

Q   And you said that it came back registered to the victim?

A   Yes.

Q   At that time, though, of course you didn't know who the victim was, true?

A   Well, no.

Q   Okay, and you said something that when it came back registered to the victim, it also came back with a PPO?

A   Well, running, I guess when they ran the vehicle, it automatically runs the registered owner and it showed that there was a PPO that she was the protected party.

Q   Okay, would you tell the jury what a PPO is?

A   Personal Protection Order.

Q   Okay, she was the protected party against who?

A   Timothy Allen Walker.

Q   Okay, and based on that information, sir, if I understood you correctly, you put a BOL out?

A   Yes.

Q   Okay, and BOL is be on the lookout for?

A   Yes.

Q    Okay, from the time you put the BOL out til you got some type of response, sir, could you tell me how long it was?

A    A couple of hours.

Q    Okay, and you got the response from whom?

A    From Van Buren Township.

Q    Okay, and once you got the response, and if it was somebody other than you, you can tell me, once you got the response about Timothy Walker, you wanted to go and speak with him, is that correct?

A    Well I was sent to –

Q    I'm sorry, I didn't hear you.

A    I was dispatched to go to the residence on Buchanan and pick him up.

Q    And pick him up.  Now when you say pick him up, do you mean arrest him?

A    Take him into custody, yes.

Q    Okay, and do you know why it was you were going to arrest him?

A    Take him in for questioning.

Q    Okay, now, and did you do that?

A    Yes, well I didn't pick up Mr. Walker.  I took custody of his half brother.

Q    Do you know his half brother's name, sir?

A    I'm sorry –

Q    Take your time.

A    Sidney Hutcherson.

44

Q   Okay, you didn't pick up the half brother, you didn't arrest the half brother?

A   I took him into custody for questioning.

Q   Okay.  So actually then you took two people in?

A   Yes, not, I didn't have two people in the vehicle, no but -

Q   But two people were arrested?

A   Right.

Q   Okay.  Who was in your vehicle?

A   Mr. Hutcherson.

Q   Okay, and you told us that you took some clothes.  I'm sorry, let me strike that.  At a later point, you went back?

A   Yes.

Q   That's that true, sir?

A   Yes, with a search warrant.

Q   With a search warrant.  And you personally had the search warrant, is that correct, sir?

A   Yes.

Q   Okay, and the search warrant told you what to be on the look out for, is that true, sir?

A   Yes.

Q   Okay, what were you looking for?

A   Any items that might have been related to the crime.

Q   Okay, and when you went there, sir, what exactly did you take?

A   Some clothes, shoes, gloves.  I did not personally take them.

45

I mean, you know, when we found them, they were turned over to I believe Officer Burn (ph) took them into custody and made the return to the warrant.

Q   But you were there, sir?

A   I was there, yes.

Q   Sir, let me ask you this.  Sir, when you execute a search warrant, sir, is it your understanding that you must put down items that are taken?

A   Yes.

Q   And it was done in this case?

A   Yes.

Q   Could you tell us, sir, exactly what was taken?

A   A pair of blue jeans, a black pair of jeans, a white t-shirt, pair of white shorts, short sleeve shirt, a hooded sweatshirt, micro-cassette player.

Q   Could you talk just a little louder?

A   A micro-cassette player.

Q   Okay.  Is that it?

A   Yes, a micro-cassette with micro, cassette and cassette player.

Q   Sir, isn't it true that you also took an automobile?

A   There was two vehicles taken.

Q   There was two vehicles?

A   Yes.

Q   And they were transported to the Sumpter Police Department?

A   To our impound, yes.

46

Q   Okay, that's the Sumpter Police Department impound?

A   Yes.

Q   Okay, and those vehicles belonged to whom, sir?

A   I believe it was registered to Timothy Walker and the other one was to, I guess maybe his mother, Roseanne Hutcherson.

Q   Okay, now would this be a true statement?  The clothes and the items that you collected at the scene, at Mr. Walker's house on Buchanan, is it?

A   Yes.

Q   Okay, you and your, you and/or your partner took all that stuff and put it into a garbage bag to take it to the Sumpter Police Department, is that correct, sir?

A   I don't know how they transported it.  I don't know if it was in a garbage bag or not.

Q   Okay.

A   I don't remember that.

Q   Not that important.  When you, when that stuff is taken in, who do you give it to?

A   It's placed in an evidence locker.

Q   Okay.  And from that day, did you ever see that stuff again?

A   I didn't, no.

Q   Okay, now sir, you were asked about another search warrant that you were present at, is that correct, sir?

A   Yes.

Q   Okay, and that was on the 17th?

A    I believe so, yes.

Q    Okay.  And that was on Tuttle Hill, am I pronouncing that correctly?

A    Yes.

Q    Is that in Monroe?

A    Yes.

Q    And at this point, sir, you took someone into custody?

A    Yes.

Q    Okay, and the person you took into custody was whom, sir?

A    Nicholas Wren.

Q    Okay.  Did the search warrant, sir, that you had in your possession, did it require you to take Nicholas Wren into custody?

A    An arrest warrant.

Q    You had an arrest warrant?

A    I believe it was an arrest warrant.

Q    Okay, for Nicholas Wren?

A    Yes.

Q    Okay.  And how old was -

A    Fourteen.

Q    Fourteen?  Okay, you were actually looking for someone else there, too, weren't you?

A    Yes, his brother, Richard Paul Wren.

Q    His brother, who?

A    Richard Wren.

48

Q   Okay, and did you take him into custody?

A   No, not at that point.

Q   Okay, could you tell us, sir, could you tell us everything you took out of that place up in Monroe?

A   I didn't take anything but Nicholas.  I did not enter the residence.  That was done by the Monroe County Swat Team.

Q   Okay, are you aware, you were present, though, correct?

A   I was present.

Q   Are you aware of anything they took other than Nicholas?

A   Not that I know of, no.

Q   Okay, you have not seen a return, is that correct, sir?

A   No.

Q   Okay.  And once Nicholas was taken into custody, sir, what happened to him?

A   I just took him back to the station and had him lodged pending interrogation by the detective.

Q   Okay, did you at any point attempt to interrogate him?

A   No.

Q   Did the officers from Monroe County in your presence attempt to interrogate him?

A   Not that I know of, no.

Q   Okay, but someone told him why he was being arrested?

A   I imagine.

        MS. KETTLER: Well I'm going to object to I imagine,
I guess, I think so.  He either knows or he doesn't know.

49

MR. BURKETT: What do you want me to do about that?

MS. KETTLER: It's also hearsay.

THE COURT: Well that may be true.   Do you know why the Wren teenager was arrested, Officer?

A    For taking him for questioning for the crime.

Q    Thank you.  Sir, that was on 10-17 of '07.  After that, sir, did you have anything else to do with this case?

A    I believe it was the next day that we did a search warrant and arrest warrant for the subject.

Q    Which subject, sir?

A    Kyron.

Q    Okay, and where was that taken, sir?

A    It was an address in Ypsilanti.  I don't have that information here.

Q    Okay, did you have that with you, sir?  Did you have that warrant with you when you went to his home?

A    I didn't personally, I was just part of the team.

Q    Okay, would it be fair to say then you didn't participate in the arrest?

A    Yes, I did.

Q    Oh, you did.  Okay, the home in Ypsilanti that you went to to arrest the gentleman here, do you know approximately what time it was?

A    It was in the evening and I can't remember the exact time it was.

Q   Okay, would that have been like Sunday evening?

A   If that was the date.

Q   If I was to suggest to you it was somewhere around six or seven o'clock, does that sound about right?

A   Yeah, I don't have my report here.

Q   Did you make a report, sir?

A   I should have wrote a supplement.

Q   Did you make one?

A   I think I did.

Q   Okay, but you didn't bring it with you?

A   I don't have that here, no.

Q   Okay.   If I ask you something you don't know, tell me you don't know.

A   Okay.

Q   When you went to Kyron's home, sir, do you recall who was there?

A   Kyron, his, I think his mother.   There was other people in the residence, I don't remember.

Q   Okay, was his mother, do you know if his grandmother was present?

A   Yes, I believe she was present.

Q   Okay, is it fair to say, sir, you took him into custody without any incident?

A   Yes.

Q   Okay, no one in the house gave you any kind of a problem?

A   No.

Q   Even Kyron?

A   Yes.

Q   Alright, thank you very much, sir.   May I retrieve those back?

THE COURT: Mr. White, any questions?

CROSS EXAMINATION

BY MR. WHITE:

Q   Now Officer, you say you were the first responder to the scene at about 2:30?

A   Yes.

Q   Do you know what time you got the call to go out there?

A   Just a few minutes prior to that.

Q   About how long would you say it took you to get to the scene?

A   Maybe four or five minutes.

Q   Now when you arrived, were you in a marked police car?

A   Yes.

Q   Were you in uniform?

A   Yes.

Q   Were your lights on?

A   I don't think we activated our lights.

Q   You say we, were you with another individual?

A   Yes, Officer Toth was –

Q   With you when you arrived at the scene?

A   In a separate vehicle.

Q   Was he in the car when you got the call or did you pick him up somewhere?

52

A    No, he was in a separate vehicle of his own.

Q    Alright.   Now you found out when you ran the plates that
     Stephanie had had a PPO and you were asked a little bit about
     what a PPO is.  Do you know how you get one?

A    You petition the court.

             MS. KETTLER: I'm going to object to this.   This
is not relevant for these purposes.

             MR. WHITE: Your Honor, I think that it is relevant
and the reason that it's relevant is because in order to get a
PPO, as the Court knows, you have to have substantiated allegations
of violence.

             THE COURT: My question would be why are you asking
this witness?

             MR. WHITE: I'm simply asking him if he knows.

             THE COURT: If he knows what?

             MR. WHITE: The requirements to get a PPO.

             THE COURT: Sustained.

             MR. WHITE: Thank you your Honor.

Q    Now, at that point you said you called in a be on the look
     out.  Approximately what time did you make that call?

A    Just a few seconds after I arrived, after I found the body
     and notified dispatch.

Q    And how soon were you notified that the suspect had been
     located?

A    It was a couple of hours later.

Q   Couple hours later?

A   Two hours.

Q   And so at that point you went to the house at approximately 4:40 in the morning?

A   Yes.

Q   Mr. Walker was arrested?

A   Yes.

Q   His brother was also taken into custody, correct?

A   Yes.

Q   Now Mr. Walker, you then obtained a warrant, went back and got Mr. Walker's clothing, shoes, things like that?

A   Yes.

Q   Now do you know what happened to those items?  Did you send them to the state police crime lab?

A   Yeah, I don't personally know what happened to them.  They were turned in for evidence.  That's where my knowledge of it ended.

Q   Alright, now just so I have the dates correctly again, when was the search in Monroe County pursuant to the warrant, what date was that?

A   It was the next day I believe.

Q   So that would have been the 7th?

A   On the 6th.

Q   Oh, it was still the 6th, later in the day?

A   Yes.

54

Q   Alright, and at that time you arrested Nicholas Wren or he was arrested?

A   Yes.

Q   And were you the one who transported him to the station for interrogation?

A   Yes.

Q   But you tell us that no clothing or other items were seized at that time of your knowledge?

A   Not that I know of.

Q   Now were you involved in picking up Richard Wren at the Michigan State Police?

A   Yes.

Q   And on what date was that?

A   The same date.

Q   That was also on the 6th?

A   Yes.

Q   Alright, do you know if Mr. Wren's clothing or shoes were taken as evidence?

A   I don't have that knowledge.

Q   You don't have that knowledge.  About what time in the day was it again, you said 22:35 -

A   It was 10:30 in the evening.

Q   10:30 in the evening.  Thank you very much.  I don't have anything more.

                    THE COURT: Anything else?

                              55

MS. KETTLER: I do.

REDIRECT EXAMINATION

BY MS. KETTLER:

Q   Did you listen carefully to the questions you were being asked?

A   Yes.

Q   Okay, do you remember just telling Mr. White that the search warrant on Tuttle Hill was on the day after the crime?

A   Well, I'm, the crime happened at 2:30 in the morning.

Q   But did you also listen to the questions Mr. Burkett asked you when he asked you three or four times about the search warrant on Tuttle Hill on October 17th?

A   I -

Q   And you agreed with him that was the date?

A   The date, okay.

Q   Where you kept agreeing with him that was the date? Didn't you?

A   Yes, I guess -

Q   And that's like way wrong, right?

A   Yes.

Q   Did you personally obtain the search warrant for Tuttle Hill?

A   No.

Q   No.  You said you think there was an arrest for Nicky Wren. Do you think?  Do you know whether he was there?  I mean there wasn't an arrest warrant for him, was there?

MR. BURKETT: Judge, I'm going to make an objection

56

here because not only is she contradict, she's asking him a leading question, telling him the, there was not an arrest warrant.   That is clearly leading.   And I don't think she's permitted to do that.

        MS. KETTLER: I asked him was there or wasn't there. He said -

        MR. BURKETT: Then she said, sir, there was no arrest warrant for him at that time, was there?   That is clearly leading.

        MS. KETTLER: I don't think there's anything wrong with it under the circumstances.

        MR. BURKETT: This is her witness.

        THE COURT: What would, so what would you like?

        MR. BURKETT: I would like you to tell her to ask questions properly and not leading questions.

        THE COURT: Ask questions properly, not leading questions.

        MS. KETTLER: Thank you, Judge.

Q   Was there an arrest warrant for Nicky Wren?

A   I did not have the warrant in my hand -

Q   Okay, he was -

A   I was just part of the group of officers that went.

Q   Okay, he was taken into custody for questioning?

A   Yes.

Q   You said at a later point.   That's not the same as being arrested on an arrest warrant, correct?

57

A   Right.

Q   Okay.  And so, I mean I'm not trying to be rough with you, I'm just trying to get the record clear, okay.  When you testified about the search warrant that you participated in where things were taken, did you prepare any of those warrant returns?

A   No.

Q   Okay, so would you be the person who would have the knowledge to testify in detail about what was taken at those locations?

A   No.

Q   Okay, and as far as the people who were present in Mr. Benson's home when he was taken into custody, did you interview any of the people in the house?

A   No.

Q   And when you said, I think his grandma was there, do you know for sure?  I mean did you identify anybody or are you just supposing?

A   No.

Q   Okay.  And was it your, are you the one who was supposed to make the decisions about what was taken to the lab and what wasn't?

A   No.

Q   Okay, whose responsibility is that?

A   The detective.

Q   Okay, and the officer in charge of this case?

58

A    Yes.

Q    Okay.  Nothing further, thank you.

            MR. BURKETT: Ten minutes.

            THE COURT: What?

            MR. BURKETT: I'll have questions, ten minutes, correct?

            THE COURT: Ten minutes, what?

            MR. BURKETT: Oh, well you always say you have ten minutes to ask questions.

            THE COURT: Sometimes I say five, sometimes I say ten.

            MR. BURKETT: Whatever, Judge.

            THE COURT: How many questions do you have?

            MR. BURKETT: Not that many.

            THE COURT: Go ahead.

                    RECROSS EXAMINATION

BY MR. BURKETT:

Q    Sir, you have been a police officer for thirty some years, correct?

A    Yes.

Q    Okay, and during that thirty some years, sir, one of the things that you have learned as a police officer, as a deputy sheriff, you never come into court and guess at answers, isn't that true, sir?

            THE COURT: Counsel, what's that got to do with this

                            59

trial?

       MR. BURKETT: Well, I'm rebutting what she said. The prosecutor asked were you just guessing or was it something that was really said.

       THE COURT: Well ask him a specific question.  I'm really not interested in his thirty year history as a police officer.  That's why I said what's it got to do with this case?

       MR. BURKETT: Fine, sir.  Okay, yes sir.  May I continue?

       THE COURT: If you follow my instructions you may.

       MR. BURKETT: I have to follow your instructions, you're the boss.

Q   Sir, when I asked you questions, sir, in this particular case, were you guessing at the answers?

A   I gave them to the best of my knowledge.

Q   Okay, and you answered those questions as honestly as you could, sir, correct?

A   Yes.

Q   Now, when you went to Monroe County, sir, true or false, to your knowledge the person that was arrested was wanted as a suspect in a murder case, isn't that true, sir?

A   Yes.

Q   And that is the reason he was taken into custody, correct?

A   Yes.

Q   Okay sir.  The other question that, two other questions.  The

60

first one, sir, is when you were being asked, the first set
of questions by the prosecutor, she asked you what was taken,
do you recall that, sir?

A   Yes.

Q   Okay, and during my cross I elaborated on what was taken,
correct?

A   Yes.

Q   The answers that you gave, sir, as to what was taken, you didn't
guess at that, did you?

A   I read it off the return of warrant.

Q   Okay sir, the night of the incident, sir, when, as you being
the first person at the scene, the front door to the victim's
home, was it wide open?

A   It was partially ajar.

Q   And the television was on?

A   Yes.

Q   Okay, you went inside at some point?

A   Yes.

Q   Okay, and when you say the television was on, was it playing
or what?

A   Yes.

Q   Okay.  May I retrieve my paper from you.  Sir, what time was
it when you went into the victims' house and you saw her
television playing, approximate time, as close as you can be?

A   2:45, 2:50, 3:00.

Q   Alright, thank you very much, sir.

        THE COURT: Mr. White.

        MR. WHITE: I don't have anything your Honor.

        THE COURT: Thank you, you can step down.

        (Whereupon the witness was excused at 10:35 a.m.)

Ladies and gentlemen, take a twenty minute break.

        (Whereupon the juries left the Courtroom for

        a short break)

        -   -   -

        (Whereupon the juries entered the Courtroom)

        THE COURT: You can call your next witness.

        ERIC LUKE

having been duly sworn by the Court at 11:00 a.m. was examined

and testified as follows:

        DIRECT EXAMINATION

BY MS. KETTLER:

Q   Good morning Corporal.  Would you please state your full name

    for the record?

A   Corporal Eric Luke.

Q   And where are you employed?

A   Sumpter Township Police Department.

Q   And how long have you been employed there?

A   Almost fourteen years.

Q   Okay, and did you assist in the investigation of the homicide

    of Stephanie McClure?

A    Yes, I did.

Q    Okay, did you do that at a number of different locations throughout the days immediately following the homicide?

A    Yes.

Q    Okay, I want to ask you about each of those in turn but the first thing I want to ask you about is a search warrant that was executed on Tuttle Hill Road in Monroe.   Did you go there?

A    Yes.

Q    Okay, and can you tell the jury what date and approximately what time it was that you went there?

A    It was the 6th of October approximately 1700 hours, five o'clock p.m.

Q    Five o'clock in the p.m.?

A    Yes.

Q    Okay, and now being as this is, Monroe is a different county obviously than yours, did you have assistance from other police agencies there?

A    Yes.

Q    Okay, and the search warrant that you had to execute there, in your experience as a police officer, do you sometimes have search warrants for people, to go in and get a person?

A    Yes.

Q    And do you also at times have search warrants for indicator, additional evidence of a crime?

A    Yes.

Q   And in this particular location, what were you looking for?

A   I did not do the search warrant but I believe we were looking for people.

Q   Okay, and did you find some people there that were transported or taken into custody for questioning with regard to the homicide of Stephanie McClure?

A   Yes.

Q   Okay, and who was that person or persons that you took in for questioning at that location?

A   I did not personally take him into custody.  His last name was Wren.

Q   Okay.

A   There were two –

Q   First name?

A   I don't recall his first name.

Q   Okay.  You were there with several other officers, is that correct?

A   I was there with a special response team along with both detectives.

Q   Okay, and in addition to taking Mr. Wren into custody, did you also take some physical items from that scene?

A   Yes, that was included on the search warrant, to search for items.

Q   And what is a return of a search warrant, just for the juries?

A   It is a list of items taken from a certain location.

64

Q    Okay, and you prepared that return in this case?   No?

A    I do not recall.

Q    You don't, okay.

A    I do not believe so.

Q    Okay, okay.  Was the officer in charge of the case, Detective Toth, also with you there on that occasion?

A    He arrived on the scene after we made entry into the residence, correct.

Q    Okay, and did he prepare the return?

A    I believe so, I don't know.

Q    Okay.  Did you also participate in the execution of a search warrant at 5480 Big Pine in Ypsilanti?

A    Yes.

Q    Okay, and that, similarly that was in a different county, is that right?

A    Washtenaw County, correct.

Q    Did you have assistance from other police agencies there?

A    Yes, we did.

Q    Can you tell the jury what date and approximate time that search warrant was executed?

A    It was the 7th of October approximately 1915 hours, 7:15.

Q    7:15 on what day?

A    The 7th of October.

Q    Okay, now what was your particular duties, what were your particular duties at that location?

65

A   Initially I was a member of a special response team that made entry into the residence.

Q   Okay, and once that was accomplished, did you have any particular duties inside the residence?

A   I assisted Officer Lang in retrieving property in the upstairs bedroom.

Q   Okay, did you prepare the search warrant return in that case?

A   No, I did not.

Q   Okay, did you identify or interrogate any people inside the location?

A   No, I did not.

Q   Okay.  Now I want to go back now, we talked about the search warrants, I want to go back to the scene briefly and talk about that.  Did you go to the scene shortly after Stephanie McClure's body was discovered?

A   Yes.

Q   Okay, and when you arrived there, how many other police officers were there at that time?

A   Two.

Q   Okay, and who were they?

A   Officer Toth and Officer Jablonski.

Q   Okay, what did you do when you arrived there to assist them?

A   Officer Jablonski and I deemed the scene to be unsecure because we didn't know who the shooter was.  So we entered the house and secured it, made sure nobody was inside.

66

Q   Okay, and did you observe any sign of anything being disturbed or any blood inside?

A   At that point, no.

Q   Well, at any point did you?

A   No.

Q   Okay, did you personally take any items into evidence?

A   After the search warrant arrived on the scene, I assisted Officer Toth in retrieving some items.

Q   Okay, and what were those items?

A   A purse and cell phone.

Q   Okay, and the purse, did it have someone's ID in it?

A   Yes.

Q   Did, pulled from the top?

A   There was ID inside.

Q   And do you recall whose it was?

A   Stephanie McClure.

Q   Okay, you said there was also a cell phone, is that correct?

A   Yes.

Q   And where was that cell phone located?

A   When you walked in the front door, it was directly opposite the front door in the living room on a side stand next to a chair.

Q   Okay, I'm going to show you what I'm showing counsel as People's exhibit 39. Does that photograph accurately depict the cell phone that was confiscated in the location it was in?

67

A   Yes, it does.

Q   Okay.  Move for the admission of People's exhibit 39.

       MR. BURKETT: No problem.

       MR. WHITE: No objection.

       THE COURT: It's admitted.

Q   After you insured that there was nobody inside the residence there in the trailer, what did you and other officers do with regard to the crime scene?

A   We exited the residence, set up a perimeter and taped it off around the residence.

Q   Okay, and can you tell the jury roughly how long passed between the time you arrived and the time that the perimeter was set up and it was taped off?

A   Four minutes.

Q   Four minutes?

A   Five minutes, enough time to enter the house and make sure nobody was inside, back out and set up the perimeter.

Q   Did you, I'm going to go back if I can, I realize you didn't prepare the search warrant at Tuttle Hill, but can you tell the jury what items were confiscated there and give a description of them.

A   There was one pair of white, black and red in color Nike tennis shoes.

Q   Okay, and did someone at the scene identify those as their own?

68

A   The mother and the grandmother on the scene identified them as belonging to Nicky Wren.

Q   Okay, Nicky with an N as in Nancy?

A   Correct.

Q   Alright, and the other item of footwear?

A   A pair of white in color Nike tennis shoes, again reported by the grandmother and mother to belong to Nicky Wren.

Q   Okay, and the vehicle, was there a vehicle impounded there?

A   Yes, there was a white in color 1999 Ford Escort.  It was parked in the driveway.

Q   Okay, and did you find any other items at the Tuttle Hill address that appeared to be of evidentiary value?

A   No, we did not.

Q   Okay, nothing further.  Thank you.

THE COURT: Cross exam.

CROSS EXAMINATION

BY MR. BURKETT:

Q   Is it Officer Luke or Corporal Luke?

A   Corporal Luke.

Q   Sir, you were one of the first officers that arrived at the scene?

A   Yes.

Q   Okay, and when you arrived at the scene there, do you recall whether the front door was open?

A   The front door was open.  It was ajar.

69

Q   Okay, and at some point you went in?

A   Correct.

Q   Okay, now the photo that you have of the cell phone, did you yourself take that?

A   I believe I did, yes.

Q   Okay, so you had a camera with you?

A   Correct.

Q   Okay, now you've stated that you secured the scene?

A   Correct.

Q   Okay, and does that mean putting that tape stuff around it?

A   That's one of my things I did, yes.

Q   Okay, and when you did that, how many other officers were at the scene at that time, if you know?

A   I believe it's still Officer Toth and Jablonski.

Q   Okay, so there was three of you?

A   Yes.

Q   Okay, and what else did you do while at the scene?

A   At what point?

Q   At any point while you were at the scene?

A   After securing the scene, I notified my command, requested Officer Lange, who's our canine officer to arrive on scene. I also contacted, had dispatch contact the state police forensic team.

Q   Okay, did you do anything else?

A   I accompanied Officer Lange once he got there with a short

70

track from the scene.  And I also briefly assisted the state
police forensic team before clearing.

Q   Okay.  The night of the incident, sir, that was the totality
of what you did, am I correct?

A   On the scene?

Q   Yes.

A   I believe so.

Q   Now what did you do after the night of the scene, your next
involvement in this case?

A   My next involvement would have been the next day when I came
in for my shift at five o'clock.

Q   At 5:00 p.m. or a.m.?

A   I'm sorry, 5:00 p.m.

Q   Okay, what did you do?

A   I was ordered to accompany the other group of officers to meet
with Monroe County.

Q   Okay, and this was the very next day?

A   Correct.

Q   Okay, and why were going to meet with Monroe County?

A   I won't say the next day.  I didn't clear the scene, initial
scene until probably, it was almost noon so you're talking
about five hours after I initially cleared the scene.  It
wasn't actually a twenty four hour period, it was the same
day.

Q   Oh, okay.  So you cleared the scene around noon?

71

A    Around noon.

Q    And then around five or six o'clock that evening –

A    I came back in, yes, I left and came back in at five and then that's when I was ordered to go to Monroe County.

Q    Okay. And who went with you?

A    Corporal Gannon, Officer Byrne, Officer Sharp. There were other officers but I don't recall who they were.

Q    Okay, and did you have anything in your possession such as an arrest warrant or a search warrant or what?

A    I did not, no.

Q    Okay, do you know if your team had anything?

A    At that point, no.

Q    Okay. Why were you going to Monroe?

A    To attempt to locate the two Wren brothers.

Q    Okay, were you going there for the purpose of arresting them?

A    At that point, I don't know. I was supposed to find them. That was my duty, or our duties.

Q    So you were told just to find them and once you found them, nothing?

A    We were told to meet with Monroe County, at that point come up with a game plan and attempt to locate the two brothers and then contact command or contact the two detectives.

Q    Contact who?

A    The two detectives for further information.

Q    Okay, the detectives weren't there with you, is that correct?

72

A    No, they weren't.

Q    Were they there at any point in time?

A    Yes.

Q    Okay, were they there prior to your going to execute the search warrant?

A    No.

Q    Okay, so you executed the search warrant?

A    Yes.

Q    And when you went, this is the house on Tuttle Hill, am I correct?

A    Correct.

Q    Okay, and so you went there and you executed the search warrant. Then you call your detective, is that correct, sir?

A    Correct, at some point in there, he was called. And we didn't execute a search warrant, we assisted Monroe County in executing their search warrant.

Q    Okay, but you were part of that whole team?

A    Correct.

Q    Okay, and after you did that then, you called the detectives?

A    Correct.

Q    And you said something to the effect okay, we found them. Now what do I do with them?

A    I did not speak personally with the detectives, they were notified by some member of our team.

Q    Okay, did you hear the notification?

73

A    No.

Q    After they were notified, what did you do, sir?

A    I guess I don't understand the question.

Q    After the detectives were notified, did you do anything else?

A    I waited for them on the scene.

Q    Okay.  And was someone placed under arrest, sir?

A    Yes.

Q    Who.

A    The, I believe it was Nicky.  I did not place him under arrest but I believe Nicky was placed in custody.

Q    Okay, now did you take part in the searching of the home?

A    Yes.

Q    Okay, did you search the entire home?

A    Yes.

Q    And what were you looking for?

A    Any items that might, any items that showed anything.

Q    Okay, did you find something that showed anything?

A    I was asked by detectives to confiscate the two pair of shoes and the vehicle in the driveway.

Q    What about clothes?

A    Nothing.

Q    You weren't -

A    Nothing stood out.

Q    Okay, and you said you searched every room?

A    Yes, I did not personally search every room, I was part of

74

the group that searched.

Q   Okay, and what about the automobile?   Did you search the automobile?

A   Yes, I did.

Q   You personally?

A   Yes.

Q   Okay, did you, and the automobile was taken in?

A   The automobile was seized, correct.

Q   And taken back to Sumpter Township?

A   Yes.

Q   Okay sir, did you see any blood on the automobile?

A   No.

Q   Did you find anything in the automobile?

A   No.

Q   If you know sir, was the automobile that you seized, had it been reported stolen?

A   Not to my knowledge, no.

Q   Okay, so did you run a lien check to see who owned the automobile?

A   Yes.

Q   And who was the owner?

A   I believe it was the mother but I did not confirm that.

Q   Okay.   Then the next thing that you did if I understand you correctly, you went to the city of Ypsilanti in Washtenaw County?

75

A    I believe it was Ypsilanti Township, correct.

Q    Okay, and the purpose of that was to do what, sir?

A    Serve a search warrant on that location.

Q    Okay, did you participate in that?

A    Yes.

Q    Okay, and what did you do, sir?

A    I was a member of our special response team that goes in the, goes through the front door, the first ones in.

Q    Alright, and I'm, correct me if I'm wrong, I'm assuming that you had no problems?

A    No.

Q    Okay, was someone arrested?

A    Yes.

Q    Who?

A    The Defendant.

Q    Okay, and no problems arresting him, correct?

A    No.

Q    Okay.  Now do you recall anything of what was taken from that location?

A    Yes, I do.

Q    What was it?

A    Not specific, I assisted Officer Lange in seizing several cell phones, ID's and other property from the bedroom reported belonging to the Defendant.

Q    Okay, when you said ID's, you said plural, whose ID's?

76

A    His ID's.

Q    Oh, okay.  And you said other property?

A    Correct.

Q    What other property?

A    There were some cell phones.  After I look at my report, I'll tell you.

Q    Sure.

A    Some shoes, some cell phones, several of his ID's, one I believe was a school ID, several pair of shoes.

Q    Okay, but you also seized some clothing, didn't you?

A    I did not personally, I assisted Officer Lange.  Those are the items that I was involved in.  I turned them over to Officer Lange and he completed the return of search warrant.

Q    Okay, from your personal knowledge, sir, and things you observed, did you see any of the Defendant's clothes taken into custody?

A    Did I seize or see?

Q    See and seize?

A    There was clothes in the room.  I do not recall anybody being seized, personally, no.

Q    And everything that you took, sir, what did you do with them?

A    They were turned over to Officer Lange right in the room.

Q    Okay, did you, after that you had nothing else to do with the case?

A    No.

77

Q    Okay, you've told us about the execution of two search warrants. Did you participate in the execution of any other search warrants?

A    No.

Q    Okay.  I don't have anything further.

                    THE COURT: Mr. White.

                    CROSS EXAMINATION

BY MR. WHITE:

Q    Now you were part of a party that executed a search warrant on Tuttle Hill Road in Monroe County, correct?

A    Correct.

Q    And was the warrant, do you have the warrant with you?

A    No.

Q    Do you recall the warrant, its contents?

A    I had no part in the warrant.

Q    Okay, do you know of your own knowledge whether it was for an individual or whether it was to search the premises?

A    I do not recall specifically what it was for.

Q    Was there a search of the premises?

A    Yes.

Q    Alright, and certain items were seized, correct?

A    Correct.

Q    Now one of the things that happened was that Nicky Wren, not Ricky Wren, but Nicky Wren was arrested?

A    Correct.

                    78

Q   Alright, some other things were seized, you said two pairs of shoes were seized?

A   Yes.

Q   And those were taken from the house?

A   Or I'm sorry, I shouldn't say Nicky, a Wren brother was taken into custody.  I do not recall which one it was.

Q   You don't know which one it was?

A   No.

Q   Alright.  So, and there were two pairs of shoes taken, correct?

A   Yes.

Q   Now do you know whether that individual acknowledged those were his shoes?

A   They were advised, I was advised they were Nicky's shoes by the grandmother and the mother who were on the scene.

Q   Alright, but you don't have any independent verification of the ownership of those shoes?

A   No, I do not.

Q   Alright, now you searched, you impounded a vehicle and that was searched?

A   Correct.

Q   And you searched the home?

A   I assisted in a search of the home, correct.

Q   Did, were there any other out buildings on the property you searched?

A   No, not that I observed, no.

79

Q    Do you know if anyone else searched any out buildings?

A    I do not recall.  I don't think there were any out buildings there.

Q    Do you know if anyone else searched the property outside the home?

A    There were officers outside the home, yes.

Q    Did you observe them conducting a search?

A    I saw officers outside the home, I don't know what they were doing.

     Alright.  Going back, and I realize I'm taking this a little out of order, you said when you were originally at the scene, that you did follow a track for some distance?

A    I assisted Officer Lange in a short track.

Q    Right, and how long was the track?

A    My guesstimate of distance, maybe three hundred yards.

Q    Alright, and what direction did it go?

A    There are streets in that specific mobile home park or at odd angles, probably in a –

Q    If I showed you a map of the mobile home park, would it be of assistance to you?

A    Yes, it would.

Q    The reason I'm looking at this, I'm trying to ascertain where north is.  I'm going to ask you, can you come down here for just a moment.  Alright, this is 372, do you see the street number on 372 Utah?

80

MR. BURKETT: I'm sorry, could you talk just a tiny

bid louder.

Q    Alright, do you see that address at 372 Utah?

A    Yes.

Q    And you said you followed a track about three hundred yards.
     Can you tell us what direction the track went in?

A    From here, these are empty lots -

Q    Right.

A    On both sides of 372.

          MS. KETTLER: If we can do that so both juries can

see.

          MR. WHITE: That's what I'm trying to do actually.

A    There's at least one empty lot, maybe both.  There's an empty
     lot on this side.  So this mobile home is by itself.  It went
     from approximately where the vehicle was and the victim out
     front in this direction.

Q    Alright, now was this a canine track?

A    Yes.

Q    Alright, so it wasn't you looking at footprints, this was done
     with dogs?

A    Correct.

Q    Alright, when did the dogs lose the scent?

A    I do not recall.

Q    Now you said three hundred yards but actually it looks from
     what you're saying like it was just over to the next street.

81

Would that be more accurate?

A   I said approximately three hundred yards.

Q   Alright, so you're saying it was three hundred yards over there?

A   Approximately three hundred yards -

Q   To the point on this street, Nevada Street, where you lost it?

A   Correct.

Q   Alright, thank you.  Now there's no way of knowing at this point whether the track that the dogs were following was the perpetrator or some other person, is there?

A   No.

Q   Now the physical items that were taken from the Tuttle Hill search, did you personally turn them into Officer Lange or did you turn them into the evidence room?  What did you do with the items you took?

A   I turned them over to Officer Toth.

Q   Officer Toth, thank you.  And when you went into the house when you initially arrived at the scene, did you make any attempt to locate the owner of the house?

A   We were attempting to locate anybody that was in the house, not anybody specific, just to make sure the house was secure.

Q   Alright, so at that point, you were just securing the premises?

A   Correct.

Q   Alright, thank you.  Now were you present when Ricky Wren was

82

taken into custody?

A     He was not the one –

       MS. KETTLER: I'm going to object, that assumes a fact not in evidence.

Q     Alright, do you know whether Ricky Wren was taken into custody?

A     I was at the location in Monroe County when a Wren brother was taken into custody.  Which one that was, I do not know.

Q     Alright, thank you.  I don't have anything further then.

       THE COURT: Anything else?

       MS. KETTLER: No, thank you your Honor.

       THE COURT: Thank you Corporal, you can step down.

Call your next witness.

       (Whereupon the witness was excused at 11:24 a.m.)

       CHRISTOPHER MCGLYNN

having been duly sworn by the Court at 11:25 a.m. was examined and testified upon his oath as follows:

       DIRECT EXAMINATION

BY MS. KETTLER:

Q     Good morning Corporal.  Would you please state your full name for the record?

A     Corporal Christopher McGlynn.

Q     Okay, and where are you employed?

A     Sumpter Township Police Department.

Q     How long have you been employed in Sumpter Township?

A     Seventeen years.

83

Q   And is all of that time as a police officer or a corporal?

A   Yes.

Q   Okay, did you assist other members of your police department in the response to and the investigation of the homicide of Stephanie McClure?

A   Yes ma'am.

Q   And by the way, about how many officers are employed at our department?

A   Approximately fifteen.

Q   Okay, first of all, did you go to the scene?

A   No ma'am.

Q   Did you, however, participate in the execution of one or more search warrants?

A   Yes ma'am.

Q   Okay, first of all I want to ask you about whether you participated in the execution of a search warrant at 48531 South I-94 Service Drive in the Harbor Club apartments?

A   Yes ma'am.

Q   And which particular apartment was that?

A   It was apartment number 303.

Q   And whose apartment was it?

A   I believe it belonged to Ms. Bennett.

Q   Okay, and can you tell the jurors what day and roughly what time it was that you executed that search warrant at that apartment?

84

A   The date I believe was October the 7th, 2008.  And –

Q   8 or 7?

A   I'm sorry.

Q   There's been no October 7th of 2008.  You said 2008, it was 2007, right?

A   I'm sorry, yes, 2007.

Q   Alright, and about what time?

A   About 9:15, 9:20.

Q   At night?

A   Yes ma'am.

Q   Okay, when you went there, are you searching for an individual or an individual and/or evidence?

A   Individual and/or evidence.

Q   Okay, and did you confiscate a number of items as evidence from that location?

A   Yes ma'am.

Q   How many bedrooms are in this location?

A   Two.

Q   Okay, and did you prepare the search warrant return from that location?

A   No, I did not.

Q   Okay, but can you, did you document the items seized?

A   Yes ma'am.

Q   Alright, do you have a copy of your report?

A   Yes ma'am.

Q   I assume you don't have them all memorized, is that correct?

A   That's correct.

Q   Can you, if you need to refresh your recollection with your report, that's fine, but I need you to tell the juries if you would please the items that you confiscated there at the apartment?

A   There was a court document with the name Kyron Benson that was located on the bedroom floor.

Q   Alright, when you say bedroom floor, is there more than one bedroom?

A   Yes ma'am.

Q   You said there are.  Which, are these all from one bedroom or are they from various bedrooms?

A   I believe they're from one bedroom.

Q   Okay, and what else?

A   Bank statement from National City with the name Paula Bennett, a court document with the name, Richard Wren.

Q   And where specifically was that located?

A   The court document with Richard Wren was located between a mattress and a box spring in the master bedroom.

Q   Okay, what else?

A   Handwritten note with an address and the name McClure written on it.  And that was located on the floor in the master bedroom.

Q   What else?

A   Photograph of Kyron Benson which was located in the master

86

bedroom.

Q   Alright.

A   Pink women's sweat pants that were located in a basket of dirty clothes in the dining room area, women's gray sweat pants which were located in a basket of dirty clothes in the dining room area, Michigan operator's license with the name Jessica Fritz.

Q   And where particularly was that located?

A   That was located underneath the sofa in the living room.

Q   Okay, what else?

A   A notebook with a butterfly design on it located in a night stand in the master bedroom, 2004 Lincoln High School yearbook located in an outdoor storage area which is off the balcony.

Q   Okay, now let me stop you just for a minute.

A   Sure.

Q   This is not on the ground floor, right?

A   No, it is not.

Q   Okay, and there's a storage area that's actually on the balcony. Did it have a door on it?

A   Yes, it does.

Q   Okay, go ahead.  Oh I'm sorry, one more question about that. Is that accessible only from the balcony of that apartment?

A   Yes ma'am.

Q   Okay, go ahead.

A   27 exposure single use camera which was located also in that outdoor storage area, two boxes from Sony Play Stations.  There

87

were no consoles inside, just the boxes.  They were located

underneath the television in the livingroom.

Q   Okay.  Now how thorough of a search did you do at this location?

A   A real thorough search.

Q   Okay, did you the ceiling tiles in the ceiling in the hallway

    or closet area between the master bedroom and the bathroom?

A   No, I did not, that was Officer Byrne.

Q   Officer who?

A   Byrne.

Q   Byrne, okay.  Did you actually watch him doing that?

A   I don't recall, ma'am.

Q   Okay, fair enough.  Now I want to ask you further about one

    of the items that you confiscated there.  I'm going to show

    you what's been shown to both counsel and marked as People's

    41.  Is that the item you referred to as the handwritten note

    with the address and name McClure on it?

A   Yes ma'am.

Q   Okay, move for the admission of that exhibit.

        MR. WHITE: I'd like an opportunity to examine

outside the, before I stipulate –

        THE COURT: I'm sorry?

        MR. WHITE: It's got something written on the back

and I just would like to have an opportunity to just see what's

on the back of it before I stipulate to its admission.

        MS. KETTLER: I don't have any objection to that

but he's testified it's the item he confiscated.

Q    This is sealed before I'm showing it to counsel, correct?

A    Yes ma'am.

      MR. WHITE: Your Honor, for the record, I am opening this envelope up.  I have no objection to the admission at this time.

      THE COURT: Any objection?

      MR. BURKETT: No, I thought you heard me, no.

      THE COURT: Alright, it's admitted.

      MS. KETTLER: Thank you.

Q    About how long did your search take at that Harbor Club address?

A    I'd say approximately two hours.

Q    Okay.  Now I want to ask you about whether you with the assistance of a reserve officer did some work to try to –

      MR. BURKETT: Excuse me for one second, there's been no testimony about a reserve officer being here.

      THE COURT: Overruled.

Q    Okay, did you do some work with a reserve officer, Officer Lynch?

A    Yes ma'am.

Q    And where did the two of you go on October 9th?

A    I have to refresh my memory.

Q    Okay, do you have your report?

A    Yes, I do.  The address was 7200 Bunton Road in Ypsilanti Township.

Q    Okay, and what did you go there looking for?

A    Specifically we were looking for a deceased puppy.

Q    And did you find the deceased puppy?

A    Yes ma'am.

Q    Okay, where was it located, describe with as much specificity as you could, please?

A    There was a, the property itself was a two story farmhouse. Behind that farmhouse directly approximately thirty, forty yards, is a small wooden out building of a barn, possibly a chicken coop at one point.   Inside that barn, there was a black duffel bag and inside that duffel bag was the deceased puppy.

Q    Okay, and did you take that, the remains of the puppy somewhere for an examination by a veterinarian?

A    I did not personally.

Q    Okay, fair enough.   Did you document in your report that   they would be conveyed to a vet?

A    I did.

Q    Okay, and as far as you know, did that take place?

A    Yes ma'am.

Q    By the way, the People, just so the record is clear, who is this property owned by?

A    The property is owned by Mark and Linda Gerard.

Q    Okay, and did they cooperate fully with your efforts to search their property?

A    Yes ma'am.

90

Q    Okay.   Let me also ask you is there some kind of a lake or
      pond in this immediate area where the dead puppy was found?

A    Yes ma'am.

Q    Okay, and did you make any efforts to have that water, body
      of water searched by a dive team for a potential weapon?

A    Yes ma'am.

Q    And who, where did that dive team come from?

A    It came from Van Buren Township.

Q    Okay, did you remain there while those officers dove and
      searched the pond?

A    Yes ma'am.

Q    About how long did that take?

A    Several hours.

Q    Okay, and did the, the divers were actually in the water for
      several hours?

A    Yes ma'am.

Q    Okay, and did they succeed in bringing out any kind of a weapon
      that you observed?

A    No ma'am.

Q    Nothing further, thank you Corporal.

                    THE COURT: Cross exam.

                    CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning, Officer.   It is Officer, correct?   Corporal,
      I'm sorry, forgive me.   Sir, first of all I want to discuss

                            91

the search warrant that you did on 10-7-07, that was the search warrant you testified to of Ms. Bennett's home, is that correct, sir?

A   I'm sorry, are you -

Q   That was the search, I'm sorry, you had a search warrant in your possession to search the home of the Defendant, is that correct, sir?

A   Yes sir.

Q   Okay, and were you the affiant on that search warrant?

A   No sir, I was not.

Q   Okay, who all participated with you on that search warrant, sir?

A   Myself, Officer Byrne and several members of the Western Wayne Criminal Investigations Team.

Q   Okay, what, about five people?

A   Five to six.

Q   Okay, and you were the one that's in charge of it, is that correct, sir?

A   Yes sir.

Q   Okay, and you, once you got back to your station, sir, you wrote a report out about this, correct?

A   Yes sir.

Q   And the report that you wrote, I think you labeled supplemental report?

A   Yes sir.

Q   Okay, and you're required to write a supplemental report if you do anything on the case, is that correct sir?

A   Yes sir.

Q   You wrote in your report, if you need to look at it, feel free to.  Just let me know if you do.  You wrote on your report that the five or six of your guys made a thorough search of the premises, is that correct sir?

A   Yes sir.

Q   And it is your understanding that you did do a thorough search?

A   Yes sir.

Q   Okay, has anyone discussed with you, and this is a yes or no thing, anything that was found in that house after you made the thorough search?

A   No sir.

Q   Okay, sir, do you have an independent recollection of what that place looked like?

A   Somewhat, yes sir.

Q   Okay, the ceiling tile, sir -

A   Yes sir.

Q   A lot of the ceiling tile was removed, is that true, sir?

A   I don't recall the ceiling tile being removed.  Are you talking about as we came into the scene?

Q   No, I'm talking about being removed by the police officers?

A   Yes sir, we did move ceiling tiles.

Q   And what was the purpose of moving the ceiling tile?

A    We were looking for a weapon.

Q    Okay, anything else?   Did your search warrant say find a weapon as well as ammunition?

A    I'm sorry sir?

Q    You were looking for a weapon as well as ammunition?

A    We were looking for anything that may be pertinent to the case.

Q    I understand, sir.   And you thought that a weapon or something that might be pertinent to the case could be hiding in the ceiling tile, correct?

A    Yes sir.

Q    And is that one of the reasons that you, strike that.   Were you in charge of that search?

A    Yes sir.

Q    And one of the reasons that you directed your people to look up in that ceiling tile was to find any kind of evidence, correct?

A    Yes sir.

Q    And once your people did the thorough search by looking into the ceiling tile as well as other things, you were convinced there was no weapon or ammunition up there, is that true sir?

A    At the time, yes.

Q    Beg your pardon?

A    Yes sir, at that time.

Q    Okay, and sir, you didn't locate any bullets in that place, did you?

94

A    No, I did not.

Q    And if you had located them, they would have been taken into custody, correct?

A    Yes sir.

Q    Okay, you went through all of the drawers and things in the home, correct?

A    Yes sir.

Q    Now on this supplemental report, sir, there are I think, oh, I think there are about twelve items that you took into custody?

A    Thirteen.

Q    Thirteen, you're correct.   It's these items, I somewhat want to discuss with you.

A    Sure.

Q    Sir, you found clothes, women's clothes that you took into custody?

A    Yes sir.

Q    Is that true, sir?

A    Yes sir.

Q    You also took some men's clothing into custody.   Or did you?

A    No sir, I don't believe so.

Q    Okay, at any point in time during this search, did you ever have any clothes that you took into custody that belonged to a male?

A    No sir, I don't believe so.

Q    Oh, okay.   Sir, could you tell us why you took women's clothes

95

into custody?

A    Because there were some stains on those clothing that caught
     my attention.

Q    Okay, could you describe the stains.

A    The stains were a dark color or reddish color, possibly blood.

Q    You thought they were blood?

A    They could have been, yes.

Q    Okay, so you took them into custody?

A    Absolutely.

Q    Correct.  How many women's clothes did you take into custody?

A    I believe there were two pair of sweat pants.

Q    Okay.  And I want to make sure, sir, both sweat pants were
     female?

A    Yes sir.

Q    Okay, you told us why you took the first pair into custody.
      Why did you take the second pair into custody?

A    Same reason.

Q    They had blood, what you thought was blood on them?

A    Yes sir, what could have been.

Q    Okay, now the items that you thought had blood on them, you
     took them into custody, what did you do with them?

A    I packaged them and processed them as evidence.

Q    Okay, did you give them to anyone?

A    They were given to Corporal Czinski, Detective Czinski, back
     at the station.

96

Q   Okay, the detective here?

A   Yes sir.

Q   Okay, and did you tell the detective, sir, that, I think these things got blood on them?  Did you tell that to him, sir?

A   I did advise him they were stains of a suspicious nature.

Q   Okay, after you gave them to the detective, sir, did you have anything else to do with those clothes?

A   No sir, I did not.

Q   You said that during your search, sir, you found a Michigan operator's license?

A   Yes sir.

Q   Okay, who all's license did you find, sir?

A   The name on the Michigan operator's license was Jessica Fritz.

Q   Okay, and you seized that?

A   Yes sir.

Q   Okay, a butterfly design notebook?

A   Yes sir.

Q   You took that into custody?

A   Yes sir.

Q   And you gave it to the detective?

A   Yes sir.

Q   Did you look into the notebook?

A   I believe I did.  I don't recall what was in it, though.

Q   Fair enough.  You took into custody a Play Station?

A   Empty boxes, sir.

97

Q    Oh, empty boxes of a Play Station, okay.   How many?

A    There was two.

Q    Two?

A    Two.

Q    Okay.   Now, does that conclude what you did at the Defendant's apartment?

A    As far as —

Q    As far as the search went?

A    Yes, yes sir.

Q    Okay, how long, sir, would you tell us that you were in the apartment searching for evidence?

A    Approximately two hours.

Q    Okay, and could you somewhat describe the apartment, like the number of rooms it had?

A    As you come in the front door, you walk into a large living room.   The living room is on the left as you're walking in. On the right, there's like a dining area.   Off of that dining area, there's a small kitchen.   Between the kitchen and the living room, there's a hallway.   The first bedroom is on the left.   As you're walking, there's a bathroom on the right, right across from the door to the master bedroom.   And the master bedroom, right off the master bedroom to the right there's another bathroom.

Q    Okay, now you're required, are you not, sir, that when you execute a search warrant to fill out a return?

A    Yes sir.

Q    Did you fill out a return in this case?

A    That was done by Officer Byrne.

Q    Okay, Officer who?

A    Byrne.

Q    Byrne, okay.

A    Yes sir.

Q    And he was at the scene, correct?

A    Yes sir.

Q    And, but he was operating under your authority?

A    Yes sir.

Q    Okay.  The next thing you did as it relates to this case after you left on October 7th, what was it?

A    Relating to this case was a search of the farm property on Bunton Road.

Q    Okay, by the way, did you happen, sir, to interview, yourself or were you present when anyone else interviewed any witnesses in this case?

A    No sir.

Q    You were not present?

A    No sir.

Q    And you did not interview anyone?

A    No sir.

Q    Sir, did you happen on October 7th to look into the dumpster behind the place as you were searching it?

99

A   No, I did not.

Q   You never looked in the dumpster?

A   No sir.

Q   Okay.  Sir, okay, so you went to the farm, some farm place?

A   Yes sir.

Q   Who directed you to that farm place?

A   Corporal Czinski, Detective Corporal Czinski.

Q   Okay, and you found what you believe was a puppy?

A   Yes sir.

Q   Do you know what color the puppy was?

A   Black and white.

Q   Okay, do you remember what kind it was?

A   It appeared to be a pit bull.

Q   Okay, and what did you do with that?

A   It was turned over, Officer Lynch took it to a vet.

Q   Okay, anything else?

A   I'm sorry?

Q   I'm sorry, unartfully asked.  And that was all you had to do at that time, is that correct?

A   Yes sir.

Q   Now what's the next thing you had to do on this case?

A   As far as the search of the farm or –

Q   As far as, well, that was all you did at the farm, correct?

A   Other than having the pond searched.

Q   Okay, the pond was, the pond was on the farm?

100

A     Yes sir.

Q     Okay, based on your knowledge, and if you don't know, that's fine, based on your knowledge, sir, why did you search the pond?  Because you were in charge, correct?

A     Yes sir.

Q     Why did you search the pond?

A     Possibly for a weapon.

Q     Okay, what made you think there might be a weapon there, sir?

A     With the, there was a statement that was made to me that there was possibly water involved somewhere.  Also with the proximity to the deceased's puppy, we felt that we should search that pond.

Q     Okay, I'm not asking you, sir, what the entirety of the statement but who made the statement?

A     I'm sorry?

Q     Who made the statement to you?

A     What statement?

Q     That said that you might find -

A     I don't recall.  It was a fellow officer.

Q     A what?

A     It was a fellow officer but I don't recall who.

Q     Okay, and based on what a fellow officer told you, sir, a dive team searched the pond?

A     Yes sir.

Q     How long were they searching the pond, sir?

101

A    Several hours.

Q    So we can have a clear view, how large was the pond?

A    I'm going to say approximately five acres.

Q    The pond was five acres?

A    It was a very large pond.

Q    Okay, do you have any idea how deep the pond was?

A    The dive team members were fully submerged so I'm not sure exactly how deep.

Q    Okay, now since you were in charge of the search of the pond, sir, did you call the search off?

A    No, I did not.

Q    Okay, when you left, sir, were you convinced that a thorough search of the pond had been done?

A    Yes.

Q    Okay, and you found no incriminating evidence at that point?

A    No sir.

Q    Okay.  After that, sir, what is the next thing you did as it relates to this case?

A    That was all I had to do with this case.

Q    Okay.  Let me ask you this, sir.  Were you present, the scene, that night, the scene of this incident?

A    No sir.

Q    So you, did you ever go to the scene?

A    No sir.

Q    You've never been to the scene?

102

A    No sir.

Q    Okay, did you ever talk to any of the witnesses in this case?

A    No sir.

Q    Sir, thank you very much.

                    THE COURT: Cross exam.

                    CROSS EXAMINATION

BY MR. WHITE:

Q    Now Corporal, you conducted a search of the premises on south I-94 service drive?

A    Yes sir.

Q    And you said you were accompanied by another detective from your department and also by several people from the Western Wayne Unit?

A    Yes sir.

Q    What's the formal name of the Western Wayne Unit?

A    I believe it's called Western Wayne Criminal Investigations.

Q    Alright, and these are people that are experienced at searching property and other investigative techniques?

A    Yes sir.

Q    Now when you went to that apartment, was the property secured, was it locked?

A    Yes sir, I believe it was.

Q    Alright, and how did you gain entry?

A    It was forced entry.

Q    You used forced entry, you didn't get a key from a manager

                              103

or anything?

A   No sir.

Q   And can you describe exactly how the forced entry is accomplished?

A   No, I cannot.   I was not present at the door.

Q   Okay, did you observe the door after, when you came to the scene?

A   Yes sir.

Q   Were both the knob lock and deadbolt locks smashed so as to be non-functional?

A   I don't recall.

Q   Alright, now did you supervise the search of the apartment or did you just, or did you participate in it also?

A   I also participated.

Q   Alright, are you the individual that found the note that is listed as People's exhibit 41?

A   Yes sir.

Q   Alright, and if I can show this to you.   Now can you tell us what the note says?

A   It says 10664 Buchanan, Belleville, Michigan 48111, person named Jinny, J-I-N-N-Y scratched out and another letter which I cannot make out also scratched out.

Q   Alright.

A   Directly beside that it says McClure, M-C-C-L-U-R-E.

Q   Alright, now that address is on Buchanan, it's not on Utah

Street, correct?

A    It says Buchanan, sir.

Q    Now where was that, did you personally find that?

A    Yes sir.

Q    And where was it located?

A    It was lying on the floor in the master bedroom.

Q    It was, in the middle of the floor, to the side?

A    It was between the bed and the entrance to the closest area prior to the bathroom, right in the middle of the floor.

Q    Alright, now do you know of your own knowledge whether that was ever processed for either fingerprints or checked for handwriting?

A    I don't know, have any knowledge of any of that.

Q    Alright, and you took that item and you did what with it?

A    I logged it and placed it into this evidence bag.

Q    Now you indicated you found Jessica Fritz's driver's license under the livingroom couch?

A    Yes sir.

Q    Where was it, was it way under the couch or under a cushion or -

A    It was underneath the couch itself.  It was on the floor underneath the sofa.

Q    Now was this sofa one that's close to the floor or is it up on high legs?

A    I don't recall.  I don't recall.

105

Q    You don't recall?  Do you recall whether you had to lift the sofa in order to find it?

A    Yes I did.

Q    Oh, you did have to lift it?

A    Yes sir.

Q    Okay, that's fine, thank you.  And the women's clothing you found, you provided, you checked that in to be processed as evidence, too, because you thought there were possible blood stains on it.  And the puppy was turned over to Officer Lynch, is that correct?

A    Yes sir.

Q    And your understanding is he was supposed to take it to a vet?

A    Yes sir.

Q    You don't have any firsthand knowledge of whether that was done or not?

A    I don't have any –

             THE BAILIFF: I will put you out of this courtroom.

             MR. WHITE: Shall I continue your Honor?

             THE COURT: Please.

Q    Alright.

A    Can you repeat the question?

Q    Now you don't have firsthand knowledge of what was done with the puppy after it was –

A    No sir.

Q    Okay.  Now when you left the apartment, were you present when

the team left the apartment?

A   Yes sir.

Q   And how was the apartment secured?

A   At that point we contacted security from Harbor Club which
    is the apartment complex.  We advised them of the damage to
    the door and that the door needed to be secured.  They advised
    that they would do that and they would make sure the area was
    secured.

Q   Were you there when they came over to secure it?

A   I'm sorry?

Q   Were you present when Harbor Club came over to secure the unit?

A   I was there when, not when they actually secured it, no, I
    was not.

Q   Alright, so you don't know how long after your team left that
    the unit was secured, if at all, by Harbor Club?

A   I do not know.

Q   Alright.  And in fact, you don't know if they even secured
    the unit, correct?

A   I do not know.

Q   I don't have any more questions.

                    THE COURT: Anything else.

                    MS. KETTLER: No, nothing further.

                    THE COURT: You can step down.  You're free to go.

    Call your next witness.

        (Whereupon the witness was excused at 11:56 a.m.)

                            107

RITA MERRY

having been duly sworn by the Court on her oath at 11:56 a.m. was examined and testified as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q   Good morning, ma'am, would you pull that close to you, please, the microphone.  Thank you, would you state your full name for the record, please?

A   Rita Ann Merry.

Q   And what is your relationship, if any, to either of the Defendants?

A   To Paula Bennett.  She's my cousin and to Kyron, he's not nothing.

Q   Okay.  I want to direct your attention back to, did you know Stephanie McClure before she was killed?

A   I had met her once but other than that, no.

Q   Okay.  I'm going to direct your attention back to October 5th of 2007.  Where were you employed at that time?

A   At Rite Aid.

Q   And are you still employed there?

A   No, I'm not.

Q   Okay, was there, did you know most of your cousin Paula's friends or some of them?

A   Some of them, yes.

Q   Okay, do you know Breanna Kandler?

A    Yes, I do.

Q    And on that day, October 5th, 2007, did there come a time that Paula and/or some of her friends came to see you while you were working at Rite Aid?

A    Yes, they did.

Q    Okay, can you tell the juries about what time it was?

A    Oh my gosh, I don't even remember.

Q    Do you know what shift hours you were working?

A    I worked afternoons.

Q    Okay, so that means it would have been, if you were at work, it would have been some time after what time?

A    Probably after five o'clock.

Q    Okay, and before what?  When did you get off?

A    Ten o'clock we close.

Q    Okay, and who was it that came to visit you with Paula?

A    It was Paula and I think it was Breanna.  I don't remember actually.

Q    Okay, do you know Breanna?

A    Yes, I do.

Q    Okay, and were you expecting the two of them to come in or did they just show up?

A    No, they just showed up.

Q    Okay, and did one or both of them tell you, listen to my question.  Did one or both of them tell you some things that they had recently experienced?  Just yes or no.

109

A    Yes.

Q    Okay, and how long did they stay there and talk to you about that?

A    Gosh, I don't remember.  They were probably at the store maybe a half hour.

Q    Okay, that's all I have for both juries.  I have briefly for Ms. Bennett's jury only, your Honor.

THE COURT: The Benson jury can step into the jury room.

(Whereupon the Benson jury left the Courtroom)

THE COURT: You can proceed.

MS. KETTLER: Thank you.

Q    And when, who was it that first spoke to you about this event that they had just experienced?  Do you remember, was it Breanna or Paula?

A    I spoke with Paula.

Q    Okay, and what did Paula tell you?

A    She told me that some things was stolen out of her apartment and I asked her, I said well who would steal things out of your apartment?  And she said well the only person that it could be would be Stephanie because her and Kyron were the only two that had keys to her apartment besides Stephanie>

Q    Okay, and how did she, how did her mood seem about that, about Stephanie, about her belief that Stephanie had stolen her things?

110

A    Well she was upset about it.

Q    Okay, and what else did she tell you?

A    She told me that she, let me think, it's been so long. She said that if Stephanie took her things, she wanted to get them back. If she did not get them back, that Kyron was going to go and shoot her.

Q    Okay. And did she tell you that more than once or just once?

A    Just once.

Q    Did she talk to you about any discussions that she had had with Kyron?

A    No.

Q    About that topic?

A    No.

Q    What about Breanna, did Breanna say anything about discussions with Kyron to you?

A    No, Breanna wasn't there when I talked to Paula.

Q    Okay, but Paula said Kyron was going to shoot Stephanie if she didn't get things back, is that right?

A    Right.

Q    Okay, what else did you talk about, you said you thought they were there for about a half hour?

A    Yeah, we just, small talk.

Q    Okay.

A    Just how the day was going, stuff like that, you know, what are you guys getting, things like that.

111

Q So this comment about Kyron's going to shoot Stephanie, does that come before the small talk about the day or at the end or in the middle?

A In the middle.

Q Okay, so she just said Kyron's going to shoot her and then continues to talk about other things?

A Right.

Q Is it your testimony that you and she did not discuss how serious Kyron sounded when he said that?

A It didn't sound serious to me.

Q Okay, my question is, I'm not asking you what you thought because you weren't there.

A Right.

Q I'm asking you did you discuss with your cousin whether or not she thought Kyron was serious?

A Well I asked her, I was like are you serious, I mean come on, some stolen items, I mean why don't you go to the police. And she's like well that's, you know, probably what I'm going to do.

Q Okay. But my question was did you discuss with her, yes or no, whether or not Kyron sounded serious about shooting Stephanie?

A No, we didn't discuss that.

Q Okay, and your testimony is you did not have any discussion when Breanna indicated she didn't think he would do something

112

like that.  And Paula said, I don't know, he sounded pretty serious.

A   No, Breanna wasn't there when we discussed it.

Q   Okay, and you refused to give a written statement to the police, is that correct?

A   I don't think so.

Q   Well, you met with the police about what happened that day, correct?

A   With Detective Toth and Czinski.

Q   And Toth and Czinski asked you to make a written statement, isn't that correct?

A   Oh yeah, I guess they did, I'm sorry.

Q   And you refused, is that correct?

A   Right.

Q   You also refused to come to the police station to talk with them, is that right?

A   They said they would meet me at my aunt's.

Q   Who wanted them to meet you somewhere other than the police station?

A   I'm sorry?

Q   Whose request was it to meet somewhere other than the police station?

A   I requested it to Detective Toth.

Q   And why is that?

A   I don't know, I just requested it.

113

Q     Well, wasn't there a specific reason you asked to meet them
      at a secret location?

A     I don't remember.

                    MR.    WHITE:    I'm    going    to    object.    The
characterization secret calls for a conclusion.

                    MS. KETTLER: I'm asking her if she asked for that.

                    THE COURT: You can proceed.

Q     Did you not ask them to meet you at a secret location because
      you were afraid?

A     I could have, yes, I could have.

Q     You could have?

A     Right, I don't recall.

Q     You don't recall, okay.  Have you been a witness in a homicide
      a lot of times in your life?

A     Never.

Q     Okay, isn't this something kind of important?

A     Well, yeah.

Q     But you don't recall that?

A     No.

Q     But you could have asked them to come to a secret -

A     I could have, right.

Q     It is also true that you could have discussed with Paula that
      Kyron sounded pretty serious?

A     No.

Q     Okay, so you're sure that didn't happen but you don't remember

                                   114

if you asked to go to a secret location?

A   Right.

Q   Nothing further.

THE COURT: Now the jury can return.

MR. WHITE: Do you want the jury to return before I cross examine?

THE COURT: Oh, I didn't know you were going to cross examine her now.  Sure, you can cross examine her.  Go ahead.

MR. WHITE: Thank you.

CROSS EXAMINATION

BY MR. WHITE:

Q   Alright, now this took place back on October 5th of last year?

A   Yes.

Q   Alright, and Breanna and Paula came to the store where you were working?

A   Correct.

Q   Now Paula told you that these items had been stolen from her apartment?

A   She just said some items.

Q   Alright, now did she seem enraged herself or angry or anything?

A   Not too, no, not really.

Q   Did she say she was disappointed in Stephanie?

A   Yes, she said she was upset that her things were missing.

Q   Because Stephanie is her friend?

A   She didn't say that she was upset with Stephanie, she just

115

said she was upset her things were gone.

Q    Alright, now did she tell you she'd already reported it to the police at that point?

A    No, she had not.

Q    She did not tell you this?

A    She told me she did not do it yet.

Q    Oh, she told you she had not done it yet?

A    Right.

Q    Okay, and so she did indicate that Kyron was really mad about this?

A    She just said that he was upset about it and then that's when she said that if they didn't get their things back that he was going to shoot her.

Q    And she used the word shoot?

A    Yes.

Q    Alright, and did she just say that one time?

A    Yes.

Q    Did she say what her opinion of that was?  Did she say that she thought it was silly or ridiculous?

A    I don't recall.

Q    You don't recall what she said or didn't say?

A    Right.

Q    And you do recall her saying I'll probably go to the police?

A    Right.  And I suggested that would be a great idea.  That's what she needed to do.

116

Q   Okay, now you were asked about her showing up with Breanna
    at your job on that particular date.  Did she show up fairly
    often on your job to visit with you?

A   Um-hm.

Q   How often would you say she -

        THE COURT: Counsel, what's that got to do with this
trial?

        MR. WHITE: I think the significance to this trial
is to show that this is not some important isolated incident where
my client had this overwhelming need to discuss this.   It was simply
routine behavior on her part.

        THE COURT: Okay.

Q   It was frequent that she'd show up?

A   Yes, frequently.

Q   And she'd just discuss what was going on her life?

A   Right, always.  We always did that.

Q   Alright.  I don't have anything more for the witness.  Thank
    you your Honor.

        THE COURT: You can bring the jury.

        (Whereupon the Benson jury entered the courtroom)

        THE COURT: Mr. Burkett, cross exam?

        MR. BURKETT: I don't have any questions.

        THE COURT: Thank you, you can step down.   Call your
next witness.

        (Whereupon the witness was excused at 12:09 p.m.)

                        117

THE COURT:  Oh, I'm sorry, do you have -

MS. KETTLER: No.   Our next witness is only for Mr.

Benson's jury.

THE COURT: Well, the jury for Ms. Bennett can be excused.

Please be back Monday morning at 9:00 a.m.   Do not discuss the case.

(Whereupon the Bennett jury was excused)

SUSAN DUFRESNE

having been duly sworn by the Court at 12:09 p.m. was examined

and testified upon her oath as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q    Can you pull that microphone nice and close to you, please?

A    Sure.  Alright, can you please tell the juries your full name

     for the record?

A    Susan Marie Dufresne.

Q    Okay, and how are you employed?

A    I work for Sumpter Township dispatch.

Q    Okay, does that mean you're a civilian or a police officer?

A    Civilian.

Q    Okay, how long have you worked there?

A    Five years.

Q    Have you ever testified in court before?

A    Not for the police department.

Q    Are you a little nervous?

A    Yes.

118

Q    Okay, try not to be nervous.  If I ask you a question you don't understand, let me know.  Just listen carefully to the questions if you would, please.  I want to refer your attention back to October 8th of 2007.  Did there come a time where both Defendants in this case, Ms. Bennett and Mr. Benson, were in custody at your police department and in a place where you could watch and listen to them?

A    Yes.

Q    Okay.  Were they both in a cell together?

A    No.

Q    Alright, can you explain for the jury, if you would, please, where they were in connection to where you were when you made observations of them?

A    They were in the back of the police department in the cell area.

Q    Okay.  And keep in mind the jury's never been to your police department so where were you positioned that allowed you to see or hear them, if you could?

A    Okay, I'm in the front in the dispatch area.  We have monitors where we can hear and see them.

Q    Okay, so you have visual and audio monitors, is that correct?

A    Yes.

Q    And I'm sorry, I forgot already what you said, it's been a long morning, they were in the same cell or separate cells?

A    Separate cells.

119

Q    Okay.  But you have a monitor for each of them?

A    Yes.

Q    Are those cells in a position where people that are in those cells can communicate with each other?

A    Yes.

Q    Okay, and did you during the course of your day there at work monitor them on those video and audio monitors?

A    Yes.

Q    Can you tell me about what time of day it was that you got to work and you first started paying attention to what's going on with that?

A    I work afternoons, I'd have to refer to my notes what time --

Q    Okay, did you make a report?

A    Yes.

Q    Okay.  So, I don't need an exact time, what time did your shift start?

A    At four o'clock.

Q    Okay, and are you monitoring them because you're supposed to or just out of curiosity or what?

A    That's part of my job.

Q    Okay, and why in particular are you monitoring the two of these individuals?

A    Well at the time when they were lodged, they were not to communicate with each other.

120

Q   Okay, and who said they shouldn't be communicating with each
     other?

A   Officer Detective Toth.

Q   Okay, he told you that or them or both?

A   Both.

Q   Okay, and you observed him telling them that?

A   Yes.

Q   Okay, did they nonetheless communicate with one another?

A   Yes.

Q   Okay, and explain how this physical set up allowed this to
     happen.   Where would you have to position yourself to
     communicate, for example, where would Mr. Benson have to
     position himself to communicate with Ms. Bennett in the other
     cell?

A   The cells are side by side.

Q   Okay.

A   At times he would lay on the floor and talk like underneath
     the door so she could hear him.

Q   Okay, so there's a door between them or –

A   There's a wall between them.

Q   Okay, so there's a door at the front of the cell?

A   Yes.

Q   Okay, and a door on each of the cells?

A   Yes.

Q   And they're side by side?

121

A     Yes.

Q     And were you able to tell from the monitor if he was speaking out loud or whispering?

A     He was whispering before their interviews.

Q     Okay, and when he's whispering, are you able to make out what he's saying?

A     Yes.

Q     Okay, what did you hear him saying before their interview?

A     He would tell Ms. Benson, don't talk, don't talk.

Q     Did he tell her that once or more than once?

A     More than once.

Q     Okay, and how long did that go on before their interview started?

A     I'd have to refer to my notes.

Q     Okay, if that will refresh your recollection.

A     It was probably about four hours after my shift started.

Q     Okay.  Four hours after your shift started that they went in for their interviews?

A     Yes.

Q     Okay, and who went first?

A     Mr. Benson.

Q     Okay, and when Mr. Benson returned to the cell was Ms. Bennett still in her cell?

A     Yes.

Q     Okay, and did they take her out immediately after Mr. Benson

122

returned?

A    Yes.

Q    Okay, did they have any conversation with each other before they took Ms. Bennett out?

A    No.

Q    Okay, about how long was Ms. Bennett out?

A    Not really long, I think about ten minutes or so.

Q    Okay.  And when she returned then, was Mr. Benson still in his cell?

A    Yes.

Q    So after they're both back in their cells, are they talking with each other?

A    Yes.

Q    And tell me what Mr. Benson said to Ms. Bennett?

A    He asked her what she said, what she told them.

Q    Okay.

A    She replied nothing.  And did you tell him you wanted a lawyer.  And she said yes.  And he asked her what her charges were.  She said murder.  And he said if they charge me with murder and you with murder, who do you think they'd pick.  And she said me.  And he asked her if she would say that.  He asked her that multiple times, would you say that.

Q    Would she say that she did it?

A    Yes.

Q    Did she respond to that?

123

A    I don't recall.

Q    Did he, how long did they talk about this particular topic, about whether she would say that she did it after he returned to the cell?  Can you put an estimate on that?

A    Not really, I don't recall.

Q    Okay.  And did he continue to talk with, did Mr. Benson continue to talk with Ms. Bennett after that?

A    Briefly off and on because he was then taken to another facility.

Q    Okay, so they were there for some together before one had to be taken to a separate facility to separate them, is that accurate?

A    Yes.

Q    Okay, did he tell her about whether she should continue to talk?  At times did he tell her to keep her voice down?

A    Yes.

Q    And other than telling her to keep her voice down, did they discuss what was going to happen when they went to court tomorrow?

A    She asked him if they would get out when they went to court and he said -

Q    And what did he say?

A    He told her it depends, it depended on the bond, how much the bond would be.

Q    Did he discuss a certain figure?

124

A    He said with the charge, it may be high.

Q    Did he discuss a certain dollar amount?

A    I don't recall.

Q    Would your report refresh your recollection?

A    Yes.

Q    Okay, go ahead and look at that.  Do you have it?

A    Yes.  He didn't, he said it could be a million dollars.

Q    Or what else?  Complete the sentence.

A    Or it could be nothing.

Q    Okay.  Did he discuss with Ms. Bennett how long they would be in jail?

A    Yeah, he did tell her that it could be two days, it could be two years or longer.

Q    And what did she do after that?

A    She started to cry.

Q    And did she say anything?

A    Yeah, what are we going to do?  He told her to pray.

Q    Okay, what else did he tell her?

A    I don't recall.

Q    Referring to the very end of your report?

A    Oh, he reassured her how much he loved her.

Q    Did he say that repeatedly or just once?

A    He would say that repeatedly the whole time they were there.

Q    Okay.  And was there, you prepared a written report of your observations on the monitor, is that right?

125

A    Yes.

Q    Okay, and when did you prepare that report?

A    I think I prepared it the same day.

Q    Does it have a date on it?

A    October 8th.

Q    Okay, and did somebody, did anybody tell you what to write in this report?

A    No.

Q    Okay, and is this the truth of what you observed of their conversations on the audio video monitor?

A    Yes.

Q    In fact, about that specific thing I asked you about, you said that Mr. Benson said would you say that.  How many times did you put that in your report?  I'm going to refer you to just a little over half way down in your report.

A    I put it in here twice.

Q    Alright, one right after the other?

A    Yes.

Q    And does that mean he said it twice?

A    Yes.

Q    Nothing further, thank you Ms. DuFresne.

                    THE COURT: Cross exam.

                         CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning, good afternoon, ma'am.

                              126

A    Hi.

Q    Were you instructed to monitor their conversations?

A    Yes.

Q    Okay, and who gave you those instructions?

A    Detective Toth.

Q    Okay, and now your monitoring system also has a way of recording, does it not?

A    Yes.

Q    I assume that you recorded it?

A    I assume, I don't know for sure.

Q    You don't know whether these conversations were recorded?

A    Well I imagine they were.

Q    Well can I see the recording?   I'm sorry, can I have the recordings?

A    You would have to talk to my supervisor.   I don't deal with that.

Q    You don't deal with that?

A    No.

Q    Okay, during this recording, I mean during this conversation, you never heard Mr. Benson say he did this act, did he?

A    No.

Q    Okay, ma'am, when you were listening to all these conversations, do you know whether or not Mr. Benson had been told by the police that he doesn't have to make any statements?

A    I have no knowledge of that.

Q    Okay.   Did the officer in charge of this case ever come to
     you and ask you give us a copy of the recording?   Did they
     ever do that?

A    No.

Q    The officer told you something to the effect of just write
     down what you think happened or what you heard?   Is that what
     they told you?

A    No.

Q    Okay, what were you instructed to do?

A    As with all prisoners, we monitor them.   We were told to pay
     attention to them, listen to their conversation and make notes.

Q    I understand that.   Maybe I didn't make my question clear
     enough.   After you did all this and you told Officer Toth what
     transpired here, okay, you knew Mr. Benson was in there for
     murder, didn't you?

A    Yes.

Q    Okay, you told this to Detective Toth, correct?

A    I don't understand the question.

Q    You told Detective Toth what you heard?

A    Yes.

Q    Okay, you also, at that point the detective told you something
     to the effect, this is a murder case.   If you heard that, give
     me the tapes?

A    No.

Q    Has anybody from the Sumpter Police Department from the chief

128

on down ever asked you to produce the tapes?

A    No.

Q    But there are tapes available?

A    That's not something they would ask me so I don't know.

Q    That's it.

THE COURT: Thank you.  Oh, I'm sorry, Ms. Kettler, anything else?

MS. KETTLER: No, nothing further.  Thank you, Judge.

THE COURT: Thank you ma'am, you can step down.

(Whereupon the witness was excused at 12:23 p.m.)

MR. WHITE: I have no questions, your Honor.

THE COURT: Well, thank you.  You can step down and you're free to go.  Ladies and gentlemen, as you probably know I don't deal with trials on Fridays so do not discuss the case. Have a pleasant weekend and be back Monday morning at 9:00 a.m.

(Whereupon the jury was excused for the day)

(On the record without the jury)

THE COURT: Was there a question about the tapes?

MR. BURKETT: Yeah, I'd like to have a copy of it. We had previously asked for copies of the tapes in an order that you signed.

THE COURT: I didn't -

MS. KETTLER: Judge, if the tape existed, it would certainly have been provided to him.  And I think counsel did that with the jury still in her on

129

purpose.

THE COURT: Well that's why I stopped it because that thought occurred to me but I'll have to give him the benefit of the doubt because if I thought he was doing that, he would be relieved of considerable money by the way of fines.

MS. KETTLER: I appreciate you checking him so to speak but the damage is done and I think counsel has been a lawyer long enough to know better than that.

MR. BURKETT: I will say this one time, Judge.   I treat people in this courtroom with respect and I demand that they treat me the same way and don't be accusing me of things that they have no, I ain't talking about you, I'm talking about her.

THE COURT: I'm certain as I sit here that you aren't talking about me because if you were talking about me, that would cause me to lighten your wallet.   What happened was the jury was walking out when you said loud enough for me to hear and the record should reflect the jury was less than five feet from me walking out, you said I'd like to have a copy of the tape.   That's when I stopped you and indicated no conversation between the lawyers should occur while the jury is in earshot.   I didn't use the word earshot, I was more concerned about having them leave.   Now, there's nothing further I intend to do about it but if you want to make a big deal out of it, I'm perfectly capable of making a ruling.

MR. BURKETT: I'm finished.

THE COURT: Good.   As to closing arguments, I'll allow each lawyer to have one half hour with their closing arguments and they will be done with one jury at a time.   So Ms. Kettler will half hour.   Then one of the defense lawyers a half hour.   Then I'll instruct that jury and send them into deliberations.   And then

130

we'll do the second closing argument or the closing argument for the second jury and instructions.   So I don't have any idea when this is going to take place.   Does anybody have a clue when this is going to end?

MS. KETTLER: I think, I feel confident that I would be finished with my remaining witnesses before one o'clock on Monday.

THE COURT: Really?

MS. KETTLER: Yes.

THE COURT: Okay.

MR. BURKETT: I need to say something to you at sidebar and the reason why, it's not a public thing if you would allow me to approach.

THE COURT: All three lawyers can approach.

(Matter concluded)



STATE OF MICHIGAN )

COUNTY OF WAYNE   )


I, Jeffrey B. Goldsmith, Official Court Reporter for the Third Judicial Circuit of Michigan, do hereby certify that I reported the foregoing proceedings before the Honorable MICHAEL J. CALLAHAN; Circuit Judge on May 15, 2008; that the

131

foregoing 133 pages constitute a true and correct transcript of the proceedings so held.


_____
Official Court Reporter
CSMR-0037