STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF
MICHIGAN,

                    Plaintiff,

-v-                              Case No. 07-024733-01
07-024733-02
KYRON DARELL BENSON and
PAULA RENAI BENNETT,

                    Defendants.
_____/

JURY TRIAL
VOLUME VIII

Proceedings had before the

Honorable MICHAEL J. CALLAHAN, Judge of the Third Judicial

Circuit of Michigan, 703 Frank Murphy Hall of Justice,

Detroit, Michigan 48226, on May 19, 2008.

APPEARANCES:

            MS. MOLLY KETTLER                    Assistant Prosecuting
Attorney

                        On behalf of the Plaintiff


            MR. RAYMOND BURKETT
    Attorney at Law

                        On behalf of Def. Benson


            MR. WALTER A. WHITE
            Attorney at Law

                        On behalf of Def. Bennett

            Jeffrey B. Goldsmith
            Official Court Reporter
            CSMR-0037
                        INDEX


WITNESS                                          PAGE

MICHAEL LANGE

| | |
|---|---|
| Direct Examination by Ms. Kettler | 3 |
| Cross Examination by Mr. Burkett | 16 |
| Cross Examination by Mr. White | 22 |

JOHN TOTH

| | |
|---|---|
| Direct Examination by Ms. Kettler | 31 |
| Cross Examination by Mr. Burkett | 96 |
| Redirect Examination by Ms. Kettler | 96 |
| Continuation of Cross Examination by Mr. Burkett | 97 |

| EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| Plaintiff's #70 | Prev. | 34 |
| Plaintiff's #40 | Prev. | 92 |

May 19, 2008

Detroit, Michigan

P R O C E E D I N G S

*     *     *

THE COURT: Each juror is present and properly seated and you

3

may call your next witness.

     MS. KETTLER: Thank you your Honor.

     MICHAEL LANGE

having been duly sworn by the Court at 9:33 a.m. was examined and testified upon

his oath as follows:

     DIRECT EXAMINATION

BY MS. KETTLER:

Q  Good morning Officer, would you please state your full name for the record?

A  Michael Lange.

Q  Okay, and where are you employed?

A  Sumpter Township Police Department.

Q  Can you pull that a little closer to you and keep your voice up nice and loud?

A  Okay.

Q  And how long have you been employed at Sumpter Township Police
    Department?

A  Over sixteen years.

Q  Okay, I want to ask you about a number of things that you did in connection
    with this investigation.   I'm going to start off at the scene.   Did you go to the
    scene of the homicide of Stephanie McClure in the very early morning hours of
    October 6th, 2007?

A  Yes.

Q  Okay, can you tell me when you arrived there, were other officers already there
    and if so, who were they?

A  Yes, there were already officers which were Corporal Luke and Officer
    Jablonski and Officer Toth.

Q     Okay.   Did you, was the scene already secured and taped off when you arrived?

A     It was secured.

Q     Okay, did you assist in checking the trailer to make sure it was secure and there were no other victims or gunmen present?

A     I did not go in the trailer.

Q     Okay, were you there when that was done however?

A     No.

Q     Okay, after you arrived, was the scene taped off?

A     Repeat the question.

Q     Was the scene taped off with police tape?

A     No.

Q     Okay.   But was it eventually?

A     Yes.

Q     Okay, did you assist Officer Lange and another officer, and I use that term loosely, with a dog track in this case?

A     I'm Officer Lange.

Q     Okay, I'm sorry, are you a canine handler?

A     Yes, I am.

Q     Okay, and who was the other officer -

A     Corporal Luke.

Q     Okay, and who was the dog?

A     That was my dog, Canine Henry.

Q     Okay, and is Henry a drug dog, a bomb dog or a tracking dog?

A     He's a dual purpose patrol/narcotics dog.

Q      Okay, and did you and Henry attempt to track, get a track from the scene for a
       possible gunman?

A      Yes.

Q      Alright, and can you tell the jury, I want to show you a, what's previously been
       admitted as People's exhibit 2.   And we have two juries here so the best you
       can, I'm going to ask you not to put, block this and I'm going to ask you to step
       down here and show us please roughly, and describe roughly where you
       started the track and where the dog ended his track.   You don't need to mark
       it.   You just, people use this to point to.

A      I started at the body on Utah Court.

Q      Okay.

A      And the dog tracked across the -

Q      Nice and loud with the voice please.

A      I started at the deceased's body on Utah Court and then went across to, ended
       at Nevada.

Q      Okay, and did it end right when you got to Nevada?

A      Yes.

Q      And how did the dog indicate that it picked up a track?

A      The dog indicates by sniffing the ground and then goes on the forward
       movement.

Q      Okay, and in your experience handling Henry, had he picked up a track from
       the dead body?

A      Yes.

Q      And how did you become aware that the track ended right when you got to
       Nevada?

6

A     The dog stopped at the sidewalk at Nevada Street.    That's how the dog indicates that a track stopped.

Q     Okay, and just so you, you can get back on the witness stand, thank you.    Just so we're clear, you're not telling these juries that you know who or what Henry was tracking, just that he picked up a track from near the scene of the homicide and stopped at Nevada, is that right?

A     That's correct.

Q     Okay.    Did you, how long did you remain at the scene, roughly?

A     Forty five minutes to an hour.

Q     Okay, and from the scene, were you dispatched to another location?

A     Yes I was.

Q     And where was that?

A     Haggerty sub.

Q     Okay, and what street in particular.

A     I'd have to refer to my notes.

Q     Okay, if that would refresh your recollection.

A     10800 Buchanan Street.

Q     Okay, and what were you dispatched to that location for?

A     To search for another male subject.

Q     Okay, and that person was who?

A     May I refer to my notes?

Q     If that would refresh your recollection.

A     Timothy Walker.

Q     Okay.    Was he already secured at the residence by another police department when you arrived?

7

A    No, he was not.

Q    Okay, well was he in the residence?

A    No.

Q    Okay, when did he arrive there?

A    He arrived on the sidewalk as we were, myself and several other Van Buren
     officers were outside.

Q    Okay, and was he taken into custody for questioning without incident?

A    Yes.

Q    Was that location then secured for execution of a search warrant?

A    Yes.

Q    Okay.   When you arrived at that scene, how many Van Buren officers were
     there roughly?

A    Five.

Q    Okay, and did you participate in the execution of the search warrant at
     Buchanan?

A    Yes.

Q    Okay, and did you wait there for it to arrive?

A    Yes.

Q    What was your particular role in the execution of the search warrant at
     Buchanan?

A    Search for any evidence that was related to the incident.

Q    Okay, and after that search was, well, did more than one officer engage in
     executing the search warrant?

A    Yes.

Q    And after that work was done, what function did you perform in particular

yourself?

A    Securing property that was taken from the residence.

Q    And did you prepare the return of the search warrant?

A    Yes I did.

Q    And what, if you could tell us, was taken at the Buchanan address?    Do you know it without referring to the search warrant return?

A    I know of clothing.

Q    Okay, to give us a specific description would you have to refer to the search warrant return?

A    Yes.

Q    And that was prepared by you?

A    Yes.

Q    Alright, I'm handing you your search warrant return.    Tell the juries what was taken from the search warrant.

A    One pair of blue jeans, one pair of black jeans, one white t-shirt, one pair of white shorts, one short sleeve shirt, one cream hooded sweatshirt, one Sony micro-cassette recorder containing one Panasonic micro-cassette, one Sony micro-cassette was taken.

Q    Okay.    Now once that was prepared then, was that the completion of your work at Buchanan?

A    Yes.

Q    And was that the first, the first search warrant you assisted in executing that day?

A    Yes.

Q    And that was the same day as Stephanie McClure's body was discovered?

9

A     Yes.

Q     Alright, was there another search warrant that you assisted in that day?

A     No.

Q     Okay, did you assist in planning for a search warrant the next day, referring to your work in Ypsilanti?

A     Yes.

Q     Alright, was that the same day or the next day?

A     I believe it was the same day.

Q     Alright, and what was the address on that?

A     Can I refer to my notes?

Q     Sure, if that will refresh your recollection.

A     5480 Big Pine, Ypsilanti.

Q     Okay.   And was that conducted in conjunction with officers from that jurisdiction in Ypsilanti?

A     Yes.

Q     Alright, and did you assist in the actual search there or just provide security and planning assistance?

A     Both.

Q     Okay, did you identify and interview any individuals in the residence?

A     Yes.

Q     And who did you identify there at the residence?

A     Kyron Benson, the homeowner and also a younger female that was also at the residence.

Q     And who was the homeowner?

A     Can I refer to my notes?

10

Q   If that will refresh your recollection.

A   Katherine Smith.

Q   And what was her relationship to the Defendant?

A   She identified herself to me as Kyron's mother.

Q   Okay, and the younger lady who was there, what was her name?

A   Crystal Davidson.

Q   And did she indicate what, if any, relationship she had to the Defendant?

A   A sister to Kyron.

Q   Okay, and about what time was it that you were there at the Big Pine address with this search warrant?

A   I'd say after eight o'clock.

Q   And this was the day following the discovery of Stephanie McClure's body?

A   Yes.

Q   Alright, did Mr. Benson give you any trouble when he was taken into custody?

A   No.

Q   Alright, what were the items that were taken from that residence?

A   I'd have to refer to the tabulation.

Q   Okay.

A   Would you like me to read them off?

Q   Yes.

A   One cellular flip phone, one pair of Reebok black leather court shoes, one Motorola cell phone with the charger, one Motorola cell phone, another Motorola cell phone, one LG cell phone, one Lincoln highschool ID bearing the name of Kyron Benson, one Michigan operator's license having Kyron Benson and an address of 5480 Big Pine, Ypsilanti, Michigan.

11

Q      And why was that significant to take that with the address on it?

A      It shows his residency.

Q      Okay, continue.

A      One LG cell phone, one personal protection order with the name of Timothy
       Walker and Kyron Benson, which showed a date of 2-28-06.

Q      And who was the protected party on that?

A      Timothy Walker.

Q      Alright, and who was the party who was barred from having contact with him?

A      Kyron Benson.

Q      Alright, what else?

A      Then also a Washtenaw County Sheriffs Department report, report number of
       05-34780.

Q      Okay, is that the totality of the items taken?

A      Yes.

Q      Total of how many cell phones taken from that address?

A      Six.

Q      Okay, and at that point when you were finished executing the search warrant,
       was Mr. Benson taken into custody reference to the homicide of Stephanie
       McClure?

A      Yes.

Q      Alright.   Did you also transport a witness in this case at some point in time?

A      Yes, I did.

Q      And what was that young lady's name?

A      I'd have to refer to my notes.

Q      Alright, and would that refresh your recollection?

                                        12

A    Yes.

Q    Go ahead and do that.

A    Kathleen McIntyre.

Q    Okay, and where did you take her into custody?

A    In the area of Ecorse and Harris.

Q    And what day was that?

A    That was on the same date that we executed the warrants on Big Pine.

Q    Was it before or after the warrants on Big Pine?

A    After.

Q    Okay, and was she taken into custody for questioning?

A    Yes.

Q    And where did you transport her to?

A    Back to the Sumpter Township Police Department.

Q    Okay.   Did you also take some part in beginning the processing of one of the Defendants?

A    Yes.

Q    And which one was that?

A    Ms. Bennett.

Q    Okay, and when did that occur?

A    After I arrived with Ms. McIntyre at the police station.

Q    Okay, and did you take her out of the vehicle and take her into start processing her in?

A    Yes, I did.

Q    Alright, now I also want to ask you was there a point in time sometime days after the homicide of Stephanie McClure that you participated in the execution

14

of a search warrant at the Harbor Club Apartment complex?

A     Yes.

Q     Alright, can you tell the jury what day that was and what happened to take you to that location on that occasion?

A     Referring to my notes it took place on 10-18 of 2007.

Q     Okay, and why did you happen to go there or why was a search warrant obtained at that time?

A     I was requested by Detective Toth and Officer Cayce to type up a search warrant for this particular residence due to the fact that several small ammunition bullets were found at the residence.

Q     Okay, describe as clearly as you can where you found those and what the condition of the ceiling above it was?

A     I didn't find the bullets.   Officer Cayce advised me that some bullets were found.

Q     Where were they when you got there?

A     At the police station.

Q     At the police station or did you go to the Harbor Club Apartments?

A     I went to the Harbor Club Apartments after the fact.

Q     Okay.   And what was your purpose in going there after the fact?

A     To seize or obtain any other evidence that was related to the incident.

Q     Okay, and was this after Officer Cayce had already been there to execute the search warrant?

A     Yes.

Q     Or to seize the bullets?

A     To seize the property.

Q     Okay, and when you went there, though, describe the condition of the ceiling

       tiles in the closest area between the bedroom and the bathroom?

A     The ceiling tiles were moved and also there was approximately an eight inch

       hole on the, from the ceiling into the wall.

Q     So when you went there, the bullets had already been recovered.   Did you take

       anything additional pursuant to the search warrant?

A     No.

Q     Okay, nothing further.   Thank you, sir.

                         THE COURT: Cross exam.

                         CROSS EXAMINATION

BY MR. BURKETT:

Q     Good morning Officer Lange.

A     Good morning.

Q     Officer, let me start, if I might, with the last thing you testified to, the search

       warrant at the Harbor place.   Do you know what I'm referring to?

A     Yes.

Q     How many search warrants at the Harbor place were you involved in?

A     One.

Q     The one, okay.   Were you aware when you went there that the place had

       already been searched by your department?

A     Yes.

Q     Okay, do you have any knowledge by looking at photos or anything what the

       place looked like when they finished?

A     No.

Q     Okay.   When you went there, sir, specifically what were you looking for?

                                          16

A     Any other evidence that could help out in the crime.

Q     Okay.   But how long were you there?

A     Forty minutes, forty five minutes.

Q     And someone was with you?

A     Yes.

Q     Prior to going in, was the residence secured?

A     Yes.

Q     Okay, so how did you get in?

A     The security.

Q     Allowed you to go in?

A     Yes.

Q     Once you showed them you had a search warrant?

A     Yes.

Q     Okay, now you have described the ceiling to us.   Was the entire ceiling taken down or just most of it?

A     There's just a small hole, approximately eight inches.

Q     Okay, when you said, the ceiling had tile on it, correct?

A     Yes.

Q     Similar to the tile here?

A     Yes.

Q     Okay, and how many of those tiles were missing?

A     I have no idea.

Q     If you know?   Beg your pardon?

A     No idea.

Q     Okay.   Well, did you look at the tile?

17

A    I mainly, my main focus was the hole in the wall.

Q    Okay, I'm not referring to the hole in the wall now.   I'm referring to the tile in the ceiling, okay.   Now, did you look up at the ceiling?

A    I looked at it but I didn't physically count how many ceiling tiles were moved.

Q    Okay, were there any moved?

A    Yes.

Q    Okay, when you went there, did you go there with the knowledge that bullets had been found in the ceiling?

A    Into the wall, yes.

Q    No, not the wall, the ceiling?

A    No.

Q    Okay.   Now you talked about a search warrant that was issued at Mr. Benson's home.   You participated in that?

A    Yes.

Q    Okay, and you told us some of the things that were taken?

A    Yes.

Q    Isn't it true, sir, that Mr. Benson's grandparent's automobile was taken into custody?

A    I have no knowledge of that.

Q    Okay sir.   I want to talk with you just a second concerning the night of the killing.   You were at the scene, is that correct, sir?

A    Yes.

Q    Okay, now approximately how long were you, did it take you to get there once the radio run came out?

A    Less than twenty minutes.

18

Q    Okay, you were already on active duty that night, is that correct, sir?

A    No.

Q    Oh, you were called from home?

A    Yes.

Q    Okay.   Were you, once you got involved in the case, sir, were you monitoring police calls?

A    No.

Q    Okay.   You said something in terms of going to Mr. Benson's home, not Mr. Benson, I'm sorry, Mr. Walker's home, correct?

A    Yes.

Q    And you were meeting the Van Buren Police?

A    I was meeting them there, yes.

Q    Okay, could you tell us how the Van Buren Police got involved?

A    They were there and called by Detective Toth for mutual aid and assistance by our department.

Q    Okay.   When you went there, sir, were you aware whether or not Mr. Walker's automobile was there?

A    I have no idea.

Q    Okay, maybe I didn't ask that properly.   Did you go there looking for Mr. Walker's automobile?

A    No.

Q    Okay, was Mr. Walker's automobile taken into custody?

A    Yes.

Q    Okay, by you?

A    No.

19

Q      And you told us clothes that were taken into custody?

A      Yes.

Q      Okay, you didn't mention the automobile.   What about Mr. Walker's, any of Mr. Walker's shoes.   Were any of those taken into custody?

A      I'd have to refer to the tabulation.

Q      Please do.

A      No.

Q      Now, Henry is your dog, is that correct?

A      Yes.

Q      And did you train him?

A      Yes, I did.

Q      Okay, German Shepard or -

A      German Shepard, yes.

Q      Okay, now forgive my ignorance about this but I want to ask you some questions about that.   You put your German Shepard on a track to see where it would lead, is that correct?

A      Yes.

Q      Okay, did you ever take any of the things that you found at Mr. Walker's house to see if your dog recognized them?

A      No.

Q      Sir, I'm going to show you what purports to be two automobiles that were taken into custody by your department.   Do you recognize any of those, sir?

A      Now I do, yes.

Q      Beg your pardon?

A      Yes.

20

Q   Okay, I'm referring to the one that was taken at, in Ypsilanti at Kyron's home,
    sir.   Does that refresh your memory as to whether or not you took an
    automobile from there?

A   It appears that both vehicles were taken from Buchanan Street.

Q   Okay, and you still don't have any independent recollection of whether or not
    any automobile was taken in Ypsilanti?

A   It shows, no, not in Ypsilanti, no.

Q   Okay, the stuff, the things that you took on Buchanan, sir, what was done with
    it?

A   The items?

Q   Yes.

A   The clothing?

Q   What did you do with them?

A   I turned them into the police department.

Q   Okay.   Could you tell me, sir, the two cars that were taken on Buchanan, sir,
    what were they?

A   A 1989 Lincoln, 2-door, silver.   The second vehicle would have been a 1996
    Dodge Neon, 2-door, red in color.

Q   I have nothing further.

                THE COURT: Mr. White.

                MR. WHITE: Thank you your Honor.

                CROSS EXAMINATION

BY MR. WHITE:

Q   Good morning Officer Lange.

A   Good morning.

21

Q    Now you're with Sumpter Township Police Department?

A    Yes, I am.

Q    Are you a patrol officer?

A    Yes.

Q    And how long have you been with the department?

A    A little bit over sixteen years.   It's going to be seventeen years in June.

Q    Alright, now you got a call about the homicide in the early morning hours of the 6th of October, correct?

A    Yes.

Q    And you arrived with your dog, do you keep the dog at home with you?

A    Yes I do.

Q    Alright, now you said you trained the dog yourself.   How long have you been working with Henry?

A    Approximately two years.

Q    And you said by the time you arrived at the trailer, there were officers securing the scene, it was not taped off, correct?

A    Not yet.

Q    Alright, and approximately what time would you say you arrived at the scene?

A    I'd have to refer to my notes.

Q    If you could, please.

A    I don't have that noted but after one o'clock, I believe.

Q    Now was the first thing you did attempt the canine track with Henry?

A    Yes.

Q    And you started him at the body or near the body?

A    Near the body.

Q   How close to the body?

A   I don't know.

Q   Okay, if I could bring you back up to the chart here.   And of course we have to speak up when we're over here.   Alright, now my recollection is this is roughly the location of the body, correct?

A   Yes.

Q   And would you then show us the track you followed with Henry where it ended.

A   Started near the body here on Utah Court and the track led me approximately into the middle of Nevada Street, the next street over.

Q   Alright, thank you, you can have a seat.   Now do you know what the distance of that track was?

A   Less than a hundred yards.

Q   Did you measure it or is that an estimate?

A   That's an estimate.

Q   Alright, and how did Henry indicate that he had a track when you began the track?

A   With his nose down and he started digging in the ground and moving forward.

Q   Alright, and how did he indicate that the track had ended?

A   Stopped.

Q   Alright, now after he stopped, did you make any effort to recover the track at that point?

A   Yes, I did.

Q   And what efforts did you make to recover the track?

A   Tried to do an area search but my canine wouldn't go any further in that area that I stopped at.

23

Q    When you say wouldn't go any further, did he refuse to go further or did you take him in a circle, say, and he never picked up anything?

A    Well, if you want me to explain, we give the dog the command to search again and then we let him free search and when there isn't a track, the dog is just going to just move in a circle and then come right back to where the track ended.

Q    Now you don't know that this track has anything whatsoever to do with this homicide case, do you?

A    No.

Q    Alright, did you, you didn't give the dog a piece of clothing or anything to follow, anything like they do in the movies, right?

A    No.

Q    Alright.   Now when you were done with that track, did you return to the scene of the body and attempt to see if other tracks could be found or established?

A    Yes.

Q    And were you successful?

A    No.

Q    So the only track you found was the one leading over to Nevada Street?

A    Nevada, yes.

Q    Nevada, excuse me.   And can you establish how old that track was?

A    No.

Q    Alright, now you said you later went to 10800 Buchanan?

A    Yes.

Q    And initially, did you have a search warrant with you when you went to that scene?

24

A    No.

Q    Alright, the scene was secured by which department?

A    Van Buren.

Q    Alright, now you said, when did you first see Timothy Walker?

A    When I was outside the residence.

Q    Alright.   Now, was he walking towards the residence or was someone bringing him out of the residence?

A    I don't recall.

Q    Alright, is it possible that he was actually secured in his bed and brought out of the residence by other officers?

A    Could have been.

Q    Right, now was there any other individual detained at that address?

A    I don't recall that.

Q    Alright, and you indicated that you seized some property.   Were you the person who was responsible for taking the property seized to the department?

A    Yes.

Q    And the property you seized, what did you do with it?

A    I boxed it up at the residence and took it back to the police station.

Q    And where did you place it?

A    At the police station?

Q    Yeah.

A    I don't recall that.

Q    Did you ever handle any of those items again?

A    No.

Q    Alright.   Now there's been question about a search done at Big Plains where

Kyron Benson was taken into custody.   Is that the only search, the only other search you were part of conducting?

A   No.

Q   Alright, let's go through that.   Now at that address, you indicated among other things taken were six cell phones, correct?

A   Yes.

Q   Did you ascertain who the phones belonged to?

A   No.

Q   Alright, did you ascertain how many people lived in the residence?

A   No.

Q   Did you ascertain whether any of the phones belonged to Kyron Benson?

A   No.

Q   Now at that point Mr. Benson was taken into custody, were you responsible for transporting him or was someone else?

A   Someone else.

Q   Alright, the property that was taken into custody at Mr. Benson's residence, were you responsible for transporting the property?

A   Yes.

Q   And what did you do to that?

A   I placed it in a box and took it back to our police station.

Q   Alright, and what did you do with it at the police station?

A   Placed it into Detective Czinski's officer.

Q   Detective Suzuski's office?

A   Czinski.

Q   Alright.   Now you didn't put it in a locked evidence room?

26

A    No.

Q    Now the search warrant at Harbor Club, you were involved in on the 18th of October, that was, as you indicated, subsequent to someone finding cartridges at the residence?

A    Yes.

Q    And you indicated there was a hole in the wall?

A    Yes.

Q    And was this in the vicinity of some hanging ceiling tiles?

A    Yes.

Q    But you don't remember the exact situation of the ceiling tiles, is that correct?

A    No.

Q    Now if the ceiling tiles had been in place, could you have seen that hole?

A    Yes.

Q    Alright, so the hole was not somewhere where the ceiling tiles covered the wall?

A    That's correct.

Q    Now did you take some action subsequent to discovering that hole to see if there was any other evidence at the scene?

A    Yes.

Q    And what did you do?

A    We actually cut into the wall.

Q    Alright.   And what was the purpose of cutting into the wall?

A    To see if anything dropped down through the wall to the floor.

Q    Alright, did you use a metal detector to see if there was anything metallic in the wall?

27

A    I didn't have that use.

Q    Did you locate anything in the wall?

A    No.

Q    Did you locate in your search of the premises anything at all relating to firearms?

A    No.

Q    I have no further questions for this witness.

THE COURT: Anything else?

MS. KETTLER: No, nothing further.

THE COURT: Thank you Corporal, you can step down and you're free to go.

(Whereupon the witness was excused at 10:04 a.m.)

THE COURT: Call your next witness.

MS. KETTLER: Your Honor, I have one matter just for Mr. Benson's jury at this point, if I could.

THE COURT: Ms. Bennett's jury, please step into the jury room.

(Whereupon Ms. Bennett's jury left the Courtroom)

MS. KETTLER: At this point, we're going to read a stipulation into the record and that is as follows:   The People and the Defendant agree and stipulate that the Defendant, Kyron Benson, has previously been convicted of a felony punishable by four or more years and has not met the requirements for regaining eligibility to lawfully carry a firearm.   Is that a correct stipulation, counsel?

MR. BURKETT: That is correct.

MS. KETTLER: That's all for this jury alone.

THE COURT: We need the other jury?

28

MS. KETTLER: Yes.

THE COURT: You can bring the jury.

(Whereupon the Bennett jury entered the Courtroom)

JOHN TOTH

having been duly sworn by the Court at 10:09 a.m. was examined and testified upon his oath as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q   Alright, good morning.  If you could pull that nice and close to you, I'd appreciate it.  Would you state your full name for the record, please?

A   John Toth.

Q   Alright, and are you the officer in charge of the investigation of this case?

A   Yes.

Q   Okay, would you please tell the juries, if you would please, briefly how, what your duties as the officer in charge are and how that's different from the various officers who have done a part of this?

A   I guess the difference is that I was just overseeing everything and continuing forward with whatever presented itself -

Q   Okay.

A   Where other people had just been assigned something.

Q   Okay, and is this the, I don't think I asked you, how long have you been a police officer?

29

A Thirteen years.

Q And has all of that thirteen years been at the Sumpter Township Police Department?

A Eight years has.

Q Okay, and before that where were you employed?

A I was with the city of Belleville.

Q City of?

A Belleville.

Q Okay.   And in your time as a police officer, how many homicide investigations have you been in charge of prior to this one?

A Zero.

Q Okay, how many homicide investigations has the Sumpter Township Police Department handled during the time you've been employed there?

A Zero.

Q When was the last homicide in Sumpter Township?

    MR. BURKETT: Judge, I'm going to object.   I don't see the relevance of that.

    MS. KETTLER: I think it's relevant in that there have been attacks on this investigation.   It's relative, it's relevant to that.

    THE COURT: Overruled.

Q What did I ask you last?   Have you, when was the last homicide in Sumpter Township?

A Convicting homicide -

Q No, the last homicide in Sumpter Township that was investigated by any police agency?

30

A      MSP did investigate one but it was a justifiable defense.

Q      Okay, and how long ago was that?

A      That one actually was when I was here.   I may have misunderstood your question.

Q      Okay, you were not in charge of that investigation, is that right?

A      Michigan State Police was.

Q      Alright, and the last homicide that you recall in Sumpter Township was investigated by the Michigan State Police with assistance from your department, is that correct?

A      MSP, once they arrived with the lab techs, they took over the investigation.

Q      Okay, I want to ask you first of all, you heard Heaven Kindall testify in this matter, and I want to ask you about a 911 tape.   Are you, have you provided me as well as both defense attorneys with a copy of the 911 tape that was, 911 call that was placed after the shots were heard when Stephanie McClure was killed?

A      I believe it was provided.   I didn't make the -

Q      Did you provide it to our office?

A      Yes.

Q      Okay, and have you listened to that?

A      Yes, I have.

Q      Okay, and is taping of 911 calls something that is done in the ordinary course of business by the Sumpter Township Police Department?

A      Yes.

Q      And is that tape that you provided me a business record that is kept in the ordinary course of business?

31

A    Yes.

Q    Alright, I have shown counsel and I'm going to mark this as People's exhibit 70, an audiotape and I'd ask the Court, I'm going to move for its admission.

      MR. BURKETT: Judge, I've already said I have no objection to it.

      MR. WHITE: Neither do I.

      THE COURT: It's admitted.

      MS. KETTLER: May I play it for the jury at this point?

      MR. BURKETT: I have no objection.

      MR. WHITE: Nor do I.

      THE COURT: You can play it.

      (Whereupon the 911 tape was played for the juries)

Q    Alright, first of all I'm going to ask you how did you, how were you first dispatched to the scene?

A    The dispatcher taking the call told me about it.

Q    Okay, and I need you to keep your voice up loud.

A    The dispatcher that took the call told me about it.

Q    Okay, and were you on call for this type of thing that night or what happened, what caused you in particular to be dispatched to the scene?

A    Just rotation of runs, no specific reason.

Q    And when you arrived at the scene, who was already there?

A    Myself and Officer Jablonski were running basically, he was right in front of me. We were running a semi-code, we just had our lights going.   When we pulled in, he took the circular road which is California, which will take you to all the courts.   He went kind of towards the east.   I went to the west just in the event somebody was walking from that location.

32

Q    Okay.

A    He arrived and I, it was like simultaneously after him I arrived.

Q    Okay, and as you circled around then, did you observe anybody fleeing from the scene?

A    No.

Q    Okay, and you went directly to 372 Utah Court at that point after you had made that loop around?

A    Eventually I found that we were going to 372 Utah Court.

Q    And you and Officer Jablonski arrived there almost simultaneously, is that your testimony?

A    Yes, simultaneously.

Q    Okay, and when you arrived there, what do you do?

A    As I was pulling in and putting my car in park, that's when Officer Jablonski said, you know, we need an ambulance.

Q    Okay, and so what did you do?

A    I exited the car and I walked up to the body and it was very obvious she was dead.

Q    Okay, and did you personally check to make sure, what did you do that made that obvious to you?

A    I just touched her and I could see that, it was obvious she was dead.

Q    Okay.

A    Jablonski had indicated that she was dead.

Q    Okay, and so you called for an ambulance?

A    Officer Jablonski did.

Q    And what did the two of you do after that point?

33

A    At that point, we just set up into a secure location because we didn't have any idea if there was a suspect in the area.   We didn't -

Q    Okay, you set up in a secure location and wait for what to happen?

A    We wanted to make entry into the residence to make sure that there was no other victims or any suspects; however -

Q    What did you wait for to happen before you did that?

A    We waited for Corporal Luke to arrive.

Q    Okay, and when Corporal Luke arrived then, what did you do?

A    I maintained security outside the residence and I entered the residence.

Q    Okay, was anybody located within the trailer that was brought out of the residence?

A    No.

Q    When you first arrived there you said the young lady's body was there and she was obviously dead.   Were there any other civilians in that immediate area besides the apparently deceased young lady?

A    No.

Q    Alright, after your officers made sure the situation was secure, what did you set in motion at that time at the scene?

A    Trying to establish what had happened.

Q    Alright.

A    Identifying the body.

Q    So here you are, you had a young lady deceased here.   You mentioned identifying the body.   Is that one of the first things you need to do?

A    At that particular -

Q    You didn't know who she was, right?

34

A     At that particular moment, that was the next thing that the process needed to start.

Q     Okay, and how did you go about identifying who she was?

A     At that point, all I could do was run the license plate of the vehicle that the body was next to.

Q     And did that license plate match the young lady herself?

A     It matched her physical description.   I had no idea who the young lady was at that moment.

Q     Okay, so you did a physical description based on what kind of records, through the lien?

A     Through the lien.

Q     Alright, and so did you work for that period of time on the assumption then that you had the correct name of the deceased there?

A     At that time it was an assumption.

Q     Okay, and what other information did you get when you ran the license plate that you acted upon at that point in time?

A     The way our dispatch is set up, when you run a license plate, it also runs the registered owner.   It returned with a personal protection order protecting who we thought was Stephanie McClure.

Q     Okay, so at that point you're going on the assumption until the relatives can identify her that she's Stephanie McClure based on the physical description you get running the plate, is that correct?

A     That's correct.

Q     Okay, and then you get, a PPO pops up with her as the protected party and who was the person she is to be protected from?

35

A    Timothy Walker.

Q    Okay.   And obviously, or maybe not obviously do you have any idea who's

      killed this young lady at this point?

A    No.

Q    Okay, and so receiving that information about Timothy Walker, what do you do

      with that at that point or what do you direct to be done?

A    We put out a BOL for Timothy Walker.

Q    And a BOL is what?

A    Be on the lookout.

Q    Alright, and how soon after you got to that scene would you say you put that

      BOL out for Timothy Walker?

A    Ten minutes, maybe less.

Q    Okay, and did you, at that point in time when you put the BOL out did you also

      get information about where he, what   his registered address was?

A    We did a vehicle search for him and we were able to establish that indeed he

      was to Buchanan.

Q    Buchanan in what jurisdiction?

A    Van Buren.

Q    Okay, and is that one of your neighboring jurisdictions?

A    It's directly north of us.

Q    Okay.   From the time then that you put out the BOL, how long passes before

      you have some information that Mr. Walker's spotted?

A    A Van Buren officer had -

Q    How long before you get that information?

A    Another five minutes.

36

Q    Okay, and about five minutes you get that information from who?

A    Chris Hayes of Van Buren Township.

Q    Okay, and receiving that information, the information is that he's located where?

A    His vehicle was located at his address.

Q    Okay, on Buchanan in Van Buren?

A    Yes.

Q    Okay, and based on that what action did you take, ask Van Buren to take to assist you?

A    Officer Hayes did what he was supposed to do and he just started setting up a perimeter.   We didn't even have to ask him to at that point.

Q    Okay.   Alright, he advises you he has already started to set up a perimeter at that address?

A    Yes.

Q    You've advised, Officer Hayes is from Van Buren?

A    Yes.

Q    And you've advised him that Timothy Walker is a what in a homicide investigation?

A    Just a possible.

Q    Okay, but you want him secured and not going anywhere, is that right?

A    That's correct.

Q    Did you later get some information, and about how long then is that from the time you get to the scene until you're advised by Van Buren that they're there and his vehicle's there?

A    A total time?

37

Q     Yes, roughly?

A     It couldn't have been fifteen minutes.   His arrival time was 3:02.

Q     Okay.   And then at some point later do you realize that they actually, or did you
      get information that they actually had the person, Timothy Walker, in addition to
      his vehicle?

A     I don't have the exact time.

Q     Okay, but did you receive that information at some time later?

A     At some point Officer Hayes indicated that he had been observed because
      people were looking out the windows.

Q     Okay, and at that point what actions did your department take to try to further
      your investigation?

A     We asked them to continue assisting.

Q     Okay.   By doing what?

A     Maintaining the perimeter.

Q     And doing what with regard to the actual person, Timothy Walker?

A     If he's seen, the BOL was requesting that he be detained.

Q     Okay, that he be kept there, is that right?

A     Yes, that we wanted to talk to him.

Q     Alright, you said you got information that he was actually seen, is that right?

A     I don't know who was looking out the window but people were looking out the
      window and eventually Van Buren made contact because the occupants of the
      home came out.

Q     Okay, but my question is did you receive information that he was seen there?

A     At some point, the exact time, I do not know.

Q     Alright, and when that takes place you ask, you continue to ask Van Buren to

                                        38

keep him if they see him, is that right?

A    Right.

Q    Alright, did you, did Corporal Luke ask you to take some further actions at that point in time?

A    Corporal Luke was in charge of the scene and he had asked me to start the search warrant process, the search warrant process being the house in front of where the body was found and the Buchanan address.

Q    Okay, and the house in front of where the body is found is what?

A    372 Utah.

Q    Okay, is that normal to get a search warrant for a scene, a homicide scene like that?   Well, maybe you don't know.

A    I really don't know.   We didn't even know who owned the house.

Q    Whose request was that that you get a search warrant before that inside the trailer was processed?

A    Michigan State Police.

Q    Okay, and you also worked on getting a search warrant for Buchanan, is that right?

A    Yes.

Q    And which one did you actually complete first?

A    Buchanan.

Q    Okay, is that because that was the highest priority at that point?

A    I believe so, I don't recall.

Q    Alright, and did the state police start processing the outside before they went inside at the crime scene?

A    Yes.

39

Q   Alright, so you're completing Buchanan because they didn't start on the
    outside, is that right?

A   I believe my thought process was because another agency was aiding us.

Q   Okay, and then once that search warrant was obtained for Buchanan, did you
    cause it to be delivered there?

A   Yes.

Q   And by that time was Tim Walker there at that residence?

A   Yes.

Q   Alright.   And was he taken into custody without any incident?

A   Yes.

Q   Alright, and then shortly after, was there anyone else there at the scene that
    was also taken in for questioning at the Buchanan address?

A   Yes.

Q   And who was that?

A   Sidney Hutcherson.

Q   And what was his relationship, if any, to Timothy Walker?

A   I believe some type of step brother or half brother.

Q   Okay.

A   I don't recall.

Q   At this point in time, do you have any information linking Tim Walker to the
    homicide or are you acting just on the fact that, you know, there's a PPO out
    there protecting the victim from him?

A   There was a PPO plus there was an active domestic violence complaint.

Q   Okay.   And was that a misdemeanor case or a felony case?

A   Misdemeanor.

Q     Did you have the opportunity to review the paperwork with regard to that?

A     Yes.

Q     Did Ms. McClure seek medical treatment for any injuries in that case?

MR. BURKETT: Judge, I'm going to object.   I don't think -

THE COURT: Sustained.

Q     It's a misdemeanor case, correct?

A     Yes.

Q     Okay.   Do you talk to Mr. Walker and Mr. Hutcherson separately?

A     Yes.

Q     And where does that take place?

A     In Detective Czinski's office.

Q     Is that you personally speaking with them?

A     Myself and Czinski.

Q     Okay.   And by the time that you have Walker and Hutcherson in custody, do you, have you, had the search warrant for Utah completed and delivered to that scene?

A     Yes.

Q     Alright, now when is it that you became aware that you were going to be in charge of the investigation of the case?   Was it after you -

A     It was when I delivered the search warrant back to 372 Utah.

Q     Okay, and you did that before or after you spoke with Hutcherson and Walker?

A     Before.

Q     Okay, so now you're back at your police department and you're getting ready to interview Walker and Hutcherson, is that correct?

A     Yes.

41

Q      Who do you speak to first?

A      Walker.

Q      Okay -

                    THE COURT: Let me just interrupt here.    Ladies and

gentlemen, you can take a twenty minute break.    Counsel, will you approach.

                    (Whereupon the juries left the Courtroom for

                     a short break)

                     -   -   -

                    (Whereupon the juries entered the Courtroom)

Q      Okay, I think we were, we left off at the place where you were getting ready to

        interview Sid Hutcherson and Tim Walker, is that right?

A      I believe, I'm not sure.

Q      Okay, which one of those two individuals did you interview first?

A      Walker.

Q      Okay, and Walker, Mr. Walker, was he cooperative?

A      No.

Q      Okay, was there something that you observed about Mr. Walker that caused

        you concern with regard to interviewing him?

A      A large scar on his head.

Q      And what about his demeanor?

A      Just evasive, not cooperative in general.

Q      With regard to the injury, did it make an impression on you, his demeanor in

        talking to you?

A      Yes.

Q      What, you've had the opportunity to speak with lots of people as a police

42

officer, is that right?

A   Correct.

Q   And what was your concern talking with him?

A   His mental capability.

Q   Okay.   Did you inquire about the big scar on his head?

A   Yes.

Q   Did he have some type of head injury?

A   He was evasive about that.

Q   Okay, when you first talked with him, did you tell him that Stephanie McClure was dead?

A   No.

Q   Okay, so how long would you say that you spent talking with him initially?

A   At least thirty minutes.

Q   Okay, and after that period of time did you speak with someone else, did you speak with Mr. Hutcherson?

A   After Walker, we spoke to Hutcherson.

Q   Okay, and Mr. Hutcherson is what relationship to Tim Walker?

A   I don't recall the exact, it's either step brother or half brother, something of that nature.

Q   Okay, and did you talk with Mr. Hutcherson about why you had the two of them there?

A   I talked with both of them about why we had them there but not at first with Walker.

Q   Okay, now we're on Mr. Hutcherson.

A   I'm sorry.

43

Q     And I'm asking you did you talk with him about why you had him there?

A     Yes.

Q     Okay, and what did you tell him about why you had the two of them there?

A     I just advised them that Stephanie McClure was found deceased and there was the PPO and they were boyfriend and girlfriend and that's why they're there.

Q     Okay, and Mr. Walker's not in the room at this point, just you and Mr. Hutcherson, is that right?

A     That's correct.

Q     Okay, and did you tell Mr. Hutcherson how Ms. McClure appeared to have been killed, by what means?

A     Mr. Walker?

Q     Mr. Hutcherson.

A     I think we just said that she was shot.   We didn't give any detail.

Q     Now after you told him that information, did he share some information with you?

A     Did he share information with us?

Q     Regarding his brother or half brother.

A     He basically said -

         MR. BURKETT: Judge, I'm going to object to whatever he said because that's purely hearsay and it's still excited utterance.

         MS. KETTLER: I'm not, first of all, I haven't asked him for the content yet.   But when I do, I think that there's a reason for that.   But at this point, I'm just asking if he shared information.

         THE COURT: Overruled.

Q     Did he share information with you about his brother?

44

A    Basically that his brother was -

Q    About his brother's condition?

A    That he had had operations.

            MR. BURKETT: Judge, same objection.   I mean this is purely
hearsay what he's getting ready to say.

            THE COURT: Overruled.

Q    Okay, that the brother had had an operation?

A    Yes.

Q    Okay, and did he, did you enlist his help in trying to get his brother to be
      forthcoming about these circumstances going on here?

A    No.

Q    Did Mr. Hutcherson share some information with you that led you to an
      additional possible suspect?

A    To an additional possible suspect?

Q    Yes.

A    No, I don't recall him actually -

Q    Alright, did Mr. Hutcherson indicate to you, did you ask Mr. Hutcherson whether
      or not Mr. Walker was with him at the time of the killing?

A    Yes.

Q    And did Mr. Walker have an alibi?

A    Yes.

Q    And based on that information, did you talk with Mr. Walker again after you
      discovered that he had an alibi?

A    No.

Q    Okay.   You didn't talk with him again after you talked with Mr. Hutcherson?

A     No.

Q     Okay.   Did either of them then provide you any additional information that led

      in the direction of another possible suspect?

A     No.

Q     And did Mr., did you eliminate Mr. Walker as a suspect based on the fact that

      he had an alibi?

A     The alibi and plus more tips were coming in.

Q     Okay, so after you finished your conversations with Mr. Walker and Mr.

      Hutcherson, you were receiving information from other sources, is that correct?

A     That is correct.

Q     And what are those sources?

A     People calling into dispatch with tips.

Q     Unidentified or identified people?

A     Family members of McClure.

Q     Okay.   And they, did they provide you with some information about who they

      thought might have done this was?

A     Richard Wren.

Q     Okay.   So the answer is yes, they provided you with information?

A     Yes, I'm sorry.

Q     And was there more than one source, more than one individual who pointed

      you in that direction of Richard Wren?

A     I didn't actually take the tips.   The tips were just provided to me.

Q     Okay, did you receive more than one tip from family members of Ms. McClure

      accusing Richard Wren of possibly being the person involved in this?

A     From what I understand there was multiple calls.

46

Q   So when you received that information, what action did you take based upon it?

A   At that point, Corporal Gannon gathered that information.   We had been on for twenty some hours at that point.   He advised Monroe County that he was going to be going down to a Tuttle Hill address to try to make contact with Mr. Wren.

Q   Okay, so you, at this point, you're the officer in charge of the case, correct?

A   Correct.

Q   And you, one of the things that you want to do, your department wants to do and you want to do is to follow up on this Richard Wren issue, is that correct?

A   That's correct.

Q   And where do you identify as a possible address that Richard Wren may be connected with?

A   I'd have to look at notes.

Q   Okay, if that will refresh your recollection.

A   10225 Tuttle Hill.

Q   Okay, and that's in Monroe, Michigan?

A   Yes.

Q   Alright, you sent an officer from Sumpter down there to make contact there?

A   Monroe wouldn't allow that to occur.

Q   Okay, did Monroe, at your behest, make contact with people at the location?

A   Monroe County actually did a search warrant to that location.

Q   Okay, and did officers from your department go down there to assist them in the execution of that search warrant?

A   Yes.

Q   Okay, and you're coordinating this as the officer in charge, is that correct?

A   I did not coordinate that.

47

Q    You're coordinating your department's participating -

A    Yes.

Q    Is that right?

A    Yes.

Q    Who, first of all, who is present at the location in Monroe civilian wise?

A    After the search warrant is executed?   I'm sorry.

Q    When your officers go there, okay, they go there with some officers from Monroe, correct?

A    Correct.

Q    There are some civilians there at the location, is that correct?

A    Correct.

Q    Who are they?

A    Nick Wren, his mother and grandmother.

Q    Okay, and Nick Wren, what is his relationship, if any, to Richard Wren?

A    His brother.

Q    Okay, and you said that Nick Wren's mother is there at the location?

A    Yes.

Q    And the grandmother, is that correct?

A    Yes.

Q    And at that point in time, is Richard Wren at that location?

A    No.

Q    Alright, what information is shared with Nick Wren at that location in Monroe, if any, about what your and Monroe's purpose in being there is?

A    None with Nick Wren.

Q    Okay, did you take some items from that location, did officers seize some items

48

from that location that were turned over to you?

A     Yes.

Q     Okay, and we've heard about that from the officers that executed the search warrant, correct?

A     Yes.

Q     And those items were identified as being whose?

A     Nick Wren's and the vehicle returned, I believe, to his mother.

Q     Okay, so you, do you or officers from your department share information with the mother and/or the grandmother of Nick Wren about why you're there, who and what you're looking for?

A     I explained to her the reason why we were there.

Q     Okay.   And what did you tell her about the reason you were there?

A     I advised her that we were conducting a homicide investigation and that Sumpter Township was in charge of the investigation and it had broadened out to include multiple jurisdictions.

Q     Okay, and did you indicate to her whether or not, what you wanted to do with regard to her other son, Richard Wren?

A     We want to question him.

Q     Okay, was Nick Wren taken into custody at that point in time for questioning?

A     Yes.

Q     And did he give you any difficulty?

A     No.

Q     Was he transported to Sumpter for questioning?

A     Yes.

Q     Alright, and you've heard some assertion here at some point that the Wren's

49

were packed up and ready to leave town.   Did you see any indication of that?

A   No.

Q   Did you investigate the presence or non-presence of vehicles at that location?

A   There was a vehicle there.

Q   And the vehicle, was it searched at the scene or impounded?

A   It was lightly searched at the scene but we chose to impound it.

Q   Why is that?

A   It wasn't even a real functioning vehicle.

Q   When you say it wasn't really functioning, what do you mean by that?

A   It would only go between like twenty five and thirty five miles an hour.

Q   Okay, so was it towed then?

A   Yes, it was impounded.

Q   And did you ask the Wren mother and grandmother to bring Nick for

questioning or did you just bring him on your own?

A   We had the option of letting them drive the vehicle up there but the vehicle

wasn't functioning properly -

Q   Is that how you became aware it wasn't functioning properly?

A   Yes.

Q   Okay, and so did you then transport, or your department transport Nick Wren

for questioning?

A   My department did.

Q   Okay, and did you talk to Nick Wren before you came into contact with his

brother, Richard Wren?

A   Yes.

Q   Okay, and Richard Wren, did you subsequently come into contact with him?

50

A     Eventually, yes.

Q     Was he picked up by police officers?

A     Originally, no.

Q     Okay, how did you become aware of his whereabouts?

A     He had gone to Michigan State Police in Washtenaw County and said that he was wanted for questioning or there's a mistake, something of that nature.

Q     Okay, he turns himself in at Ypsilanti Michigan State Police?

A     Yes.

Q     Okay, and from there did you dispatch a car to pick him up over there?

A     A car was dispatched, yes.

Q     Okay.   So in talking with Nicholas Wren, did you talk with him about the whereabouts of his brother at the time or approximate time that Stephanie was killed?

A     He didn't know.

Q     He didn't know what?

A     He didn't know anything about his whereabouts.

Q     Okay.   Did he, however, provide you with additional information that caused you to, well, let me ask you this.   Was Richard Wren a possible suspect to you at this point?

A     He was.

Q     Okay, and did Nicholas Wren provide you with additional information that caused you to investigate that possibility further?

A     Yes.

Q     And what was the information you received from Nicholas Wren?

A     That there was some type of credit card, lack of better words, scam.

51

Q     Okay, and Nick, Nicholas Wren is telling you this information, is that right?

A     We had received information about, we had received tips about this apparent scam.

Q     Okay, so you had tips about that and who are the tips that this scam is involving?

A     Richard Wren and Stephanie McClure.

Q     Okay, and based on the fact that you had these tips, did you talk to Nicholas Wren about that?

A     Yes.

Q     And did he provide you information confirming or denying that?

A     He confirmed it.

Q     Okay, and he confirmed that his brother was involved in this?

A     Yes.

Q     With Stephanie?

A     Yes.

Q     Okay, Stephanie McClure.   Alright, and so did you then have the opportunity to talk with Richard Wren about that particular issue, the credit card scam between, that Stephanie and he were allegedly involved in?

A     He wouldn't talk about that.

Q     Okay.   Did you contact the jurisdiction in which this had allegedly gone on?

A     Yes.

Q     Okay, and what jurisdiction was that?

A     Washtenaw.

Q     Washtenaw County?

A     Yes.

Q      Which police agency did you contact to investigate that?

A      Washtenaw County Sheriffs Department.

Q      Okay.   And did you, was there actually a court case involving that in existence?

A      No.

Q      Okay, and what was the scam exactly?

A      It was, in regards to what we'd been told or what was in Washtenaw's -

Q      What you learned from the tips, what you brought, let me ask you this.   Did Washtenaw County Sheriffs Department know anything about this before you contacted them?

A      There wasn't a report generated at the time, no.

Q      Okay, so they, you contact them about this and there's no police report in existence about that?

A      At this point, there was not, no.

Q      Okay, subsequent to your contacting them and talking to them about it, did they create one?

A      Yes.

Q      And did you confirm that the Washtenaw County Prosecutor's Office either did or did not have a criminal case against Richard Wren for that at that time?

A      At that time the incident was closed.

Q      Okay, and was there a reason it was closed?

A      Stephanie McClure was dead.

Q      Okay, before that was there a court case in existence?

A      There wasn't going to be a court case from -

Q      Why?

A      There just wasn't enough there to support it.

53

Q     There's not even a police report until you contact them?

A     Correct.

Q     Okay, did you confront Richard Wren with the fact that you knew about that, the credit card scam?

A     He just wouldn't talk about it.

Q     Okay, and did you talk, however, was he aware that Stephanie was dead when you were talking to him?

A     Yes.

Q     Okay, and did you talk with him about his whereabouts at the time that the young lady was murdered?

A     Yes.

Q     And did he provide an alibi for himself?

A     He advised that he was at a party with people.

Q     Okay, and did he advise the location of that party and the times?

A     In Ann Arbor, and just some general times.   I'd have to refer back to -

Q     Okay, but did he give you that information?

A     Yes.

Q     Okay, and did you take any steps or talk to anybody to either verify that alibi or discount that alibi?

A     While we were talking to him, a female came in.

Q     Okay, and who was that?

A     Christina Simon.

Q     And did you take a statement from her?

A     A statement was taken.

Q     Okay, now up until this point, have you spoken yet to either Jessica Fritz or

Breanna Kandler?

A    No.

Q    Okay, so after you finish your interview with Mr. Wren and the statement's taken from Christina Simon, where's your investigation at that point leading to? What's your next step as you're trying to solve who the person who did this is?

A    After speaking with Richard Wren?

Q    Yes.

A    The next step was to locate Jessica Fritz.

Q    Jessica?

A    Fritz.

Q    Okay, and how did it happen that you went in the direction of contacting her?

A    Through Richard Wren's statement.

Q    Okay.   Did Richard Wren, did you question him about where he had been that entire evening?

A    Yes.

Q    And did he indicate to you where he went after he left the party?

A    He was at the party and he had received a phone call from -

               MR. BURKETT: Judge, I'm going to object to this.

               MR. WHITE: I as well your Honor.   This goes directly to the heart of the facts in the case, your Honor.   It's clearly hearsay.

               MS. KETTLER: This is not offered for the truth of the matter asserted.   It's offered for why he did what he did in his investigation, why he eliminated certain individuals as suspects.

               THE COURT: Overruled.

Q    Did he indicate to you where he had been after he left that party?

A    He was requested by Jessica Fritz via telephone to respond over to Paula Bennett's house.

Q    Okay, and so is that what led you in the direction of seeking out Jessica Fritz to question her?

A    Yes.

Q    Okay, was that the first lead as it were to point you in that direction of those people who later became witnesses in this case?

A    As to Jessica Fritz?

Q    Yes.

A    Yes.

Q    Okay.   Now I just want to go back for a minute.   The tips that you're receiving from Stephanie's, the victim's family in the case, they're blaming, they have it in their mind that someone else has done this, is that right?

A    At the point -

Q    Initially, before you talked to Jessica Fritz?

A    At that point, it was Richard Wren had done it.

Q    That's their impression, that's what they're telling you?

A    That was their impression, yes.

Q    Okay, and you as an officer in charge, is that how you decide who you're going to charge with the murder, who the victim's family thinks did it?

A    No.

Q    Okay.   Did you ever at any point in time get any information that led you to believe that either Richard Wren and/or Nicholas Wren were getting ready to flee and leave the state or leave the city?

A    No, that was more information that was brought in from the victim's family.

56

Q     Okay, those were claims by the victim's family?

A     Yes.

Q     Did you substantiate that in any way?

A     No.

Q     Okay.   Did you ever threaten to arrest Richard Wren if he didn't turn himself in voluntarily?

A     No.

Q     Okay.   Did the Wren's, in fact, provide you, were they aware of the fact that the victim's family thought that Richard Wren was involved in this?

A     Yes.

Q     Okay, and how did they make you aware of that?

A     They advised that they had received phone calls of a threatening nature.

Q     From members of the victim's family?

A     Apparently.

Q     Okay, that's what they believed at least.

A     That's what they believed it to be.

Q     Tell the juries what day it is and roughly what time it is by the time you are led in the direction of the need to interview Jessica Fritz by Richard Wren?

A     Three o'clock in the morning.

Q     Of what day?

A     Let me think, the 7th.

Q     7th of October -

A     Off the top of my head without looking at my notes.

Q     Okay, roughly.    Okay, and do you have any difficulty finding her to submit to an interview?

57

A    No.

Q    Okay, where did you find her?

A    At her house.

Q    Okay, and she'd come in voluntarily?

A    We had to give her a ride.

Q    Okay, but did she come in voluntarily?

A    Yes.

Q    Okay, and did she give you a statement, was she cooperative in telling you what information she had about events leading up to Stephanie's death?

A    Yes.

Q    Okay, she, did she give you a written statement that evening?

A    Yes.

Q    Did you give her her Miranda Rights before you questioned her?

A    Yes.

Q    Do you Mirandize, in fact, all the civilian witnesses in this case before you take statements from them?

A    I believe a hundred percent.

Q    Why is that?   Did you think she killed Stephanie?

A    We had no idea what these people were going to say.   We didn't know anything for a fact at this point.   Even after the conclusion, the continuation, we still Mirandized people.

Q    Okay, because do you have any preconceived notion about who the killer is at this point?

A    No.

Q    Alright, have you decided who you're going to charge?

58

A   No.

Q   Are you continuing your investigation and trying to look at all the information before you make that conclusion?

A   Yes.

Q   Okay, can you tell the juries roughly how long you talked with Jessica Fritz, in time, just approximately?

A   A guesstimate, if I look at -

Q   Roughly.

A   Hour and a half, two hours.

Q   Okay, and she completed a written statement, is that correct?

A   Yes.

Q   Do you recall roughly how many pages that statement was?

A   Roughly one to one and a half.

Q   The first statement she gave?

A   Yes.

Q   Okay, and did you, in talking with her, did you get pointed in the direction of someone else that you needed to interview?

A   She had made mention of Katie.

Q   Okay, Katie who?

A   McIntyre.

Q   Okay, and did you have any other names of individuals you wanted to interview?   Who else did you interview on this case?

A   We've interviewed Mike Larvaidan.   We've interviewed Breanna Kandler, Rita Merry.

Q   Alright, how did you get to Breanna Kandler?

59

A    We were aware of Breanna Kandler.   However, Breanna Kandler's mother

      called because she was scared and indicating that she was in fear of her

      daughter's safety.

                          MR. BURKETT: Judge, I'm -

Q    Let me stop you.   Listen carefully to my question.   How did you get led to

      Breanna Kandler?

A    Just through statements.

Q    Of who, from who?

A    I'd have to refresh my memory.

Q    Did Jessica talk about Breanna Kandler?

A    Off the top of my head, I believe so, yes.

Q    Okay, and did Jessica talk about Katie?

A    Yes.

Q    Did Jessica talk about Paula Bennett's involvement in this?

A    Yes.

Q    Did she talk about Kyron Benson's involvement in this?

A    Yes.

Q    Okay, and so based on that, did you attempt to interview Katie McIntyre?

A    Yes.

Q    What steps did you take to try to interview Katie McIntyre?

A    We, when we located her, she was walking down the street.

Q    Okay, did you attempt to ask her to, or did you ask her to submit to an

      interview?

A    Yes.

Q    Did you give her her Miranda Rights.

60

A   Yes.

Q   Did she refuse to answer any questions?

A   Yes.

Q   Okay, did you let her go after that?

A   Yes.

Q   And was that out on the street or did you take her to the police station?

A   We brought her to the police station.

Q   Okay.   And what about Breanna Kandler, when did you come into contact with her?

A   I think the 10th, I'm not sure, I'd have to look at my notes.

Q   Okay, why don't you go ahead and do that.

A   The 8th, she came into the police department of her own free will.

Q   Alright, and did you also give her Miranda Rights before you interviewed her?

A   Yes.

Q   Okay, did you have any reason to believe she was going to incriminate herself?

A   No.

Q   You're still trying to keep your mind open about where this is going to lead, is that safe to say?

A   That's correct.

Q   Okay, now her statement, roughly how many pages was her statement to you?

A   I guess eight to ten pages without looking and counting.

Q   Okay, and is it accurate to say you sought her out, she didn't come to you?

A   She was, in the order of things that was to come, however, she sought us out before we got to her.

Q   Okay, when did she seek you out?

61

A    On the 8th.

Q    Okay, after you talked with Jessica Fritz?

A    After we talked to Jessica Fritz, yes.

Q    Okay, and after Jessica Fritz had mentioned her to you?

A    Yes.

Q    So Breanna contacts you and indicates she may have information that you
     need to have for your investigation?

A    Yes.

Q    Okay, now I want to rewind you for a minute to when you took that statement
     from Jessica Fritz.   After you take that statement on paper, is that just he end
     of it or is there some additional procedure you follow at the behest of the
     prosecutor's office?

A    She was brought down to Detroit along with Richard Wren.

Q    Okay, and for what purpose is she brought here?

A    To provide sworn testimony under an Investigative Subpoena.

Q    Okay, so both she and Richard Wren give sworn testimony under oath?

A    Yes.

Q    Okay, and then do they change their stories of what they told you?

A    No.

Q    Okay, do they, in fact, go through and adopt their statements they've given you
     line by line under oath.

A    I believe that was the process.   The prosecutor took care of that, I did not.

Q    The prosecutor did it?

A    Yes.

Q    Okay, now with regard to Breanna Kandler, did she ultimately, you said she

                                        62

gave you a statement on the 10th, you believe?

A    Excuse me, I'm sorry.

Q    You believe Breanna Kandler gave you a written statement on the 10th of
October?

A    I believe it was the 8th.

Q    Okay, I apologize.   And after she did that, was she also brought down for an
Investigative Subpoena?

A    Yes.

Q    And did she adopt her statement under oath as well?

A    Yes.

Q    Okay, and did she change her story from what she had told you when she gave
a statement to you?

A    Not that I recall.

Q    Now at some point, there was a search warrant executed at Harbor Club
Apartments, at Paula Bennett's apartment that Kyron Benson sometimes lived
at, is that right?

A    That's correct.

Q    Now was that before or after you took a statement from Jessica Fritz?

A    After.

Q    Okay, and was that before or after you took a statement from Richard Wren?

A    After.

Q    And was that before or after you took a statement from Breanna Kandler?

A    Before, I believe.

Q    Okay, did you participate in the execution of that search warrant?

A    No.

Q    Did you, however, as the officer in charge, this is kind of an aside, as the officer in charge, is the evidence that's confiscated in these various search warrants turned over to you for your determination about what testing is to be done?

A    Ultimately in the end, yes.

Q    Okay, alright.   Did you also interview Rita Merry, who you saw testify in this case, a cousin of Defendant, Paula Bennett?

A    Yes.

Q    Okay, when was it, if you recall, that you interviewed her?

A    I'd have to look at notes.

Q    Okay, if that will refresh your recollection.

A    It was on 10-8 at 1:44 p.m.

Q    Okay, did you, did she come to the police station to talk to you?

A    No, she did not.

Q    Did you ask her to do that?

A    Yes.

Q    And did she say why she was refusing?

A    She was in fear.

Q    Okay, did you meet her someplace different than the police station?

A    Yes.

Q    And was that a place that she requested you meet her at?

A    Yes.

Q    Did she share with you whatever information or did she claim to share with you the information she had about Stephanie's homicide?

A    Yes.

Q    Okay, did you ask her to put what she told you on paper?

64

A    Yes.

Q    Did she agree to do that?

A    No.

Q    Did she say why she was refusing?

A    She was in fear.

Q    Okay, she said she was in fear?

A    Yes.

Q    Did you make another attempt to interview Katie McIntyre after that first time that she refused to answer any questions?

A    Every time that we've even tried to contact her, it's just been an impossibility whether it's -

Q    Okay, my question is did you try again after that first time?

A    I do not believe so, no.

Q    After she told you she wouldn't talk to you the first time, you just gave up? Listen to my question.   Did you try more than once to talk to her?

A    She had hired an attorney.

Q    Okay, but did you try more than once -

A    Oh yes, yes, I'm sorry.

Q    How many times do you think you tried to talk to her?

A    Oh, four.

Q    And did she ever, did she continue to refuse to answer any questions?

A    There was a point where I thought that we were going to have a meeting but then there was an attorney change

     and -

Q    So she continued, to answer my question, did she continue until she got on that

65

witness stand to answer any questions about her knowledge of this killing?

A    Yes.

Q    Okay.   You saw testimony of an individual named Mike Larvaidan in the course of this trial, correct?

A    Yes.

Q    And where did you first, when did he first come on your radar screen as either Mike or big Mike as being somebody who was with Kyron and Paula when they killed Stephanie?

A    Early, early on.

Q    Okay, do you remember who it was that gave you the information Mike or big Mike?

A    It was big Mike.

Q    Okay, do you remember who it was that gave you that information?

A    Jessica Fritz.

Q    Okay, and did you, did she know that person's real name?

A    She didn't have any idea who it was.

Q    Okay, she, did you then start to try to figure out who that person was?

A    Yes.

Q    And how, did you ultimately, well obviously you ultimately found him.   How did you figure out from having the name Mike or big Mike, how did that lead you to Mike Larvaidan?

A    Officer Buccellato, on the day of the search warrant at the Big Pine address, which is Mr. Benson's address, she was there and in plain clothes capacity just observing the address.   She monitored a vehicle that had been at that address and taken down the license plate.   As time had gone on and the reports had

66

been turned in and in the process of reviewing, I ran one of the license plates

on her report and it came back to, one of them came back to Michael

Larvaidan.

Q    Okay, and so based on that, do you attempt to locate him and question him

about his knowledge of the homicide of Stephanie McClure?

A    Yes.

Q    Okay, can you tell the jury roughly when it was that you first identified Michael

Larvaidan as a person that may be big Mike?

A    I would guess -

Q    You said it was after some reports came in.

A    I would guess two weeks into it.

Q    Okay, and how long after that was it that you first went to him and tried to

interview him?

A    I'd have to look.

Q    Okay.

A    The actual interview occurred on 1-31.

Q    Okay, January 31st of this year?

A    Yes.

Q    Okay, now at that time -

A    Excuse me, did I say January 31st?

Q    Yes.

A    I may have erred.   No, that is correct.

Q    Okay, and at that time did he acknowledge that he had been in the car with

Paula and Kyron right before you heard the shots fired?

A    I'm sorry?

Q     Did he acknowledge, did Mike Larvaidan, when you interviewed him, did he acknowledge that he had been in a car with Kyron and Paula?

A     No.

Q     Did you Mirandize him before you interviewed him?

A     Yes.

Q     Okay, again you're still trying to keep your options open?

A     Yes.

Q     Did you know at that point in time whether he had anything to say that was going to incriminate him?

A     We didn't know what he was going to say.

Q     Okay, did you have any evidence to say that he had done anything besides be in the car and try and stop Kyron?

A     We didn't even know that.

Q     Okay, because at that point he's still not acknowledging   that he had been in the car, is that right?

A     At that point, yes.

Q     Okay.   As you're talking to him, do you develop, now I don't want you to tell me what it is yet, but do you develop an opinion at that point in time about whether he's being forthcoming with you or not?

A     Yes.

Q     And was your opinion that he was being forthcoming or not?

A     That he was not.

Q     Okay, and what is it that you observed that led you to believe he's not being forthcoming?

A     There's quite a few things -

68

Q    What did you observe that led you to that conclusion?

A    The fact of not outright denying a hundred percent on it, the fact of long
     hesitation.   There was points where I would just sit there and lodge the clock
     and watch him.   There would be nobody even talking and he would just sit
     there.

Q    And was he free to leave?

A    Of course, he had been -

Q    Did you tell him he was free to leave?

A    Yes.

Q    And there were times that he would just sit there and not leave?

A    He would just sit there.

Q    Okay, and, but he never came right out and denied being there, is that right?

A    He denied -

Q    A hundred percent?

A    Yeah, he denied killing -

Q    What do you mean by, tell the juries what you mean by that?

A    By?

Q    That he didn't deny it a hundred percent.

          MR. WHITE: Your Honor, I'm going to object now.   I think this
question or series of questions needs to be broken into individual questions.   I'm
getting confused and I suspect the witness may not understand what the answer
being sought here is.

          THE COURT: Overruled.

Q    What do you didn't, you came to the conclusion he wasn't a hundred percent
     denying being in the car, what do you mean by that?

A     You could pose a question to him and he would sit there.

Q     Okay.

A     And he wouldn't respond.   He wouldn't, and it would be a question that would normally shock somebody, I believe.

Q     Okay, so eventually, you told him he was free to leave, is that right, at all times?

A     Yes.

Q     And eventually did you say well, that's it, you know, the interview's over?

A     I personally, way before the interview was over, I spoke up and said this is over.

Q     Okay, and did he still continue to sit there?

A     He would sit there and look at Detective Czinski.

Q     Did you also receive some information about him expressing his condolences to members of the victim's family?

A     Yes.

Q     After that interview in January ended, did you later seek to interview him again?

A     Yes.

Q     Okay, and when you interviewed him the second time, did you Mirandize him again?

A     Yes.

Q     And where was that, the second interview?

A     In Plymouth at a division of Ford.   It's not actually Ford, I don't think, some type of automotive group.

Q     Okay, you Mirandized him again, is that right?

A     Yes.

Q     He's not at the police department so he's not in your custody, is that right?

A     That's correct.

Q  Okay, I don't want you to tell me where you got this information but did you confront him with a piece of information that you had developed in your investigation?

A  Yes.

Q  And was that piece of information something that he had said in the car after the shooting?

A  Yes.

Q  And after you confronted him with that piece of information, did he acknowledge that he had been there?

A  Yes.

Q  And is that the time that he gave you his statement and indicated what he had indicated in testimony here?

A  Yes.

Q  Okay.   Did you ever at any time during this investigation have any evidence that he had done anything besides be present and tried to stop Kyron from killing Stephanie?

A  We were under the impression that he was present prior to the interview but as the interview went on, we found that he was trying to stop the incident from occurring.

Q  So he was a witness or a suspect?

A  He was a witness.

Q  Okay.   Did he bring it to your attention that he had received a telephone call from the grandmother of Defendant Benson?

A  Yes.

Q  Okay, and how much, when was it that you took that statement from him when

71

he acknowledged his presence in the car just before the shooting?

A   4-21 of '08.

Q   April 21st of this year?

A   Yes.

Q   And was that information then provided to the defense, that supplemental statement?

A   Yes, it was.

Q   And would that, when in time did Mr. Larvaidan report receiving the phone call from Mr. Benson's mother, before or after that statement was provided?

A   After discovery.

Q   Okay, how soon after that?

A   After it was delivered to the prosecutor's office.

Q   Okay, how many, like days or hours after that?

A   Days.

Q   And he brought it to your attention that the Defendant's grandmother had contacted him, is that right?

A   Yes, we discussed that.

Q   Now we have heard about a number of search warrants being executed throughout the course of this case.   And is it accurate to say that you, while you're executing these search warrants and obtaining them, that you run through a number of possible suspects before you end up charging these two Defendants?   Did you investigate Tim Walker?

A   We went through two, and then there's -

Q   Okay, at some point in time you looked at Tim Walker briefly?

A   Yes.

Q    You also looked at Richard Wren, is that correct?

A    Yes.

Q    And ultimately the evidence pointed to these two Defendants, is that correct?

A    That's correct.

Q    Okay, so explain to the juries what evidence you sent to the lab to from these search warrants and why you sent the things you did and why you didn't send every single piece of evidence you confiscated to the lab?

A    I guess I'll go back.   There's multiple questions there.

Q    Okay, I am duly checked, Officer.   Let me -

A    I'm sorry.

Q    First search warrant that you did was at whose house?

A    The very first one is at Walker's house.

Q    Okay, and those items, initially there were some items taken from Mr. Walker, is that right?

A    Right.

Q    Were any of those items sent to the state police lab?

A    No.

Q    Why not?

A    They had been eliminated as suspects.

Q    Okay, and were there, what was the next search warrant that you did?

A    372 Utah, which is the location of the incident.

Q    And what was taken from that location?

A    MSP took multiple things and we took a cell phone.

Q    Okay, a cell phone from inside the trailer, is that right?

A    That's correct.

73

Q      What did you do with that cell phone?

A      We did search warrants on the cell phone.

Q      okay, explain what that means to the juries.

A      A search warrant onto the residence is for the residence.   Then once you start
       getting into smaller devices, you have to do another search warrant to get into
       that device to identify what's inside the device.

Q      Inside as far as data?

A      Data, yes.

Q      Were there any, was this a phone that stores pictures or just data?

A      I believe it does everything, data, pictures.

Q      So you sent that to the state police to retrieve what was in the content of the
       device, is that right?

A      Yes.

Q      Did anything that the state police, was that all provided to both defense
       counsels?

A      Yes.

Q      Okay, did anything in that device advance your investigation?

A      No.

Q      Okay, the next search warrant you executed was where?

A      After Utah, the next search warrant that we participated in is going to be the
       Tuttle Hill address.   However, Monroe County drafted the search warrant.

Q      Okay, and what items were seized there?

A      Off the top of my head, shoes and a car.

Q      Okay, and those items, were they sent to the state police lab?

A      I believe the shoes were.

84

Q    Okay, at this point in time had Mr. Wren been eliminated as a suspect?

A    No.

Q    Okay, when you send in the information, you're still considering that as a possibility, is that right?

A    Yes.

Q    Okay, and did you also, there were some items retrieved at Harbor Club, is that correct?

A    There was items taken from Harbor Club, yes.

Q    Okay, and those items, what of those items were sent to the state police lab?

A    From Harbor Club?

Q    Yes, from Paula Bennett's apartment that was sometimes shared by Mr. Benson?

A    Clothing.

Q    Okay, and are those the sweat pants that forensic scientist Doring testified about?

A    I think she and Nutter testified about the clothing.

Q    Okay, those items were sent, correct?

A    Yes.

Q    Okay.   And from the, were there any cell phones taken from the Harbor Club location?

A    I do not believe so, I'd have to double check.

Q    Alright, and from the Big Pine location in Ypsilanti, we've heard the testimony of an item seized from there.   There were a number of cell phones seized.   Did you take those phones to the state police lab and do search warrants on those?

A    There were search warrants done.   However, one was determined to be his

85

phone and -

Q    And how was that determined?

A    Through the stuff that's inside the device.

Q    The data inside the device?

A    Yes.

Q    And I'm sorry, it's not the lab, it's the Criminal Investigations Division in Livonia that the phones were -

A    That's correct.

Q    Did you upon, well, let me finish these first.   There were also a pair of black leather court shoes taken from the Harbor Club apartment, is that right?

A    I don't believe those were taken from there.

Q    Okay, where were those taken from?

A    I believe Mr. Benson's residence.

Q    Okay, alright, and those were submitted to the lab, correct?

A    I believe so, yes.

Q    At that point in time, was Mr. Benson still a suspect in this?

A    Yes, he was.

Q    Okay.   Did you ultimately obtain a cell phone that was Paula Bennett's cell phone?

A    Yes.

Q    And where did you get that from?

A    Her person.

Q    Okay, and when was that?

A    The night that we picked her up.

Q    And did you also do a search warrant on that to see if there was any

86

information in there that would advance the investigation?

A     Yes.

Q     Okay.   And was there, was all this information downloaded from these devices provided to the defense?

A     Yes.

Q     Was there anything in there that was helpful in advancing your investigation?

A     No.

Q     What types of things are in, just for the juries, in case they're curious, what types of things are in here, in Paula's phone?

A     Photographs, text messages.

Q     Okay, alright.

A     Phone codes.

Q     And I'm sorry, I may have neglected to ask you this, did you send the victim's phone also to the state police for a search warrant?

A     Yes.

Q     Anything in there advance the investigation?

A     No.

Q     Okay, did you in addition to finding out what's in the phones, did you at the direction of the prosecutor's office, seek the phone records for various phones?

A     Yes.

Q     And did that also require a search warrant?

A     Yes.

Q     Have you made a review of the, and were those phone records provided to the defense?

A     Yes.

87

Q Now did you make a review of those phone records to try to see if you could get any information that would advance your investigation?

A Yes.

Q Did you make a determination about whether or not there were phone calls going on back and forth between Mr. Benson and the victim in the dates leading up to the homicide?

A Yes.

Q Okay, and were there?

A Yes.

Q Okay, was there just one or two or how would you -

A Several.

Q Okay, and what about between Ms. Bennett and the victim and the days leading up to the homicide?

A Yes.

Q Several?

A Yes.

Q Okay, and when was the last call between Mr. Benson's phone and the victim's phone before Ms. McClure was murdered?

A I believe right before 6:00 p.m. on the 5th.

Q Okay, and that's the last, is that the last call on the phone records between their two phones?

A That's the way I recall it, yes.

Q Okay, and what about, and those are here and available, is that right?

A Yes.

Q What about the last call between Ms. Bennett's phone and the victim's phone?

88

A    Prior to the call of Mr. Benson.

Q    Okay, when you say prior to, how close in time?

A    Minutes.

Q    Okay, so from around 6:00 or 6:30 the night before she's murdered, these several phone calls you'd seen in the days leading up to it, they just stopped. That's the last call between them, is that accurate.

A    That's correct.

Q    Did you ever retrieve the stolen laptop and Play Station that the victim had apparently taken from the Harbor Club address?

A    We recovered the stolen laptop and a pair of shoes but we never recovered a Play Station.

Q    Okay, and where was the laptop recovered from?

A    The family, McClure family.

Q    They brought it to you?

A    Yes.

Q    Okay, did you also do a search warrant on that with the state police?

A    Yes.

Q    Was there any information on that that advanced your homicide investigation?

A    No.

Q    Was that also provided to the defense, the contents of that?

A    Yes.

Q    You heard, yesterday you heard Sue DuFresne, an employee, a civilian employee of your police department, strike that, I'll come back to that.   I'm going to show you a picture that's previously been shown to both counsel and has been marked as People's exhibit 40.   Have you see that photograph

89

before?

A   Yes.

Q   And does that accurately depict a view of the trailer where the homicide occurred from the direction of Heaven Kindall's porch?

A   Yes.

Q   Move for the admission of People's exhibit 40.

      MR. BURKETT:   I have no objection.

      MR. WHITE: I'd like to voir dire very briefly.

      THE COURT: Go ahead.

BY MR. WHITE:

Q   Did you take that photograph?

A   No, I did not.

Q   What time was the photograph taken?

A   I don't, I wasn't there when it was taken.   I don't know.

Q   Okay, so you don't whether the street lights or any of the other conditions were the same when that picture was taken as when -

A   When we arrived?   They are not the same.

Q   They are not the same as when you arrived?

A   Correct.

Q   And what would have been different?

A   Well, you'd have evidence markers, you'd have police tape -

Q   Okay, how about the light levels?

A   The light levels, the porch light is not on.

Q   The porch light is not on on which apartment or which trailer?

A   372 Utah.

90

Q     So that is not, is that the way the scene looked when you arrived except for the
      evidence markers?

A     I thought the question was is this the view from Heaven Kindall.   Maybe I
      misunderstood.   This is not the exact same representation as I've indicated by
      the markers, the tape and the porch light.

Q     Alright, so the porch light is off in that photograph?

A     It appears to be, yes.

              MR. WHITE: Thank you.   Your Honor, I'm going to object to the
admission of the exhibit.   I think the fact that the porch light is off would be a basis
for finding that this shows the scene to be darker and thus Ms. Kindall's testimony
less reliable than it would be if we had an accurate photograph so I object.

              MS. KETTLER: I think it's admissible with a caveat that with the
exception of the porch light being off, it is the view from that direction.

              THE COURT: I'll allow it.   It goes to weight, not admissibility.

              MS. KETTLER: Thank you.

Q     Now you later in your investigation took an additional statement from Jessica
      Fritz, is that correct?

A     There have been a few additional ones, yes.

Q     Okay, did you as a result of a search warrant that was executed in Ms.
      Bennett's jail cell, have some letters that were retrieved from her jail cell?

A     Yes.

Q     Okay, and after you received that information, did you go and talk to Ms. Fritz
      and retrieve a letter from her that's been admitted into evidence?

A     I have the letter that was secured from the search warrant from her cell -

Q     Right.

91

A      And while I was conducting other business with Fritz, I also secured the letter that was mailed from Ms. Bennett to Fritz.

Q      Okay, and Ms. Fritz did not initially tell you the information about the transfer of a gun from her former boyfriend, Mr. Wren, to Mr. Benson and Ms. Bennett in July?   She didn't tell you that in the initial interview, did she?

A      No.

Q      Okay.   Did that change your determination of whether you charged the right people in this case?

A      No.

MR.  WHITE: Your Honor, I'm going to object to that.   What we're doing is having the prosecutor get the police officer to vouch for him picking the right people and I think that's not evidence, that's just him vouching and giving a direct opinion on guilt or innocense.

MS.  KETTLER: I didn't ask him for an opinion on guilt or innocense, your Honor, I asked him if it changed his opinion about whether he had done the right thing in his investigation.   And the investigation -

THE  COURT: Overruled.

MS.  KETTLER: Has been repeatedly attacked and so I think it's a proper question.

THE  COURT: Overruled.

MS.  KETTLER: If I could just have one moment your Honor. That's all I have for both juries.   I have one small matter for Mr. Benson's jury only.

THE  COURT: Ms. Bennett's jury, you can step into the jury room.

(Whereupon the Bennett jury left the Courtroom)

Q      Thank you, you heard the testimony of Sue DuFresne, a civilian employee of

92

your department yesterday?

           THE COURT: Thursday.

Q    Oh, I'm sorry, Thursday, yes.

A    She's an employee of Central Dispatch, which is a separate entity of Sumpter
Police.

Q    Okay, she works in the same building?

A    She works in our building, yes.

Q    Okay, and you heard her testify that there is a recording system that records
prisoners in the holding area, is that right?

A    That's correct.

Q    And is that accurate?

A    It's not entirely accurate, no.

Q    Okay, at my direction did you obtain the written policy regarding that
equipment?

A    Yes.

Q    And has that been provided to both counsels in this case?

A    Yes.

Q    Okay, that particular equipment, does it record at all, either video or audio?

A    It's never recorded audio and at times it will record video.

Q    Okay, at the point in time that Mr. Benson and Ms. Bennett were in that holding
area, was the video recording capability, was it working?

A    I don't even know if it was working.

Q    Okay, but is it, but it never recorded audio, is that correct?

A    As far back as I can remember, it was originally up in the city of Belleville and
we eventually obtained it.

93

Q    Has it ever recorded -

A    Even in the city of Belleville, it didn't record audio.

Q    Okay, so this equipment was used in Belleville when you worked at Belleville as well?

A    Yes.

Q    Okay, and what's the primary purpose that you have these people monitoring individuals in the cell?

A    The purpose that they monitor is to safeguard, for the prisoner's sake, or if they're suicidal or they may have smuggled some type of contraband.

Q    Okay, and is there actually a prisoner security safety kind of policy that's in writing there -

A    There sure is.

Q    That's been provided.   Nothing further, thank you Officer.

            MR. BURKETT: Judge, while the other jury's out, as it limits to this thing right here, could I question him on that or you prefer me just to send the jury out?

            THE COURT: Sure, you can question him.

            MR. BURKETT: Only limited to this.

            THE COURT: Well wait, okay, yes, go ahead.

            MR. BURKETT: Limited to the recording, I mean to the video thing.

CROSS EXAMINATION

BY MR. BURKETT:

Q    Sir, when you say that the video equipment was in place, are you saying that it does not have the capability of audio?

94

A    As far back as I can remember, it's never had capability of audio.

Q    Okay, now you're saying that it cannot, you cannot hear anything, I mean you cannot -

A    On playback, you cannot hear anything.

Q    That's all I have as it relates to that, Judge.

THE COURT: You can bring the jury back.

MS. KETTLER: I'm sorry, Judge, could I briefly redirect just on that issue?

THE COURT: Sure.

### REDIRECT EXAMINATION

BY MS. KETTLER:

Q    When you say playback, you mean, are you saying you can hear it, you can monitor it, but you can't record audio?

A    You can hear it.   It's a monitoring system with an intercom system where everything that is being, any sounds in the lockup area can be heard in dispatch.

Q    But not recorded?

A    But not recorded.

Q    And does this policy, in fact, refer to a monitoring rather than a recording system?

A    It's a monitoring system.

Q    Nothing further, thank you.

(Whereupon the Bennett jury entered the Courtroom)

THE COURT: Cross exam.

95

CONTINUATION OF CROSS EXAMINATION

BY MR. BURKETT:

Q    Good morning, sir?

A    Good morning.

Q    Now as I understand it, you are the officer in charge of this case, is that correct, sir?

A    In conjunction along with Detective Czinski, that's correct.

Q    You were first asked questions in terms of this being your first homicide investigation and as well as the Sumpter Police homicide cases.   You're not suggesting, sir, because of that you did not do a thorough investigation?

A    Absolutely not.

Q    Okay, and if you thought that you needed help with this investigation, sir, you are at liberty to call the Michigan State Police?

A    And we did.

Q    I mean to help do the investigation?

A    Yes.

Q    Okay, did you call them and ask them, I'm not talking about the work that was done by the crime unit, did you call them and tell them we need help with this investigation?

A    We conferred with them but did we ask them and come out and -

Q    And help you?

A    No.

Q    Okay, so the fact that this was your first had virtually no meaning, correct?

         MS. KETTLER: I'm going to object to asking him to comment on the evidence.

96

MR. BURKETT: What evidence?

THE COURT: Overruled, go ahead.

Q   The fact, sir, that this was your first investigation, sir, has no meaning on what you've done, correct?

A   No.

Q   Okay, is it true, sir, you would agree with me, would you not, sir, that as the officer in charge of the case that in a real sense, you're wearing two hats? First, you do an investigation, is that correct, sir?

A   I don't understand what you mean by the two hats.

Q   Okay, your first job, sir, is to do an investigation?

A   You investigate a crime, that's true, yes.

Q   Yes, and you did that first.   And then after the investigation is completed and someone is arrested and charged with that offense, your second thing that you do is help the prosecutor in securing a conviction, is that true, sir?

A   I work for the prosecutor in the state cases, that's correct.

Q   Okay, and is it also true, sir, that as the investigatory, sir, you are to do a fair and impartial investigation, is that correct, sir?

A   That's correct.

Q   And of course you did that in this case, true?

A   I believe so, yes.

Q   Okay.   Sir, the first thing I want to ask you about is, well, there's several things but you made some references about Nick Wren, do you recall that, sir?

A   Yes.

Q   Isn't it true that both the brothers were involved in the scam that Ms. McClure was in?

97

A    Without properly investigating it, but do I believe that they were involved in a scam, the three of them together in Washtenaw County?   Yes.

Q    Yes.   And isn't it also true, sir, that when you interviewed Nick Wren, that he told you, sir, did he not that Ms. McClure was scheduled to testify against his brother, correct?

A    I don't believe he said that.

Q    Did you print that in any report, sir?

A    If I could look at my report so I could refresh my memory?

Q    Sure.

A    That reflects that under his understanding that that was the case.

Q    Okay, let's go over that, under whose understanding?

A    Nick Wren.

Q    Nick Wren.   He told you under his understanding that Ms. McClure was scheduled to testify against his brother, correct?

A    Under his understanding, his own personal understanding.

Q    Okay, now you testified earlier this morning that when the incident occurred, the night of the shooting that you put a BOL, be on the lookout for Mr. Walker?

A    A BOL was put out.   I didn't physically put it out.   The dispatcher puts out the BOL, we do not.

Q    Okay, and I think you testified, sir, that in about fifteen minutes or -

A    Roughly thereabouts.

Q    Okay sir, your report that you wrote, sir, indicated that within seconds after you put that BOL out, sir, that you got a hit on it, correct?

        MS. KETTLER: Can I have the report number you're referring to please.

MR. BURKETT: Sure, hand me the report.   Here you go.

MS. KETTLER: Incident report, okay, thank you.

Q   Do you recall that, sir?

A   What -

Q   Within fifteen seconds.

A   What you're questioning about was Chris Haye's observations, which was prior to his arrival to the Buchanan address is what you're speaking of.

Q   Sir, as the officer in charge of the case, your job is to review all reports, is that correct, sir?

A   I don't understand what you're saying.

Q   You reviewed every report that the other polices officers make, correct?

A   I did the best that I could, yes.

Q   Okay, isn't it true, sir, that when you got a search warrant to search the person's, Mr. Walker's home, sir, that you've said within fifteen seconds after putting out a BOL, be on the lookout for his car, it was spotted, correct?

A   That's what I recall, correct.

Q   Okay, tell me, sir, and isn't this a true statement, you didn't go to the house immediately.   The car was seen by another police agency, what they thought was the car, shortly after the shooting, isn't that true, sir?

A   Shortly after the BOL.

Q   Okay, and the BOL was put out shortly after the shooting, correct?

A   You still have to have -

Q   No, just answer the question.

A   No.

Q   What time did, after the shooting, how long was it before you put a BOL out?

A   I would guess, yeah, a drive time of approximately, to get to the location, I'm trying to answer your question to the best of my ability without me -

Q   That's okay.

A   Without me explaining this, I would just be guessing.   If you'd prefer me to guess.

Q   Okay, after you get to the scene, sir, you put a BOL out, correct?

A   Correct.

Q   And within fifteen seconds, you get a hit on it, correct?

A   That's correct.

Q   And the hit you got, it was I saw what I think, and the hit was by another police, the Canton Police or the -

A   Van Buren Police.

Q   Van Buren Police says I think I saw this car very, very recently pass me by?

A   That's correct.

Q   Okay, and based on all this, sir, you get a search warrant to search Mr. Walker's home, true sir?

A   I don't know how to answer that question.

Q   Did you get a search warrant to search his home?

A   Did we get a search warrant, yes.   Is that the totality as the reason why, the answer's no.

Q   No sir.

          MS. KETTLER: I would ask the witness's answer not be cut off.

Q   I won't cut him off.   Sir, did you do, did you ask anyone to do anything to check to see whether the car that the Van Buren Police saw was the same car that was in the driveway?

100

A    He never caught up to the actual car that he thought he may have seen.

Q    Okay, it fit the description?

A    In his past recollection, it fit the description.

Q    Okay, and his past recollection was less than thirty minutes old, correct?

A    That would be correct.

Q    Okay, did anybody, sir, did you ask anyone to go feel the hood of that car to see if it was still warm?

A    I did not ask anybody to feel the hood of the car to see if it was warm.   I recall in my recollection Officer Hayes did know.

Q    Now sir, you told us a few minutes ago that everyone that was interviewed, and you used the term one hundred percent, was given Miranda warnings, is that true, sir?

A    I think I said I believe one hundred percent.

Q    Okay, sir, the 911 call, did you give her Miranda Warnings?

A    I didn't take her statement.

Q    Well, were Miranda Warnings given?

A    The question, I understood it was the people that I interviewed, did I give Miranda to.

Q    Okay.

A    I did not interview Ms. Kindall.

Q    Sir, you were in charge of the investigation, correct?

A    Not at that point I was not.

Q    Okay, did you subsequently go back and ask someone to give Ms. Kindall Miranda Warnings?

A    No, I did not.   At that point, I didn't even know her name was Ms. Kindall.

101

Q      Do you see what I'm handing you sir?

A      Yes.

Q      Who is it?

A      Sid Hutcherson.

Q      Okay, may I have it back.   Did you give Ms. Hutcherson Miranda Warnings?

A      I believe so.

Q      Could I see them?

A      I'm sorry, I did not.

Q      You did not?

A      No, I did not.

Q      Okay, this hundred percent is not correct then, is it?

A      The correct response was I said I believe, not that a hundred percent.

Q      Now, when the 911 caller made the phone call, how long afterwards, sir, before your department interviewed her?

A      Could you repeat that please.

Q      Sure, once the 911 call was made, how long after that was it before your department interviewed her?

A      I'd have to see her statement.   I didn't take her statement.

Q      Okay, but you have read her statement?

A      I've read her statement, yes.   If I saw the statement, I might be able to see if there was a time on it.

Q      Okay, did you, sir, ask anyone to do anything as it relates to finding a possible white male that she described?

A      Could you repeat that please?

Q      Sure, did you ask anyone to do anything in locating the white male that she

102

described?

A   I requested that Officer Lange conduct a canine search from the area in the direction that was described.

Q   As it relates to Mr. Walker, whose description does the 911 caller fit best, Mr. Walker or Mr. Benson?

A   The 911 call doesn't indicate if it's a white male or a black male.

Q   No, but when she was interviewed, sir -

A   I did not interview her.

Q   Okay, but now you've read the reports.

A   Well, if you'd like me to review the report.

Q   That's alright, that's okay.

A   I'm more than willing to.

Q   Let me ask you this, sir, I'm a little bit confused on this one topic.   When you went to Mr. Kyron's home, sir, was a car taken?

A   I'd have to look at the search warrant return but in my recollection, there was not one taken.

Q   You do not thing his grandparent's car -

A   I was not in charge of that scene.   I was there for a short moment.

Q   Regardless of who's in charge of the scene, you're in charge of the case?

A   That's correct.

Q   Did the Sumpter Police have his grandparent's car towed to the Sumpter Police station?

A   Before I could accurately answer that I'd have to look at the search warrant return but I believe the answer is no.

Q   When you got to the scene that night, sir, was the door open?

103

A    It was ajar.

Q    So is that yes, it was open?

A    It was ajar, not, my understanding of the word open is wide open.

Q    Okay, now you ordered, Timothy Walker, you ordered him to be arrested, is that correct, sir?

A    No, I requested that he be detained and brought to me for questioning.    He was never processed or arrested for anything.

Q    Was, when the officers came to his house that night, sir, was he free to leave?

A    At that moment in time, the answer would be no.

Q    Okay, was he put in handcuffs?

A    I was not there.

Q    Is it your department policy to place people in handcuffs?

A    I would suspect that the answer to that would be yes but I was not there, I didn't -

Q    Okay.    And you already said he wasn't free to leave.

A    Yes.

Q    Now, you got a search warrant for the home?

A    That is correct.

Q    Okay, and we already heard about the clothes and things that were taken from the home, correct?

A    Okay.

Q    You didn't bother to ask them to get his shoes?

A    I would have to look at the search warrant return but I believe that there were shoes taken.

Q    Why don't you get the search warrant return and look at it.

104

A    There's no shoes on the search warrant return.

Q    So no shoes were taken?

A    I would assume that he was wearing his shoes.

Q    Okay, you took shoes from Kyron's house, correct?

A    I would have to look at the search warrant return and make -

Q    You don't know that, sir?

A    Shoes were taken from there but I don't, at this present moment in time, the location, for all I know they're on his feet, in his closest, at the front door.

Q    Okay, any time you want to look at any search warrant or any materials you have, I don't mind.

A    Okay.

Q    Okay, but if you need to really to look at the search warrant return to know that shoes were taken from Kyron's house, fine.

A    Yes.

Q    Beg your pardon?   You took them from his house?

A    Yes.

Q    Why did you taken shoes from Kyron Benson's house?

A    Because at that point he was a suspect in the homicide.

Q    So was Mr. Walker.

A    He had been eliminated at this point.

Q    He hadn't been eliminated when you brought him into the station, correct?

A    He hadn't been eliminated when he was brought into the station, that is correct.

Q    Okay, he hadn't been eliminated when you got the search warrant because the search warrant says you're suspecting it, correct?

A    That's correct.

Q      Okay, when you asked for the search warrant, sir, my original question, why

       didn't you take his shoes?

A      I believe he had shoes on.   I wasn't there.

Q      Because he had shoes on, okay.   The things that were taken, sir, they weren't

       put up for safeguard, they were just thrown in somebody's office?

A      This office, there's one key to it and only Czinski has a key.   I don't even have

       access to that office.

Q      Okay, well let me ask you this.

A      It's pretty safe.

Q      You have a place where you store evidence, correct?

A      The amount of evidence that we were collecting -

Q      No, no, answer the question.   Do you have a place -

                     MS. KETTLER: I'm going to ask that the witness be permitted to

answer the question before he's interrupted.

                     THE COURT: He will.

Q      You have a place where you store evidence, true or false?

A      I guess I don't understand the ruling.   Was I to answer that last question or -

                     THE COURT: I said you will answer it, I'm confident.   Go ahead.

A      In regards to the last question -

Q      We're not talking about, I don't think the Judge is talking about the last

       question.   We're talking about do you have a place where you store evidence?

A      Yes.

Q      Okay, the things you took from Mr. Walker was not placed in that particular

       room that you have, is that true, sir?

A      We don't have a room like what -

                                      106

Q     Okay.   So they were stored in somebody's office?

A     In this particular situation before they could be processed, yes, they were

       stored in somebody's office.

Q     The knife that was taken from the scene, sir, where was it stored?

A     MSP.

Q     Did you store, you also, sir, took automobiles from Mr. Walker, is that correct,

       sir?

A     That's correct.

Q     Why did you take them?

A     At that point we had no idea on his status in the case.   He was still in the

       beginning phase of the investigation and if there was any evidence within the

       vehicle, we impounded it.

Q     Okay, and sir, once you impounded them, sir, did you have someone from the

       crime scene go over them?

A     We had Corporal Luke go over the vehicle.

Q     Is Corporal Luke from the crime scene?

A     The crime scene investigation was still underway with MSP.

Q     Listen to my question.   Once you took these two cars from Mr. Walker, sir, did

       you have some expert from the crime scene go over these cars, yes or no?

A     No.

Q     Once you took the clothes from Mr. Walker, sir, you had no one from the crime

       scene go over them, yes or no?

A     No.

Q     Okay, sir, isn't it true that the clothes were in a garbage bag stored in

       somebody's office, I think you said this gentleman?

                                         107

A     Czinski?

Q     Yes, okay.   And Mr. Walker came into the station the next day without your

being there and demanded his clothes and the clerk working the desk gave

them to him.   Is that true, sir?

A     No, I don't believe that to be true.

Q     Read it to yourself and then I'm going to ask you some questions.   Does that

kind of refresh your memory as to what happened, sir?

A     Yes.

Q     Okay, Mr. Walker came into the station.   Some clerk working the desk handed

him the garbage bag full of clothes, correct?   Yes or no?

A     We don't have a clerk, within the context of your question, without everything in

it, was the clothing returned, yes, it was.

Q     Okay, now sir, you told the prosecutor a few minutes ago that Mr. Walker had

some type of injuries?

A     Yeah, unknown to me.

Q     Beg your pardon?

A     Unknown to me, yes.

Q     Okay, did you see any visible injuries on him?

A     Other than a scar, no.

Q     A scar, what kind of scar, sir?

A     On his head.

Q     Beg your pardon?

A     On his head.

Q     Do you personally do any investigation as to where that scar came from?

A     I have no idea where it came from, no, I did not.   He was not forthcoming.

Q    Okay, it's true then that Mr. Walker, sir, when you say not forthcoming, I'm

saying he was not cooperative, is that a true statement sir?

A    That would be a true statement.

Q    He would not give you any information?

A    That is a true statement.

Q    Okay, but he was with someone else?

A    That is true.

Q    And other than the person he was with, did you interview anyone else as it

relates to Mr. Walker?

A    No, we did not.

Q    So you had a conversation with this other person and based on that

conversation, you said Mr. Walker is no longer a suspect, is that what you're

telling us?   And you can answer that yes or no.

A    At that point, I would categorize it probably ninety percent, ruled out ninety to a

hundred percent, yes.

Q    Okay.   Now a few minutes ago, sir, just so I can understand your frame of

mind, you told the Court that it was something of a misdemeanor, what he had

done to Ms. McClure?

A    The domestic violence?

Q    Yeah.

A    Yes, it was charged as a misdemeanor.

Q    Okay, in your opinion, sir, do you treat that less serious?

A    Than what, anything?   No, absolutely not.   Everything's serious.

Q    Oh, okay.   Sir, did you take a written statement, sir, from Mr. Walker?

A    No.

Q      Okay, why not?

A      He couldn't provide one.

Q      Well, let's put it this way.   Did you ask him for a written statement?

A      I don't recall.   We had moved on to Mr. Hutcherson.

Q      True or false, sir, you gave Mr. Walker, – - Mr. Walker his constitutional rights?

A      True.

Q      Is that a true statement, sir?

A      True.

Q      Okay, after you gave Mr. Walker his constitutional rights, sir, the followup

       question is, did you ask him to give a statement?

A      I don't recall asking him for a statement, no.

Q      Okay, if you didn't, why not?

A      At that point we were starting to receive information of other possibilities and

       stuff like that at that point.

Q      What time of morning are we talking about?

A      At this point?

Q      Yes.

A      I would guess coming on to eleven, noon.

Q      What time was the rights given?

A      10:00 a.m. or 10:15 a.m.

Q      10:15, within six hours after the shooting, correct?

A      More close to eight hours.

Q      Okay, you asked the person that he was with to give a statement, is that true,

       sir?

A      That's correct.

110

Q     And that person's name again is what, sir?

A     Excuse me?

Q     What was the person's name?

A     Sidney Hutcherson.

Q     Mr. Hutcherson.   Prior to Mr. Hutcherson giving a statement, sir, did you advise

        Mr. Hutcherson of his constitutional rights?

A     I don't recall.

Q     You can look in your folder.

A     I think I've already testified to that, that there wasn't.

Q     Oh, so he wasn't given, okay.   And the relationship between Mr. Hutcherson

        and Mr. Walker was what sir?

A     Some type of brother I believe.

Q     Okay.   Sir, at any point, once you were the officer in charge of the case, sir, did

        you tell your dog trainer, sir, to have the dog sniff Mr. Walker's clothes to help

        determine whether or not he was at the scene?

A     I'm going to attempt to answer the question.   We don't have a dog trainer.

        We have a handler.   He goes to training and he's trained by a trainer.   In

        regards to sniffing the clothing, my understanding, I'm not a dog handler -

Q     No, I'm just asking you did you -

A     My understanding is that that's, for what the dog is certified, that's not a part of

        what that dog can do.

Q     Okay, now back to my original question, sir.   You did not ask that to be done,

        correct?

A     That's correct.

Q     Okay, now Mr. Ricky Wren and his brother, Nick, correct, they were both

111

suspects in this case, is that true, sir?

A     That's true.

Q     Okay, sir, did you ever get a search warrant to search Ricky Wren's home?

A     His home?

Q     Yes, where he lived.

A     We got the address, we were under the impression that he lived down on Tuttle

       Hill.

Q     Okay sir, when you read his name through your lien system, it shows an

       address in Ypsilanti, correct?

A     Yes.

Q     Okay, that's where he was, okay, did you get a search warrant to search Ricky

       Wren's home in Ypsilanti?

A     No.

Q     Okay.   Now you told this Court and this jury a few minutes ago, sir, that Ricky

       Wren voluntarily came in to the police department because you thought

       something about he was wanted by the police.

A     He was under the impression that he was wanted and he went to the police

       station.   We didn't reach out to him.

Q     He went to the state police station?

A     He went to the state police.

Q     Is it true, sir, that his computer, and he told you that his computer was filled with

       emails from Stephanie McClure's family saying we know you're the blankety

       blank that killed our cousin?

A     He had indicated to us that he had received stuff on My Space, correct.

Q     Okay, and you reviewed it, didn't you?

112

A    I've seen it, yes.

Q    Okay, now did you talk with the people in Ms. McClure's family, sir, to ascertain who sent him this email and how do they know that, sir?   Well, that's a two part question.   Did you talk with the person that sent the email?

A    No.

Q    Okay, so you don't know what evidence they may or may not have had that Ricky Wren killed their cousin?

A    I'm under the impression it's about this credit card scam that isn't exactly what it's supposed to be.

Q    Okay.   Sir, you told us that you had information from whatever source it was that Ricky and his brother was trying to leave town, is that correct, sir?

A    We, Corporal Gannon had received that information, that is correct.

Q    Okay, and do you know where that information came from, sir?

A    Stephanie McClure's mother.

Q    Okay, and did you also have information, sir, that not only was he leaving town but that they had stolen a car to leave town in?

A    I never heard that before.

Q    Okay, you didn't get a report about his mother or his grandmother or sister reported that Ricky and his brother took their car?

A    I don't have a report of that.

              MS. KETTLER: Is there a report number you're referring to?

              MR. BURKETT: She's going to find it.

              MS. KETTLER: Okay.

Q    You can read as much as you want.   I'm only going to ask you the parts that I have marked in yellow.   Does that refresh your memory, sir?

113

A    I've read it.

Q    No, does that refresh your memory of what information you had?

A    Towards that?

Q    Yes.

A    No, I don't recall that.

Q    You don't recall that?

A    In reading it, I was under the impression that you said that there was a police report in regards to the automobile and this was like an after the fact -

Q    Did you have information, sir, that that car, that Ricky and his brother had taken a car?

A    That's not what that report says.

Q    No, but that was my question.

A    When that was drafted, I would be home in bed asleep.   I had no idea of that as it was transpiring.

Q    Okay, when you woke up the next day, sir, you read all the reports that the other policemen made on this case, true or false, sir?

A    When I woke up the next morning, I came into the station and I responded to Tuttle Hill.

Q    Okay.   So are you telling us you didn't bother to read the reports the other police officers made?

A    The other report wasn't drafted at that point.

Q    Now Ricky gave you a statement, is that correct, sir?

A    Yes.

Q    And you also brought him down to the prosecutor's office to give a statement under oath, is that true, sir?

114

A     That's correct.

Q     Okay.   Sir, did you ever compare, not to what was is in it, but did you ever compare the statement that Ricky gave you with the statement that Paula gave you?

A     I've never even, repeat that again.

Q     Did you read the statement that Ricky gave you, sir?   You read it, didn't you?

A     Yes.

Q     Did you read the statement that Paula gave you?

A     Paula's never given a statement.   She asked for counsel.

Q     I don't mean Paula, I'm sorry, Jessica, Jessica Fritz.

A     Have I sat down and compared the two?

Q     Yes, yes.

A     I've read, I've never sat down and like taken a highlighter and like comparing the two or something like that, no.

Q     Now, you took a car when you went to Tuttle Hill?

A     Yes, a car was impounded.

Q     Okay, why did you take the car?

A     So that Corporal Luke could take a close look at that vehicle.

Q     Okay, and you've already told us he's not an evidence expert, correct?

A     He's not an evidence expert; however, he's an evidence technician.

Q     Okay, Corporal Luke, sir, reported to you that what he thought was blood in the car, correct?

A     He said that there was something in there that he did not know what it is but he would like to take a closer look, it could be blood.

Q     Okay, and because it could it be blood, sir, did you have the state police come

115

down and examine it?

A   Corporal Luke said that he -

Q   Did you have the state police -

A   No.

Q   You did not?

A   No.

Q   Sir, you testified, sir, as it relates to Mike, Big Mike, that you did not know what he looked like until sometime in January?

A   I don't recall testifying to that.

Q   Okay, you did know what Big Mike looked like then, did you not, sir, shortly after the incident occurred?

A   The exact time line, I don't recall.

Q   Okay, did you see Big Mike at Kyron's grandmother's house, sir, the day you arrested Kyron?

A   I did not, no.

Q   Okay, do you have reports, sir, from the police department from your -

A   Officer Buccellato you're referring to?

Q   Yes.

A   I don't recall that she said that she identified Big Mike.

Q   Sir, I'll get back to that in a second.   Sir, when you interviewed Big Mike, sir, the very first time, it is true, is it not, that he told you he had never seen or met Stephanie, is that true, sir?

A   I'd have to review to make sure that it's articulated properly.

Q   Please do.

A   Did you indicate where you're speaking of?

116

Q       The first statement that he gave you.

A       It just might be helpful if you could tell me like what page, stuff of that nature.

Q       I'll find it, sir.   While I'm finding that, let me move on to something else and I'll come back to it.

A       Okay, fine.

Q       Sir, in any written statement that Mike gave you, sir, isn't it true that he has never told you that they saw, I'm sorry, that he saw Stephanie outside as they were driving down the street that morning.   Isn't that true, sir?

A       As to a written statement?

Q       Yes sir.

A       I believe as to written, the answer is no.   Could you repeat that question again, please?

Q       Sir, in any written statement that Big Mike gave you, sir, isn't it true that he never told you, sir, that when they were driving down the street, they saw Stephanie McClure standing outside that car?   That was never told to you -

A       In a written statement, no.

Q       Beg your pardon?

A       As a written statement, the answer would be no.

Q       Okay, and you took two written statements from him, correct?

A       No.

Q       You took more than two?

A       I believe there was one.

Q       Okay, you took a statement from him back in January.   And then you took another statement from him in April, April 9th, I think it is.

A       Okay.

117

Q    That's two.

A    The question that asked me wasn't did we take two statements, you asked me if we took two written statements and the answer to that is no.

Q    Okay, sir -

A    Did we take two statements at two separate times, verbal statements, the answer is yes.

Q    Okay, in the two written statements, verbal statements that were reduced to writing, sir, he, Mike never told you that he saw Kyron outside talking to Stephanie, did he, sir?

A    In the third statement, which I was present with the prosecutor, he did, yes.

Q    Was that statement reduced to writing?

A    It wasn't my interview, it was the prosecutor's interview.

Q    Now this third statement that was not reduced to writing, sir, this was taken the Monday before the trial started?

A    I believe that would be accurate, yes.

Q    And that's the first time that you heard about that, that he saw, they saw Stephanie outside when they drove by?

A    He was showing a map of the location and that's when he indicated, yes.

Q    Okay, did you say, sir, you have never told us this before, did you ask him that question, sir?

A    It wasn't my interview.

Q    You can still ask questions, though, even if it wasn't your interview?

A    No, I did not ask that.

Q    The portion I have in yellow, I'm going to ask you as it relates to whether or not he tells you he had never met Stephanie McClure and he did not know her.

118

Let me know when you're ready.

A   I'm sorry, I'm a slow reader.

Q   Take your time.

A   To this page, go ahead.

Q   Okay, I didn't want to rush you.   Do you remember my question?

A   No.

Q   Did Big Mike tell you, sir, on that interview that he did not know Stephanie and he had never met her?

A   In those exact terms as you're presenting, he advised that he was familiar with the victim.

Q   Did he tell you he'd ever met her, sir?

A   As into that exact words?

Q   Yes.

A   No, it doesn't say that he met her, it says that he was familiar with her.

Q   Look at the sentence before that, sir.   Why don't you read it out loud.

A   The sentence right prior to that?

Q   If you need to read the entire paragraph, you can to make sense.

A   Officers questioned how Larvaidan could not know the victim as he had been at the apartment so many times and knew so much about Paula allowing someone to move in.

Q   Okay, and what was his response to that, sir?

A   Larvaidan advised that now he thought about it and he was familiar with the victim and knew that Kyron was upset with Paula for letting the victim move into the apartment and that the victim apparently stole items when she moved out of the apartment.

119

Q   Okay, now when you, the first time you asked him that, sir, he told you he did

not know her.   And when you suggested that how could you not know her, then

he said my memory's better.   Is that basically what happened?

MS. KETTLER: Well, I'm going to object to asking the witness to

interpret the words of someone else.   They are what they are.

THE COURT: Weren't the words just read into the record?

MR. BURKETT: Yes.

THE COURT: Sustained.

Q   Sir, Mike, Big Mike told you, sir, did he not, that the only place he saw the gun

was when Kyron first got into the car, true sir?

A   He told us that he saw a gun at that point, yes.

Q   He never told you that when Kyron got out of the car, he had a gun, did he, sir?

A   That would be correct.

Q   Okay, he never told you, did he, sir, that when Kyron came back to the car he

saw a gun, correct?

A   That would be correct.

Q   He never told you, sir, that Kyron told him that he shot anybody, did he, sir?

A   No, he did not.

Q   Sir, what I'm going to ask you, that's your statement, that's part of your report,

sir.   What I'm going to ask you to do -

A   This is part of Detective Czinski's report.

Q   Okay.

A   But the totality of the report, yes.

Q   I just want you to read that one sentence, paragraph that I have marked in

yellow.

120

A       Just read it?

Q       Yes.

A       Larvaidan was asked if he knew the victim and he advised no, that he had

         never met her.

Q       I'm sorry, sir, there was more -

A       Yeah, there's another sentence.

Q       Sure.

A       Larvaidan was shown a picture of the victim and again advised that he did not

         know her.

Q       Thank you, sir.   Big Mike told you, sir, that at the time of this incident he was at

         a bar in Ann Arbor?

A       That's correct.

Q       Okay, did you do any investigation to see whether or not that was true?

A       As to going to the -

Q       Yes?

A       No.

Q       Okay, Big Mike also told you sir, did he not, that he went to Stephanie

         McClure's family and offered their sympathies, and offered them, I'm sorry, you

         had information, I think you testified to, that Big Mike talked to Ms. McClure's

         family and offered them his condolences?

A       We had information about that through the victim's family.

Q       The victim, who, Ms. McClure's family?

A       Correct.

Q       Did you ask Big Mike whether or not that was true?

A       He advised it was not true.

Q    Okay, was Big Mike at the preliminary examination that was held out in Romulus?

A    I did not see him there.

Q    Okay, did you hear of information that he was there?

A    I personally did not, no.

Q    Okay.   Now, you interviewed the other witnesses that you and the prosecutor were talking about.   First of all, no witness, sir , that you took a written statement from ever told you that when Mr. Benson and Paula, when they went to the house with their four friends that evening they were looking for the puppy.    Do you recall that, sir?   Do you recall that?

A    Could you repeat that portion?

Q    Yes.   You interviewed several witnesses, Brianna, Jessica and the other witnesses.   And they told you that when they got to the house, they were looking for the puppy, correct?

A    They looked for the puppy.

Q    Yes.   No witness, not one witness, sir, told you, did they, sir, that when they got to the house and looked for the puppy, including Kyron, that Kyron said, oh, he must be in the freezer.   Nobody told you that, did they sir?

A    I believe that somebody had said that.

Q    Beg your pardon?

A    I believe somebody had said that, yes.

Q    Well then could you show us the report that whoever said that.

        THE COURT: Ladies and gentlemen, I'll let him look that up and be back tomorrow at nine o'clock.   Don't discuss the case.

        (Whereupon the jurors were excused and Court

122

was recessed)

(Matter concluded)

STATE OF MICHIGAN )

COUNTY OF WAYNE    )

I, Jeffrey B. Goldsmith, Official Court Reporter for the Third Judicial Circuit of Michigan, do hereby certify that I reported the foregoing proceedings before the Honorable

MICHAEL J. CALLAHAN, Circuit Judge on May 19, 2008; that the foregoing 130 pages constitute a true and correct transcript of the proceedings so held.

_____
Official Court Reporter
CSMR-0037

123