STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF
MICHIGAN,

        Plaintiff,

-v-                        Case No. 07-024733-01 &
                                     07-024733-02

KYRON DARELL BENSON and
PAULA RENAI BENNETT,

        Defendants.
_____/

JURY TRIAL
VOLUME IX

              Proceedings had before the
Honorable MICHAEL J. CALLAHAN, Judge of the Third Judicial
Circuit of Michigan, 703 Frank Murphy Hall of Justice,
Detroit, Michigan 48226, on May 20, 2008.

APPEARANCES:

                        MS. MOLLY KETTLER
                        Assistant Prosecuting Attorney

                          On behalf of the Plaintiff

                        MR. RAYMOND BURKETT
                        Attorney at Law

                          On behalf of Def. Benson

                        MR. WALTER A. WHITE
                        Attorney at Law

                          On behalf of Def. Bennett

                        Jeffrey B. Goldsmith
                        Official Court Reporter
                        CSMR-0037

<u>INDEX</u>

| <u>WITNESS</u> | <u>PAGE</u> |
|---|---|
| SCOTT SOMERSET, M.D. | |
| Direct Examination by Ms. Kettler | 3 |
| Cross Examination by Mr. White | 14 |
| Redirect Examination by Ms. Kettler | 24 |
| Recross Examination by Mr. White | 25 |
| JOHN TOTH | |
| Continuation of Cross Examination by Mr. Burkett | 26 |
| Cross Examination by Mr. White | 44 |

| <u>EXHIBITS</u> | <u>MARKED</u> | <u>ADMITTED</u> |
|---|---|---|
| None | | |

May 20, 2008

Detroit,                Michigan

P R O C E E D I N G S

*      *      *

THE COURT:  The People of the State of Michigan versus Kyron Benson and Paul Bennett.  Ms. Kettler, you can call your next witness.

MS.  KETTLER:  Thank  you,  we'll  call  Dr.  Scott Somerset.

JOHN SCOTT SOMERSET, M.D.

having been duly sworn by the Court at 9:25 a.m. was examined and testified upon his oath as follows:

DIRECT EXAMINATION

BY MS. KETTLER:

Q    Good morning Doctor.  Would you please state your full name for the record.

A    John Scott Somerset.

Q    And you are employed by Wayne County?

A    That is correct.

Q    And would you tell the juries please in what capacity you're employed?

A    I'm an Assistant Medical Examiner.

Q    Okay, and what are your educational, what's your educational background?

A    I earned a Ph.D. in Human Genetics from the University of Texas

3

Medical Branch in Galveston, Texas.  I earned an M.D. degree from the University of Texas at San Antonio.  I did a fellowship, I mean I did a residency in pathology and a fellowship in forensic pathology.

Q  Okay and as an assistant medical examiner for Wayne County, is one of your duties to perform post mortem examinations?

A  Yes, it is.

Q  And are you a licensed physician in the state of Michigan?

A  Yes I am.

Q  Okay, and have you previously been qualified as an expert in forensic pathology by various courts?

A  Many times.

Q  And allowed to give your expert opinion in that field?

A  Yes.

Q  Will we have a stipulation to the doctor's qualifications?

        MR. BURKETT: Yes.

        MR. WHITE: Yes.

        MS. KETTLER: May I proceed your Honor?

        THE COURT: Yes.

        MS. KETTLER: Okay.

Q  Doctor, you indicate that one of your duties is to perform post mortem examinations.  I want to ask you whether you had the occasion to do an autopsy on a young lady by the name of Stephanie McClure on October 7, 2007?

A  Yes, I did.

4

Q   Okay, and in addition to doing the actual autopsy, did yo
    prepare a written report of your findings?

A   Yes, I did.

Q   Alright, and if you could just briefly tell the juries the
    procedure that's followed with regard to the external and
    internal examination in performing an autopsy and then we'll
    go into the specifics of this young lady's in particular.

A   Okay, the external examination is exactly what the name
    applies.  We look at the outside of the body, the clothing,
    the injuries and document them, take pictures.  Then the next
    part of the autopsy is where we actually open the body.  We
    do a Y shaped incision on the chest and an incision on the
    back of the head to take out the brain.  And we correlate the
    injuries we saw on the outside of the body with the injuries
    we see on the inside of the body and recover bullets or any
    evidence.

Q   Okay, and it's one of your statutory duties as a medical
    examiner to determine cause of death?

A   Yes it is.

Q   And is it also to determine a manner of death?

A   Yes.

Q   And could you explain to the jury briefly the difference between
    cause of death and manner of death?

A   Causes of death would be somebody could die of a heart attack,
    would be a natural cause.  It could be multiple stab wounds,

5

those are causes of death.  Manners of death would be natural,
accident, homicide, suicide, are indeterminate.

Q   Okay, and in this particular case of Stephanie McClure, what
was the cause of her death?

A   Multiple gunshot wounds.

Q   Okay, let me ask you first of all upon your external examination
of the young lady's remains, did you observe any injuries other
than the gunshot wounds, anything in the nature of defensive
wounds or abrasions or lacerations?

A   No, I did not.

Q   Okay, did you externally observe evidence that immediately
let you know you were dealing with gunshot wounds?

A   Yes, I did.

Q   Okay, and would you please tell the juries how many gunshot
wounds Stephanie McClure suffered?

A   There were five.

Q   Okay, I want to ask you in you report, do you number the gunshot
wounds for purposes of description?

A   Yes.

Q   Okay, so for example in your report, you have a gunshot wound
number one and I'm going to ask you some questions about that.
 Does that in any way denote the order in which the gunshot
wounds were suffered?

A   No, it does not.

Q   Is that possible for you to tell?

6

A   In some, in very few cases, not in this one.

Q   Okay, and so the numbering is simply for ease of reference, is that correct?

A   Correct.

Q   Alright, first can you tell me, you have the approximate age, weight and height of the young lady who you were performing an autopsy on?

A   Yes, I do.

Q   Okay, if you could share that with the juries please.

A   She was twenty two years-old.  She was five feet two inches and weighed one hundred and twenty nine pounds.

Q   Okay, and let's talk about each of the gunshot wounds at this point.  The one that you've labeled in your report as gunshot number one, gunshot wound number one, would you please tell the juries first of all, was that a through and through wound?

A   Yes it was.

Q   Okay, and explain to the juries what is meant by a through and through wound?

A   It means that there's an entrance wound where the bullet entered.  It went through the body and then an exit wound where the bullet exited.  The significance of that is there's no bullet recovered from the body because it passed through the body.

Q   Okay, and will you tell the juries the location of the first gunshot wound and what the wound track was?

7

A     The entrance wound was above her right eyebrow on her forehead
      obviously and it went upward and to her left and it exited
      her forehead.   And the wound track was just between the skin
      and the skull.

Q     Okay, and so when we speak about a wound track, can you just
      explain for the jurors what that is and how you can determine
      what it is?

A     A wound track in the simplest terms is just a hole the bullet
      makes and there's hemorrhage around it because you're damaging
      the body and the body bleeds into the wound track.   And just
      to clarify, all the way through this when I say front to back,
      left to right, upward and downward, it means in relation to
      her body.   It means her left to her right, her front to her
      back and upward is if she were standing.   I don't know if she
      was standing.   But when I say upward, it's upward in her body.

Q     So when you refer to the anatomical position, maybe you could
      use that to explain to the juries, that concept a little bit
      more clearly.

A     Well it's a standard position.   It's if a person is standing
      with their arms down at their sides with the palms facing
      forward.   And most of the descriptions that we have are in
      regard to that because we don't know the position of the person
      when they were shot.

Q     Okay, so when you refer to directions, for example with regard
      to the wound track in the first wound, when you say right to

8

left and upward, you're referring to that as, with reference
to the body being in the anatomical position, is that correct?

A    Exactly.

Q    Okay, does that mean that you can tell in any way how she was
standing or sitting or laying down at the time she suffered
that gunshot wound?

A    No.

Q    It means that you can tell what the direction of the bullet
was only, is that right?

A    The analogy I like to use is that if you were to show anyone
a photograph of a group of people, somebody could look at that
photograph and say well, Sam is in front of Joe who's to the
left of Sally.  And it's only good for that moment.  You don't
know where they were all standing the moment before the picture
was taken.  You don't know where they were standing after the
picture was taken.  But at that moment, you know.  And so what
I could say about this one wound is that the wound track, the
entrance and the exit and the barrel of the weapon that shot
her lined up at that instant.  So it came straight out of the
weapon, went to the entrance wound, went through between the
skin and the scalp, between the skin and the skull and then
exited.  And all that's in a straight line.

Q    And, okay thank you.  And now I want to ask you about the wound
that you've numbered number two in your report.  Tell the

9

juries first, please, was that a through and through wound?

A   Yes it was.

Q   And where was the location of that wound and what was the wound track?

A   Gunshot wound number two was to the back of the neck, a little bit to the right and it exited the front right of the neck.

Q   Okay, and was there any bullet or portion of a bullet recovered from that wound?

A   No, there was not.

Q   And then again, that's because that's a through and through wound, is that right?

A   Correct.

Q   And if you would please, with regard to gunshot wound number three, was that through and through?

A   Yes it was.

Q   So again, no bullet or portion of a bullet recovered, correct?

A   Correct.

Q   And what's the location and the wound track of that wound?

A   Gunshot number three was to the front of the neck.  And it passed through the neck.  No major blood vessels or structures were involved.  It then went into the chest and went through the upper lobe of the left lung.  It then went through the second rib on the left.  We number ribs one through twelve with number one being at the top and twelve being the lowest rib.  And so it went through the second rib on the left and

10

then ended on an exit wound on the back.

Q   Okay, so when we talk about the wound track as far as direction,
is that front to back?

A   Correct.

Q   And right to left?

A   Yes.

Q   And slightly downward?

A   Correct.

Q   But only when the body's viewed in the anatomical position?

A   That is correct.

Q   Okay, and with regard to gunshot wound number four, please,
is that a through and through wound?

A   Yes, it is.

Q   No bullet or part of a bullet recovered?

A   That is correct.

Q   And what was the location of that gunshot wound?

A   It entered her left arm.  Your arm is between your shoulder
and your elbow.  It entered her left arm just above the elbow,
went through the arm and fractured the bone in your arm, the
humerus, and then exited at the top of her left shoulder.
So basically it just went through her left arm and fractured
the bone.

Q   Okay, so sharply upward?

A   Correct.

Q   Okay.

11

A    Of course that depends on what position your arm is in at the moment she was shot.

Q    Okay, and finally with regard to the fifth, the wound you've numbered as the fifth gunshot wound.

A    That's to the left back.

Q    Is that a through and through wound?

A    No, it was not.

Q    Okay, what was recovered from that wound?

A    A deformed bullet.

Q    Okay, an entire bullet or a portion?

A    An entire bullet.

Q    Okay, tell the jury, you've indicated where that wound was to, can you tell them the path and directionally the path of the wound?

A    This is a more complicated path.  It went steeply upward in the body.  So it was on her left back and went steeply upward.  It went through the ninth left rib in her back.  It went through the body of T-8.  Your backbone is divided into two parts by their function.  We have one part that's for support and another part that protects your spinal cord.  Okay, it went through the part that is for support.  So the bullet went through that.  It went through the right lung.  It went through her thyroid gland which is in her neck and then went through the left upper teeth, the molars on the left and then went up through into her skull and through her brain.  And I found

12

the bullet between the scalp and the skull.

Q    Okay, and because of the circumstances of this particular
     wound, was there anything that you could tell about the way
     her body was positioned or part of her body was positioned
     on that wound?

A    Yes.

Q    And what could you determine?

A    The only way that you could have this wound is that, to line
     everything up in a straight line is that her head was turned
     to her right at the moment that wound was inflicted.  That's
     why it's going from left to right but it ends up in her left
     side of her brain.  Because if you picture me now with my head
     turned all the way to the right, if I was shot in the back
     and it went steeply upwards through my neck, then it would
     hit my teeth on the left and go to my left brain.  So the bullet
     in general is going from left to right in her body, through
     her back and into her neck but then it winds up on the left
     side of her head because her head was turned to her right at
     that one moment.

Q    Okay, and so that deformed bullet, was that, that was removed
     from Stephanie's body by you at the medical examiner's officer,
     is that correct?

A    That is correct.

Q    Is that placed on evidence to be turned over to the police
     agency?

14

A    Yes.

Q    Okay.   You told us what the cause of Stephanie's death was.

     Have you made a determination about the manner of death?

A    Yes.

Q    And what is that?

A    That was homicide.

Q    Nothing further, thank you Doctor.

                    THE COURT: Cross exam.

     MR. BURKETT: Your Honor, if it please the Court, I'm going

to defer my cross examination to Mr. White.

                    CROSS EXAMINATION

BY MR. WHITE:

Q    Good morning Doctor.

A    Good morning.

Q    Now the first thing you did when you received the body was

     what, an external examination or were there preliminary

     matters?

A    Well the first thing we do is we get information surrounding

     how the body was found.   Anything we can, anything our

     investigators can find out.   And we have whatever information

     we can have before we start the autopsy.

Q    And what information, who did you get information from?

A    From our investigators in the medical examiner's office.

Q    Alright, so these were from the medical examiner's office not

     from the state police?

                            15

A   Well they confer sometimes with the state police but yes, the information's from our investigators.   They'll ask witnesses at the scene if they saw anything.   They'll look at the scene.   Sometimes they'll take pictures and let us know what they found out.

Q   Alright, now the body as you first saw it, was it dressed or undressed?

A   I believe it was dressed.

Q   Alright, did it come with any other property; for instance a necklace or any other property besides just the body and the clothing?

A   I don't put that in my report.   I put the clothing in my report.   Our investigators, if there are valuables on the body, quite often they'll log them in.

Q   Alright, now when you observed the clothing, were there bullet holes in any of the clothing?

A   I didn't make note of that.

Q   Now, would you in the normal course of events, if you had certain clothing make notes of it or holes in the clothing, make notes of that?

A   I mainly make note of bullet holes in clothing if there's a reason to think there was close range firing or something and even then you can't really all the time tell if there was close range firing.   I sometimes do and sometimes I don't.   So I really can't swear that there was a hole or there wasn't a

16

hole in her clothing.

Q    There was nothing you felt necessary to make note of, though?

A    Correct.

Q    Alright.   Now by the time you received the body, had rigor mortis begun?

A    Yes.

Q    Were you able to establish a time of death medically as opposed to testimonially from witnesses or investigators?

A    No, it's, in this case the time of death from investigators and witnesses would be much, much more accurate than I could determine by looking at the body.

Q    Alright.   Now did you collect any fibers or any other potential evidence from the body prior to removal of the clothing?

A    We obtained fingernail clippings.

Q    Alright.   Did you obtain fingerprints?

A    I don't know how she was identified.   She could have, there are various ways.   It may have been by fingerprints.

Q    Alright, but you did not do that?

A    I did not.

Q    Did you undress the body?

A    People, myself and people that work with me undressed the body.

Q    Were you present when it was undressed?

A    Yes.

Q    Alright, and having observed that, did you observe anything unusual?

17

A    Yes I did.

Q    And what did you observe?

A    We found a bullet on the autopsy tray.  It probably fell out of her clothing.  I also turned that in as evidence.  It grossly looked like the bullet I recovered from her body, about the same size but I'm not a ballistics expert so I don't know if it's the same type of bullet or not.  And I submitted that bullet as evidence.

Q    Now did you mark that bullet in any way?

A    I put it, I did our normal procedure.  I put it in an envelope, its own unique envelope and labeled it as such and turned it in.

Q    You followed the same procedure, I'd assume, with the bullet you recovered from the body?

A    Correct.

Q    Now did you weigh either of those bullets or did you leave that for the ballistics people?

A    That's for the ballistics people.

Q    Alright, now on your external examination of the body after it was undressed, did you, you said you noticed five bullet holes.

A    Well, five gunshot wounds.

Q    Gunshot wounds, yes.  Some of them obviously were pairs?

A    Correct.

Q    Did you notice any other injuries to the body?

18

A   No, I did not.

Q   Alright, no bruising, no other injuries of any sort?

A   No.

Q   Now, the five bullet holes you observed, the first one you indicated was a shot that was between the scalp and the skull?

A   That's where the wound track was, correct.

Q   Alright, now you, was the entrance wound circular in shape or was it elongated?

A   It was circular.

Q   Alright, so what had happened, would it be correct in assuming, that the bullet hit and was deflected by the skull?

A   Well there was no damage to the skull.  There was no divot or impression in the skull so it more likely, it may have been deflected somewhat by it but more likely that was the direction of the bullet above the right eyebrow, I believe, where I'm pointing now and an exit on my forehead, on the left side of my upper forehead.  So basically it was a straight line between my two fingers going towards my left forehead.  And since the skull was not damaged, I would assume that the bullet was not deflected much if at all.

Q   Alright, but that's why I asked if it would be an elongated hole rather than a round hole.  Now did you measure the entrance hole?

A   No, I did not.

Q   So you can't tell us the gross size of the hole, whether it

19

would have .357, .32 –

A   Oh, I have photographs with a scale on it, with a ruler and the scale, and the photograph and you can use that to measure the size.

Q   But you don't have that information today?

A   Well I have the photographs but I didn't calculate the size of the hole.

Q   Alright, now the first wound would not have been a lethal wound, is that correct?

A   No, they're all potentially fatal.  How we do that is you're bleeding from each one.  Each gunshot wound is bad.  Obviously some of these are much, much more serious than others, much more immediately fatal than others.  But you could get shot and then die a week later from an infection of a relatively minor one.  So because she died before she had a chance to die from the minor wounds, we say they're all wounds that are potentially fatal.

Q   Alright, but by that criteria if I cut my hand and get an infection, it's a potentially fatal wound, correct?

             THE COURT: Counsel, you can't ask a question like that.  You can ask any question you wish about the autopsy.

Q   Alright, the first wound is not one that you would normally expect to be fatal, is it, with some kind of medical treatment?

A   No.

Q   Alright, was there any damage to the brain inside the skull

20

at the point where the first wound took place?

A   No.

Q   Now the wound to the entrance at the back of the neck, you said the wound was from front, from back to front, correct?

A   Correct.

Q   And that it involved no major arteries or blood vessels?

A   Correct.

Q   Alright, was that a wound that with proper medical treatment would be likely to be fatal?

MS. KETTLER: I'm going to object as to the relevance of this.  It's completely irrelevant for legal purposes.

MR. WHITE: Your Honor, I think that the cross examination, first off, we have a broad range but I'm trying to establish exactly which wounds would likely be fatal, which weren't and the angle and nature of the damage from a fatal wound.

THE COURT: Well I believe the doctor answered the question about the fatality connected with the bullet.

MR. WHITE: My recollection is he described a number of wounds and I, this is why I'm doing the cross examination, of course, my recollection is that the indications are that if any of the bullets were to be fatal wounds in and of themselves, it would be the fifth one.  And I may be incorrect in my recollection.

MS. KETTLER: Judge, first of all, the questions all assume that the fact is not in evidence.  The doctor has testified he cannot say which wound was first.  So to say, to ask

21

those questions is assuming a fact not in evidence.  He's only
numbered them in his report.  It's irrelevant.

        MR. WHITE: And of course I was just going with the
numbers in his report.  I have no idea either of the order that
—

        THE COURT: Well except then you lighted on the
notion that there was a fifth bullet and the fifth bullet was fatal.
That's what you just said.

        MR. WHITE: Then I mis-spoke myself.  I meant number
five, of course, not the fifth.

        THE COURT: Sustained.

Q    Now other than the fact that you conclude that the deceased's
     head was turned to one side when bullet number five was fired,
     can you conclude anything else about the position of the body
     at the time the other bullets were fired?

A    No.

Q    And you did not observe any kind of stippling around any of
     the wounds?

A    That is correct.

Q    Alright, and you did not observe or perform any chemical tests
     that indicated that, anything to do with the distance the shots
     were fired from?

A    Correct.

Q    Alright, is it your medical conclusion that death was caused
     by one or more of these bullets?

A     Yes.

Q     And is it your conclusion that it was any particular bullet, number one through number five?

                    MS. KETTLER: Object to the relevance.

                    THE COURT: Overruled, I'll allow that.

A     They were all, I know I'm repeating myself, but they were all potentially fatal.   You can have multiple relatively minor wounds and there's a cumulative effect with each gunshot when you're bleeding more.   So they're all, maybe ask the question again, I'm sorry.

Q     Alright, did you conclude that any particular one of these bullet wounds, one through five, was the most likely to be fatal?   This is assuming no medical, immediate medical treatment.

A     Well as I said, number five is obviously much more serious than any of the others.   You could not recover from five.

Q     Alright, when you first examined the body, how much blood was on the body?

A     I don't remember.   There was blood we had to clean up but it's hard to give a volume of blood when you just see it dried on the body.

Q     Was there a great deal or was there a small amount or moderate amount?

A     I've never graded it like that, I guess a moderate amount.

Q     Could you tell whether it had, from the blood that had come

23

out of the body and way that it drained the position  the body
was in by your own observation?

A   No.

Q   Now you say that a bullet was recovered from the autopsy –

        MS. KETTLER: I can't hear counsel.

Q   Now you say that a bullet was recovered from the autopsy tray?

A   That is correct.

Q   And where on the autopsy tray was it recovered in relation
to the body, near what part of the body?

A   It was just loose on the autopsy tray.  I don't know where
it came from.  We do our best to remove everything from a tray
when we move a body.  So theoretically the trays are clean
with nothing on them.  And then while we were removing the
clothing, we suddenly found a bullet loose on the tray.  I
have no idea where it came from but it did look similar to
the bullet that I know came from the body.

Q   Thank you Doctor, just one more moment.  I don't have any
questions at this point.

        THE COURT: Anything else?

        MS. KETTLER: Yes, just briefly.

        REDIRECT EXAMINATION

BY MS. KETTLER:

Q   The bullet, the second bullet that was on the autopsy tray,
was that also deformed like the one you removed from the young
lady's body?

24

A   I don't believe it was but that's from memory.

Q   Okay.  Are you a firearms examiner?

A   No, I'm not.

Q   Do you examine firearms evidence and make conclusions form it?

A   No, I do not.

Q   Do you rather turn that over to police agencies for further examination?

A   I do what you said, I turn it over to the police agencies for further examination.

Q   Thank you, nothing further.

THE COURT: Anything else?

RECROSS EXAMINATION

BY MR. WHITE:

Q   Just one question, the bullet you recovered from the body, did it appear to be deformed?

A   Let me make sure what I said, I would assume it would be deformed because of all it went through.

Q   But I'm not asking for your assumptions –

A   I understand, I understand, sir, I'm not trying to, yes,  I said deformed.

Q   And the one on the tray?

A   I didn't, all I did, when I talked about the one on the tray, I just made it clear that I was not calling it from, I'm not a firearms expert.  I'm not saying it's from the same weapon.

25

I just found it loose on the tray.

Q    But did that one appear to be deformed to your observation?

A    Let me see if I made a statement one way or the other.   No,
     I didn't.

Q    Nothing more.

              THE COURT: Thank you Doctor, you're free to go.

A    Thank you.

          (Whereupon the witness was excused at 9:52 a.m.)

              THE COURT: Detective Toth.   Cross examination by
Mr. Burkett continues.

                     JOHN TOTH

          (Witness having been previously sworn)

            CONTINUATION OF CROSS EXAMINATION

            MR. BURKETT: May I proceed?

            THE COURT: Oh yes.

BY MR. BURKETT:

Q    Good morning everyone.   Good morning Detective Toth.

A    Good morning.

Q    Sir, when we broke yesterday the last question I asked you
     was, I believe it was when you talked with the people that
     were in the apartment earlier that day, did anyone give you
     any written statements, sir, that when they were searching
     for the puppy that Kyron stated to them, why don't you look
     in the freezer for the puppy?   And you said you would search
     your records.   Did you do that?

                         26

A   I didn't search my records for anything at this point, no.
    But I don't recall that being the question.  The question that
    I recall it to be was did anybody say it, not did anybody write
    it down.  I believe the question was actually did anybody say
    this.

Q   Okay, do you have any statement, sir, where that was said?

A   Could you, what exactly are you questioning, as said as in
    regards to a statement?

Q   Sorry, I didn't mean to interfere with your, did you
    finish?

A   Yes.

Q   Did anyone put in their statement that when they were looking
    for the puppy, that Kyron said why don't you look in the freezer,
    that's where it would be or something to that effect?

A   There isn't a written statement in regards to that, no.

Q   Okay, and there is not an oral statement to that, isn't that
    true, sir?

A   It seems that I recall testimony in regards to that.  The
    question was did anybody say this?

Q   Yes.  Sir, isn't this true, the very first time you heard that
    was in this courtroom?

A   I believe it was in the 34th District actually, I believe.
    But I think it continued on into this courtroom.

Q   Somebody said that in the 34th District Court?

A   I believe, I've never seen the transcripts, I'm just going

27

on recollections of what had transpired in a previous court.

Q   Okay, and sir, is this true, when you wrote your report, your investigative report, what you put in that report was everyone was looking for the puppy.  And at some point Kyron went to the freezer and found it and became very, very angry.  Did you write that in your report and sign it?

A   That he became very, very angry?

Q   Yeah, that he became very angry, yes?

A   You said very, very angry.

Q   Okay, forget the very, did you put in your report that he became angry when he saw the puppy?

A   I'm not trying to be argumentative, I'm just trying to answer the question that you're posing to me.

Q   Yes, do you recall putting that in your report, sir?

A   The verbiage that you're using, no, I do not.

Q   Is that the report, sir, that you wrote out?

A   This is one of many.

Q   Okay, you signed it?

A   This is my report, yes.

Q   Okay, why don't you read what I have marked in yellow as it relates to the puppy.

A   They all looked in, they all looked for it and Benson found it in the freezer dead.  Benson became upset and advised that he was going to kill McClure and if anyone said anything, that someone, excuse me, that someone was going to kill them.  He

28

also advised before he, Benson, did anything, his friends would

know who they were, where they lived.   Then Fritz, McIntyre,

do you want me to continue?

Q   No, just the part I had marked in yellow.

A   Actually the way that this, it's that sentence.

Q   Okay, now sir, now that you've read that, does that refresh

your memory?

A   Yes,

Q   As to what was said.   Benson looked in the pocket, I mean looked

in the freezer and saw the puppy and became very angry, correct?

A   That is correct, he became angry, the way the sentence reads

is he became angry and then he threatened the people that were

there.

Q   That's fine, sir.   During your investigation, sir, did you

find any motive or come across any reason why Kyron Benson

would kill his own puppy?

          MS. KETTLER: I'm going to object to calls for

speculation.

          THE COURT: Sustained.

Q   All of the information, sir, that you had was that the puppy

belonged to Kyron Benson, isn't that correct, sir?

A   All the information indicates -

Q   Yes.

A   Not to my recollection, no.

Q   That's fine.   Sir, yesterday I was asking you questions and

29

you asked me if you could see the report and I told you I'd

find it but I'd go on to something else while we were looking

for it. It relates to the fact, sir, whether or not you saw

Big Mike at the time that or just prior to Mr. Benson being

arrested. Do you recall that, sir?

A   That wasn't the exact what you were talking about. You were

talking about was he identified at the scene and the answer

to that is no.

Q   Okay, did you observe him there, sir?

A   No.

Q   Okay.

       THE COURT: Well before you approach, I need some

more precision.

       MR. BURKETT: I'm sorry, I could not hear you.

       THE COURT: I need some more precision. You said

in your last phrase of the question, did he see him there? Where

is there?

       MR. BURKETT: Oh, I'm sorry, yesterday, I didn't

want to go over what we went over yesterday. Yesterday we were

 -

       THE COURT: Oh really?

       MR. BURKETT: Beg your pardon?

       THE COURT: I said, oh really. Go ahead.

       MR. BURKETT: Yeah.

       THE COURT: Where is there?

MR. BURKETT:  There was at Mr. Benson's home in Ypsilanti.

THE COURT: Go ahead.

A    Do you want me to just read this?

Q    No, I want you to read it to yourself and tell me if that refreshes your memory?

A    Do you want me to just read the whole page?

Q    Read as much as you want but what I have marked as number three is what I'm interested in.

A    I'm sorry, I think I moved the sticky notes.

Q    That's alright.

A    This isn't even the report we were speaking of yesterday.

Q    Sir, I didn't ask you that, I just asked you to read the report and whether or not that refreshed your memory?

A    Okay.

Q    You and your crew observed Mr. Benson –

THE COURT: No, you can't do that.  You changed the –

MR. BURKETT: Oh, you're right.  I'll do it over.

THE COURT: He can't tell what anybody else saw.  Go ahead.

Q    Okay, what is that you're holding, sir?

A    It's a police report.

Q    And sir, did you have any information, sir, that Mike was at the home at the time you arrested Mr. Benson?

31

A   His vehicle was there.  That's -

Q   Well, and that's -

A   But that's what this is talking about.

Q   Okay, so the answer is no, you didn't have that information,
    is that correct, sir?

A   And that's what I testified, nobody identified his person as
    being at the scene.  It was his vehicle.

Q   Sir, did you take his vehicle into custody?

A   We never came across his vehicle.

            MS. KETTLER: Whose vehicle?

            MR. BURKETT: Well he said his vehicle's there so

-

            THE COURT: Ah, ah, ah, ah, I'm really a patient
guy but when lawyers start talking to one another in front of
me -

            MS. KETTLER: I apologize.

            THE COURT: I find it to be rude.

            MS. KETTLER: I apologize, Judge.

            MR. BURKETT: Okay, I'm going to move on.

            MS. KETTLER: I object to the question as not
specific.

Q   Sir, do you recall writing in your report that we went to Kyron's
    house and surveillance confirmed that Mike was there on the
    date we arrested Kyron.  Do you recall that, sir?  Do you
    recall that, sir?

32

A    No, not that verbiage, no.  The highlighted area?

Q    Yes.  Did you put that in your report, sir?

A    Could you repeat the question?

Q    Yes sir.  In your report, sir, did you put down that when you arrested Big Mike it was confirmed that, I mean I'm sorry when you arrested Kyron, that it was confirmed by surveillance that Big Mike was there just prior to him being arrested?

A    That's the way that's written.  You're speaking of an after the fact report.

Q    Okay.

A    I'm sorry, I'm just trying to answer your questions.

Q    Thank you, I appreciate it.  Sir, the day before the trial started, sir, you had, by that time you had information, sir, that the gun that was used to kill the victim in this case, Stephanie McClure, was either a .32 or a .357, is that correct, sir?

A    That's incorrect.

Q    What information did you have?

A    The only information that I had from Michigan State Police was the opinion of it being a .38 to a .357.

Q    Okay, a .38 or a .357?

A    Not a .32.

Q    I'm sorry, I mis-spoke myself, a .38 or a .357.  Sir, did Mike ever tell you that the gun which he claims he saw Kyron with was either a .38 or a .357?

A     I believe he claimed it was a revolver.

Q     No, but that wasn't my question, sir.  Let me repeat it.  Did
      he, did Mike tell you, sir, that the gun that Kyron had was
      either a .38 or a .357, and you can answer yes or no?

A     No.

Q     He never told you that?

A     Nope.

Q     Sir, did anyone, sir, ever tell you that when the group of
      people were in the house earlier that day, the four women and
      Kyron, that they saw Kyron sit on a basketball and say, before
      anybody was hurt or shot, that I am going to prison now for
      the rest of my life because I'm going to kill Stephanie?  Did
      anyone ever tell you that, sir?

A     No.

Q     Okay.  The very first time you heard a statement like that
      was here in court, isn't that true, sir?

A     That's correct.

Q     Thank you.  Sir, yesterday the prosecutor asked you were the
      statements that the three or four ladies gave you, were they
      all consistent with each other and she asked you did their
      statements stay consistent throughout?  Do you recall that,
      sir?

A     No, I don't.

            MS. KETTLER: Objection, that assumes a fact not in
evidence and I object to asking the witness to comment on other

                              34

people's testimony.

MR. BURKETT: Well now wait, may I respond to that?

THE COURT: Please.

MR. BURKETT: The questions she asked him yesterday was were their statements consistent throughout?  And she read when the statements were taken and when the testimony was given.  And you allowed that to be done.

THE COURT: I don't recall any question about were the statements consistent?  Was there an objection?

MR. BURKETT: Yes.

MS. KETTLER: That question that he just said is not what he asked the witness, though.  You can't change the question and then say oh, that's not what he said.  What he asked the witness --

THE COURT: Oh Ms. Kettler, if you have a long career in this profession, you'll understand that it can happen.

MS. KETTLER: Well I'm objecting to it because what he just said to your Honor is not the same question he just asked the witness.  What I object to is the question he asked the witness and that is were they consistent with each other?  And I never asked that question and I object to it being asked because it's asking for commentary on the evidence and that's the jury's job.

THE COURT: I'll excuse the jury.  We'll take this up out of your presence.  Step into the jury room, you can have a fifteen minute break.

35

(Whereupon the juries left the Courtroom for

a short break)

(On the record without the jury)

THE COURT: Well apparently there's a record that

has to be repaired.   I do not recall Ms. Kettler asked, being asked,

being able to ask or did she ask the question, Detective, did you

find the statements of the four women witnesses to be consistent?

I don't recall that.

MR. BURKETT: She definitely -

MS. KETTLER: I did not ask that question.

MR. BURKETT: Okay.

THE COURT: Well then I will cause the transcript

to be prepared and we'll come back in a week.   I do not recall

that question.   If that question was asked, it escaped me.

MR. BURKETT: Okay.

THE COURT: If the question was asked and objected

to and I didn't sustain it, I erred.

MR. BURKETT: Well I'm not going to tie you up for

a week to look for that.

THE COURT: Oh, it's no, my term doesn't end until,

the end of 2008 and I'm running for reelection.

MR. BURKETT: We'll vote for you.

THE COURT: Fine, so that will give me six more years.   I have

no problem continuing the matter until I find it.   I have not heard in my courtroom in

this case a question from the prosecutor that said were the statements of the women

36

consistent.

MR. BURKETT: Your Honor, I'm sorry, were you finished?

THE COURT: Yes.

MR. BURKETT: I've got, she asked also, your Honor, and this is the only one I want to get into, were the women, were their statements consistent throughout?

THE COURT: Well first of all, I don't know why I ever would allow the Corporal, Detective Toth to say that.

MR. BURKETT: Well that's why Mr. White objected -

THE COURT: Well I'll, if that's happened, I'm going to change the record then.   I will sustain the objection now.

MS. KETTLER: The only thing anywhere in the ballpark to that I asked was did she change her story?   I did not ask -

THE COURT: Now did you say that of one witness?

MS. KETTLER: Right, did one witness -

THE COURT: Hang on, who was that witness?

MS. KETTLER: Oh, about Jessica Fritz, Breanna Kandler, did they change their stories, not compared to each other.

MR. BURKETT: Did they change their stories, that's what I'm getting at.   Did they -

THE COURT: Well you can ask that but that's not what you asked.   You asked this detective on the stand in front of two juries whether or not he could testify about the consistency of witness's statements.

MR. BURKETT: I understand your Honor but rather than tie you up for a week -

THE COURT: It doesn't matter to me.

MR. BURKETT: I understand that. I'm now going to go with was their story, did they change their testimony or did they change their stories to you?

THE COURT: Okay, you can do that individual -

MR. BURKETT: Yes.

THE COURT: By identifying the witness. It isn't a question and I will not allow it for this witness to comment on whether there was consistency among the witnesses.

MR. BURKETT: I understand.

THE COURT: That's what's improper.

MR. BURKETT: Okay.

THE COURT: I never heard that question before this morning.

MR. WHITE: Your Honor, if I could just put my two cent's worth in.

THE COURT: Oh, you can have five cents if you want.

MR. WHITE: Thank you your Honor. But my objection, and I don't make very many as you'll have noted was basically that —

THE COURT: I have no control over what the lawyers do in their representation of their clients nor do I care to.

MR. WHITE: Thank you your Honor. And I recall an objection that essentially that the testimony we've discussed now consisting of vouching for witnesses by the police officer and

that was my recollection of it.

THE COURT: Well, that's cavalier because that's trying to create in this record an appellate issue which I'm willing to fare it out at this point.   I'm not going to give the Defendant if she's convicted a bite at the appeals apple.   There was no vouching in this courtroom for anybody's testimony.   None.

MR. WHITE: Thank you.

THE COURT: I'm not on the Court of Appeals, I'm just telling you there wasn't any.

(Whereupon Court was recessed)

(On the record without the jury)

THE COURT: Based on your commitment, it's obvious to me that we will have to do the closing of Ms. Bennett today and the closing for Mr. Benson tomorrow.

MR. BURKETT: Judge, I'm sorry my ear's stopped up.

THE COURT: Yes, based on your commitment out of the courtroom for this afternoon, we will do the closing for Ms. Bennett this morning and the closing for Mr. Benson tomorrow morning.

MR. BURKETT: Okay, I don't get an opportunity to tell you, I respect the opportunity to take care of this.

THE COURT: Oh, you're welcome.

(Whereupon the jury entered the Courtroom)

MR. BURKETT: May I proceed?

THE COURT: Please.

39

Q     Detective Toth, I want to talk to you first about Jessica Fritz
      and the different statements that had given you over a period
      of time.  You were present the day after the shooting on the
      twelfth floor in the prosecutor's office, correct?

A     Yes.

Q     And you had Ms. Fritz up there.  Do you recall that, sir?

A     Yes.

Q     And even though the prosecutor was asking her questions, you
      too, was allowed to ask questions, is that true, sir?

A     After the prosecutor is done, yes.

Q     Okay, so the answer's yes.  Sir, a series of questions that
      was asked of Ms. Fritz was the night of the shooting, did you
      see Kyron with a gun and she said no.  You recall that, don't
      you?

            MS. KETTLER: I think I'd object to asking him to
comment on someone else's testimony.  It's hearsay.

            THE COURT: Well he hasn't ask that yet, he just
asked if he recalled it.  I'll allow that.

A     That specific question, I do not.

Q     Okay, let me ask you do you recall this being said on October
      the 7th.

            MS. KETTLER: Now I object.  Reading the transcript
of someone else's testimony is hearsay.

            THE COURT: Sustained.

Q     Okay, I didn't think I was reading the transcript, I was just

                                40

asking does he recall these questions being asked of him.

THE COURT: Well where will you get them from?

MR. BURKETT: Well, once I have them written down and I might be referring to the transcript but I'm not going to say part of the transcript.

THE COURT: I'm confused.

MR. BURKETT: Okay, I'll move away from that, sir.

Q    True or false, sir, was, did Ms. Fritz deny to you on the twelfth floor that she had never seen this man with a gun?

MS. KETTLER: Objection, hearsay.

THE COURT: It's sustained.

MR. BURKETT: It was under oath your Honor.   Okay.

Q    Sir, on October 13th, sir, you took a written statement from Ms. Fritz, is that correct?

A    I'd have to look at the notes.

Q    Okay, strike that.   On January, also on January the 13th, you took a written statement from Ms. Fritz, is that correct, sir?

A    Once again I'd have to look at the notes.

Q    Okay, you can look at them.

A    January 13th is her date of birth.   That actual date is 4-15 of the statement.

Q    Okay.   You took that statement, correct?

A    Yes.

Q    Okay, at that point in time, sir, you asked her did she ever see Kyron with a gun, correct?

41

MS. KETTLER: Objection, hearsay.

MR. BURKETT: Your Honor, I'm trying to show inconsistent statements that Ms. Fritz told.

THE COURT: Well Ms. Fritz was on the stand, did you ask her?

MR. BURKETT: I did. But if you're going to ask the question, may I tell you what my position is? If you're going to ask the question, was Ms. Fritz's statement or was her story consistent throughout, I should be allowed to show where it was not.

THE COURT: Sustained.

MS. KETTLER: Judge, that was not, again, the question that was asked.

THE COURT: Sustained.

Q   Sir, would you agree with this, Ricky Wren is six feet tall?

A   Six feet?

Q   Yes.

A   That would probably be fairly accurate.

Q   Alright, Nick Wren is about 5' 8"?

A   He may be a little bit shorter.

Q   I'm sorry, 5' 10"? Okay, I'm sorry, Nick Wren is about 5' 10", correct?

A   Correct.

Q   And Timothy is about 5' 8", is that correct, sir?

A   Correct.

42

Q    And of course my client is 5' 6", correct?

A    Correct.

Q    Now the description that you had, sir, the only description
     that you had, sir, was a tall white male, correct?

A    On the 911, it was a male.

Q    Okay, you also had, it was a tall male, correct sir?

A    I don't believe that's on the 911.

Q    Okay, when you interviewed the witness, the 911 caller?

A    When I interviewed the 911 caller -

Q    She told you it was a tall, white male?

A    I don't believe that -

          MS. KETTLER: I'm going to object that this is
hearsay.  It's also a mis-characterization of her testimony when
she testified.

          THE COURT: Strangely Mr. Burkett all these
questions sound like closing argument.  The 911 call clearly is
hearsay.

          MR. BURKETT: Yes.

          THE COURT: How do you overcome that?

          MR. BURKETT: Well, the report he took from her,
it might be hearsay but if it's, I'll tell you what, why don't
I just move on.  And I need to approach the bench to ask you a
question if you will allow it?

          THE COURT: No, just move on.

          MR. BURKETT: Well, okay.

                              43

Q   Sir, the last set of questions I want to ask you is the type of automobile, sir, that Timothy Walker drove was what?

A   Recollection, it's a Neon, I believe.

Q   Okay, a Neon.  And an officer spotted a Neon and tried to follow it that night, isn't that correct, sir?

A   His recollection was he believed he had passed a vehicle similar to that description and he turned on that vehicle and he attempted to catch up to that vehicle.  However, he never caught up to that vehicle.

Q   Okay.

A   Then he responded to the Buchanan address.

Q   Okay, thank you, sir.  That's all I have.

             THE COURT: Mr. White.

             MR. WHITE: Thank you your Honor.

             MR. BURKETT: I do have one other question, I'm sorry.

Q   Did you ever check out the dumpster behind Ms. Bennett's place?

A   I did not, no.

Q   Alright, thank you.

                    CROSS EXAMINATION

BY MR. WHITE:

Q   Alright Detective Toth, now as the case officer, it's been a while since we've gone over that.  It was your job first off act as an investigator and then also coordinate the activities of the other officers in the case, is that correct?

                         44

A   Well I was present, yes.  There was times that I would be away from the investigation.

Q   Alright, but evidence that was produced would come to you at the police department, correct?

A   It was actually brought to Detective Czinski's office.

Q   Alright, were you the one who was responsible for seeing it transmitted for evaluation by various agencies, the state police, for example?

A   I do not do that paperwork, no.

Q   So you didn't have anything to do with what got tested and what didn't?

A   We'd discuss things but I didn't do the paperwork that would get this piece of evidence to the climate or, of that nature.  No, I did not do that paperwork.

Q   And so you didn't, did you make those decisions or did you just not, and not do the paperwork or did you not make the decisions as to what went where either?

A   I was working jointly with Detective Czinski and we would discuss things.

Q   Alright, but ultimately was it your decision or his what went to the lab and what did not?

A   For that particular question, it's kind of difficult to answer due to the fact in our department he's higher ranking than I am but I guess in the vein that we're going, I guess it would be me.

45

Q   Did you ever want to send something to be evaluated by the lab and get vetoed by Detective Czinski?

A   No.

Q   Now, when you first came to the scene, were you one of the first two officers there?

A   I was the second.

Q   You were the second.  And it's your testimony that the door was ajar?

A   Correct.

Q   How far ajar was it?

A   Something like that.

Q   About a foot apart, as you're holding your hands, maybe a little less?

A   That's a foot, might be a little under.

Q   Alright, was there one door or two?  Was there a screen door or just the one door that -

A   There was a screen door and a, I guess it'd be called a storm door, is what I believe it to be.  I don't do construction but the door after the screen.

Q   Okay, so the outer door was closed?

A   The outer door, yes.

Q   Alright, now did you go in and gather any evidence inside that residence or not?

A   After the search warrant was secured.

Q   Alright, and were you the person that gathered up the phone?

46

A    Yes.

Q    Did you obtain a warrant for that phone?

A    After we secured the phone, yes.

Q    Alright, now you indicated that there had been calls to that phone from both Mr. Benson's and Ms. Bennett's number on the 5th in the afternoon, five or six in the afternoon, is that your testimony?

A    Yes.

Q    Alright, now did you note how long those calls were, were they one minute calls as you would get if you didn't get through or were they five minute calls?

A    There was, that one particular call, I believe was a short call.  But there were several calls leading up to, for the times –

Q    And how long were those calls that were leading up?  Were any of them over a minute?

A    I believe, yeah, I believe so.

Q    Alright, do you have the records with you?

A    I'm going to have to back into the, the paperclips are disconnected.  There may be more information in there.

Q    Now do you recall when the last call made out by Ms. McClure was?

A    It appears that the last call going out was on 10-6-07 at 1:13 and seven seconds a.m.

Q    And what number was that?

47

A    It looks like it was to 1-734-796-0483.

Q    Did you contact the person at the other end of that line, number?

A    Let me check one other thing.  No.

Q    Alright, do you know when the last inbound call was on Ms. McIntyre's phone?

A    Inbound appears to be on 10-6-07 at 12:43 and 34 seconds.

Q    Alright, so that was before the last outbound call?

A    Yes.

Q    And you don't know who was calling on the last outbound call or the nature of the conversation?

A    I'm sorry, maybe I misunderstood the question.

Q    You know who was called by the last outbound call?

A    I thought we were talking about, the outbound, I believe we already discussed.   Are we still discussing this phone number?

Q    Alright, now let me repeat myself so we won't be unclear. You did not get a hold of the person and discuss the nature of the call on the last outbound call, correct?

A    Correct.

Q    Okay, now are there any outbound calls shown on her phone to either Kyron Benson or Paula Bennett?

A    Yes.

Q    And when were they made?

A    For the matter of the record, we have phone records from 10-3-07 at 12:06 a.m. and then they end on 10-6-07 at 11:22 and 25 seconds.

48

Q   In the morning or the evening?

A   I'm sorry, p.m.

Q   Okay, so there was a call to Ms. Bennett's phone or Mr. Benson's phone?

A   No, I didn't testify to that, I was saying the record of the phones that we have were from this date to this date so that I could explain, the beginning where it begins, I didn't say what you had said.

Q   Alright, then maybe I misunderstood you.

A   Maybe I misunderstood.

Q   Right, let me start, were there calls from Stephanie McClure to either Kyron Benson or Paula Bennett on the records that you got for her phone?

A   Correct, and I was explaining the records. Now I'll answer your question. We have Ms. Bennett on 10-3-07 at 12:22 and 16 seconds a.m. We have Ms. Bennett once again at 12:23 and 02 seconds. Ms. Bennett again on 10-3-07 at 12:23 and 45 seconds. Ms. Bennett again 10-3-2007, 12:52 and 08 seconds. Once again, this is in the a.m., I forgot to express that. Once again, 10-3-2007, 1:28 and 39 seconds a.m. and that's Ms. Bennet.

Q   Alright, now just for a second, those are outbound calls, just so we're clear, right?

A   I can go back. So far, yes, outbound.

Q   Alright, were any of those over a duration of one minute?

49

A    If I'm understanding how the duration works on this record,
     I'd say yes.  If I understand it correctly, I'm not professing
     to.

Q    So you're not sure what that's showing.  In other wards, as
     to the –

A    The actual duration?

Q    Yeah.

A    I would come to the conclusion, if you just want my opinion.

Q    Well no, you don't know what it is, correct?

A    No, I do not.

Q    Alright, you don't have, for instance, something from the phone
     company telling you what each one of the columns is and –

A    I believe I do but I just didn't understand the duration
     portion.

Q    Alright.  Now when was the last call made by Stephanie McClure
     to either Mr. Benson or Ms. Bennett?

A    From Ms. McClure to Bennett or Benson?

Q    Yes.

A    It appears to Ms. Bennett, be on 10-5-2007 at 5:54 p.m. and
     53 seconds.

Q    Alright now –

A    To –

Q    Go ahead.

A    To Mr. Benson, it'd be 10-5-2007 at 5:51 and 39 seconds p.m.

Q    Okay, so those were calls initiated by Ms. McClure.  Now does

                              50

the bill show that she was either returning calls from either
one of the Defendants or that they called her back?

A   I can't testify to what the content of conversations are.

Q   No, but you can testify, and that's what I'm asking is, are
there calls within a minute or two either before or after
originating from Ms. Bennett or Mr. Benson to Ms. McClure?
Are they in the same time frame?

A   Yes.  In relationship to those two individual calls or -

Q   Yes, those two calls?

A   Or those two people calling back?

Q   Calls either before or after Stephanie McClure called their
numbers?

A   Yes.

Q   And when were those?

A   There's a call from Mr. Benson to Ms. McClure on 10-5-2007
at 5:56 and 54 seconds.

Q   Now was that after Ms. McClure's call to him?

A   Yes.

Q   And how about to Ms. Bennett?

A   I believe there's no more from Ms. Bennett after that.

Q   Alright, now when you began this investigation one of the first
things you found out was that there was PPO in existence on
Mr. Walker, is that correct?

A   That's correct.

Q   And so he was the first person you looked at as a possible

51

suspect, correct?

A    As a person of interest and possible suspect, yes.

Q    Alright, and you issued a BOL so that he could be located, correct?

A    A BOL is be on the lookout.

Q    Right, to locate him, right?

A    If a police officer has an encounter with this person.

Q    Alright, and now he was located at his home approximately three o'clock in the morning, correct?

A    Van Buren Township made it to his residence at 3:02 a.m. and that's when they began to set up a perimeter.

Q    Alright, now you said there were people looking out the window from the house when the perimeter was being established?

A    Yes.

Q    Alright, and did the occupants come out of the house at what time, do you know?  Were you there yet by the time they came out of the house?

A    I never was there.

Q    You never was there?

A    No.

Q    Alright, now do you know if anybody checked to see if the engines of the vehicles there were warm?

A    I believe that Officer Hayes from Van Buren Township did, yes.

Q    Right, but he's not here to testify as to the results of what he found, correct?

52

A    But I thought the question was from my recollection -

Q    Someone did check it?

A    From my recollection, that's correct.

Q    Alright, now how far is it from 372 Utah to Buchanan?

A    Estimate upwards to six miles.

Q    Forty six miles?

A    I said six miles.

Q    Upwards to six miles?

A    Upwards to six miles, maybe a little more.

Q    Some days my hearing doesn't work as well as it might.

A    I'll try to speak up.

Q    It's not intentional.  And at that place, Mr. Walker was taken
     into custody and also Mr. Hutchin, is it Hutcherson or -

A    It's Hutcherson, I think.

Q    Hutcherson, thank you.  Okay, now the materials, there were
     a number of materials of clothing seized, correct?

A    There was, yes, there was clothing taken.

Q    No shoes were taken, correct?

A    Not physically taken at the search warrant, no.

Q    Though Mr. Walker was wearing shoes, correct?

A    Logic would tell me he was.

          MS. KETTLER: Judge, I'm going to object at this
point.  This has all been asked and answered before, just in the
interest of time.

          MR. WHITE: Asked and answered before by whom?

53

THE COURT: Overruled.

A    You don't know whether any other shoes were, well, you know that no other shoes were recovered in the house because they didn't make it to you, correct?

A    That's correct.

Q    And you never took Mr. Walker's shoes to see if they matched any of the foot impressions, did you?

A    I'd have to refer to a note.  Oh, I'm sorry, I didn't hear the question.  Did Mr. Walker's shoes –

Q    Did you ever take Mr. Walker's off his feet –

A    Shoes go to MSP for –

Q    Tests?

A    No.

Q    Alright, now Mr. Walker had a PPO out on him, against him by the deceased, correct?

A    Yes.

Q    And he had a pending case of assault against him by the deceased, is that correct?

A    Yes.

Q    Alright, now as a result of her death, the assault case was dismissed, right, because there was no witness?

A    I don't know the outcome of the case.  I believe there was –

MS. KETTLER: I'm going to object to questions calling for speculation.

54

THE COURT: Sustained.

Q   I didn't ask for speculation, I asked if he knew.   I'm not going to argue.   Forget I said anything.   I was wrong.   Now, the reason you decided not to pursue Mr. Walker any further was because of information one, from, is it his brother, that he was at home the whole time?

A   That wasn't the final factor, no.

Q   Well and the other factor was that you got information from the victim's family that Ricky Wren did it, correct?

A   That would be a factor that eventually got to the point of elimination.

Q   Okay, now can you physically describe Mr. Walker?

A   He's a white male.   He's got a shaved head and he has a scar on his head.

Q   Alright, and could you describe Mr. Hutcherson?

A   He's a white male that has dark hair and at the time I believe he had a goatee.

Q   Okay.   Now after you decided to look into Mr. Wren, someone returned Mr. Hutcherson's clothing that was taken.

A   Corporal Gannon.

Q   Was that at your direction?

A   The way I recall it is at the direction of Detective Czinski.

Q   Alright, so that wasn't a decision you made to return the clothing?

A   It was a sound decision.   I don't dispute it.

55

Q   Now, you're aware that footprint impressions were taken by the Michigan State Police, correct?

A   Yes.

Q   And you're aware that they did not match the foot gear belonging to my client and Mr. Benson, correct?

A   Yes.

Q   You're aware that there was no physical evidence at the scene connecting either my client or Mr. Benson to that scene, correct?

A   Yes.

Q   Knowing that, did you ever have anybody go back and compare that evidence, particularly the footprint impressions, to any of the other possible suspects; for instance, Mr. Wren?

A   No.

Q   Mr. Walker, you never compared them to Mr. Walker.

A   In regards to Mr. Wren, shoes were delivered to MSP but I don't know whose shoes they were but they received some.   In regards to Mr. Walker, no.

Q   The point is that having gotten negative results from these two suspects, you never had anything further done with that evidence to see if other suspects could be developed, did you?

A   That's correct.

Q   Now at some point your attention was turned to Mr. Wren, Ricky Wren, correct?

A   He was a subject of interest, yes.

56

Q   Alright, and was that the same day?

A   The same day of the body?

Q   No, the same day that you were looking at Mr. Walker?

A   Yes.

Q   Alright.  Now Mr. Wren turned himself into the Michigan State Police, correct?

A   Yes.

Q   And was he transported to your station?

A   We, a car was dispatched and he was picked up and he was brought to our station.

Q   And he was Mirandized?

A   Yes.

Q   And he gave an interview?

A   Yes.

Q   Did you tape or videotape the interview?

A   We don't have those capabilities, no.

Q   Alright, do you have a tape recorder, you could have audio taped it?

       THE COURT: Counsel, next question.

Q   Now you indicated that you checked with Washtenaw County and they did not have a pending case against Mr. Wren, correct?

A   In regards to what?

Q   The check scheme?

A   There is a report that has been generated by Washtenaw County that does not list Mr. Wren as a suspect.

57

Q    Right, now Mr. Wren' brother, Nicky, spoke about that same
     case as if it was pending, did he not?

A    He spoke of the case, yes.

Q    Now you interviewed Ricky Wren, did Ricky Wren ever indicate
     to you that he thought there was no case against him in Washtenaw
     County?

              MS. KETTLER: Objection, calls for hearsay.

              THE COURT: Sustained.

Q    Because of Ms. McClure's decease, there could be no case against
     Mr. Wren, correct?

              MS. KETTLER: Objection.

              THE COURT: Sustained.

              MR. WHITE: Your Honor, I believe at this point,
     I'm just going into the same thing the prosecutor covered on direct
     examination.

              MS. KETTLER: It calls -

              THE COURT: Hang on.

              MR. WHITE: I believe she opened the door and that's
     why I think I can pursue the area further.

              THE COURT: Well, I sustained the objection.

Q    Now you asked Mr. Wren where he was at the time of the death
     of Ms. McClure, correct?

A    Yes.

Q    And where did he tell you?

A    He was at a party in Ann Arbor.

Q    Did you ever confirm his alibi?

A    There was a Christina Simons that said that she was at the party with Mr. Wren.

Q    Did she indicate what time he had left?

A    I do not believe her statement indicates what time that he left the party with her.

Q    So he left the party with her is what you're saying?

A    Can I take a look at the statement?

Q    Sure.

A    I have it.  Her statement indicates that she was with, on the 5th starting at 10:00 p.m. and parting ways at 3:30 a.m. on the 6th.  So the answer's yes.

Q    Alright, now she came into the police station with him when he turned himself in, too, didn't she?

A    I'm under the impression that she was with him at MSP.  I was not at MSP.

Q    And they had a boyfriend girlfriend relationship at least in the past?

A    In the past from what I understand, yes.

Q    Alright, and then you located Jessica Fritz, correct?

A    We came to Jessica Fritz by Ricky Wren.

Q    Alright, and she indicated what time Mr. Wren had gone to Paula Bennett's house, correct?

A    Yes I believe, I'd have to pull that out to check to see an exact time.  Would you like me to do that?

59

Q    If you could, please.

MS. KETTLER: Your Honor, I'm going to object at this point because Jessica Fritz has already testified about this. It's essentially asking him to comment on various people's witness statements.

MR. WHITE: I will move on your Honor.   In this particular case, I agree with the prosecutor.

A    So disregard?

THE COURT: Yes.

Q    Just go ahead.   Now you spoke to Ms. Fritz, or rather you spoke to Mr. Wren for how long at the station that day?

A    I would guess a rough estimate, approximately two hours, hour and a half.

Q    Alright, and other than talking to his present girlfriend or former girlfriend did you check with anyone else at the party to see if he'd really been there?

A    No.

Q    Did you get any physical evidence from him, shoes, anything like that?

A    Off his person, no.

Q    Now we've had a discussion of a search in Monroe County where Nick Wren, and some items were obtained but you never went to the home of Ricky Wren, did you?

A    You're saying in Ypsilanti?

Q    Right, in Ypsilanti?

60

A   No, I never did.

Q   No search warrant was ever executed on those premises, correct?

A   No.

Q   Now as to Mike Larvaidan, you first heard the name, when, you said October of 2007?

A   The first time I heard the name?

Q   Yeah, Big Mike, the first time you heard the name Big Mike?

A   The first time I heard, as into -

Q   In the context of this case.

A   But in the context of identifying Mike Larvaidan?

Q   Yes.

A   Upon reviewing Officer Buccellato's report, I came across a license plate. That license plate returned to him. I didn't know if it was Big Mike because I didn't know who Big Mike was. I could make an assumption due to the fact his first name was Mike. I would have assumed that that would be Big Mike. So I would have to say that that would probably be the first time that I was aware.

Q   Alright, now you got this license plate in October of 2007, correct?

A   Yes.

Q   And you had information that this Big Mike person might have been in the car when this, the incident happened, correct?

A   That would be correct.

Q   Alright, now when was the first time you located and interviewed

61

Mike Larvaidan?

A   I believe it was in January.

Q   Would January 31st seem correct to you?

A   That seems correct to me.

Q   So this is an individual you believed might have been int he car and from October to the end of January you didn't make any attempt to interview him?

A   This is an individual that I thought may be Big Mike.

Q   Alright, but you didn't pursue that lead until the end of January?

A   That's correct.

Q   Alright, now when you initially encountered him, he told you he was not present at that time of the incident, correct?

A   That is correct.

Q   And he indicated to you that he did not know Stephanie McClure, is that correct?

A   That's not entirely correct.

Q   Well initially he indicated to you that he did not know Stephanie McClure?

A   That would be correct.

Q   During the course of your interrogation of him, he gradually acknowledged that he had not been initially truthful and he did know Stephanie McClure, at least somewhat, correct?

A   The way that that occurred was Mike would go over to their apartment and play video games with Mr. Benson.  Ms. McClure

62

lived at the apartment and I found it hard to understand how if he was always at their apartment, two, three times a week playing video games, how he could not know who that subject was. And upon discussing that, then he recalled, oh, that's right. I am familiar with her.

Q   But initially when you showed him a photograph of her, he said he didn't recognize her, correct?

A   That's correct.

Q   Alright, now that conversation with him took place where, at the Sumpter Township Police Department?

A   Yes.

Q   Alright, and he had been Mirandized for that, correct?

A   Yes.

Q   Now the next conversation you had with him was in April, correct, April 21st?

A   I'd have to just briefly look at the note. I can get it fairly quickly. The second time would indeed be 4-21.

Q   Alright, and was that in a conference room at his place of employment?

A   I believe that's what the company would describe it.

Q   Now who was present for this interrogation?

A   Myself, Detective Czinski and Mike.

Q   Alright, and I assume this was not recorded either from what you said previously?

A   You assume correctly.

63

Q    Alright, and did you begin by giving him a Miranda Warning?

A    We began by giving him a subpoena to appear in court here.

Q    Alright, did you give him a Miranda Warning?

A    Yes, we did.

Q    Now at that point, he was aware of the nature of the charges against Kyron Benson and Paula Bennett, correct?

            THE COURT: Counsel, I don't know how you can possibly expect an answer to that question.

Q    You had just given him a subpoena relating to the case, correct?

A    For a trial, yes.

Q    Alright, now did he indicate to you that he was aware of the nature of the charges against Mr. Benson and Ms. Bennett?

A    I don't believe he did.  In regards to laying out the charges, no.

Q    Now at that point you indicated to him that you had information that would have placed him in the car, correct?

A    Correct.

Q    And at that point he answered questions for you, correct?

A    At that point, we Mirandized him and then we discussed the case.

Q    Alright, now did he write out a written statement?

A    Yes.

Q    He did, he wrote it out himself?

A    He wrote his responses himself, that is correct.

Q    Alright, so he didn't just write out freehand a statement of

what had happened.   You asked him questions and he answered them, correct?

A   Correct.

Q   Now, was this after you'd had a statement of everything he knew?

A   We had discussed the case and we asked questions and I wrote questions, excuse me, and then I read him the questions and then he wrote his answers.

Q   Alright, now none of those questions and answers have anything to do with Paula driving the vehicle around the apartment complex.   Did he tell you about that at the time and you just forgot to put that question in?

A   Could you repeat that -

Q   I'm going -

A   You said driving around the apartment complex.   We were -

Q   Or trailer park.

                    MR. WHITE: Can I approach the witness with this statement?

                    THE COURT: Sure, why not?

A   I'm sorry, I'm supposed to be looking for something?

Q   Do you recall, first off, do you recall him ever indicating to you that Ms. Bennett had driven, say around Nevada Street, and driven around the apartment complex?

                    MS. KETTLER: Your Honor, I'm going to object to this because this has already been covered with the witness himself.

65

And to that extent, it's hearsay.

    THE COURT: Overruled.

A Does this statement anywhere indicate, I'm just trying to make
  sure -

Q That Ms. Bennett drove the vehicle around the apartment
  complex, trailer park, I'm sorry, I don't know what, I've got
  a -

A It says we saw Kyron running and Paula was driving and Kyron
  hopped in the car.

Q Alright, so it doesn't indicate anything about any driving
  before that, does it?

A No.

Q And it doesn't indicate about the vehicle going down to the
  end of Utah and turning around and coming out, does it?

A No.

Q And it doesn't indicate anything about Kyron being seen talking
  to Stephanie, does it?

A No.

Q Now those had been things that you -

    THE COURT: Counsel, that's going to call for
speculation.

    MR. WHITE: I'm simply going to ask him about what
he did.

    THE COURT: Oh, okay, you can ask him about what
he did.

Q    Okay, you did not put any reference to those things in to those
     questions because those were not things that were discussed,
     correct?

A    That would be correct.

Q    Now did Big Mike or Mike Larvaidan actually write those answers
     out himself?

A    He sure did.

Q    Alright, so he is able to read and write?

A    By his penmanship and his writing, I'd say yes.

Q    He never indicated to you that he had any difficulty reading
     or writing?

A    No.

Q    Okay.  Now Ms. Fritz had made a number of statements to you
     and we've discussed those with her about, during last year,
     correct, about the case and everything?

A    Since the beginning of the case?

Q    Yes, since October, you've talked to Ms. Fritz a number of
                 times?

A    I've talked to her a few times, yeah.

Q    Alright, the first time there was any reference to Ricky Wren
     being the source of any firearms was when?

A    I believe it was on subpoena, the date of the subpoena.

Q    Alright, and did she indicate that one of the reasons she was
     talking to you then was because Mr. Wren had stolen things
     from her mother and herself?

                              67

A   I don't believe that's what was said.

Q   She said two things to you.

      MS. KETTLER: Your Honor, I'm going to object.  This area was covered with the witness herself.   And it's also a misrepresentation of what's in the report.

      THE COURT: Well it's also hearsay, that's the bigger problem that I have.

Q   I'll move on, your Honor.  If I need to come back to it, I
    will.  Thank you your Honor.

      THE COURT: Well if you do, you're going to have to explain to me why it's not hearsay.

      MR. WHITE: And I would be prepared at that time to do so your Honor but for right now I'll move along.

      THE COURT: Anything else?

      MR. WHITE: Your Honor, if I can have just a moment.  I don't believe so at this time.  Thank you.

      THE COURT: Ms. Kettler, anything else?

      MS. KETTLER: Could I have just one second to consult?  No, nothing further.

      THE COURT: Thank you, you can step down.  Call your next witness.

      (Whereupon the witness was excused at 11:20 a.m.)

      MS. KETTLER: The People rest your Honor.

      THE COURT: Mr. Burkett.

      MR. BURKETT: One second.  Your Honor, we're going

to rest.

THE COURT: Mr. White.

MR. WHITE: The defense would rest on behalf of Paula Bennett.

THE COURT: Ladies and gentlemen, that completes the evidence phase of the trial.  As you can plainly understand, closing arguments must be done separately so I will excuse the jury for Mr. Benson until tomorrow morning at nine.  When you return to Court, it will be for closing argument and instructions.  So the Benson jury is excused.

(Whereupon the Benson jury was excused at 11:22 a.m.)

- - -

THE COURT: And the Bennett jury can take seats, in the jury box, I mean.  You can have a ten minute break.

- - -

THE COURT: You're free to go.

MR. BURKETT: I am?

THE COURT: Yes.

MR. BURKETT: You don't want me to stay?

THE COURT: I don't care if you stay.

- - -

(On the record without the jury)

THE COURT: As I indicated earlier, you're limited to thirty minutes each.  I'll give you a five minute warning when you're near the end of your time.  And for Ms. Kettler, that

69

includes both closings.  Thank you.

(Whereupon Court was recessed)

—   —   —

(Whereupon the Bennett jury entered the Courtroom)

THE COURT: Closing argument by the People.

MS. KETTLER: Thank you your Honor.  Good morning ladies and gentlemen.  I want to talk to you about this case. But before I do that, I want to ask you very importantly, because you've been here for a while and I think there's a reason for that and I'll talk about that more later.  I want to ask you to kind of rewind your memory to what you heard at the very beginning of this case because that's really the most important part.  And I would suggest to you if you look at the evidence as a whole in this case, it's going to be very clear what happened to Stephanie McClure and it's going to be very clear to you what you need to do in order to do your job as a juror.

I'll start out by showing you something that's been admitted in evidence because you didn't get a chance to see that. This morning you heard some questions of the medical examiner about which bullet killed her and things of that nature.  I'm going to show you, this has been admitted in evidence and unfortunately because we have two juries, you haven't been able to see all of these exhibits as closely as you can.  However, you, if you ask the Judge, I'm quite sure he will give you the exhibits to look at.

70

This is Stephanie McClure.  This is Stephanie McClure before she was dead.  This is Stephanie McClure after Kyron Benson and Paula Bennett got done killing her.  This is Stephanie McClure, and what Stephanie McClure's life came down to and why it was taken away from her really, is really, nobody should ever die but it's such a crying shame, such a senseless loss in this case; a Play Station, a laptop computer, some games, some toys and someone's sense that he would have lost respect if he didn't confront her and do what he did that night.  That's the crying shame of all of this.

And although I'm sure many of those young people wish that they could back when they heard Mr. Benson in front of Ms. Bennett again and again threaten to kill this young lady. I'm sure they wish they could go back and call the police.  I'm sure they wish they could go back and try more aggressively to stop this from happening.  But they can't because she's dead over material things and a loss of respect.

This is a first degree premeditated murder case. And I want to remind each one of you that when we talked about this case in jury selection we talked about the law, which is about aiding and abetting, and the Judge read that law to you.  And the Judge is going to instruct you on the law again.  And I want to say this right off the bat, if anything I say about the law seems different to you than what the Judge says, you go by what the Judge says because he's the Judge and what he says about the law goes

71

in this courtroom.

But I want to remind each and every one of you that you said that you understood that law of aiding and abetting and that although you might have some thoughts of sympathy enter into your mind for this young lady, that you would do your job and you would follow that law.  And the fact is from hearing this evidence, it's quite clear that Kyron Benson is the person who took Stephanie's life directly, because of his perceived loss of respect over these things that had been taken from him.

And it's hard to kind of look at that and put it on a balancing scale next to what Paula did to enable him to do that.  But that's not the law.  The law doesn't provide if you only do ten percent of it, if you could put a number on it which you can't, that if you only do ten percent of it, you get to walk away.  The law provides that if you help somebody commit a crime like the person who directly did it, that you are responsible for that.  And each one of you all said that you could do that despite the waterworks, despite the sympathy you may feel for this young lady.  It doesn't add up in any way, shape or form to giving her a walk for what she did in helping Mr. Benson to commit this crime.

And frankly, I'm sure she wishes she could go back and do things differently.  But she can't because one thing is not going to change in this case and that's that Stephanie is always going to be dead because this young lady chose, no matter what

72

a boogeyman you want to make Mr. Benson into and blame it on him, she is an adult, young woman who made choices in this case that helped him kill Stephanie McClure.

I would suggest to you that because we know that that is what the law is, that if you assist somebody, you are just as guilty as that person if you knowingly assist them, that the first thing you need to decide in this case is what is the crime that was committed, was a crime committed and what was it.   Because as I indicated to you, Mr. Benson and Ms. Bennett are both charged with first degree premeditated murder in this case.   And premeditated murder has the following elements.   Remember we talked about elements.   My job is to prove the elements beyond a reasonable doubt.   That's my job.   It's fair.   I embrace that obligation.   And I submit to you that we've done it with the evidence in this case.   But this is the only thing we have to prove are the elements of the crime.   And I ask you to keep that in mind.

First of all, that the Defendant caused the death. That's the first element.   You heard the testimony of any number of witnesses who gave testimony about the fact that leading to the fact that Kyron Benson shot Stephanie McClure.   Now was somebody standing right there next to him when he did it who can come to Court and say, I saw him take out a particular caliber of gun and this is what it looked like and this is how many times he shot and what was he wearing when he did it?   No.

That's not reality, ladies and gentlemen.   If we

73

had a videotape, we wouldn't need you.  The reality is the Judge
is going to instruct you on something called circumstantial
evidence.  This is some pretty darn good circumstantial evidence
I would submit to you because if you use your common sense and
you thing back about the fact that Mr. Benson was talking all evening
leading up to this crime about the fact that he was going to kill
this young lady, how he was going to do it, that he was going to
shoot her, that he  was going to go over there and confront her,
why he was going to do it.  That's some pretty compelling evidence
on itself.

            But on top of that you have his friend, who has
no reason to lie.  And if you use your common sense and you observe
this young man here.  Clearly, he did not relish being here and
telling what he knew about his friend.  But I would submit to you
that he did because ultimately he probably had time to think about
the fact that ultimately the truth does come out.  You can't hide
it forever.  And he had time also to think about what was the right
thing to do.  Yeah, I don't want to tell on my friend but a young
lady is dead.

            So if, I want you to think about that when you're
evaluating his credibility.  But I also want you to think about
what he said while I would argue that he was testifying very
credibly.  He said that they went over there and he tried to talk
Kyron out of doing this even though he said again and again, I'm
about to kill this bitch.  I'm going to shoot this ho, and that

he saw Kyron with a gun minutes before they went over to the trailer park and that minutes after Kyron got out of the car after seeing Stephanie, he went over there and minutes later, after he last saw him going in the direction of Stephanie, he heard gunshots. Okay?

Now I'm not going to get into a tit for tat with these lawyers but, you know, you heard some questions about well, did you see him shoot her? No, he didn't see him shoot her. But he saw him with a gun. He heard him say again and again he was going to do it. He tried to stop him. And when he got back in the car, all Mike could say was why? Why indeed, ladies and gentlemen? Why indeed? And to that, what do we have the evidence saying, well what man, I didn't shoot her. Somebody else was over there and shot her? No, we have what Kyron says which is, I would have lost respect otherwise. So I would submit to you that it is very, very far beyond a reasonable doubt that this young man, Mr. Benson, caused the death of the victim.

We also have the second element which is intent to kill. Did he intend to kill her? Well ladies and gentlemen, when you shoot somebody five times, that's pretty much what happens. You are intending to kill them. But in addition to his actual actions of shooting five times, you're also having statements all through the day. And that's where we lead into premeditation and deliberation. It is difficult to imagine a more premeditated crime than this.

75

It's not very often that somebody not only has the audacity to kill somebody over his perceived loss of respect, but it's very unusual that he also has the audacity to go around talking about it all day and threatening people about what's going to happen if they tell.  That's a person who's bound and determined to do what he has decided to do.  And his premeditation in this case is very clearly established.

Deliberation, that's another element of first degree murder, okay.  Did he have time to think about the pros and cons and really decide to make a decision to do what he did.  Again, I would submit to you it's difficult to imagine a case that was more deliberated than this one.  Because in addition to him running around making all these crazy threats, brandishing a firearm, threatening people in advance who are witnesses, he's got his friend trying to talk him out of it.  But no, he's going to do it anyway.  I'm about to kill this ho.  Okay, that's pretty darn deliberated and pretty darn premeditated.

Nonetheless, you are going to have the opportunity to consider a less serious crime, which is second degree murder.  Second degree murder element, oh, let me just talk about this briefly.  See at the bottom here, not justified, excused or reduced.  There's no claim of legal justification or an excuse for this killing.  The question you'll have to decide is is it done under circumstances which reduce it to a lesser crime.  And that is the fact that the Judge is going to instruct you on the

76

law that you have the opportunity to consider this less serious
crime which is second degree murder.

These are the elements of second degree murder;
that the defendant intended to kill or, not all, or intended to
great bodily harm or knowingly created a very high risk of death
or great bodily harm knowing that death or such harm was a likely
result.  I would submit to you that although you're going to have
the opportunity to consider this less serious crime, that this
evidence in this case for you to do your job demands a finding
that this was a first degree murder.  Because of the things I
discussed in the context of telling you the elements of first degree
murder, there is a truckload of evidence of premeditation and
deliberation and intent to kill in this case.

Now, as we've discussed Ms. Bennett is charged as
an aider and abettor.  The Judge is going to talk to you again
about the law about aiding and abetting.  And I want to go over
this again just briefly because there are elements to aiding and
abetting also and I'm going to talk about those.  But I want to
remind you that the law as the Judge is going to give it to you
is that if you find that Paula Bennett knowingly assisted Kyron
Benson in murdering Stephanie McClure, she is just as guilty as
he is, the person who directly committed this crime.  You all said
you can do this.  It may not seem right.  It may not seem fair.
But it is the law and each one of you pledged that you could do
that.

77

And this is further indication, and the Judge is going to tell you this.  It doesn't matter how much help or advise or encouragement.  There's a saying that's often used for this principle in the law and that is, "you're in for a penny, you're in for a pound."  And that's what we have here is a situation where Ms. Bennett assisted, in fact she made it possible, for Kyron to murder Stephanie there in that trailer park.  I would submit to you but for the fact of her assistance, it wouldn't have happened that night.  Why?  Because Stephanie had been living with the two of them.  Kyron Benson did not know where to find Stephanie.  Paula made that possible.

Paula found out and you heard the testimony from Ms. Fritz that they knew she was staying at one of her two aunts.  And you also heard testimony from Ms. McIntyre that Kyron was sitting there yelling and screaming at her.  And you know what, I'm sorry, I know that some of you may feel some sympathy that this is not a healthy relationship but those are choices she made and she has to be accountable nonetheless because she's not dead.  But she allowed somebody, helped somebody, made it possible for somebody to kill somebody who was once her friend.  Because he sat there and he said, "you're going to help me kill this bitch.  I can't believe I'm going to go to jail for the rest of my life for killing this bitch."

Now mind you, this is after Paula Bennett had been riding around with him in a car with Breanna Kandler listening

78

to him say that he was going to kill this woman, displaying a gun. And if he was mean and rotten, I'm sorry, nobody knew that better than Paula Bennett. And she still took him over there to find this girl knowing that again and again he expressed his intent to kill. That's first degree murder. That's not oh, I created a high risk of danger. That is first degree murder. She made it possible and you saw actually, oddly enough, unusually enough, even actually physical evidence of that.

And again, look at these exhibits if you feel you need to. People's exhibit 41, here's an address found in her apartment, one of the addresses they thought they could find Stephanie at, one of two places she's going to be with one of her aunts. There's even her name down there, McClure, on the bottom of it. These are the elements of aiding and abetting, ladies and gentlemen. The alleged crime is committed by the defendant or another person. It doesn't matter if the other person is convicted. That's why I talked to you about the fact that you will have to do your job without worrying about what the other jury's doing with regard to Mr. Benson. Your consideration of this is in the evidence in this case with regard to this Defendant. Second element, before or during the commission of the crime the defendant did something to assist. Third, the defendant, and in this case we're talking of Paula Bennett, that defendant, intended the commission of the crime or, very important here, knew that the other person intended it.

79

I'm not going to stand here and tell you that Paula Bennett wanted Kyron to kill Stephanie necessarily.  It wasn't her idea.  I don't have to prove that.  All I have to prove is that she knew that he intended to do that and chose to help him anyway.  And that's exactly what this evidence shows.  It's shown as we discussed, it's been the testimony by the female witnesses that heard the threats, that saw him walk to that freezer and take that puppy right out of there and say, well I didn't do it. Stephanie must have done it.

I'm going to suggest to you, ladies and gentlemen, that in the use of your common sense that Paula Bennett knew exactly who killed that puppy.  Paula Bennett knew exactly who put that puppy in the freezer.  And that when people are preparing to do wrong or when they have done wrong, they look for reasons to vilify the person and blame them and get people on their side and make it seem okay to do what they're going to do.  That's what that dead puppy was all about.  You know you might have noticed I'm a pretty plain spoken person.  I'm not the kind of person that goes around reading Shakespear but I heard something from a play once that, a Shakespear play, "Me thinks he does protest too much". I think that applies pretty well here.

He's one, as soon as he walks right there and takes that puppy out, it's like, oh, well I didn't do it.  Well nobody said you did.  But now that you mention it, you did walk right to it.  You are protesting before somebody even accuses you.  And

you immediately go about blaming Stephanie who you're trying to
persuade people, Paula, it's a good idea to kill.  So she knew
that.  She knew exactly what he was going to do and she chose to
help him do it.  And for that, ladies and gentlemen, she's got
to be held responsible.  I don't expect you to take any joy in
it.  I don't take any joy in it.  But that's what we're here for,
to decide this case based on the law and the evidence.  And the
only verdict that's going to be just in this case is for you to
find her responsible for that.

        Now I want to just talk about two other issues sort
of briefly and then I will have another chance to talk to you later.
 But I want to talk to you about, there's been a lot made of these
other people who might have done it, okay.  I'm also going to
suggest to you that someone who's done wrong, through their lawyer,
the Defendant's not speaking here.  She doesn't have any obligation
to do that.  When I refer to the Defendant, she has counsel here
to make arguments for you.  I'm also going to suggest to you that
if you use your common sense, when there is an overwhelming mountain
of evidence pointing to you being guilty, that the thing that comes
to your mind, the only thing you can do at that point in time is
to try and create a smokescreen to cloud the issues, one.  Or two,
point the finger at other people.

        Were there other people who may have been angry
with Stephanie McClure, who had beef with her, to use a slang term?
 Absolutely.  I'm not going to stand here and tell you there wasn't.

But to stand here and argue that next to this mountain of evidence that Kyron Benson and Paula Bennett killed her, to say well, Tim Walker might have done it.   Ricky Wren might have done it.   Well, you know, frankly, Martians from outer space might have done it, too.   But that's not what happened.   That's not what the evidence shows.

And while these officers here did this investigation to the best of their ability, maybe Officer Toth isn't the best person testifying on the stand but that doesn't make him a liar and that doesn't change this proof.   And what this proof is is that you heard in the beginning of this case, oh, they just went directly to Kyron because he fit the pattern.   Well, no that's not what happened.   In fact what happened was  the officer in charge did what an officer should do to try and get to the truth, he kept an open mind and he investigated numerous possible suspects before this case was ultimately closed.   He investigated Tim Walker.   And he investigated the possibility that Richard Wren was involved.   But the fact is that at this, when he first caused that evidence to be collected at the scene, that is the very beginning of the investigation.   It's a very early time.   You're collecting things, preserving them so that they can be tested as the investigation unfolds, okay.

Now people can stand here and say well, you didn't send Tim Walker's shoes to the lab to check for carpet fibers all they want.   And that's fair for people to ask questions about why

the investigation was done the way it was.  What I want you to
do is ask yourself in this CSI age, anybody can come up with a
hundred questions of did you do this, this and this.  Ask yourself,
stop, ask yourself what would that have shown if they had done
that?  Would that have overcome the testimony of witnesses that
Kyron had been threatening all day to kill this lady?  Would that
have overcome the fact that Kyron's own friend comes and says that,
he essentially admits that he did it?

Moreover, let's say you're of the opinion that,
taking that for an example, Tim Walker's shoes, you didn't check
them for carpet fibers.  Okay, look behind that assertion that
I would suggest to you is to point the finger at others when we
know who has done that, when you know who's done this based on
the evidence, what would that have told you?  Well, Tim Walker
was the ex-boyfriend.  He'd been in her trailer before.  And
moreover, the carpet fibers, as the investigation went along,
became irrelevant because the crime was committed outside.
There's no blood in the trailer, okay.  So all I'm asking you is
to listen to those kinds of things with a skeptical ear and think
about what's really being said and think about the finger pointing.
And what that really amounts to is the attempt to try to distract
you from the very compelling evidence that you heard in this case
at the beginning of this case.

THE COURT: Five minutes.

MS. KETTLER: Thank you your Honor.  I'm going to

83

stop now.

THE COURT: Mr. White.

MR. WHITE: Members of the jury, this is my last opportunity to state to you, because of the way the laws are written and the burden of proof being on the People, Ms. Kettler will have a chance to make a response after I'm done.  So I'm going to try and cover now what I think are the salient points in the case against Paula Bennett.

The system we have is based on a division of powers.  The legislature determines what the laws are in this state.  The Judge instructs you on the law and occasionally there have been disputes between the lawyers over what's admissible and the Judge has properly made rulings on it.  If there's a conviction, it's up to the Judge to sentence them.  That's not your concern.  Your decision is the facts of the case whether based on the evidence you've heard in this courtroom and not sympathy or prejudice or my argument or Ms. Kettler's, but based on the facts you've heard in this in this courtroom, whether you are convinced beyond a reasonable doubt that a client is guilty or not guilty.

Always remember you have two duties.  You have a duty to convict the guilty.  You also have the duty not to convict the people who have not been proven to be guilty.  And the Judge will stress this over and over to you and I don't believe Ms. Kettler would disagree with that for a minute.  You don't have the option of finding somebody innocent.  In Scotland, they have a system

84

where you've got verdicts of guilty, innocent and not proven. Our not guilty verdict is the same as the Scotish not proven verdict.

And so the question is whether the crime alleged is proven to you beyond a reasonable doubt.

Now, how do you determine guilt or innocense?  Well you've heard a whole lot of evidence over the last couple weeks and you're going to have to weigh it different ways.  And the Judge is going to give you some guidelines in his sentencing instructions on how to evaluate witnesses.  But you've looked at the elements of the offense and Ms. Kettler's indicated elements of murder, of aiding and abetting and other things and the Judge is going to read you the actual elements of the crime and of aiding and abetting.  You look at the elements of the offense and then you say, is this element proven beyond a reasonable doubt, is this one?  And you go down the list.  Because in order to find somebody guilty you have to be convinced beyond a reasonable doubt that every element of the offense has been proven to you beyond a reasonable doubt.

Now in this case, the charge is murder in the first degree, premeditated murder.  My client is not charged with killing anybody.  What she is charged with is what's called aiding and abetting.  In order to be guilty of aiding and abetting, the first thing, and this is as Ms. Kettler said, regardless of the other jury, you have to be convinced that Kyron Benson committed a murder. Because if he's not guilty, she didn't aid and abet him.

85

One of the things we discussed was other possible suspects in the case. And a prosecutor can refer to this as a smokescreen if they want but the reason you discuss that and the reason you discuss the evidence and the reason you discuss the work the police did do or didn't do and the quality or lack of quality of that work is to see whether or not that first element is met, mainly that Mr. Benson is guilty of this.

If we go back to the very beginning of this case, Heather Kindall, the lady who heard the shots and the screaming. She looks out and she sees two people, one of whom she perceives to be white. She also has testified that the porch light is on. Now the People have shown you a picture of the scene and they acknowledge in that picture that it's not accurate, it doesn't show the porch light on. It shows it as being much darker than it actually was.

The fact of the matter is that we have a witness who indicates there were two people there. And it's a person with no axe to grind and no reason to lie or dissemble in any way. Now that's the reason we go into two other possible suspects are. That's the reason we go into why the investigation was conducted. That's why we go into things, for example why evidence, the footprint impressions for example, were not followed up by the police after it turned out there was no physical evidence against Mr. Benson or my client.

Now, the way we conclude a person is guilty is by

86

being convinced beyond a reasonable doubt.  There's also a way
to evaluate whether or not they are not guilty.  The first way
you evaluate that is lack of proof, lack of evidence pointing to
their guilt.   In this case, there is no physical evidence.
Evidence wasn't tested.   There's no shoe prints.   There's no
fingerprints.  There's no physical evidence at all.  They can't
even say for sure what kind of gun, there's questions about whether
or not Mr. Benson had a gun or not that day, what kind of gun it
was that fired the bullets.

      The next thing we look at is the unsatisfactory
nature of the evidence.   There was no followup on Heaven Kindall's
testimony about the two people, or the white male.   And remember,
she heard the shots.   She heard the scream.   She looks out the
window right there before anybody else could be there.   Now, we've
got the two chief witnesses against my client because remember
my client's charged as an aider and abettor.   And so what we've
got to decide is whether the crime was committed and whether she
knew what was going on and helped Mr. Benson commit that murder
knowingly.   I think you're going to, when you hear the
instructions, you're going to realize that.

      Let's look at the motives of the two witnesses that
really talked to her.   The first one is Mike Larvaidan.   Mike
Larvaidan didn't come forward.   He was in the car but he didn't
come forward.   He is confronted by the police several months later.
And why it took them several months, we'll never know, but several

months later and said, I wasn't there.  And the police could tell
he was lying.  Finally in April of this year, he was confronted
again by the police.

Now, by this time he knew a couple of things.  He
knew that there were three people in that car.  He knew that two
of them, Paula and Kyron were in jail charged with first degree
murder.  He knew that he had just been given a Miranda Warning.
And he knew that if he didn't right to be right where they are
he'd have to say what the police need and the prosecutor needed
him to say.  So he made a statement on the 21st.  And why they don't
bother to take further statements in Sumpter, I don't know but
they didn't.

But there was a statement made, a discussion held
and as a result of that discussion, Detective Toth wrote out a
series of questions for him.  And he answered them.  Now I'm
assuming Detective Toth was competent enough that if something
important, for example, being driven down to the end of the street
and seeing Stephanie, that would have been one of those questions.
It wasn't.  That Paula had gotten in the car and driven around
the neighborhood, driven around the, or driven around the block,
that that would have been one of the discussions.  It wasn't.

All Mike said in his original statement was that
they got there, that Kyron got out of the car, that Paula got in
the driver's seat, that they heard shots, Kyron ran up and Paula
drove away.  That was his original statement.  Now that Monday,

88

the day before this trial started, he talked to the prosecuting attorney, he talked to Detective Toth and he tells a whole new story, far more elaborate than anything that came out on April 21st. And I would contend that you might want to consider what his motives are to make the story better, better than it was April 21st.

And I would contend that you have good reason to believe that he was not trying to satisfy the truth, not trying to hurt his friend Kyron as little as possible but trying to cement his position as a witness and not a defendant in a first degree murder case. And at that point, Mike Larvaidan would have said anything to sit up in that witness chair rather than over here at this table.

Now, let's look at Jessica Fritz. We've got somebody whose original story was that Paula came in and said Kyron had shot him and then she said well, did you see him shoot him? No. Did you hear any shots, what did you do? I heard shots fired. The story gets elaborate. It gets better and better and better each time it's told. Now when you're going to see Jessica Fritz when she went in to help provide an alibi for her boyfriend, Ricky Wren, one of the people who was initially a suspect in this case. And she stood by her man. She testified to fill in the rest of the alibi that hadn't been covered by the lady Ricky had gone to the party.

Now let me just say this aside that except for a

89

girlfriend and ex-girlfriend, these officers never investigated whether Mr. Wren had an alibi.  They never looked for any physical evidence for Mr. Wren.  But she comes in and says, oh Ricky, you know, did this, that and the other thing.  Now several months later, after Ricky's ripped her mother and herself off, she suddenly decides just before the trial to provide evidence or information that Ricky provided a gun to Kyron months before the crime.  And she says well, I saw the gun.  And it turned out she didn't see the gun.  The gun was in a case, if in fact was a gun at all. There was a case that supposedly was a gun that was transferred. There was a laptop that was transferred.  But she was pretty clear on cross examination she hadn't seen a gun.

Now why didn't she bring this up before?  Oh, I didn't want to get Ricky in trouble because, you know, he's a felon selling a gun to another felon and because he's my boyfriend then. But come spring when she's broken up with him, she's ready to throw him to the wolves for the weapons charge.  Ms. Fritz has a disregard for the need to tell the truth, the whole truth and nothing but the truth.

Now, let's look at the rest of the situation here. The story that came out during the course of the trial was that Ms. Bennett got information that her property had been taken by her old roommate, Stephanie McClure.  She did the very right thing, the same thing that every one of you would have done, she went and reported the crime to the police.  She didn't go out and beat

90

Stephanie's head in.  She didn't raise up, you would cry, she didn't even act angry, she acted disappointed, if you remember back, she went in to report the crime to the police.

Later in the day, she told her boyfriend about it. And he got outraged.  But he didn't say time after time after time I'm going to kill her, I'm going to kill her, I'm going to kill her.  A couple of other things happened.  For instance, when he said things that were crazy like "I'm going to kill her", Paula's response was "that's nuts."  He also said, enters first with the "I'm going to kill her", "I'm going to get our stuff back."  And later in the day he told Paula, you were dumb for letting her have the key but now we're going to go get our stuff.  That's what Ms. Fritz told us, shoot the move, man.  It didn't mean shoot Stephanie McClure, it meant go get the stuff back.

Now the question is did my client intentionally aid him knowing or believing he was going to commit a homicide? Let's look at the evidence.  All day she'd argued that she just wanted her stuff back and that's the evidence you've heard.  There were other people who'd heard Kyron Benson make the same remarks alternating between, I'm going to kill her and I'm going to go get my stuff back.  And none of them took it seriously.

Now we all know Kyron Benson.  But we know that nobody thought he was serious.  People saw a gun on him earlier in the day.  He was arguing with two guys over a traffic accident. He went back, got a gun, didn't brandish it.  Maybe it was a little

91

bit of courage for him or something.  We'll never know that.  But
the fact of the matter is that nobody took him seriously.  She
didn't take him seriously.  His buddy, Mike, didn't take him
seriously.  He never got out of the car and reported it to the
police.  He didn't have her drive away or anything else.  None
of them thought he was gonna do it.  None of them thought seriously
that he was gonna to do it.  And if you have a reasonable doubt
as to whether she thought she was helping him do it, she's not
guilty because she's not aiding and abetting a murder.  She thinks
she's going over there to get her stuff back.  That's not, and
she gives him the address for that purpose, that is not the same
as going over there to help commit a murder.

So what you've got to do, you've got to decide what's
in her head?  What's her purpose?  And how do you do that?  You
do that with direct and circumstantial evidence.  Circumstantial
evidence was that she went over there with him.  Circumstantial
evidence is that the woman got killed.  Direct evidence is that
she called back and forth to Stephanie six hours before the crime.
Obviously she wasn't so outraged that she wasn't communicating
with her friend, Stephanie, and vice versa.

Well, direct evidence is the fact that she made
enumerable statements that Kyron was crazy to want to go hurt
anybody and that she wanted to handle it through the court system
and the direct evidence is that she did go to the police and file
a police report.  She didn't turn from somebody who wanted to file

92

a police report to somebody who wanted to help Kyron kill Stephanie.

She was somebody who like everybody else, nothing special about her, same as Mike, same as Jessica Fritz, like everybody else, she didn't take Kyron seriously.

Now, maybe Kyron killed Stephanie, maybe he didn't. The evidence tends to point to the fact that he did. But if she doesn't take him seriously, she isn't intentionally assisting him in that crime, she is not aiding and abetting him in first degree murder. Now, the evidence in this case, you should be clear at this point, we spent a lot of time in this case. We spent a lot of time listening to evidence and a lot of it didn't have a darn thing to do with my client. A lot of it didn't have anything to do with Kyron. It just shows the investigation the police conducted and it's proper for the People to put it on and I'm not criticizing that.

But the crucial evidence for you folks to consider when you go back in that jury room and decide Paula's fate, the crucial evidence for you to consider is whether or not she intentionally assisted someone in committing a crime and that during the commission of the crime she did assist in the commission of that crime and that she intended to assist in the crime alleged or have known the other person was going to commit the crime alleged. And that's the key thing.

Listen to the jury instruction on aiding and abetting, not part of the instruction, all of the instruction.

93

And if you do that I'm going to assume at the end of this case you're going to come to the logical conclusion and acquit my client. Thank you.

THE COURT: Ms. Kettler.

MS. KETTLER: Thank you.   The one and most important thing I want to ask all of you to do in response to that closing argument, when you go back in that jury room, I want you to think about what the evidence was, not what the lawyers say it was, but the evidence was.   Because it would take me an hour to talk about all the things that Mr. White claims the evidence said.   It wasn't what the evidence said.   To do your job, think of what the evidence says, not what he says it says, not what I say it says, the actual evidence.   And the fact is Paula never said that's crazy.   Breanna said that's crazy.   And in response, she was told, I don't care and if you say anything, you're next.   So you can't confuse, try to confuse the evidence in people's minds and hide what the clear evidence is because the truth always comes out and I know that you will take your job seriously in doing that.

Other very important thing I want you to do is listen to the law carefully because I would submit to you that Mr. White also misstated the law.   She doesn't have to want to help kill her.   She has to help him go there knowing what he intends to do and that's exactly what she did, okay.   Very important, ask you to listen to that 911 call again.   It's in evidence, you can listen to it.   Heaven Kindall, and you heard her testify, you saw her.

94

I wouldn't ask her if the sky was blue.  She said I assumed, I reached the conclusion, I assumed it was a white guy because he wasn't wearing baggy pants.  Come on now, if you listen to the actual tape which is made right at the time she's observing it, she doesn't say it's a white man.  She doesn't say it's a tall man.  She says it's a man and a woman.  That's a smokescreen to get you to not pay attention to the evidence.  That's reaching conclusions based on assumptions and we all know that that does not lead to the truth.

I don't have a lot of time so what I want to ask you to do at this point is to focus on this.  In order to acquit Paula Bennett in this case, you're going to have to ignore all these pieces of evidence.  You're going to have to ignore that Kyron was furious that Stephanie had stolen these things.  You're going to have to ignore that he repeatedly threatened to kill the victim in the presence of both Breanna and Paula.  You're going to have to ignore that he talked about possessing a gun as soon as he got in that car with Breanna and that he did display a gun at the Dairy Barn.  You're going to have to ignore that he said again and again that Stephanie is done.

And when he was challenged on the craziness about killing over material things, that he doesn't care, he's going to do it anyway.  You're going to have to ignore that he walked right to that freezer and took that puppy out and said, oh, I didn't do it.  You're going to have to ignore that he tells these girls

95

at the apartment that if they tell anybody about him killing Stephanie, somebody's going to come for them.  You're also going to have to ignore that he told them people would know where to find them, that he threatened to kill Stephanie more times than I can count.  That's what Katie McIntyre said.

And Katie McIntyre refused to even make a statement because she was trying to protect her friend.  But ultimately in court under oath, she had to say that because that's what he said, that he's sitting on a basketball telling Paula, you're going to help me kill this bitch.  You're stupid, screaming at her for letting people walk all over her.  I can't believe I'm going to jail for the rest of my life for killing this bitch.  You're also going to have to ignore that he told Mike Larvaidan again and again through the day how angry he was about the things being stolen and that he was planning to confront Stephanie.

You would also have to ignore him saying, let's go shoot this move, that he displayed the gun in the car, that he tells his friend that he's about to shoot this bitch, that I'm about to kill this ho.  Probably most importantly with regard to this Defendant, you're going to have to ignore the fact that Paula Bennett found out where they could find Stephanie and that she gave him directions to go there where Stephanie was staying now and that he got out of the car when they saw her and went over there.  And five minutes later, Mike hears those shots.  Benson's running for the car and Bennett has moved it to a place to avoid,

96

and you can look at that map of that trailer park that Mike testified about.  She moved the car to a place a, where he can avoid detection; b, where they can get out of there easier and allow easier access to that first gate.  That's the two most important ways she helped him commit this crime.  And that upon reentering the car, Larvaidan says why and Benson says I would have lost respect.

And again, perhaps most telling, you would have to ignore in addition to all these other things that right after this crime happened, Paula Bennett comes bursting into that apartment wide-eyed, shaking and says, "He did it".  "He did it, he killed Stephanie."  What a surprise.  He did what he was saying he was going to do all day.  And she helped him.

THE COURT: One minute.

MS. KETTLER: Convict her of the crime that she helped him to commit which is first degree premeditated murder.  She knew he was going to kill her and he did.

THE COURT: Ladies and gentlemen, I'm going to excuse you.  I must instruct the juries together so I don't need you until ten o'clock tomorrow morning.  The closing argument will be going on in your absence.  But then both juries will be instructed together on the law.  However, this jury will hear additional instructions as you already know on the issue of aiding and abetting.  So do not discuss the case.  Be back tomorrow morning at ten o'clock and it will be at that time to receive the instructions on the law that you are to consider in connection

97

with the facts in this case in order to reach your verdict.

    (Whereupon the Bennett jury was excused at 12:27 p.m.)


STATE OF MICHIGAN )

COUNTY OF WAYNE    )


    I, Jeffrey B. Goldsmith, Official Court Reporter for the Third Judicial Circuit of Michigan, do hereby certify that I reported the foregoing proceedings before the Honorable MICHAEL J. CALLAHAN, Circuit Judge on May 20, 2008; that the foregoing 99 pages constitute a true and correct transcript of the proceedings so held.


                _____
                Official Court Reporter
                CSMR-0037