UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA BENNETT,

                               Petitioner,                    Case No. 5:12-cv-12054
                                                      Hon. John Corbett O'Meara

v.

MILLICENT WARREN,

                               Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) GRANTING CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

      This is a habeas case filed by a Michigan prisoner under 28 U.S.C. § 2254. Petitioner Paula Bennett was convicted after a jury trial in the Wayne Circuit Court of one count of first-degree murder, MICH. COMP. LAWS § 750.3167. As a result of her conviction Petitioner is serving a sentence of life imprisonment without possibility of parole. The amended petition raises two claims: 1) the trial court erroneously instructed the jury on the elements of aiding and abetting, and 2) Petitioner was denied the effective assistance of trial and appellate counsel. The Court finds that Petitioner's claims are without merit. Therefore, the petition will be denied. The Court will, however, grant Petitioner a certificate of appealability with respect to both claims and grant permission to proceed on appeal in forma pauperis.

## I. Background

      Petitioner was charged with first-degree murder in connection with the shooting death of Stephanie McClure. Petitioner was tried jointly with Kyron Benson, who shot and killed McClure. The prosecutor's theory was that Petitioner aided and abetted the crime by directing Benson to

McClure's residence with the knowledge that he intended to kill her. The Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

Defendants lived together in Bennett's apartment. The victim, Stephanie McClure, was Bennett's friend and sometimes stayed at Bennett's apartment. In October 2007, defendants discovered that several items, including a Play Station 2, clothes, and shoes, had been stolen from Bennett's apartment. Benson became angry over the stolen items and began to blame McClure for stealing them. Benson started making threatening comments to several people about McClure, including commenting that he wanted to kill McClure for stealing the items. Benson told one of the persons to whom he had indicated that he wanted to kill McClure, Breanna Kandler, one of Bennett's friends, that he would kill Kandler too if she "[said] anything" about his threats. Benson wanted Kandler to drive him to McClure's trailer to get the apartment key back from McClure. Kandler testified that she took Benson's threats seriously and, accordingly, refused to take Benson to McClure's trailer.

Later in the evening, defendants and several of their friends were at Bennett's apartment. They noticed that defendants' puppy was missing and were looking around the apartment for the dog. Benson joked that maybe the dog was in the freezer, and when he checked in the freezer, he did indeed find the puppy, which was dead. Benson immediately accused McClure of killing the dog as well. Two of Bennett's friends testified that they thought Benson had killed the dog because of the way he reacted to finding it. After the dead dog was disposed of, defendants and their friends went to a Dairy Mart. While at the Dairy Mart, Kandler saw Benson take a gun out of his car and put it in his pants. Another friend, Jessica Fritz, testified that she had previously seen her boyfriend sell a gun to Benson. Later that evening, Bennett and Benson left their friends, stating that they were going to "get [their] stuff back."

Benson then called his friend Michael Larvaidan and asked him to meet defendants at a Kroger store. Larvaidan had spoken to Benson about the stolen items several times in the preceding days. He testified that he tried to get Benson to calm down about the incident. According to Larvaidan, while at Kroger, Benson was angry and "going on about trying to get his stuff back, . . . talking about going to kill [McClure]." Benson showed Larvaidan a gun while he was talking about this. After Larvaidan got into the car with defendants, Bennett directed Benson to go to "Holiday West," the trailer park where McClure lived. Benson drove according to Bennett's directions. Once they reached the trailer park, Bennett specifically directed Benson to McClure's trailer. They saw McClure standing outside by the trailer, in front of a car. Benson said, "That's her."

Larvaidan testified that he told Benson, "[D]rive off." Benson drove around the trailer park and then parked the car. Larvaidan told him "just to talk to her. Don't do nothing stupid." Benson got out of the car and walked toward McClure's trailer. Bennett moved to the driver's seat, and she and Larvaidan continued to drive around the trailer park. While they were driving around, Larvaidan saw Benson talking to McClure. After several minutes they heard three or four gunshots and then saw Benson running away. Bennett started crying as soon as they heard the gunshots. Bennett drove toward where Benson was running, and Benson got back in the car. Larvaidan asked Benson, "Why?" Benson responded that "he would have lost respect in the . . . hood." Larvaidan also said, "[You] better hope she's dead . . . 'cause if she's not, [you're] going to jail."

Because Bennett was charged with murder on a theory of aiding and abetting Benson, several witnesses testified regarding the interactions between defendants and Bennett's conduct toward Benson. The evidence presented demonstrated that Bennett was present when Benson started making threats about killing McClure, as well as threats toward Kandler. Benson was also yelling at Bennett at this time, telling her that she "was dumb for giving [McClure] a key." Kandler testified before Bennett's jury only that Bennett told her that she thought Benson "looked pretty serious" about killing McClure, although Kandler testified that she never witnessed Bennett agree to kill McClure.

Fritz testified that she heard defendants arguing for an extended period before they went to McClure's trailer; Benson was again yelling at Bennett because she had given a key to McClure. Bennett told Benson that she had filed a report with the police and that the police would take care of it. Fritz could not recall Benson's response to Bennett. After the argument, Bennett told Fritz that she and Benson were "leaving to get their stuff back."

Finally, Larvaidan testified that Benson was talking openly in the car about shooting McClure just before Bennett gave Benson directions to McClure's trailer. Bennett did not respond to these comments. Larvaidan also testified that after they heard gunshots, Bennett immediately began crying and drove back around toward McClure's trailer, where they observed Benson running away. Following numerous seemingly erroneous leads, the police eventually arrested defendants for the murder of Stephanie McClure. After defendants were arrested, Benson was observed telling Bennett under the door between their jail cells, "Don't talk."

Following trial, defendants were found guilty on all counts and sentenced as previously stated. These appeals ensued.

*People v. Bennett*, 802 N.W.2d 627, 631-33 (Mich. Ct. App. 2010) (footnotes omitted).

Following her conviction and sentence, Petitioner filed a claim of appeal in the Michigan

Court of Appeals. Her brief on appeal raised the following claims:

> I. Defendant was denied due process when she was convicted of first-degree murder as an aider and abettor in a case where the prosecutor failed to prove that defendant knew of the principal's intent or assisted the principal in the commission of the murder.
>
> II. Defendant was denied due process when the prosecutor improperly vouched for and bolstered the testimony and quality of investigation of the officer in charge of the case, suggesting to the jury that the officer's testimony was corroborated by evidence known to the government but not known to the jury.

The Michigan Court of Appeals affirmed Petitioner's convictions in a published opinion. *Id.* One Judge dissented, raising issues that were not presented by Petitioner. The dissenting Judge found that the jury instructions on aiding and abetting were erroneous and that the case should be remanded to the trial court for a hearing to determine whether Petitioner was denied the effective assistance of counsel. *Id.*

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims she raised in the Michigan Court of Appeals and adding the claim that the jury was erroneously instructed regarding the standard for aiding and abetting. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Bennett*, 796 N.W.2d 75 (Mich. 2011)(table).

Petitioner then filed the instant action, raising the following claims: 1) insufficient evidence was presented to prove that Petitioner aided and abetted Benson, and the jury was erroneously instructed on aiding and abetting, 2) the prosecutor committed misconduct, 3) Petitioner was denied the effective assistance of trial counsel, and 4) Petitioner was denied the effective assistance of appellate counsel. Respondent filed a motion to dismiss based on Petitioner's failure to exhaust her ineffective assistance of counsel claims. Dkt. 11. The Court issued an order determining that the case would be held in abeyance while Petitioner sought state post-conviction review on her unexhausted

claims. Dkt. 14.

Petitioner then returned to the trial court and filed a motion for relief from judgment, raising the following claims:

I. Trial counsel was ineffective for failing to investigate and pursue a duress defense.

II. Defendant's trial counsel was constitutionally ineffective by adopting defense of co-defendant which undermined his client's own defense and created a conflict of interest.

III. Trial counsel failed to impeach state witness properly.

IV. Ineffective assistance of appellate counsel.

Dkt. 21-18, at ¶ 4.

The trial court denied the motion for relief from judgment for failure to demonstrate "good cause" and "actual prejudice" under Michigan Court Rule 6.508(D)(3), and also because the claims lacked merit. Dkt. 21-21. Petitioner then filed an application for leave to appeal in the Michigan Court of Appeals, raising the same claims. The Michigan Court of Appeals denied the application for leave to appeal for failure to establish entitlement to relief under Rule 6.508(D). Dkt. 21-22. Petitioner applied for leave to appeal in the Michigan Supreme Court, but her application was also denied with citation to Rule 6.508(D). *People v. Bennett*, 866 N.W.2d 432 (Mich. 2015) (table).

Petitioner then returned to this Court by filing a motion to reopen the case along with an amended petition. The amended petition indicates that Petitioner is abandoning her sufficiency of the evidence and prosecutorial misconduct claims. See Dkt. 18, Pg ID 462. Her pleading indicates that she is raising the following claims: 1) the jury was erroneously instructed on the law of aiding and abetting, and 2) Petitioner was denied the effective assistance of counsel where: a) trial counsel failed to investigate and present evidence regarding battered women's syndrome and domestic violence, b) trial counsel deficiently adopted Benson's defense that he did not commit the murder,

c) trial counsel failed to adequately impeach prosecution witness Kandler, and d) appellate counsel failed to raise Petitioner's state post-conviction claims on direct review. Dkt. 18. Respondent has filed a responsive pleading, Dkt. 20, Petitioner filed a reply, Dkt. 22, and the matter is now ready for decision.

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As

a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

## III. Analysis

A. Aider and Abettor Jury Instruction

Petitioner asserts that her due process right to a fundamentally fair trial was violated when the trial court gave a misleading jury instruction on the law of aiding and abetting. Specifically, and picking up on the dissenting opinion in the Michigan Court of Appeals, Petitioner asserts that the jury instruction on aiding and abetting might have led the jury to conclude that it was enough if Petitioner should have known–rather than actually knew–that Benson was going to commit the murder to satisfy the mens rea requirement for aiding and abetting. Petitioner asserts that the use of the words "must have known" rather than "knew" in the jury instructions could have been understood in the context of this case as "should have known." See, *Bennett*, 802 N.W.2d at 642-44.

Initially, the Court notes that there is a question whether Petitioner has met the exhaustion requirement for this claim. See 28 U.S.C. § 2254(b)(1)(a) (requiring a habeas petitioner to present her claims to the state courts prior to seeking federal habeas relief). Petitioner first raised the claim in the Michigan Supreme Court on direct review after it was raised by the dissenting Judge in the Michigan Court of Appeals. Presentation of a claim to the Michigan Supreme Court without first raising it in the Michigan Court of Appeals generally does not satisfy the exhaustion requirement. See *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Skinner v. McLemore*, 425 F. App'x 491, 494 (6th Cir. 2011); *Farley v. Lafler*, 193 F. App'x 543, 549 (6th Cir. 2006). Petitioner did not re-raise the claim in her motion for relief from judgment or subsequent appeal. The State does not raise non-

exhaustion as an issue, however, nor does it address the claim in its responsive pleading. The Court is authorized to nevertheless address and reject the claim because it finds that it lacks merit. See § 2254(b)(2).

A habeas court may grant the writ based on errors in state jury instructions "only in extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). The Due Process Clause requires the prosecution to prove every element of the charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Accordingly, when the jury is not correctly instructed as to the required elements of the charged crime, the defendant's right to have every element proven beyond a reasonable doubt is implicated. See *Sandstrom v. Montana*, 442 U.S. 510 (1979) (finding that deficient jury instruction violated the defendant's constitutional rights by not requiring that the state prove every element of the criminal offense beyond a reasonable doubt). Every ambiguity, inconsistency or deficiency in a jury instruction, however, does not necessarily constitute a due process violation. *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009). It is not enough that there might be some "slight possibility" that the jury misapplied the instruction. *Id.* at 191. Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient in comparison to a model state instruction. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

Here, the trial court instructed the jury on the elements of aiding and abetting in accordance with Michigan's model instruction as follows:

> In this case, the defendant is charged with committing first degree murder or intentionally assisting someone else in committing it. Anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly

commits it and can be convicted of that crime as an aider and abettor. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the alleged crime was actually committed either by the defendant or someone else. Second, that before or during the crime the defendant did something to assist in the commission of the crime. Third, the defendant must have intended the commission of the crime alleged or must have known the other person intended its commission at the time of giving assistance.

It does not matter how much help or advice or encouragement the defendant gave. However, you must decide whether the defendant intended to help another commit the crime and whether his or her help or advice or encouragement actually did help or advise or encourage the crime. Even if the defendant knew the alleged crime was planned or being committed, the mere fact that he or she was present when it was committed is not enough to prove he or she assisted in committing it.

Dkt. 21-16, at 43-44.

Under Michigan law, to prove aiding and abetting, the prosecution must prove the following elements beyond a reasonable doubt: (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or knew that the principal intended to commit the crime at the time he gave aid and encouragement. *Riley v. Berghuis*, 481 F.3d 315, 322 (6th Cir. 2007) (citing *People v. Carines*, 460 Mich. 750 (1999)).

Petitioner asserts that with respect to the third element, instructing the jury that Petitioner "must have known" of the principal's intent rather than "knew" of the principle's intent altered the mens rea from requiring the aider to subjectively know the principal's intent to an objective "should have known" standard. Without explicitly saying so, Petitioner's position it that the word "must," as a modal verb, can be understood as creating an obligation to do a thing without saying whether the obligation was fulfilled. For example, the sentence, "A tax payer must know that his tax return is due by April 15," can be understood as stating an obligation for a person to know when his tax return is due without stating whether a person actually knows of the due date. So too, Petitioner

asserts, "An accessory must know the principal's intent," might be understood to state an obligation without stating whether it was met. Petitioner asserts that the jury might have found her guilty even if they only found that the circumstances of the case should have led her (or a reasonable person in her position) to know of Benson's intent to commit the murder, though through willful blindness, fear, or some other psychological state, she did not actually know that he intended commission of the crime.

Petitioner's argument nevertheless fails because she has, at most, shown a "slight possibility" that the jury misapplied the instruction. *Waddington*, 555 U.S. at 191. Putting a sentence as the one at issue with "must" in the past tense changes its ordinarily understood meaning. Thus, changing the above example to: "The tax payer must have known that his tax return was due by April 15," unless read in a particularly sarcastic and exaggerated tone, would reasonably be understood to state a deduction that the tax payer actually knew of the due date. So too, "the defendant must have known the other person intended [the crime's] commission," would only reasonably be understood by the jurors as requiring them to find that Petitioner actually knew that Benson intended to commit murder to satisfy the mens rea requirement for aiding and abetting. That is, the use of the term "must" in the instruction was used to preface one of the two mental states the defendant must possess to be guilty as an aider and abettor.

Accordingly, the Court finds that the jury instructions did not misstate any of the required elements of the charged crime under Michigan law, and therefore her due process right to be convicted only upon proof beyond a reasonable doubt of each element was not infringed.

B. Ineffective Assistance of Counsel

Petitioner raises several claim of ineffective assistance of counsel. She claims that her trial

attorney: 1) failed to investigate and raise a duress defense supported by battered women's syndrome and evidence that she was a victim of domestic abuse, 2) performed deficiently by adopting Benson's defense that he did not commit the murder, and 3) failed to adequately cross examine prosecution witness Kindler with prior inconsistent statements. Petitioner also asserts that her appellate counsel was ineffective for failing to raise these claims in the Michigan Court of Appeals during her direct appeal.

Respondent asserts that review of the claims is procedurally defaulted. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if a state court's decision rests on a procedural state law ground that is independent of the federal question and is adequate to support the judgment. See *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, procedural default is not a jurisdictional bar to review of a habeas petition on the merits. See *Trest v. Cain*, 522 U.S. 87, 89 (1997). Additionally, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of the petitioner's claims, "for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In the present case, the Court deems it more efficient to proceed directly to the merits, especially because Petitioner alleges that her appellate counsel was ineffective for failing to raise the defaulted claims on direct review.

To establish ineffective assistance of counsel, a defendant must show both that: 1) counsel's performance was deficient, i.e., "that counsel's representation fell below an objective standard of reasonableness"; and 2) the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "[A] court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

1. Failure to Present Evidence of Duress

Petitioner first asserts that her trial attorney was ineffective for failing to investigate and present evidence related to battered women's syndrome and domestic violence to support a duress defense. Petitioner asserts that evidence that she was a battered woman would have explained the reasonableness of her actions in light of the danger she felt from Benson, and that such evidence had a bearing on her intent and motive. She argues that such evidence would have supported her contention that she felt in danger of imminent death or violence if she did not comply with Benson's request to direct him to the victim's location despite the absence of an explicit threat.

Petitioner also asserts that expert testimony regarding battered women's syndrome was imperative in her case to explain: "1) why Ms. Bennett felt trapped and controlled by Benson; 2) why defendant rode along with Benson and obeyed his commands; 3) why she didn't run or remove herself from the abuse or this incident; and 4) why she complied with Benson's request for the directions to the victim's residence." Dkt. 18, at Pg ID 491-92. She asserts that expert testimony would have assisted the jury in evaluating her state of mind and negated the element of intent to murder. Id., at 494. Petitioner explains, "This defendant has presented substantial mitigating factors, and if the jury would have had the opportunity to weigh those factors, there [was] a reasonable alternative outcome possible in this case." Id., at 496.

Under Michigan law, battered woman syndrome testimony is admissible when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse. *People v. Christel*, 449 Mich. 578, 580 (1995). Battered woman syndrome is a defense to criminal activity asserted by a woman who claims that her allegedly criminal conduct is instead the legitimate product of self-defense. See *People v. Etchie*, 2012 Mich. App. LEXIS 333, 2012 WL 556194 at *1 (Mich. Ct. App., Feb. 21, 2012).

The problem for Petitioner's claim is that even if she could show that she was the victim of domestic violence, that she was a battered woman, and that she honestly felt in imminent danger of losing her life if she did not direct Benson to the victim's location, it would not have presented a valid defense under state law to first-degree murder. Michigan courts have repeatedly held that duress is not a defense to homicide. See, e.g., *People v. Gimotty*, 216 Mich. App. 254, 257 (1996); *People v. Dittis*, 157 Mich. App. 38, 41 (1987); see also *Gimotty v. Elo*, 40 Fed. Appx. 29, 33 (6th Cir. 2002). Defense counsel cannot be deemed to have rendered deficient performance for failing to make a futile argument or objection. *United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000).

Furthermore, Petitioner cannot show that she was prejudiced by her trial counsel's failure to pursue this line of investigation. The *Strickland* Court cautioned that "[i]n making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." *Id.*, 466 U.S. at 694-695.

So while it is true as a factual matter that presenting evidence that Petitioner was battered and abused by Benson and was fearful of losing her own life would have garnered sympathy with the jury, the possibility of a verdict based on sympathy is not the type of result that can be considered in evaluating the prejudice prong of an ineffective assistance of counsel claim. As the Sixth Circuit recently noted, "[s]uch possibilities, real as they are, 'are irrelevant to the prejudice inquiry' under *Strickland*. *Lee v. United States*, 825 F.3d 311, 315 (6th Cir. 2016) (quoting *Strickland*, 466 U.S. at 695). Accordingly, even if counsel would have been allowed to present evidence showing that Benson battered Petitioner, there is no "reasonable probability" as defined by *Strickland* that the result of trial would have been more favorable to her. The allegation is therefore without merit.

2. Decision to Contest Benson's Guilt

Next, Petitioner asserts that her attorney was ineffective for adopting Benson's defense that he did not commit the murder. Petitioner states that she always maintained that Benson committed the crime, but her defense was that she was not a party to it. She contends that given the evidence of Benson's guilt, her counsel's decision to challenge the case against Benson detracted from her independent defense that she was not a party to the crime.

This claim is not sufficiently sensitive to the record. In fact, Petitioner's counsel attacked the prosecutor's case on both grounds. He asserted that the prosecutor did not prove beyond a reasonable doubt that Benson murdered the victim, and thus that Petitioner could be found guilty as an aider and abettor. Counsel also contended that even if Benson was guilty of murder, however, the prosecutor did not prove beyond a reasonable doubt that Petitioner intended or knew of his intent to commit the crime.

In closing argument, Petitioner's counsel made the following argument:

Now, let's look at the rest of the situation here. The story that came out during the course of the trial was that Ms. Bennett got information that her property had been taken by her old roommate, Stephanie McClure. She did the very right thing, the same thing that every one of you would have done, she went and reported the crime to the police. She didn't go out and beat Stephanie's head in. She didn't raise up, you would cry, she didn't even act angry, she acted disappointed, if you remember back, she went in to report the crime to the police.

Later in the day, she told her boyfriend about it. And he got outraged. But he didn't say time after time after time I'm going to kill her, I'm going to kill her, I'm going to kill her. A couple of other things happened. For instance, when he said things that were crazy like "I'm going to kill her," Paula's response was "that's nuts." He also said, enters first with the "I'm going to kill her." "I'm going to get our stuff back." And later in the day he told Paula, you were dumb for letting her have the key but now we're going to go get our stuff. That's what Ms. Fritz told us, shoot the move, man. It didn't mean shoot Stephanie McClure, it meant go get the stuff back.

Now the question is did my client intentionally aid him knowing or believing he was going to commit a homicide? Let's look at the evidence. All day she'd argued that she just wanted her stuff back and that's the evidence you've heard. There were other people who'd heard Kyron Benson make the same remarks alternating between, I'm going to kill her and I'm going to go get my stuff back. And none of them took it seriously.

Now we all know Kyron Benson. But we know that nobody thought he was serious. People saw a gun on him earlier in the day. He was arguing with two guys over a traffic accident. He went back, got a gun, didn't brandish it. Maybe it was a little bit of courage for him or something. We'll never know that. But the fact of the matter is that nobody took him seriously. She didn't take him seriously. His buddy, Mike, didn't take him seriously. He never got out of the car and reported it to the police. He didn't have her drive away or anything else. None of them thought he was going to do it. And if you have a reasonable doubt as to whether she thought she was helping him do it, she's not guilty because she's not aiding and abetting a murder. She thinks she's going over there to get her stuff back. That's not, and she gives him the address for that purpose, that is not the same as going there to help commit a murder.

So what you've got to do, you've got to decide what's in her head? What's her purpose? And how do you do that? You do that with direct and circumstantial evidence. Circumstantial evidence was that she went over there with him. Circumstantial evidence is that the woman got killed. Direct evidence is that she called back and forth to Stephanie six hours before the crime. Obviously she wasn't so outraged that she wasn't communicating with her friend, Stephanie, and vice versa.

Well, direct evidence is the fact that she made enumerable statements that Kyron was crazy to want to go hurt anybody and that she wanted to handle it through the court system and the direct evidence is that she did go to the police and file a police report. She didn't turn from somebody who wanted to file a police report to somebody who wanted to help Kyron kill Stephanie. She was somebody who like everybody else, nothing special about her, same as Mike, same as Jessica Fritz, like everybody else, she didn't take Kyron seriously.

Now, maybe Kyron killed Stephanie, maybe he didn't. The evidence tends to point to the fact that he did. But if she doesn't take him seriously, she isn't intentionally assisting him in that crime, she is not aiding and abetting him in first degree murder. Now the evidence in this case, you should be clear at this point, we spent a lot of time in this case. We spent a lot of time listening to evidence and a lot of it didn't have a darn thing to do with my client. A lot of it didn't have anything to do with Kyron. It just shows the investigation the police conducted and it's proper for the People to put it on and I'm not criticizing that.

But the crucial evidence for you folks to consider when you go back in that jury room and decide Paula's fate, the crucial evidence for you to consider is whether or not she intentionally assisted someone in committing a crime and that during the commission of the crime she did assist in the commission of that crime and that she intended to assist in the crime alleged or have known the other person was going to commit the crime alleged. And that's the key thing.

Listen to the jury instruction on aiding and abetting, not part of the instruction, all of the instruction. And if you do that I'm going to assume at the end of this case you're going to come to the logical conclusion and acquit my client. Thank you.

Dkt. 21-15, at 90-94.

Accordingly, it is simply not true that defense counsel's strategy was to present a "unified defense" and attack the prosecutor's case against Benson. Rather, defense counsel directly attacked the sufficiency of the evidence offered to prove that Petitioner knew of Benson's intention to commit murder. "There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. While Petitioner provides several reasons allegedly undercutting counsel's rationale for also attacking the case against Benson in addition to attacking the case against her, counsel's strategy "need not be particularly intelligent or even one most lawyers would

adopt." *Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001), rev'd on other grounds, 535 U.S. 685 (2002). "Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation." *McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000). Petitioner has failed to demonstrate that her attorney's action of attacking the case against Benson as well as attacking the case against her constituted professionally deficient performance. The allegation is therefore without merit.


3. Failure to Impeach Kandler with Prior Statement

Petitioner next asserts that her counsel did not adequately cross examine Breanna Kandler at trial. Petitioner asserts that Kandler made a statement to police that she was uncertain whether Benson was serious when he made statements threatening to murder the victim, and that during the preliminary examination she testified she could not remember what Petitioner said about whether Petitioner thought Benson was serious. Petitioner asserts that her trial attorney was ineffective for failing to use these prior statements more effectively when Kandler testified at trial that she thought Benson was serious, and that she heard Petitioner say that she thought he was serious. Unfortunately, Kandler's statement to police was never made part of the record and is not before the Court.

The record indicates that during her preliminary examination testimony, Kandler testified that she was scared of Benson after he threatened to kill the victim and warned her that she would be next if she told anyone. Dkt. 21-2, at 160. Kandler admitted that she made a statement to the Sumpter Police indicating that she "never believed that [Benson] would do that thing." Id., at 161-62. But she explained on cross-examination at the preliminary examination that she told the police that because Benson had threatened her. Id., at 161. Kandler testified that she "was scared for [her] life." Id., 164. When asked directly at the preliminary examination, "Did you think actually that Mr.

Benson was going to kill somebody that evening?" Kandler responded, "No." Id. 180. Kandler also testified that there was a discussion with Petitioner about whether Benson was serious, but she could not "remember what [Petitioner] said exactly." Id., 181.

Accordingly, while Kandler admitted at the preliminary examination that she made a statement to the police after the murder that she did not believe Benson was serious when he threatened to kill the victim, she explained that she said that because she was scared of Benson. She then testified that she did not actually believe Benson would murder the victim, and she could not remember what Petitioner said about whether she believed Benson was serious.

At trial, Kandler recounted on direct examination the threats Benson made to herself and the victim. Dkt. 21-9, at 36-41. When asked if she took the threats seriously, Kandler answered, "to an extent, yes." Id., 41, 62. She was concerned enough by the threats that she refused to drive Petitioner and Benson to the victim's location herself. Id., 42. Kandler also testified that Petitioner was "freaking out," and was "crying and scared." Id. Kandler acknowledged that in her police statement she recalled Petitioner saying that Benson looked pretty serious about killing Stephanie. Id., at 60.

Benson's counsel cross examined Kandler at trial about whether she believed Benson's threats: "Now, I understand you correctly, when [Benson] stated that he was going to kill Stephanie, you told the police you didn't take that seriously, did you?" Dkt. 21-9, at 61-62. Kandler responded, "I did to an extent. . . . but not completely." Id., 61-62. When Benson's counsel tried to explore Kandler's views on whether Benson's threats were serious, objections posed by the prosecutor on relevance grounds were sustained. Id., at 62-64.

Then when Petitioner's counsel then cross examined Kandler at trial, he elicited testimony that after Benson said he wanted to kill the victim, Petitioner "was crying. She was scared. And she didn't want him to do it." Id., at 78. Petitioner told Benson that he was crazy and she wanted the

18

court system to handle it. Id. Benson threatened Kandler if she said anything, and Kandler refused to drive Petitioner and Benson to the victim's location herself. Id., at 79. At one point when Benson got out of the car, Petitioner told Kandler that she thought Benson was pretty serious about killing the victim. Id., at 80. Petitioner's counsel dealt with this statement by eliciting testimony that neither Kandler or Petitioner went to the police, suggesting they did not really believe Benson intended to shoot the victim, their friend. Id.

It is true that Kandler's trial testimony, at points, seemed to suggest more certainty about whether she and Petitioner believed that Benson intended to murder the victim. It is difficult to gauge the extent to which Kandler's trial testimony could have been impeached with her police report, however, as that document was not made part of the record. It does appear based on the trial record that Kandler told police that Petitioner said that Benson "seemed pretty serious" about killing the victims. Dkt. 21-9, at 60. Accordingly, it's not clear that there were solid grounds for challenging Kandler's trial testimony based on her statements to police. That leaves Kandler's preliminary examination testimony. Had Petitioner's counsel referred Kandler to her preliminary examination testimony where she stated she couldn't remember what Petitioner said about the sincerity of Benson's intentions (a passage where Kandler was not asked to look at her statement to police), the prosecutor most probably would have simply referred Kandler once again to the police report to explain her preliminary examination testimony or to refresh her recollection.

Nevertheless, when the trial court reviewed this claim on state post-conviction review, it found that Petitioner's counsel performed deficiently by failing to challenge Kandler's trial testimony more thoroughly. Dkt. 21-21, at 5. The state court nevertheless rejected Petitioner's claim because she failed to demonstrate prejudice:

Despite the strong evidence that trial counsel rendered objectively deficient

performance, the Court of Appeals majority held:

> . . . [I]n order for the prosecution to prevail on the element of aiding and abetting raised in Bennett's appeal, the prosecution must prove that the defendant either intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. . . . Despite Bennett's directing this Court's attention to some evidence that suggests that it was not Bennett's desire to kill the victim, there was considerable evidence from which the jury could have inferred that Bennett knew of Benson's intent. **She observed and heard Benson make multiple and serious threats to kill the victim. She saw him with a gun immediately before directing him to the location of the shooting and driving there with him. Consequently, the evidence presented at trial belies Bennett's argument on appeal that she did not want Benson to kill the victim.** However, even if we concluded that the evidence established that Bennett may have been reluctant to have Benson kill the victim, that evidence does not negate the critical element of Bennett's knowledge of Benson's specific intent to kill the victim. The evidence proffered by Bennett on appeal merely demonstrates that Bennett may have been unenthusiastic about the prospect of Benson's killing the victim. Such evidence does not negate the fact that Bennett was aware of Benson's specific intent to kill the victim. Thus, we find that there was sufficient evidence from which the jury could conclude that Bennett was guilty of first-degree murder on a theory of aiding and abetting. . . .

> In sum, this Court will not usurp the jury's authority to weigh the evidence and resolve any conflicts. As the circumstances of the case may indicate that defendant's toxic relationship with codefendant, Benson may not have severely clouded her judgment, there is evidence to support the jury's inference that defendant *heard* Benson's threats, *saw* him with a gun, and ultimately *decided* to enable, and thus *encourage* Benson to murder the decedent. Therefore, defendant's argument must fail in its entirety.

Id., at 5 (empahsis in original).

This decision did not constitute an unreasonable application of the *Strickland* prejudice standard. Although the trial court did not recite the controlling standard to determine if Petitioner was prejudiced by her counsel's deficient performance in this portion of its decision, it did so at an earlier point, correctly stating: ". . . the defendant had the burden to show . . . that it is reasonably

probable that the result[] of the proceeding would have been different had it not been for counsel's error." Id., at 3.

The *Strickland* standard directs a reviewing court to consider all the evidence presented at trial and how the deficient performance altered the evidentiary profile of the case when determining whether a defendant was prejudiced by her counsel's performance:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-696.

In essence, by referring to the weight of the evidence presented by the prosecution to demonstrate Petitioner's knowledge of Benson's intent, and finding that even a more thorough cross examination of Kandler would not have altered the outcome of the trial, the trial court conducted the type of prejudice inquiry directed by *Strickland*. The conclusion that Petitioner was not prejudiced was based on the state court's reasoned assessment of the strength of the case the prosecution presented against Petitioner. As discussed above, the prosecutor was required to prove, among other elements, that Petitioner knew Benson intended to commit the crime. A reasonable argument can be made that substantial evidence was presented at trial to satisfy that element notwithstanding Kandler's testimony. Michael Larvaidan testified that Benson showed him a gun and talked about killing the victim. Petitioner was present when Benson started making threats about killing the victim, and Petitioner was aware of Benson's possession of the firearm when he made

the threats. Larvaidan testified that Benson talked openly during the car ride to the victim's neighborhood about shooting her, and Petitioner nevertheless continued to direct Benson to the victim's trailer. While Larvaidan attempted to talk Benson out of killing the victim during the ride, Petitioner remained silent except to give Benson directions to the victim's trailer.

A reasonable jurist might conclude that in light of the other evidence of Petitioner's guilt, it is not reasonably probable that the outcome of the trial would have been different had Kandler been more thoroughly cross-examined with her preliminary examination testimony. The difference between the testimony given by Kandler at the two proceedings was not so great as to compel the state court to find a reasonable probability of a more favorable outcome for Petitioner. The omitted cross examination would still have left unaffected the evidence presented that Petitioner saw Benson armed with a gun, heard his repeated threats to kill the victim, and nevertheless drove him to the victim's location. Accordingly, the Court finds that the state court adjudication of this allegation of ineffective assistance of counsel did not involve an unreasonable application of the clearly established Supreme Court standard.

4. Ineffective Assistance of Appellate Counsel

Finally, Petitioner asserts that her appellate counsel was ineffective for failing to raise the claims she raised on state post-conviction review in her direct appeal. It is not ineffective assistance for appellate counsel to decide not to raise meritless claims. See *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."). Petitioner was not denied the effective assistance of appellate counsel because the claims he alleges her appellate counsel should have raised on direct appeal are without merit.

IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11, Rules Governing Section 2254 Proceedings. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted). Here, jurists of reason could debate the Court's resolution of Petitioner's claims.

The hard truth here is that Petitioner did not do much to be required to serve a non-parolable life sentence. There is no dispute that Petitioner did not want her friend to be killed. As ably argued by defense counsel at trial, nothing changed in the few hours between Petitioner making a police report against Stephanie and her death that caused Petitioner to go from complainant to murderer. All the testimony presented at trial indicated that she was crying and hysterical when Benson began making his death threats. And whether Petitioner was the victim of domestic abuse or not, there is

little question that Petitioner was the one calling all the shots–he was the one with the gun and he was the one driving the car to the scene of the crime. Finally, the assistance Petitioner rendered Benson was almost inconsequential–she directed him to a trailer park the location of which he already knew, and though she directed him to the victim's trailer, Stephanie already happened to be standing outside by her car.

When a case is as closely drawn as this, the impact of potential errors become magnified. In fact, whether error occurred at all becomes more difficult to determine. As evidenced by the dissenting Judge in the Michigan Court of Appeals, the Court finds that jurists of reason might differ on whether any of Petitioner's claims have merit and whether the state court adjudication of her claims ran contrary to, or involved an unreasonable application of, clearly established Supreme Court law. Therefore, the Court grants a certificate of appealability with respect to all of Petitioner's claims.

The Court will also grant permission to appeal in forma pauperis because any appeal of this decision could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **GRANTS** a certificate of appealability, and 3) **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED.**

s/John Corbett O'Meara
United States District Judge

Date: April 12, 2017

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, April 12, 2017, using the ECF system and/or ordinary mail.

<u>s/William Barkholz</u>
Case Manager